# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT T. BROCKMAN, | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  22-cv-00202 |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| Defendant. | ) | |

## UNITED STATES' RESPONSE IN OPPOSITION FOR DETERMINATION ON COMPLAINT FOR JUDICIAL REVIEW AND ABATEMENT OF JEOPARDY ASSESSMENT AND JEOPARDY LEVY PURSUANT TO 26 U.S.C. § 7429[1]

---

[1] The United States recognizes that its Response exceeds this Court's 25-page limit for typical motions and memorandums of law, and in an abundance of caution, the United States requested additional pages in its Motion to Extend Page Limits (Dkts. 17, 20) and Motion for Expedited Ruling (Dkt. 18).  The Court has not yet ruled on that request.  However, this case is not typical, and therefore, this Response is not typical.  The Plaintiff filed a complaint and motion under 26 U.S.C. § 7429 seeking judicial review of the reasonableness of an IRS jeopardy assessment and levy for $1.4 billion in tax liability.  Section 7429(b)(3) requires the Court to make a determination within 20 days after this proceeding was commenced - or by February 9, 2022.  The Court's determination is *de novo* and not limited review of an agency record.  The proceeding is summary in nature and the Court is not required to hold a hearing or a trial.  Although the United States has the burden of proof on the issues raised in this case, this Response may be the only opportunity to explain the law for the Court, present its case and respond to the Plaintiff's arguments.  In light of the special nature of this case, to allow for a reply by the Plaintiff, and to give the Court time to review the parties' submissions before the February 9, 2022 deadline, the United States' believes it is necessary to file this Response while its motion for leave is still pending and in accordance with the additional pages requested therein. (Dkts. 17, 18, 20).

i

# TABLE OF CONTENTS

TABLE OF CONTENTS                                                                 ii

TABLE OF AUTHORITIES                                                             iv

INTRODUCTION                                                                      1

ISSUE                                                                            2

LEGAL AUTHORITY                                                                  2

SUMMARY                                                                          3

PROCEDURAL POSTURE                                                              6

OVERVIEW OF BROCKMAN'S OFFSHORE STRUCTURE                                      7

I.   Brockman's creation and use of his complex offshore system to evade his tax obligations led to the jeopardy assessment and levies. ................................................... 7

   A.   Brockman's offshore structure ............................................................. 8

      1.   Brockman initially concealed his ownership using trusts formed in the Massengill family name ................................................................ 10

      2.   Brockman used various trustees and directors as his nominees ........................ 11

      3.   Brockman maintained control over directors, trustees, trust protectors, and other service providers ................................................................ 13

   B.   Brockman's offshore entities ............................................................. 15

      1.   Point Investments ................................................................... 17

         a.   Brockman maintained control over the investing activity conducted by Point Investments and related entities ........................................... 19

         b.   Brockman controlled Point Investments and the AEBCT by directing the location of the accounts ........................................................ 23

      2.   Edge Investments ................................................................... 24

         a.   Brockman personally directed the investments of Edge Investments ........... 26

      3.   Cabot Investments ................................................................. 26

         a.   Brockman controlled Cabot Investments by personally directing the use and investment of assets. ................................................................ 27

   C.   Brockman used his offshore entities to fund asset purchases for personal purposes 30

      1.   Brockman purchased a luxury yacht with offshore funds from Cabot ............. 30

      2.   Brockman's Colorado property ..................................................... 34

         a.   Regency Management (holding real estate in Colorado) ............................. 34

  b. Henke Holdings LLC/Henke Property LLC ................................................ 36

  c. Mountain Queen Inc. .................................................................................... 37

  d. Brockman's control of Henke Holdings and Mountain Queen ..................... 37

 3. Brockman's Jet ........................................................................................................ 40

D. Brockman's directive to Tamine to reorganize and replace the trusts and companies comprising the offshore structure highlights his control and efforts to keep his offshore structure hidden from IRS ............................................................................ 42

E. Actions to avoid IRS detection ................................................................................. 45

 1. Use of code names ................................................................................................... 45

 2. Attending an anti-money laundering seminar .......................................................... 46

 3. Preparing false documents ....................................................................................... 46

 4. Destroying records and giving orders for destruction of records ............................ 46

**LAW AND ARGUMENT**  **47**

**II.** **Statutory framework for jeopardy assessments** .................................................... **47**

**III.** **The evidence establishes that jeopardy appears to exist, and the jeopardy assessment is reasonable** .............................................................................................. **52**

A. Brockman was designing to place his property beyond the IRS's reach ............. 52

B. The Brockmans are currently selling and gifting their Texas real estate, including entering into transactions shortly after Brockman's indictment, in an attempt to place the assets beyond IRS reach .......................................................................................... 53

C. Brockman's past and current use of foreign entities, domestic entities, and funds from foreign accounts to hide his assets during the years at issue warrants the jeopardy assessments ....................................................................................................................... 59

D. Subsequent evidence further proves the IRS's concerns ....................................... 63

 1. Brockman's post indictment sale of his interest in Hardwicke ......................... 63

 2. Brockman closing and draining financial accounts creates jeopardy .............. 65

 3. Brockman created two offshore trust with two foreign accounts and funded the trusts from U.S. sources .................................................................................................. 68

**IV.** **Brockman's arguments relating to R & R and the Bermuda litigation are incorrect** ............................................................................................................................ **68**

A. Reynolds and Reynolds ........................................................................................ 68

B. Bermuda litigation ................................................................................................ 70

C. Brockman's thirty-nine count indictment is a factor in determining jeopardy ..... 73

**CONCLUSION**    Error! Bookmark not defined.**74**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amyx v. United States*,
     529 F. Supp. 98 (D. Ohio, 1981) .................................................................. 58

*Arnold v. United States*,
     1998 U.S. Dis. Lexis 22310, 83 A.F.T.R.2d (RIA) 3018 ............................ 51

*Bean v. United States*,
     618 F. Supp. 652 (N.D.Ga.1985) ............................................... 50, 51, 65, 74

*Billig v. United States, 1981 WL 1898, at *3, 49 A.F.T.R.2d (P.–H.) 82–
     479, 82–480, 81–2 U.S.T.C. (CCH) para. 9792 at 88,635
     (N.D.Ga.1981)* ............................................................................................ 50

*Bremson v. United States*,
     459 F. Supp. 121 ......................................................................................... 50

*Camp v. Commissioner*,
     635 F. Supp. 585 (E.D. La. 1986) ......................................................... 50, 74

*Cantillo v. Coleman*,
     559 F. Supp. 205 (D. N.J. 1983) ........................................................... 49, 51

*Central De Gas Chihuahua, S.A v. United States*,
     790 F. Supp. 1302 (W.D. Tex. 1992) ................................... 48, 49, 50, 59

*DeLauri v. United States*,
     492 F. Supp. 442 (W.D. Tex. 1980) ........................................................... 48

*Felkel v. United States*,
     570 F. Supp. 833 (D. S.C. 1983) ........................................................... 48, 59

*Garcia v. United States*,
     714 F. Supp. 1036 (N.D. Cal. 1989) .......................................................... 48

*Golden ADA, Inc. v. United States*,
     934 F. Supp. 341 (N.D. Cal. 1996) ............................................................ 50

*Golden West Holdings Trust v. United States*,
     2009 WL 1457107 (D. Ariz. May 21, 2009) .............................................. 50

*Harvey v. United States*,
    730 F. Supp. 1097 (S.D. Fla. 1990) ..................................................................*passim*

*Haskin v. United States*,
    444 F. Supp. 299 (C.D. Cal. 1977) ........................................................ 59, 63

*Hecht v. United States*,
    609 F. Supp. 264 (S.D.N.Y. 1985)............................................................ 2, 49

*Holman v. United States*,
    505 F.3d 1060 (10th Cir.2007) ...................................................................... 10

*In re Wyly,* 552 B.R. 338, 391-394 (Bankr. N.D. Tex. 2016) ............................ 4

*Loretto v. United States*,
    440 F. Supp. 1168 (E.D. Pa. 1977) .............................................. 48, 50, 63

*Magluta v. United States*,
    952 F. Supp. 798 (S.D. Fla. 1996) ........................................................ 48, 51

*Marranca v. United States*,
    587 F. Supp. 663 (M.D. Pa. 1984) ................................................................ 49

*McAvoy v. IRS*,
    475 F. Supp. 297 (W.D.Mich.1979) .............................................................. 50

*Mesher v. United States*,
    736 F. Supp. 233 (D. Or. 1990) .................................................................... 51

*Miller v. United States*,
    615 F. Supp. 781 (N.D. Ohio 1985)........................................................ 49, 51

*Nolan v. United States*,
    539 F. Supp. 788 (D. Ariz. 1982) .............................................. 47, 48, 49, 50

*Olbres v. I.R.S.*,
    837 F. Supp. 20 (D.N.H. 1993)...................................................................... 64

*Oxford Capital Corp. v. United States*,
    211 F.3d at 284............................................................................................ 10, 57

*Revis v. United States*,
    558 F. Supp. 1071 (D. R.I. 1983).............................................. 51, 53, 63

*Rey Balaguer v. United States,* 656 F. Supp. 383, 385 (D. P.R. 1987)............................ 48

*Serpa v. United States*,
   1981 *WL* 1759 (D. Neb. Mar. 12, 1981) .................................................. 48, 50

*United States v. Brockman*,
   Case No. 4:21-cr-00009 (S.D. Tex. 2021) ........................................... 5

*United States v. Doyle*,
   482 F. Supp. 1227 (E.D. Wis. 1980) ................................................ 48

*Varjabedian v. United States*,
   339 F. Supp. 2d 140 (D. Mass. 2004) ............................................ 48, 49

*Welch v. United States*,
   575 F. Supp. 464 (S.D.Miss.1983) ................................................ 50

*Wellek v. United States*,
   324 F. Supp. 2d 905 (N.D. Ill. 2004) ......................................... *passim*

*Young v. United States*,
   671 F. Supp. 1340 (S.D. Fla. 1987) ........................................... 48, 74

*Zion Coptic Church. Inc. v. United States*,
   1979 WL 1333 (S.D. Fla. Mar. 19, 1979) ..................................... 59

**Statutes**

26 U.S.C. § 6212 ............................................................ 47

26 U.S.C. § 6213 ............................................................ 47

26 U.S.C. § 6851 ............................................................ 58

26 U.S.C. § 6851(a)(l) ...................................................... 58, 69

26 U.S.C. § 6861 ............................................................ 1, 47

26 U.S.C. § 7201 ............................................................ 74

26 U.S.C. § 7429 ........................................................... *passim*

26 U.S.C § 7429(b)(3) ...................................................... i, 2, 48

26 U.S.C § 7429(b)(3)(A) ................................................... 45

26 U.S.C § 7429(b)(3)(B) ................................................... 45

26 U.S.C § 7429(f) ......................................................... 2, 47

26 U.S.C § 7429(g)(1) ........................................................................... 2, 49

31 U.S.C § 5314 ......................................................................................... 74

31 U.S.C § 5322(b) .................................................................................... 74

Foreign Account Tax Compliance Act (FATCA) ................................. 44, 45

HIRE Act .............................................................................................. 44, 45


**Treasury Regulations**

Treas. Reg. § 301.1.6851-1(a)(1) .................................................. 3, 49, 51, 63

Treas. Reg. § 301.1.6861-1 .......................................................... 3, 49, 51, 63


**Other Authorities**

Rev. Proc. 2000-12 .................................................................................... 45

Black's Law Dictionary 1072 (7th ed.1999) ............................................. 10

https://www.irs.gov/businesses/corporations/foreign-account-tax-
    compliance-act-fatca ......................................................................... 45

## INTRODUCTION

At over $1.4 billion in tax, fraud penalties, and interest owed, this case represents the largest jeopardy assessment/levy case in the history of the United States. The scale of Robert T. Brockman's ("Brockman") fraudulent activity, which utilized (and is utilizing) dozens of alter egos, foreign trusts, nominees, and other tax avoidance vehicles established in several known tax-haven jurisdictions to avoid reporting over $2.7 billion in income, is unprecedented. Brockman used tax avoidance vehicles to control a vast corporate empire while ostensibly owning very little in his own name. Brockman's "own nothing, control everything" strategy is unraveling, and the time has now come for him to pay what he owes.

The Internal Revenue Code and Regulations authorize the Internal Revenue Service ("IRS") to bypass normal assessment and collection procedures in cases where it appears that collection may be rendered ineffective or "jeopardized" if collection efforts are delayed. In such a case, 26 U.S.C. § 6861 and the applicable regulations authorize the IRS to immediately determine the amount of the tax due, serve notice of the jeopardy assessment on the taxpayer, demand payment, and levy upon a taxpayer's property. Here, the IRS made a jeopardy assessment against Brockman for income taxes, fraud penalties, and interest totaling $1,418,272,371.71 for the 2004-2007, 2010, and 2012-2018 tax years. Then, the IRS filed Notices of Federal Tax Liens and issued levies to collect Brockman's outstanding tax liabilities. This conduct goes back more than 20 years and is continuing today with additional movement of assets by Brockman after learning that he was under investigation.

1

## ISSUE

Whether the IRS's jeopardy assessment and levy against Brockman is reasonable under the circumstances?

## LEGAL AUTHORITY

In response to the IRS' jeopardy assessment, Brockman has filed suit under 26 U.S.C. § 7429 which grants him a very limited judicial review of the jeopardy assessment and levy.  The Court's review is summary and is not subject to appeal.[2]  And it is limited to two questions: (1) whether the jeopardy action is reasonable under the circumstances, and (2) whether the amount assessed is appropriate.[3]  The determination is not designed to establish Brockman's ultimate liability for the taxes at issue; that is accomplished in a later proceeding in Tax Court, Claims Court, or a United States district court where he may also pursue refund claims for amounts collected under the jeopardy procedures. Here, Brockman does not challenge the amount of the jeopardy assessments and appears to have recently filed a petition in Tax Court for that purpose.

As explained more fully below, Section 7429 does not require a full evidentiary hearing.[4]  The Court conducts a summary proceeding where both parties present information which may be affidavits, exhibits or other forms.[5]  The United States bears the burden of proving the jeopardy assessment and levy are reasonable under the circumstances, but the taxpayer bears the burden on the amount assessed.[6]  Given the

---

[2] 26 U.S.C. § 7429(f).
[3] 26 U.S.C. §§ 7429(b)(3) and (f).
[4] *Hecht v. United States*, 609 F. Supp. 264, 266 (S.D.N.Y. 1985).
[5] *See Harvey v. United States,* 730 F. Supp. 1097, 1104 (S.D. Fla. 1990).
[6] 26 U.S.C. § 7429(g)(l).

summary nature and time constraints of the Section 7429 review proceeding, the parties

may rely on evidence that would not be admissible in a civil or criminal trial.[7]   Further,

because the Court's determination is *de novo* rather than deference to agency discretion,

the United States may also rely on any relevant fact or information even if it was not

known or considered at the time the IRS made its administrative determination.[8]

Courts have determined that "reasonable under the circumstances" means

something more than not arbitrary and capricious and something less than supported by

substantial evidence.  The standard is not rigorous and has been described as similar to

probable cause in a criminal case.  The inquiry focuses on appearances and may include

whether the taxpayer appears to be planning to depart from the United States to conceal

himself; appears to be designing to conceal, dissipate or place his property beyond the

reach of the government; or it appears his financial solvency is imperiled.[9]

## SUMMARY

As shown below, for years Brockman has engaged (and is currently engaged) in a

complex strategy of concealing the ownership of his assets, the effect of which is to

egregiously understate his taxable income.  Brockman's long history of hiding his assets

using foreign trusts, foreign corporations, and nominees to layer up ownership supports

the IRS's belief that his current actions are ways to keep or further place assets out of the

reach of the IRS.  As a result, the IRS's jeopardy assessment is reasonable and

---

[7] *See Harvey*, 730 F. Supp. at 1104
[8] *Wellek v. United States*, 324 F. Supp. 2d 905, 911 (N.D. Ill. 2004).
[9] Treas. Reg. § 301.6861-1; Treas. Reg. § 1.6851-1(a)(1).  There are two other parts to the test under the Treasury regulations but these are not at issue in this case.

appropriate under the circumstances.

Brockman's offshore scheme started with the creation of the A. Eugene Brockman Charitable Trust ("AEBCT" or the "Trust"), formed in Bermuda in 1981.[10]  Together with AEBCT, his strategy uses dozens of offshore entities, including a multitude of sham trusts, corporations, LLCs, and other entities.  Although Brockman outwardly owns none of these entities, he controls them all.  This is accomplished by his use of hand-picked trustees and trust "protectors" that he controls.  The complexity, breadth, and sheer audacity of Brockman's offshore structure is precisely what allowed him to evade over a billion dollars in taxes and enabled him to use the offshore system as his personal piggy bank.[11]  Brockman's complex offshore empire is illustrated on Government Exhibit. 3.

As is more fully described below and in the attached Jeopardy Report,[12] Brockman's concealment and efforts to place his property outside of the reach of the United States' tax authorities is stunning.  Moreover, these efforts are continuing.  He appears to be designing quickly to place his property beyond the reach of the government by maintaining his property offshore, transferring it from one tax haven to another, concealing it, dissipating it, or transferring it to other persons, including family members.

For example, after learning he was under criminal investigation by at least April of

---

[10] Brockman directed the name of the Trust be changed from its original "A. Eugene Brockman Children's Trust" to "A. Eugene Brockman Charitable Trust." Brockman was concerned about potential IRS scrutiny of having "Children's" in the trust name because of the news of the potential criminal prosecution of Texas-based billionaires Sam Wyly and Charles Wyly for tax evasion involving offshore trusts.  Gov. Exs. A-78, A-85 at pg. ET_0000012144-12245.  See  *In re Wyly*, 552 B.R. 338, 391-394 (Bankr. N.D. Tex. 2016)
[11] Gov. Ex. 3.
[12] *See* Gov. Ex. 2.

2020,[13] Brockman transferred his community property interest in one of his Houston, Texas properties to his wife, Dorothy Brockman.  After his indictment on October 1, 2020,[14] at Brockman's direction, Mrs. Brockman sold this property for $1.375 million. The Brockmans sold another Houston, Texas property for $4.1 million, and their residence (Brockman's address of record with the IRS) is currently listed for sale for $15.35 million.  Brockman closed several bank accounts and withdrew at least $3,182,030 in 2020 from his other accounts.  Sometime in 2020 Brockman created two new foreign trusts with foreign bank accounts in the Cayman Islands and transferred funds to them from U.S. sources.  Post-Brockman's indictment, Mrs. Brockman (i) gifted another $3.567 million property to her daughter-in-law, and (ii) sold securities in excess of $9 million.  It was also recently discovered that post-indictment Brockman sold his 1% in Hardwicke (ownership of his jet) and his interest in the yacht Albula (see below).

Mrs. Brockman, acting on Brockman's behalf, also filed suit in Bermuda that resulted in the removal of the current Bermuda trustee of AEBCT (St. John's Trust Company ("SJTC")), and appointment of a new Cayman Islands-based trustee chosen by Mrs. Brockman.  Brockman did not domesticate the AEBCT or its control to the United States.  Instead, through Mrs. Brockman, he moved the AEBCT and its control to another tax haven, (Cayman Islands), subject to another tax haven's laws (Bermuda) where a U.S.

---

[13] In April of 2020, Brockman's attorneys contacted the attorneys for the United States Department of Justice requesting that the United States not indict Brockman.  *See* Case 3:20-cr-00371-WHA Dkt. # 64 at pg. 4, lns. 16-20.

[14] Brockman was indicted in California on charges of federal tax evasion, wire fraud, money laundering, evidence tampering, destruction of evidence, and failure to file FBARs.  Gov. Ex. A-90.  This case was transferred to Houston.  *United States v. Brockman,* Case No. 4:21-cr-00009 (S.D. Tex. 2021).

judgment for taxes may be unenforceable.

## PROCEDURAL POSTURE

Prior to the jeopardy assessments, a delegate of the Chief Counsel of the IRS approved, in writing, the jeopardy assessments and collection actions against Robert Brockman.[15]  On September 7, 2021, the IRS made a jeopardy assessment against Brockman for taxes, fraud penalties and interest for a total of $1,418,272,371.71 for the 2004-2007, 2010, and 2012-2018 tax years.[16]  On September 9, 2021, Brockman was personally served with the IRS Notice of Jeopardy Assessment and Rights to Appeal.[17]  On October 7, 2021, Brockman filed a Request for Administrative Review of the Notice of Jeopardy Assessment  and Rights to Appeal ("Administrative Appeal").[18]  Brockman did not challenge or contest the amounts of the IRS jeopardy assessments in his Administrative Appeal.  On October  27, 2021, IRS Office of Appeals, determined that the jeopardy assessments  were reasonable.[19]  On January 20, 2022, Brockman filed this suit seeking judicial review of the jeopardy assessment and levy.  On January 21, 2022, Brockman filed his motion for determination.  Brockman has not challenged the amount of the jeopardy assessments in his complaint or motion for determination.  Thus, the amounts of the jeopardy assessments are not an issue before this Court.  The case is ripe for adjudication and this Court should uphold the jeopardy assessments and levies.

---

[15] Gov. Ex. 1 Agent Paxton's declaration at ¶ 62.
[16] *Id*.
[17] Gov, Ex, 24 Sandles' declaration at ¶ 24.
[18] Gov. Ex. 35.
[19] Gov. Ex. 36.

## OVERVIEW OF BROCKMAN'S OFFSHORE STRUCTURE

I.   **Brockman's creation and use of his complex offshore system to evade his tax obligations led to the jeopardy assessment and levies.**

Brockman graduated in 1963 with a Bachelor of Science degree in business administration from the University of Florida.  In 1964, he started his career in marketing at the Ford Motor Company.  From 1966 to 1970, he worked as an IBM sales associate in the Houston, Texas branch office, selling automotive parts inventory and accounting data processing services to car dealerships.  Brockman made his billions in the auto industry, forming several companies integral to his offshore scheme:

**Universal Computer Systems Inc. ("UCS"):** In 1970, Brockman left IBM and founded his original company UCS, headquartered in Houston, Texas, to provide data processing services to auto dealerships (*e.g.*, preparing weekly reports of their parts inventory).  Successor UCS companies developed and installed computer-based dealership management software packages for large dealerships and dealership groups. Brockman served as chairman and CEO of UCS and its affiliated companies.

**Universal Computer Systems Holding Inc. ("UCSH"):** In 1987, Brockman formed UCSH as a Delaware corporation that is currently the parent holding company of Dealer Computer Systems Inc., the Reynolds & Reynolds Company, and other affiliated U.S. and foreign subsidiaries involved in Brockman's businesses.  Brockman served as CEO of UCSH until he resigned following his indictment.[20]  Brockman owns UCSH through a series of foreign entities he controls, including the AEBCT, Spanish Steps

---

[20] Shortly after his indictment, on November 6, 2020, Brockman resigned from leadership positions of his companies. Gov. Exs. A-90, A-92.  *See also* Gov. Ex. 7 pgs. 14 and 15.

Holdings LLC, and Spanish Steps Holdings Ltd.[21]

**Dealer Computer Systems Inc. ("DCS"):** DCS is a Delaware corporation with its principal place of business in Houston, Texas and provides computer software and hardware systems, supporting auto dealerships' parts and repair operations.  UCS and DCS merged in 2001, with DCS as the surviving entity post-merger.  DCS is currently a wholly owned subsidiary of UCSH.

**The Reynolds and Reynolds Company ("R & R"):** Reynolds & Reynolds is an Ohio corporation headquartered in Dayton, Ohio with operations in the U.S., Canada, United Kingdom, and Europe.  R & R develops software used by automotive dealers and manufacturers and distributes industry business forms and promotional items.  In 2006, UCSH acquired R & R and merged the operations of the two companies under the R & R brand.  Brockman served as chairman and CEO of the combined companies until he resigned following his indictment.

Brockmans' control over these U.S. companies' ownership is concealed by his offshore structures: AEBCT (Trust) owns 100% of Spanish Steps Holdings LLC, which owns 100% of Spanish Steps Holdings Ltd., that in turn owns 99.173% of Universal Computer Services Holding ("UCHS"), which owns 100% of Dealer Computer Services Inc., ("DCS"), and that owns 100% of R & R.[22]

### A.    Brockman's offshore structure

Most of Brockman's assets are held (a) by offshore trusts and holding companies,

---

[21] Gov. Ex. A-11. *See also* Gov. Ex. 1 at ¶ 25, (structure chart).
[22] Gov. Ex. 2 at pgs. 5-8. *See also* Gov. Ex. 1 at ¶ 25, (structure chart).

or (b) through an intentionally convoluted ownership structure designed to both conceal his ownership and underreport his taxable income.[23]  Using this structure, during the period from 2004 through 2018, Brockman failed to report approximately $2.7 billion of income on his tax returns, consisting of unreported investment income and gains—derived from private equity funds formed by Brockman with his former business associate, Robert Smith ("Smith") of Vista Equity Partners ("Vista Equity"), a $635 million distribution from UCSH characterized as a non-taxable redemption, as well as other investing activity personally directed by Brockman.[24]

In October 2020, Smith entered a Non-Prosecution Agreement with the United States admitting to willfully evading U.S. tax and filing false returns for 2000 through 2015.[25]  Smith admitted to engaging in an illegal scheme to conceal income and evade taxes by using an offshore trust structure with related foreign corporations and offshore bank accounts.  Smith's offshore structure was similar to Brockman's because he recommended the arrangement to Smith.  Brockman referred Smith to Houston-based attorney, Carlos Kepke, who advised Brockman regarding the use of offshore entities, to set up Smith's offshore structure.  Kepke was indicted for conspiracy and assisting in the filing of a materially false income tax return related to Smith.[26]

Beginning in the mid-1980s, Brockman established a myriad of sham foreign trusts and companies for concealment and to avoid U.S. income tax.  Brockman

---

[23] *See* Gov. Ex. 3 (Structure Chart).
[24] Gov. Ex. 2 at pgs. 10, 14, 17, 43 and 44.
[25] Gov. Ex. A-93.
[26] Gov. Ex. A-94.

appointed nominee[27] directors, trustees, and trust protectors while controlling all offshore entities and use of assets.  The offshore entities were managed by trust companies, and transaction "recommendations" by Brockman were provided to these companies through several "protectors."  While cloaked as mere "recommendations," in fact, these directives were always followed (*see* discussion *infra* for examples).

Brockman used his substantial untaxed proceeds held in his offshore entities for personal purposes.  He bought vacation homes, investment real estate, a jet aircraft, and a luxury yacht, discussed *infra*.

### 1.    Brockman initially concealed his ownership using trusts formed in the Massengill family name

Brockman originally held ownership of his offshore entities through trusts formed in the names of his former employee Don Jones' wife's family members ("Massengill Trusts").[28]  This was designed to conceal Brockman's connection to the entities.

Brockman compensated Don Jones for the use of the Massengill Trusts.[29]

Brockman used the following Massengill Trusts before replacing them with other trusts:

   • Massengill Grandchildren's Trust (replaced by Point Purpose Trust to hold ownership of Point Investments Ltd.);[30]

---

[27] The use of nominees to secretly hold property for true beneficial owners and shield it from tax collection is not permitted under U.S. law.  Property is held by a nominee when someone other than the taxpayer has legal title but, in substance, the taxpayer enjoys the benefits of ownership. *Oxford Capital Corp. v. United States*, 211 F.3d at 284. A third party is the taxpayer's nominee where "the taxpayer has engaged in a legal fiction by placing legal title to property in the hands of a third party while actually retaining some or all of the benefits of true ownership." *Holman v. United States*, 505 F.3d 1060, 1065 (10th Cir.2007). *See also*, Black's Law Dictionary 1072 (7th ed.1999) (defining nominee as "[a] party who holds bare legal title for the benefit of others").

[28] Gov. Ex. A-59 (Don Jones wrote in an email to Evatt Tamine that "Income will be $200,000 per year to an entity of my choice as long as the Jones/Massengill entities are involved with the Brockman entities in any way. When they are only handling their affairs the compensation will cease").

[29] *Id.*

[30] Gov. Exs. A-15, A-16.

• Massengill Children's Trust (replaced by Edge Purpose Trust to hold ownership of Edge Capital Investments Ltd.);[31]
• Louise C. Massengill Family Trust (replaced by Cabot Purpose Trust to hold ownership of Cabot Global Investments Ltd.).[32]

### 2.  Brockman used various trustees and directors as his nominees

Brockman controls the AEBCT and the entities it owns through nominees that are ostensibly trustees of the trusts or directors of the corporate entities. The structure is generally the same for all of Brockman's assets. The assets are held by offshore entities, which are themselves owned or held by entities located in different foreign countries. This second entity is held by the AEBCT or another, separate trust in yet another foreign country. The sole director of each of these entities is the same person, and this person is also the trustee of the trust that is at the top of the structure. This person answers directly to Brockman and does not act without Brockman's approval.

From 2003 until 2018, this person was Evatt Tamine ("Tamine").[33] Prior to Tamine the duties were divided between Gordon Howard and Don Jones. In an affidavit sworn to on July 4, 2020, and filed with the Supreme Court of Bermuda, Tamine explained that Brockman controlled the AEBCT and his related offshore entities: ". . . Mr. Brockman gave very detailed instructions directing the administration of the [Trust] and all the other entities that were associated with him" and "Brockman was intimately involved in every aspect of the administration of the Brockman trust, and it was

---

[31] Gov. Exs. B-10, B-11, B-12.
[32] Gov. Exs. C-4, C-5.
[33] Gov. Ex. A-48 at ¶¶ 1, 51, 52, 60, 92, 99 and Gov. Ex. 34, Tamine test. at pg 3-92, ln. 18 to pg. 3-93 at ln.10.

administered exclusively as his direction."[34]

**Gordon Howard:** Gordon Howard was the trustee of the AEBCT until Tamine took over in 2010.  Brockman told Tamine that, "Gordon's presence in regard to the [AEBCT] is desirable for making things smell good in the course of an inquiry, but is not absolutely necessary."[35]  In 2010, Brockman personally directed Tamine to replace Howard as the director of SJTC, which was the trustee of the AEBCT.[36]

**Don Jones:**  Jones worked as CFO for UCSH until 1995.  Jones then relocated to Bermuda to manage Brockman's offshore entities.[37]  As noted above, Brockman initially held his assets in the Massengill Trusts (formed in the name of Jones' wife's family members) that were eventually replaced with trusts created by Tamine.

**Evatt Tamine:** Brockman hired Tamine in 2003.  He worked with Don Jones and assumed more responsibility over time until Jones retired in 2010.  At Brockman's direction, Tamine also replaced Gordon Howard as the director of the SJTC when Howard died, thus becoming the trustee of the AEBCT.[38]  Tamine is an Australian national.  He is a barrister in Australia but lived in Bermuda where the AEBCT was located.[39]  As noted below, Tamine detailed how Brockman controlled his entities,[40] and explained that nothing material happened with respect to the AEBCT that was not

---

[34] Gov. Ex. A-48 ¶¶ 98–99. Gov. Ex. 34, Tamine testimony at pg, 3-94, ln. 4 to pg. 3-95 at ln.18.
[35] Gov. Ex. A-55.
[36] *Id.*  Gov. Ex. A-56 at MLATSW_835 and ET_0001761242 (pg. 4).
[37] Gov. Ex. A-48, at ¶ 81.
[38] *Id.* ¶ 140.
[39] *Id.* at ¶ 1.
[40] Gov. Ex. A-48 in particular ¶¶ 52, 57, 63, 64, 78, 92, 97, 98, 99 140, 143.

ordered or approved by Brockman.[41]  Tamine was the trustee or director of all

Brockman's offshore entities.

### 3.    Brockman maintained control over directors, trustees, trust protectors, and other service providers

Tamine described his role as the "figure head" of the AEBCT and other trusts and

that he held "the key directorships" to "control the information."[42]  Tamine stated that he

undertook this role to maintain Brockman's control over these entities (for Brockman's

"benefit and protection").[43]

The previous trustee of the AEBCT, Gordon Howard, who served as trustee until

his death in August 2010, similarly did not exercise a fiduciary or managerial role for the

AEBCT, but was directed by Brockman.[44]  As noted above, Brockman told Tamine that

Howard's presence was desirable for "making things smell good" but is not "absolutely

necessary."[45]  Brockman personally directed that Tamine replace Howard as trustee of

the AEBCT, and Brockman drafted or approved letters ostensibly written by Tamine to

third parties as trustee of the AEBCT.[46]

Along with giving specific directions, Brockman controlled Point Investments Ltd.

and the AEBCT and related entities by having "doomsday documents" on file.[47]  These

---

[41] *Id.* ¶ 99. Gov. Ex. 34, Tamine testimony at pg. 3-95 at lns. 12-18.
[42] Gov. Ex. A-80, ¶ 18.
[43] Gov. Ex. A-53, in particular ¶ 3(i).
[44] Gov. Ex. A-48, ¶ 60 ("Gordon Howard did not perform any executive role at all. All decisions were made by Mr. Brockman and implemented by Don Jones, with Mr. Howard providing the corporate formalities where required, acting entirely on Don Jones' instructions. This continued after I later took on Don Jones' role").
[45] Gov. Ex. A-55.
[46] Gov. Ex. A-56.
[47] Gov. Ex. A-57. *See also* Gov. Ex. ¶¶ 132-134.

documents consisted of undated, pre-signed letters of resignation from Tamine for all applicable entities and pre-signed letters of resignation from all trustees and trust protectors.[48]  Tamine's duties included "Annually verify that there are letters of resignation from all trustees and that Bob [Robert Brockman] has the originals."[49]  This allowed (and may still allow Brockman to immediately replace these individuals if needed.  Brockman also had copies of electronic signatures of Tamine and trustees and trust protectors of other trusts so that he could use their electronic signature to sign documentation relating to the entities.[50]

Brockman maintained control by communicating with Tamine at in-person meetings as well as telephone, encrypted email, secure messaging, and using code names for himself, Tamine and others.[51]  For example, Brockman used the code name "Permit,"[52] while Tamine used the code name "Redfish.[53]  Brockman also created to-do lists for Tamine that were updated at least monthly.[54]

Brockman controlled Tamine by controlling Tamine's compensation, which included both discretionary and incentive bonuses that Brockman granted based upon Tamine achieving Brockman's investment goals and other objectives.[55]  Brockman and Tamine discussed Tamine's 2014 compensation package between March and May

---

[48] *Id.*
[49] Gov. Ex. A-51.
[50] Gov. Exs. A-48 (¶ 129), A-58.
[51] Gov. Ex. 48 at . ¶¶ 66,122.   See Gov. Ex. A-85 at pg. ET_0000015036-15037 (pgs. 11-12).
[52] Gov. Ex. A-85 at pg. ET_0000015036-15037.
[53] *Id.*
[54] Gov. Ex. A-51.
[55] Gov. Exs. A-52 and A-53.

2014.[56]  Brockman increased Tamine's salary and bonus potential.  He also agreed to a

separate retirement fund with a $1 million Brockman contribution made each

December.[57]  During these discussions, Tamine acknowledged and complained that he

was subject to risk of IRS investigation.[58]  He requested that Brockman provide

additional compensation to purchase a home in Sydney, Australia, as well as provide a

litigation contingency fund.[59]  Tamine complained that "You have the assets of Cabot

and Edge to provide financial support in the event they go after the AEBCT. I have

nothing and I would not be able to tap into Cabot and Edge as it would draw attention to

those entities. If I am targeted I have to be cut loose by you in relation to Cabot and Edge.

I understand and accept that risk, but I am badly exposed."[60]  Brockman eventually

agreed to provide a litigation contingency fund for Tamine as well as funds for Tamine to

purchase a home in Australia.[61]  To further obscure their relationship, Brockman's

entities paid Tamine through his company, Tangarra Consultants, Ltd. ("Tangarra"),[62]

## B.    Brockman's offshore entities

In 1981, Brockman's father, A. Eugene Brockman, formed the AEBCT and

funded it with $25,000 for the benefit of his children which included Brockman.

However, the Trust instrument allowed "any and all persons" – including beneficiaries -

to add property to the Trust Fund (corpus) and purports to make the beneficiaries' rights

---

[56] Gov. Exs. A- 52, A-53 .
[57] Gov. Ex. A-52.
[58] *Id.*
[59] *Id.*
[60] Gov. Ex. A-53.
[61] Gov. Exs. C-7, A-52, C-22.
[62] Gov. Ex. 48. at ¶ ¶ 18, 73, 74, 77 and Gov. Ex. 34, Tamine test. at pg 3-92, ln. 24 to pg. 3-93 ln. 5.

to receive distributions subject to broad spendthrift language and anti-alienation terms aimed at preventing creditors from attaching to the beneficiary's interest in the AEBCT. The Trust purports to give the Trustee the discretion to make all investment, management, and distribution decisions.  The Trust gave the "Trust Protector" the power to replace the Trustee.[63]  Initially, Brockman was the Trust Protector, but later he named and controlled the Trust protector through the "doomsday documents."[64] In effect, Brockman had complete control over the trust.  It is through this Trust that Brockman ran part of his multi-billion-dollar empire and was the genesis of his carefully crafted scheme to avoid reporting and paying his substantial tax liabilities.

At the heart of this scheme was the creation of a group of offshore entities (trusts, corporations, LLCs) in several tax haven jurisdictions including Bermuda, Cayman Islands, Nevis, Switzerland, Singapore, Guernsey, Jersey, British Virgin Islands, and Isle of Man.[65]

Three of Brockman's entities served as the focal point of this structure: Point Investments Ltd. ("Point Investments"), Edge Capital Investments Ltd. ("Edge Investments"), and Cabot Global Investments Ltd. ("Cabot Investments").  Although Brockman formed these entities for his personal investing activity, Brockman failed to report his ownership of the entities or the entities' foreign bank accounts on his tax returns or information return forms.

---

[63] Gov. Ex. 4 (Trust Indenture), page 1, (Trust Protector can replace Trustee with or without cause).
[64] Gov. Ex. A-57 at ET_0000054300.
[65] Gov. Exs. A-63, A-64.  *See also* Gov. Ex. 3.

16

### 1.      Point Investments

In 1999, Brockman formed Point Investments in the British Virgin Islands (later re-domiciled in Bermuda)[66] to invest as a limited partner in various private equity funds formed by Brockman with Robert Smith of Vista Equity.  Brockman held foreign bank accounts at Butterfield Bank (Bermuda), Bermuda Commercial Bank ( Bermuda) ("BCB"), Mirabaud & Cie (Geneva, Switzerland), Banque SYZ (Geneva, Switzerland), and Bank of Singapore (Singapore) in the name of Point Investments and related entities.[67]  During the years 2004 through 2018, Brockman used Point Investments to avoid U.S. income tax on approximately $2.3 billion of net capital gains, $29 million in interest income, and $5.9 million in dividends.[68]

Brockman holds beneficial ownership of Point Investments through an unnecessarily complex web of offshore trusts and foreign entities.  Each of those foreign trusts and entities were under the nominal control of Tamine, who answered solely to Brockman.  In particular, the stock for Point Investments was divided into voting shares and investment shares.[69]  The common/voting shares of Point Investments were held 100% by the nominee company Point Investments LLC,[70] which was held 100% by the Point Purpose Trust.[71]  For the common (voting) shares, Tamine was the director of Point Investments.[72]  Tamine was also the director of Providence Trust Company (PVT) Ltd. in

---

[66] Gov. Ex. A-25 at 8.
[67] Gov. Exs. A-5 through A-9.
[68] Gov. Ex. 2 at pgs. 10, 43 and 44.
[69] Gov. Ex. A-25 at 11, ¶ 4.
[70] Gov. Ex. A-11, A-14, and A-15.
[71] Gov. Ex. A-12 (originally held by the Massengill Grandchildren's Trust, Gov. Exs. A-14 and A-15).
[72] Gov. Ex. A-11, Organizational Chart from Bermuda search.

Nevis, which was the trustee of the Point Purpose Trust that owned Point Investments LLC in Nevis.[73]  That entity held the common share of Point Investments in Bermuda.[74] The investment shares of Point Investments were held by Brockman-controlled foreign entities, Spanish Steps Holdings Ltd. and Spanish Steps Holdings LLC,[75] which were held 100% by the AEBCT.[76]  Point Investments' unnecessarily complex web of offshore ownership is illustrated below:



*Corporate trustee: Providence Trust Company (PVT) Ltd (Nevis), Evatt Tamine, Director

**Corporate trustee: St John's Trust Company (PVT) Ltd (Bermuda), Evatt Tamine, Director

***Vista Equity Fund II, L.P., Vista Equity Partners Fund III (Parallel), L.P., et al.

Point Investments invested in private equity funds managed by Vista Equity. Vista Equity organized funds as limited partnerships to mainly invest in U.S.-based software companies and technology-related businesses.[77]  It also served as general

---

[73] Gov. Exs. A-11, A-12, A-13, A-15, and A-16. See also Gov. Ex. 5 at ¶19.

[74] Gov. Ex. A-11.

[75] Gov. Ex. 5 at ¶¶ 1, 16, 17, 18 and 19; Gov. Ex. A-302 at 4.

[76] Gov. Ex. A-13, Letter to UK Compliance Officer; Gov. Ex. A-201, Point Investments' application for bank account at Mirabaud & Cie at 14; Gov. Ex. A-202, Declaration of beneficial owner of Point Investment's bank account at Mirabaud & Cie; Gov. Ex. A-302, SSH application for bank account at Mirabaud & Cie at ET_0001775889 (pg. 2).

[77] Gov. Ex. 1 Agent Paxton's declaration at ¶¶ 13, 14, 15, 17, 18 and 19.

partner of the limited partnerships and managed funds while Brockman, through Point Investments, held limited partner interests in the investment funds.

In 2000, Brockman committed to invest $300 million in Vista Equity Funds II, LP. In 2004, this capital commitment was increased by $700 million, for a total $1 billion commitment. Brockman made similar capital commitments to other Vista Equity funds during the relevant years: he committed another $952 million in capital to Vista Equity Partners Fund III, LP ($100 million), Vista Foundation Fund I, LP ($90 million), Vista Equity Partners Fund IV, LP ($612 million), and Vista Equity Partners Fund IV Co-Invest 2-A, LP ($150 million).[78] Brockman, through Point Investments, made his capital contributions by transferring the money to the Vista Equity funds from his bank accounts at BCB and Mirabaud.[79]

### a. Brockman maintained control over the investing activity conducted by Point Investments and related entities

A recent affidavit prepared by Tamine, dated July 4, 2020, was filed in litigation in the Supreme Court of Bermuda involving the AEBCT.[80] Tamine's affidavit explains (i) his employment for Brockman from 2004 to 2018 and his role in managing Brockman's offshore entities at Brockman's direction, and (ii) that Brockman controlled all related offshore entities despite the appointment of nominee shareholders, trustees, corporate directors, or trust protectors. Tamine explained that Brockman gave Tamine and other nominees instructions by phone, encrypted emails, secure messaging, meetings,

---

[78] Gov Ex. 2 at pg. 13.
[79] Gov. Ex. A-10.
[80] Gov. Ex. A-48.

"to do" lists, and performance reviews.[81]

> Tamine stated that Brockman controlled the AEBCT and related offshore entities:

>> Mr. Brockman gave very detailed instructions directing the administration of the Brockman Trust and all the other entities that were associated with him . . . [Brockman] made all the substantive and strategic decisions and he directed others to implement them. Nothing material ever happened in relation to the Brockman Trust that was not ordered or approved by Mr. Brockman, either in writing or orally.[82]

At Brockman's request, Tamine tracked significant transactions (all transactions in excess of $100,000) to and from the bank accounts for Brockman-controlled entities in an Excel spreadsheet called "Significant Transaction Report" ("STR") and provided the report to him regularly.[83]  The report was to be divided into separate tabs "for each of the four major structures."[84]  Brockman monitored and commented on the monthly cash report prepared by Tamine for Point Investments, the AEBCT, and other Brockman-controlled entities.[85]

As noted, Brockman provided directions to Tamine in the form of "to-do" lists and performance reviews.  Brockman's list of duties for Tamine included "Continue to address the projects on the To-Do List" and "Update the To-Do list at least monthly."[86] The to-do lists were updated from time to time with items being removed when completed and new items being added.

Brockman documented his specific instructions to Tamine related to Vista Equity

---

[81] *Id.* at ¶ 97.
[82] *Id.* at ¶¶ 98-99.
[83] *See* Gov. Exs. A-49, A-50.  *See also* Gov. Exs. A-9, A-10.
[84] Gov. Ex. A-49.
[85] Gov. Exs. A-49, A-50.
[86] Gov. Ex. A-51.

funds under the "Vista Equity Fund" and "Investments" sections of the to-do list he

prepared for Tamine.  For example, Brockman's May 21, 2011 to-do list for Tamine

mentioned "consider $200M initial commitment to VEPFIV – awaiting partnership

agreement from Vista" and "also consider co-invest fund that invests alongside Vista

deals" under the Vista Equity Fund section and "VFF $50M commitment" under the New

Investments section.[87]

Brockman reviewed and gave approvals for Tamine to make the capital

commitments and capital calls for each Vista Equity fund by transferring funds from

Point Investments' bank accounts.  For example, Tamine emailed Brockman on August

4, 2011, requesting approval to contribute $1,180,097 to Vista Equity Partners Fund III,

LP on a capital call and Brockman replied with approval by email on August 9, 2011:

"OK BB".[88]  The table below outlines Gov. Ex. A-47, which contains a sample of emails

where Brockman approved capital calls.

| Date | Fund | Capital Call Description | Page |
|---|---|---|---|
| Dec. 8–9, 2010 | VFF I | "Big Machines" | 1–2 |
| Dec. 17, 2010 | VEPF III | Management fees | 3 |
| Dec. 21–22, 2020 | VFF I | Management fees | 4 |
| July 28–Aug. 9, 2011 | VEPF III | Aderant – CompuLaw LLC | 5 |
| Sep. 12, 2011 | VEPF III | *Tamine notes that he only made the payment without approval because of deadline.* | 6 |
| Oct. 11–12, 2011 | VEPF III | | 7 |
| Nov. 3–6, 2011 | VEPF III | Zywave acquisition of Emerging Information Systems | 8 |
| Jan. 3–7, 2012 | VEPF IV and VFF I | Management Fees | 9 |
| Jan. 6–7, 2012 | VEPF III | Management Fees for first half of 2012 | 10 |

---

[87] Gov. Ex. A-54.
[88] Gov. Ex. A-47.

| Date | Fund | Capital Call Description | Page |
|------|------|------------------------|------|
| Jan. 10–17, 2012 | VEPF IV | Thomson Reuters' Trade and Risk Business Investment | 11 |
| Jan. 24–26, 2012 | VEPF III | Public company investment | 12 |
| Mar. 7–8, 2012 | VEPF IV | CDC Software | 13 |
| Apr. 9–15, 2012 | VFF I | Essential Learning LLC | 14 |
| May 30–June 4, 2012 | VEPF IV | Public company investment | 15 |
| May 31, 2012 | VEPF III | Public company investment | 16 |
| Jul 10–14, 2012 | VEPF III | Management fees | 17 |
| Sep. 23–25, 2012 | VEPF IV | Point investment increase | 18 |
| Sep. 23–25, 2012 | VFF I | Big Machines | 19 |
| Nov. 30–2012 | VEPF IV | Public company investment | 20 |
| Dec. 9, 2012 | VFF I | | 21 |
| Mar. 21, 2013 | VFF I | Partnership expenses. ***Brockman requires explanation of tax expense prior to funding*** | 22 |
| Jul. 10, 2013 | VEPF III, VFF I | Bullhorn, Inc. | 23 |
| Jul. 12–13, 2013 | VEPF III | Public company investment | 24 |
| Jul. 12–13, 2013 | VEPF IV | Vitera acquisition of SuccessEHS, Inc. | 25 |
| Jul 12–13, 2013 | VEPF III, IV VFF I, VEPF IV, VFF II | Management Fees for second half of 2013 | 26 |
| Oct. 24–29, 2013 | VEPF IV | Greenway | 27 |
| Oct. 24–29, 2013 | VEPF IV | Omnitracs | 28 |
| Dec. 13–15, 2013 | VFF II | | 29 |
| Jun. 12–16, 2014 | VFF II | Autotask | 30 |
| Jun. 20–24, 2014 | VEPF IV | Convery Compliance Systems | 31 |
| Dec. 25–26, 2014 | Vista V | TIBCO | 32 |
| Mar. 27–28, 2015 | VFF II | | 33 |
| Apr. 14–18, 2016 | VFF II-A | | 35 |
| Jul. 3–5, 2016 | | Management fees | 36 |

Another example is a June 10, 2014, email in which Tamine emailed Brockman to ask whether he was interested in investing in debt from a company called Websense.[89]

---

[89] Gov. Ex. A-70.

On June 11, 2014, Brockman responded that he was interested as "long as we have that much dry powder in SSHLTD [Spanish Steps Holdings LTD]," with the further explanation that he needed to have $250 million available to give to Centre College.[90]

### b. Brockman controlled Point Investments and the AEBCT by directing the location of the accounts

Brockman instructed Tamine regarding the location of Point Investments and AEBCT bank accounts.[91]  Brockman was also given the user id and bank passwords so he could personally access the accounts.[92]  Some of these communications took place in April of 2020, after Brockman was aware that he was under investigation.

| Date | Description | Page |
|---|---|---|
| May 31–June 1, 2012 | Emails about how to temporarily invest funds in accounts at Mirabaud & Cie. | 1 |
| June 5, 2010 | Tamine giving Brockman the usernames and passwords for the Point and Spanish Steps accounts at Mirabaud. | 2 |
| Apr. 26, 2011 | Brockman directing Tamine how to move funds for AEBCT, Edge, and Cabot | 3 |
| Jun. 6, 2012 | Tamine transmitting and explaining Point financial statement to Brockman | 4 |
| Mar. 8–Apr. 19, 2021 | Tamine email to Brockman discussing moving funds out of Bermuda based banks and into Switzerland to avoid asset freezing orders and investment risk | 5–8 |

When Brockman and Tamine were notified in July 2017 that the bank accounts held at BCB were frozen due to pending investigations, Brockman authorized setting up new banking relationships in separate jurisdictions along with other steps to conceal his

---

[90] *Id.*
[91] Gov. Ex. A-61 ( a sample of emails showing Brockman using Tamine as a nominee to exercise control over bank accounts for Point Investments, Spanish Steps, Edge Investments, and Cabot Investments).
[92] *Id.*; *see also* Gov. Ex. A-204.

investing activity and offshore structure.[93]  In a memorandum to Brockman, Tamine proposed keeping the Point Investments' accounts in Switzerland and explained that, although he and other individuals served as director, trustee, manager, or trust protector of Brockman's offshore entities, Brockman retained complete control over the assets and activities conducted by these entities. The memorandum laid out a plan where Tamine plans to transfer each of the large structures -- the AEBCT, Point Investments, Edge Investments, Cabot Investments, and Regency Management -- to separate jurisdictions to avoid regulators.  The same memorandum discusses hiding money with an attorney in Australia for living expenses and legal fees if there was an investigation of Brockman or Tamine.  The stated reason for doing this is the investigation of Robert Smith of Vista. Brockman responds in an email that he concurs with all of Tamine's suggestions.[94]

### 2.    Edge Investments

Edge Investments was formed in the 1990s as Edge Investment Fund Ltd. in the British Virgin Islands.[95]  In 2008, the company was renamed as Edge Capital Investments Ltd. and incorporated in Nevis.[96]  During the relevant years (2009-2018), Brockman held bank accounts in the name of Edge Investments at BCB and Mirabaud.  During these years, Brockman, through Edge Investments, avoided U.S. income tax on approximately $18.5 million in interest income and $49.2 million in unreported capital gains.[97]

Brockman holds beneficial ownership of Edge Investments through his ownership

---

[93] Gov. Exs. A-63, A-64
[94] *See* Gov. Exs. A-63, A-64, A-65.
[95] Gov. Exs. B-4 through B-9.
[96] *Id.*
[97]  Gov. Ex. at pgs. 14, 43 and 44

of two foreign trusts, Alpheus Charitable Trust and Edge Purpose Trust, and various

foreign corporations.  Like Point Investments, each of the foreign entities in Edge

Investments ownership structure were under the nominal control of Tamine, who

answered solely to Brockman.  The common/voting shares of Edge Investments were

held 100% by the nominee company Wilbury Management LLC (held 100% by the Edge

Purpose Trust).[98]  The investment/beneficial shares were held by the Brockman-

controlled entity, Cascade Holdings LLC (held 100% by the Alpheus Charitable Trust)

("Cascade").[99]  Edge Investments held 100% ownership of Augustus Investments LLC, a

Delaware LLC.[100]   Edge Investments complex layered ownership is illustrated as

follows:



*Corporate trustee via Providence Trust Company Ltd (Nevis), Evatt Tamine, director

[98] *See* Gov. Exs. B-10, B-11, B-12.
[99] The investment shares of Edge Investments were previously held by additional Brockman-controlled
foreign companies: Legend Investments LLC, Cascade Holdings LLC, Platoon Investments LLC, and
Addington Trading LLC.  *See* Gov. Ex. B-13.  Brockman instructed Tamine to consolidate these entities
and ownership was held by Cascade Holdings LLC.
[100] *See* Gov. Exs. B-13, B-14.

### a.      Brockman personally directed the investments of Edge Investments

Brockman directed and controlled the decision making for Edge Investments and Tamine carried out his investing activity.  No other purported director, trustee, trust protector, or manager was consulted or involved in the decision making.  As with Point Investments, Tamine's memorandum to Brockman also covers Edge Investments and explained that although he and other individuals served as director, trustee, manager, or trust protector of Brockman's offshore entities, Brockman retained complete control over the entities' assets and activities.[101]  Brockman agreed.[102]  Among the investments Brockman used Edge Investments for was to hide his involvement in purchasing R & R debt on the secondary market, which allowed him to earn interest income and make a profit when the loans were repaid at full face value by his own company.[103]

### 3.      Cabot Investments

Cabot Investments was originally formed in the British Virgin Islands.[104]  In 2008, the company was renamed Cabot Global Investments Ltd. and incorporated in Nevis.[105] During the relevant years, Brockman held bank accounts in the name of Cabot Investments at BCB and Mirabaud.[106]  During the 2011 through 2017, Brockman, through Cabot Investments, avoided tax on approximately $49.6 million in interest income and $3.9 million in unreported capital gains.[107]

---

[101] Gov. Ex. A-48, in particular ¶¶ 52, 57, 63, 64, 78, 92, 97, 98, 99 140, 143
[102] Gov. Ex. A-63 and A-64.
[103] Gov. Exs. B-19, B-20, and B-23.
[104] *See, e.g.,* Gov. Exs. C-4, C-12.
[105] Gov. Ex. C-12.
[106] Gov. Ex. C-21.
[107] Gov. Ex. 5.

Brockman holds beneficial ownership of Cabot Investments through an unnecessarily complex web of offshore trusts, foreign and domestic entities. Each of those foreign trusts and entities were under the nominal control of Tamine, who answered solely to Brockman. The common/voting shares of Cabot Investments were held 100% by the nominee company Strummer Management LLC (held 100% by the Cabot Purpose Trust).[108] The investment/beneficial shares were held by the Brockman-controlled entity, Addington Trading LLC (held 100% by the Messery Charitable Trust).[109] Cabot Investments held 100% ownership of Spartacus Investments LLC, a Delaware LLC.[110] Cabot Investments complex layered ownership structure is as follows:



### a. Brockman controlled Cabot Investments by personally directing the use and investment of assets.

As with Point Investments and Edge investments, Tamine's memorandum to

---

[108] Gov. Exs. C-3, C-4, C-5.
[109] Gov. Ex. C-5.
[110] *Id.*; *see also* Gov. Ex. C-3.

Brockman explained that Brockman retained complete control over Cabot Investments, and Brockman agreed.  As an example, Tamine's March 19, 2013 to-do list included a "New Investments" section which listed the companies whose debt Cabot Investments would be investing in: Vision Solutions, Applied Systems, Misys, The Petroleum Place, SumTotal, Deltek Inc.[111]  Tamine leveraged his experience with the debt investing on behalf of Edge Investments and established contacts for the purpose of debt investing on behalf of Cabot Investments.[112]  Brockman also controlled Cabot Investment entities though the "doomsday documents" previously discussed, and he had copies of electronic signatures of Tamine and trustees and trust protectors of other trusts.[113]

Brockman monitored the regular reports provided by Tamine.  For example, by email dated March 6, 2011, Tamine forwarded a report to Brockman on the investment made by Cabot Investments in Sunquest debt and the interest paid and noted that they "are yet to close the latest Sunquest debt purchase."[114]  Tamine asked Brockman if he would like any changes to the report and informed Brockman that he will send the report "each month and will add the debt of other companies that we buy."[115]  Brockman replied by email to Tamine that the "report format looks fine" and that they "would need separate reports depending on who purchases the debt – Cabot, Edge, or Point."[116]

At Brockman's request, Tamine maintained detailed accounting records for Cabot

---

[111] Gov. Ex. C-10.
[112] Gov. Ex. C-12.
[113] Gov. Exs. A-57, A-48, A-58, C-13.
[114] Gov. Ex. C-15.
[115] *Id.*
[116] *Id.*

Investments, provided monthly financial statements and reports to Brockman for review and comment.[117]  Tamine conducted a "semi-annual financial review of all entities face to face by the end of the first half of the year" with Brockman.[118]  As with the other offshore entities, Tamine tracked for Brockman significant bank transactions to and from the bank accounts for Cabot Investments in the STR and regularly provided it to Brockman.[119]

Tamine acknowledged that the assets of Cabot Investments were controlled and belonged to Brockman.  By email dated April 24, 2011, Brockman instructed Tamine to convert funds held in bank accounts (balances in accounts held in the name of "Cabot-Spartacus-Schwab") from U.S. dollars to Canadian dollars.[120]  Tamine replied that same day and stated, "Bob, I'll start the process immediately. Should I start looking for debt opportunities in the Canadian market? Evatt," and Brockman responded "Evatt, Once you get this done, then that would be appropriate. Bob."[121]

By email dated April 26, 2011, Brockman told Tamine that he was okay with leaving the Cabot funds in the Charles Schwab account, rather than transferring those funds to Switzerland and converting to Canadian dollars.[122]  Brockman stated, "Moving Edge and Cabot Schwab funds – we would not want to do to Mirabaud – and getting set up with another Swiss bank will take too long. Bob."[123]  Tamine's May 16, 2012 to-do

---

[117] *See* Gov. Exs. C-16, C-1.2.
[118] Gov. Ex. C-9.
[119] Gov. Ex. C-7.
[120] Gov. Ex. C-18.
[121] *Id.*
[122] Gov. Ex. C-19.
[123] *Id.*

list included a statement under "Trips" that Tamine was to "finish Cabot/Edge bank accounts in Switzerland."[124]

During 2013, Tamine and Brockman continued to discuss opening an account for Cabot Investments in Switzerland and moving funds from Bermuda to Switzerland to reduce their exposure in Bermuda.  Tamine stated that he was working on opening an account for Cabot at Mirabaud (Switzerland) and that as far as the bank was concerned, Brockman's controlled entity, Addington LLC (entity holding 100% of Cabot Investments) was held by charitable trusts and that "It took some time, but Mirabaud are comfortable with the explanations."[125]  Brockman replied to Tamine that he was happy Tamine could transfer such large funds out of Bermuda Commercial Bank "with so little hassle."[126]

### C. Brockman used his offshore entities to fund asset purchases for personal purposes

#### 1. Brockman purchased a luxury yacht with offshore funds from Cabot

During 2014, Brockman became interested in purchasing a luxury yacht named "Turmoil" for his personal use and instructed Tamine to inspect and pursue acquisition of the yacht.[127]  Turmoil (renamed the "Albula" by Brockman) is a 63.7 meter/209-foot motor yacht that can accommodate up to 16 guests and 14 crew.  Brockman used $34.8 million in funds from Cabot Investments to purchase the yacht and for maintenance costs.

To purchase the yacht, Brockman instructed Tamine to conceal that Brockman

---

[124] Gov. Ex. C-20 at ET_0000054307.
[125] Gov. Ex. C-21 at ET_0001943978.
[126] *Id.*
[127] Gov. Exs. C-23, C-24, C-25, C-26.  *See also* Gov. Exs. C-35, C-36.

was the interested party and that the "entities" Tamine represented were interested in a yacht in the $24 million dollar range.[128]  Yet, Brockman decided the offer price for the yacht and when to withdraw this offer.[129]  Brockman authorized Tamine to begin working with a Cayman Islands-based lawyer about forming an offshore structure to hold ownership of the yacht.[130]  On May 5, 2015, Brockman emailed Tamine that "The name of the purchasing entity for Turmoil should be 'Fisheries Research Foundation.' The new name for Turmoil would be 'Fisheries Research I.' From a strategy standpoint, I am trying to figure out how to stay out of a bidding war. This means that there has to be a closing bid – where the brokers are convinced that it is a final bid."[131]

Brockman also emailed Tamine an updated employment agreement with UCSH to include a provision to base Brockman's compensation off EBITDA[132] rather than pre-tax income, which would provide additional funds for Brockman to charter the yacht.[133]  To further conceal his personal use, Brockman agreed with the suggestion to purportedly charter the yacht to Brockman's business associates, Robert Smith and Al Deaton, while using his offshore funds to reimburse them.

Brockman's to-do for Tamine dated January 18, 2015, included "[o]wnership and operation of the Turmoil" among his list of tasks.[134]  Brockman outlined the ownership structure and stated that a charitable foundation will be established with funds to

---

[128] Gov. Ex. C-27.
[129] Gov. Exs. C-33 and 34. and Gov. Ex. 34, Tamine testimony at pg, 3-97, ln. 7-16.
[130] Gov. Exs. C-28, C-29.
[131] Gov. Ex. C-30.
[132] "EBITDA" means "Earnings before interest, taxes, depreciation, and amortization."
[133] Gov. Exs. C-31, C-32.
[134] Gov. Ex. C-43.

purchase and operate the yacht and the purpose of the foundation will be purportedly "fisheries conservation."[135]

On January 29, 2016, Tamine made a $34 million offer on Brockman's behalf for the Turmoil yacht.[136]  On May 22, 2016, Brockman instructed Tamine to falsely suggest that the yacht would be used for exploration/marine research.[137]  Brockman and Tamine continued to pursue the acquisition of the Turmoil and were able to acquire ownership of the yacht in 2016.[138]

On November 8, 2016, $3.5 million was transferred from the Cabot Investments' Mirabaud account to Alley Maass Rogers and Lindsay Escrow.  On December 22, 2016, an additional $29,345,725.39 was transferred to complete the purchase.[139]  On December 29, 2016, $1 million was transferred to MTS Yachts Fisheries Research I.[140]  The transactions were recorded in Cabot Investments' accounting records as "redemption by Addington for Donation to Fisheries Research Foundation" rather than as Brockman's personal expense or distributions.[141]

The yacht was renamed the "Albula", and ownership was held in the Brockman-controlled, Cayman Islands' company named Fisheries Research Foundation Ltd.[142] Brockman's foreign ownership structure and funding of his yacht's purchase,

---

[135] *Id.*
[136] Gov. Ex. C-37, in particular at MLATSW _017177 and 17209
[137] Gov. Ex. C-38.
[138] Gov. Ex. C-37.
[139] Gov. Ex. C-45.  *See also* Gov. Exs. C-7 and C-39.
[140] *Id.*
[141] Gov. Ex. C-39.
[142] *See* Gov. Ex. C-44 in particular at ¶ 2.

improvements, and operating costs (amounting to approximately $43.8 million) is

described as follows:[143]



| Transfers from Cabot Global Investments Swiss Mirabuad Account | | | | | |
|---|---|---|---|---|---|
| Date | Amount | to whom | Comment | Evidentiary Cite | |
| 11/7/2016 | $3,500,000.00 | Alle Maass Rogers and Linsay Escrow | Transfer from Cabot for Deposit on Turmoil | C-7, C-45 | |
| 12/22/2016 | $29,345,705.00 | Alle Maass Rogers and Linsay Escrow | transfer from Cabot for closing on Turmoil | C-7, C-45 | |
| 12/29/2016 | $1,000,000.00 | MTS Yachts Fisheries Research Acct. | Operating Costs for Fisheries Research | C-7, C-45 | |
| 2/20/2017 | $1,000,000.00 | MTS Yachts Fisheries Research Acct. | Operating Costs for Fisheries Research | C-7 | |
| 3/22/2017 | $2,242,308.11 | MTS Yachts Fisheries Research Acct. | | C1-1.2, at MLATSW_021800 | |
| 7/4/2017 | $1,641,600.92 | MTS Yachts Fisheries Research Acct. | | C1-1.2, at MLATSW_021803 | |
| 2/28/2018 | $1,801,860.00 | MTS Yachts Fisheries Research Acct. | | | |
| 6/22/2018 | $3,335,900.85 | MTS Yachts Fisheries Research Acct. | | | |
| | | | | | |
| Total | $43,867,374.88 | | | | |

After the acquisition, Brockman used the yacht for his personal use and he

personally supervised the maintenance and operations of the yacht.  For example,

Brockman reviewed and approved the yacht's hull painting, on-board medical equipment

for his wife, and the yacht crew's performance reviews.[144]

Similar to his other assets, Brockman used Tamine as his nominee to conceal his

ownership and control of Albula.  The Albula crew, other yacht owners, and marina

---

[143] Gov. Ex. 1 Revenue Agent's Declaration at ¶¶ 38, 39, and 40.
[144] Gov. Exs. C-40, C-41, C-42.

personnel knew that Brockman was Albula's true owner, as evidenced by inquiries Tamine received.  As a result, Brockman and Tamine concocted a story to conceal Brockman's ownership by claiming that the yacht was majority owned by a charitable trust and Brockman was only a minority owner with exclusive rights of usage.[145]

In June of 2017, Brockman and Tamine were aware of United States' Department of Justice's criminal investigation of Robert Smith, Brockman's partner in the Vista Equity funds.  Brockman and Tamine knew the yacht's ownership placed a "target" on them, such that hiding the true ownership of the yacht was paramount to keep Brockman's activities from being discovered by the government.[146]

### 2. Brockman's Colorado property

#### a. Regency Management (holding real estate in Colorado)

Brockman continued his obfuscation by using nominees, foreign trusts, multiple layering of entities, and washing transactions to hide his true and beneficial ownership of his Colorado real estate.  In 1998, Brockman formed Regency Management in the British Virgin Islands (later re-incorporated in Bermuda). Brockman holds ownership of Regency Management through the foreign trust, Heraclides Charitable Trust.[147]

From 2003 to the present, Brockman transferred proceeds from his unreported income in Edge Investments and Cabot Investments into Regency Management to purchase and develop real estate in Colorado for his personal use.[148]  Brockman formed several U.S. companies (Mountain Queen Inc., Henke Holdings, and Henke Property

---

[145] Gov. Ex. C-36.
[146] *Id.* at MLATSW_020480 and 020481.
[147] Gov. Ex. B-42.
[148] Gov. Exs. C-46, C-47, C-48, C-49.

LLC)[149] to hold title to the properties to shield his connection and ownership of the

properties, illustrated below:



In 2010, Brockman told Tamine he wanted to increase his investments in Colorado

real estate by putting more funds into Regency Management.[150]  Thus, on December 16,

2010, Brockman caused $15 million to be transferred via an "intra bank transfer" from

Edge Investments' Bermuda account, to Regency Management's Bermuda account.[151]

Brockman then directed that Regency Management wire transfer $265,000 on December

---

[149] *Id.*
[150] Gov. Ex. B-41 at ET_0000043809.
[151] Gov. Exs. B1.30 (Jan 2011) and C-46.

17, 2010,[152] and $4,731,019 on December 23, 2010,[153] to complete the purchase of the "Frying Pan Canyon Ranch" aka "Tie Camp Ranch," in Eagle County, Colorado.[154]   The Tie Camp Ranch consisted of three parcels, 120 Ash Rd., Basalt CO, 6081 Frying Pan Rd., Basalt, CO, and Frying Pan Road.   Further hiding his ownership, Brockman titled the Tie Camp Ranch in Henke Property even though Henke Property did not provide the funds to purchase the Tie Camp Ranch as the funds came directly from Regency and ultimately Edge Investments.[155]

### b.   Henke Holdings LLC/Henke Property LLC

Henke Holdings, a Colorado LLC , was formed by Brockman on September 9, 2005.  Henke Property LLC ("Henke Property"), a Colorado LLC, was also formed and is 100% owned by Henke Holdings.  Regency Management (Bermuda) is listed as the 100% shareholder of Henke Holdings on its federal corporate tax returns.[156]  However, Brockman does not disclose his beneficial ownership and control of Regency Management. Between 2005 and 2010 Brockman acquired several properties in Colorado and held title to the properties in the name of Henke Property.

For example, in early May 2010, Brockman, through Regency Management and Henke Property, purchased Prehm Ranch, consisting of 35 acres in Glenwood Springs, Colorado ("Prehm Ranch") for approximately $539,000.[157]  Brockman approved the

---

[152] Gov. Ex. B-39.
[153] Gov. Ex. B-40.
[154] Gov. Exs. B-35, C-47.
[155] Gov. Exs. C-46, C-47, and C-48.
[156] Gov. Ex. B-60.
[157] Gov. Ex. 1, Agent declaration at ¶¶ 33- 36 and C-47.

purchase and set the purchase price of the Prehm Ranch property.[158]  Brockman also

dictated that the funds to purchase Prehm Ranch would come from Regency

Management.[159]  Brockman, however, placed the title to Prehm Ranch in Henke Property

rather than in his own name or Mountain Queen, Inc.  From 2010 – 2016, Regency

transferred over $24,000,000 from its Bermuda bank account to Henke Property to

purchase and maintain Brockman's Colorado Real Estate.[160]

### c.   Mountain Queen Inc.

Mountain Queen Inc. ("Mountain Queen"), a Colorado Corporation was

incorporated by Brockman on April 30, 1998 and first filed a federal corporate tax return

in 2003.  Regency Management is listed as the 100% shareholder of Mountain Queen.[161]

In 2003, Brockman acquired a vacation home in Aspen, Colorado and held title in

the name of Mountain Queen.  In 2004 Brockman acquired additional parcels also held in

the name of Mountain Queen.  Brockman's business associate, Al Thorpe, served as

president of Mountain Queen until his death in 2013, he was replaced by Carl Linnecke

with Brockman's approval.[162]

### d.   Brockman's control of Henke Holdings and Mountain Queen

Similar to his control of his offshore entities, Brockman retained and exercised

complete control over the properties held in the Regency Management structure.  The

presence of nominee corporate officers of Mountain Queen and Henke Holdings (Alfred

---

[158] Gov. Ex. C-49.
[159] Gov. Ex. C-50, at ET_0001760281 and Gov. Ex. C-47.
[160] Gov, Ex, 24 Sandles' declaration at ¶ 16.
[161] Gov. Ex. B-61.
[162] Gov. Ex. C- 50.

Thorpe and later Carl Linnecke) merely created the appearance that Brockman was not associated with the structure to conceal his ownership and control over the properties. Brockman's ownership and control of the properties can be seen in the following areas: (i) Brockman had exclusive right to use the properties; (2) Brockman provided specific directions to Tamine (previously Don Jones) regarding the day-to-day management of the properties, including approval of tenants and fishing rights;[163] (3) Brockman approved the use of funds from Regency Management to transfer to Mountain Queen and Henke Holdings for property acquisitions;[164] (4) Brockman received monthly reports from Tamine listing all expenses of $2,000 or more, with copies of invoices for Brockman's review and approval of payments;[165] (5) Brockman gave direction regarding the accounting treatment of property expenses for tax purposes;[166] (6) Brockman approved the selection of Carl Linnecke to serve as president of Mountain Queen and approved paying $3,000-$5,000 per month for Linnecke to serve as President.[167]   Linnecke was not informed that Brockman was the true owner of Mountain Queen and underlying properties.  Tamine's explanation to Linnecke was that the properties were owned by a charitable trust with charitable purposes.[168]  In December 2010, $15 million held in Edge Investments' Bermuda bank account was transferred to the account held in the name of Regency Management Ltd. ("Regency Management").[169]  A portion of the $15 million

---

[163] Gov. Exs. C-57, C-58.
[164] Gov. Exs. C-46, C-47, C-48, C-49.
[165] Gov. Ex. C-56.
[166] Gov. Ex. C-58.
[167] Gov. Ex. C-50.
[168] *Id.*
[169] Gov. Exs. B-1.30, B-35 and C-46.

was used to acquire property near Basalt, Colorado and for the construction of a fishing lodge on the property for Brockman's personal use.[170]  Title to the property was held in the name of Henke Property  as part of Brockman's offshore structure to conceal his ownership and relationship to the Colorado properties.[171]

From 2014 through 2016, Brockman authorized an additional $7 million from Cabot Investments to Regency Management to pay for improvements and maintenance on his fishing lodge and property.  On December 1, 2014, September 26, 2015, April 20, 2016, and October 24, 2016, $5 million, $1 million, $500,000, and $500,000, respectively, was transferred from Cabot Investments to Regency Management.[172]  These transactions were recorded as "Redemption by Addington and Transfer to Regency."[173]  The funds were then periodically transferred from Regency Management to Henke Property  with the description "Funding of Henke to meet costs."[174]  As illustrated below, Brockman used multiple offshore entities with multiple offshore accounts and a two-step washing transaction to hide both the source of the funds and his ownership:



---

[170] Gov. Exs. C-47, C-48, C-49, C-50.
[171] Gov. Ex. C-51.  *See infra* for additional discussion of Brockman's concealing his purchases and ownership of Colorado properties.
[172] Gov. Ex. C-7.
[173] Gov. Exs. C-52, C-53, C-54, C-55.
[174] Gov. Exs. C-47, B-35.

### 3.    Brockman's Jet

As with his Colorado real estate and luxury yacht, it is reasonable for the IRS and the Court to believe Brockman is or appears to be planning to place his property beyond the government's reach through his use of foreign and multi-layered entities, a nominee, and convoluted movements of funds from foreign accounts to hide his ownership of a jet.

In late 2012, Brockman became interested in purchasing a jet.  In December 2012, Brockman created an offshore structure with multiple U.S. entities to purchase and hold title to the aircraft.  To accomplish this, Brockman formed a Delaware LLC named Hardwicke Properties LLC ("Hardwicke").[175]  Tamine formed the foreign trust, Framfield Charitable Trust, which held a foreign corporation, Framfield Assets Ltd. ("Framfield Assets") and opened a bank account at Mirabaud & Cie in Geneva, Switzerland in the name of Framfield Assets.[176]  Tamine served as a nominee trustee and corporate director of these Framfield entities.[177]  As part of the scheme, Brockman also formed the Delaware corporation Red Plains Air Charter Inc. ("Red Plains") to hold ownership of Hardwicke, the entity that ultimately held title to the jet.[178]  Brockman's ownership structure is illustrated as follows:

---

[175] Gov. Exs. A-11, A-62.
[176] *Id.*
[177] *Id.*
[178] *Id.*



In particular, Brockman wanted his jet to be owned by a separate foreign entity, Framfield Assets, "so that the tax returns for Red Plains never shows Spanish Steps Holdings Ltd. and the AEBCT as the ultimate beneficial owner."[179]  Brockman, who was keenly aware the IRS may audit him, used this foreign ownership structure to keep his entities (*e.g.,* Cascade) from being exposed to the government.[180]  Cascade holds Edge Investments, the entity used to fund Brockman's Colorado property purchases through Regency Management.

To further obscure his ownership, Brockman also used convoluted money transfers through several washing transactions involving Spanish Steps Holdings Ltd. to hide his ownership of his jet.  On December 27, 2012, Brockman authorized $15 million to be transferred from the AEBCT held in the bank account of Spanish Steps Holding

---

[179] Gov. Ex. A-62 at ET_0001932966.
[180] *Id.* at ET_0001932940-31.

Ltd. to the account held in the name of Framfield Assets.[181]  Brockman then approved the

initial $12.5 million funding amount for Red Plains at Amegy Bank.

| DATE | FROM | TO | PAYMENT OUT | PAYMENT IN | INTERNAL | BANK | REASON |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
| 12/27/2012 | Framfield Assets Ltd | Red Plains Air Charter Inc | $12,500,000.00 |  |  |  | Transfer of funds to Red Plains Air Charter Inc |
| 12/27/2012 | Spanish Steps Holdings Ltd | Framfield Assets Ltd |  |  | $15,000,000.00 | Mirabaud | Transfer of funds to purchase aircraft through Red Plains Air Charter |

Tamine described the washing transaction to Brockman: "[the funds will transfer

from [Spanish Steps Holdings Ltd.] account at Mirabaud to Framfield Assets Ltd.  Then

from Framfield Assets to Red Plains. This will remove us one further level from

connecting [Spanish Steps Holdings Ltd.] and Red Plains."[182]  Brockman's movement of

the $12.5 million is illustrated as follows:[183]



### D.    Brockman's directive to Tamine to reorganize and replace the trusts and companies comprising the offshore structure highlights his control and efforts to keep his offshore structure hidden from IRS

Brockman directed Tamine to simplify and reorganize the offshore structure.  The

purported trustees, trust protectors, and managers of those trusts and companies were

neither involved nor consulted regarding the change in structure and replacements.  For

example, Brockman instructed Tamine to "reduce the number of entities-or at least focus

---

[181] Gov. Ex. A-9.
[182] Gov. Ex. A-62 at ET_0001932966.
[183] *See* Gov. Ex. A-9.

on getting rid of inactive entities" in the "Strategic Long-Term" section of Tamine's to-do list, dated April 26, 2009.[184]  Brockman refers to this reorganization as a "clean up" of the structure.[185]

Tamine noted that re-incorporating Cabot Investments under Nevis law was part of a larger restructuring.  Tamine stated that "The way in which we have restructured – particularly for Edge and Cabot as Nevis entities – means that we can make changes without all the disclosures that would have been necessary previously."[186]

Tamine suggested moving the Cabot group of entities to the AEBCT structure or one of the trusts formed in the name of Brockman's mother, Pearl Brockman: "The Edge and Cabot group assets are then rolled into either the AEBCT, the AEBGCT or one of your mother's trusts. This can all be done offshore and would not be reportable. I recommend the AEBCT. We have accounts at Bermuda Commercial Bank where these transfers would hardly raise interest."[187]  Brockman disagreed with this proposed reorganization -- he wanted to keep the entities separate from the AEBCT structure because of potential IRS scrutiny: "These other two structures need to be kept way in the background with separate charitable trusts, trust protectors, and underlying companies."[188]

Brockman described the proposed reorganization of the Cabot Investments'

---

[184] Gov. Ex. C-60 at ET_0000036312.
[185] Gov. Ex. C-62.
[186] Gov. Ex. C-12 in particular ¶ 4.
[187] Gov. Ex. C-62.
[188] *Id.*

structure to Tamine by email dated July 28, 2010.[189]  The reorganization involved consolidating the Brockman-controlled entities (Addington Trading LLC, Choice Holdings LLC, and Barrier Holdings LLC) with Addington Trading holding all shares in Cabot Investments and the "new charitable trust" holding the shares of Addington Trading to replace the Massengill Trusts.   The proposed reorganization was also included in the to-do list dated December 17, 2011, under the section "Entity Structure."[190]  Brockman instructed Tamine to "focus on the Cabot structure clean up for now" by email dated July 29, 2010.[191]

Tamine again emailed Brockman on December 2, 2012 to discuss the proposed reorganization of the Cabot ownership structure.[192]  Tamine suggested creating a charitable purpose trust and transferring the common shares of Cabot from the Louise Massengill Family Trust to the newly created purpose trusts.[193]  Brockman replied by email on December 9, 2012, that he approved of this plan.[194]  Tamine emailed Brockman on March 6, 2013, confirming that he moved the ownership of the common shares (non-investment shares) in Cabot to new charitable purpose trusts, eliminating the connection to the Massengill Trusts.[195]  Tamine explained that this was done "as part of the clean up ahead of the many changes brought in by FATCA and other increased KYC scrutiny."[196]

---

[189] Gov. Ex. C-61.
[190] Gov. Ex. C-13 at ET_0000049331.
[191] Gov. Ex. C-61.
[192] Gov. Ex. C-63.
[193] *Id.*
[194] *Id.*
[195] Gov. Ex. C-64.
[196] *Id.*  The Foreign Account Tax Compliance Act (FATCA), which was passed in 2010 as part of the HIRE Act, generally requires that foreign financial Institutions and certain other non-financial foreign

(continued...)

Tamine confirmed that he established the trusts and companies to conceal

Brockman's relationship to the structure while retaining control over the entities.  For

example, Tamine's 2013 performance self-evaluation, dated March 10, 2014, forwarded

to Brockman for the annual compensation review, explained Tamine's accomplishments

regarding Brockman's offshore structures and concealment of Brockman's connection to

the entities and "covering our tracks."[197] Brockman also did not want to take a

distribution from or clear out the ABECT Trust because "it draws attention to my

personal returns" from the IRS.[198]

### E.    Actions to avoid IRS detection

Brockman has taken many actions, including using code names, creating false

documents, and destroying documents over the years to avoid detection by the IRS and

other governmental authorities.

### 1.    Use of code names

Brockman assigned code and alias names for himself, his nominees and other

offshore service providers when communicating via encrypted email regarding offshore

activity.  Brockman used the email code name "Permit" or "Permit1."[199]  Brockman, an

---

entities report on the foreign assets held by their U.S. account holders or be subject to withholding on certain payments. The HIRE Act also contained legislation requiring U.S. persons to report, depending on the value, their foreign financial accounts, and foreign assets.
https://www.irs.gov/businesses/corporations/foreign-account-tax-compliance-act-fatca  Know Your Customer Rules ("KYC") that under local laws that require a non-US financial institution to obtain identity documents from clients, understand the nature of customers' activities and qualify that the source of funds is legitimate usually relating to tax reporting and/or anti-money laundering rules. In particular, KYC rules refer to the documentation required under local law that have been approved by the IRS for purposes of establishing the identification and tax residence of a non-US person for purposes of the qualified intermediary program.  See Rev. Proc. 2000-12 and Announcement 2000-48.
[197] Gov. Ex. C-65 in particular at ¶¶ 2, 9, 13 and 14.
[198] Gov. Ex. A-60.
[199] *Id.*; Gov. Ex. A-85 at ET_0000015036 and 15037.

avid fisherman, assigned fish-related code names to the other individuals:[200]

| Name | Code Name | Alias |
|---|---|---|
| Robert Brockman | Permit or Permit 1 | John Barnes |
| Evatt Tamine | Redfish | Michael Gilbert |
| Don Jones | Bonefish or King | |
| Robert Smith | Steelhead | |
| James Gilbert | Chum and Snapper | Tina Nash |
| Al Deaton | Tarpon | |

Brockman also referred to the IRS as "the house."[201]

### 2.    Attending an anti-money laundering seminar

Brockman approved Tamine's attending an anti-money laundering seminar in

Bermuda (under an assumed identity) to learn bank compliance practices.[202]

### 3.    Preparing false documents

Brockman also controlled the various foreign trusts and companies by having

copies of electronic signatures of Tamine and trustees and trust protectors of other trusts

so that Brockman could use their electronic signature to sign documentation relating to

the entities.[203]  Tamine at Brockman's direction provided false documents to a bank to

change Trust protectors of AEBCT.[204]

### 4.    Destroying records and giving orders for destruction of records

Brockman routinely backed up files to Micro SD cards and deleted files from his

laptop by running the program "Evidence Eliminator" to wipe his computer hard

drives.[205]  He also insisted that Tamine and other individuals use Evidence Eliminator.[206]

---

[200] Gov. Ex. A-85 at ET_0000015036 and 15037..
[201] Gov. Ex. A-85 at ET_0000015156 and Gov. Ex. 34, Tamine testimony at pg. 3-108, lns.17-18.
[202] Gov. Ex. A-85 at MLATSW_002380 - 2381.
[203] Gov. Ex. A-88.
[204] Gov. Ex. 34, Tamine testimony at PM 3-30 ln. 25 to pg. 3-34 ln. 9.
[205] *Id.*
[206] *Id.*

Brockman also personally physically destroyed records related to his offshore activity.  He discussed that he traveled to the offices of his attorneys in Washington, DC and personally shredded documents from the firm's files which were "super sensitive" including the "various proposed structures" for the "Hot Rod" project as well as "the organizational chart of the international entities."[207]

Brockman instructed Tamine to "purge all computer files that are held by Don that involve offshore entities including hammering disks, shredding CDs, etc."[208]  Tamine confirmed that he destroyed two external hard drives per Brockman's direction.[209]

## LAW AND ARGUMENT

## II.   Statutory framework for jeopardy assessments

Congress created Code Section 6861[210] to allow assessment and collection in cases where more routine methods may be rendered ineffective or "jeopardized" if collection efforts are delayed.  In those cases, the IRS may immediately determine the amount of the tax due, serve notice of the jeopardy assessment on the taxpayer, demand payment, and levy upon the taxpayer's property.[211]  Under 26 U.S.C. § 7429, taxpayers may seek very limited judicial review of these actions on an expedited basis.  The decision of a district court is not subject to review.[212]

---

[207] Gov. Ex. D-27.
[208] Gov. Ex. A-88 in particular MLATSW_000851.
[209] *Id.*
[210] The jeopardy assessment of Brockman's income tax liability was made under 26 U.S.C. § 6861. Section 6861 authorizes making a jeopardy assessment for income taxes and other taxes for which a notice of deficiency must be issued under Section 6212 and which may be contested in Tax Court under Section 6213.  "Section" references are to Title 26 of the United States Code (the Internal Revenue Code).
[211] *See Nolan v. United States*, 539 F. Supp. 788, 789 (D. Ariz. 1982).
[212] *Id.* § 7429(f).

The scope of the determination under Section 7429 is summary and limited to two questions: (1) whether the jeopardy or termination action is reasonable under the circumstances, and (2) whether the amount assessed is appropriate.[213]  The determination is not designed to establish the taxpayer's ultimate liability for the taxes at issue.[214]  That ultimate determination may be accomplished in a later proceeding brought by the taxpayer in Tax Court, Claims Court, or a United States district court where the taxpayer may also pursue refund claims for amounts collected under the jeopardy procedures.

While Section 7429 does not set forth specific guidelines as to what constitutes "reasonable under the circumstances," the courts have determined that this term means "something more than not arbitrary and capricious and something less than supported by substantial evidence."[215]  In other words, "[t]he standard of reasonableness required to support a determination under review pursuant to § 7429 is not a rigorous one."[216]  The burden has been described as similar to probable cause in a criminal case.[217]

The general test used to determine whether making an assessment is reasonable includes an inquiry into whether (1) the taxpayer is or appears to be planning to quickly depart from the United States to conceal himself; or (2) the taxpayer is or appears to be

---

[213] *Id.* § 7429(b)(3); *Central De Gas Chihuahua, S.A v. United States,* 790 F. Supp. 1302, 1304 (W.D. Tex. 1992); *Varjabedian v. United States,* 339 F. Supp. 2d 140, 144 (D. Mass. 2004); *Wellek,* 324 F. Supp. 2d at 911; *Magluta v. United States*, 952 F. Supp. 798, 801 (S.D. Fla. 1996); *Young v. United States,* 671 F. Supp. 1340, 1343 (S.D. Fla. 1987).

[214] *See Varjabedian*, 339 F. Supp. 2d at 144 (*citing Rey Balaguer v. United States*, 656 F. Supp. 383, 385 (D. P.R. 1987)).

[215] *Central De Gas*, 790 F. Supp. at 1304; *Felkel v. United States*, 570 F. Supp. 833, 838 (D. S.C. 1983); *Loretto v. United States*, 440 F. Supp. 1168, 1172 (E.D. Pa. 1977); *Garcia v. United States*, 714 F. Supp. 1036, 1077 (N.D. Cal. 1989); *Harvey*, 730 F. Supp. at 1104; *DeLauri v. United States,* 492 F. Supp. 442, 445 (W.D. Tex. 1980).

[216] *Serpa v. United States*, 1981 *WL* 1759, at *2 (D. Neb. Mar. 12, 1981).

[217] *Nolan*, 539 F. Supp. at 790; *United States v. Doyle*, 482 F. Supp. 1227, 1229 (E.D. Wis. 1980).

designing to place his property beyond the reach of the government either by removing it from the United States or by concealing it, or by transferring it to other persons, or by dissipating it; or (3) the taxpayer's financial solvency appears to be imperiled.[218]  If any one of these three conditions is found to exist, making a jeopardy assessment is reasonable.[219]

Of necessity, Section 7429 does not call for a full evidentiary hearing.[220]  The court's review is not to be treated as a trial on the ultimate merits of the tax liabilities. Rather, the court conducts a summary proceeding where both parties present the information on which they rely in support of their respective positions.

The burden of proving that making a jeopardy assessment was reasonable is upon the United States.[221]  But given (i) the time constraints involved in a hearing to review the assessments, and (ii) the fact that the proceeding is intended to be summary in nature with the United States merely required to establish reasonableness of the assessment, the proof the government can use to satisfy its burden need not be in a form that satisfies the requirements of the Federal Rules of Evidence.[222]

The evidence which is admissible and on which the court can rely includes

---

[218] Treas. Reg. § 301.6861-1; Treas. Reg. § 1.6851-1(a)(1). *See Central De Gas,* 790 F. Supp. at 1305; *Varjabedian*, 339 F. Supp. 2d at 155, *Wellek*, 324 F. Supp. 2d at 912; *Cantillo v. Coleman*, 559 F. Supp. 205, 206-207 (D. N.J. 1983).

[219] *See Wellek*, 324 F. Supp. 2d at 912; *Nolan*, 539 F. Supp. at 790, (*citing* S. Rep. No. 94-938, p. 365 n. 6, reprinted at 1976 U.S. Code Cong. & Ad. News at 3795).

[220] *Hecht v. United States*, 609 F. Supp. 264, 266 (S.D.N.Y. 1985).

[221] 26 U.S.C. § 7429(g)(l).

[222] *Miller,* 615 F. Supp. at 786; *Harvey,* 730 F. Supp. at 1104; *Marranca v. United States*, 587 F. Supp. 663, 668 (M.D. Pa. 1984).

evidence that would not be admissible in a civil or criminal trial.[223]  Such evidence

includes affidavits,[224] even affidavits containing Government agents' conclusions and

opinions, hearsay,[225] information that the revenue agent learned from individuals or IRS

personnel or confidential sources,[226] documents submitted as exhibits,[227] and, of course,

testimony.[228]  In short, courts "must consider any information that has a bearing" on the

two issues the court must address.[229]  Because the judicial review the jeopardy

determination is *de novo* rather than deferring to the discretion of the agency

determination, the courts may also consider facts and information gathered after the IRS

made its determination and assessment.[230]

It is also not essential that each specific item of information on which the

jeopardy assessment is based be accurate for the jeopardy determination to be reasonable

under Section 7429.[231]  The United States need only show that Brockman's actions

*appear* to jeopardize collection, not that he will do so.[232]  Appearances are what count:

---

[223] *See Harvey*, 730 F. Supp. at 1104; *Billig v. United* States, 1981 WL 1898, at *3, 49 A.F.T.R.2d (P.–H.) 82–479, 82–480, 81–2 U.S.T.C. (CCH) para. 9792 at 88,635 (N.D.Ga.1981).
[224] *McAvoy v. IRS*, 475 F. Supp. 297, 299 (W.D.Mich.1979); *Bremson v. United States*, 459 F. Supp. 121, 122 & n. 2, 123, 125 & n. 11, 127 & n. 15, (W.D.Mo.1978); *Loretto*, 440 F. Supp. at 1171 & n. 4.
[225] *Bremson*, 459 F. Supp. at 127, 128.
[226] *Bean v. United States*, 618 F. Supp. 652, 656–657 (N.D.Ga.1985).
[227] *Loretto*, 440 F. Supp. at 1171.
[228] *Welch v. United States,* 575 F. Supp. 464, 466 (S.D.Miss.1983); *Bremson*, 459 F. Supp. at 122 n. 3.
[229] *Bremson*, 459 F. Supp. at 125; *see also McAvoy*, 475 F. Supp. at 298; *Loretto*, 440 F. Supp. at 1173.
[230] *Wellek*, 324 F. Supp. 2d at 911; *Camp v. Commissioner*, 635 F. Supp. 585, 587 (E.D. La. 1986); *Nolan*, 539 F. Supp. at 790; *Central De Gas*, 790 F. Supp. at 1304; *Loretto*, 440 F. Supp. at 1173.
[231] *Serpa*, 1981 WL 1759, at *2 ("[I]t is not essential that every fact upon which the determination is based be proven accurate in a subsequent judicial proceeding in order for that determination to be reasonable under § 7429 . . . The standard is one of reasonableness, not one of substantial evidence.").
[232] *Golden West Holdings Trust v. United States*, 2009 WL 1457107, *4 (D. Ariz. May 21, 2009); *Wellek,* 324 F. Supp. 2d. at 911; *Golden ADA, Inc. v. United States*, 934 F. Supp. 341, 345 (N.D. Cal. 1996) ("Whether Golden ADA in fact intended to liquidate its assets and place them beyond the reach of the IRS thereby avoiding payment of its taxes is irrelevant. It is the appearance of such things that is relevant

(continued...)

"In order to establish that the making of a jeopardy assessment is reasonable under the circumstances, the Service 'need only establish that the taxpayer's circumstances appear to be jeopardizing collection of a tax—not whether they definitely do so.'"[233]

In determining whether any of these the "circumstances" is present, there are many factors that courts may consider including whether: (1) the taxpayer is involved in illegal activity,[234] (2) the taxpayer travels abroad frequently, (3) the taxpayer is leaving or may be expected to leave the country, (4) the taxpayer has recently conveyed real estate, (5) or discussed such conveyance, (6) the taxpayer controls bank accounts containing liquid funds, (7) the taxpayer has not supplied public agencies with appropriate forms or documents when requested to do so, (8) the taxpayer controls numerous business entities, (9) the taxpayer attempts to make sizable bank account withdrawals at the time of the assessment, (10) the taxpayer maintains foreign bank accounts, (11) the taxpayer takes large amounts of money offshore, and (12) the taxpayer has many business entities which can be used to hide his assets.[235]

The "appearances" in this action establishing that the jeopardy assessments were

---

and controlling."); *Cantillo,* 559 F. Supp. at 207; *Revis v. United States*, 558 F. Supp. 1071, 1078 (D. R.I. 1983).

[233] *Miller*, 615 F. Supp. at 786 (*emphasis* in original) (*quoting Cantillo*, 559 F. Supp. at 207).  See also, Treas. Reg. § 301.6861-1; Treas. Reg. § 1.6851-1(a)(1); *Bean v. United States*, 618 F. Supp. 652, 658 (N.D. Ga. 1985) ("Whether Bean in fact intended to depart the country, liquidate his assets and thereby avoid payment of his taxes is irrelevant").

[234] *Magluta,* 952 F. Supp. at 801-802.

[235] *Bean v. United States*, 618 F. Supp. 652, 658 (N.D. Ga. 1985) (citations omitted). There are a host of other reasons that have helped courts find that jeopardy assessments were appropriate. *See Wellek*, 324 F. Supp. 2d at 912; *Mesher v. United States*, 736 F. Supp. 233, 235-36 (D. Or. 1990) (listing six factors courts will consider). *See Arnold v. United States,* 1998 U.S. Dis. Lexis 22310 *23-24, 83 A.F.T.R.2d (RIA) 3018 (taxpayers holding of residence and other assets in nominee corporations supported jeopardy assessments).

reasonable are abundant.  After a 30 year history of hiding assets and income from the United States in his offshore structures, Brockman's more recent activities appear to be a continuation of his past in a way that appears to further jeopardize collection of his taxes. For example, within six months of his October 1, 2020, indictment, Brockman and his wife (i) sold two Houston properties, (ii) gifted another Houston property to their daughter-in-law, (iii) listed his Houston residence for sale, (iv) sold his interest in the jet, (v) closed several of his U.S. bank accounts, (vi) transferred control of his offshore empire to another tax haven locale (Cayman Islands), (vii) created two new offshore trusts with foreign accounts and transferred funds from the U.S. to them and (viii) used multiple foreign corporations, foreign trusts, foreign accounts, nominees, and other business entities.  Furthermore, sometime in 2020, Brockman dissipated or transferred to unknown accounts some $3,634,317 from his U.S. based financial accounts.  In short, many of the above-described factors support the jeopardy assessment.

III.    **The evidence establishes that jeopardy appears to exist, and the jeopardy assessment is reasonable**

A.    **Brockman was designing to place his property beyond the IRS's reach**

In deciding whether a taxpayer is or appears to be designing quickly to place his property beyond the reach of the government, the question is whether the United States reasonably believes collection of the taxes is in jeopardy if it must delay assessment and collection pending pre-assessment and pre-collection administrative and judicial review. In making this determination, courts have held that the United States need not show

immediate dissipation or removal of assets.[236]  Rather, the test is whether the collection

of taxes would be ineffective or jeopardized if collection efforts are delayed during the

standard administrative preassessment and pre-collection review process.[237]  The

question is whether the taxpayer appears to be manipulating his property in such a

manner as to place them beyond the reach of the government.[238]  Here, the IRS acted

reasonably in believing that Brockman appeared to be designing to place his assets

beyond the reach of the government because of the transfer and impending/recent sales of

millions of dollars in real estate and Brockman's decades-long and extensive efforts to

hide his true ownership of assets held offshore in convoluted structures in multiple

foreign jurisdictions.  In short, the evidence establishes that jeopardy exists.

### B.   The Brockmans are currently selling and gifting their Texas real estate, including entering into transactions shortly after Brockman's indictment, in an attempt to place the assets beyond IRS reach

It is reasonable for the IRS and the Court to believe that it appears Brockman is

planning to place his property beyond the government's reach.  Since his indictment,

Brockman, through his wife, is actively transferring, gifting, and attempting to sell his

U.S. based real estate.

As noted above, Brockman engaged in a decades-long scheme of hiding and

disguising his true ownership of his assets to evade detection and collection by IRS.

Additionally, Brockman's domestic assets that were not hidden using nominees and

---

[236] *Harvey*, 730 F. Supp. at 1107.
[237] *Id.* (citation omitted); see *Revis*, 558 F. Supp. at 1078 (noting "speed . . . a relative concept"; collecting cases of taxpayer actions spanning years).
[238] See *Revis*, 558 F. Supp. at 1078.

layered entities, are currently being transferred, gifted, and put up for sale to avoid

collection efforts.

Shortly after Brockman's indictment, he disposed of, and is actively trying to

dispose of, property with a value in excess of $24.49 million.  While this is a small

fraction of Brockman's total taxes owed, it represents property holdings in his or his

wife's name.  The timeline of this disposal is summarized:

- 10/1/2020     Brockman indicted on federal tax evasion, wire fraud, money laundering, evidence tampering and destruction of evidence, and failure to file FBARs.  The amount Brockman owes is over $1.4 billion.

- 10/26/2020   Brockman lists 1731 Sunset Blvd, Houston TX 77005 (the "Sunset Property"), for sale, and it is sold on May 12, 2021 for $1.375 million.[239]

- 11/12/2020   3702 Inwood Drive, Houston TX 77019 (the "Inwood Property"), valued at $3.7 million, gifted to daughter-in-law Elizabeth Bellows Brockman on November 12, 2020.[240]

- 12/11/2020   335 West Friar Tuck Lane, Houston TX 77024 ("335 West Friar Tuck"), sold for $4,100,000 million.[241]

- 5/17/2021     333 West Friar Tuck Lane, Houston TX 77024 ("333 West Friar Tuck"), principal residence of the Brockmans listed for sale for $15.35 million.[242]

A cursory examination of these transactions reveals Brockman's machinations in

attempting to place property beyond the reach of the IRS.

---

[239] Gov. Exs. 17 and 18. The property had originally been listed for sale on October 26, 2020.  As with the Brockman's personal residence, this property was originally acquired as community property in 2011 but on October 17, 2019, the Brockmans recorded a partition agreement followed by a deed on the same date with Brockman conveying his 50% separate interest in the property to Mrs. Brockman to hold as her 100% sole and separate property. Gov. Exs. 16 and 17.

[240] Gov. Exs. 20 and 21 Gift Deed… Mrs. Brockman originally acquired the property as her sole and separate property by deed recorded on January 21, 2020 and she gifted the property to her daughter-in-law, Elizabeth Bellows Brockman, on November 12, 2020. Gov. Exs. 19 and 21.

[241]  Gov. Exs. 12 and 13. The property was sold with Mrs. Brockman acting on Brockman's behalf as power of attorney. Gov. Ex. 12 and Gov. Ex. A-95.

[242]  Gov. Ex. 12 and Gov. Ex. A-95.  Although originally acquired by Brockman and his wife as community property in 1997, they shortly thereafter on December 30, 1997, recorded a partition agreement followed by a deed on February 17, 1998, with Brockman conveying his 50% separate share to Mrs. Brockman to hold title as her 100% sole and separate property.  Gov. Ex. 9.

For example, in May 2011, the Brockmans acquired the Sunset Property, a four-story townhouse located in Houston.[243]  For eight years, the Brockmans held this property as community property.  In September 2018, the Bermuda police executed a search warrant on Tamine's home and storage facilities in Bermuda.[244]  As noted above, Tamine was Brockman's employee, agent, and nominee.

After the search warrant, on October 17, 2019, Brockman partitioned the Sunset Property into separate property between himself and his wife.  On the same day, Brockman transferred his 50% (separate) interest in the Sunset Property to his wife.  On October 1, 2020, Brockman was indicted.  On October 26, 2020, merely three weeks after Brockman's indictment, Brockman listed the Sunset Property for sale.  It was sold in May 2021, for $1.375 million.

Similarly, in March 2005, the Brockmans acquired 335 West Friar Tuck.  For fifteen years, the Brockmans held the property as community property.  Yet, two months after his indictment, Brockman, through his wife, sold the property on December 11, 2020, for $4.1 million.

The Brockmans acquired their principal residence, 333 West Friar Tuck, years ago.  For twenty-four years, they maintained the 333 West Friar Tuck property as their principal residence.  Seven months after his indictment, 333 Friar Tuck was listed for sale for $15.35 million.

---

[243] Gov. Ex. 14.
[244] See Gov. Ex. 25 (Constable Rock's Statement describing September 5, 2018, search of Tamine's home in Bermuda).

On January 21, 2020, Mrs. Brockman acquired the Inwood Property.  She acquired this property as her separate property, though she earns no separate income apart from community income from Brockman.  On November 12, 2020, a little more than a month after Brockman's indictment, Mrs. Brockman gifted the Inwood Property worth $3,567,218 to her daughter-in-law, Elizabeth Bellows Brockman, as her sole and separate property.[245]  Brockman's actions show that he is attempting to insulate this property not only from the IRS's reach (due to his substantial tax liabilities), but he is also trying to shield the Inwood Property from being associated with his son, who was involved in Brockman's businesses.

Brockman's post-indictment transfers are conducted by his wife (Dorothy Brockman) through a statutory durable power of attorney.[246]  Shortly after Brockman became aware of his pending indictment, in July 2020, he signed the power of attorney.  It was recorded in the public record on December 14, 2020.   Immediately after Brockman's indictment, Dorothy Brockman began selling and transferring their property using the power of attorney.

The timing of the power of attorney, its subsequent recording, and its use evidence further maneuverings by the Brockmans to hide Brockman's involvement and dissipate his assets.  Brockman has a history of using nominees to acquire, sell, and manage his assets and companies.  Based upon Brockman's actions, his repeated pattern of hiding assets by disguising their true ownership through nominees and multi-layered foreign

---

[245] Elizabeth Bellows Brockman is Brockman's daughter-in-law (the wife of Brockman's only son).
[246] Gov. Exs. 2 (Jeopardy Report), A-95 (statutory power of attorney).

entities, it is reasonable for the IRS and the Court to believe that the collection of taxes will be rendered ineffective and jeopardized.

Brockman's defense of these property transfers reveals that his attempts to keep his assets from the IRS started as far back as the 1990s. Brockman asserts the Court cannot rely on several of these property transfers because the properties were owned solely by Dorothy Brockman and she files separate tax returns.

Tellingly, Brockman claims that his 1992-1995 tax years were examined by the IRS. Starting with their 1996 tax year, the Brockmans began filing separate tax returns. On December 31, 1997, Brockman partitioned the 333 West Friar Tuck property into 50% separate property ownership between he and his wife. Brockman then on February 17, 1998 transferred his 50% separate property interest to his wife. Before these transfers took place, the IRS could have reached Brockman's interest in these properties. After these transfers, the IRS will have to assert and prevail on additional administrative actions such as the use of alter ego, nominee, or transferee liens and levies, or the government will need to seek judicial determinations using similar or other causes of action. As the Fifth Circuit noted, "[t]hese issues are fact-intensive and involve imprecise legal rules."[247] However, in deciding whether to sustain the jeopardy assessment against Brockman, the Court does not need to adjudicate whether Mrs.

---

[247] "While related, the concepts of nominee, transferee, and alter ego are independent bases for attaching the property of titled to a third party in satisfaction of a delinquent taxpayer's liability. A nominee theory involves the determination of the true beneficial ownership of property. An alter ego theory focuses more on those facts associated with a 'piercing the corporate veil' analysis. In contrast, a fraudulent transferee theory requires (1) an intent to defraud the Internal Revenue Service as a creditor or (2) a transfer without consideration which rendered the taxpayer insolvent. These issues are fact-intensive and involve imprecise legal rules." *Oxford Cap. Corp. v. United States*, 211 F.3d 280, 284 (5th Cir. 2000).

Brockman owned all the above properties separately or whether such properties were beyond the reach of the United States under any legal theory of recovery. Rather, the test is whether it is reasonable to believe that collection against the Brockman-related properties is in jeopardy due to Brockman's actions in selling or gifting them to third parties.[248]

Likewise, under Section 6851(a)(1) jeopardy can exist when a taxpayer's actions "prejudice or . . . render wholly or partially ineffectual proceedings to collect the income tax…." Thus, Brockman incorrectly asserts there is no jeopardy because (i) the property transfers/sales are public and were to third parties, and (ii) Mrs. Brockman purchased substitute properties and the IRS could therefore trace the sales proceeds. More importantly, Brockman, his wife, or his daughter-in-law could easily place any proceeds from these sales or the gifted properties into Brockman's offshore Trust making it more difficult for the IRS to reach them for collection purposes, but Brockman would still control and enjoy those assets in the same way he has controlled and enjoyed the Trust's assets for decades.

Brockman's actions are either making it harder to collect from these properties or are entirely removing the properties from the collection process. Thus, it reasonably appears that jeopardy exists, because Brockman's actions are taken to delay or frustrate, prejudice, or render IRS collection ineffective.

---

[248] *See, e.g., Amyx v. United States,* 529 F. Supp. 98, 99–100 (D. Ohio, 1981) (determination of who actually owned certain cash was not the issue).

**C.     Brockman's past and current use of foreign entities, domestic entities, and funds from foreign accounts to hide his assets during the years at issue warrants the jeopardy assessments**

The jeopardy assessment is reasonable and proper based on Brockman's past and current actions to hide his assets during the years at issue.  As part of the IRS's investigation, it learned of Brockman's extensive (and unprecedented) offshore scheme using multiple foreign entities, domestic entities, and foreign accounts to hide his assets. Jeopardy exists based on Brockman's past, and continuing, use of nominee or shell companies to hide Brockman's assets and conceal his true ownership.[249]  Based on its investigation, the IRS learned that Brockman has:

> (1)     extensive involvement with setting up his business activities and transactions in the names of other entities and in an obfuscating way;
>
> (2)     significant involvement in foreign trusts and foreign businesses;
>
> (3)     access to and use of multiple foreign bank accounts; and
>
> (4)     numerous connections to, as well as having assets located in, well-known tax haven jurisdictions.  These locations make the collection of assets by creditors difficult, if not impossible.

The IRS conducted a thorough investigation that exposed Brockman's complex offshore empire used to hide his assets from the IRS.   Brockman had entities located in at least five different known tax havens: Switzerland, Bermuda, British Virgin Islands, Nevis, and the Cayman Islands.  This offshore scheme consisted of at least eight different foreign trusts in Bermuda, fourteen foreign corporations in Nevis, and entities in the Cayman Islands, BVI, and Bermuda.  Additionally, Brockman used nine U.S.

---

[249] *Haskin v. United States*, 444 F. Supp. 299, 302 (C.D. Cal. 1977); *Central De Gas,* 790 F. Supp. at 1302; *Zion Coptic Church. Inc. v. United States*, 1979 WL 1333, *1 (S.D. Fla. Mar. 19, 1979); *Felkel*, 570 F. Supp. at 835, 838-39; *Harvey*, 730 F. Supp. at 1101, 1107 (S.D.Fla.,1990).

corporations and twelve different foreign bank accounts located in Bermuda and Switzerland.[250]  These facts are more than is needed to meet the non-rigorous, probable cause standard necessary to show that the jeopardy assessment is reasonable.

The jeopardy assessment against Brockman is also reasonable under the circumstances, because of his use of numerous foreign accounts, foreign trusts, and foreign and domestic corporations to acquire and hold personal assets (Colorado real estate, a luxury yacht, and an airplane).  Brockman seeks to ignore his history of hiding assets and refuses to address it by claiming it is irrelevant to the jeopardy assessment determination.  But consideration of Brockman's history of using and continuing use of nominee or shell corporations to hold his personal assets is reasonable and "warrants the making of jeopardy assessments against the plaintiff."[251]

 In *Harvey*, the IRS made jeopardy assessments in 1987 for the tax years 1978-1983.  The court considered Harvey's purchase of real estate in the name of a corporation in 1978, use of foreign accounts from 1979 to 1983 and holding other assets in the name of corporations during the years at issue as relevant facts to consider in determining whether the IRS jeopardy assessment was reasonable.[252]

In this case, the IRS, on September 7, 2021, made jeopardy assessments for the 2004-2018 years in an aggregate amount exceeding $1.4 billion against Brockman.  During these years, Brockman used ten entities, consisting of two foreign trusts, three

---

[250] *See* Gov. Ex. 3, diagram of offshore empire.
[251] *Harvey,* F. Supp. at 1107.
[252] *Id.* at 1106-1107.

foreign corporations and five U.S. corporations to hold tens of millions of dollars in assets: Brockman's Colorado real estate ($36 million), luxury yacht ($32.8 million) and airplane ($12.5 million).  To fund the acquisitions, maintenance, and operations of these assets, Brockman used offshore funds, running the funds through foreign corporations and different foreign bank accounts in Switzerland and Bermuda.

As another example, Brockman used an offshore foreign charitable trust in Bermuda (Heraclides Charitable Trust) to hold a Bermuda foreign corporation (Regency Management).  Regency Management owned three separate U.S. corporations (Henke Holdings LLC, Henke Property LLC, and Mountain Queen), which held his ownership of at least six Colorado properties worth about $36 million.  During the 2010 – 2016 years, Brockman funded the acquisition, maintenance, and repairs of his Colorado real estate through at least three offshore foreign bank accounts in Bermuda in the names of Regency Management, Cabot Investments, and Edge Investments.

Brockman's yacht ownership was also held in the name of a foreign company, Research Fisheries Foundation located in Bermuda.  In 2016-2018, Brockman funded the yacht's acquisition and operations in the amount of $43.8 million through an offshore Swiss bank account held in the name Cabot Investments and through another foreign entity domiciled in Nevis.  Brockman appears to assert that he was not trying to hide his interest in the yacht because he reported it on Forms 8938 filed with the IRS.  However, what Brockman fails to disclose is that he failed to file the Form 8938 for 2016 and the Forms 8938 he filed were inaccurate by under reporting the value of the assets by some

$29,345,705.[253]   Brockman failed to file the Form 8938 for 2016, the year the yacht was

purchased.[254]   Brockman's Forms 8938 for 2017 and 2018 states that the total asset value

of Fisheries Research Foundation was $3,500,000.[255]   Fisheries Research Foundation

held the luxury yacht Albula that was purchased in 2016, for $32,845,705.[256]

Furthermore, it was recently disclosed that sometime in 2020 Brockman sold his

interest in Fisheries Research Foundation and the yacht Albula.  On November 17, 2021,

Brockman's nominee Tamine testified that Brockman no longer had an interest in the

yacht.[257] The yacht Albula was held by the entity Fisheries Research

Foundation.  Brockman's Form 8938 filed with his 2020 return on October 15, 2021,

stated "yes" to whether a foreign asset was acquired or sold during the 2020 year.[258]

Brockman's Form 8938 for 2020 did not list his ownership in Fisheries Research

Foundation indicating that his interest in entity or asset held in this entity was sold in

2020.[259]   Again, when Brockman knew he faced criminal indictment by the U.S., he

transferred a known asset out of reach of the IRS.

Even assuming a justifiable explanation exists for hiding one's assets using a

complex ownership scheme involving several tax havens, purity of motive alone is not

dispositive, nor would it undermine the reasonableness of the jeopardy assessment.  The

key consideration must be whether Brockman appeared to be manipulating and moving

---

[253] Gov. Ex. 1 at ¶¶ 41, 42 and 43.
[254] *Id.*
[255] *Id.* and Gov. Ex. 6.
[256] See Gov. Ex 1 at ¶ 39 and Gov. C-7 and C-45.
[257] Gov. Ex. 34 Tamine Test. pg. pm 3-6 lns. 2- 8.
[258] Gov. Ex. 1 at ¶¶ 59, 60.
[259] *Id.*

his property to place it beyond the government's reach.[260]

## D.   Subsequent evidence further proves the IRS's concerns

### 1.   Brockman's post indictment sale of his interest in Hardwicke

When determining whether the jeopardy assessment is reasonable, the Court should review the information available to the IRS at the time of the jeopardy determination and assessment, as well as any other information that bears on this issue.[261] This can include information that the IRS learned after it made its determination and made the assessment.

Unbeknownst to the IRS at the time of the jeopardy assessment, after his indictment (but before the assessment), Brockman quickly sold his 1% interest in Hardwicke.  This is evidence as to why the jeopardy assessment should be affirmed.

Apart from his nominee ownership, Brockman owned 1% of Hardwicke which holds title to the jet that was purchased through funding from an offshore entity, Spanish Steps Holdings' Swiss bank account.  Brockman's 1% ownership of Hardwicke was known and disclosed to the IRS.  On March 24, 2021, within six months after his indictment, Brockman sold his 1% interest to R & R for $288,858 in cash.[262] Brockman's subsequent sale of his 1% in Hardwick was not disclosed to or known by IRS at the time of the jeopardy assessment.

On September 9, 2021, the IRS filed a Notice of Federal Tax Lien ("NFTL") for

---

[260] See *Revis*, 558 F. Supp. at 1077.  *See also*, Treas. Reg. § 301.6861-1; Treas. Reg. § 1.6851-1(a)(1).

[261] *Haskin*, 444 F. Supp. at 304 (citing S. Rep. No. 94-938 at 365); *see also Wellek*, 324 F Supp. 2d at 911; *Harvey*, 730 F. Supp. at 1104; *Loretto*, 440 F. Supp. at 1173.

[262] Gov. Ex. 7 at pgs. 16-20. Dorothy Brockman sold the interest on behalf of Brockman through her power of attorney.

the jeopardy assessments against Hardwicke as an alter-ego of Brockman.[263]  On October

12, 2021, Hardwicke filed a collection appeal, separate from the jeopardy appeal, with

the IRS.[264]  Hardwicke asserts that the NFTL filed against it was improper because

Hardwicke cannot be an alter ego of Brockman as he is no longer a shareholder in, or

owns 1% of, Hardwicke.[265]  Hardwicke's argument is that the IRS cannot collect

Brockman's tax liabilities from Hardwicke because Brockman sold his interest before the

IRS made a jeopardy assessment and filed a lien.  Hardwicke argues that, in essence, the

IRS collection efforts have been recently defeated or delayed by Brockman quickly

disposing of his interest in Hardwick after he was indicted.  It is for this very reason that

the jeopardy assessment and levy procedures exist.

Brockman's assertion that he is just disposing of property in the normal course of

business is not the issue.  The issue is whether it appears, and therefore is reasonable for

the Court to believe Brockman is quickly selling his assets to jeopardize collection.[266]

Brockman owned his 1% interest in Hardwicke since 2012.  Brockman was

indicted in October 2020.  Then, after holding his interest for eight years, in March 2021,

Brockman (during the pendency of his criminal case) sells his 1% in Hardwicke for

$288,588 cash.  It is unknown where Brockman has transferred this cash or if he

---

[263] Gov. Ex. 24 at ¶ 32.
[264] Gov. Ex. 7.
[265] Gov. Ex. 7 at pgs. 11-12 of 23.
[266] *Olbres v. I.R.S.*, 837 F. Supp. 20, 22 (D.N.H. 1993) (taxpayer's assertion that they were liquidating property to pay taxes not to place the property beyond government's reach not dispositive as it was reasonable for IRS to view the sales as jeopardy).

dissipated the funds.  It is reasonable to view Brockman's quick disposal of a known asset after his indictment which reduced this 1% ownership interest to cash as an action designed to place his property beyond the reach of the government.  Because of Brockman's actions on this sale, the belief that collection of the taxes appears to be in jeopardy is reasonable.

Likewise, Brockman purchased the yacht Albula in 2016.  Then sometime in 2020 after learning he was under criminal investigation Brockman transferred or sold his interest in the yacht Albula.  Brockman's disposal of his assets, namely the jet and yacht support a reasonable belief that that Brockman's actions are designed to place his property beyond the reach of the IRS which puts collection in jeopardy.

### 2. Brockman closing and draining financial accounts creates jeopardy

It is reasonable for the IRS and the Court to believe that it appears Brockman is planning to place his property beyond the government's reach since Brockman is closing bank accounts, draining funds out of his known financial accounts and either dissipating or transferring these funds to unknown accounts.  Brockman's withdrawing significant sums from accounts around the time of the assessment is a factor in favor for jeopardy.[267]

On September 9, 2021, the IRS levied on what it believed were all Brockman's and his wife's known U.S. financial accounts.[268]  From the financial institutions' responses to the IRS levies it was discovered that in May of 2021, Brockman closed his Amegy and Wells Fargo Bank accounts.[269]

---

[267] *Bean*, 618 F. Supp. at 658.
[268] Gov, Ex, 24 Sandles' declaration at ¶ ¶ 33, 34, 35 and 36.
[269] *Id.* at ¶ ¶ 35, 36, 57 and 58.

As of September 9, 2021, the IRS also discovered that Brockman's National Financial Services account had no balance.  Sometime in 2020, National Financial Services made a distribution of $1,301,319 to Brockman from his account.[270] In June of 2020, within a few months of Brockman's attorneys contacting the United States regarding Brockman's potential indictment in April of 2020, Brockman sold stock from his National Financial Services account of $663,655.[271]  Also, sometime in 2020 Great-West Trust Company made a net distribution of $1,217,056 to Brockman.[272]  On September 15, 2020, Brockman sold securities in his John Hancock and Morgan Stanley accounts totaling $452,287.[273]  However, as of September 9, 2021, the combined funds in the John Hancock and Morgan Stanley accounts totaled a mere $70,963.07.[274]  Where did the remaining $381,323.93 in funds go?  In 2020, from the U.S. financial accounts held in Brockman's name, Brockman received $3,634,317.[275]  However, the September 9, 2021, IRS levies only secured a total of $163,406.79 held in accounts in Brockman's name.[276]  Thus, Brockman has dissipated or transferred $3,470,910.21 in funds to unknown accounts or recipients.

Since his indictment Brockman and/or his wife have transferred and sold property of $5,763,858.[277]  Sometime in 2020 and before the IRS levies of September 9, 2021,

---

[270] *Id.* at ¶ 59.
[271] Gov. Ex. 24 Sandles' declaration at ¶ 59.
[272] *Id.* at ¶ 62.
[273] *Id.* at ¶¶ 60 and 61.
[274] Gov. Ex. 24 at ¶ 35.
[275] $1,301, 319 (National Finance) + $1,217,056 (Great -West) + $1,115,942 securities sales =$3,634,317.
[276] *Id.* at ¶ 35.
[277] Sunset Property of $1.375 million plus 335 West Friar Tuck property of $4,100,000 million plus Hardwicke at $288,858 = $5,763,858.

Brockman transferred or withdrew at least $3,634,317 from his financial accounts. Additionally, in 2020 after Brockman's indictment, Mrs. Brockman sold securities/stocks of $9,287,777.[278]  Since 2020, it appears that Brockman was taking steps to jeopardize collection of his tax liabilities by transferring, selling, and dissipating assets out of the reach of the IRS totaling $18,685,952 as follows.[279]

| Amount | Date | Description of Asset or property | Evidentiary Cite |
|---|---|---|---|
| $1,375,000 | May 2021 | 1731 Sunset Blvd, Houston TX 77005 | Gov. Exs. 17, 18 |
| $4,100,000 | December 2020 | 335 West Friar Tuck Lane, Houston TX 77024 | Gov. Ex. 32 |
| $   288,858 | March 2021 | 1% interest in Hardwicke  (Bombardier jet) | Gov. Ex. 7 |
| $1,301,319 | 2020 | distribution from National Financial Services LLC | Gov. Ex. 33 at pg. 30. |
| $1,217,056 | 2020 | distribution Great-West Trust Company | Gov. Ex. 33 at pg. 30. |
| $1,115,942 | 6/2020 through 9/2020 | Sales of securities from Morgan Stanley, National Financial Services and John Hancock accounts | Gov. Ex. 33 at pgs. 8-21. |
| $9,287,777 | 10/20/2020 through 12/31/2020 | Sales of securities by Dorothy Brockman | Gov. Ex. 32 |
| **$18,685,952** | *Total amount* | | |

Yet, all the IRS levies on Brockman and his wife's known financial accounts only secured $2,449,695.12.[280]  The Brockmans' actions beg the question where is this other $16,236,256.88?  The IRS does not know what happened to the proceeds from these property sales, securities sales, and distributions.  It appears funds are being dissipated or transferred to unknown accounts or recipients.  There is also a very valid concern that the recent sales proceeds would be placed offshore since Brockman currently has access to so

---

[278] Gov. Ex. 24 at ¶ 65.
[279] Gov. Ex. 24 at ¶ ¶ 64 and 65.
[280] Gov. Ex. 24 at ¶ ¶ 35 and 36.

many foreign bank accounts.   This concern is heightened by Brockman's 20-plus-year history of hiding his assets using foreign trusts, foreign corporations, and nominees to layer up ownership.

### 3. Brockman created two offshore trusts with two foreign accounts and funded the trusts from U.S. sources

In July of 2020 Brockman created two new offshore foreign trusts and opened two new foreign accounts located in the Cayman Islands.[281]  Brockman funded the offshore trusts and foreign accounts with $100,000 each from U.S. sources.[282]  Thus, Brockman moved $200,000 from U.S. sources to offshore trusts and foreign accounts in the Cayman Islands.  The IRS cannot issue an administrative levy to a foreign entity in the Cayman Islands to collect a taxpayer's tax liabilities.  This was after Brockmans attorneys contacted the Department of Justice in April of 2020 seeking to avoid his indictment.  Thus, it reasonably appears that jeopardy exists, because Brockman's actions placed a significant amount of his property or funds beyond the government's reach.

## IV. Brockman's arguments relating to R & R and the Bermuda litigation are incorrect

### A. Reynolds and Reynolds

Brockman's argument that no jeopardy exists because the U.S. theoretically can collect from R & R but has not made allegations against R & R ignores the legal standard for jeopardy assessments, the layered foreign ownership of R & R, and Brockman's current propensity to dispose of his assets.  The IRS does not have to prove that Brockman is trying to dissipate, remove, or conceal every asset he owns from IRS

---

[281] Gov. Ex. 1 Agent Paxton's declaration at ¶¶ 56-60.
[282] *Id.*

collection, because the statute contemplates a taxpayer partially removing assets.[283]  The fact that the IRS might be able to collect Brockman's taxes through R & R through the use of nominee liens, levies or possibly litigation, does not render the IRS's jeopardy determination and assessment invalid. Indeed, Brockman's argument improperly nullifies the entire jeopardy statute by suggesting that the government must first prove nominee ownership and defeat layers of foreign ownership on one asset before ever resorting to jeopardy procedures to collect other assets.

Brockman's assertion that his R & R stock could cover his tax liabilities rings hollow.  To date, Brockman has not (i) pledged his R & R stock to the IRS, (ii) made any voluntary payments toward his $1.4 billion jeopardy assessments, or (iii) posted a bond as allowed under Section 6863(a) to stay the collection of the jeopardy assessments.[284]

The ownership of R & R is layered up through an offshore trust and several offshore companies.  The AEBCT (Bermuda)[285] owns Spanish Steps Holdings LLC (Nevis).  Spanish Steps Holdings LLC owns Spanish Steps Holding Ltd. (BVI), which owns UCSH (Delaware Corp.).  UCSH owns 100% of Reynolds & Reynolds.[286]   The layered, complex ownership of R & R supports a finding of jeopardy.

These entities might sell or transfer all or part of the stock in R & R, just as Brockman sold his 1% interest in Hardwicke, without the IRS's knowledge.  The layered ownership of R & R and Brockman's demonstrated propensity to transfer assets during

---

[283] 26 U.S.C. § 6851(a)(l).
[284] Gov. Ex. 24. Revenue Officer Sandles' Declaration at ¶ ¶ 26, 27 and 28.
[285] The AEBCT now appears to be in control of a trust company in the tax haven, Cayman Islands.
[286] *See* Gov. Ex. 1 at ¶ 25, diagram.

his pending criminal case highlights the difficulty and delay the IRS may have to navigate in order to collect from R & R, further endangering collection.

## B. Bermuda litigation

Brockman also argues there is no jeopardy because the IRS is wrong about the facts underlying the Bermuda litigation and the AEBCT is controlled by a new, independent trustee subject to Bermuda law.  Brockman's argument misstates the standard, glosses over facts, and misses the IRS's reasonable belief concerning the Bermuda litigation.  The IRS's belief that the litigation in Bermuda was commenced to move control over Brockman's offshore operations to another tax haven (Cayman Islands) for the purpose of removing Brockman's offshore assets from IRS collection is reasonable.  The IRS's belief is not conjecture; rather, it is based on Brockman's past actions and suspect timing of the Bermuda litigation.

As explained, Brockman has a long history of operating and controlling foreign entities through nominees, despite his hollow assertions that the entities were correctly formed and the control of the AEBCT purports to be independent.  Previously, Brockman's offshore structure utilized six foreign trusts, including AEBCT, that were supposedly controlled by allegedly independent trust companies and trustees.  But, in reality Brockman controlled every foreign trust, every foreign company, and every foreign account through his nominees, particularly Tamine.  The AEBCT owns Spanish Steps Holdings LLC which owns Point Investments.  Point Investment holds (i) $1.3 billion in two Swiss accounts at Mirabaud et Cie, (ii) $110 million in a Swiss account at Banque SYZ, and (iii) $15 million at Bank of Singapore.  These liquid assets are in

foreign accounts in tax haven jurisdictions and can easily be moved to other foreign tax havens via different accounts under different names, as Brockman has done.

In January 2017, Brockman was informed that Bermuda Commercial Bank had frozen certain bank accounts of his offshore entities.  Brockman authorized moving banking relationships and forming "mirror companies" in multiple tax haven jurisdictions.[287]

In late September 2018, the Bermuda Police Service executed a search warrant on Tamine's records.  Tamine was the director of SJTC which controlled AEBCT. Brockman was aware of investigations into his foreign entities.  Soon after, the Bermuda litigation was initiated to change the trustee of AEBCT.  Brockman formed Medlands (PTC) Limited ("Medlands"), incorporating it on July 15, 2019, solely for the purpose of acting as trustee of the AEBCT.[288]

After Brockman's indictment, Mrs. Brockman in December 2020 petitioned the Bermuda courts to appoint Medlands to replace SJTC as the trustee of the AEBCT.[289] James Gilbert ("Gilbert") was Medlands' sole director and Medlands replaced SJTC as trustee of the Trust.  Gilbert was Brockman's long-time associate and nominee, working for Brockman as early as 2004.  When performing tasks for Brockman, Gilbert had the alias of "Tina Nash" and email code name of "chum."  In 2008, when Gilbert was working on Brockman's offshore structure, Brockman assigned him the code name of

---

[287] Gov Exs. A-63, A-64.
[288] *Id.* at ¶ 82.
[289] Gov. Ex. 26, Final Judgment, 2020 No. 37, ¶ 9 and ¶ 13.

"Snapper". In 2012, Brockman named Gilbert as a backup nominee for Tamine in case of emergency as Gilbert knew of Brockman's offshore structures. Mrs. Brockman later petitioned the Bermuda court to change the trustee from Medlands to BCT Limited in yet another tax haven, the Cayman Islands.[290] Brockman's assertion of independent trustee of a reputable company is suspect and further leads to IRS belief was reasonable. Peter Goddard appears to be the sole director of BCT which is now the Trustee of AEBCT. Gov. Ex. 27 at p. Goddard is a past business associate of Brockman through Brockman's old nominee Don Jones.[291]

In April 2020, Brockman was aware of the United States' investigation of his tax crimes. Thus, in addition to changing the location of the AEBCT trustee to the Cayman Islands, Brockman initiated litigation in Bermuda to wind up Point Investments and move its assets to entities in other tax havens.[292] The recent judgment in the petition to wind up Point Investments appears to chastise the former directors of Point Investments, who opposed the liquidation of Point Investments at the request United States Department of Justice, for cooperating and discussing the petition with the United States taxing authorities.[293] The Bermuda court provides the reason why Point Investments wanted to liquidate and remain offshore in that taxes due under the laws of a foreign country are unenforceable in English Courts (Bermuda) and a foreign judgment seeking to recover taxes under foreign law is likewise unenforceable.[294]

---

[290] *Id.* at ¶ 5 and ¶ 9.
[291] Gov. Ex. 38 and brief supra at pgs. 9-11. See also Gov. Ex. B-43.
[292] Gov. Ex. 5. 2020 090 29 Petition ¶ J.54.2.
[293] Gov. Ex. 27 at ¶¶ 42, 45-47, 49-53.
[294] Gov. Ex. 27 at ¶ 53.

Thus, when Brockman is confronted with government action against him, his assets, his entities, or his foreign bank accounts, he responds by opening new foreign accounts, creating new mirror companies to hide his assets, and moving control to other foreign entities in well-known tax havens.  Brockman asserts the IRS is completely wrong about the Bermuda litigation and no jeopardy exists because the AEBCT is now controlled by Trustees in the Cayman Islands who are subject to Bermuda law.  While Brockman argues these actions do not rise to jeopardy, the United States observes that Brockman did not domesticate the AEBCT or its control to the United States.  Instead, through Mrs. Brockman, he moved the AEBCT and its control to another tax haven, (Cayman Islands), subject to a separate tax haven's laws (Bermuda) where, as shown above, a U.S. judgment for taxes may be unenforceable.  Based on the above the IRS reasonably believed it appeared the collection of taxes was in jeopardy, as the Bermuda litigation was commenced to place control of Brockman's offshore structure out of the reach of the United States for taxes by moving it to the Cayman Islands. The test is not whether the IRS was completely right about, or listed, all the Bermuda litigation, but whether it is reasonable for the IRS and the Court to believe that it appears Brockman is making collection of taxes from his assets more difficult.

### C.    Brockman's thirty-nine count indictment is a factor in determining jeopardy

Brockman dismisses his past acts and the criminal allegations in his indictment as irrelevant and "unproven".  Yet, involvement in illegal activities, even being under indictment for criminal tax violations, is a factor the courts consider when determining

whether a taxpayer's circumstances appear to be jeopardizing collection of a tax.[295]

Brockman was indicted on seven counts of tax evasion under 26 U.S.C. § 7201 for the 2012-2018 years, six counts for failing to file an FBAR under 31 U.S.C. §§ 5314 & 5322(b), reporting his foreign accounts, plus additional counts for wire fraud, money laundering, evidence tampering, and destruction of evidence.  The IRS revenue agents, when determining collection appeared to be in jeopardy, properly reviewed, considered, and relied in part upon on the allegations raised in Brockman's indictment.[296]   The United States' comprehensive indictment against Brockman and his transfers of property right after his indictment establish the IRS had a reasonable belief, and it is reasonable for the Court to believe, that it appears collection of taxes is in jeopardy.

## CONCLUSION

Based on the above, the Court should find that the jeopardy assessments and levies are reasonable, and the tax assessments are appropriate.

---

[295] *Harvey*, 730 F. Supp. at 1107; *Young*, 671 F. Supp. at 1343.  *See also Camp*, 635 F. Supp. at 587.
[296] See *Bean*, 618 F. Supp. at 656–657 (revenue agent can rely on information learned from individuals or IRS personnel or confidential sources).

Dated: January 31, 2022

DAVID A. HUBBERT
Deputy Assistant Attorney General

By:

/s/ Herbert W. Linder
HERBERT W. LINDER
Ohio Bar No. 0065446
Jonathan L. Blacker
State Bar No. 00796215
John P. Nasta, Jr.
Florida Bar No. 1004432
Attorneys, Tax Division
Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas  75201
(214) 880-9754
(214) 880-9774 (facsimile)
Herbert.W.Linder@usdoj.gov
Jonathan.blacker2@usdoj.gov
John.nasta@usdoj.gov

ATTORNEYS FOR UNITED STATES

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 31, 2022, I filed the foregoing document by electronic means on all parties who have entered an appearance through the Court's ECF system, including the following:

Jason S. Varnado
Julia N. Camp
Kathryn Keneally
Frank J. Jackson
Michael J. Scarduzio
Anthony J. DeRiso
Irina K. Bleustein
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
Attorneys for Plaintiff

/s/ Herbert W. Linder
HERBERT W. LINDER

76