# GOV

# EXHIBIT

# 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ROBERT T. BROCKMAN,　　　　　)
　　　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　　)　　　Case No. 22-cv-00202
v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
UNITED STATES OF AMERICA　　　)
　　　　　　Defendant.　　　　　　)

**DECLARATION OF REVENUE AGENT**
**DAMON PAXTON UNDER 28 U.S.C. §1746**

I, Damon Paxton declare:

1.　　　My name is Damon Paxton.  I am over 21 years of age, of sound mind, capable and

competent of making this declaration, and have personal knowledge of the facts herein stated,

based upon my review of the official records of the Internal Revenue Service.

2.　　　I am currently employed as a duly commissioned Revenue Agent in the Large Business

& International ("LB&I") operating division of the IRS and assigned to an International

Individual Compliance ("IIC") field examination team with a post of duty in San Francisco,

California.  I previously worked as a Revenue Agent in the Small Business/Self-Employed

("SBSE") operating division of the IRS from September 2010 before transferring to the LB&I

division in July 2019, where I have remained since.

3.　　　 I was the Revenue Agent assigned to the examination of Robert T. Brockman's

("Brockman") 2004 through 2018 tax years regarding his income tax liabilities and the IRS's

jeopardy assessment against him for the 2004-2018 years.

4.　　　This affidavit is submitted in support in the case of *Robert T. Brockman v. United States*,

Case No. 22-cv-0202   This affidavit/declaration does not include every fact or matter observed

by me, the IRS, or known by the IRS and the United States that support a jeopardy



Government
Exhibit

1

determination.  The information contained herein is based upon my review of the documents contained in the IRS administrative files and information obtained during the examination process.

5.     Although Internal Revenue Manual 4.15.1.9.2 provides that the IRS examiner interview the taxpayer, that provision also instructs examiners to exercise caution before interviewing the taxpayer because the government's case may be impeded if the taxpayer has knowledge of a potential jeopardy assessment. Based on information I had reviewed, I believed that if I interviewed Brockman before the IRS issued the jeopardy assessment, he would become aware of the potential of the jeopardy assessment and take further actions to place assets beyond the reach of the IRS.

6.     On October 1, 2020, Brockman was indicted for 7 counts of tax evasion under 26 U.S.C. § 7201 for the 2012-2018 years for willfully evading income tax.  *See* Exhibit A-90.  Based upon the information in the indictment, it appeared that Brockman from at least 1999-2018 significantly under reported his income due to the use of offshore foreign entities to hide capital gains, interest, and dividend income possibly in excess of $2 billion.  Thus, it appeared that Brockman would have significant tax liabilities for the 2004-2018 years that could exceed hundreds of millions of dollars.

7.     The IRS could not, however, attempt to collect this expected large tax liability because the IRS had not assessed an actual tax liability against Brockman. The IRS anticipated that it would not be able to do so using ordinary assessment procedures for many years due to the process of assessing underpayments of tax.  The IRS would have to issue a statutory notice of deficiency, the taxpayer could then petition the United States Tax Court to determine his tax

liabilities, and it could take years before a final decision would be entered by the Tax Court and collection could begin under those procedures.

**Summary of Facts**

8.      Attached as Government Exhibit 2 is the Robert T. Brockman Jeopardy Report ("Jeopardy Report").  I helped create the Jeopardy Report and have knowledge of it.

9.      Brockman has a history of using offshore foreign trusts, foreign corporations, foreign financial accounts in other entities' names, and multi layered structures to hide his assets and avoid federal income taxes.  During 2004 through 2018, Brockman used a complex scheme of offshore foreign trusts, foreign and domestic companies, nominee ownership, nominees, and numerous foreign financial accounts to conceal his assets from the United States and avoid reporting $2.7 billion in income.  Brockman's offshore tax avoidance empire was established in several well-known tax-haven jurisdictions.

10.     Brockman used the tax haven jurisdictions of Belize, Bermuda, Cayman Islands, Malta, Nevis, Switzerland, Singapore, Guernsey, and British Virgin Islands ("BVI").

11.     A tax haven jurisdiction generally refers to a country or jurisdiction that enables multinational corporations and individuals to escape the rule of law in the countries where they operate and live, and to pay less tax than they should in those countries.

12.     Attached as Government Exhibit 3 is a diagram of Brockman's offshore tax avoidance empire maintained during the 2004-2018 tax years at issue.  I created this diagram based upon numerous exhibits, knowledge gained during the jeopardy investigation, and IRS administrative files.

13.     Brockman's offshore structure used numerous foreign bank accounts to hide the funding of investments and purchases, some of which are as follows:

| Brockman foreign entity | Foreign Bank Name | Foreign Bank Location | Domicile of Foreign Entity |
|---|---|---|---|
| AEBCT | Bank of N.T. Butterfield | Bermuda | Bermuda |
| Spanish Steps Holdings Ltd. | Bank of N.T. Butterfield<br>BCB<br>Mirabaud & Cie<br>Bank of Singapore | Bermuda<br>Bermuda<br>Switzerland<br>Singapore | BVI |
| Point Investments Ltd. | BCB<br>Mirabaud & Cie<br>Banque SYZ<br>Bank of Bermuda | Bermuda<br>Switzerland<br>Switzerland<br>Bermuda | Bermuda |
| Framfield Assets Ltd | Mirabaud & Cie | Switzerland | Bermuda |
| Legend Investments LLC | BCB | Bermuda | Nevis |
| Regency Management Ltd. | BCB | Bermuda | Bermuda |
| Edge Capital Investments | BCB Bank<br>Mirabaud & Cie | Bermuda<br>Switzerland | Nevis |
| Cabot Global Investments | BCB Bank<br>Mirabaud & Cie | Bermuda<br>Switzerland | Nevis |
| Addington Trading LLC | BCB | Bermuda | Nevis |
| Cascade Holdings LLC | BCB | Bermuda | Nevis |
| Spanish Steps Holding LLC | Barclays Bank<br>HSBC | Guernsey<br>Malta | Nevis |
| St. John's Trust Co. | Bank of N.T. Butterfield<br>BCB | Bermuda<br>Bermuda | Bermuda |

"BCB" is Bermuda Commercial Bank Limited.

14.     Point Investments Ltd. ("Point Investments"), Edge Capital Investments Ltd. ("Edge Investments"), and Cabot Global Investments Ltd. ("Cabot Investments") were the focal points of Brockman's offshore structure.  Brockman failed to report his ownership of, or contributions to or distributions from, the foreign entities or their foreign bank accounts on his individual tax returns or on foreign information return forms (e.g., IRS Forms 5471, 8938, 3520 or 3520-A).

15.     Point Investments, Edge Investments and Cabot Investments earned significant capital gains, interest, and dividends during the years at issue.  Brockman failed to report the income earned from these entities on his federal income tax returns for 2004-2018.  *See* Gov. Ex. 2, Jeopardy Report at pgs. 59-63.

4

16. During the years 2004 through 2018, Brockman used Point Investments to avoid U.S. income tax on $2,329,895,223 of net capital gains, $29,108,401 in interest income, and $5,924,339 in dividends. *See* Gov. Ex. 2, Jeopardy Report at pgs. 10-13.

17. I created the diagram below to detail the ownership of Point Investments through a complex web of offshore entities. This Point Investments diagram is based upon numerous exhibits, documents and knowledge gained during the jeopardy investigation.



*Corporate trustee: Providence Trust Company (PVT) Ltd (Nevis), Evatt Tamine, Director

**Corporate trustee: St John's Trust Company (PVT) Ltd (Bermuda), Evatt Tamine, Director

***Vista Equity Fund II, L.P., Vista Equity Partners Fund III (Parallel), L.P., et al.

18.     Point Investments invested in private equity funds managed by Vista Equity Partners ("Vista Equity").  Vista Equity organized funds as limited partnerships to mainly invest in U.S.-based software companies and technology-related businesses.

19.     Brockman, through Point Investments, made a commitment to invest $300 million in Vista Equity Fund II, LP, a Cayman Islands limited partnership, managed by Robert Smith of Vista Equity.

20.     Brockman, through Point Investments, made very large capital commitments to fund the various Vista Equity Funds partnerships, as follows:

- $1 billion to Vista Equity Funds II, LP (between 2000 and 2004)
- $ 100 million to Vista Equity Partners Fund III (Parallel), LP
- $ 90 million to Vista Foundation Fund I (Parallel), LP
- $612 million to Vista Equity Partners Fund IV (Parallel), LP
- $150 million to Vista Equity Partners Fund IV Co-Invest 2-A, LP

21.     The capital contributed to the Vista Equity funds were made through Point Investments' foreign bank accounts at BCB and Mirabaud & Cie bank account in Switzerland.

22.     During the years 2004 through 2018, Brockman used Edge Investments to avoid U.S. income tax on $49,295,088 of net capital gains and $18,578,558 in interest income.  *See* Gov. Ex. 2, Jeopardy Report at pgs. 14-16.

23.     Edge Investments was originally formed in the BVI but was later redomiciled in Nevis.  I created the diagram below to detail the ownership of Edge Investments through a complex web of offshore entities.   This Edge Investments diagram is based upon numerous exhibits, documents and knowledge gained during the jeopardy investigation.



*Corporate trustee via Providence Trust Company Ltd (Nevis), Evatt Tamine, director

24.     Brockman used Edge Investments to invest in distressed debt, purchasing the distressed

debt of a company on the secondary market at a typically discounted value.  Brockman used

Edge Investments to secretly purchase the debt of Reynolds and Reynolds Company ("Reynolds

and Reynolds") while he was CEO of Reynolds and Reynolds.

25.     Reynolds & Reynolds is an Ohio corporation headquartered in Dayton, Ohio with

operations in the U.S., Canada, United Kingdom, and Europe.  Reynolds & Reynolds develops

software used by automotive dealers and manufacturers and distributes industry business forms

and promotional items.  In 2006, Brockman's company UCS Holding Inc., acquired Reynolds &

Reynolds and merged the operations of the two companies under the Reynolds & Reynolds

brand.  Brockman served as chairman and CEO of the combined companies until he resigned in November of 2020 following his indictment. Brockman's layered ownership of Reynolds & Reynolds is as follows:



26.     Brockman's purchase of the Reynolds and Reynolds debt was a violation of the terms of the credit agreements signed by Brockman.  Brockman, as CEO of UCS Holding Inc. and Reynolds & Reynolds, had access to insider, non-publicly available information about the

financial condition of Reynolds & Reynolds that would impact the price of the debt trading on the secondary market. Brockman used this insider information for personal benefit by disclosing this information to Evatt Tamine ("Tamine") and giving direction to Tamine regarding placing orders to purchase the debt. *See* Gov. Ex. 2, Jeopardy Report at pgs. 14-16, and Gov. Ex. A-90.

27.     In 2003, Brockman hired Tamine, an Australian national and barrister. From 2004 through 2018, Tamine primarily resided in Bermuda and served as nominee trustee and/or corporate director of Brockman's various offshore trusts and companies. Tamine managed Brockman's various entities contained in his offshore structure as Brockman's nominee. However, Brockman was in control of the entities in the offshore structure including the funds held in the foreign accounts. Brockman made all significant decisions regarding the operations of the foreign trusts and companies. Nothing material happened with respect to the offshore structure, including funds held in foreign bank accounts that was not ordered or approved by Brockman. Tamine formed the Bermuda-based company, Tangarra Consultants Ltd. Tamine was paid, through Tangarra, by entities controlled by Brockman for the services provided to Brockman. *See* Gov. Ex. A-48.

28.     During the years 2011 through 2018, Brockman used Cabot Global Investments ("Cabot Investments") to avoid U.S. income tax on $3,995,957 of net capital gains and $49,653,000 in interest income. *See* Gov. Ex. 2, Jeopardy report at pgs. 17-19.

29.     Cabot Investments was originally formed in the BVI but was later renamed and re-incorporated in Nevis. I created the diagram below to detail the ownership of Cabot Investments through a complex web of offshore entities. This Cabot Investments diagram is based upon numerous exhibits, documents and knowledge gained during the jeopardy investigation.



*Trustee via Messery Purpose Trust and Messery (PTC) Limited

30.     During the 2010 to 2017 years at issue, Brockman used Cabot Investments to invest in "distressed debt" issued by companies on the secondary debt market, similar to the debt investing conducted by Brockman using Edge Investments.

31.     Brockman used funds from Edge Investments' and Cabot Investments' foreign bank accounts for his Colorado real estate holdings contained in the "Regency Management" offshore structure.

32.     Brockman caused the formation of the offshore foreign charitable trust, Heraclides Charitable Trust, in Bermuda, to hold Regency Management, a Bermuda foreign corporation ("Regency").  Regency owned three separate U.S. corporations (Henke Holdings LLC, Henke

Property LLC, and Mountain Queen), all which held Brockman's Colorado properties worth about $36 million.

33.     I created the diagram below to detail the ownership of Brockman's Colorado real estate held in the Regency Management offshore structure through a complex web of offshore and domestic entities.   This Regency Management offshore structure diagram is based upon numerous exhibits, documents and knowledge gained during the jeopardy investigation.



34.     During the 2010 to 2016 years, Brockman funded the acquisition, maintenance, and repairs of his Colorado real estate through at least three offshore foreign bank accounts in Bermuda in the names of Regency Management, Cabot Investments, and Edge Investments. Brockman used funds from Edge Investments' and Cabot Investments' foreign bank accounts held at BCB to transfer to Regency Management's foreign account at BCB for the Colorado real estate holdings contained in the Regency Management offshore structure.  The transfers are detailed as follows:

| B. Transfers from Edge Capital Investments to Regency Management | | | | |
|---|---|---|---|---|
| | | | | |
| Edge Capital Investments Ltd (Bermuda Commercial Bank Acct# 200703-01) | | | | |
| Transaction | Date | Amount | Description | Comment* |
| 1 | 12/16/2010 | 15,000,000.00 | Internal Transfer Capital Contribution | Transfer of funds to meet future property acquisitions- funds redeemed out of Edge. |
| | TOTAL | 15,000,000.00 | | |
| | | | | |
| *Description from Brockman's "Significant Transaction Report": | | | | |

| A. Transfers from Cabot Global Investments to Regency Management | | | | |
|---|---|---|---|---|
| | | | | |
| Cabot Global Investments Ltd (Bermuda Commercial Bank Acct# 1000078828) | | | | |
| Transaction | Date | Amount | Description | Comment* |
| 1 | 12/1/2014 | 5,000,000.00 | Internal Transfer Transfer | Transfer between Cabot and Regency re Funding |
| 2 | 9/26/2015 | 1,000,000.00 | Internal Transfer  Contribution | Transfer between Cabot and Regency re Funding |
| 3 | 4/21/2016 | 500,000.00 | Internal Debit Contribution | Transfer between Cabot and Regency re Funding |
| 4 | 10/24/2016 | 500,000.00 | Internal Debit Contribution | Transfer between Cabot and Regency re Funding |
| | TOTAL | 7,000,000.00 | | |
| | | | | |
| *Description from Brockman's "Significant Transaction Report" | | | | |

See Gov *See* Gov. Ex. 2, Jeopardy Report at pgs. 20-26, and Gov. Exs. B-35 and C-7.

35.     Brockman transferred over $24 million from the Regency Management BCB account to Henke Property LLC to purchase and maintain his Colorado real estate holdings.

36.     The Colorado real estate held in the Regency Management offshore structure is detailed as follows:

a.  Henke Property LLC (4 properties)

1.  "Frying Pan Canyon Ranch" AKA "Tie Camp Ranch", Eagle County CO
    Sales price $5,000,000, Acquired 12/23/2010
    - 120 Ash Rd, Basalt CO (Parcel # 2469-102-00-004)
    - 9081 Frying Pan Rd, Basalt CO (Parcel # 2469-102-00-014)
    - Frying Pan Road (Parcel # 2469-102-00-015)

2.  300 McFarlane Gulch Rd, Aspen CO 81611, Pitkin County (Parcel # 273729100006)
    Sales price $4,600,000, Acquired 9/22/2005
    11.97 acres
    Building # 1 (2 bd, 2 bath)
    Building # 2 (2 bd, 2 bath)

3.  Lot 8, Prehm Ranch, Glenwood Springs CO 81601, Garfield County (Parcel # 218534402008)
    (Vacant land, 35 acres)
    Sales price $539,000, Acquired 5/3/2010

4.  Lot 22, Carbondale CO 81623, Garfield County (Parcel # 239319208022)
    (Vacant residential land, .0268 acres)
    Sales price $97,500, Acquired 10/3/2005

b.  Mountain Queen Inc. (2 properties)

1.  230 McFarlane Gulch Rd, Aspen CO 81611, Pitkin County (Parcel #273729100004)
    ("Aspen Vacation Home")
    Sales price $9,150,000, Acquired 3/6/2003
    Sales price $1,000,000 Acquired 9/20/2004
    Actual Value $15,933,400 (Assessed Year 2021)
    37.97 acres
    Building # 1 (2 stories, 4 bd, 6.5 bath)
    Building # 2 (2 stories, 2 bd, 2.5 bath)

2.  Lot 6, Peachblow PUD, Basalt CO 81621, Eagle County (Parcel # 2469-091-02-004)
    (Vacant residential land, 0.35 acres)
    Sales price $640,000, Acquired 11/23/2004

The above Colorado property information was obtained from deeds, county tax information,

forfeiture complaint and other transfer documents.

37.   Significant transaction reports were created by Tamine at Brockman's direction for

transactions of $100,000 for each of Brockman's entity. Gov. Ex. A- 49.

13

38.     Brockman used funds from Cabot Investment's Swiss bank account at Mirabaud to purchase a luxury yacht, "Turmoil," for his personal benefit.  The Turmoil is a 63.7 meter/209-foot motor yacht that can accommodate up to 16 guests and 14 crew.  The Turmoil was renamed the "Albula".  Gov. Ex. 2 at pg. 27.

39.     In 2016-2018, Brockman funded the yacht's acquisition and operating costs with funds from Cabot Investment's Swiss Mirabaud bank account as follows:

| Transfers from Cabot Global Investments Swiss Mirabuad Account | | | | | |
|---|---|---|---|---|---|
| Date | Amount | to whom | Comment | Evidentiary Cite | |
| 11/7/2016 | $3,500,000.00 | Alle Maass Rogers and Linsay Escrow | Transfer from Cabot for Deposit on Turmoil | C-7, C-45 | |
| 12/22/2016 | $29,345,705.00 | Alle Maass Rogers and Linsay Escrow | transfer from Cabot for closing on Turmoil | C-7, C-45 | |
| 12/29/2016 | $1,000,000.00 | MTS Yachts Fisheries Research Acct. | Operating Costs for Fisheries Research | C-7, C-45 | |
| 2/20/2017 | $1,000,000.00 | MTS Yachts Fisheries Research Acct. | Operating Costs for Fisheries Research | C-7 | |
| 3/22/2017 | $2,242,308.11 | MTS Yachts Fisheries Research Acct. | | C1-1.2, at MLATSW_021800 | |
| 7/4/2017 | $1,641,600.92 | MTS Yachts Fisheries Research Acct. | | C1-1.2, at MLATSW_021803 | |
| 2/28/2018 | $1,801,860.00 | MTS Yachts Fisheries Research Acct. | | | |
| 6/22/2018 | $3,335,900.85 | MTS Yachts Fisheries Research Acct. | | | |
| | | | | | |
| Total | $43,867,374.88 | | | | |

40.     I created the diagram of Brockman's layered ownership of the Albula based upon numerous exhibits and knowledge gained during the jeopardy investigation as follows:



41.     IRS Form 8938 is titled "Statement of Specified Foreign Financial Assets."  It is required to be filed by taxpayers who have ownership of foreign assets.

14

42.     Brockman failed to file the Form 8938 for 2016 for the foreign entity Fisheries Research Foundation, Ltd., the year in which the yacht was purchased.

43.      Brockman filed inaccurate Forms 8938 for Fisheries Research Foundation for 2017 and 2018 by misrepresenting his total percentage ownership interest and thereby under reporting the value of the Fisheries Research Foundation's foreign assets by $29,345,705.   Brockman's 2017 and 2018 Forms 8938 stated that the total asset value of Fisheries Research Foundation was $3,500,000. Gov. Ex. 27.   However, Fisheries Research Foundation held the luxury yacht Albula that was purchased in 2016, for $32,845,705.  *See* Gov. Exs. C-7 and C-45.

44.     In late 2012, Brockman became interested in purchasing a jet.  In December 2012, Brockman created an offshore structure with multiple foreign and U.S. entities to purchase and hold title to the aircraft.  Brockman caused the formation of a foreign trust, Framfield Charitable Trust, which held a foreign corporation, Framfield Assets Ltd. ("Framfield Assets").  Framfield Assets opened a bank account at Mirabaud in Switzerland.  Tamine served as a nominee trustee and corporate director of these Framfield entities.  As part of the scheme, Brockman also formed the Delaware corporations of Red Plains Air Charter Inc. ("Red Plains") to hold ownership of Hardwicke Properties LLC, that ultimately held title to the jet.   *See* Gov. Ex. A-11 and A-62.

45.     I created the diagram of Brockman's layered ownership of the jet based upon numerous exhibits and knowledge gained during the jeopardy investigation as follows:



46.     The funds for the jet purchase came from same day transfers from Spanish Step Holdings

Ltd.'s Mirabaud Swiss bank account to Framfield Assets' Swiss account to Red Plains' Amegy

account as follows:

| DATE | FROM | TO | PAYMENT OUT | PAYMENT IN | INTERNAL | BANK | REASON |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| 12/27/2012 | Framfield Assets Ltd | Red Plains Air Charter Inc | $12,500,000.00 | | | | Transfer of funds to Red Plains Air Charter Inc |
| 12/27/2012 | Spanish Steps Holdings Ltd | Framfield Assets Ltd | | | $15,000,000.00 | Mirabaud | Transfer of funds to purchase aircraft through Red Plains Air Charter |

*See* Gov. A-9.

47.     At the time of the jeopardy assessment against Brockman, the IRS personnel involved in

the jeopardy investigation were not aware of Brockman's sale of his 1% in Hardwick Properties

LLC.

16

*Actions giving rise to jeopardy*

48.     The above paragraphs and the Jeopardy Report clearly show that it reasonably appeared to the IRS that Brockman was taking steps to jeopardize collection of those large tax liabilities by placing assets out of the reach of the IRS.

49.     Actions supporting or giving rise to jeopardy are Brockman's illegal activities, unreported income of $2.7 billion, concealment of assets using a complex offshore scheme with foreign entities and foreign accounts, Brockman's complete control of his offshore empire, transfers of real property shortly after his indictment, his Bermuda litigation, and several actions to avoid IRS detection including destroying records.  *See* Gov. Ex. 2 Jeopardy Report.

50.     Brockman was engaged in illegal activities as he was indicted on multiple counts including tax evasion charges for the 2012-2018 years relating to Brockman's use of the Brockman Charitable Trust, Point Investments', Edge Investments', and Cabot Investments' offshore entities. Gov. Ex. A-90.  Brockman's business partner Robert Smith entered into a Non-Prosecution Agreement with the United States Department of Justice admitting to willfully evading U.S. tax and filing false returns for 2000 through 2015.  Gov. Ex. A-93.  Smith admitted to engaging in an illegal scheme to conceal income and evade taxes by using an offshore trust structure with related foreign corporations and offshore bank accounts.  *Id.*  Smith's offshore structure was similar to the Brockman's because Brockman recommended the arrangement to Smith.  *Id.*  Brockman referred Smith to Houston-based attorney, Carlos Kepke ("Kepke"), who advised Brockman regarding the use of offshore entities, to set up Smith's offshore structure. Kepke was indicted for conspiracy and assisting in the filing of a materially false income tax return related to Smith.  Gov. Ex. A-94.

17

51.     As described in detail previously and in the Jeopardy Report, Brockman used a complex

offshore structure of dozens of alter egos, foreign trusts, foreign corporation, multiple foreign

accounts, nominees, and other tax avoidance vehicles established in several known tax-haven

jurisdictions to avoid reporting over $2.7 billion in income from the 2004-2018 years.

52.     For over 20 years, Brockman engaged (and is currently engaged) in a complex strategy of

concealing the ownership of his assets. By use of the word "concealment," the IRS was noting

Brockman's pattern uses of multiple foreign corporations, foreign trusts, foreign accounts,

nominees, and other business entities to hide his true/beneficial ownership of assets.  In fact,

Brockman's hidden ownership of assets would be disguised merely by using only one simple

nominee owning record title to the asset, but instead Brockman used layers of ownership

involving foreign trusts, foreign corporations, and even domestic entities.  Brockman also used

numerous foreign bank accounts and convoluted movements of funds from foreign accounts to

purchase and maintain assets in further guise to conceal the true ownership of the assets.  Some

examples that demonstrate the lengths Brockman would go to in order to disguise his true

ownership was his purchase of Colorado real estate, his luxury yacht, and his jet.

53.     Brockman used an encrypted email system, aliases, and code names to disguise

communications regarding his assets, investments, control of his offshore empire, and ultimately

his unreported income to the IRS.  Brockman used the code name "Permit". Tamine used the

code name "Redfish".  And Robert Smith was known as "Steelhead". Gov. Ex. A-85.  Brockman

also caused the physical destruction of records related to his offshore activity.  For example,

Brockman instructed Tamine to test other software packages as a potential replacement for

Evidence Eliminator, such as "Cyberscrub".  Gov. Ex. A-51, page 2 (# 17).  Brockman further

instructed Tamine to purge all computer files that are held by Don Jones that involve offshore entities including hammering disks and shredding CDs. Gov. Ex. A-88.

54.     Other "appearances" in this action establishing that the jeopardy assessments were reasonable are that within six months of his October 1, 2020, indictment, Brockman, and his wife sold two Houston properties, gifted another Houston property to their daughter in law, listed his Houston residence for sale, sold his interest in the jet, and in the Bermuda litigation transferred control of his offshore empire to the Cayman Islands, another tax haven locale.

55.     The culmination of these events reasonably gave the IRS the impression that Brockman had set up a system to conceal his assets from collection by the IRS, and was taking steps to liquidate and/or put additional assets beyond the IRS's reach.

***Subsequent Actions giving rise to and support jeopardy***

56.     After the jeopardy assessments, on October 15, 2021, Robert Brockman filed his 2020 federal income tax return.

57.     On Schedule B of the prior year 2019 federal income tax return, Brockman checked "no" declaring that he did not have any interest in or signature authority over any foreign financial account and not made transfers to or received distributions from a foreign trust. Brockman also checked "no" to these questions on his prior year returns from 2004 through 2018.

58.     Brockman checked "yes" on Schedule B of the 2020 federal income tax return, made available to examiners in late November 2021, to disclose his ownership of foreign accounts and foreign trusts. Brockman's Form 8938, "Statement of Specified Foreign Financial Assets", filed with his 2020 federal income tax return lists two foreign accounts opened at Bessemer Trust, Georgetown Grand Cayman, in 2020 and funded with $100,000 each. Gov. Ex. 28. Brockman's Form 8938 also states that two Form 3520 ("Annual Return To Report Transactions With

Foreign Trusts and Receipt of Certain Foreign Gifts") returns were filed for foreign trusts. Thus, in July of 2020 Robert Brockman created two offshore foreign trusts located in the Cayman Islands and funded the trusts with $100,000 each from U.S. sources.

59.     Brockman previously filed a Form 8938 indicating his ownership Fisheries Research Foundation, Ltd., which is the entity that held the luxury yacht "Albula." Brockman's Form 8938 filed with his 2020 return no longer lists Brockman's ownership interest in Fisheries Research Foundation indicating that this entity or asset held in this entity may have been sold or otherwise disposed of during 2020. Gov. Ex. 28. Yet, no sale of this interest in the entity or underlying asset is reported on Brockman's individual tax return in 2020.

60.     In 2020, Brockman appears to have created two new foreign trusts with two foreign accounts in the Cayman Islands funded with $200,000 from U.S. sources and may have sold or transferred his interest in Fisheries Research Foundation. These Brockman actions support the IRS's belief that Brockman continues set up a system to conceal his assets from collection by the IRS and taking steps to liquidate and/or put additional assets beyond the IRS's reach.

61.     Based upon Dorothy Brockman's separately filed 2020 tax return, from October 20, 2020, to December 31, 2020, Dorothy Brockman, Robert Brockman's wife who resides with him in Texas – a community property state, sold securities, stocks, or other non-real estate investments in the gross amount of $9,287,777. Gov. Ex. 32. See also Gov. Ex. 2 at pg. 32.

***Tax liability and Computations***

62.     A delegate of the Chief Counsel of the IRS approved in writing the jeopardy assessments and collection actions of such assessments against Robert Brockman for the 2004-2018 tax years. On September 7, 2021, the IRS made a jeopardy assessment against Brockman for taxes, fraud penalties and interest for a total of $1,418,272, 371.71 for the 2004-2018 tax years as follows:

**Tax Table 1**

| Year | Tax | Penalty- Fraud | Interest* | Total |
|------|-----|----------------|-----------|-------|
| 2004 | 82,512,479 | 61,884,359.25 | 157,830,197.30 | 302,227,035.55 |
| 2005 | 32,772,341 | 24,579,255.75 | 55,088,712.34 | 112,440,309.09 |
| 2006 | 38,916,900 | 29,187,675.00 | 55,409,699.31 | 123,514,274.31 |
| 2007 | 2,547,543 | 1,910,657.25 | 3,029,157.13 | 7,487,357.38 |
| 2008 | (722,954) | - | - | (722,954) |
| 2009 | (1,330,216) | - | - | (1,330,216) |
| 2010 | 110,120,720 | 82,590,540.00 | 91,051,351.22 | 283,762,611.22 |
| 2011 | (1,692,011) | - | - | (1,692,011) |
| 2012 | 21,712,495 | 16,284,371.25 | 14,112,694.08 | 52,109,560.33 |
| 2013 | 36,939,855 | 27,704,891.25 | 21,390,135.23 | 86,034,881.48 |
| 2014 | 14,156,595 | 10,617,446.25 | 7,223,004.84 | 31,997,046.09 |
| 2015 | 53,460,628 | 40,095,471.00 | 23,404,569.21 | 116,960,668.21 |
| 2016 | 23,918,714 | 17,939,035.50 | 8,422,393.99 | 50,280,143.49 |
| 2017 | 108,161,287 | 81,120,965.25 | 28,619,232.27 | 217,901,484.52 |
| 2018 | 17,576,763 | 13,182,572.25 | 2,797,664.79 | 33,557,000.04 |
| **TOTAL** | **542,796,530** | **407,097,240** | **468,378,812** | **1,414,527,191** |

*See* Gov. Ex. 2 at pg. 59.  *See also* Gov. Ex. 29.

63.     The interest due on the jeopardy assessments as set forth in Tax Table 1 was computed to

September 9, 2021.

64.     The highlighted portions in Table 1, indicate refunds for tax years 2008, 2009, and 2011

that are barred from refund or credit by Title 26. Brockman will be entitled to a reduction in tax

for that year, but the refund will be barred since the refund statute is expired.  Further, Brockman

will not be entitled to use the tax reduction amounts to offset the liabilities from the other years.

65.     Government Exhibit 2, the Jeopardy Report, exhibits and attachments to the jeopardy

report set forth the calculations of unreported income, penalties and tax liabilities in Table 1

above.  This affidavit/declaration, Jeopardy Report, exhibits and attachment to the jeopardy

report do not include every fact or matter observed by me, the IRS, or known by the IRS and the

United States that support the ultimate determination of Robert Brockman's tax liabilities,

penalties or deficiencies for the tax years listed in Table 1 above.

21

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31 day of January 2022.

Damon Paxton
Revenue Agent
Internal Revenue Service

# GOV

# EXHIBIT

# 2

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN             SSN: ███3444             YEARS: 2004-2018

**Reasons for Making Jeopardy Assessment - Summary**

Based on the factors identified, a jeopardy assessment is recommended for tax years 2004 through 2018.

Mr. Brockman is a business executive and served as the Chairman and CEO of the software development company he founded, Universal Computer Services Holding Inc. ("UCS Holding Inc."), and its foreign and domestic subsidiaries.

On October 1, 2020, Brockman was indicted on federal tax evasion, wire fraud, money laundering, evidence tampering and destruction of evidence charges, and on November 6, 2020, Brockman resigned from his positions as Chairman and CEO of his companies.

During the period from 2004 through 2018, Brockman failed to report approximately **$2.7 billion** of income on his tax returns, consisting of unreported investment income and gains (derived from private equity funds formed by Brockman with his business associate, Robert Smith of Vista Equity Partners, a $635 million distribution from his company UCS Holding Inc. characterized as a non-taxable redemption, as well as other investing activity personally directed by Brockman).[1]

Brockman was able to conceal his unreported investing activity and avoid U.S. income on the approximate $2.7 billion in unreported income and gains by using foreign trusts and companies, discussed in this Report in **Section 5, *Brockman holds ownership of UCS Holding Inc and subsidiaries in an offshore structure***, and **Section 6, *Brockman's use of offshore entities to conduct investment activity***. Beginning in the mid-1980s, Brockman established a myriad of sham foreign trusts and companies for concealment and to avoid U.S. income tax. Brockman appointed nominee directors, trustees, and trust protectors while maintaining control over all offshore entities and the use of assets.

Brockman held his untaxed proceeds in offshore entities and used the funds for personal purposes. For example, Brockman established foreign trusts and companies to conceal his use of the untaxed proceeds to purchase and hold ownership of various assets, including vacation homes, investment real estate, a corporate aircraft, and a luxury yacht, as discussed below in **Section 7, Brockman's use of offshore entities to conceal his ownership of assets,** of this Report.

Brockman also used the untaxed proceeds held in his offshore entities, in part, to make large charitable contributions to universities for board of trustee positions and for the construction of facilities with the Brockman name. For example, between 2009 and 2017, Brockman transferred funds totaling $20 million to Rice University for the Brockman Hall for Physics, $17.3 million to Rice University for the Brockman Hall for Opera, $25 million to Baylor College of Medicine, and $25.5 million to Center College where the A. Eugene Brockman Commons (in honor of Brockman's father) and the Pearl Brockman Hall (in honor of Brockman's mother and grandmother) were constructed. Brockman served as the Chairman of the Board of Trustees of Center College, trustee on the board of Baylor College of Medicine, and served on the Council of Overseers at the Rice University Graduate School of Business. (See **Section 11** below).

---

[1] On October 9, 2020, Brockman's business associate Robert Smith entered a Non-Prosecution Agreement with the U.S. Department of Justice admitting to having engaged in his own tax evasion scheme involving his own use of foreign trusts and companies to conceal his profits from the Vista Equity Partners investment funds. (See Section 11 below).

**Government Exhibit**

2

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN             SSN: ████-3444             YEARS: 2004-2018

As discussed in **Section 11** of this Report, during the years involved, Brockman took action, as well as directed others, to adopt measures to prevent the IRS from detecting Brockman's offshore entities and unreported investing activity, including:

- Using code names and aliases in correspondence and email addresses to conceal identities when discussing Brockman's activities
- Using encrypted messages and encrypted email servers
- Using encrypted voice chat headsets for video-conference calls
- Using software to remotely access and transfer files to computers stored in offshore locations
- Using software for encrypted phone calls and text messages and for deleting call records
- Concealing Brockman's computer files stored on USB drives and MicroSD cards in luggage when traveling to avoid potential discovery and seizure by officials
- Preparing false and backdated documents
- Using file deletion software to wipe computer hard drives
- Shredding business records and correspondence
- Physically destroying computer hard drives

In January 2017, when Brockman was informed that Bermuda Commercial Bank had frozen the bank accounts for his offshore entities in Bermuda, Brockman authorized moving banking relationships and forming "mirror companies" in multiple jurisdictions, including Switzerland, Singapore, Guernsey, Cayman Islands, Jersey, Nevis, British Virgin Islands and Isle of Man. (See **Section 11** below).

Further, based on the facts described below, Brockman appears to be taking action to place property beyond the reach of the government, thereby impeding the IRS's ability to seize assets for the taxes that he would owe.

In particular, Brockman has transferred his 50% community property interest in several real estate properties located in Houston, Texas to his wife, Mrs. Brockman, to hold as her 100% separate property. Following Brockman's criminal indictment in October 2020, Mrs. Brockman has sold these properties for $1,375,000 (10/26/2020) and $3,999,000 (12/11/2020), gifted one property with appraised value of $3,767,173 to the Brockmans' daughter-in-law (11/12/2020), and has listed their current residence for sale for $15,350,000 (listed on 5/17/2021). (See **Sections 10** and **11** of this Report below).

Brockman continues to hold vacation homes and investment real estate, located in Colorado, and a luxury yacht, in the name of nominee entities. (See **Sections 7** and **10** of this Report below).

Also, Brockman currently owns 99.173% of his company, UCS Holding Inc. and its subsidiaries, though his ownership of the A. Eugene Brockman Charitable Trust, formed in Bermuda. The Brockmans are currently pursuing litigation in Bermuda civil courts to replace the current trustees of the Brockman Charitable Trust and to appoint new trustees, based in the Cayman Islands. This would potentially grant Brockman greater control over the trust and ability to dispose of, or transfer, trust and company assets beyond the reach of the government. The litigation concerning the appointment of the new trustees was argued before the Bermuda Appellate Court in January 2021 and the Court's decision and further proceedings are currently pending. (See **Sections 5** and **11** of this Report below).

---

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                  SSN: 3444                  YEARS: 2004-2018

## 1. Background

**Robert Theron Brockman, ("Taxpayer" or "Brockman")** (SSN: ████ 3444), DOB ████████, is a U.S. citizen and resident of Houston, Texas and is currently 80 years old.[2]

Brockman is married to **Dorothy Kay Brockman, ("Mrs. Brockman")**. The Brockmans married in 1968. Mrs. Brockman is a U.S. citizen and resident of Houston Texas and is currently 79 years old.

The Brockmans have one child, **Robert Theron Brockman II**, DOB ████████ currently 47 years old. Robert Brockman II is married to **Elizabeth Bellows Brockman**, DO████████ currently 40 years old. Robert Brockman II and Elizabeth Brockman are U.S. citizens and residents of Houston, Texas.

Brockman is involved in philanthropic activity. Brockman established a 501(c)(3) exempt private foundation, **The Robert T Brockman Charitable Foundation ("The Brockman Foundation")** (EIN# ████ 9422), with Brockman serving as president/director and Mrs. Brockman serving as vice president/director.

## 2. Brockman's Business Activity

Brockman was raised in St. Petersburg, Florida and attended Center College in Danville, Kentucky before transferring and graduating in 1963 summa cum laude with a Bachelor of Science degree in Business Administration from the University of Florida.

In 1964, Brockman started his career in marketing at the Ford Motor Company. From 1966 to 1970, Brockman worked as a sales associate for IBM in the Houston, Texas branch office, selling automotive parts inventory and accounting data processing services to car dealerships.

**Universal Computer Systems Inc. ("UCS"):** In 1970, Brockman left IBM and founded his original company, Universal Computer Services Inc. ("UCS") with headquarters in Houston, Texas, to provide data processing services to auto dealerships (such as preparing weekly reports of their parts inventory). Later, successor UCS companies developed and installed computer-based dealership management software packages for large dealerships and dealership groups. Brockman served as chairman and CEO of UCS and its affiliated companies.

**Universal Computer Systems Holding Inc. ("UCS Holding Inc.")[3]:** In 1987, Brockman formed UCS Holding Inc. as a Delaware corporation which is currently the parent holding company of Dealer Computer Systems Inc., the Reynolds and Reynolds Company, and other affiliated U.S. and foreign subsidiaries involved in Brockman's businesses. Brockman served as CEO of UCS Holding Inc.

**Dealer Computer Systems Inc. ("DCS"):** DCS is a Delaware corporation with its principal place of business in Houston Texas and provides computer software and hardware systems, supporting the parts

---

[2] Exhibit 1 (INOLES).
[3] Prior to 2005, UCS Holding Inc. was formerly called Universal Computer Consulting Holding Inc.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN            SSN: ███████3444            YEARS: 2004-2018

and repair operations of auto dealerships. UCS and DCS merged in 2001 with DCS as the surviving entity post-merger. DCS is currently a wholly-owned subsidiary of UCS Holding Inc.

**The Reynolds and Reynolds Company ("Reynolds & Reynolds"):** Reynolds & Reynolds is an Ohio corporation headquartered in Dayton, Ohio with operations in the U.S., Canada, UK and Europe. Reynolds & Reynolds develops software used by automotive dealers and manufactures and distributes business forms and promotional items for the automobile industry. In 2006, Brockman's company UCS Holding Inc. acquired Reynolds & Reynolds and merged the operations of the two companies under the Reynolds & Reynolds brand. Brockman served as chairman and CEO of the combined companies.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN            SSN: ████3444            YEARS: 2004-2018

The complete list of U.S. subsidiaries of UCS Holdings Inc., as of December 31, 2019 is shown below:[4]

**COMMON PARENT CORPORATION:**

| No. | Name of Corporation | EIN | Primary Business activity | | | | |
|-----|---------------------|-----|---------------------------|--|--|--|--|
| 1 | **Universal Computer Systems Holding Inc.** | ████414 | Computer Services | | | | |

**SUBSIDIARY CORPORATIONS:**

| No. | Name of Corporation | EIN | Primary Business activity | Owned by Corporation | No. of shares | % voting power | % value |
|-----|---------------------|-----|---------------------------|----------------------|---------------|----------------|---------|
| 2 | **The Reynolds and Reynolds Company** | ████1120 | Software Publishing | 21 | 1 | 100% | 100% |
| 3 | Reynolds & Reynolds Holdings Inc. | ████1081 | Holding Company | 2 | shares disposed | 0% | 0% |
| 4 | Reyna Capital Corporation | ████4403 | Leasing | 2 | 500 | 100% | 100% |
| 5 | Reynolds Vehicle Registration Inc. | ████3689 | Holding Company | 2 | 100 | 100% | 100% |
| 6 | IMakeNews Inc | ████427 | Web Casting | 2 | 1000 | 100% | 100% |
| 7 | Med-Pass Inc. | ████9861 | Distribution | 2 | 600 | 100% | 100% |
| 8 | Key Control Holding Inc. | ████421 | Assembly | 21 | 1000 | 100% | 100% |
| 9 | Wilshire Travel Inc. | ████4402 | Services | 21 | 1000 | 100% | 100% |
| 10 | Who's Calling Holding Inc. | ████4891 | Holding Company | 21 | 100 | 100% | 100% |
| 11 | Add-On-Auto Inc. | ████6540 | Software Publishing | 2 | 1000 | 100% | 100% |
| 12 | DCS Risk Management Ltd. | ████9777 | Property and Casualty Insurance | 1 | 100 | 100% | 100% |
| 13 | Secure Title Administration Inc. | ████338 | Title Services | 2 | 1000 | 100% | 100% |
| 14 | International Document Services Inc. | ████5613 | Software Publishing | 2 | 84650 | 100% | 100% |
| 15 | AppOne Inc. | ████9521 | Software Publishing | 2 | 1000 | 100% | 100% |
| 16 | RRS Inc. | ████3584 | Other Business Support Services | 21 | shares disposed | 0% | 0% |
| 17 | Auto Data Direct Financial Services Inc. | ████7066 | Financial Services | 2 | 100 | 100% | 100% |
| 18 | Auto Data Direct Services Inc. | ████909 | Business Services | 2 | 100 | 100% | 100% |
| 19 | Direct Post Office Inc. | ████712 | Business Services | 2 | 100 | 0% | 100% |
| 20 | Auto Data Direct Inc. | ████6674 | Business Services | 2 | 100 | 100% | 100% |
| 21 | **Dealer Computer Services Inc.** | ████8101 | Software Publishing | 1 | 1000 | 100% | 100% |
| 22 | Callbright Corporation | ████397 | Internet Application | 21 | 1000 | 100% | 100% |

[4] Exhibit A-89, pages 3-5.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN          SSN: ▇▇▇3444          YEARS: 2004-2018

The complete list of PARTNERSHIP INTERESTS held by UCS Holding Inc. (20% or more interest), as of December 31, 2019 is shown below:[5]

| No. | Name of Entity | EIN | Country of organization | % owned in profit, loss or capital |
|-----|----------------|-----|------------------------|-----------------------------------|
| **1** | **Hardwicke Properties LLC*** | ▇0474 | US | 99%* |
| 2 | Open Dealer Exchange LLC | 1512 | US | 50% |
| 3 | The Appraisal Lane LLC | 8944 | US | 61.96% |
| 3 | Computer Vehicle Registration | 7174 | US | 20% |
| 4 | PowerSportsX LLC | 3545 | US | 28.02% |

*Mr. Brockman personally owns the remaining 1% interest in Hardwicke Properties LLC.

The complete list of FOREIGN CORPORATIONS held by UCS Holding Inc. (20% or more interest, reported on Form 1120 and Forms 5471), as of December 31, 2019 is shown below:[6]

| No. | Name of Entity | EIN | Country of Incorporation | Country of Principal Business Activity | % Owned in Voting Stock |
|-----|----------------|-----|-------------------------|----------------------------------------|-------------------------|
| 1 | Reynolds and Reynolds Ltd | N/A | UK | UK | 100% |
| 2 | Reynolds and Reynolds SAS | N/A | France | France | 100% |
| 3 | Cardis Reynolds GmbH | N/A | Germany | Germany | 100% |
| 4 | Reynolds and Reynolds bv | N/A | The Netherlands | The Netherlands | 100% |
| 5 | Reynolds and Reynolds Vastgoed bv | N/A | The Netherlands | The Netherlands | 100% |
| 6 | Reynolds and Reynolds nv | N/A | Belgium | Belgium | 100% |
| 7 | Reynolds and Reynolds (Canada) Ltd | N/A | Canada | Canada | 100% |
| 8 | UCS European Holdings Ltd | N/A | UK | UK | 100% |
| 9 | Contact Advantage Ltd | N/A | UK | UK | 100% |
| 10 | Contact Advantage (Russia) Ltd | N/A | UK | UK | 100% |

The complete list of FOREIGN DISREGARDED ENTITIES held by UCS Holding Inc. (reported on Form 1120 and Forms 8858), as of December 31, 2019 is shown below:[7]

| No. | Name of Entity | EIN | Country of Organization | Country of Principal Business Activity | % Owned by Parent Company |
|-----|----------------|-----|------------------------|----------------------------------------|---------------------------|
| 1 | UCS Systems Ltd | 0654 | UK | UK | 100% |
| 2 | Kalamazoo Computer Group International bv | 2489 | The Netherlands | The Netherlands | 100% |
| 3 | Contact Advantage Holdings Ltd | 5083 | UK | UK | 100% |
| 4 | Contact Advantage Group Ltd | 5062 | UK | UK | 100% |

---

[5] Exhibit A-89, page 1.
[6] Exhibit A-89, page 1.
[7] Exhibit A-89, page 6.



JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                      SSN ███████3444                     YEARS: 2004-2018

### 3. Brockman's resignation from his businesses in November 2020

Brockman resigned from his positions as chairman and CEO of UCS Holding Inc. and Reynolds and Reynolds on November 6, 2020, following his criminal indictment on federal tax evasion and money laundering charges in October 2020.[8] Reynolds and Reynolds President and COO Tommy Barras was named to replace Brockman as CEO of the companies.[9]

### 4. Brockman's appointment of Mrs. Brockman as his Power of Attorney

On July 20, 2020, Brockman signed a Statutory Durable Power of Attorney under Texas law appointing Mrs. Brockman as his agent with a general power of attorney over his affairs. The Power of Attorney was recorded in Harris County, Texas on December 14, 2020.[10]

As power of attorney, Mrs. Brockman has the authority to perform or undertake any action Brockman could perform, including but not limited to, transactions involving real estate, personal property, stocks and bonds, business operating, banking, estate, trust and other beneficiary transactions, personal and family maintenance and tax matters.

Additional specific powers were granted under the power of attorney in Clause I.A., *Trust for My Benefit*. Mrs. Brockman has the power to transfer any of Brockman's property to a revocable or irrevocable trust he created for his own benefit. In addition, Mrs. Brockman may establish or amend a revocable trust or irrevocable trust for his benefit and may transfer any of his property to such trust. The provision also states that Mrs. Brockman is authorized to amend the trust agreements establishing the Robert T Brockman Charitable Trust and the Robert T Brockman Management Trust.

Discussed further below, Mrs. Brockman has exercised her authority as power of attorney over Brockman's affairs to conduct real estate transactions on his behalf and also to pursue litigation in Bermuda concerning the appointment of a new trustee for Brockman's trust, the A. Eugene Brockman Charitable Trust.

---

[8] Exhibit A-90.
[9] Exhibit A-92.
[10] Exhibit A-95.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN          SSN: ███████3444          YEARS: 2004-2018

**5. Brockman holds ownership of UCS Holding Inc and subsidiaries in an offshore structure**
Brockman does not directly hold stock ownership of UCS Holding Inc. and subsidiaries as an individual shareholder.

Instead, Brockman holds ownership of his businesses through a series of foreign entities which Brockman controls, including the **A. Eugene Brockman Charitable Trust**, **Spanish Steps Holdings LLC** and **Spanish Steps Holdings Ltd.,** as displayed below:[11]



The **A. Eugene Brockman Charitable Trust**[12] (also referred to as "AEB Charitable Trust" or "AEBCT" or "the Brockman Charitable Trust") is a trust created by Trust Indenture dated May 26, 1981 under the laws of Bermuda. The settlor of the Trust was Brockman's father **(Mr. A. Eugene Brockman)** who died in 1986. The trust is a discretionary trust for the benefit of Brockman, Mrs. Brockman, Brockman's brother **(Thomas David Brockman)** and his wife, together with any charitable organizations organized in Bermuda, the United States or Great Britain.

---

[11] Exhibit A-11.
[12] The "A. Eugene Brockman Charitable Trust" was formerly called the "A. Eugene Brockman Children's Trust."

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN: ███████3444                YEARS: 2004-2018

**Spanish Steps Holdings LLC** is a company organized under the laws of Nevis and is held 100% by the Brockman Charitable Trust. Spanish Steps Holdings LLC, in turn, holds 100% ownership of Spanish Steps Holdings Limited.

**Spanish Steps Holdings Limited** is a company incorporated under the laws of the British Virgin Islands. The shares of Brockman's company UCS Holding Inc. and its subsidiaries are held directly by Spanish Steps Holding Ltd. The 2019 Form 1120 return filed by UCS Holding Inc. lists Spanish Steps Holdings Ltd. as 99.173% shareholder.[13]

In 2003, Mr. Brockman hired **Evatt Tamine**, an Australian national and barrister.  From 2004 through 2018, Tamine primarily resided in Bermuda and served as nominee trustee and/or corporate director of Mr. Brockman's various offshore trusts and companies while Brockman made all significant decisions regarding the operations of the foreign trusts and companies.  Tamine formed the Bermuda-based company, Tangarra Consultants Ltd, and Tamine was paid, through Tangarra, by entities controlled by Brockman for the services provided to Mr. Brockman.

**Don Jones** was a U.S. person who had worked with Brockman since the early 1980s and served as the CFO of Brockman's company, UCS Holding Inc. (formerly called UCS Inc.) until 1995. In 1995, Jones was hired by Brockman to relocate to Bermuda and manage Brockman's various offshore entities as nominee, including the Brockman Charitable Trust. Don Jones formed the Bermuda-based companies, Wedge Consulting Ltd and Pilot Management Ltd, and was paid by Brockman through these entities, when providing services to Brockman. Don Jones' involvement with the Brockman offshore entities was gradually reduced by Brockman as Tamine assumed more responsibility as the successor to Don Jones. Don Jones fully retired in 2010 and returned to the United States and subsequently died in 2016. When Jones retired, Tamine became the sole nominee for Brockman.

---

[13] Exhibit A-89, page 2.

JEOPARDY RECOMMENDATION REPORT
ROBERT T. BROCKMAN                SSN: ████3444                YEARS: 2004-2018

## 6. Brockman's use of offshore entities to conduct investment activity

### a.) Point Investments

In 1999, Brockman formed Point Investments Ltd ("Point Investments") in the British Virgin Islands (later re-domiciled in Bermuda) to invest as a limited partner in various private equity funds formed by Brockman with his business associate, Robert Smith of Vista Equity Partners.[14]

### Unreported Income – Point Investments

During the years 2004 through 2018, Brockman, through Point Investments, avoided U.S. income tax on approximately $2.3 billion of net capital gains, $29 million in interest income, and $5.9 million in dividends (amounts determined from Point Investments financial statements and before allowable deductions and losses). See Section 11b, Unreported Income, of this Report.

| Unreported Net Capital Gain | |
| --- | --- |
| Tax Year | Point Investments |
| 2004 | $ 12,135,737 |
| 2005 | $ 214,200,713 |
| 2006 | $ 245,158,414 |
| 2007 | $ 25,900,641 |
| 2008 | $ (8,087,386) |
| 2009 | $ - |
| 2010 | $ 773,045,853 |
| 2011 | $ 6,686,899 |
| 2012 | $ 125,405,712 |
| 2013 | $ 122,745,397 |
| 2014 | $ 32,302,010 |
| 2015 | $ 196,107,631 |
| 2016 | $ 82,214,921 |
| 2017 | $ 439,636,493 |
| 2018 | $ 62,442,188 |
| Total | $ 2,329,895,223 |

| Unreported Interest Income | |
| --- | --- |
| Tax Year | Point Investments |
| 2004 | $ 119,359 |
| 2005 | $ 4,244,577 |
| 2006 | $ 7,356,125 |
| 2007 | $ 1,227,245 |
| 2008 | $ 1,375,680 |
| 2009 | $ 6,382 |
| 2010 | $ 513,283 |
| 2011 | $ 2,266,460 |
| 2012 | $ 231,000 |
| 2013 | $ 238,847 |
| 2014 | $ 1,458,485 |
| 2015 | $ 7,355,730 |
| 2016 | $ 423,484 |
| 2017 | $ 878,790 |
| 2018 | $ 1,412,954 |
| Total | $ 29,108,401 |

| Unreported Dividend Income | |
| --- | --- |
| Tax Year | Point Investments |
| 2016 | $ 16,835 |
| 2017 | $ 1,733,071 |
| 2018 | $ 4,174,433 |
| Total | $ 5,924,339 |

---

[14] Robert Smith was the Chairman and CEO of Vista Equity Partners, a private equity firm which formed private equity fund partnerships.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN: ███3444                YEARS: 2004-2018

**Organizational Structure**

Brockman holds beneficial ownership of Point Investments through his ownership of the **A. Eugene Brockman Charitable Trust** and **Point Purpose Trust**, and foreign corporations, as displayed below:



As illustrated above, Mr. Brockman concealed his ownership and control of Point Investments by establishing nominee foreign trusts and companies:

- The common/voting shares of Point Investments were held 100% by the nominee company **Point Investments LLC**[15], which was held 100% by the **Point Purpose Trust**. The Point Purpose Trust was created at Brockman's direction to replace the **Massengill Grandchildren's Trust** in the offshore structure.[16]

---

[15] Exhibit A-11; Previously, the common shares of Point Investments Ltd were held directly by The Massengill Grandchildren's Trust. [Exhibit A-12 and A-14].

[16] The Massengill Grandchildren's Trust was a testamentary trust created in 1995 on the death of Frank Massengill. Don Jones was Brockman's employee who worked on Brockman's offshore activities prior to Tamine's employment and taking over this role. Frank Massengill is the father of Don Jones' wife (Melissa Jones, nee Massengill). Frank Massengill died in 1995 and had no other relationship to Brockman. The Massengill Grandchildren's Trust (and other Massengill Family Trusts) was used by Brockman to shield his connection to Point Investments and other Brockman-controlled entities. Don Jones' compensation included payment for the use of the Massengill Trusts as part of the Brockman offshore structure. [Exhibit A-59 ("Income will be $200,000 per year to

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN:  ███ 3444                YEARS: 2004-2018

- The investment shares[17] of Point Investments were held by **Spanish Steps Holdings Ltd.** and **Spanish Steps LLC**, which were held 100% by the **A Eugene Brockman Charitable Trust ("Brockman Charitable Trust" or abbreviated as "AEBCT")**.[18]
- The Brockman Charitable Trust, through Point Investments, held 100% ownership of **Rome Investments LLC**, a Delaware LLC.[19]

**Brockman's Control of Point Investments and Brockman Charitable Trust**
Evatt Tamine served as director of Point Investments and Spanish Steps Holding.

Tamine also served as trustee of the Point Purpose Trust (as director of the Nevis-based corporate trustee, Providence Trust Company (PVT) Ltd.) and as trustee of the Brockman Charitable Trust (as director of the Bermuda-based corporate trustee, St. John's Trust Company (PVT) Ltd.).

Brockman retained and exercised complete control over the Brockman Charitable Trust, Point Investments and related foreign trusts and companies and personally directed the individuals who served as nominee trustees, directors, and trust protectors.

See Section 11c, Concealment of Assets (Sham Entities), of this Report, for an explanation of the methods and specific examples of Brockman's control.

See also Attachment A, *Brockman Income from Point Investments*, and exhibits for further explanation.

**Brockman's use of Point Investments for investing activity – 2000 through 2018**
Brockman formed Point Investments in order to invest as a limited partner in private equity funds managed by Vista Equity Partners.

Brockman, through Point Investments, also directly invested in other companies and generated additional investment income/(loss) and realized capital gains and losses.

Brockman invested in approximately 11 different Vista Equity Partner investment funds between 2000 and 2018.

---

an entity of my choice as long as the Jones/Massengill entities are involved with the Brockman entities in any way. When they are only handling their affairs the compensation will cease.")]. In 2014, the Massengill Grandchildren's Trust was replaced by the **Point Purpose Trust** as part of the reorganization of the Point Investments group structure by Tamine at Mr. Brockman's direction. [Exhibit A-15 and A-16].

[17] The Point Investment financial statements explain that authorized capital is divided into one voting, non-participating Founder's share (exclusive right to vote at General Meetings on all matters but no right to dividends and only the right to the return of paid capital on winding up) and Participating shares (not entitled to vote but are entitled to dividends and all surplus of assets on redemption of shares) [Exhibit A-25 "Share Capital"].

[18] See Exhibit A-13. The A. Eugene Brockman Charitable Trust is a trust settled in 1981 by Brockman's father, Alfred Eugene Brockman. Brockman's father died in 1986. The Brockman Charitable Trust is the ultimate beneficial owner of all the investor shares in Point Investments Ltd.

[19] Rome Investments LLC (EIN# unknown). Financial statements indicate that Rome Investments was used to hold a Charles Schwab investment account and the Charles Schwab funds were transferred to accounts held in the name of Spanish Steps Holdings [Exhibits A-5 and A-9].

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN          SSN: ██████3444          YEARS: 2004-2018

Brockman made very large capital commitments to fund the various Vista Equity Funds partnerships, for example:

- $1 billion to Vista Equity Funds II, LP (between 2000 and 2004)
- $ 100 million to Vista Equity Partners Fund III (Parallel), LP
- $ 90 million to Vista Foundation Fund I (Parallel), LP
- $612 million to Vista Equity Partners Fund IV (Parallel), LP
- $150 million to Vista Equity Partners Fund IV Co-Invest 2-A, LP

As each individual Vista Equity Partnership generated investment income and realized gains and losses, Brockman received allocations of partnership income/loss as well as distributions from the partnerships.

Audited financial statements were prepared for each of the Vista Equity funds.  The financial statements provided detailed information to the partners regarding partnership operations and investment activity, including the Statement of Operations, Balance Sheet, Schedule of Investments, Statement of Changes in Partner's Capital, Statement of Cash Flows, and explanatory notes.

Audited financial statements were also prepared for Point Investments which provided detailed information regarding the operations and investment activity of Point Investments.[20]

Brockman, through Point Investments, received distributions from the Vista Equity funds by wire transfer to the Point Investments bank accounts held at Bermuda Commercial Bank and Mirabaud.

For example, the 2010 Financial Statement prepared for Vista Equity Fund II, LP reported a total of $1,003,842,484 in distributions to Point Investments as limited partner, for the year ended December 31, 2010, with $59,649,903 as year-end distribution payable (consisting of working capital hold back and escrow).[21] A total of $943,475,859 in distributions were paid by wire from Vista Equity Fund II to Brockman's account held in the name of Point Investments at Mirabaud bank (account #██ 463) during the period from June 2020 and January 2011,[22] as illustrated below, and as recorded in Brockman's significant transaction report.[23]

| Wire Transfers to Point Investments Ltd from Vista Equity Fund II, LP | | | | |
|---|---|---|---|---|
| Point Investments Ltd (Mirabaud Acct# ██7463) | | | | |
| Transaction | Date | Amount | Description | Comment* |
| 1 | 6/2/2010 | 799,008,883.01 | Credit | Distribution on sale of Ventyx |
| 2 | 12/27/2010 | 111,484,996.13 | Credit | VEF II Notice of Distribution on sale of SIS |
| 3 | 1/3/2011 | 32,981,980.35 | Credit- Vista Equity Fund II LP | VEF II Distribution of Proceeds of Big Machines |
| | TOTAL | 943,475,859.49 | | |
| *Description from Brockman's "Significant Transaction Report" (Point) | | | | |

---

[20] Exhibits A-17 through A-33.
[21] Exhibit A-34, pages 1 and 2.
[22] Exhibit A-34, pages 3-5.
[23] Exhibit A-10, page 5.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN: ███████3444                      YEARS: 2004-2018

**b.) Edge Capital Investments**

In the 1990s, Brockman formed Edge Capital Investments Ltd (Edge Capital Investments), formerly named Edge Investment Fund Ltd., in the British Virgin Islands (later re-domiciled in Nevis in 2008).

**Unreported Income – Edge Capital Investments**

During the years 2004 through 2018, Brockman, through Edge Capital Investments, avoided U.S. income tax on approximately $18.5 million in interest income and $49.2 million in unreported capital gains (based on Brockman's records and bank records).  See Section 11b, Unreported Income, of this Report.

| Unreported Interest Income | |
| --- | --- |
| Tax Year | Edge Capital Investments |
| 2009 | $          3,104,589 |
| 2010 | $          1,628,961 |
| 2011 | $                      - |
| 2012 | $                      - |
| 2013 | $          4,780,916 |
| 2014 | $          4,152,410 |
| 2015 | $             254,375 |
| 2016 | $          2,580,612 |
| 2017 | $          1,131,477 |
| 2018 | $             945,218 |
| Total | $        18,578,558 |

| Unreported Net Capital Gain | |
| --- | --- |
| Tax Year | Edge Capital Investments |
| 2010 | $        46,891,939 |
| 2011 | |
| 2012 | |
| 2013 | |
| 2014 | $          1,009,459 |
| 2015 | |
| 2016 | $             104,121 |
| 2017 | $          1,289,568 |
| Total | $        49,295,088 |

**Organizational Structure**

Similar to Point Investments (above), Mr. Brockman holds beneficial ownership of **Edge Capital Investments** through his ownership of the foreign trusts, **Alpheus Charitable Trust** and **Edge Purpose Trust**, and foreign corporations, as illustrated below:

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN ▇▇▇3444                YEARS: 2004-2018



*Corporate trustee via Providence Trust Company Ltd (Nevis), Evatt Tamine, director

As illustrated above:

- The common/voting shares of Edge Capital Investments were held 100% by the nominee company **Wilbury Management LLC**, which was held 100% by the **Edge Purpose Trust**. The Edge Purpose Trust was formed to replace the **Massengill Children's Trust** in the offshore structure.[24]
- The investment/beneficial shares[25] were held by **Cascade Holdings LLC**, which was held 100% by the **Alpheus Charitable Trust.**
- Edge Capital Investments held 100% ownership of **Augustus Investments LLC**, a Delaware LLC.[26]


**Brockman's Control of Edge Capital Investments**

Evatt Tamine served as director of Edge Capital Investments and as trustee of the Edge Purpose Trust and Alpheus Charitable Trust.

---

[24] The Massengill Children's Trust was a testamentary trust established in the 1990s on the death of Frank Massengill. The Massengill Trusts were used by Brockman to shield his connection to Edge Capital Investments and other Brockman-controlled entities. As of March 2000, the trust purportedly held ownership of Edge via LLC bearer shares. [Exhibit B-9, page 24 ("corp20000322 Original Edge LLC Membership Bearer Certificate No. 1 held by Massengill Children's Trust")]. The Massengill Children's Trust would later be replaced by the **Edge Purpose Trust** as part of the reorganization of the Edge group structure by Tamine at Mr. Brockman's direction as a precaution against potential IRS scrutiny. [Compare Exhibit B-10 (prior structure) with Exhibits B-11 and B-12 (revised structure)].

[25] The investment shares of Edge Capital Investments were previously held by additional Brockman-controlled foreign companies, such as Legend Investments LLC, Cascade Holdings LLC, Plattoon Investments LLC, and Addington Trading LLC. [See Exhibit B-13]. Brockman instructed Tamine to consolidate these entities and ownership was held entirely by Cascade Holdings LLC.

[26] Augustus Investments LLC (EIN# ▇▇▇2990). Financial statements indicate that Augustus Investments was used to hold a Charles Schwab investment account. [Exhibit B-13 and B-14].

JEOPARDY RECOMMENDATION REPORT
ROBERT T. BROCKMAN          SSN:  ████3444          YEARS: 2004-2018

As with Point Investments, Brockman retained and exercised complete control over Edge Capital Investments and related foreign trusts and companies and directed the use of assets and activities conducted by these entities.

See Section 11c, Concealment of Assets (Sham Entities), of this Report, for an explanation of the methods and specific examples of Brockman's control.

See also Attachment B and exhibits, *Brockman Income from Edge Capital Investments*, for further explanation.

**Brockman's use of Edge Capital Investments for investing activity – 2009 through 2018**
"Distressed debt" investing is purchasing the debt of a company on the secondary market, often at a discount of the face value of the debt.

Beginning in 2009, Mr. Brockman instructed Tamine to use the company Edge Capital Investments to engage in a fraudulent scheme involving the purchase of debt issued by the company Reynolds and Reynolds, when Brockman learned that the debt was trading at discounts of between 25% and 35% of face value.[27] Brockman's stated goal was to purchase debt at discounts for the purpose of earning interest income and making a profit when the loan principal was repaid (receiving the full face value of the debt).

During 2009, Brockman, through Edge Capital Investments, acquired the "distressed debt" which had issued by Reynolds and Reynolds at discounts of the face value. Brockman directed Tamine to acquire debt with an aggrege face value of $67,577,455 at a discounted cost of $20,685,515.

During 2009 and 2010, Brockman earned $3.1 million and $1.6 million, respectively, in interest income on his holdings of the Reynolds and Reynolds investments and avoided U.S. income tax.

On April 21, 2010, Mr. Brockman received proceeds representing the full face value of the Reynolds & Reynolds debt in the amount of $ 67,577,455 and thus realized $46.8 million in unreported taxable gain in 2010, with $34.2 million as long-term capital gain and $12.6 million as short-term capital gain.

Between 2012 and 2017, Brockman continued his "distressed debt" investing activity using Edge Capital Investments. Brockman bought debt issued by companies, other than Reynolds & Reynolds, which generated interest income (while holding the investment) and generated capital gains when the investments were sold.

---

[27] The scheme was a violation the terms of the credit agreements signed by Brockman. Reynolds & Reynolds is a company which had been acquired in 2006 by Brockman's company and had become a wholly owned subsidiary of UCS Holding Inc. Mr. Brockman served as CEO and Chairman of the merged companies. The original debt offering was in connection with the acquisition of Reynolds and Reynolds in 2006. Brockman, as CEO of UCS Holding Inc. and Reynolds & Reynolds, had access to insider, non-publicly available information regarding the financial condition of Reynolds & Reynolds which would impact the price of the debt trading on the secondary market. Brockman used this information for personal benefit by disclosing this information to Tamine and giving direction to Tamine regarding placing orders for Reynolds debt.

JEOPARDY RECOMMENDATION REPORT
ROBERT T. BROCKMAN                SSN: ███████3444                YEARS: 2004-2018

**c.) Cabot Global Investments**

In 2003, Brockman formed Cabot Global Investments Ltd ("Cabot Global Investments"), formerly called Cabot Fund Ltd., in the British Virgin Islands (later re-domiciled in Nevis in 2008).

**Unreported Income – Cabot Global Investments**
During the years 2011 through 2017, Brockman, through Cabot Global Investments, avoided U.S. income tax on approximately $49.6 million in interest income and $3.9 million in unreported capital gains (based on Brockman's records and bank records).  See Section 11b, Unreported Income, of this Report.

| Unreported Interest Income | |
|---|---|
| Tax Year | Cabot Global Investments |
| 2011 | $          4,041,796 |
| 2012 | $          6,414,531 |
| 2013 | $        12,405,800 |
| 2014 | $          7,825,176 |
| 2015 | $          7,993,899 |
| 2016 | $          8,423,036 |
| 2017 | $          2,548,763 |
| Total | $        49,653,000 |

| Unreported Net Capital Gain | |
|---|---|
| Tax Year | Cabot Global Investments |
| 2012 | $          2,982,668 |
| 2013 | $             375,000 |
| 2014 | $             575,789 |
| 2015 | $               62,500 |
| Total | $          3,995,957 |

**Organizational Structure**
Mr. Brockman holds beneficial ownership **Cabot Global Investments** through his ownership of the foreign trusts, **Messery Charitable Trust** and **Cabot Purpose Trust**, and underlying foreign corporations (illustrated below):



JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                    SSN: ██████3444                    YEARS: 2004-2018

As illustrated above,

- The common/voting shares[28] of Cabot Global Investments were held 100% by the nominee company **Strummer Management LLC**[29], which was held 100% by the **Cabot Purpose Trust**. Note- The Cabot Purpose Trust was formed to replace the **Louise C. Massengill Family Trust** in the offshore structure.[30]
- The investment/beneficial shares were held by **Addington Trading LLC**, which was held 100% by the **Messery Charitable Trust**.[31]
- Cabot Global Investments held 100% ownership of **Spartacus Investments LLC**, a Delaware LLC.[32]

**Brockman's Control of Cabot Global Investments**

Evatt Tamine served as director of Cabot Global Investments Ltd and related entities.

However, Brockman retained and exercised complete control over Cabot Global Investments and related foreign trusts and companies and directed the use of assets and activities conducted by these entities.

See Section 11c, Concealment of Assets (Sham Entities), of this Report, for an explanation of the means and specific examples of Brockman's control.

See also Attachment C, *Income from Cabot Global Investments* and exhibits for further explanation.

**Brockman's use of Cabot Global Investments for Investing Activity – 2010 through 2017**

Between 2010 and 2017, Brockman, using Cabot Global Investments, invested in "distressed debt" issued by companies on the secondary debt market, similar to the debt investing conducted by Brockman using Edge Capital Investments (above).

---

[28] Exhibit C-3 and C-4.

[29] Strummer Management LLC replaced **Pitch Holdings LLC** as the common/voting shareholder of Cabot Global Investments. Exhibit C-5.

[30] Louise C Massengill is the mother of Don Jones' wife (Melissa Jones, nee Massengill) and had no other connection to Brockman. Louise Massengill died on September 18, 2000. From 2000, the Massengill Family Trusts were used by Brockman to shield his relationship to Cabot Global Investments and other Brockman-controlled entities. The Louse C. Massengill Family Trust would later be replaced by the **Cabot Purpose Trust** as part of the reorganization of the Cabot group structure by Tamine at Mr. Brockman's direction.

[31] The investment shares of Cabot Global Investments were held at one time held by additional Brockman-controlled foreign companies, **Addington Trading LLC** (34%), **Choice Holdings LLC** (33%), and **Barrier Holdings LLC** (33%). [Exhibit C-5; See also Attachment D, Brockman Stock Redemption Recharacterized as Dividend Income, discussing the Cabot Global Investments structure prior to 2010]. As of 2011. the investment shares were held solely by the Brockman-controlled **Addington Trading LLC**.

[32] Spartacus Investments LLC (EIN# unknown). Financial statements indicate that Spartacus Investments was used to hold a Charles Schwab Cash Sweep account. [Exhibit C-6]. Between 2010 and 2012, the funds held in the Spartacus Investments LLC Charles Schwab account were transferred to the Cabot Global Investments Bermuda Commercial Bank account to use for investing activity. [Exhibit C-7]. There is no indication of additional activity within Spartacus Investments LLC after May 2012.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN ███3444                YEARS: 2004-2018

Brockman earned interest income on his debt holdings and the interest payments were wired to Brockman's accounts held in the name of Cabot Global Investments.

During the years 2011 through 2017, Brockman, through Cabot Global Investments, earned approximately $49.6 million in interest income and avoided U.S. income tax.

During the years 2012 through 2015, Brockman disposed of debt investments held by Cabot Global Investments which generated capital gains.  Brockman, through Cabot Global Investments, avoided U.S. income tax on approximately $3.9 million in unreported capital gains during this period.

JEOPARDY RECOMMENDATION REPORT
ROBERT T. BROCKMAN          SSN: ███3444          YEARS: 2004-2018

## 7. Brockman's use of offshore entities to conceal his ownership of assets

**a.) Regency Management (holding real estate in Colorado)**
In 1998, Brockman formed the foreign company **Regency Management Ltd** ("Regency Management") under the laws of the British Virgin Islands (later re-incorporated in Bermuda). Brockman holds ownership of Regency Management in the foreign trust, **Heraclides Charitable Trust**.[33]

From 2003 to the present, Brockman used the proceeds of his unreported income to transfer into Regency Management to purchase and develop real estate in Colorado for his personal use and for long-term investment. Brockman formed the U.S. companies, Mountain Queen Inc., Henke Holdings LLC and Henke Property LLC, to hold title to the properties in order to further shield his connection and ownership of the properties, as illustrated below:



---

[33] The Heraclides Charitable Trust was formed in 2011. Prior to 2011, Brockman held ownership of Regency Management in the foreign trust named Companion Charitable Trust (formed in 1998).

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN ████3444                YEARS: 2004-2018

**Henke Holdings LLC/Henke Property LLC**
Henke Holdings LLC, a Colorado LLC (EIN# ████3576) was formed by Brockman on September 9, 2005 and corporate status was elected for Federal tax purposes. Henke Property LLC, a Colorado LLC, was also formed and is 100% owned by Henke Holdings LLC.

Regency Management (Bermuda) is listed as the 100% shareholder of Henke Holdings LLC (Form 1120, Schedule K) on the Form 1120 returns filed for Henke Holdings LLC.[34]

Between 2005 and 2010 Brockman acquired several properties in Colorado and held title to the properties in the name of Henke Property LLC.

1. "Frying Pan Canyon Ranch" AKA "Tie Camp Ranch", Eagle County CO
Consisting of three parcels:
o        120 Ash Rd, Basalt CO (Parcel # 2469-102-00-004)
o        9081 Frying Pan Rd, Basalt CO (Parcel # 2469-102-00-014)
o        Frying Pan Road (Parcel # 2469-102-00-015)

2. 300 McFarlane Gulch Rd, Aspen CO 81611, Pitkin County (Parcel # 273729100006)
Consisting of 11.97 acres and two 2bd/2bath structures

3. Lot 8, Prehm Ranch, Glenwood Springs CO 81601, Garfield County (Parcel # 218534402008)
Vacant land, 35 acres

4. Lot 22, Carbondale CO 81623, Garfield County (Parcel # 239319208022)
Vacant residential land, .0268 acres

**Mountain Queen Inc.**
Mountain Queen Inc., a Colorado Corporation (EIN ████6032) was incorporated by Brockman on April 30, 1998 and the 2003 year was the initial year for filing a Form 1120 corporate return.

Regency Management (Bermuda) is listed as the 100% shareholder of Mountain Queen Inc. (Form 1120, Schedule K) on the Form 1120 returns filed for Mountain Queen Inc.[35]

In 2003, Brockman acquired a vacation home located in Aspen Colorado (230 McFarlane Gulch Rd, Aspen CO 81611) and held title in the name of Mountain Queen Inc. In 2004, Brockman acquired additional parcels with title held in the name of Mountain Queen. Brockman's business associate, Al Thorpe, served as President of Mountain Queen Inc. until his death in 2013 and replacement by Carl Linnecke.

1. 230 McFarlane Gulch Rd, Aspen CO 81611, Pitkin County (Parcel #273729100004) ("Aspen Vacation Home"), consisting of 37.97 acres and two structures.

2. Lot 6, Peachblow PUD, Basalt CO 81621, Eagle County (Parcel # 2469-091-02-004)
Vacant residential land, 0.35 acres

---

[34] Exhibit B-60.
[35] Exhibit B-61.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN: ████3444                YEARS: 2004-2018

**Brockman's control of Henke Holdings and Mountain Queen Inc.**

Similar to Brockman's control of the offshore entities used for concealing his investing activity, Brockman retained and exercised complete control over the properties held in the Regency Management offshore structure.

The presence of nominee corporate officers of Mountain Queen Inc. and Henke Holdings LLC (Alfred Thorpe and later Carl Linnecke) was merely to create the appearance that Brockman was not associated with the offshore structure and to conceal Brockman's ownership and control over the properties.

Brockman's ownership and control of the properties can be seen in the following areas:

- Brockman had exclusive right to use the properties.
- Brockman provided specific directions to Evatt Tamine (previously Don Jones) regarding the day-to-day management of the properties, including approval of tenants[36] and fishing rights.[37]
- Brockman approved the use of funds from Regency Management to transfer to Mountain Queen Inc. and Henke Holdings for property acquisitions.[38]
- Brockman received monthly reports from Evatt Tamine listing all expenses of $2,000 or more, with copies of invoices for Brockman's review and approval of payment.[39]
- Brockman gave direction regarding the accounting treatment of property expenses vs. capitalization for tax purposes.[40]
- Brockman approved the selection of Carl Linnecke to serve as President of Mountain Queen Inc. (on the death of the previous nominee corporate officer Al Thorpe) and approved paying $3,000-$5,000 per month for Linnecke to serve as President.[41] Carl Linnecke was not informed that Brockman was the true owner of Mountain Queen and underlying properties. Tamine's explanation to Linnecke was that the properties were owned by a charitable trust with charitable purposes.[42] Tamine was Linnecke's point of contact regarding the properties and Tamine directed and approved Linnecke's actions according to Brockman's wishes.

---

[36] Exhibit C-57.
[37] Exhibit C-58.
[38] Exhibits C-46 through C-49.
[39] Exhibit C-56.
[40] Exhibit C-58.
[41] Exhibit C-50, pages 1-3.
[42] Exhibit C-50, page 2.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN: ███3444                YEARS: 2004-2018


**Detail on properties held in the Regency Management offshore structure:**

**Henke Property LLC (4 properties)**

1. **"Frying Pan Canyon Ranch" AKA "Tie Camp Ranch", Eagle County CO**
   Sales price $5,000,000, Acquired 12/23/2010
     - 120 Ash Rd, Basalt CO (Parcel # 2469-102-00-004)
     - 9081 Frying Pan Rd, Basalt CO (Parcel # 2469-102-00-014)
     - Frying Pan Road (Parcel # 2469-102-00-015)

2. **300 McFarlane Gulch Rd, Aspen CO 81611, Pitkin County (Parcel # 273729100006)**
   Sales price $4,600,000, Acquired 9/22/2005
   11.97 acres
   Building # 1 (2 bd, 2 bath)
   Building # 2 (2 bd, 2 bath)

3. **Lot 8, Prehm Ranch, Glenwood Springs CO 81601, Garfield County (Parcel # 218534402008)**
   (Vacant land, 35 acres)
   Sales price $539,000, Acquired 5/3/2010

4. **Lot 22, Carbondale CO 81623, Garfield County (Parcel # 239319208022)**
   (Vacant residential land, .0268 acres)
   Sales price $97,500, Acquired 10/3/2005


**Mountain Queen Inc. (2 properties)**

1. **230 McFarlane Gulch Rd, Aspen CO 81611, Pitkin County (Parcel #273729100004)**
   ("Aspen Vacation Home")
   Sales price $9,150,000, Acquired 3/6/2003
   Sales price $1,000,000 Acquired 9/20/2004
   Actual Value $15,933,400 (Assessed Year 2021)
   37.97 acres
   Building # 1 (2 stories, 4 bd, 6.5 bath)
   Building # 2 (2 stories, 2 bd, 2.5 bath)

2. **Lot 6, Peachblow PUD, Basalt CO 81621, Eagle County (Parcel # 2469-091-02-004)**
   (Vacant residential land, 0.35 acres)
   Sales price $640,000, Acquired 11/23/2004

---

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN          SSN ████3444          YEARS: 2004-2018

**Bank transfers at Brockman's direction to Regency Management for the purchase and maintenance of the Colorado real estate:**

**From Cabot Global Investments - $ 7 million total (2014- 2016)[43]**

| A. Transfers from Cabot Global Investments to Regency Management | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| Cabot Global Investments Ltd (Bermuda Commercial Bank Acct# ████8828) | | | | | |
| Transaction | Date | Amount | Description | Comment* | |
| 1 | 12/1/2014 | 5,000,000.00 | Internal Transfer Transfer | Transfer between Cabot and Regency re Funding | |
| 2 | 9/26/2015 | 1,000,000.00 | Internal Transfer  Contribution | Transfer between Cabot and Regency re Funding | |
| 3 | 4/21/2016 | 500,000.00 | Internal Debit Contribution | Transfer between Cabot and Regency re Funding | |
| 4 | 10/24/2016 | 500,000.00 | Internal Debit Contribution | Transfer between Cabot and Regency re Funding | |
| | TOTAL | 7,000,000.00 | | | |
| | | | | | |
| *Description from Brockman's "Significant Transaction Report" | | | | | |

**From Edge Capital Investments - $ 15 million total (2010)[44]**

| B. Transfers from Edge Capital Investments to Regency Management | | | | |
|---|---|---|---|---|
| | | | | |
| Edge Capital Investments Ltd (Bermuda Commercial Bank Acct# ████03-01) | | | | |
| Transaction | Date | Amount | Description | Comment* |
| 1 | 12/16/2010 | 15,000,000.00 | Internal Transfer Capital Contribution | Transfer of funds to meet future property acquisitions- funds redeemed out of Edge. |
| | TOTAL | 15,000,000.00 | | |
| | | | | |
| *Description from Brockman's "Significant Transaction Report": | | | | |

---

[43] Exhibit C-7.
[44] Exhibit B-35.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN ███████3444                YEARS: 2004-2018

**Payments from Regency Management to Henke Property to acquire real estate and for improvements, maintenance and operating costs of the properties:**

**From Regency Management - $ 24 million total (2010-2016)[45]**

| C. Wire Transfers from Regency Management | | | | |
|---|---|---|---|---|
| Regency Management Limited (Bermuda Commercial Bank Acct#███17-01) | | | | |
| Transaction | Date | Amount | Comment* | |
| 1 | 4/28/2010 | 489,344.39 | Henke Property LLC | Balance of purchase price of Prehm Ranch No. 8 |
| 2 | 6/29/2010 | 100,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 3 | 8/2/2010 | 100,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 4 | 9/17/2010 | 150,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 5 | 12/17/2010 | 265,000.00 | Henke Property LLC | Earnest money paid for purchase of Tie Camp Ranch |
| 6 | 12/23/2010 | 4,731,018.63 | Henke Property LLC | Balance of purchase price of Tie Camp Ranch |
| 7 | 5/25/2011 | 100,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 8 | 6/29/2011 | 100,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 9 | 8/15/2011 | 200,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 10 | 2/7/2012 | 150,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 11 | 5/25/2012 | 100,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 12 | 7/16/2012 | 250,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 13 | 9/28/2012 | 250,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 14 | 10/23/2012 | 250,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 15 | 2/11/2013 | 150,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 16 | 3/15/2013 | 250,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 17 | 6/4/2013 | 150,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 18 | 7/11/2013 | 150,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 19 | 8/7/2013 | 150,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 20 | 8/19/2013 | 250,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 21 | 9/9/2013 | 250,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 22 | 10/7/2013 | 600,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 23 | 10/28/2013 | 100,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 24 | 11/18/2013 | 250,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 25 | 12/3/2013 | 500,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 26 | 12/12/2013 | 750,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 27 | 1/24/2014 | 500,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 28 | 3/17/2014 | 350,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 29 | 4/23/2014 | 600,000.00 | Henke Property LLC | Funding of Henke to meet costs |

---

[45] Exhibit B-35.

## JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                    SSN: ████3444                    YEARS: 2004-2018

| | | | | |
|---|---|---|---|---|
| 30 | 5/15/2014 | 750,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 31 | 6/24/2014 | 500,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 32 | 7/1/2014 | 250,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 33 | 7/17/2014 | 750,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 34 | 8/27/2014 | 1,500,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 35 | 9/8/2014 | 500,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 36 | 10/10/2014 | 500,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 37 | 12/1/2014 | 750,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 38 | 12/19/2014 | 750,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 39 | 1/23/2015 | 500,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 40 | 3/25/2015 | 750,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 41 | 3/26/2015 | 100,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 42 | 5/1/2015 | 750,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 43 | 6/1/2015 | 250,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 44 | 6/29/2015 | 200,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 45 | 8/2/2015 | 300,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 46 | 8/2/2015 | 1,000,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 47 | 9/28/2015 | 1,000,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 48 | 4/20/2016 | 200,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 49 | 7/23/2016 | 200,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 50 | 9/11/2016 | 100,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 51 | 10/6/2016 | 75,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 52 | 10/24/2016 | 100,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 53 | 11/30/2016 | 100,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| | **TOTAL** | 24,110,363.02 | | |
| | | | | |
| | *Description from Brockman's "Significant Transaction Report" (Regency and Colorado Property Group) | | | |

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN            SSN: ███████3444                    YEARS: 2004-2018

**b.) Fisheries Research Foundation Inc. (Luxury Yacht)**

In 2014, Brockman became interested in purchasing the luxury yacht "Albula" (formerly named "Turmoil") for his personal use. The Albula is a 63.7 meter/209-foot motor yacht and able to accommodate up to 16 guests as well as carrying up to 14 crew onboard.

Brockman directed Tamine regarding the inspection and negotiations with brokers for purchasing the yacht while Tamine concealed that Brockman was the interested party.[46]

Brockman also requested that Tamine consult with a Cayman Islands-based maritime attorney and to establish an offshore company, named **Fisheries Research Foundation**, to acquire and hold ownership of the yacht.[47] Brockman told Tamine to falsely state that the offshore entity was a charitable foundation with scientific and charitable purposes of "fisheries conservation" and that the yacht would be used for exploration and marine research.[48]

Brockman authorized Tamine to make a $34 million offer for the yacht, and in December 2016, the funds were transferred from the Cabot Global Investments bank account to purchase the yacht.[49]



**Brockman's control and personal use of the yacht**

The annual operating costs for the yacht, including 11 crew, was estimated to be $3.5 million.[50]

After acquiring the Albula yacht, Brockman and his wife used the yacht for personal travel, for example a trip on the yacht in Bermuda.

---

[46] Exhibits C-23 through C-27; Exhibits C-35 through C-37.
[47] Exhibits C-28 through C-30.
[48] Exhibit C-38.
[49] Exhibit C-39 and C-45.
[50] Exhibit C-25.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN             SSN: ███████3444             YEARS: 2004-2018

Brockman funded the yacht's operating costs with regular wire transfers from the Cabot Global Investments bank account (i.e., proceeds from Brockman's unreported investing activity through the Cabot Global Investments offshore structure) to a bank account held in the name of MTS Yachts Albula/Fisheries Research Foundation (see below).

Brockman exercised control of the yacht as its sole owner by using it exclusively for his personal use as well as exercising decision-making authority over all matters involving the yacht, such as personally approving the improvements and maintenance for the yacht. As with the real estate owned by Brockman, Tamine would serve as the point of contact to third parties while Brockman's identity as owner was concealed. Tamine would forward all issues concerning the yacht to Brockman and Brockman would review and give his decision and instructions to Tamine to execute.

For example, Brockman reviewed and approved the yacht's hull painting[51], the selection of on-board medical equipment for Brockman's wife[52] and personally reviewed and approved the employee performance reviews for the yacht crew.[53]

When questions arose regarding the ownership and use of the yacht among other yacht owners, Brockman directed Tamine to falsely explain that Brockman is a "minority owner with certain exclusive rights of usage" and that Tamine represents the charitable foundation as the majority owner of the yacht and that the foundation is engaged in supporting marine research conducted by leading universities.[54] Brockman asked Tamine to occasionally use the yacht to create the appearance that Brockman was not the sole owner and that Tamine was using the yacht for the foundation's marine research purposes.[55]

Brockman drafted a revised employment agreement with his company UCS Holding Inc. to include a provision which would provide additional funds for Brockman to use to create the appearance that he was paying to charter the yacht from the foundation.[56]

In order to create the appearance of additional chartering activity, Brockman approved a plan to charter the yacht to Brockman's business associates, Robert Smith and Al Deaton, to demonstrate a variety of charters other than Brockman, himself.[57] Instead of paying for the charter, Brockman agreed that the plan would be to use offshore funds to reimburse his business associates for the charter of the yacht.[58]

---

[51] Exhibit C-40.
[52] Exhibit C-41.
[53] Exhibit C-42.
[54] Exhibit C-36, pages 2-3.
[55] Exhibit C-36, pages 2-3.
[56] Exhibit C-31.
[57] Exhibit C-36, page 1.
[58] Exhibit C-36, page 1.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN: ████ 3444                YEARS: 2004-2018

**Bank transfers at Brockman's direction (from Cabot Global Investments) for the purchase of the yacht Albula and for improvements and operations of the yacht (approx. $43.8 million total):[59]**

| Transfers from Cabot Global Investments Ltd (Mirabaud   Acct# ██ 1017) | | | | |
|---|---|---|---|---|
| Transaction | Date | Amount | Description | Comment* |
| 1 | 11/7/2016 | 3,500,000.00 | Alley Maass Rogers and Lindsay Escrow | Transfer from Cabot for Deposit on the Turmoil |
| 2 | 12/22/2016 | 29,345,705.00 | Alley Maass Rogers and Lindsay Escrow | Transfer from Cabot for Closing on the Turmoil and costs |
| 3 | 12/29/2016 | 1,000,000.00 | MTS Yachts Fisheries Research I   Acct# 24223724 | Operating costs for the Fisheries Research I |
| 4 | 2/20/2017 | 1,000,000.00 | MTS Yachts Fisheries Research I   Acct# 24223724 | Operating costs for the Fisheries Research I |
| 5 | 3/22/2017 | 2,242,308.11 | MTS Yachts Albula   Acct# 242237242 | Not available |
| 6 | 6/29/2017 | 1,641,600.92 | MTS Yachts Albula   Acct# 242237212 | Not available |
| 7 | 7/4/2017 | (1,641,600.92) | Credit- Invalid Beneficiary Account Number | Not available |
| 8 | 7/4/2017 | 1,641,600.92 | MTS Yachts Albula   Acct# 242237412 | Not available |
| 9 | 2/28/2018 | 1,801,860.00 | MTS Yachts Albula   Acct# 242237412 | Not available |
| 10 | 6/22/2018 | 3,335,900.85 | MTS Yachts Albula   Acct# 242237412 | Not available |
|  | **TOTAL** | 43,867,374.88 |  |  |
|  |  |  | *Description from Brockman's "Significant Transaction Report" (Cabot Global Investments Ltd) | |

---

[59] Exhibit C-7.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN: ███3444                YEARS: 2004-2018

**c.) Framfield Assets Ltd. (Corporate Aircraft)**

In December 2012, Brockman formed an offshore structure to acquire a corporate aircraft from Brockman's company, UCS Holding Inc. (which was being held in a Delaware LLC named Hardwicke Properties LLC).[60] To accomplish this, Tamine formed the foreign trust, **Framfield Charitable Trust**, and foreign corporation, **Framfield Assets Ltd.** ("Framfield Assets") and opened a bank account at Mirabaud in Geneva Switzerland in the name of Framfield Assets. Tamine served as nominee trustee and corporate director. As part of the plan, Brockman also formed the DE corporation **Red Plains Air Charter Inc.**

On December 27, 2012 Brockman authorized $15 million to be transferred from the Brockman Charitable Trust held in the bank account of Spanish Steps Holding Ltd. to the account held in the name of Framfield Assets.[61] $12.5 million was then transferred by Framfield Assets to the account held in the name Red Plains Air Charter to use for the purchase of the 99% interest in Hardwicke Properties LLC.[62] The organization of Framfield Assets and related entities, following the 2012 acquisition of Hardwicke Properties LLC is illustrated below:



---

[60] Exhibit A-11, page 2; Exhibit A-62.
[61] Exhibit A-9.
[62] Exhibit A-9.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN          SSN: ████ 3444          YEARS: 2004-2018

**Brockman owned the corporate aircraft through Red Plains Air Charter Inc. (2012-2014)**

The 2012 and 2013 Form 1120 return for Red Plains Air Charter Inc. (EIN# ████ 8169), reported the ownership of Hardwicke Properties LLC.

Tax year 2012 and 2013
- A Form 1120 Corporate Tax Return was filed for Red Plains Air Charter with the 2012 year as the initial year.[63]
- The 2012 Form 1120, Schedule G, *Information on Certain Persons Owning the Corporation's Voting Stock*, reported Framfield Charitable Trust (Bermuda) as the 100% shareholder.[64]
- The 2012 Form 1120, Schedule L, Balance Sheet, reported $1,500,000 cash and Other Investments $11,000,000 (99% interest, Hardwicke Properties LLC), for total assets $12,500,000.[65]
- The 2013 Form 1120 also reported the 99% interest in Hardwicke Properties LLC.[66]

Tax year 2014 to present
- The 2014 Form 1120 Corporate Tax Return for Red Plains Air Charter included a Form 8949, which reported the sale of the 99% interest in Hardwicke Properties LLC in 2014 (Date sold 1/31/2014, Proceeds $8,300,000, Cost basis $8,345,061, Loss ($45,061)).[67]
- The Form 1120 tax returns for Red Plains Air Charter Inc. for tax years 2015 through 2019 report on Schedule L, Balance Sheet, Cash $8,900,000 and Accounts receivable $9,000, for total assets $8,909,000.[68] Red Plains Air Charter no longer reports ownership of Hardwicke Properties LLC (and corporate aircraft) after 2014.

**Re-acquisition and Current Ownership of Hardwicke Properties LLC by UCS Holding Inc.**

UCS Holding Inc. (EIN# ████ 4414)
- The 2014 Form 1120 Corporate Tax Return for UCS Holding Inc. reported its ownership of the 99% interest in Hardwicke Properties LLC (Form 1120, Schedule K, Other Information, line 5b), indicating that UCS Holding Inc. reacquired the 99% interest in Hardwicke Properties LLC.
- The Form 1120 tax returns through 2019 continue to report Hardwicke Properties LLC as owned by UCS Holding Inc.

As discussed above, Brockman holds ownership of UCS Holding Inc. through his ownership of the Brockman Charitable Trust and Spanish Steps Holding.

During the relevant years, Brockman personally owned 1% interest in Hardwicke Properties LLC and reported the partnership item on his Form 1040, Schedule E.

---

[63] Exhibit A-97, page 1.
[64] Exhibit A-97, page 4.
[65] Exhibit A-97, page 3.
[66] Exhibit A-97, page 6.
[67] Exhibit A-97, pages 16-18.
[68] Exhibit A-97, pages 19-21.

JEOPARDY RECOMMENDATION REPORT
ROBERT T. BROCKMAN          SSN: ███3444          YEARS: 2004-2018

**8. Form 1040 tax returns**
Mr. and Mrs. Brockman have each timely filed separate U.S. Individual income tax returns Form 1040 with the filing status of Married Filing Separate from the 1996 tax year to the present.[69] The last year that the Brockmans filed a joint Married Filing Joint Form 1040 return was the 1995 tax year.[70]

The Brockmans' Form 1040 tax returns listed the same tax preparer for tax years 2004 to 2011 (Gary M Thorpe, CPA, Thorpe & Thorpe CPA's, Houston, Texas) and for tax years 2012 to 2018 (Don L Passmore, CPA, Passmore & Associates LLC, Houston, Texas).

**Brockman's 1040 returns (Married Filing Separate)**
Brockman lists his occupation as "Executive." The primary source of income reported on Brockman's tax return is W-2 wages from The Reynolds and Reynolds Company (as paying agent on behalf of Dealer Computer Services and the other consolidated companies under the UCS Holding Inc. umbrella).

On Schedule B, Brockman reported interest income on bank accounts and separately stated partnership interest income and Brockman also reported dividend income on financial accounts and separately stated partnership dividend income.

Brockman answered "no" to the question asked on Schedule B regarding having a financial interest in or signature authority over a financial account in a foreign country and left "blank" the response regarding whether he was required to file FinCEN form 114, FBAR.

Brockman answered "no" to the question asked on Schedule B regarding receiving a distribution from or being a grantor of, or transferor to, a foreign trust.

As discussed above, Brockman did not disclose his ownership of or report the income attributable to the Brockman Charitable Trust, Point Investments, Spanish Steps, Edge Capital Investments, Cabot Global Investments or other foreign trusts or companies.

**Community Property – 50% Division of Income**
The Brockmans resided in Texas (a community property state) and allocated their income 50% between spouses as community property on their separate Form 1040 returns. The Brockmans included a Form 8958, Allocation of Tax Amounts Between Certain Individuals in Community Property States. This Form was used to prepare a 50% allocation of income items such as the W-2 wages from Reynolds and Reynolds, interest income, dividends, capital gains/(losses), and pension income. The Form was also used to prepare a 50% allocation of W-2 withholding and additional Medicare taxes.

**Mrs. Brockman's 1040 returns (Married Filing Separate)**
On filed tax returns, Mrs. Brockman's occupation is listed as "homemaker." For tax year 2011 and prior, Mrs. Brockman also included a Schedule C-EZ with filed tax returns (NAICS 511000) with the activity described as "book writing." However, little or no Schedule C net income or net self-employment income was reported during the years 2004-2011. No Sch C or C-EZ was included for years after 2011. Mrs. Brockman's primary source of income is the 50% community property allocation of Brockman's W-2 wages and interest, dividends, capital gains/(loss) and pension income per Form 8958.

---

[69] Exhibit 2 (IMFOLT), page 3.
[70] Exhibit 2 (IMFOLT), page 2.

JEOPARDY RECOMMENDATION REPORT
ROBERT T. BROCKMAN                    SSN: ████3444                    YEARS: 2004-2018

### 9. Prior IRS examination (Form 1040 – Tax years 2006, 2007)

Mr. Brockman's 2006 and 2007 Married Filing Separate Form 1040 returns were previously examined by the IRS Large and Mid-Sized Business Operating Division (Fairfax VA).

A Form 4549-A, Examination Report, with adjustments made at the individual level was issued to disallow Schedule E losses from two partnerships, Wizard Productivity LP and Hardwicke Properties LLC. The partnership losses were disallowed at the individual level on Schedule E by recharacterizing them from non-passive to passive due to Brockman's lack of material participation in partnership activities. The losses were disallowed as passive and carried forward per limitations of IRC 469. The exam deficiencies for Brockman's Form 1040 return were computed as $434,825 in 2006 and $571,649 in 2007.[71]

The 2006 and 2007 Form 1040 examinations were closed unagreed to Appeals. Following Appeals involvement, the exam deficiencies were adjusted to $324,297 in 2006 and $426,570 in 2007 and the IRS transcripts indicate that the deficiency amounts and applicable interest amounts were fully paid by Brockman on July 25, 2011.[72]

The 2006 and 2007 IRS examination did not involve Brockman's ownership of offshore entities or unreported investing activity. Information regarding Brockman's offshore activity was not disclosed by Brockman or his representative during the 2006-2007 IRS examination.

Examiner obtained approval for the reopening of the 2006 and 2007 tax years for the purpose of preparing the jeopardy assessment.

---

[71] Exhibit 2 (IMFOLT), pages 5 and 7.
[72] Exhibit 2 (IMFOLT), pages 5 and 7.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN: 3444                YEARS: 2004-2018

**10. Known Financial Condition**

**a.) Bank / Investment Accounts:** *(accounts are presumed open; current balances unknown)*

*1.* ***Zions Bancorporation, NA/Amegy Bank, NA***
*1 S Main St*
*Salt Lake City UT 84133*
- Acct# �switch7534 (Robert T Brockman)
- Acct �switch7540 (Robert T Brockman)
- Acct# �switch7542 (Robert T Brockman)
- Acct# �switch7550 (Robert T Brockman)
- Acct# �switch0740 (Robert T Brockman)
- Acct# �switch2296 (Red Plains Air Charter Inc)

*2.* ***Morgan Stanley Smith Barney LLC***
*One New York Plaza, 8th Floor*
*New York NY 10004*
- Acct# �switch3286 (Robert T Brockman)
- Acct# XXXX5769 (Robert T Brockman)
- Acct �switch5345 (Robert T Brockman)

*3.* ***Wells Fargo Enterprise – Avtg Enter Fund***
*DST Asset Manager Solutions Inc.*
*PO Box 219284*
*Kansas City MO 64121*
- Acct# �sw7001 (Robert T Brockman)

*4.* ***National Financial Services LLC***
*499 Washington Blvd*
*Jersey City NJ 07310*
- Acct# �w 001 (Robert T Brockman)
- Acct# �w6782 (Robert T Brockman)
- Acct# �w6863 (Robert T Brockman)

*5.* ***John Hancock Signature Services***
*PO Box 55913*
*Boston MA 02205*
- Acct# �w8667 (Robert T Brockman)

*6.* ***Lord Abbett Affiliated Fund***
***DST Asset Manager Solutions Inc***
*PO Box 219284*
*Kansas City MO 64121*
- Acct# XXXX9840 (Robert T Brockman)
- Acct# �w9734 (Robert T Brockman)

---

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                    SSN ▮▮▮▮3444                    YEARS: 2004-2018

7. **HSA Bank, A Division of Webster Bank, NA**
   *605 N 8th Street, Ste 320*
   *Sheboygan WI 53081*
   - Acct# ▮▮▮▮▮4724 (Robert T Brockman)

8. **Mirabaud & Cie, SA Bank**
   *Claridenstrasse 26*
   *8002 Zurich Switzerland*
   - Acct# ▮▮9951 (Edge Capital Investments)
   - Acct# ▮▮7463 (Point Investments Ltd)
   - Acct# ▮▮7462 (Spanish Steps Holdings Ltd)
   - Acct# ▮▮1017 (Cabot Global Investments Ltd)
   - Acct# Unknown (Framfield Assets Ltd)

9. **Bank of Singapore**
   *63 Market St, #22-00 Bank of Singapore Centre*
   *Singapore 048942*
   - Acct# Unknown (Spanish Steps Holdings Ltd)


**b.) Real Estate**

   **Harris County, Texas**

1. **333 West Friar Tuck Lane, Houston TX 77024**
   **(Mr. and Mrs. Brockman's principal residence)- currently listed for sale at $15,350,000 (MLS # 20114033)**
   o Property Type: Residential
   o Legal description: Tr 2 Abst 785 E B Cogswell
   o Description: 6 bedroom house with guest house; private lake, tennis court, pool
   o Current owner/grantee: Dorothy K Brockman
   o Previous owner/grantor: Alfred L Deaton III and Elizabeth Evans Deaton
   o Deed history:
      ▪ 7/2/1997, General warranty deed (grantees- Robert T Brockman and Dorothy Kay Brockman)
      ▪ 12/30/1997, Special warranty deed (partition agreement from community property to equal undivided shares as separate property ownership)
      ▪ 2/17/1998, Special warranty deed (Brockman conveyed his 50% undivided interest to Mrs. Brockman so that she holds 100% title as sole and separate property)
   o Appraised/Fair market value: Currently listed for sale at $15,350,000 (May 17, 2021 MLS listing)
   o Encumbrances: None

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN          SSN: ███████3444          YEARS: 2004-2018

2. **335 West Friar Tuck Lane, Houston TX 77024**
   **(Property sold on December 11, 2020 for $3,999,000, MLS # 54931128)**
   - o  Property Type: Vacant Land
   - o  Legal description: Lt 8 Sherwood Forest Sec D
   - o  Description: 1.55 acre lot
   - o  Current owner/grantee: Carole Walter Looke and Cecile James Looke III
   - o  Previous owner/grantor: Robert Brockman and Dorothy Brockman (Mrs. Brockman acting as power of attorney for Brockman)
   - o  Deed history:
     - ▪ 3/9/2005, General warranty deed (Grantee- Dorothy Brockman; Grantor- M Russ Robinson and Leslie W Robinson)
     - ▪ 12/11/2020, Warranty deed (Grantors- Robert Brockman and Dorothy Brockman, Dorothy Brockman, Power of attorney; Grantees- Carole Walter Looke and Cecile James Looke III)

3. **1731 Sunset Blvd, Houston TX 77005**
   **(Property listed for sale on October 26, 2020; sold on May 12, 2021 for $1,375,000, MLS # 32400123)**
   - o  Property Type: Residential
   - o  Legal description: Lt 8 Blk 1 Cheyne Walk Sec 2 Amend
   - o  Description: 4 story townhouse
   - o  Current owner/grantee: Franci Neely
   - o  Previous owner/grantor: Dorothy Brockman
   - o  Deed history:
     - ▪ 5/2/2011, General warranty deed (Grantees- Brockman and Mrs. Brockman as husband and wife)
     - ▪ 10/15/2019, Form 1099-S, Old Republic National Title Insurance Co (Date of closing 10-15-2019), Item Description: 1731 Sunset Blvd, Houston TX 77005, Real estate sales proceeds $760,000.
     - ▪ 10/17/2019, Partition agreement (from community property to separate property)
     - ▪ 10/17/2019, General warranty deed (Brockman conveyed his 50% undivided interest to Mrs. Brockman so that she holds 100% title as sole and separate property)
     - ▪ 5/14/2021, General warranty deed (Grantor- Mrs. Brockman; Grantee- Franci Neely) sales price $1,375,000.
   - o  Appraised/Fair market value: Property sold for $1,375,000
   - o  Encumbrances: None

---

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                    SSN ███3444                    YEARS: 2004-2018

4. **3702 Inwood Drive, Houston TX 77019**
   **(Property gifted to daughter-in-law on November 12, 2020)**
   - o Property Type: Residential
   - o Legal description: Lot 10 Blk 85 River Oaks Sec 11
   - o Description: 4 Bedroom home
   - o Current owner/grantee: Elizabeth Bellows Brockman, sole and separate property
   - o Previous owner/grantor: Dorothy Brockman
   - o Deed history:
     - ▪ 1/21/2020, General warranty deed (Grantee- Dorothy Brockman; Grantor-Everett L Anschutz and Karen Anschutz)
     - ▪ 11/12/2020, Gift general warranty deed (Grantee- Elizabeth Brockman)
   - o Appraised/Fair market value: $3,767,173 (Harris County)
   - o Encumbrances: None

5. **3465 Overbrook Lane, Houston TX 77027**
   **(currently owned by Mrs. Brockman)**
   - o Property Type: Residential
   - o Legal description: Lt 1 & Tr 2A Blk 62 River Oaks sec 7
   - o Description: 5 Bedroom home
   - o Current owner/grantee: Dorothy Brockman, sole and separate property
   - o Previous owner/grantor: Mary Taylor Bosarge
   - o Deed history:
     - ▪ 1/21/2021, Warranty deed (cash) (Grantee- Dorothy K Brockman; Grantor- Mary Taylor Bosarge)
   - o Appraised/Fair market value: $6,328,511 (Harris County)
   - o Encumbrances: None (cash)

   **Pitkin County, Colorado**

6. **230 McFarlane Gulch Rd, Aspen CO 81611 (Brockman "Aspen Vacation Home")**
   **Property is titled in Mountain Queen Inc.**
   - o Parcel # 273729100004
   - o Property Type: Residential
   - o Description: Two structures- Building #1 (2 stories, 4 bd 6.5 bath); Building #2 (2 stories, 2 bd, 2.5 bath)
   - o Acres: 37.97
   - o Current owner/grantee: Mountain Queen Inc., a Colorado Corporation
   - o Previous owner/grantor: Willie Otto Louis et al/Lewis Richard D 50% Int
   - o Deed history:
     - ▪ 3/6/2003, Warranty deed (sales price $9,150,000)
     - ▪ 9/20/2004, Warranty deed (sales price $1,000,000).
   - o Appraised/Fair market value: $ 15,933,400 (2021)
   - o No outstanding mortgage

---

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN               SSN: ████3444               YEARS: 2004-2018

7. **300 McFarlane Gulch Rd, Aspen CO 81611**
   **Property is titled in Henke Property LLC which is held 100% by Henke Holdings LLC**
   - Parcel# 273729100006
   - Property Type: Residential
   - Description: Two structures – Building #1 (2 bd, 2 bath); Building #2 (2 bd, 2 bath)
   - Acres: 11.97
   - Owner: Henke Property LLC
   - Acquired by warranty deed on 9/22/2005
   - Sale price $4,600,000.
   - No outstanding debt

8. **10 Popcorn Lane, Aspen CO 81611 = (Brockman, through Point Investments, holds a $4.6 million note on this property)**
   - Parcel: 273728305001
   - Property Type: Residential
   - Legal description: Subdivision: Mountain High Condo Unit: 1
   - Current owner/grantee: Difficult LLC, a Delaware LLC (Alfred L Deaton, III, Member)
   - Previous owner/grantor: Colorado Meyer Family Return LLC
   - Deed history:
     - 3/30/2011, Special Warranty Deed (Grantor- Colorado Meyer Family Return LLC; Grantee- Difficult LLC, $5,260,000 sales price)
     - 3/30/2011, Deed of Trust (Grantor- Difficult LLC; Lender: Point Investments Ltd, a Bermuda Corporation, $4,000,000 Note)
     - 2/7/2012, Deed of Trust (Grantor- Difficult LLC, Lender: Point Investments Ltd., $4,643,333.33 Note)[73]
   - Appraised/Fair market value: $9,117,000 (2021)
   - Encumbrances: No other mortgages or liens
   - The Point Investments Ltd 2017-2018 financial statements report the $4,643,333.33 principal balance on the note from Difficult LLC on the balance sheet as of 12/31/2018, stating that the terms as 4.3% interest, due 4/1/2031 or upon sale of property. With accrued interest, the loan balance was reported as $6,213,344 at 12/31/2018.[74]


   **Eagle County, Colorado**

9. **"Frying Pan Canyon Ranch" AKA "Tie Camp Ranch"**
   **Property titled in Henke Property LLC and held 100% by Henke Holdings LLC**
   - 120 Ash Rd, Basalt CO (Parcel # 2469-102-00-014)
   - 9081 Frying Pan Rd, Basalt CO (Parcel # 2469-102-00-014)
   - Frying Pan Road (Parcel # 2469-102-00-015)
   - Deed history:
     - 12/28/2010, Special Warranty Deed (Grantor- UIHLEIN, LYNDE BRADLEY 1986 DEC OF TRUST; Grantee- Henke Property LLC) Sales price $5,000,000.
   - Encumbrances: None

---

[73] Exhibit A-96
[74] Exhibit A-33, page 23 (Loans receivable and accrued interest).

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN          SSN: ███████3444          YEARS: 2004-2018

10. **Lot 6, Peachblow PUD, Basalt CO 81621, Eagle County (Parcel # 2469-091-02-004)**
    **Property is held by Mountain Queen Inc.**
    - o Parcel # 2469-091-02-004
    - o Vacant residential land (0.35 acres)
    - o Cost is reported on Mountain Queen Inc., Form 1120, Other Investments $ 790,982
    - o Current owner/grantee: Mountain Queen Inc.
    - o Previous owner/grantor: Aaron L Levitt Trust, et al.
    - o Deed history:
        - ▪ 11/23/2004, Special Warranty Deed (Grantor- Aaron L Levitt Trust, et al;
          Grantee- Mountain Queen Inc.) Sales price $640,000
    - o Encumbrances: None


**Garfield County, Colorado**

11. **11 River Park Lane, Carbondale, CO 81623**
    **Property is held by Dorothy Kay Brockman as her sole and separate property**
    - o Parcel # 239320305028
    - o Description: Single Family Residence
    - o Current owner/grantee: Dorothy Kay Brockman, as sole and separate property
    - o Previous owner/grantor: Weber Living Trust c/o David G Krall, as successor trustee
    - o Deed history:
        - ▪ 8/28/2020, General warranty deed, (Grantor- Weber Living Trust, Krall, David G-
          Sccr Trustee; Grantee – Dorothy Kay Brockman) Sales price: $3,500,000
    - o Encumbrance: None

12. **Lot 8, Prehm Ranch, Glenwood Springs CO 81601**
    **Property titled in Henke Property LLC and held 100% by Henke Holdings LLC**
    - o Parcel # 218534402008
    - o Description: Vacant Land, 35 acres
    - o Current owner/grantee: Henke Property LLC, a Colorado LLC
    - o Previous owner/grantor: Prehm Ranch Holdings LLC
    - o Deed history:
        - ▪ 5/4/2010, General warranty deed, Quitclaim deed (water rights), (Grantor-
          Prehm Ranch Holdings LLC; Grantee – Henke Property LLC) Sales price $539,000
    - o Appraised/Fair market value: $800,000 (2021)
    - o Encumbrance: None

13. **Lot 22, Aspen Glen, Carbondale CO 81623**
    **Property titled in Henke Property LLC and held 100% by Henke Holdings LLC**
    - o Parcel # 239319208022
    - o Description: Vacant residential land, .0268 acres
    - o Current owner/grantee: Henke Property LLC, a Colorado LLC
    - o Previous owner/grantor: Dimatteo/Bond Development Company LP

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN: ████3444                YEARS: 2004-2018

- o Deed history:
  - ▪ 10/5/2005, Warranty deed, (Grantor- DIMATTEO BOND DEV CO L P; Grantee – Henke Property LLC) Sales price $97,500
- o Encumbrance: None

### c.) Stock & Partnership Interests

1. **UCS Holding Inc and subsidiaries, EIN# ████4414 (Corporation):** 99.173% stock ownership is held by Mr. Brockman in the Brockman Charitable Trust (and underlying foreign corporation, Spanish Step Holdings), as of December 31, 2019.

2. **Red Plains Air Charter Inc. (EIN# ████8169), 100% stock held by Mr. Brockman in the Framfield Charitable Trust (Bermuda) and Framfields Assets Ltd (Bermuda)**
   - o Delaware Corp (Entity # ██996)
   - o Incorporated: 11/27/2012
   - o Form 1120, Schedule L Balance Sheet Cash $8,900,000.
   - o Per Schedule G, held 100% by Framfield Charitable Trust (Bermuda)

3. **Brockman & Son Ltd, EIN# ████7347 (Partnership):** 6.58% partnership interest

4. **Briteseed LLC, EIN# ████3741 (Partnership):** 13% partnership interest

5. **Nehemiah Holdings LLC, EIN# ████9920 (Partnership):** 77.78% partnership interest

6. **Nehemiah Ventures LLC, EIN# ████1611 (Partnership):** 33.33% partnership interest

7. **Falcata Capital LLC, EIN# ████8044 (Partnership):** 1% partnership interest

### d.) Other Assets

1. **Aircraft – 2014- Bombardier BD-700-1A10 Global 6000**
   (The aircraft is held in Hardwicke Properties LLC, a DE LLC, registered in OH (EIN# ████0474), with ownership held 99% by UCS Holding Inc. and 1% by Mr. Brockman)
   - o Registered Owner: Hardwicke Properties LLC
   - o FAA Aircraft Registration Number (Tail Number): N529DB
   - o Issuance: 5/9/2016, Expires 5/31/2022
   - o Serial Number: 9675
   - o Model: BD-700-1A 10
   - o Aircraft Bill of Sale: March 25, 2016 (Seller: Bank of Utah under trust agreement)
   - o Rents received: Form 1099-MISC Sunset Aviation LLC DBA Solarus Aviation $618,408 (2018)
   - o Appraised/Fair market valuation: TBD
   - o Encumbrance: None

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN              SSN: ▆▆▆3444              YEARS: 2004-2018

2. **Luxury Yacht - "Albula" (formerly named "Turmoil")**
   (The yacht is held by Brockman in the Cayman Islands Corporation, Fisheries Research Foundation Ltd.)
   - Description: 64m yacht
   - Registered: Cayman Islands
   - IMO Registration: 1008920
   - Current owner: Fisheries Research Foundation Ltd. (Cayman Islands)
   - Brockman filed a Form 8938, *Statement of Specified Foreign Financial Assets*, with his 2017 and 2018 tax returns to report his ownership of 100 shares of stock in the foreign corporation, Fisheries Research Foundation Ltd. (Value $3,500,000).
   - The yacht was acquired in 2016 with $32.8 million in funds from Cabot Global Investments (Mirabaud account), transferred to Alley Maass Rogers and Lindsay Escrow.[75]
   - Additional funds were transferred in 2016 and 2017 from Cabot Global Investments (Mirabaud account) to MTS Yachts Fisheries Research I for operating costs.[76]
   - Encumbrance: None
   - Note- Brockman also formed Albula Acquisition LLC (TX LLC) EIN#▆▆▆7085, with an established date of July 2017. However, no returns were filed for this entity and there was no indication of activity using this entity.

**11. Activity Giving Rise to Jeopardy**

**a.) Illegal Activities**

On October 1, 2020, Brockman was criminally charged with Federal income tax evasion, wire fraud and money laundering offenses primarily related to Brockman's use of the Brockman Charitable Trust, Point Investments, Edge Capital Investments, and Cabot Global Investments offshore entities.[77]

The criminal charges filed against Brockman include:
   - Conspiracy to defraud the U.S. and commit tax evasion (Count 1)
   - Federal tax evasion (tax years 2012-2018) (Counts 2 through 8)
   - Failure to file FBAR (years 2013-2018) (Counts 9 through 14)
   - Wire Fraud affecting a financial institution (Counts 15 through 34)
   - Concealment, tax evasion, and international money laundering (Counts 35 through 37)
   - Evidence tampering and destruction of evidence (Counts 38 and 39)

On March 18, 2021, the U.S. Department of Justice filed a civil forfeiture action in Federal Court to claim property owned by Brockman in Colorado (121 Ash Road, Basalt CO held by Brockman in the name of Henke Property LLC) and approximately $77 million in funds held and frozen in a Mirabaud bank account

---

[75] Exhibit C-45.
[76] Exhibit C-7.
[77] Exhibit A-90.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN:███3444                YEARS: 2004-2018

in the name of Brockman's entity Edge Capital Investments.[78] The forfeiture complaint alleges that the proceeds of Brockman's illegal activity involving Edge Capital Investments (Brockman's fraudulent investing in Reynolds & Reynolds debt which was charged as wire fraud[79]) can be traced to the funds used to purchase the Colorado property and the funds currently held in the Mirabaud bank account.

**Evatt Tamine**, who was employed by Brockman to serve as trustee and corporate director of Brockman's offshore entities between 2004 and 2018, has been a cooperating witness with the U.S. Department of Justice investigation of Brockman.[80] In September and October 2018, the Bermuda Police Service (BPS) obtained search warrants and carried out searches of Tamine's home and storage facilities in Bermuda and seized a number of electronic devices and hardcopy documents related to Brockman's offshore entities. In July 2020, Tamine filed a sworn affidavit with the Supreme Court of Bermuda, Commercial Court, involving trust litigation concerning the Brockman Charitable Trust, explaining that Brockman controlled the administration of the offshore entities and engaged in practices to avoid detection by tax authorities and regulators and to deceive financial institutions.[81]

On October 9, 2020, Brockman's long-time business partner, **Robert Smith**, who formed and managed the Vista Equity Partners investment funds as general partner, entered a Non-Prosecution Agreement with the U.S. Department of Justice admitting to willfully evading federal income taxes and filing false U.S. tax returns for the period from 2000 through 2015.[82] Robert Smith admitted to having engaged in a tax evasion scheme involving his use of foreign trusts and companies, which he controlled and beneficially owned, to conceal his profits from the Vista Equity Partners investment funds. In the statement of facts accompanying the Non-Prosecution Agreement, Robert Smith explained that Brockman (referred to as "Individual A") approached Smith with the idea of forming the Vista Equity private equity funds and that Brockman invested in the funds using Brockman's own foreign trust structure in order to avoid U.S. income tax on the profits.

On April 15, 2021, the Houston-based attorney **Carlos Kepke**, was criminally indicted for conspiracy to defraud the U.S. (18 U.S.C. 371) and aiding and assisting the filing of a materially false income tax return (IRC section 7206(2)) for his role in establishing and managing Robert Smith's offshore trusts and companies and facilitating Robert Smith's evading income tax on income from the Vista Equity Partners investment funds.[83]

Carlos Kepke is a licensed attorney whose specialty over 30 years involved the use of foreign structures for tax planning. Carlos Kepke assisted Brockman with originally forming the Brockman Charitable Trust and other foreign entities.[84]  In Robert Smith's Statement of Facts, Smith stated that Brockman had referred Smith to Carlos Kepke (referred to as "Individual B") for the purpose of forming Smith's own foreign trusts and other entities to avoid U.S. income and estate taxes.[85]

---

[78] Exhibit A-91.
[79] See Attachment B, *Income from Edge Capital Investments*, for further explanation of Brockman's using Edge Capital Investments for investing in Reynolds & Reynolds debt.
[80] Exhibit A-48 (Tamine affidavit), page 2, paragraph 5.
[81] Exhibit A-48 (Tamine affidavit), pages 11-31.
[82] Exhibit A-93.
[83] Exhibit A-94.
[84] Exhibits A-82 through A-84; Exhibit A-87, page 6 ("I am almost thinking that Carlos (as the attorney that originally set up the AEBCT) should come into possession of the documents that appoint the new Protector.").
[85] Exhibit A-93, page 9, paragraph 5.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN          SSN: ████3444                    YEARS: 2004-2018

**b.) Unreported Income**

During the period from 2004 through 2018, Brockman failed to report approximately **$2.7 billion** of income on his tax returns (after allowable losses and deductions).

The unreported income consists of investment income and gains derived from activity though Brockman's sham offshore entities, Point Investments, Edge Capital Investments, and Cabot Global Investments, and from a $635 million distribution from his company UCS Holdings Inc. in 2004 which has been recharacterized from a non-taxable stock redemption to a cash distribution to shareholder from corporate earnings and profits. Brockman exercised complete control over the unreported investment earnings and gains.

Summary of Unreported Interest Income- By Entity and Year (2004-2018):

| Unreported Interest Income | | | | |
|---|---|---|---|---|
| Tax Year | Point Investments | Edge Capital Investments | Cabot Global Investments | Total |
| 2004 | $ 119,359 | | $ - | $ 119,359 |
| 2005 | $ 4,244,577 | | $ - | $ 4,244,577 |
| 2006 | $ 7,356,125 | | $ - | $ 7,356,125 |
| 2007 | $ 1,227,245 | | $ - | $ 1,227,245 |
| 2008 | $ 1,375,680 | | $ - | $ 1,375,680 |
| 2009 | $ 6,382 | $ 3,104,589 | $ - | $ 3,110,971 |
| 2010 | $ 513,283 | $ 1,628,961 | $ - | $ 2,142,244 |
| 2011 | $ 2,266,460 | $ - | $ 4,041,796 | $ 6,308,256 |
| 2012 | $ 231,000 | $ - | $ 6,414,531 | $ 6,645,531 |
| 2013 | $ 238,847 | $ 4,780,916 | $ 12,405,800 | $ 17,425,562 |
| 2014 | $ 1,458,485 | $ 4,152,410 | $ 7,825,176 | $ 13,436,071 |
| 2015 | $ 7,355,730 | $ 254,375 | $ 7,993,899 | $ 15,604,004 |
| 2016 | $ 423,484 | $ 2,580,612 | $ 8,423,036 | $ 11,427,132 |
| 2017 | $ 878,790 | $ 1,131,477 | $ 2,548,763 | $ 4,559,030 |
| 2018 | $ 1,412,954 | $ 945,218 | $ - | $ 2,358,172 |
| Total | $ 29,108,401 | $ 18,578,558 | $ 49,653,000 | $ 97,339,959 |

Summary of Unreported Dividend Income – By Entity and Year (2004-2018):

| Unreported Dividend Income | | | | |
|---|---|---|---|---|
| Tax Year | Point Investments | Cash Distribution from UCCH Inc. | Total | |
| 2004 | | $ 537,668,946 | $ 537,668,946 | amount recharacterized from stock redemption and treated as qualified dividend income to the extent of corporate earnings and profits |
| 2016 | $ 16,835 | | $ 16,835 | |
| 2017 | $ 1,733,071 | | $ 1,733,071 | |
| 2018 | $ 4,174,433 | $ - | $ 4,174,433 | |
| Total | $ 5,924,339 | $ 537,668,946 | $ 543,593,285 | |

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN: ▮▮▮▮3444                YEARS: 2004-2018

### Summary of Unreported Net Capital Gains – By Entity and Year (2004-2018)

| | | Unreported Net Capital Gain | | |
|---|---|---|---|---|
| Tax Year | Point Investments | Edge Capital Investments | Cabot Global Investments | Total |
| 2004 | $ 12,135,737 | | | $ 12,135,737 |
| 2005 | $ 214,200,713 | | | $ 214,200,713 |
| 2006 | $ 245,158,414 | | | $ 245,158,414 |
| 2007 | $ 25,900,641 | | | $ 25,900,641 |
| 2008 | $ (8,087,386) | | | $ (8,087,386) |
| 2009 | $ - | | | $ - |
| 2010 | $ 773,045,853 | $ 46,891,939 | | $ 819,937,792 |
| 2011 | $ 6,686,899 | | | $ 6,686,899 |
| 2012 | $ 125,405,712 | | $ 2,982,668 | $ 128,388,380 |
| 2013 | $ 122,745,397 | | $ 375,000 | $ 123,120,397 |
| 2014 | $ 32,302,010 | $ 1,009,459 | $ 575,789 | $ 33,887,259 |
| 2015 | $ 196,107,631 | | $ 62,500 | $ 196,170,131 |
| 2016 | $ 82,214,921 | $ 104,121 | | $ 82,319,042 |
| 2017 | $ 439,636,493 | $ 1,289,568 | | $ 440,926,061 |
| 2018 | $ 62,442,188 | $ - | $ - | $ 62,442,188 |
| Total | $ 2,329,895,223 | $ 49,295,088 | $ 3,995,957 | $ 2,383,186,268 |

### Summary of Adjustments to Income - After allowable losses and deductions (2004-2018)

| Tax Year | Total Unreported Interest Income | Total Unreported Dividend Income | Total Unreported Net Capital Gain | Other Income (Loss) Point Investments | Sch E Income/(Loss) Point Investments | Net Operating Loss (NOL) Carryback | Total* |
|---|---|---|---|---|---|---|---|
| 2004 | $ 119,359 | $ 537,668,946 | $ 12,135,737 | | | | $ 549,924,042 |
| 2005 | $ 4,244,577 | | $ 214,200,713 | | $ (2,409,623) | | $ 216,035,667 |
| 2006 | $ 7,356,125 | | $ 245,158,414 | | $ (791,377) | $ (446,701) | $ 251,276,461 |
| 2007 | $ 1,227,245 | | $ 25,900,641 | | $ (7,640,104) | | $ 19,487,782 |
| 2008 | $ 1,375,680 | | $ (8,087,386) | | $ (4,769,071) | | $ (11,480,777) |
| 2009 | $ 3,110,971 | | $ - | $ 20,272 | $ (3,582,966) | $ (71,619,253) | $ (72,070,976) |
| 2010 | $ 2,142,244 | | $ 819,937,792 | $ 406,061 | $ (6,592,999) | $ (67,994,994) | $ 747,898,104 |
| 2011 | $ 6,308,256 | | $ 6,686,899 | $ (78,321,241) | $ (9,859,357) | | $ (75,185,443) |
| 2012 | $ 6,645,531 | | $ 128,388,380 | | | | $ 135,033,910 |
| 2013 | $ 17,425,562 | | $ 123,120,397 | | | | $ 140,545,959 |
| 2014 | $ 13,436,071 | | $ 33,887,259 | | | | $ 47,323,330 |
| 2015 | $ 15,604,004 | | $ 196,170,131 | | | | $ 211,774,135 |
| 2016 | $ 11,427,132 | $ 16,835 | $ 82,319,042 | | | | $ 93,763,009 |
| 2017 | $ 4,559,030 | $ 1,733,071 | $ 440,926,061 | | | | $ 447,218,162 |
| 2018 | $ 2,358,172 | $ 4,174,433 | $ 62,442,188 | $ - | $ - | $ - | $ 68,974,793 |
| Total | $ 97,339,959 | $ 543,593,285 | $ 2,383,186,268 | $ (77,894,908) | $ (35,645,497) | $ (140,060,948) | $ 2,770,518,159 |

*Total adjustment to taxable income before adjustments to Itemized deductions and Personal Exemptions

JEOPARDY RECOMMENDATION REPORT
ROBERT T. BROCKMAN                SSN: ███3444                    YEARS: 2004-2018

### c.) Concealment of Assets (Sham Entities)

**Brockman used sham foreign entities to conceal his ownership of entities generating investment gains**

As discussed above in **Section 5, *Brockman holds ownership of UCS Holding Inc and subsidiaries in an offshore structure***, and **Section 6, *Brockman's use of offshore entities to conduct investment activity***, Brockman established multiple offshore structures for concealment purposes and to avoid U.S. income tax. Brockman used the appointment of nominee directors, trustees, managers and/or trust protectors, such as Evatt Tamine, merely to create the appearance that Brockman was not associated with the offshore structure and to conceal Brockman's ownership and control over the entities and financial accounts.

For example, Brockman directed that the name of the Brockman Trust be changed from its original "A Eugene Brockman Children's Trust" to "A Eugene Brockman Charitable Trust." Brockman was concerned about potential IRS scrutiny of having "Children's" in the trust name in light of the news of the criminal prosecution of Texas-based billionaires Sam Wyly and Charles Wyly for tax evasion involving offshore trusts.[86]

**Brockman originally held ownership using trusts formed in the Massengill family name**
Brockman originally held ownership of his offshore entities through trusts formed in the name of his employee Don Jones' wife's family members (the Massengill Family Trusts). This was designed to further conceal Brockman's connection to the underlying Brockman-controlled entities.

Don Jones was compensated by Brockman for the use of the Massengill Trusts as part of the Brockman offshore structure.[87]

Brockman used the following trusts formed in the Massengill family name, before having them replaced with other trusts:
- Massengill Grandchildren's Trust (Brockman used to hold ownership of Point Investments)
- Massengill Children's Trust (Brockman used to hold ownership of Edge Capital Investments)
- Louise C Massengill Family Trust (Brockman used to hold ownership of Cabot Global Investments)

**General nature of Brockman's control over the offshore entities**
- Tamine explained that, although he and other individuals served as director, trustee, manager or trust protector of Brockman's offshore entities, Brockman retained complete control over the assets and activities conducted by these entities.[88]

---

[86] Exhibit A-78.
[87] See Exhibit A-59 ("Income will be $200,000 per year to an entity of my choice as long as the Jones/Massengill entities are involved with the Brockman entities in any way. When they are only handling their affairs the compensation will cease.").
[88] An affidavit prepared by Tamine, dated July 4, 2020, was filed in litigation in the Supreme Court of Bermuda involving the Brockman Charitable Trust. [Exhibit A-48]. Tamine's affidavit provides details and supporting exhibits explaining his employment for Mr. Brockman from 2004 to 2018 and his role in managing Brockman's

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN              SSN: ███3444              YEARS: 2004-2018

- Tamine explained that Brockman controlled the Brockman Charitable Trust and related offshore entities: **". . . Mr. Brockman gave very detailed instructions directing the administration of the Brockman Trust and all of the other entities that were associated with him"** and that **"[Brockman] made all of the substantive and strategic decisions and he directed others to implement them. Nothing material ever happened in relation to the Brockman Trust that was not ordered or approved by Mr. Brockman, either in writing or orally . . ."**[89]

- In addition to direction by in-person meetings, phone, encrypted email and secure messaging, Brockman provided directions to Tamine in the form of To-Do lists and Performance Reviews. Brockman's list of duties for Tamine included to **"Continue to address the projects on the To-Do List"** and to **"Update the To-Do list at least monthly."**[90] The To-Do lists were updated from time to time with items being removed as they were completed and new items being added.

- The annual compensation, discretionary bonus and investment incentive bonus which Brockman granted to Tamine and other service providers were tied to accomplishing Brockman's investment goals and other objectives.[91]

**Examples of Brockman's control over investment decisions**

- Brockman documented his specific instructions to Tamine regarding investment decisions in the To-Do Lists he prepared for Tamine.
  - For example, investment decisions for Point Investments were labeled under the **VISTA EQUITY FUND** and **INVESTMENTS** sections of the To-Do list Brockman prepared. Brockman's May 21, 2011 To-do list for Tamine mentioned **"-consider $200M initial commitment to VEPFIV – awaiting partnership agreement from Vista"** and **"-also consider co-invest fund that invests alongside Vista deals"** under the **VISTA EQUITY FUND** section and **"-VFF $50M commitment"** under **NEW INVESTMENTS** section.[92]
  - Brockman's To-Do List for Tamine, dated March 19, 2013[93] included a **"NEW INVESTMENTS"** section which listed the companies which Cabot Global Investments would be investing in: Vision Solutions, Applied Systems, Misys, The Petroleum Place, SumTotal, Deltek Inc.

- Brockman gave specific instructions to Tamine by email, such as opening a trading account at Deutsche Bank in the name of Edge Capital Investments.[94] Brockman instructed Tamine to represent himself as acting on behalf of Edge Capital Investments when inquiring about the purchases of debt at Deutsche Bank and opening a trading account with Deutsche Bank.[95] Between March and April 2009, Tamine, at Brockman's direction[96], executed ten trades in the name of Edge Capital Investments to debt on the secondary market.

---

offshore entities at the direction of Mr. Brockman and that Mr. Brockman controlled all related offshore entities despite the appointment of nominee shareholders, trustees, corporate directors or trust protectors. [Exhibit A-48, pages 11-29].

[89] Exhibit A-48 (Tamine affidavit), page 19, paragraphs 98-99.

[90] Exhibit A-51.

[91] See Exhibits A-52 and A-53.

[92] Exhibit A-54.

[93] Exhibit C-10.

[94] Exhibit B-21.

[95] Exhibit B-20.

[96] Exhibit B-22 (examples of emails from Brockman to Tamine directing the investing activity in 2009).

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN              SSN: ███3444              YEARS: 2004-2018

**Examples of Brockman's control over trustees, directors and trust protectors**

- Tamine described his role as the "figure head" of the Brockman Charitable Trust and other trusts and that he held "the key directorships" to "control the information."[97] Tamine stated that he undertook his role with respect to the various entities to maintain Brockman's control over the entities (for Brockman's "benefit and protection").[98]

- The previous trustee of the Brockman Charitable Trust, **Gordon Howard**, who served as trustee until his death in August 2010, similarly did not exercise a fiduciary or managerial role for the trust, but was directed by Brockman.[99] Brockman, in an email to Tamine dated October 24, 2004, stated that "**Gordon's presence in regards to the [Brockman Trust] is desirable for making things smell good in the course of an inquiry, but is not absolutely necessary."**[100] Brockman personally directed that Tamine replace Gordon Howard as trustee of the Brockman Trust.[101]

- In addition to giving specific directions, Brockman maintained control over Point Investments and the Brockman Charitable Trust and related entities by having "doomsday documents" on file. These documents consisted of undated, pre-signed letters of resignation from Tamine for all applicable entities and pre-signed letters of resignation from all trustees and trust protectors.[102] Tamine's duties included to **"Annually verify that there are letters of resignation from all trustees and that Bob has the originals."**[103] This allowed Brockman to immediately replace these individuals if needed.

- Brockman also maintained control over the various companies and trusts by having copies of electronic signatures of Tamine and other trustees and trust protectors so that he could use their electronic signature to sign documentation relating to the entities.[104]

**Examples of Brockman's control over funds held by the offshore entities**

- As discussed above, Brockman held decision making authority over the use of assets held by the offshore entities when making investment decisions.

- Brockman was given the userid and password of bank accounts held in the name of the offshore entities so that he could personally have access to the accounts.

- Brockman controlled the selection of financial institutions and jurisdictions for foreign bank accounts. For example,

  o By email dated April 24, 2011, Brockman instructed Tamine to convert funds held in bank accounts (balances in accounts held in the name of **"Edge-Augustus-Schwab BCB")** from U.S. dollars to Canadian dollars.[105] Tamine replied that same day and stated **"Bob, I'll start**

---

[97] Exhibit A-80, page 5 (paragraph 18) and page 6 (paragraph 22).
[98] Exhibit A-53, pages 2-3 (paragraph 3).
[99] Exhibit A-48 (Tamine affidavit), page 13, paragraph 60 ("Gordon Howard did not perform any executive role at all. All decisions were made by Mr. Brockman and implemented by Don Jones, with Mr. Howard providing the corporate formalities where required, acting entirely on Don Jones' instructions. This continued after I later took on Don Jones' role.").
[100] Exhibit A-55.
[101] Exhibit A-56.
[102] Exhibit A-57 (To Do List "Projects – Other").
[103] Exhibit A-51.
[104] Exhibit A-58; Exhibit A-48 (Tamine affidavit), page 25, paragraph 129.
[105] Exhibit B-45.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN:        3444                YEARS: 2004-2018

the process immediately. Should I start looking for debt opportunities in the Canadian market? Evatt" and Brockman responded "Evatt, Once you get this done, then that would be appropriate. Bob"[106]

- o By email dated April 26, 2011, Brockman stated to Tamine that he did not want to move accounts to a Swiss bank: "Moving Edge and Cabot Schwab funds – we would not want to do to Mirabaud – and getting set up with another Swiss bank will take too long. Bob." [107]

- o Later, Brockman's To-Do List for Tamine, dated May 16, 2012 included a statement under "TRIPS" that Tamine was to "finish Cabot/Edge bank accounts in Switzerland."[108]

- o During 2013, Tamine and Brockman continued to discuss opening an account for Cabot Global Investments in Switzerland and moving funds from Bermuda to Switzerland to reduce their exposure in Bermuda.[109]

- o Tamine stated that he was working on opening an account for Cabot in Bank Miabaud (Geneva, Switzerland) and that as far as the bank was concerned, Brockman's controlled entity, Addington LLC (entity holding 100% of Cabot Global Investments) was held by charitable trusts and that "It took some time, but Mirabaud are comfortable with the explanations."[110] Brockman replied to Tamine that he was happy Tamine was able to transfer such large funds out of Bermuda Commercial Bank "with so little hassle."[111]

- Brockman had control of funds to make loans to Tamine and to Brockman's business associates:

- o Brockman approved large loans to Tamine ($900,000 to purchase a property in Bermuda and $900,000 for the purchase of property in England). Brockman used money from Edge Capital Investments to transfer to Legend Investments (labeled Performance Investments) to pay the loans to Tamine.[112]

- o Brockman authorized a $75 million payment to Robert Smith from the Point Investments Mirabaud bank account on July 18, 2014 purportedly as an unsecured loan.[113] There is no explanation of the purpose of the $75 million loan to Robert Smith and no record of repayment of the loan or interest payments in Point Investment financial records.

- o Brockman authorized that Point Investments make $4.5 million in loans to a business associate named Al Deaton for the purchase of real estate in Aspen Colorado and a $5 million loan to a business associate named Allan Smith which remain unpaid based on available records.[114]

- Brockman had control of funds to make large charitable contributions:

- o Brockman's control over the assets of Point Investments and the Brockman Charitable Trust can be seen in Brockman's use of funds for charitable giving, [115] including Brockman

---

[106] Exhibit B-45.
[107] Exhibit B-46.
[108] Exhibit B-48, page 8.
[109] Exhibit C-21.
[110] Exhibit C-21.
[111] Exhibit C-21.
[112] Exhibits B-43 and B-44.
[113] Exhibits A-10; Exhibit A-30 (Point Investments 2014 Financial Statement "Loan Receivable")
[114] Exhibit A-10; Exhibit A-7; Exhibit A-30 (Point Investments 2014 Financial Statement "Loan Receivable")
[115] Exhibits A-66 and A-67.

JEOPARDY RECOMMENDATION REPORT
ROBERT T. BROCKMAN                SSN: ███3444                YEARS: 2004-2018

     instructing Tamine to pledge a $250 million cash contribution to Center College, before Brockman decided to withdraw the pledged contribution.[116]

o  Between 2009 and 2017, Brockman transferred funds totaling $20 million to Rice University for the Brockman Hall for Physics, $17.3 million to Rice University for the Brockman Hall for Opera, $25 million to Baylor College of Medicine, and $25.5 million to Center College where the A. Eugene Brockman Commons (in honor of Brockman's father) and the Pearl Brockman Hall (in honor of Brockman's mother and grandmother) were constructed.[117] At Brockman's direction, Tamine prepared Excel spreadsheet reports of Brockman's charitable contributions pledged and/or paid using trust assets.[118]

**Examples of Brockman's control over the organization of trusts and companies within the offshore structures**

- Brockman gave direction to Tamine (and previously Don Jones) regarding the organization of the entities within the Brockman Charitable Trust offshore structure and gave approval to reorganize and replace the trusts and companies within the structure.[119]

- Brockman's duties for Tamine included to **"Monitor the ongoing legislative process in the USA and other jurisdictions and facilitate whatever restructuring ends up being required."**[120]

- Tamine, with Brockman's approval, re-domiciled Point Investments from the British Virgin Islands to Bermuda to avoid new BVI reporting and disclosure regulations.[121]

- Brockman instructed Tamine to begin simplifying the entities which comprised the offshore structure as part of a reorganization. For example, Brockman instructed Tamine to **"reduce the number of entities- or at least focus on getting rid of inactive entities"** in the **"STRATEGIC LONG-TERM"** section of Brockman's written To-Do List prepared for Tamine, dated April 26, 2009.[122] Brockman refers to this reorganization as a **"clean up"** of the structure.[123]

- In 2010, Tamine suggested a plan to Brockman to consolidate other Brockman-controlled entities into the Brockman Charitable Trust structure for simplification and additional control by Brockman stating that they "could cut off probably 50-70% of our existing structures- trusts and companies."[124] Brockman disagreed with Tamine's proposed reorganization because of potential IRS scrutiny and instructed Tamine that the two entities **"need to be kept way in the background with separate charitable trusts, trust protectors, and underlying companies."**[125]

- Brockman provided a description of the proposed reorganization of the Cabot Global Investments structure to Tamine by email dated July 28, 2010.[126] The proposed reorganization was also included in Brockman's To-Do List for Tamine, dated December 17, 2011, under the section **"ENTITY**

---

[116] Exhibit A-70 and A-71.
[117] Exhibit A-69.
[118] Exhibits A-68 and A-69.
[119] For example, Brockman's To Do List, dated 9/18/2004 [Exhibit A-76 "Strategic Long-Term" and "Evatt Projects"].
[120] Exhibit A-51.
[121] Exhibit A-79, page 2 (paragraph 7).
[122] Exhibit C-60.
[123] Exhibit C-62.
[124] Exhibit A-73, page 2 (paragraph 4).
[125] Exhibit A-73, page 1.
[126] Exhibit C-61.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN: ███3444                YEARS: 2004-2018

STRUCTURE."[127]


**Brockman used sham foreign trusts and foreign companies to disguise ownership of assets**

Brockman established additional sham trusts and companies to conceal his purchase and ownership of various assets (as discussed above in **Section 7, Brockman's use of offshore entities to conceal his ownership of assets**):

- o   Brockman authorized the purchase of land and improvements to build a fishing lodge for Brockman's personal use (the "Frying Pan Canyon Ranch" AKA "Tie Camp Ranch") and other real estate in Colorado, using funds from Edge Capital Investments. Title to the properties was held in the name of Henke Property LLC, a Colorado LLC with no apparent connection to Brockman and thus concealing his ownership. Ownership of the property was further concealed because ownership of Henke Property LLC was held by Henke Holdings LLC, which in turn, was held by an offshore structure established by Brockman (consisting of the Heraclides Charitable Trust and Regency Management Ltd.).

- o   Brockman authorized the purchase of a vacation home and other real estate located in Colorado with title held in the name of Mountain Queen Inc., a Colorado Corporation, with no apparent connection to Brockman and thus concealing his ownership.  Ownership of the property was further concealed because Mountain Queen Inc. was held by the offshore structure established by Brockman (consisting of the Heraclides Charitable Trust and Regency Management Ltd.).

     In 2014, Brockman became interested in purchasing the luxury yacht "Albula" (formerly named "Turmoil").  Brockman instructed Tamine to conceal that Brockman was the interested party when pursuing the acquisition and authorized Tamine to form a Cayman Islands-based offshore company to hold ownership of the yacht. Brockman used approximately $43.8 million in funds from his Cabot Global Investments bank account to purchase and maintain the yacht with ownership of the yacht held in the name of the Cayman Islands company, Fisheries Research Foundation Ltd.

- o   In 2012, Brockman authorized $ 15 million to be paid from the Brockman Charitable Trust assets (Spanish Steps Holdings bank account) for the purchase of an aircraft from Brockman's company UCS Holding Inc. Brockman instructed Tamine to form an offshore structure (consisting of the Framfield Charitable Trust, Framfield Assets Ltd, and Red Plains Air Charter Inc.) to acquire and hold ownership of the entity holding the aircraft (Hardwicke Properties LLC).

---

[127] Exhibit C-13.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN: ████3444                     YEARS: 2004-2018

**Brockman's records indicate many other foreign "charitable" trusts were used in prior years**

During the 2004-2018 years, Brockman used the following foreign trusts with "charitable" in the trust name to create the false appearance of a charitable purpose and to avoid scrutiny by the IRS and other authorities and financial institutions:

- A. Eugene Brockman Charitable Trust (Brockman used to hold ownership of Point Investments and Spanish Steps Holding and UCS Holdings Inc.)
- Heraclides Charitable Trust (Brockman used to hold ownership of Regency Management, Henke Holdings and Mountain Queen Inc.)
- Messery Charitable Trust (Brockman used to hold ownership of Cabot Global Investments)
- Alpheus Charitable Trust (Brockman used to hold ownership of Edge Capital Investments)
- Framfield Charitable Trust (Brockman used to hold ownership of Red Plains Air Charter Inc.)

Based on Brockman's worksheets listing the inventory of formation documents,[128] Brockman has a long history of using foreign trusts and companies.  For example, Brockman's list of formation documents reveal that Brockman formed many other foreign trusts with "charitable" names, such as the following:

| Name | Listed Date of Trust Indenture |
| --- | --- |
| Companion Charitable Trust | 2/18/1998 |
| Endurance Charitable Trust | 3/20/2003 |
| Provident Charitable Trust | 10/16/1997 |
| Evergreen Charitable Trust | 6/19/1997 |
| Legacy Charitable Trust | 12/14/1987 Jones Family Trust Indenture |
| Oxford Charitable Trust | 6/19/1997 |
| Waterford Charitable Trust | 7/27/1998 |
| Seneca Charitable Trust | 12/13/1994 |
| Aberdeen Charitable Trust | 10/1/2003 |
| Benevolent Charitable Trust | 6/25/1997 |
| Inverness Charitable Trust | 10/1/2003 |
| Lineage Charitable Trust II | 10/1/2003 |
| Maritime Charitable Trust | 9/27/1991; 6/19/1997 |
| Service Charitable Trust II | 6/25/1997 |
| Shetland Charitable Trust | 10/1/2003 |
| Worldwide Charitable Trust | 6/19/1997 |
| Heritage Charitable Trust | 2/23/1990 |
| Worldwide Hunger Fund Charitable Trust | 5/20/1993 |
| Enterprise Charitable Trust | 6/25/1997 |
| Challenge Charitable Trust | 10/15/1998 |
| Lineage Charitable Trust | 12/24/1992 |
| Philanthropic Charitable Trust | 6/25/1997; 9/21/1994 |

---

[128] Exhibit B-9 (inventory of Brockman formation documents); Exhibit A-82 (inventory of correspondence with attorney Carlos Kepke).

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN            SSN: ████3444            YEARS: 2004-2018

**d.) Transfers to place property beyond the reach of the government**

**The Brockmans are currently selling and gifting their real estate in Texas**
As discussed above in **Section 10b, Real Estate**, the Brockmans have been selling and listing properties for sale in the months following Brockman's criminal indictment in October 2020.

- o The Brockman's principal residence **(333 West Friar Tuck Lane, Houston TX 77024)** is currently listed for sale for $15,350,000 (MLS # 20114033). Although originally acquired by Mr. Brockman and his wife as community property in 1997, the Brockmans shortly thereafter recorded a partition agreement followed by a deed with Brockman conveying his 50% separate share to Mrs. Brockman to hold title as her 100% sole and separate property.

- o The Brockmans sold a 1.55 acre lot **(335 West Friar Tuck Lane, Houston TX 77024)** on December 11, 2020 for $3,999,000 (MLS # 54931128). The property was sold with Mr. and Mrs. Brockman, with Mrs. Brockman acting on Mr. Brockman's behalf as power of attorney.

- o The Brockmans sold their 4 story townhouse **(1731 Sunset Blvd, Houston TX 77005)** on May 12, 2021 for $1,375,000 (MLS # 32400123). The property had originally been listed for sale on October 26, 2020. As with the Brockman's personal residence, the Sunset Blvd property had originally been acquired by the Brockmans as community property in 2011 but shortly thereafter the Brockmans recorded a partition agreement followed by a deed with Brockman conveying his 50% separate interest in the property to Mrs. Brockman to hold as her 100% sole and separate property.

- o The Brockmans gifted their 4 bedroom home **(3702 Inwood Drive, Houston TX 77019)** to their daughter-in-law on November 12, 2020. The property had originally been acquired by Mrs. Brockman as her sole and separate property by deed recorded on January 21, 2020 and gifted the property to her daughter-in-law, Elizabeth Bellows Brockman on November 12, 2020 as her sole and separate property. The Brockman's son, Robert T Brockman II, was not included in the gift of title to the property.

**The Brockmans have litigation pending in Bermuda to appoint new trustees of the Brockman Charitable Trust**
The Brockmans initiated court proceedings in Bermuda to replace the current trustees of the Brockman Charitable Trust and to appoint new trustees, based in the Cayman Islands, potentially granting them greater control over the trust and ability to dispose or transfer trust assets.

As discussed above, the Brockman Charitable Trust is the ultimate owner of Brockman's U.S.-based companies (including UCS Holding Inc. and Reynolds & Reynolds) and Brockman's offshore companies (including Point Investments).

The trust litigation in Bermuda, *St John's Trust Company (PVT) Limited vs. James Watlington, et al.*, was filed in The Supreme Court of Bermuda in 2019. The Brockmans sought an ex parte injunction to effectively terminate the authority of the current trustees of the Brockman Trust.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN              SSN ████ 444              YEARS: 2004-2018

The litigation concerning the appointment of new trustees is before the Bermuda Appellate Court with decision pending (Civil Appeal No. 8 of 2020 - *St. John's Trust Company (PVT) Limited v Medlands (PTC) Limited et al.*).[129]

Mrs. Brockman is acting on Mr. Brockman's behalf in the trust proceedings pursuant to the power of attorney granted to her by Brockman.

### e.) Actions to avoid IRS detection

Brockman has taken actions over the years to avoid detection by the IRS and other tax authorities and regulators.

### Use of code names

Brockman assigned code names for himself and for nominees and other offshore service providers when communicating via encrypted email regarding the offshore activity.[130]

Brockman used the email code name "Permit" or "Permit1."

Given that Brockman is an avid fisherman, he assigned fish-related code names to the other individuals.

Below are examples from Brockman's list of code names he assigned to users of the encrypted email system:[131]

|   | Person | Code Name |
|---|--------|-----------|
| o | Robert Brockman | "Permit" or "Permit1" |
| o | Evatt Tamine | "Redfish" |
| o | Don Jones | "Bonefish" or "King" |
| o | Cris Ruffel-Smith | "Coho" |
| o | Peter Poole | "Grayling" |
| o | Robert Smith | "Steelhead" |

In these encrypted emails, Brockman referred to the IRS as "the house."

### Use of aliases

At various points, Brockman used the alias "John Barnes" when communicating by email with Evatt Tamine and other individuals regarding the offshore activity.[132]

---

[129] Exhibit A-84, page 4 ("Meanwhile in Bermuda, oversight of the multi-billion-dollar A. Eugene Brockman Charitable Trust, remains in limbo, as attorneys for Brockman and his wife Dorothy argued recently to the Bermuda appellate court that they ought to appoint a new independent trustee to oversee the trust, replacing anyone connected to former trustee Tamine. According to attorneys, Cayman Island-based trust specialist Maples Group has agreed to take on the job.")
[130] Exhibit A-85, pages 10-11.
[131] Exhibit A-85, pages 10-11.
[132] Exhibit A-85, page 12.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN          SSN: ████3444          YEARS: 2004-2018

Brockman also assigned the alias "Michael Gilbert" to Tamine, the alias "Harry Andrews" to Don Jones and James Gilbert was assigned the alias "Tina Nash."[133]

The alias or code name would be incorporated into the secure email addresses used by Brockman and other individuals, for example, Brockman used his code name "Permit" when establishing his email addresses: permit1@lambdaprime.org, permit@proventusconstans.com, permit@houstonfishingservice.com; Don Jones incorporated his alias "Harry Andrews" into harryandrews@fscresearch3.com and code name "King" into king@lambdaprime.org; Tamine incorporated his code name "redfish" into redfish@proventusconstans.com and redfish@lambdaprime.org.

**Use of encrypted messages and emails**

Brockman used a number of different email systems as he insisted on upgrading security to avoid detection by the IRS and other authorities.[134]

For example, beginning in 2005, Brockman used the encrypted server/secure email system with the domain name "@houstonfishingservice.com".[135]  Brockman later changed to the domain name "@lambdaprime.org" and also used the domain names "@proventusconstans.com" and "@hannah.com."

Between 2005 and 2010, Brockman adopted the email encryption system called PGP.[136]

Brockman chastised Tamine for violating security protocols when Tamine, from Bermuda, sent an email to Brockman with an Excel attachment from his personal email account (etamine@logic.bm) instead of the secured email account (redfish@lambdaprime.org) calling it a "breach of security."[137] Brockman instructed Tamine to immediately close his personal email account and eliminate all other email accounts on his main computer except for the redfish@lambdaprime.org account.

**Laptop security and other security measures**

Brockman was concerned about having his computers and laptops seized and searched by U.S. customs or by other authorities.

Brockman instructed Tamine to use the RADMIN remote access software on his laptop so that he would be able to transfer files and work remotely on laptops located elsewhere and travel with a "stripped down laptop that has no files on it."[138] Brockman stated he was concerned about going through Customs with computer files and that they "should never do that."[139]

---

[133] Exhibit A-48 (Tamine affidavit), page 24, paragraphs 120-121.
[134] Exhibit A-48 (Tamine affidavit), page 25, paragraph 125.
[135] Exhibit A-85, pages 14-16.
[136] Exhibit A-48 (Tamine affidavit), page 25, paragraph 126.
[137] Exhibit A-85, pages 17 and 21.
[138] Exhibit A-85, page 24; Exhibit A-86, pages 1-3; Exhibit A-88, page 2.
[139] Exhibit A-86, page 1.

JEOPARDY RECOMMENDATION REPORT
ROBERT T. BROCKMAN                 SSN:▬▬▬3444                 YEARS: 2004-2018

Brockman himself possessed an "RADMIN laptop" in addition to his laptop at home.[140] Brockman stated that his goal for Tamine and for Don Jones "is to get everything converted to a completely RADMIN form of access."[141] Tamine discussed that he installed the RADMIN server set up so that he could work remotely on a laptop located in the Cayman Islands.[142]

Brockman expressed concern about the security of using Skype for video-conferencing when discussing his offshore activity. Brockman stated he believed Microsoft's acquisition of Skype made it less secure because Microsoft may be "opening the door to government access to audio."[143] Brockman instructed Tamine to disable the microphone and speaker in Skype and use the RADMIN encrypted voice chat headsets instead.[144]

Brockman discussed with Tamine the need to "figure out a good video conferencing piece of software that will run over a VPN from one dedicated IP address to another" in light of the "Big Brother activities of the US government."[145]

Brockman instructed Tamine to purchase and test the Romanian-developed "Invisible Secrets 4" software package as a security measure in the event their laptop were physically seized.[146] Brockman was interested in embedding encrypted messages into photo image files (without disturbing the appearance of the photo) so that Brockman would be able to hide sensitive information regarding his offshore activity in photos images and prevent detection if the laptop were searched by authorities.

**Use of phones**
Brockman directed that Tamine and other individuals use the secure application called "Silent Phone" to avoid having permanent call records regarding his offshore activity.[147]

Brockman also directed that Tamine and Don Jones cease making direct calls from landline or cell phones to the British Virgin Islands and Cayman Islands out of concern that the IRS may be intercepting and analyzing calls made between the U.S. and the Cayman Islands or the British Virgin Islands.[148] Brockman referred to the Senate Investigations Committee Report and his belief that tax authorities may be scanning telephone records as the reason for concealing phone calls to and from the British Virgin Islands.[149]

Brockman directed that Tamine and Don Jones open Vonage phone accounts with British Virgin Island telephone numbers so that the calls "will look innocent" and "will take another layer of programming for the [IRS] to figure that one out."[150]

---

[140] Exhibit A-85, pages 5 and 7.
[141] Exhibit A-88, page 11.
[142] Exhibit A-86, page 3.
[143] Exhibit A-85, pages 22-23.
[144] Exhibit A-85, page 23.
[145] Exhibit A-85, page 25.
[146] Exhibit A-85, page 5.
[147] Exhibit A-85, page 12; Exhibit A-48 (Tamine affidavit), page 24, paragraph 119.
[148] Exhibit A-85, page 8.
[149] Exhibit A-85, page 9.
[150] Exhibit A-85, page 8.

JEOPARDY RECOMMENDATION REPORT
ROBERT T. BROCKMAN                    SSN: ████3444                    YEARS: 2004-2018

**Concealing computer files while traveling**
Brockman required Tamine to adopt security measures when traveling with computer files or transporting laptops.[151] Brockman's concern was that the computer files or laptops may be seized or otherwise searched by Customs or other authorities.[152] On one trip by Tamine from France to Bermuda, Brockman suggested Tamine create two backup copies of files on encrypted MicroSD cards and travel to Bermuda with one copy concealed in luggage and the second copy to be mailed to himself in Bermuda by FedEx concealed with other miscellaneous correspondence.[153] Brockman insisted that Tamine not travel through the U.S. on his connection to Bermuda and Tamine confirmed that he was not going through the U.S.[154]

Brockman's Annual Performance Review for Tamine included the task to "Convert to keeping all email and financial records on an encrypted USB dongle carried in a different location in luggage when traveling abroad" among the "General Goals for Every Year."[155]

**Moving bank accounts and operations to additional foreign jurisdictions**
In January 2017, when Brockman was informed that Bermuda Commercial Bank had frozen the bank accounts for his offshore entities in Bermuda, Brockman authorized moving banking relationships and forming "mirror companies" in multiple jurisdictions, including Switzerland, Singapore, Guernsey, Cayman Islands, Jersey, Nevis, British Virgin Islands and Isle of Man.[156]

**Attending anti-money laundering seminar**
Brockman approved Tamine's attending an anti-money laundering (AML) seminar in Bermuda (under an assumed identity) to learn bank compliance practices.[157]

**f.) Preparing false documents**

Brockman also maintained control over the various foreign trusts and companies by having copies of electronic signatures of Tamine and other trustees and trust protectors so that Brockman could use their electronic signature to sign documentation relating to the entities.[158]

Brockman learned that copy machine/laser printer has encoded information identifying the manufacturer and month and year of manufacture.[159] This would potentially allow authorities to detect

---

[151] Exhibit A-86, pages 1 and 3; Exhibit A-88, page 3.
[152] Exhibit A-86, page 1.
[153] Exhibit A-86, page 5.
[154] Exhibit A-86, pages 3 and 6.
[155] Exhibit A-51.
[156] Exhibits A-63 and A-64.
[157] Exhibit A-85, pages 1-2.
[158] Exhibit A-48 (Tamine affidavit), page 25, paragraph 129.
[159] Exhibit A-87, page 1.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                    SSN:       3444                    YEARS: 2004-2018

false and/or backdated documents by identifying discrepancies between the stated date of the document and the manufacture date of the paper used. As a result, Brockman set aside packets of copy paper with dates on them for potential future use for backdating documents (using the appropriate supply of reserve paper).[160] Brockman also instructed Don Jones and Tamine that if they are preparing backdated documents, to never use the originals which printed from the laser printer but to run the document through a standard copy machine first.

On one particular occasion, Brockman directed Tamine to prepare a backdated memorandum memorializing a fictitious conversation between Tamine and the trust protector of the Brockman Charitable Trust, Trevor Lloyd, who was deceased at the time.[161] Tamine agreed and prepared the false memorandum of a telephone conversation as if the deceased Trevor Lloyd had resigned from his position as trust protector and concurred with Tamine's suggestion for potential replacements.[162] Although agreeing to prepare the false memorandum, Tamine acknowledged that "[a]ny third party looking at this shall call it for what it is, a fix-up after Trevor's death."[163]

**g.) Destroying records and giving orders for destruction of records**

Brockman had the routine practice of backing up files to MicroSD cards and deleting files from his laptop and running the program "Evidence Eliminator" to wipe his computer hard drives.[164]

Brockman insisted that Tamine and other individuals use Evidence Eliminator in addition to "PGP" file deletion because, according to Brockman, the "PGP" file deletion process only deleted the current copy of the file but not "previous copies that are laying around hidden on the disk. [Evidence Eliminator] is the only tool we have that wipes free space."[165]

Brockman's Annual Performance Review for Tamine included the task to "Run Evidence Eliminator at least weekly on your computer" among the "General Goals for Every Year."[166]

Brockman also instructed Tamine to test other software packages as a potential replacement for Evidence Eliminator, such as "Cyberscrub."[167]

Brockman also personally physically destroyed records related to his offshore activity. Brockman discussed that he traveled to the offices of his attorneys in Washington DC and personally shredded documents from the firm's files which were "super sensitive" including the "various proposed structures" for the "Hot rod" project as well as "the organizational chart of the international entities."[168]

---

[160] Exhibit A-87, page 1.
[161] Exhibit A-87, pages 6-8.
[162] Exhibit A-87, pages 2-3 and page 8.
[163] Exhibit A-87, page 4.
[164] Exhibit A-88, pages 1 and 3.
[165] Exhibit A-88, page 11.
[166] Exhibit A-51, page 2 (# 17).
[167] Exhibit A-88, page 6.
[168] Exhibit D-27.

JEOPARDY RECOMMENDATION REPORT
ROBERT T. BROCKMAN                SSN: ▮▮▮▮3444                YEARS: 2004-2018

Brockman stated he wanted to personally review and shred documents before turning the remaining documents over to an outside document shredding company.[169]

Brockman also directed the physical destruction of computer hard drives and described this process as "hammer treatment."[170]

Brockman instructed Tamine to physically destroy hard drives if they could not be properly wiped or otherwise when needed.[171]

Brockman instructed Tamine to "purge all computer files that are held by Don that involve offshore entities including hammering disks, shredding CDs, etc."[172] Tamine confirmed that he destroyed two external hard drives per Brockman's direction.[173]

---

[169] Exhibit D-27.
[170] Exhibit A-88, page 11.
[171] Exhibit A-88, page 4.
[172] Exhibit A-88, pages 7-9.
[173] Exhibit A-88, page 4.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN ▮▮▮▮▮3444                YEARS: 2004-2018

**12. Method of Computation**:
The Form 4549-A, Report of Income Tax Examination Changes, Form 886-A, Explanation of Items, and supporting worksheets are attached as Exhibits 4 through 13.

**Summary**

The tax, penalties, and interest to be assessed under jeopardy assessment procedures, by year, is summarized below:

| Year | Tax | Penalty- Fraud | Interest* | Total |
|---|---|---|---|---|
| 2004 | 82,512,479 | 61,884,359 | 157,830,197 | 302,227,036 |
| 2005 | 32,772,341 | 24,579,256 | 55,088,712 | 112,440,309 |
| 2006 | 38,916,900 | 29,187,675 | 55,409,699 | 123,514,274 |
| 2007 | 2,547,543 | 1,910,657 | 3,029,157 | 7,487,357 |
| 2008 | (722,954) | - | - | (722,954) |
| 2009 | (1,330,216) | - | - | (1,330,216) |
| 2010 | 110,120,720 | 82,590,540 | 91,051,351 | 283,762,611 |
| 2011 | (1,692,011) | - | - | (1,692,011) |
| 2012 | 21,712,495 | 16,284,371 | 14,112,694 | 52,109,560 |
| 2013 | 36,939,855 | 27,704,891 | 21,390,135 | 86,034,881 |
| 2014 | 14,156,595 | 10,617,446 | 7,223,005 | 31,997,046 |
| 2015 | 53,460,628 | 40,095,471 | 23,404,569 | 116,960,668 |
| 2016 | 23,918,714 | 17,939,036 | 8,422,394 | 50,280,143 |
| 2017 | 108,161,287 | 81,120,965 | 28,619,232 | 217,901,485 |
| 2018 | 17,576,763 | 13,182,572 | 2,797,665 | 33,557,000 |
| TOTAL** | 539,051,139 | 407,097,240 | 468,378,812 | 1,414,527,191 |

*Note: The interest due is estimated and computed to September 12, 2021.

**\*\*The refunds for tax years 2008, 2009, and 2011 are barred from refunding by IRC, Limitations on Credit or Refund. The taxpayer will be entitled to a reduction in tax, but the refund will be barred since the refund statute is expired. Further, the taxpayer will not be entitled to use the tax reduction to offset the liabilities from the other years.**

**Unreported Income**

**a.) Unreported income and deductions related to Point Investments Ltd.**
Mr. Brockman held beneficial ownership of the foreign corporation Point Investments Ltd. through the foreign trust, A. Eugene Brockman Charitable Trust, and additional foreign trusts and corporations (the Point Investments offshore structure).

From 2004 through 2018, investment income and losses (interest, dividends, other income, capital gains/(loss)) were generated on investments held by Point Investments which was not reported by Mr. Brockman on his Form 1040 income tax returns.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN               SSN ████3444                     YEARS: 2004-2018

The adjustment was made to include the items of income, loss, and deductions directly on Brockman's Form 1040 tax return because Brockman's offshore entities are deemed shams and disregarded for tax purposes.

The items of unreported income, loss, or deductions related to Brockman's ownership of Point Investments are labeled as "Point Investments" on the Report of Income Tax Examination Changes.

The capital gain/(loss) per year is included in the "Capital Gain or Loss" adjustment on the Report of Income Tax Examination Changes. A summary document is attached to Form 886-A to identify the line item labeled "Capital Gain or Loss" on Form 4549-A since the IRS system aggregates these adjustments into one line item.[174]

The "Taxable interest," "Ordinary dividends," "Other income" and "Schedule E Income/(Loss)" attributable to Point Investments were determined primarily from information reported on audited financial statements prepared for Point Investments.[175]  On a sample basis, Examiner also traced the contributions to and distributions from the Vista Equity Funds to bank accounts held in the name of Point Investments Ltd (Bermuda Commercial Bank, Acct# ██4132 and Mirabaud & Cie Bank, Acct# ██7463).

The "Investment expenses" attributable to Point Investments were determined from information reported on audited financial statements prepared for Point Investments and allowed as Schedule A miscellaneous itemized deductions, subject to 2% AGI limitation and overall itemized limitations.[176]  For tax year 2018, no deduction was allowed for investment expenses due to the change in applicable law. Under IRC section 67(g), no miscellaneous deductions are allowed for tax years beginning after December 31, 2017.


**b.) Unreported income related to Edge Capital Investments Ltd.**
Mr. Brockman held beneficial ownership of the foreign corporation Edge Capital Investments Ltd. through the foreign trust, Alpheus Charitable Trust, and additional foreign trusts and corporations (the Edge Capital Investments offshore structure).

From 2009 through 2018, investment income (interest income and capital gains) was generated on investments held by Edge Capital Investments which was not reported by Mr. Brockman on his Form 1040 income tax returns.

The adjustment was made to include the items of unreported income directly on Brockman's Form 1040 tax return because the offshore entities are deemed shams and disregarded for tax purposes.

The interest income is labeled "Taxable Interest- Edge Capital Investments" on the Report of Income Tax Examination Changes.

---

[174] Exhibit 5, page 2 and pages 27-37.
[175] Exhibit 5, pages 2 and 3.
[176] Exhibit 5, pages 2-4.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN: ████3444                YEARS: 2004-2018

The capital gain/(loss) per year included in the "Capital Gain or Loss" adjustment on the Report of Income Tax Examination Changes. A summary document is attached to Form 886-A to identify the line item labeled "Capital Gain or Loss" on Form 4549-A since the IRS system aggregates these adjustments into one line item.[177]

The "Taxable interest" and "Capital Gains/(Loss)" amounts attributable to Edge Capital Investments were determined from copies of bank statements for accounts held in the name of Edge Capital Investments (Bermuda Commercial Bank, Acct# ██0703 and Mirabaud & Cie Bank, Acct# ██9951 ) and Excel workpapers and QuickBooks reports prepared by Evatt Tamine for Edge Capital Investments.[178]

**c.) Unreported income related to Cabot Global Investments Ltd.**
Mr. Brockman held beneficial ownership of the foreign corporation Cabot Global Investments Ltd. through the foreign trust, Messery Charitable Trust, and additional foreign trusts and corporations (the Cabot Global Investments offshore structure).

From 2011 through 2017, investment income (interest and capital gains) was generated on investments held by Cabot Global Investments which was not reported by Mr. Brockman on his Form 1040 income tax returns.

The adjustment was made to include the items of unreported income directly on Brockman's Form 1040 tax return because the offshore entities are deemed shams and disregarded for tax purposes.

The interest income is labeled "Taxable Interest- Cabot Global Investments" on the Report of Income Tax Examination Changes.

The capital gain/(loss) per year is included in the "Capital Gain or Loss" adjustment on the Report of Income Tax Examination Changes. A summary document is attached to Form 886-A to identify the line item labeled "Capital Gain or Loss" on Form 4549-A since the IRS system aggregates these adjustments into one line item.[179]

The "Taxable interest" and "Capital Gains/(Loss)" amounts attributable to Cabot Global Investments were determined from Excel workpapers and QuickBooks reports prepared by Evatt Tamine for Cabot Global Investments as verified to copies of bank statements for accounts held in the name of Cabot Global Investments (Bermuda Commercial Bank, Acct# ██0702 and Mirabaud & Cie Bank, Acct# ██1017) on a sample basis.[180]

**d.) Unreported income from cash distribution from Universal Computer Consulting Holding Inc.**
On July 7, 2004, Mr. Brockman received a $635 million cash distribution from his 100% controlled U.S. corporation, Universal Computer Consulting Holding Inc. ("UCCH Inc.").

---

[177] Exhibit 5, page 2 and pages 29-37.
[178] Exhibit 5, page 2 and pages 5-16.
[179] Exhibit 5, page 2 and pages 31-34.
[180] Exhibit 5, page 2 and pages 17-26.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN: ████3444                YEARS: 2004-2018

Mr. Brockman held beneficial ownership of 100% UCCH Inc. stock through his ownership of the foreign trust, A. Eugene Brockman Charitable Trust, and additional foreign trusts and foreign corporations.

The $635 million payment received by Brockman was treated for tax purposes in 2004 as a non-taxable payment in redemption of stock held by the offshore structure and not reported by Brockman for U.S. tax purposes.

The adjustment was made to recharacterize the transaction as a cash distribution to Brockman in 2004 taxable to Brockman under section 301 of the Code because Brockman's offshore entities are deemed shams and disregarded for tax purposes.

Applying IRC sections 301(a) and 301(c)(1), $537,668,946 of the total cash distribution is treated as qualified dividend income to Brockman in 2004 (i.e., distribution to the extent of the corporation's earnings and profits) and labeled as "Qualified Dividends- Cash Distribution from UCCH Inc." on the Report of Income Tax Examination Changes.[181]

Under IRC section 301(c)(2), the remaining $97,331,054 amount of the cash distribution will be treated as a non-taxable return of capital (i.e., recovery of the adjusted basis held by Mr. Brockman in the UCCH Inc. stock) for purposes of the jeopardy assessment.


**Itemized Deductions**

For tax years 2004 through 2017, Mr. Brockman's investment expenses attributable to Point Investments (described above) were allowed as Schedule A miscellaneous itemized deductions under IRC section 212 and subject to the 2% AGI limitation and overall limitation on itemized deductions under IRC sections 67 and 68.

The itemized deduction limitations were applied as statutory adjustments and the remaining allowable deduction amount, if any, is reflected on the Report of Income Tax Examination Changes as an adjustment to "Itemized Deductions."

For tax year 2018, no deduction is allowed for Schedule A miscellaneous itemized deductions subject to 2% AGI limitation under IRC section 67(g) enacted as part of TCJA.


**Net Operating Loss Deductions**

The net operating loss (NOL) generated by the examination adjustments to the 2008 tax year has been carried back to tax year 2006 pursuant to IRC Section 172 and fully utilized in the 2006 tax year with no remaining NOL carryover.  The Taxpayer did not make any elections which would affect the normal two-year carryback period.

The net operating loss generated by the examination adjustments to the 2011 tax year has been carried back to tax year 2009 pursuant to IRC Section 172 and partially fully utilized in the 2009 tax year and carried to the 2010 tax year and fully utilized in the 2010 tax year.  The Taxpayer did not make any elections which would affect the normal two-year carryback period.

---

[181] Exhibit 5, page 38.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                 SSN: ███████3444                 YEARS: 2004-2018

**Personal Exemption**

The personal exemption for tax year 2009 has been adjusted as statutorily computed due to the increased adjusted gross income determined on the report.

**Alternative Minimum Tax**

Following examination adjustments to the 2007, 2008, 2009 and 2010 tax years, the alternative minimum taxable income (AMTI) and liability for alternative minimum tax was recomputed as a statutory adjustment.

**Net investment Income Tax**

Following examination adjustments to tax years 2013 through 2018, the modified adjusted gross income, net investment income was recomputed and the net investment income tax increased for these years as a statutory adjustment.

**Penalties**

The Report of Income Tax Examination Changes includes the IRC 6663 Fraud penalty.

Managerial approval for the assertion of penalties was obtained in writing.[182]

---

[182] Exhibit 3.

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN: ████3444                YEARS: 2004-2018

**13. Timeline of Activities**

| YEAR | ACTIVITY |
|------|----------|
| 1970 | Brockman founded his software development company, **Universal Computer Services Inc.** ("UCS Inc."), in Houston Texas. |
| 1981 | The **A. Eugene Brockman Charitable Trust** is established in Bermuda with assistance from attorney Carlos Kepke (named the A. Eugene Brockman Children's Trust at the time). The trust is a discretionary trust formed in the name of Brockman's father as settlor and for the benefit of Brockman, Mrs. Brockman, Brockman's brother (Thomas David Brockman) and his wife and any charitable organizations located in Bermuda, the U.S. or Great Britain. |
| 1986 | Brockman's father, A. Eugene Brockman, died. |
| 1987 | Brockman formed **Universal Computer Systems Holding Inc**. ("UCS Holding Inc.") formerly named Universal Computer Consulting Holding Inc. ("UCCH Inc.") |
| 1990-1994 | Brockman formed **Platoon Investments Ltd** and **Vivant Holdings Ltd** (1990)<br><br>Brockman formed additional foreign trusts and companies, for example:<br>• Heritage Charitable Trust<br>• Worldwide Hunger Fund Charitable Trust<br>• Lineage Charitable Trust |
| 1995 | Brockman's employee, Don Jones leaves his position as CFO of UCS Inc. and relocated to Bermuda to manage Brockman's offshore activities (with Don Jones operating in Bermuda as Wedge Consulting Ltd and Pilot Management Ltd pursuant to management agreements with Brockman's entities).<br><br>1995 was the last year that Mr. and Mrs. Brockman file joint Form 1040 tax returns. |
| 1996 | 1996 was the first year that Mr. and Mrs. Brockman file married filing separate tax returns. The Brockmans filed MFS returns from 1996 to the present. |
| 1997 | Brockman formed **Legend Investments LLC** and **Cascade Holdings LLC** (which in 1999 would serve as shareholders in the Edge Capital Investments offshore structure).<br><br>Brockman formed additional foreign trusts:<br>• Provident Charitable Trust<br>• Oxford Charitable Trust<br>• Benevolent Charitable Trust<br>• Evergreen Charitable Trust<br>• Provident Charitable Trust |
| 1998 | Brockman formed **Regency Management Ltd**. as a British Virgin Islands company and formed additional foreign trusts<br>• Companion Charitable Trust<br>• Challenge Charitable Trust |

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                    SSN: ███-3444                    YEARS: 2004-2018

| | |
|---|---|
| | Brockman formed **Mountain Queen Inc**. (CO Corp) and held ownership of the corporation through Regency Management. |
| 1999 | Brockman formed **Edge Capital Investments** in the British Virgin Islands (BVI) (named Edge Investment Fund Ltd at the time), later re-domiciled in 2008. <br><br> Brockman formed **Point Investments LLC** and **Point Investments Ltd.** in the BVI as a company to invest in offshore mutual funds and partnerships. |
| 2000 | **Vista Equity Fund II, LP.** <br> Brockman, through Point Investments, made a commitment to invest $300 million to Vista Equity Fund II, LP, a Cayman Islands limited partnership, managed by Robert Smith of Vista Equity Partners. |
| 2001 | Brockman, through Point Investments, directly invested $108 million in offshore mutual funds. |
| 2002 | Project "Hotrod" is first proposed by Robert Smith to Brockman. Brockman discussed that the stock redemption and stock purchase transaction would likely bring the Brockman Charitable Trust $620 million which would be structured to be a non-taxable redemption. |
| 2003 | Brockman hired Evatt Tamine to assist with managing Brockman's offshore activities. Tamine gradually assumes responsibility for managing Brockman's offshore activities as nominee trustee and corporate director. <br><br> Brockman formed **Cabot Global Investments** in BVI (named Cabot Global Fund Ltd at the time) as part of the plan to carry out the "hot rod" stock redemption transaction. <br><br> Cabot Global Investments became the 99% limited partner in Vista Equity Fund III. <br><br> Brockman formed additional foreign trusts as part of the Cabot Global Investments offshore structure (the "hotrod" trusts): <br> • Aberdeen Charitable Trust <br> • Shetland Charitable Trust <br> • Inverness Charitable Trust <br><br> Brockman formed additional foreign companies as part of the Cabot Global Investments offshore structure: <br> • Douglas Investments/Holdings <br> • Larch Holdings LLC <br> • Barrier Investments LLC <br> • Pitch Holdings LLC <br> • Choice Investments LLC |

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN          SSN: ████3444          YEARS: 2004-2018

| | |
|---|---|
| | Brockman, through Mountain Queen Inc, acquired the "Aspen Vacation Home" located at 230 McGarlane Gulch Rd, Aspen CO for $9,150,000. |
| 2004 | Brockman, through Point Investments, increased his commitment to invest in Vista Equity Fund II, LP, from $300 million total to $1 billion total.<br><br>**2004 Stock Redemption**<br>The 2004 Stock Purchase and Repurchase transaction between Brockman and his company UCCH Inc. was executed on July 7, 2004.<br><br>Spanish Steps Holding Ltd (which Brockman owned through the Brockman Charitable Trust) held 100% stock ownership of Brockman's company, UCCH Inc.<br><br>UCCH Inc. acquired 51% stock from Spanish Steps Holdings Ltd in a $635 million stock repurchase which Brockman treated as a non-taxable stock redemption. Brockman received the $635 million wire transfer from UCCH Inc.<br><br>Simultaneously, Brockman, through Cabot Global Investments and Vista Equity Fund III, acquired 46% stock in UCCH Inc. for $90,196,080, while five other executives of UCCH Inc. acquired 5% restricted stock.<br><br>Following the transaction 49% of stock was held by Spanish Steps Holding, 46% was held by Vista Equity Fund III and 5% was held by five UCCH Inc. executives. |
| 2005 | Brockman and Robert Smith continued to pursue the acquisition and merger of Reynolds & Reynolds.<br><br>Brockman formed Henke Holdings LLC and Henke Property LLC and held ownership through the foreign corporation, Regency Management Ltd.<br><br>Brockman, through Henke Property LLC, acquired the investment real estate located at 300 McFarlane Gulch Rd, Aspen CO for $4,600,000. |
| 2006 | **Stock Redemption Reversal**<br>The 2006 Stock Purchase Agreement was executed between Brockman and his company UCCH Inc. (now called UCS Holding Inc.). Brockman, through Spanish Steps Holding (as purchaser) re-acquired the 46% stock which was being held by Vista Equity Fund III (seller). Note-Brockman held 99% of Vista Equity Fund III through his ownership of Cabot Global Investments.<br><br>As a result of the reversal sale, Spanish Steps held 95% stock ownership of UCS Holding Inc. |

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN               SSN: ████3444               YEARS: 2004-2018

| | |
|---|---|
| | **Reynolds & Reynolds Acquisition**<br>Reynolds & Reynolds was acquired by Brockman's company and becomes a wholly owned subsidiary. The acquisition of Reynolds and Reynolds in 2006 involved a debt offering which was being administered by Deutsche Bank and offered in 3 tiers and eventually traded on the secondary market.<br><br>Brockman signed a credit agreement regarding the debt offering which contained restrictions on acquiring the Reynolds & Reynolds debt. |
| 2007 | Brockman formed U.S. based Spartacus Investments LLC to hold a Charles Schwab investment account and Strummer Management LLC is formed as part of the reorganization of the **Cabot Global Investments** offshore structure. |
| 2008 | |
| September 2008 | Brockman re-domiciled Edge Capital Investments and Cabot Global Investments from BVI.<br><br>Tamine opened new bank accounts in Bermuda for Brockman's offshore entities at Bermuda Commercial Bank. |
| October-December 2008 | Brockman was informed by Deutsche Bank that Reynolds & Reynolds debt is trading on the secondary debt market at discounts of face value.<br>Brockman instructed Tamine to inquire about investing in the "distressed debt" which is being traded for Reynolds & Reynolds.<br><br>Brockman instructed Tamine to inquire as a representative of Edge Capital Investments, and to conceal Brockman's involvement. |
| 2009 | Brockman and Tamine executed a plan to purchase Reynolds & Reynolds debt which was trading on the secondary debt market and to conceal the investing activity by using Edge Capital Investments.<br><br>Between January 2009 and August 2009, Tamine executed trades on Brockman's behalf to acquire a total of $67 million of Reynolds & Reynolds face value debt at discounts between 25% and 35% of face value.<br><br>Brockman began earning interest income from the Reynolds & Reynolds debt holdings. |
| 2010 | |
| March 2010 | In March 2010, Brockman authorized a $4 million loan to business associate Al Deaton related to the purchase and development of property in Aspen CO. |
| April 2010 | Reynolds & Reynolds refinanced its existing debt and Brockman received proceeds representing the full face value of the debt purchased using Edge |

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN: ████3444                YEARS: 2004-2018

| | |
|---|---|
| | Capital Investments. Brockman realized a net $46,891939 capital gain on the disposition which was not reported on tax returns. |
| May 2010 | Brockman authorized a $900,000 loan to Tamine to purchase a home in Bermuda. |
| December 2010 | Brockman authorized $15 million to be transferred from Edge Capital Investments to Regency Management to acquire real estate. $5 million of the funds were transferred to Brockman's Henke Property LLC and Brockman, through Henke Property LLC, acquired the "Frying Pan Canyon Ranch" (fishing lodge). |
| 2011-2017 | Brockman, through Point Investments, invested in additional Vista Equity Fund partnerships as limited partner and received allocated investment income and gains/losses.<br><br>Brockman, through Edge Capital Investments and Cabot Global Investments, continued to invest in "distressed" debt markets and earned interest income and realized gains during the period from 2011 through 2018 and earned interest income and realized capital gains, which were not reported on tax returns. |
| 2012 | |
| October 2012 | Brockman authorized a $900,000 loan to Tamine to purchase a home in England. |
| December 2012 | Brockman formed the foreign entities, Framfield Charitable Trust and Framfield Assets Ltd and US company, Red Plains Air Charter Inc. Brockman authorized transferring $15 million to acquire Hardwicke Properties LLC and the corporate aircraft it held from UCS Holding Inc. |
| 2014 | |
| February 2014 | Brockman became interested in acquiring the luxury yacht, Albula (formerly named Turmoil) and directs Tamine regarding the inspection of the yacht and negotiating the purchase. |
| July 2014 | Brockman authorized a $75 million loan to Robert Smith from the Point Investments bank account at Mirabaud. |
| October 2014 | Brockman authorized a $5 million loan to business associate, Allan Smith (Invictus Consulting Services). |
| 2016 | |
| November-December 2016 | Brockman paid approximately $34 million to acquire the yacht Albula and held ownership through the foreign corporation Fisheries Research Foundation Ltd (funds transferred from Cabot Global Investments). |
| 2017 | |
| August 13, 2017 | Brockman responded to Tamine's notice that Bermuda Commercial Bank froze the Bermuda bank accounts held in the name of Brockman's offshore entities. Brockman agreed with Tamine's plan to get away from Bermuda |

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN ████ 3444                YEARS: 2004-2018

|  | Commercial Bank as quickly as possible and to establish new banking relationships in other offshore jurisdictions and establish "mirror companies" and operations in other countries. |
|---|---|
| 2018 | |
| August/September 2018 | Bermuda Police Service (BPS) obtain search warrants and executed a search Tamine's home and storage facilities in Bermuda in August and September 2018.<br><br>Tamine resigned as trustee of Brockman's Charitable Trust on September 28, 2018. |
| 2019 | |
| October 2019 | On October 17, 2019, Brockman recorded a partition agreement in Harris County TX regarding the ownership of the property located at 1731 Sunset Blvd Houston TX. The partition agreement split the community property interest into 50% ownership as separate property. On the same day, Brockman recorded a warranty deed conveying his 50% interest to Mrs. Brockman to hold as her 100% separate property (this property would later be listed for sale on October 26, 2020 and sold by Mrs. Brockman on May 12, 2021). |
| November 2019 | Brockman initiated an ex parte application in Bermuda civil courts to obtain an interim injunction against the trustees of the Brockman Charitable Trust (beginning of Trust Proceedings). |
| 2020 | |
| October 1, 2020 | Brockman was indicted for federal income tax evasion, money laundering, wire fraud, evidence tampering and destruction of evidence evasion. |
| October 9, 2020 | Brockman's business associate, Robert Smith, entered a Non-Prosecution Agreement with the US DOJ admitting to willfully evading US tax and filing false returns for 2000 through 2015. |
| October 26, 2020 | The Brockmans listed their property located at 1731 Sunset Blvd, Houston TX for sale (property sold on May 12, 2021 for $1,375,000). |
| November 6, 2020 | Brockman resigned from his position as Chairman and CEO of UCS Holding and subsidiaries. Reynolds and Reynolds President and COO Tommy Barras was named to replace Brockman as CEO of the companies. |
| November 12, 2020 | Mrs. Brockman gifted their property located at 3702 Inwood Dr, Houston TX to the Brockman's daughter-in-law, Elizabeth Brockman as her separate property. Brockman's son, Robert Brockman II is not grantee of the property. The property per County records had appraised value of $3,767,173. |
| December 11, 2020 | The Brockmans sold their property located at 335 West Friar Tuck Lane, Houston TX (vacant land) for $3,999,000.  Mrs. Brockman executed the sale on Brockman's behalf pursuant to a Power of Attorney. |
| December 14, 2020 | The Brockmans recorded a Statutory Durable Power of Attorney with Harris County TX, granting Mrs. Brockman Power of attorney over Mr. Brockman's affairs. The Power of Attorney had been signed by Brockman on July 20, 2020. |

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN: ███████3444                YEARS: 2004-2018

| | |
|---|---|
| January 21, 2021 | Mrs. Brockman acquired the property located at 3465 Overbook Lane, Houston TX as her separate property. The property per County records had appraised value of $6,328,511. |
| March 18, 2021 | US DOJ filed a civil forfeiture action to claim Brockman real estate in Colorado and $77 million in funds held and frozen in a Mirabaud bank account. |
| April 15, 2021 | The Houston-based attorney, Carlos Kepke, who advised Brockman regarding the use of offshore entities was indicted for conspiracy and assisting and assisting the filing of a materially false income tax return (related to involvement with Robert Smith). |
| May 12, 2021 | The Brockmans' property located at 1731 Sunset Blvd, Houston TX is sold for $1,375,000. |
| May 17, 2021 | The Brockmans listed their principal residence, 333 West Friar Tuck Lane, Houston TX, for sale at $15,350,000. |

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                    SSN: ████3444                    YEARS: 2004-2018

**14. Index of Exhibits and Attachments**

**Exhibits**

1. Brockman INOLES
2. Brockman IMFOLT
3. Penalty Approval from Team Manager and Counsel
4. Form 886-A, Explanation of Items
5. Supporting Workpapers for Form 886-A
6. Form 4549-A, Report of Income Tax Examination Changes (2004-2005)
7. Form 4549-A, Report of Income Tax Examination Changes (2006-2007)
8. Form 4549-A, Report of Income Tax Examination Changes (2008-2009)
9. Form 4549-A, Report of Income Tax Examination Changes (2010-2011)
10. Form 4549-A, Report of Income Tax Examination Changes (2012-2013)
11. Form 4549-A, Report of Income Tax Examination Changes (2014-2015)
12. Form 4549-A, Report of Income Tax Examination Changes (2016-2017)
13. Form 4549-A, Report of Income Tax Examination Changes (2018)

**Attachments**

A. Brockman Income from Point Investments
B. Brockman Income for Edge Capital Investments
C. Brockman Income from Cabot Global Investments
D. Brockman 2004 Dividend Income from Stock Redemption

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN            SSN: ▮▮▮▮3444            YEARS: 2004-2018

**Attachment A, Brockman Income from Point Investments**

**Exhibits for Attachment A**
- A-1.10   Financial statements – Point Investments – referenced pages
- **A-2.       Reserved (through A-4)**
- A-5.       Cash report – Brockman Trust1
- A-6.       Cash report – Brockman Trust2
- A-7.       Cash report – Point Investments1
- A-8.       Cash report – Point Investments2
- A-9.       Significant Transaction Report – Brockman Trust
- A-10.     Significant Transaction Report – Point
- A-11.     Org – April 2016 Structure Charts (Brockman, Framfield)
- A-12.     Org – Chart- Point-Massengill-VEPFIV
- A-13.     Org – ET Solicitor Letter-AEBCT-Point
- A-14.     Org – ET Solicitor Letter- Point- Massengill-VEPFIV
- A-15.     Org – Point Purpose Trust – Share Transfer Form
- A-16.     Org – Point Purpose Trust – Trust Declaration
- A-17.     Financial statements – Point – 2001
- A-18.     Financial statements – Point – 2002
- A-19.     Financial statements – Point – 2003
- A-20.     Financial statements – Point – 2004
- A-21.     Financial statements – Point – 2005
- A-22.     Financial statements – Point – 2006
- A-23.     Financial statements – Point – 2007
- A-24.     Financial statements – Point – 2008
- A-25.     Financial statements – Point – 2009
- A-26.     Financial statements – Point – 2010
- A-27.     Financial statements – Point – 2011
- A-28.     Financial statements – Point – 2012
- A-29.     Financial statements – Point – 2013
- A-30.     Financial statements – Point – 2014
- A-31.     Financial statements – Point – 2015
- A-32.     Financial statements – Point – 2016
- A-33.     Financial statements – Point – 2017 2018
- A-34.     2010 - Sample tracing of distributions from Vista Equity Fund II
- **A-35.     Reserved (through A-46)**
- A-47.     Emails – Sampling of approved capital calls
- A-48.     Evatt Tamine, affidavit – 7-4-2020
- A-49.     Emails – Emails about Significant Transaction Report
- A-50.     Emails – Emails sending RTB cash report
- A-51.     RTB Performance Review for Tamine 2-5-2010
- A-52.     2014 Compensation Memo and discussion
- A-53.     2014 Compensation Memo attachment
- A-54.     RTB To Do List for Tamine 5-21-2011
- A-55.     Emails – RTB regarding Howard
- A-56.     Emails – RTB replacing Tamine for Howard
- A-57.     RTB To Do List for Tamine 5-16-2012
- A-58.     Emails – RTB regarding digital signatures
- A-59.     Emails – Email from Don Jones regarding compensation and use of trusts
- A-60.     Emails – RTB discusses Taking a distribution
- A-61.     Emails – RTB discusses banks

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN: ███████3444                YEARS: 2004-2018

A-62.     Emails – RTB discusses aircraft
A-63.     Emails – RTB to Tamine re BCB freeze 8-13-2017
A-64.     Tamine Memorandum re BCB freeze 7-29-2018
A-65.     Emails – Tamine compensation
A-66.     Emails – RTB directing charitable contributions
A-67.     Emails – RTB directing charitable contributions2
A-68.     Emails – Emails attaching charitable contribution report
A-69.     Charitable contribution report
A-70.     Emails – RTB re 250M contribution
A-71.     Emails – RTB pulls the plug
A-72.     Emails – RTB paying off Don Jones
A-73.     Emails – 2010 emails regarding Proposed Structure Changes
A-74.     Emails – 2012 Emails Clean Up Massengill Trusts
A-75.     Emails – Massengill – 2013 email ET to RB re common shares
A-76.     RTB To Do List 9-18-2004
A-77.     Emails – RTB approving Tamine letter
A-78.     Emails – RTB re name change of trust
A-79.     Tamine 2009 Self Evaluation – 1-3-2010
A-80.     Tamine 2015 Self Evaluation – 6-16-2016
A-81.     1996 Memo of discussion with RTB regarding trust
A-82.     Inventory of Carlos Kepke correspondence
A-83.     Emails – Email referring to Carlos
A-84.     News Article – Forbes – 4-15-2021
A-85.     Emails – re Security Measures
A-86.     Emails – re Security Measures – Travel
A-87.     Emails – re False documents
A-88.     Emails – re Destruction of records
A-89.     Form 1120 UCS Holding Inc – selected pages
A-90.     Indictment – Brockman
A-91.     DOJ Forfeiture Complaint 3-18-2021
A-92.     News Article – Dayton Daily News - Reynolds & Reynolds CEO facing federal charges
A-93.     Robert Smith Non-Prosecution Agreement
A-94.     Indictment – Carlos Kepke
A-95.     Harris County – Mrs Brockman Power of Attorney
A-96.     Deed of Trust 1-31-2012 – Difficult LLC (grantor) Point Investments (lender)
A-97.     Form 1120 Red Plains Air Charter Inc. (2012-2015) - select pages
**A-98.     (Reserved through A-99)**
A-100.    Bank records – Point – BCB – Account Opening ET email
A-101.    Bank records – Point – BCB – Account Opening ET Letter
A-102.    Bank records – Point – BCB – Account Opening Form
A-103.    Bank records – Point – BCB – Account Opening Form2
A-104.    (through A-113) – Bank statements – Point Investments - BCB (2003-June 2015). Note: The copies of the bank statements will not be included with the Report but are on file with the Examiner.
**A-114.    Reserved (through A-199)**
A-200.    Bank records – Point – Mirabaud – Account Opening ET email
A-201.    Bank records – Point – Mirabaud – Account Opening Form
A-202.    Bank records – Point – Mirabaud – Account Opening Forms2
A-203.    Bank records – Point – Mirabaud – Account Opening W8BEN-E
A-204.    Bank records – Point – Mirabaud – Email sending Mirabaud userid
A-205.    (through A-213) – Bank statements – Point Investments – Mirabaud (2010-2018). Note: The copies of the bank statements will not be included with the Report but are on file with the Examiner.

JEOPARDY RECOMMENDATION REPORT
ROBERT T. BROCKMAN             SSN: 3444             YEARS: 2004-2018

    **A-214.**   **Reserved (through A-299)**
    A-300.   Bank records – Spanish Steps – Mirabaud – Account Application
    A-301.   Bank records – Spanish Steps – Mirabaud – Account Opening Form
    A-302.   Bank records – Spanish Steps – Mirabaud – Account Opening Form2


**Attachment B, Brockman Income from Edge Capital Investments**


**Exhibits for Attachment B**
    B-1.10   Edge Significant Transaction Report
    B-1.20   Edge QuickBooks Financial Reports.
    B-1.30   Bank statements - Edge – BCB account statements. Note: The copies of the bank statements will not be included with the Report but are on file with the Examiner.
    B-1.40   Bank statements – Edge – Mirabaud account statements. Note: The copies of the bank statements will not be included with the Report but are on file with the Examiner.
    B-1.50   Bank statements – Edge – Mirabaud Statement of Assets. Note: The copies of the bank statements will not be included with the Report but are on file with the Examiner.
    B-1.60   Tamine Schedule of Debt Purchases – Final – Upstream
    B-1.70   Emails – Sample Emails transmitting QuickBooks Reports to RTB
    B-3.     Examiner's Timeline of activities involving the Edge Debt Buyback scheme
    B-4.     Edge Capital Docs
    B-5.     Edge – Articles of Incorporation
    B-6.     Edge – Bylaws
    B-7.     Edge – Deed of Assignment
    B-8.     Edge – Certificate of Incorporation
    B-9.     Edge – Inventory of Brockman Formation Documents (2011)
    B-10.   Edge – Structure Chart (early)
    B-11.   Edge – Structure (revised)
    B-12.   Edge KYC chart
    B-13.   Edge Cash Reports
    B-14.   Edge – People&Asset Report
    B-15.   Edge – People&Asset Report- People
    B-16.   RTB Performance Review -2-5-2010
    B-17.   2014 Compensation Memo and discussion
    B-18.   2014 Compensation Memo attachment
    B-19.   2008 emails Debt Purchase Plan emails
    B-20.   2008 RTB instruction to Tamine to use Edge
    B-21.   2009 RTB email to open Edge account
    B-22.   2009 emails Debt Purchase Plan emails
    B-23.   RTB Performance Review for Tamine 2-8-2009
    B-24.   2010 RTB emails Debt Purchase Plan
    B-25.   2010 RTB emails Debt Purchase Plan
    B-26.   2010 RTB email about Debt payout
    B-27.   2010 RTB email about Debt payout
    B-28.   BCB- Misc- Correspondence re Liquidation- Account Opening
    B-29.   ET Sub Account Opened – Edge
    B-30.   BCB Edge Sig Card
    B-31.   BCB – ET email to bank regarding beneficial ownership
    B-32.   BCB – ET added as Signatory
    B-33.   BCB – Receipt of Edge Docs
    B-34.   Regency Management Bank statement

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN:████3444                YEARS: 2004-2018

B-35.    Regency Transaction Report 2010-2016
B-36.    Property Settlement Statement
B-37.    Special Warranty Deed
B-38.    Real Estate Purchase Contract
B-39.    $265,000 Wire Transfer Detail
B-40.    $4,731,019 Wire Transfer Detail
B-41.    RTB To Do List for Tamine 5-9-2010
B-42.    Regency Structure Chart
B-43.    Legend Investments – Significant Transaction Report
B-44.    Loan to ET
B-45.    RTB Email Convert all structures to Canadian dollar
B-46.    RTB regarding Edge and Cabot accounts 4-26-2011
B-47.    Emails regarding bank accounts
B-48.    RTB To Do List for Tamine 5-16-2012
B-49.    RTB approval to Open Mirabaud – Point
B-50.    Edge – W8BEN-E
B-51.    Email to Mirabaud Bank
B-52.    2010 Email referring to reorganizing Edge
B-53.    2010 Emails regarding proposed structure changes
B-54.    2012 Emails Clean Up Massengill Trusts
B-55.    Massengill- 2013 email ET to RB re common shares
B-56.    Tamine 2013 Self Evaluation 3-10-2014
B-57.    Tamine Self Evaluation 2009
B-58.    RTB email to Tamine re BCB freeze 8-13-2017
B-59.    Tamine Memorandum re BCB freeze 7-29-2017
B-60.    2019 Form 1120 Henke Holdings LLC – select pages
B-61.    2019 Form 1120 Mountain Queen Inc – select pages
B-62.    BCB bank account statement for April 2010

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                    SSN: ███3444                    YEARS: 2004-2018

**Attachment C, Brockman Income from Cabot Global Investments**

**Exhibits for Attachment C**

C-1.2    QuickBooks Reports – Cabot Global Investments.
C-1.     Reserved
C-2.     Reserved
C-3.     April 2016 Structure Chart (Cabot)
C-4.     Cabot KYC Letter and Org Chart
C-5.     Cabot Structure Chart 2010
C-6.     Cabot Cash Report
C-7.     Cabot Significant Transaction Report
C-8.     Cabot Balance Sheet 12-31-2013
C-9.     RTB Performance Review for Tamine 2-5-2010
C-10.    RTB To Do List for Tamine 3-19-2013
C-11.    2014 Compensation Memo and discussion
C-12.    Tamine Self Evaluation 2009
C-13.    RTB To Do List for Tamine 12-17-2011
C-14.    RTB email re Digital signatures 11-2010
C-15.    RTB email about controlling Cabot 3-6-2011
C-16.    Email – sample email transmitting Cabot QuickBooks
C-17.    2014 Compensation Memo attachment
C-18.    RTB email convert all structures to Canadian dollars
C-19.    RTB regarding Edge and Cabot accounts 4-26-2011
C-20.    RTB To Do List for Tamine 5-16-2012
C-21.    Emails regarding Cabot bank accounts
C-22.    QuickBooks Report – 3M payment to Tamine
C-23.    Emails about Albula1
C-24.    Emails about Albula2
C-25.    Emails about Albula3
C-26.    Emails about Albula4
C-27.    Emails about Albula5
C-28.    Emails about Albula6 Ownership
C-29.    Emails about Albula7 Ownership
C-30.    Emails about Albula8 Fisheries
C-31.    Emails about Albula9 Employment Agreement
C-32.    Amended Employment Agreement
C-33.    Emails about Albula10 Offer
C-34.    Emails about Albula11 Offer rejected
C-35.    Emails about Albula12 RTB rejects alternate yacht
C-36.    Emails about Albula ownership
C-37.    Emails about Albula14 Follow up
C-38.    Emails about Albula15 research purpose
C-39.    QuickBooks Report re Albula payment
C-40.    Emails about Albula16 hull painting
C-41.    Emails about Albula17 medical equipment
C-42.    Emails about Albula18 crew performance reviews
C-43.    RTB To Do List for Tamine 1-18-2015
C-44.    Tamine 2016 Self Evaluation 6-4-2017
C-45.    Yacht – Cabot Mirabaud account statements showing purchase
C-46.    Regency Management bank statement
C-47.    Regency Transaction Report

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                    SSN ███████3444                    YEARS: 2004-2018

C-48.   Settlement Statement – Frying Pan Property
C-49.   Email re Lot 8 property offer
C-50.   RTB emails showing control Mountain Queen
C-51.   Regency Structure Chart
C-52.   QuickBooks Report – Cabot transfer to Regency 12-1-2014
C-53.   QuickBooks Report – Cabot transfer to Regency 9-26-2015
C-54.   QuickBooks Report – Cabot transfer to Regency 4-20-2016
C-55.   QuickBooks Report – Cabot transfer to Regency 10-24-2016
C-56.   Emails – sample email approving monthly expenses
C-57.   Emails – email requesting approval of tenant
C-58.   Emails – email requesting approval of tax return position
C-59.   Emails – email requesting approval regarding fishing rights
C-60.   RTB To Do List for Tamine 4-26-2009
C-61.   2010 Emails about reorganizing Cabot
C-62.   2010 Emails regarding Proposed Structure Changes
C-63.   2012 Emails Clean Up Massengill Trusts
C-64.   Massengill 2013 email ET to RB re common shares
C-65.   Tamine 2013 Self Evaluation 3-10-2014

JEOPARDY RECOMMENDATION REPORT

ROBERT T. BROCKMAN                SSN: ████3444                YEARS: 2004-2018

**Attachment D, Brockman 2004 Dividend Income from Stock Redemption**

**Exhibits for Attachment D**

D-1.     UCS Letter re Hotrod plan 12-2002
D-2.     Hotrod investment memo 10-2003
D-3.     VEF III ownership structure
D-4.     Letter to Howard requesting approval of Hotrod 06-2004
D-5.     Cabot Structure Chart 2010
D-6.     April 2016 Structure Charts
D-7.     Cabot KYC Letter and Org Chart
D-8.     Inventory of Brockman Formation Documents (2011)
D-9.     2010 Emails about reorganizing Cabot
D-10.    12.2.2012 Email- Clean Up Massengill Trusts
D-11.    Massengill- email ET to RB re common shares
D-12.    Hotrod proceeds Investment opp 07-2004
D-13.    BCB acct stmt 08-2004
D-14.    BCB confirmation $635M deposit 07-2004
D-15.    VEFIII- Audited SF-PwC 2004
D-16.    E&Y Footnotes Dividend Recap
D-17.    2004 Stock Repurchase Agreement (stock redemption)- selected pages
D-18.    2006 Stock Purchase Agreement (reversal sale)- selected pages
D-19.    2006 Tax Indemnification Agreement
D-20.    Setting up $200M reserve account 04-2004
D-21.    VEF Shares buyback 06-2004
D-22.    RTB to Don Jones 06-2004
D-23.    Planning response to KPMG re Cabot and Hotrod 08-2006
D-24.    RTB to Tamine re Bob involvement in VEFIII (no date)
D-25.    Hotrod statute and office relocation 08-2007
D-26.    VEFIII shutdown (no date)
D-27.    Destruction of Hot Rod records

# GOV

# EXHIBIT

# 3



Government
Exhibit
3

# GOV

# EXHIBIT

# 4

TRUST INDENTURE

This Trust Indenture is made this 26ᵗʰ day of MAY, 1981, by and between A. EUGENE BROCKMAN, a resident of Houston, Texas (hereinafter referred to as "Settlor"), and BERMUDA TRUST COMPANY LIMITED (hereinafter referred to as "Trustee").

## ARTICLE I

### INITIAL TRUST CORPUS AND RIGHT TO ADD TO THE TRUST

The Settlor has delivered to the Trustee US $25,000 as the initial corpus of this Trust, receipt of which is hereby acknowledged by the Trustee. The Settlor reserves the right to add further corpus to this or any separate Trust created hereunder. Any and all other persons shall have the right to add property of any character to this Trust or any other separate Trust created hereunder by Will or by Deed with the consent of the Trustee.

## ARTICLE II

### REVOCABILITY AND AMENDABILITY

A.   TRUST IS IRREVOCABLE

This is an irrevocable Trust, and effective with the signing of this Indenture, the Settlor shall have relinquished all rights in connection with the Trust Fund, except as specifically set forth herein.

B.   TRUST IS UNAMENDABLE

This Trust Indenture shall not be subject to amendment except by the Trustee in the manner provided in Section E of Article XIII.

## ARTICLE III

### DEFINITIONS

A.   ADULT BENEFICIARY

"Adult Beneficiary" means a Beneficiary who is twenty-one (21) years of age or more.

B.   APPOINTING BENEFICIARY

"Appointing Beneficiary" means any Beneficiary of this Trust or any separate Trust created hereunder who is, or upon attaining a particular age shall be, entitled to exercise a Special Limited Power of Appointment over all or any portion of the assets comprising that Trust.

C.   BENEFICIARIES

"Beneficiaries" means and includes: all persons, organizations, associations, or classes named or described in this Trust Indenture as Beneficiaries of this Trust, or of any separate Trust created hereunder.

Government Exhibit

4

D.   CHILD AND ISSUE

"Child" and "issue" mean lawful child and lawful issue, respectively, and shall include anyone legally adopted in accordance with the laws of the domicile of the adoptive parent or parents then in force, unless specifically provided to the contrary herein.

E.   DESCENDANTS

"Descendants" means lawful lineal blood descendants in any degree of the person or persons named or described, determined at the time of the particular distributions to such person or persons, or upon the grant or exercise of any right or privilege to, by, or in favor of said person or persons, and shall include anyone legally adopted by a descendant or person or persons so named. Any such adopted child shall for all purposes be regarded as the lawful blood descendant of each adoptive parent or parents, and for purposes of this Trust Indenture shall no longer be regarded as a child, relative, or descendant of either natural parent of such adopted child.

F.   DOLLAR

"Dollar" or "Dollars" means the currency of the United States of America.

G.   HEIRS AT LAW

"Heirs at law" means those individuals, other than creditors, who would receive the personal property of the person or persons named or described herein, determined in accordance with the laws of intestate succession of the State of residence of the Settlor in such shares as are therein defined, as if such person or persons had died intestate on the date specified for distribution domiciled in such State, owning only the property to be distributed hereunder, and as if the Settlor of this Trust and any spouse of the Settlor had predeceased the person or persons so named or described.

H.   MINOR BENEFICIARY

"Minor Beneficiary" means a Beneficiary who is less than twenty-one (21) years of age.

I.   RELATIVES

"Relatives" means all persons connected to the person or persons named or described by blood only in any degree determined at the time of the particular distributions or upon the grant or exercise of any right or privilege to, by, or in favor of said person or persons, and shall include anyone legally adopted by the person or persons so named, described, or related.

J.   SPECIAL LIMITED POWER OF APPOINTMENT

"Special Limited Power of Appointment" means the Power or Powers of Appointment granted by or pursuant to the provisions of Article VI, and shall include any Special Limited Power of Appointment granted pursuant to the exercise of any Special Limited Power of Appointment granted herein, except as otherwise specifically provided in the grant of said Power.

2.

ET_0000519244

K.   TRUST

"Trust" means the Trust created by this Trust Indenture and shall include all separate Trusts created hereafter from time to time, except as otherwise specifically provided herein.

L.   TRUST FUND

"Trust Fund" means all sums or items comprising initial contributions of corpus and all property hereafter paid or transferred to or otherwise vested in the Trustee as additions to the corpus of this Trust or any separate Trust created hereunder from time to time, all income which in accordance with the provisions hereof shall be accumulated by the Trustee, whether or not added to corpus of this Trust or any separate Trust created hereunder, and all money and other property investments and reinvestments from time to time representing said sums, additions thereto, and accumulations of any part or parts thereof respectively.

M.   TRUST PERIOD

"Trust Period" means the period commencing on the date hereof and expiring twenty-one (21) years after the death of the last survivor of the Settlor, the persons specifically identified by name in Article V hereof living on the date hereof, and all descendants of his late Majesty King George V living on the date hereof.

N.   TRUSTEE

"Trustee" means the Trustee named herein of this Trust and shall include all successor Trustees of this Trust, and the Trustees and all successor Trustees of any and all separate Trusts created hereunder from time to time, except as otherwise specifically provided herein.

O.   ULTIMATE DISTRIBUTEES

"Ultimate Distributees" means those persons described as follows:

1.   The Appointing Beneficiary of this Trust or any separate Trust created hereunder, or if there is more than one Appointing Beneficiary, then the said Appointing Beneficiaries as tenants-in-common;

2.   If there be no Appointing Beneficiary, then the descendants of the last Appointing Beneficiary of said trust per stirpes.

3.   If there be neither Appointing Beneficiary nor descendants of an Appointing Beneficiary, then the descendants of Settlor, per stirpes;

4.   If there be neither Appointing Beneficiary, nor descendants of the last Appointing Beneficiary, nor descendants of Settlor, then the heirs at law of Settlor;

5.   If there be neither Appointing Beneficiary, nor descendants of Settlor, nor heirs at law of Settlor, then any organization qualifying under Section 501(c)(3) of the United States Internal Revenue Code of 1954, as amended.

3.

ET_0000519245

P.   PROTECTIVE TRUSTS

Where any income, including any annuity or other periodic income payment, is directed to be held on "Protective Trusts" for the benefit of any person for the period of his life or for any less period, then, during that period the said income shall, without prejudice to any prior interest, be held on the following trusts, namely:

    1.   Upon trust for said person during said period or until he, whether before or after the termination of any prior interest, does or attempts to do or suffers any act or thing, or until any event happens, other than an advance under any statutory or express power, whereby, if the said income were payable during said period to said person absolutely during that said period he would be deprived of the right to receive the same or any part thereof, in any of which cases, as well as on the termination of the said period, whichever first happens, this trust of the said income shall fail or determine;

    2.   If the trust aforesaid fails or determines during the subsistence of said period, then, during the residue of that period, the said income shall be held upon trust for the application thereof for the benefit of all or any one or more exclusively of the Ultimate Distributees hereof.

Q.   COMMORIENTES

In the event that several Beneficiaries or holders of Special Limited Powers of Appointment shall die in the same disaster or at times so close as to raise doubt as to which survived, it shall be presumed that the younger shall have survived the older except in the case of husband and wife, in which case it shall be presumed that the wife shall have survived the husband.

ARTICLE IV

TRUST PROTECTOR

A.   TRUST PROTECTOR DEFINED

The Trust Protector is that person or those persons defined as follows:

    1.   Robert Theron Brockman;

    2.   Following the death of Robert Theron Brockman, the Appointing Beneficiary of this Trust, or, in the case of separate Trusts created hereunder, the Appointing Beneficiary thereunder;

    3.   If there be no single Appointing Beneficiary, any Appointing Beneficiary having a currently exercisable Special Limited Power of Appointment with respect to more than fifty percent (50%) of the Trust Fund, or any separate Trust and resulting Trust Fund created hereunder;

    4.   If there be no such Appointing Beneficiary, any Appointing Beneficiaries who together have currently exercisable Special Limited Power of Appointment

4.

ET_0000519246

with respect to more than fifty percent (50%) of the Trust Fund, or any separate Trust and resulting Trust Fund created hereunder;

5. If there be no such Appointing Beneficiaries, any person named or described as a Beneficiary of this Trust who has been granted a beneficial interest with respect to more than fifty percent (50%) of the Trust income, or the Trust income of any separate Trust and resulting Trust Fund created hereunder;

6. If there be no such Beneficiary, any persons named or described as Beneficiaries of this Trust who together have been granted beneficial interests with respect to more than fifty percent (50%) of the Trust income, or the Trust income of any separate Trust and resulting Trust Fund created hereunder;

7. If there be no such Beneficiaries, a majority of the interests represented by those individuals described in Article III, Section O, paragraphs 3 and 4, hereof.

B. ACTION BY TRUST PROTECTOR

All notices, consents, and other activities of the Trust Protector shall be in writing. Where the Trust Protector is more than one person, as defined in Section A above, a majority vote of the interests which meet the requirements of the foregoing definition shall be entitled to act collectively as Trust Protector hereunder.

C. AUTHORITY AND RESPONSIBILITY

The authority and responsibility of the Trust Protector is as set forth in this Trust Indenture.

## ARTICLE V

## BENEFICIARIES

A. DESIGNATION AND DESCRIPTION

The Beneficiaries of this Trust shall be: Robert Theron Brockman, Dorothy Kay Brockman, Thomas David Brockman, Victoria Brockman, and any organization qualifying as a charitable organization under the laws of Bermuda, the United States, or Great Britain.

B. SETTLOR EXCLUDED

The Settlor is expressly excluded, both directly and indirectly, from becoming a Beneficiary of this Trust or any separate Trust so created hereunder.

C. SETTLOR'S SPOUSE

No distributions of any kind shall be made from the Trust Fund to any spouse of the Settlor except from income derived from the initial corpus or subsequent contributions to the corpus of this Trust and which is earned or accumulated after the death of the Settlor.

5.

ET_0000519247

## ARTICLE VI

### PROVISIONS REGARDING ACCUMULATION AND DISTRIBUTION

This Trust is in part an accumulation Trust, and in part a Trust for current distribution of income and corpus. Corpus and all currently earned or otherwise undistributed income may accordingly be accumulated during the Trust Period. Distributions and matters relating thereto shall be governed as set forth herein.

A.   DISCRETIONARY DISTRIBUTIONS

Subject to the terms of an effectively exercised testamentary Special Limited Power of Appointment, the Trustee shall, during the Trust Period, have sole and absolute discretion to effect distribution of Trust corpus and/or income to any one or more of the Beneficiaries. The Trustee may distribute corpus and/or income upon the basis that such Trust income and/or corpus is desirable for any Beneficiary's education, maintenance, health, reasonable support, and comfort, and/or to enable such Beneficiary to maintain his or her accustomed standard of living, and/or to meet any emergency. Within these standards, the Trustee may utilize any or all of the Trust income or corpus, and no precept of equality need apply. The Trustee shall be entitled to act on the advice of counsel and shall not be held accountable or liable for any subsequent tax liability which may arise as a consequence of any distribution or use of corpus and/or income pursuant to this Paragraph.

B.   WAIVER OF DISTRIBUTIONS BY BENEFICIARIES

Any Beneficiary may by deed waive until further notice his or her right to all future distributions under this Trust or any separate Trust created hereunder by such deed of waiver being delivered to the Trustee of such Trust. Unless the declaration of waiver shall provide otherwise, said declaration of waiver shall be deemed effective from the 30th day following receipt by the Trustee, and no distributions shall be made thereafter to said Beneficiary. Any Beneficiary who has waived his or her right to future distributions in the manner provided herein and has not specifically made such waiver irrevocable either for all times or for some fixed period or until the happening of some stated event or following the expiration of said period during which the waiver is made irrevocable, may notify the Trustee by written declaration that he or she again wishes to receive any future distributions under this Trust Indenture, in which case this declaration, unless by its terms it shall provide otherwise, shall be deemed effective from the 30th day following receipt by the Trustee and shall apply to all distributions thereafter.

C.   GRANT OF TESTAMENTARY SPECIAL LIMITED POWER OF APPOINTMENT

1.   A testamentary Special Limited Power of Appointment over the entire Trust Fund is hereby granted to Robert Theron Brockman.

2.   Subject to the terms of a testamentary Special Limited Power of Appointment effectively exercised by Robert Theron Brockman, or upon the death of Robert Theron Brockman, should Robert Theron Brockman have failed to exercise the testamentary Special Limited Power of Appointment granted herein, a testamentary Special Limited Power of Appointment is granted to Dorothy Kay Brockman.

6.

ET_0000519248

3.    Subject to the terms of a testamentary Special Limited Power of Appointment effectively exercised by Robert Theron Brockman or by Dorothy Kay Brockman, upon the death of the survivor of Robert Theron Brockman and Dorothy Kay Brockman, should both have failed to exercise the testamentary Special Limited Power of Appointment granted to them herein, a testamentary Special Limited Power of Appointment is granted to each Beneficiary for whom an allocation has been made pursuant to Section D of this Article VI, with such power to extend only to those assets which comprise each respective separate trust. A testamentary Special Limited Power of Appointment is granted also to any Appointing Beneficiary described in Article VI.G.

D.    CREATION OF SEPARATE TRUSTS

Upon the death of the survivor of Robert Theron Brockman and Dorothy Kay Brockman, the Trustee shall, subject to the terms of an effectively exercised testamentary Special Limited Power of Appointment, allocate the then remaining Trust Fund in equal shares _per_ _stirpes_ among the lawful issue/descendants of Robert Theron Brockman and Dorothy Kay Brockman.

Each separate share shall thereafter be retained by the Trustee as a separate Trust, and except as otherwise specifically provided herein, shall be subject to all terms and conditons as set forth in this Trust Indenture. The Beneficiaries of each separate Trust so created shall be, respectively, each Beneficiary for whom such share has been allocated, all descendants of said Beneficiary who shall be living from time to time during the Trust Period, and all organizations described in Section 501(c)(3) of the United States Internal Revenue Code of 1954, as amended, as may exist on the date hereof.

It is further provided, however, that should there be no then living descendants of said Beneficiary, the then remaining Trust Fund shall be distributed to those individuals described as Ultimate Distributees, as defined herein.

E.    GRANT OF TESTAMENTARY SPECIAL LIMITED POWERS OF APPOINTMENT OVER SEPARATE TRUSTS

Each person granted a testamentary Special Limited Power of Appointment pursuant to Section C of this Article VI and each Beneficiary for whom an allocation has been made pursuant to Section D of this Article VI is hereby granted a testamentary Special Limited Power of Appointment over all assets comprising such separate Trust. Subject to the limitations set forth in Section F of this Article VI, Appointing Beneficiary may in the exercise of said testamentary Special Limited Power of Appointment do any or all of the following:

1.    Direct outright, in Trust, or otherwise all or any part of the income and/or principal in such Trust to any person or to any entity;

2.    Direct that the Trustee, or such other Trustee as the Appointing Beneficiary may specify, retain and hold any amounts in separate Trust or Trusts for the benefit of any one (1) or more of those designated by a holder of a testamentary Special Limited Power of Appointment upon such terms and conditions as may be specified by said Appointing

7.

Beneficiary, including the creation of successive testamentary Powers of Appointment, either General or Limited. Except as otherwise specifically provided in the exercise of said testamentary Special Limited Power of Appointment any separate Trust or Trusts so created shall be held and administered in accordance with all of the terms and conditions set forth in this Trust Indenture.

F.   PROVISIONS RESPECTING EXERCISE OF TESTAMENTARY SPECIAL LIMITED POWER OF APPOINTMENT

It is further provided, however, with respect to the exercise of any testamentary Special Limited Power of Appointment granted pursuant to the terms of this Trust that:

1.   No testamentary Special Limited Power of Appointment may be exercised in favor of the holder thereof, his creditors, his estate, or the creditors of his estate;

2.   No exercise of any testamentary Special Limited Power of Appointment by Will shall be effective unless admitted to probate in a court of competent jurisdiction and unless written notice of such admission to probate shall have been delivered to the Trustee no later than one year after the date of death of the person exercising such power;

3.   No exercise of any testamentary Special Limited Power of Appointment by an instrument other than a Will shall be effective unless said instrument and a certified copy of the death certificate of the person exercising such power shall have been delivered to the Trustee no later than one year after the date of death of the person exercising such power;

4.   In the case of an exercise of any testamentary Special Limited Power of Appointment the Trustee shall have no duty to inquire or do any act or thing to discount whether any Appointing Beneficiary has died or whether such testamentary Special Limited Power of Appointment has been exercised, nor shall the Trustee take notice of or be bound by any notice, express or implied, other than as provided in Paragraphs 4 and 5 of this Section F. Until said notice shall have been delivered to the Trustee no later than one (1) year after the date of death of the person exercising such power, the Trustee may exercise all of its rights, powers, and discretions including, but without limiting the power of distribution in Article VI, Section A thereof, without incurring any liability therefor;

5.   No exercise of any testamentary Special Limited Power of Appointment by Will or by other written instrument shall be effective unless such Will or such written instrument shall have been executed by the Appointing Beneficiary subsequent to the date on which the Appointing Beneficiary shall have attained the age of twenty-one (21) years; and

6.   No exercise of any testamentary Special Limited Power of Appointment shall be effective which violates the Rule against Perpetuities as applicable to this Trust Indenture.

8.

ET_0000519250

G.   RETENTION IN TRUST

In the case of each separate Trust, upon the death of the Appointing Beneficiary thereof, if any, then to the extent that said Appointing Beneficiary has not validly exercised the testamentary Special Limited Power of Appointment granted pursuant to Sections C or E of this Article VI over any part of the then remaining Trust Fund comprising such separate Trust, the Trustee shall distribute the then remaining Trust Fund comprising such separate Trust to those individuals described as Ultimate Distributees, as defined herein.

If, pursuant to the provisions set forth herein, the then remaining assets of a separate Trust, or any share or portion thereof, shall be distributable for the benefit of any individual who shall then be the Appointing Beneficiary of a separate Trust held pursuant to the provisions of this Trust Indenture, such then remaining assets, or share or portion thereof, shall be added to such other separate Trust to be held, administered, and distributed as part thereof. If, however, such then remaining assets, or any share or portion thereof, shall be distributable for the benefit of any person who shall not then be the Appointing Beneficiary of a separate Trust held pursuant to the provisions of this Trust Indenture, such then remaining assets, or share or portion thereof, shall be retained in trust by the Trustee as a separate Trust of which said person shall be the Appointing Beneficiary and all descendants of said person who shall be living from time to time during the period of said Trust, along with all organizations described in Section 501(c)(3) of the United States Internal Revenue Code of 1954 as amended, as may exist on the date of execution of this Trust Indenture, shall also be Beneficiaries. Each separate Trust so created shall be held, administered, and distributed subject to the provisions of this Trust Indenture.

H.   RENUNCIATION OR RELEASE OF TESTAMENTARY SPECIAL LIMITED POWERS OF APPOINTMENT

Any testamentary Special Limited Power of Appointment granted hereunder may be renounced or released, in whole or in part, by such Appointing Beneficiary, and may be reduced by the Appointing Beneficiary of such power in such manner as to reduce or limit the objects in whose favor the power would otherwise be exercisable. In addition to any other method of renunciation, release, or reduction recognized by law, any testamentary Special Limited Power of Appointment may be renounced, released, or reduced by such Appointing Beneficiary by a Deed signed by the Appointing Beneficiary and delivered to the Trustee of the Trust to which such renunciation, release, or reduction relates.

I.   RENUNCIATION OF BENEFICIAL INTEREST

In addition to all other rights of waiver, renunciation, or release set forth herein, any person beneficially interested in this Trust or in any separate Trust created hereunder may at any time renounce, either conditionally or unconditionally, all rights or interest in such Trust by a Deed delivered to the Trustee. Unless the renunciation shall provide otherwise, said renunciation shall be deemed effective from the 30th day following receipt by the Trustee, and thereafter such Trust or the part of such Trust which shall have been renounced shall be administered and distributed as if said person had died on the effective date of the renunciation, and as if said person had not exercised any testamentary Power of Appointment granted to said person. It is further provided, however, that such renunciation, whether conditional or unconditional, shall not, unless

9.

ET_0000519251

specifically so provided, affect in any way the right of said person to receive subsequent distributions of corpus or income from any separate Trust as may occur upon the death of any person or upon the renunciation by any other person of any interest in any separate Trust.

## J.   TRUST PERIOD AND VESTING

Notwithstanding any provisions of this Trust Indenture to the contrary, no separate Trust, nor any share or portion thereof, shall be held in trust for longer than, nor shall any estate or trust created by the exercise of any testamentary Special Limited Power of Appointment hereunder terminate later than, the Trust Period as defined herein.  If at the expiration of the Trust Period, any separate Trust, or any share or portion thereof, is still held in trust, or any estate created hereunder has not terminated, the Trustee shall cease to accumulate any net income thereof, and such separate Trust, or share or portion thereof, shall vest in and immediately be distributed to those individuals described as Ultimate Distributees, as defined herein.

## K.   TRANSFERS TO OTHER TRUSTS

The Trustee is also hereby authorized to allocate and transfer at any time all or any portion of the Trust Fund as it may in its sole discretion deem advisable to the Trustee of one (1) or more other trusts created by the Trustee or any other settlor for the benefit of one or more of the Beneficiaries hereunder, irrespective of whether such trust is subject to and administered under the laws of the jurisdiction where this Trust or any separate Trust created hereunder is then located.  This power may be exercised by the Trustee in the manner provided herein only if the trust to which assets of this Trust are to be transferred exists solely for the benefit of one (1) or more Beneficiaries hereunder, and that such trust does not differ in any substantial manner from the present Trust in its objects, purposes, terms or conditions.  It is further provided, however, that no such allocation or transfer shall be made to any trust which may by its terms have a duration exceeding the Trust Period as defined herein, nor to any trust under which the Settlor of this Trust or the spouse of the Settlor of this Trust is or may become a beneficiary.  In making any allocation or transferring any portion of the Trust Fund in the manner provided herein, the Trustee may allocate or transfer the same in kind, including undivided interests therein, or in its discretion may allocate or transfer all or part of the Trust Fund, and make such allocation or transfer in cash, or in kind, or partly in cash and partly in kind.

## ARTICLE VII

## RESIGNATION, REPLACEMENT, AND MERGER OF TRUSTEE

## A.   RIGHT OF RESIGNATION BY TRUSTEE

The Trustee shall have the right to resign as Trustee of this Trust or any separate Trust created hereunder at any time by giving ninety (90) days written notice to the Trust Protector. The successor Trustee of this Trust or any separate Trust created hereunder shall be selected by the Trust Protector.  Should the Trust Protector fail to select a successor Trustee within the period of such notice, the resigning Trustee shall have the right to appoint a successor Trustee.  Written notice of a Trustee's appointment of a successor shall be given to the Trust Protector.

10.

B.    POWER TO REPLACE TRUSTEE

The Trust Protector shall have the power to replace the Trustee of this Trust or any separate Trust created hereunder at any time, either with or without cause, upon giving thirty (30) days' written notice thereof to the Trustee.  Such notice shall designate a successor Trustee and shall contain the acceptance of the successor Trustee.

C.    EFFECT OF RESIGNATION OR REPLACEMENT OF TRUSTEE

The resignation or replacement of the Trustee of this Trust or any separate Trust created hereunder shall neither prevent nor limit in any way the ability of said Trustee to continue to act or be appointed as Trustee of any other separate Trust or Trusts created hereunder.

D.    REQUIREMENTS OF SUCCESSOR TRUSTEE

Any successor Trustee of this Trust or any separate Trust created hereunder shall be an independent corporate trustee, whether or not located within the jurisdiction specified in Article XII hereof or in any other jurisdiction where this Trust or any separate Trust is then located, which is authorized by law to engage in the business of administering trusts and which is one of the following:

1.    A Bank or Trust Company which is a subsidiary of one of the five (5) largest banking institutions having its head office in Australia, Canada, France, Hong Kong, Japan, the Netherlands, Switzerland, the United Kingdom or West Germany.  For purposes of this Section D, largest shall be measured on the basis of assets shown on the audited year end balance sheets of the banks in question during the calendar year preceding the year in which the successor trustee shall be selected; or

2.    A Bank or Trust Company owned by a consortium of banks, the majority of which Bank or Trust Company shares are owned by banking institutions which meet the requirements of Paragraph 1 above; or

3.    A Bank or Trust Company with paid in capital and surplus of not less than One Million United States Dollars (U.S. $1,000,000.00).

No successor Trustee shall be eligible in which the Settlor, the Settlor's spouse, any Beneficiary, any Trust Protector, or any holder of a Special Limited Power of Appointment has an economic interest, direct or indirect, in excess of one percent (1%).

E.    ADMINISTRATIVE PROVISIONS

Any successor Trustee of this Trust or any separate Trust created hereunder shall succeed to all of the retiring Trustee's title to the Trust Fund and all powers, rights, discretions, obligations, and immunities of the Trustee hereunder with the same effect as though such successor Trustee were originally named herein as Trustee of such Trust.  Any resigning Trustee shall execute all instruments and do all acts necessary to vest such title in any successor Trustee without prior court approval.  No successor Trustee shall be obliged to examine the accounts, records, and acts of the previous Trustee or Trustees, nor shall any such successor Trustee in any way or manner be responsible

11.

for any act or omission to act on the part of any previous
Trustee.

F.    MERGER OF TRUSTEE

If any corporate Trustee of this Trust or any separate
Trust created hereunder shall be merged or consolidated with, or
shall sell or transfer all or substantially all of its assets
and business to another corporation, or shall be reorganized or
reincorporated in any manner, the corporation to which such sale
or transfer shall be made or the successor corporation resulting
therefrom, shall thereupon become Trustee of any such Trust or
Trusts without any further act on the part of any then existing
Trustee, Settlor, or Beneficiaries of such Trust, and shall
succeed to all rights and liabilities of the existing Trustee,
provided however that said successor corporation satisfies the
requirements set forth in Section D above.

## ARTICLE VIII

### TRUSTEE'S RELATIONSHIP WITH SETTLOR AND BENEFICIARIES

A.    RELATIONSHIP WITH SETTLOR

Under no circumstances shall the Settlor have any interest
in any investment made by the Trustee of this Trust or any
separate Trust created hereunder, other than such legal interest
as would a stranger to the Trust or Trusts have in the particular
transaction in question.  The Trustee is authorized to deal with
the Settlor, to purchase property from the Settlor, or sell
property to the Settlor, but always at the fair market value of
such property, and for an adequate and full consideration in
money, or money's worth.  Under no circumstances shall this
paragraph be construed as conferring any power upon the Settlor
to require the Trustee of this Trust or any separate Trust
created hereunder to deal with the Settlor in any manner, or to
give the Settlor any power to reacquire the Trust Fund, or any
part thereof, by substituting other property of an equivalent
value.  It is the express intent of the Settlor that the Trustee
cooperate with the Executor or Administrator of the estate of
the Settlor of this Trust or any Appointing Beneficiary of this
Trust or any separate Trust created hereunder to the end that
ready cash shall be available to that person's heirs in case of
death.

B.    RELATIONSHIP WITH BENEFICIARIES

The Trustee may enter into financial transactions with the
Settlor, any Donor, any Beneficiary, or any holder of a Special
Limited Power of Appointment, or any Trust Protector, only for
adequate consideration and upon adequate security being given.
As the sole exception to this policy the Trustee may lend any
part of the Trust Fund to any Beneficiary of this Trust or any
separate Trust created hereunder, either without security or
without interest, but not without one or the other, for a period
not to exceed the Trust Period, and on terms otherwise consistent
with the provisions hereof.

C.    RELATIONSHIP WITH BENEFICIARIES WHO ARE MINORS OR INCOMPE-
      TENTS

Distributions to an incompetent Beneficiary, as defined
below, or to a Minor Beneficiary, as defined herein, may be made
in such of the following ways as in the Trustee's opinion will
be most beneficial to the interests of the Beneficiary: (a) di-
rectly to such Beneficiary; (b) to his or her parent, guardian,

12.

ET_0000519254

or legal representative; (c) to a custodian for said Beneficiary under any Uniform Gifts to Minors Act and/or Gifts or Securities to Minors Act in the jurisdiction of residence of such Beneficiary; (d) to any person with whom he or she is residing; (e) to some near relative or close friend; or (f) by the Trustee using such payment directly for the benefit of such Beneficiary, including payments made to or for the benefit of any person or persons whom said Beneficiary has a legal obligation to support. The Trustee may in its sole discretion instead hold such income or corpus for the account of such Beneficiary as custodian. A receipt from a Beneficiary or from his parent, guardian, legal representative, relative, or close friend or other person described above shall be a sufficient discharge to the Trustee from any liability for making said payments.

The Trustee is likewise authorized to consult with and act upon the advice of the parent, guardian, custodian, or legal representative of any Beneficiary who is either an incompetent or a Minor with respect to any and all matters which may arise under this Indenture and which concern the rights or interests of said Beneficiary. All statements, accounts, documents, releases, notices, or other written instruments, including, but not limited to, written instruments concerning the resignation or replacement of any Trustee or Trustees, required to be delivered to or executed by such Beneficiary may be delivered to or executed by the parent, guardian, custodian, or legal representative of said incompetent or Minor Beneficiary, and when so delivered or executed shall be binding upon said incompetent or Minor Beneficiary, and shall be of the same force and effect as though delivered to or executed by a Beneficiary acting under no legal disability.

A person shall be deemed "incompetent" if he is an Adult Beneficiary, as defined herein, who is incapacitated so as to make it impossible or impractical to give prompt and intelligent consideration to business matters. The Trustee may act upon such evidence as it reasonably deems appropriate and reliable without liability by reason thereof.

D.   ACCOUNTING REPORTS

The Trustee shall be responsible for maintenance of adequate records showing the financial condition of the Trust or Trusts, character of Trust income, amounts of tax withheld and paid, and all expenses of the Trust, as evidenced by dated receipts. Such reports shall be open for inspection at all reasonable times by the Trust Protector.

The Trustee shall also be responsible for the preparation of any annual accounting which may be requested by the Trust Protector with respect to this Trust or any separate Trust created hereunder. In addition, the Trustee shall be responsible for the preparation and filing of any documents in connection with the creation or operation of the Trust as may be required under the laws of the jurisdiction where this Trust or any separate Trust created hereunder is then located.

The Trustee's duty to render any annual accounting requested by the person or persons designated hereinabove shall be discharged in whatever manner specified by such person or persons, which may include furnishing such accountings either to such person or persons, legal counsel to such person or persons, legal counsel to the Trust, or to such other person or persons as the person or persons entitled to request an accounting may designate.

13.

ET_0000519255

E.    SPENDTHRIFT PROVISIONS AND PROTECTIVE TRUSTS

    1.    In keeping with the wholly discretionary nature of this Trust and all separate Trusts created hereunder, no Beneficiary shall have any ascertainable, proportionate, actuarial, or otherwise fixed or definable right to or interest in all or any portion of the Trust Fund.  In no case shall any Beneficiary have any right to alienate, transfer, assign, encumber, or hypothecate his contingent interest therein, either present or future, nor shall such interest of any Beneficiary be subject to claims of his creditors, or liable to attachment, execution, or other process of law.

    The income of this Trust or any separate Trusts created hereunder shall not be pledged, assigned, transferred, sold, or in any manner whatsoever accelerated, anticipated, or encumbered by any Beneficiary; nor shall any income of this Trust be in any manner subject to or liable in the hands of the Trustee for the debts, contracts, or encroachments of any Beneficiary or for any claim for alimony or for support of children pursuant to a court decree or separation agreement, or be subject to any assignment or other voluntary or involuntary alienation or disposition whatsoever by any legal or equitable process prior to the actual distribution of all or part of said income to that Beneficiary.

    2.    Where a Beneficiary has been granted any ascertainable, proportionate, actuarial, or otherwise fixed or definite right to or interest in all or any portion of the Trust fund, the Trustee shall hold any income and capital therefrom in Protective Trusts, as defined herein, for the benefit of said Beneficiary for the period of said Beneficiary's life or the period of said Beneficiary's interest, whichever is shorter.

    3.    Nothing contained in this Section shall, however, prevent or limit in any way either the exercise of, or the transfer pursuant to the exercise of, any Special Limited Power of Appointment hereunder, nor the waiver or renunciation of any beneficial interest hereunder, except as otherwise specifically prohibited in this Trust Indenture.

F.    MANNER OF DISTRIBUTION

    Upon any division, or partial or final distribution of the Trust Fund as herein provided, the Trustee may divide or distribute the same in kind, including undivided interests therein.  In its absolute discretion, the Trustee may sell all or any part of the Trust Fund, but only for adequate consideration, and may make such division or distribution in cash, or partly in cash and partly in kind.  The decision of the Trustee as to what constitutes a proper division of the Trust Fund in furtherance of the provisions of Article VI either prior to or upon distribution thereof, shall be binding upon all of the Beneficiaries of this Trust or any separate Trust created hereunder.

## ARTICLE IX

### TRUSTEE'S ADMINISTRATIVE POWERS

    The Trustee of this Trust or any separate Trust created hereunder shall have broad administrative powers with respect to the Trust Fund or any part thereof which may be exercised on

14.

ET_0000519256

such terms and in such manner as it may deem advisable, and the specific powers described below shall be without prejudice to the generality of the Trustee's administrative, investment, and management powers otherwise conferred under the terms of this Trust Indenture or by law.

A.   RIGHTS OF PERSONS DEALING WITH THE TRUSTEE

The Trustee may execute and deliver any and all instruments in writing which it may deem advisable to carry out any of the powers granted it herein. No party to any such instrument in writing signed by the Trustee shall be obligated to inquire into its validity, or be bound to see to the application by the Trustee of any money or other property paid or delivered to it pursuant to the terms of any such instrument. It is further expressly provided that anyone dealing with the Trustee is not required to inquire into the terms of this Trust Indenture, the authority of the Trustee, or to see to the application which the Trustee makes of funds or other property received by it, but shall be entitled to deal with the Trustee as if it is fully authorized to act.

Any person dealing with this Trust or any separate Trust created hereunder shall in addition be entitled to rely upon a copy or counterpart of the original Trust Indenture, and upon any instruments duly executed in accordance with the provisions thereof, to the same extent as such person might rely upon the original Trust Indenture.

B.   DETERMINATION OF PRINCIPAL AND INCOME

The Trustee shall have full power and authority to determine, in its absolute discretion, what shall constitute corpus of the Trust Fund, gross income therefrom, and net income distributable under the terms of this Trust Indenture, except as otherwise specifically provided herein, and the determination of the Trustee with respect to all such matters shall be conclusive upon all Beneficiaries howsoever interested in this Trust or any separate Trust created hereunder. This specifically includes full power and authority to add any and all amounts of accumulated income of this Trust or any separate Trust created hereunder to the corpus of such Trust to be held, administered, and distributed as a part thereof. This shall also include full power and authority to establish such reasonable reserves as it may in its discretion deem advisable to take into account the depreciation of tangible property and to amortize amounts paid for the purchase of securities or other property as authorized herein.

C.   ACTIONS NOT TO REQUIRE COURT AUTHORIZATION

The Trustee shall not be required to obtain authority or approval of any Court in the exercise of any power conferred hereunder and shall not be required to make current reports or accountings to any court of its duties hereunder except as may be required by any statute or rule of any court of competent jurisdiction.

D.   PAYMENT OF TAXES AND EXPENSES

Except as otherwise provided herein, the Trustee shall pay all property taxes, assessments, fees, charges, and other expenses incurred by it in the administration or protection of this Trust or any separate Trust created hereunder, and all such payments shall be a charge against the Trust Fund and shall be paid by the Trustee out of the income therefrom, or, in the event and to

15.

the extent that the income may be insufficient, then out of the
corpus of the Trust Fund, at any time prior to final distribution
of the Trust Fund. The determination of the Trustee with respect
to all such matters shall be conclusive upon all Beneficiaries
howsoever interested in this Trust or any separate Trust created
hereunder.

E.   TRUSTEE FEES

Unless otherwise agreed in writing between the Trustee and
the Trust Protector, the Trustee shall receive compensation and
fees in accordance with its published terms, conditions, and
service charges in effect from time to time, which fees shall be
paid first from the current income of the Trust and then, as may
be necessary, from the corpus of the Trust. The Trustee shall
also be reimbursed in the same manner for all reasonable expenses
incurred in the management of the Trust.

F.   PROVISIONS PROTECTIVE OF TRUSTEE

Once any distribution of the assets or allocation of assets
made in accordance with this Trust Indenture has taken place,
the Trustee shall have no further responsibility in connection
with such assets, except as would a stranger to the Trust. If
the Trustee shall be compelled at any time during the existence
of this Trust or any time thereafter to pay any tax or penalty
with respect thereto for any reason, the Trustee shall be entitled
to be reimbursed from the Trust Fund. If the Trust Fund be then
insufficient or if the Trust be then terminated, the Trustee
shall be reimbursed by the Beneficiaries to whom the Trust Fund
shall have been distributed, or for whose account assets from
the Trust Fund have been allocated, to the extent of the amount
received by or allocated to the account of each. The Trustee,
before making any distribution or allocation of either income or
corpus, may accordingly require a refunding agreement or may
withhold distribution or allocation pending determination or
release of any tax lien.

G.   SURRENDER OF ANY GRANTED POWER OR AUTHORITIES

The Trustee may release, in whole or in part, temporarily
or irrevocably, any power, authority, or discretion conferred
upon it hereunder by written notice delivered to the Trust
Protector hereof, with respect to this Trust or any separate
Trust created hereunder.

H.   SERVE WITHOUT BOND

The Trustee shall, in all instances, serve without furnishing
a bond for the performance of its duties except as may be required
by any law, statute, or rule of any court of competent jurisdic-
tion, in which case no surety shall be required thereon.

I.   NONLIABILITY FOR ACTS

In the performance of its duties and the exercise of its
powers hereof, the Trustee shall not be liable for any act or
omission in connection with the exercise of any powers hereunder,
or for any loss of or injury to the Trust Fund, or for any injury
to, depreciation of or loss to any properties held in Trust
resulting therefrom, except for its own actual fraud, intentional
wrongdoing, or negligence. The judgment of the Trustee on
matters placed by this Trust Indenture within its discretion
shall be final and conclusive on the Settlor and all persons

16.

ET_0000519258

having any interest in or who may acquire an interest in any
Trust created hereunder.

J.   ACCOUNTING PERIOD

The Trustee shall have the power to select a calendar or
other annual accounting period.

K.   EMPLOYMENT OF ADVISORS

The Trustee may employ in connection with the establishment,
management, execution, and termination of the Trust, and at the
expense of the Trust, such agents, custodians, brokers, invest-
ment advisors, chartered accountants, clerks, depositories,
barristers, solicitors, attorneys-at-law, or other legal counsel
and investment advisors as the Trustee may consider necessary or
desirable for any proper purpose in the interest of the Trust,
specifically including, but npt limited to, the establishment of
the Trust, with payments, the amount of which and to whom di-
rected, determined according to contract, retainer, hourly
rates, or otherwise.

L.   RELIANCE ON OPINION OF COUNSEL

The Trustee may obtain the opinion of legal counsel concern-
ing the interpretation, construction, or effect of any provision
of this Trust Indenture, or concerning any difference arising in
connection with the administration, execution, or termination of
the Trust, and is authorized, subject to any directions of a
court of competent jurisdiction, to act in accordance with and
in reliance upon the opinion of counsel.

M.   VALUATION

When anything is dependent upon the value of any property
or the existence of any fact, the Trustee may determine conclu-
sively such value and such fact.

N.   TRUSTEE DEALING WITH TRUST

The Trustee is authorized to deal with the Trust in general
business matters provided only that in all such transactions the
Trustee shall observe its fiduciary obligations to the Trust.
Where the Trustee is also a corporation authorized by law to
carry on the banking business, the Trustee is further authorized
to loan or advance its own funds to the Trust for any purpose,
at the then current rate of interest, and any such loan or
advance, together with interest, shall be a first lien against
the Trust Fund and shall be repaid therefrom.

O.   RIGHT TO SECURE RELEASES

The Trustee is hereby authorized to secure from the Settlor
or from any Beneficiary with respect to this Trust or any separate
Trust created hereunder, a full and complete release from any
and all liabilities attributable to any acts by the Trustee, or
any decisions by the Trustee to act or refrain from acting in
any manner whatsoever, with respect to the investment of the
assets of the Trust Fund, retention of any or all Trust assets,
and the sale or disposition of any or all Trust assets, and to
secure written approval from the Settlor or from any Beneficiary
of any account or statement furnished in accordance with Section D
of Article VIII.  Such release or approval shall be binding and
conclusive upon said person or persons and upon all descendants
of said person or persons, including then unborn descendants,

17.

ET_0000519259

who may then have or thereafter acquire any interest in this Trust or any separate Trust created hereunder.

P.    APPLICATION FOR EXCHANGE CONTROL APPROVAL

The Trustee is hereby authorized to make application for and to take all other necessary steps as may be necessary to obtain approval of the Foreign Exchange Control Authorities of this Trust or any separate Trust created hereunder as nonresident for Foreign Exchange Control purposes.

Q.    DELEGATION OF AUTHORITY

The Trustee may at any time and from time to time, and subject to revocation at any time, delegate the authorities, discretions, and powers, or any of them herein conferred upon the Trustee to any one or more other trustees or to any other person or persons as may be necessary to accomplish the objects and purposes of this Trust Indenture. Such delegation and all revocations thereof shall be evidenced by an instrument in writing, signed and delivered to such Trustee or to the person or persons to whom the delegation is made, and to the Trust Protector, with respect to this Trust or any separate Trust created hereunder which is affected in any way by said delegation. Under no circumstances shall any delegation be made in favor of the Settlor, his or her spouse, any Beneficiary, any Trust Protector, or any holder of a Special Limited Power of Appointment of such Trust.

R.    TRUSTEE NOT LIABLE IN CORPORATE CAPACITY

With regard to any contract, agreement, undertaking, cove-nant, or representation, entered into or made by or on behalf of the Trustee for the benefit of any Trust created hereunder, any rights, liabilities, or obligations created by virtue of such contract, agreement, undertakings, covenant, or representation shall be solely the rights, liabilities, and obligations of such Trust, and shall not be the personal rights, liabilities, or obligations of the Trustee, and, accordingly, no such liability or obligation shall at any time be asserted or enforceable against the Trustee in its corporate capacity, but only against the assets of such Trust.

ARTICLE X

TRUSTEE'S INVESTMENT POWERS

The Trustee of this Trust or any separate Trust created hereunder shall have broad investment and management powers with respect to the acquisition, holding, and disposition of all assets comprising the Trust Fund or any part thereof, which powers may be exercised on such terms and in such manner as it may deem advisable, and the specific powers described below shall be without prejudice to the generality of the Trustee's administrative, investment, and management powers otherwise conferred in this Trust Indenture or by law.

A.    GENERAL POWERS

The Trustee may acquire, hold, rent, lease, sell, convey, exchange, convert, improve, repair, manage, create, control, and invest and reinvest the Trust Fund in, such property, either real or personal, as the Trustee may deem advisable, consistent with the purposes of this Trust Indenture, whether or not such property is of the kind ordinarily permitted by law for the

18.

ET_0000519260

investment of trust funds and irrespective of risk, nonproduc-
tiveness, or lack of diversification of such investments. This
shall include the power to acquire and exercise options to
purchase any type of property authorized hereunder, either real
or personal, whether subject to any type of indebtedness or
other security interest. The Trustee may accordingly make any
payment, receive any money, take any action, and make, execute,
deliver, and receive any contract, deed, instrument, or document
which may be deemed necessary or advisable to exercise any of
the powers conferred hereunder or to carry into effect any
provisions herein contained and which in the judgment of the
Trustee are necessary or desirable for the proper administration
of the Trust Fund.

B.   REAL PROPERTY

In addition to the broad investment powers granted hereunder,
and without in any way limiting said powers, the Trustee may,
with respect to real property of any kind, wheresoever located,
sell, convey, release, mortgage, encumber, lease, partition,
improve, manage, protect, and subdivide such property, or any
interest therein or parts thereof, and may dedicate for public
use or vacate any subdivision or parts thereof. The Trustee is
also hereby authorized to resubdivide, contract to sell, grant
options to purchase, sell on any terms, convey, mortgage, pledge,
or otherwise encumber such property, or any part thereof, from
time to time, in possession or reversion, by leases to commence
either presently or at some future time, and upon any terms and
for any period or periods of time, including a period beyond the
duration of the Trust Period, and renew leases and options to
purchase the whole or any part of any reversion. These powers
include the power to purchase or lease rights for the explora-
tion for and removal of gas, oil, and all other minerals. The
Trustee may likewise partition or exchange said real property,
or any part thereof, for other real or personal property, grant
easements or charges of any kind, release, convey, or assign any
right, title, or interest in or about an easement appurtenant to
said property, or alter, repair, add to, or take from buildings
on said premises, purchase, or hold real property, improved or
unimproved, or act as trustee of any land trust of which the
Trust is a beneficiary, to convey title to the real estate
subject to such land trust, and execute all documents pertaining
to the property subject to such land trust, and act in all
matters regarding such trust, and execute assignments of all or
any part of the beneficial interests in such land trusts.

C.   SECURITIES AND COMMODITIES INVESTMENTS

In addition to the broad investment powers granted hereunder,
and without in any way limiting said powers, the Trustee is
hereby specifically authorized to purchase or otherwise acquire
for cash, credit, or installments, or invest and reinvest the
Trust Fund, or any parts thereof, in common stock, both listed
and unlisted, publicly and privately held, or in any other type
or types of securities or commodities investment, bank accep-
tances, preferred stocks, warrants, interests in common trust
funds, mutual funds, "open-end" or "closed-end" investment funds
or trusts, real estate investment trusts, beneficial interests
in land trusts, or savings and loan or building and loan associa-
tions, oil, gas, or other mineral interests, commodities, includ-
ing security or commodity futures, hedges, short positions,
options, puts, calls, straddles, or any other form of securities
or commodities position, interest, or contract.

19.

ET_0000519261

D.   BORROW OR LEND

The Trustee may borrow or lend money, and except as other-
wise specifically provided herein, at any interest and with any
security, for any purpose permitted under this Trust Indenture,
and may give security for any obligation undertaken or assumed
by the Trust.  This shall include the power to extend or renew
any existing indebtedness, as well as to guarantee and give
security for any obligation which is related to any purpose of
this Trust Indenture, including, but not limited to, the encum-
brance or hypothecation by mortgage, deed of trust, pledge, or
otherwise of any and all assets comprising the Trust Fund.  In
addition, the Trustee is hereby authorized to use all or part of
the Trust Fund to purchase certificates of deposit, Eurodollar
bond or bank deposits, or similar monetary instruments.

The Trustee may, in connection with the purchase or acqui-
sition of any property or investment, arrange and agree to such
terms and conditions as it considers proper, including without
limitation, purchases and acquisitions solely on credit and
involving the mortgaging, pledging, hypothecating, or other
encumbrancing of the property acquired or purchased, as collateral
security for payment of the purchase price thereof.  The Trustee
may also purchase or acquire any property or investment solely
on the security of its bond, or note, or series of notes, or its
unsecured contractual obligation under a deferred payment plan.
The Trustee may agree to pay any vendor from whom such property
or investment is acquired at such time or times as may be mutually
agreed, without regard to the duration of the Trust Period.

E.   INSURANCE

The Trustee may, in connection with any property obligation
or transaction related to the purposes of this Trust Indenture,
insure, co-insure, reinsure, guarantee, and otherwise assume
risks or indemnify for liability thereof, and may purchase
insurance or refrain from purchasing or renewing insurance, of
such kinds and in such amounts as the Trustee may deem advisable
at the expense of the Trust.

Subject to the terms and limitations set forth below, the
Trustee may pay, from income or corpus, insurance premiums or
other charges, and may control all rights or incidents of owner-
ship in connection therewith.

The Trust may purchase policies of insurance on the life of
the Settlor or any spouse of the Settlor or any Beneficiary or
on the life of any person in whom the Trust may have an insurable
interest, and continue in effect or terminate any life insurance
policy which may be owned or held by this Trust, provided there
shall be no adverse tax consequences to the Settlor or to any
Beneficiary, and provided that in no event shall the Trustee pay
premiums on insurance on the life of the Settlor or any spouse
of the Settlor from current or accumulated income added to the
corpus of the Trust.

F.   ANNUITIES

The Trustee may, in consideration of the receipt of cash or
securities or other property, whether real or personal, enter
into a contractual obligation with any person to pay to that
person, or to some other person, an annuity (payable at such
intervals and such amounts as may be mutually determined),
whether for a term certain or for a period ending with the date
of the death of the annuitant or for the duration of another

20.

ET_0000519262

designated life or lives. The Trustee may contract to hold all unpaid annuity payments on Protective Trusts, as defined herein. In connection with any such transaction, the Trustee shall be bound to follow sound and accepted actuarial principles in all respects.

G.   COLLECTIBLES

The Trustee may, as it deems advisable, purchase or otherwise acquire, invest in, collect, manage, sell, exchange, or otherwise dispose of or trade in paintings, sculpture, watercolors, lithographs, and other works of art; cut, uncut, mounted, and unmounted stones and gems; coins, stamps, commemorative medals, decorations, and other government issued objects of value; rare books, porcelain, antique furniture, stained glass, carpets, silver, vintage wines, antique cars, and any other type of personal property.

H.   CURRENCY TRADING

The Trustee may hold accounts comprising the entire Trust Fund or any part or parts thereof in any currency it may in its sole discretion deem advisable, and is hereby specifically authorized to trade or speculate in any currency or foreign exchange in any manner it may deem advisable.

I.   PROPORTION OF TRUST FUND INVESTED

The Trustee may invest in any amount or amounts without regard to the amount or proportions of the Trust Fund invested in any particular property or properties, including without regard to the amount or proportion of the Trust Fund invested in the securities of a single issuer.

### ARTICLE XI

#### TRUSTEE'S MANAGEMENT POWERS

The Trustee of this Trust or any separate Trust created hereunder shall have broad investment and management powers with respect to the acquisition, holding, and disposition of all assets comprising the Trust Fund, or any part thereof, which powers may be exercised on such terms and in such manner as it may deem advisable, and the specific powers described below shall be without prejudice to the generality of such powers.

A.   DISCRETIONARY INVESTMENT ACCOUNTS

The Trustee may establish with one or more brokers, investment managers, or investment advisors, discretionary investment accounts, wherein such brokers, investment advisors, or investment managers may purchase, sell, borrow, hypothecate, or otherwise manage assets in such account without obtaining the express prior approval of the Trustee with respect to any particular transaction. Any such discretionary investment account manager shall be removable by the Trustee at its sole discretion and upon at least thirty (30) days written notice to such manager. The designation of such discretionary investment account manager shall under no circumstances be construed as appointing such individual as a co-trustee hereunder. The Trustee shall not be liable for losses incurred with respect to Trust assets held or administered in such discretionary investment accounts.

21.

B.    MARGIN ACCOUNTS

The Trustee may open margin accounts or similar accounts with brokerage firms, banks, or others wheresoever in the world situated, for purposes of investing the Trust Fund as provided herein, and conduct, maintain, and operate these accounts, directly or through designation of another as agent, for purchase, sale, and exchange of stocks, bonds, commodities, and other securities, and in connection therewith may borrow money, obtain guarantees, and engage in all other activities necessary or incidental to conducting, maintaining, and operating such accounts.

C.    TRUSTEE AS SHAREHOLDER

In connection with the ownership of any securities as authorized herein, the Trustee may vote said stock, refrain from voting, give proxies, either general or limited, for any purpose, consent to, or join in any voting trust, and pay assessments or other charges in connection with all securities held in the Trust Fund. The Trustee may also hold securities in bearer form, exercise or sell stock subscriptions or conversion rights, and join in corporate or other reorganizations, consolidations, mergers, and liquidations, and may, incident thereto, deposit securities with and transfer title to any protective or other committee upon such terms as the Trustee may deem advisable. The Trustee may further join in any pseudo-corporation election by transfer of stock in any manner which might make that possible. Where the Trustee invests in the controlling shares of any company or corporation the Trustee shall not be deemed to be a member of said board of directors by virtue of holding said controlling shares, nor shall the Trustee have any duty to procure the appointment of its nominee as director or directors of said company or corporation, and be it further provided that the Trustee shall have no responsibility to inquire into, oversee, or take part in the management or affairs or business of the company or corporation or any of its subsidiaries.

D.    LITIGATION

The Trustee may commence or defend litigation with respect to the Trust, or any property included in the Trust Fund, as it may deem advisable, at the expense of the Trust. The Trustee may litigate, compromise, compound, adjust, submit to arbitration and be bound thereby, release, or otherwise settle or dispose of any claim or demands of the Trust against others, or of others against the Trust, in such manner and upon such terms as deemed proper by the Trustee, and this shall include extending the time for payment or abandoning any claims or demands in favor of or against the Trust Fund or any part thereof.

E.    PUBLIC OR PRIVATE SALE

The Trustee may sell at public or private sale, or exchange, or otherwise dispose of, any property, whether real or personal, at any time coming into the hands of the Trustee. The foregoing provision shall be deemed to include, without limitations, sales or exchanges on credit, with or without security, and shall include the power to abandon any property, either real or personal, which the Trustee deems worthless or not of sufficient value to warrant keeping or protecting, by refraining from paying taxes, water charges, rents, assessments, repairs, maintenance costs, and upkeeping of such property, and permitting such property to be lost by tax sale or other legal or equitable proceedings, or conveying such property for nominal consideration or without consideration in lieu of foreclosure or otherwise.

22.

ET_0000519264

F.   FORECLOSURES

The Trustee may participate in foreclosures.

G.   PARTICIPATION IN PARTNERSHIP

The Trustee may participate with any other person, firm, corporation, or company or trust in partnership, either as a general or limited partner, or in any joint venture therewith, in pursuance of any of the purposes of this Trust Indenture, and shall have and exercise all the powers of management and partici- pation in the management necessary and incidental to a membership in such partnership, limited partnership, or joint venture, including the making of charitable contributions, and may at any time participate in the incorporation of any such enterprise.

H.   INVEST BEYOND DURATION OF TRUST

The Trustee may make such contracts and enter into such undertakings relating to the Trust Fund, or any part thereof, as the Trustee considers advantageous to the Trust without regard to the duration of the Trust.

I.   RIGHT TO UNDERTAKE PROFIT MAKING RISKS

The Settlor realizes that the Trust can profit only from the action of the Trustee in investing the assets of the Trust Fund. Generally speaking, it will be true that support for the Beneficiaries will be adequately provided from sources other than this Trust. It is also realized that any investment carries with it the risk of loss. The Settlor expects the Trustee to invest the Trust Fund for the benefit of the Trust. Consequently, the Trustee should not fear to make speculative or long-term property investments. The Trustee shall be held harmless for any loss resulting from said investment or investments, and the making of said investment or investments shall not result in any liability on the part of the Trustee in its corporate capacity to any Beneficiary of this Trust, or any separate Trust created hereunder, either present or future, known or unknown, including unborn Beneficiaries, for breach of its obligations as Trustee.

J.   ACT AS RECEIVER

The Trustee may serve as Trustee or receiver, or Trustee and receiver, of any corporation, company, association, or institution, the stocks, shares, bonds, debentures, notes, or other obligations of which, or evidence of interest in which, the Trustee is authorized to hold. When acting in such capacity, the Trustee may receive such compensation (other than from Trust Fund) for such services as would be proper were such services performed by an individual, corporation, company, association, or institution not acting as Trustee of the Trust.

K.   HOLD PROPERTY AS NOMINEE

The Trustee may hold securities or other property, real or personal, comprising the Trust Fund in its name as Trustee, in its name as nominee, or in the name of its nominee. The Trustee may hold securities or other personal property in registered or unregistered form, in bearer form, or in any other condition that will permit ownership to pass by delivery, and shall like- wise be authorized to enter into any land trust, real property holding agreement, or similar arrangement, with respect to real property. Trust records shall at all times disclose how all of the property of the Trust is held.

ET_0000519265

The Trustee shall generally have the power to refrain from disclosing the fiduciary relationship involved in any action undertaken pursuant to this Trust Indenture in any circumstances in which the Trustee considers it expedient to do so.

L.   FORMATION OF COMPANIES

The Trust may form, or procure the formation of, one or more corporations or companies for any and all purposes consistent with the powers granted to the Trustee under this Trust Indenture.  The Trustee may exercise all of its powers under this Trust Indenture in dealings with corporations or companies so formed by it.

M.   PARTITION OF PROPERTY

The Trustee may, in whole or in part, at public auctions or at private sale, or otherwise, and upon such terms and for such sums as the Trustee may determine, partition property with any co-owner or joint owner, other than the Trustee itself, having any interest in any property in which the Trust has any estate or interest, and may effect such partition either by sale, by set-off, by agreement, or otherwise.

N.   BANK ACCOUNTS

The Trustee may open and maintain one or more savings accounts, checking accounts, term accounts, or current accounts with any bank, savings and loans, or building and loan association, wherever located, and may deposit to the credit of such account or accounts all or any part of the funds belonging to the Trust Fund that may at any time be in the possession of the said Trustee as Trustee, whether or not such funds may earn interest, and may authorize withdrawal therefrom by cheque or other instrument by such person or persons as the Trustee may from time to time authorize, or, if more than one Trustee shall be acting hereunder, by such one or more of the Trustees as shall be designated by unanimous vote of the Trustees, or such other person or persons as the Trustee may from time to time authorize by unanimous vote. Any such bank or such association is hereby authorized to pay such cheque or other instrument withdrawal, and also to receive the same for deposit to the credit of any holder thereof when so signed and properly endorsed, without inquiry of any kind.  Payments so made by such bank or such association shall not be subject to objection by any person concerned or interested in any way in the Trust.  Where the Trustee is also a corporation authorized by law to carry on the banking business, the Trustee may also, without accounting for any resultant profit, act as banker, and perform any banking service on behalf of the Trust on the same terms as for any other customer.

O.   LOCATION OF ASSETS

The Trustee may keep the whole or any part of the assets of the Trust in the jurisdiction where the Trust is located from time to time, or in any other country or countries, and in either case in such place and manner as the Trustee may deem desirable under the circumstances.

P.   ALLOCATION OF ASSETS AND JOINT INVESTMENTS

Consistent with the objects and purposes of this Trust Indenture, the Trustee is hereby authorized to allocate different kinds or disproportionate shares of property or undivided interests therein among any or all separate Trusts created hereunder

24.

ET_0000519266

and/or among the Beneficiaries of such Trust or Trusts and to determine the value thereof. The Trustee is likewise authorized to make joint investments for or on behalf of any or all separate Trusts created hereunder of which the Trustee is Trustee, and to hold such joint investments as a common fund for purposes of administration, and divide the net income therefrom in the same proportion as the respective interests of such Trusts therein.

## ARTICLE XII

### JURISDICTION OF TRUST

Subject to the provisions of Article XIII hereof, this Trust has been accepted by the Trustee, and, except as otherwise provided herein, shall be administered in Bermuda; and its validity, construction, and all rights thereunder shall be governed by the Trust laws of that jurisdiction, except as otherwise provided herein.

### ARTICLE XIII

### CHANGE OF JURISDICTION OF TRUST

All matters pertaining to any change of jurisdiction of this Trust shall be governed as set forth herein:

A.  UPON RESIGNATION OR REMOVAL OF TRUSTEE

Upon the resignation or removal of the Trustee in the manner provided in Article VII, the Trust Protector shall in addition have the power to declare by deed executed concurrently therewith that this Indenture shall, with respect to such Trust, take effect and be governed by the laws of some other jurisdiction as of the date of such declaration or any other date specified therein.

B.  UPON OCCURRENCE OF FORCE MAJEURE

Upon the occurrence of force majeure as defined more particularly in Section C of this Article XIII, the result of which is to frustrate the purposes of this Indenture or hamper the proper administration and management of the Trust hereunder, then notwithstanding anything to the contrary contained hereunder, the Trustee, or in the event of an inability of the Trustee to do so, then the Trust Protector, may, in his sole discretion, at any time or times, declare by deed that this Indenture shall, with respect to such Trust, and as of the date of such declaration or any other date specified therein, take effect and be governed by the laws of some other jurisdiction.

C.  FORCE MAJEURE DEFINED

For purposes of this Article, the events or circumstances constituting force majeure shall include in particular, but without prejudice to the generality of such term, the following:

1.  Action by authorities in jurisdiction of the Trust. The enactment of any law, or the promulgation of any regulation or order, or any action by or on the part of any governmental authority, agency, or officer of or in the jurisdiction where the Trust is located, the objective, purpose, or effect of which is to:

a.  Impose more restrictive exchange control or similar regulations; or

25.

ET_0000519267

b.   Impose any new tax or charge of any kind on Trust assets or income, or restrict in any way the use, investment, or distribution of the Trust funds; or

c.   Revoke or modify the license of the Trustee, the result of which would be to disqualify the Trustee from serving as trustee; and

d.   Revoke, restrict, suspend, or abrogate any existing laws, regulations, rights, privileges, immunities, or benefits upon which the trust relies in furtherance of its purposes; or

e.   Otherwise frustrate the purposes of the Trust.

2.   Acts of war in jurisdiction of Trust.   The declaration or existence of a state of war, civil unrest, riot, invasion by hostile military forces, or other breach of peace in the jurisdiction where the Trust is located, which action poses a threat to property, or the occurrence of any other acts or circumstances which would frustrate the purposes of the Trust.

3.   Action by authorities in the jurisdiction of the Settlor, any Donor, any Beneficiary, any Trust Protector, or any holder of a Special Limited Power of Appointment.   The enactment of any law, or the promulgation of any regulation or order, or any action by or on the part of any governmental authority, agency, or officer of or in the jurisdiction of citizenship of the Settlor, any Donor, any Beneficiary, any Trust Protector, any holder of a Special Limited Power of Appointment, or any other person engaging in any transaction with the Trust the objective, purpose, or effect of which is to:

a.   Impose more restrictive exchange control or similar regulations on transactions with, or on holdings by, a Trust established in the jurisdiction where the Trust is located; or

b.   Impose any new tax or charge of any kind on transactions with, transfers to, or distributions from a trust established in the jurisdiction where the Trust is located; or

c.   Impose any new tax or charge of any kind on the acquisition of stock or debt obligations issued by an individual or corporation in the jurisdiction where the Trust is located; or

d.   Acquire, expropriate, or confiscate any of the property or assets comprising the Trust Fund, including the compulsion of the Trustee to convert, sell, or otherwise dispose of the property or assets of the Trust Fund established in the jurisdiction where the Trust is located; or

e.   Revoke, restrict, suspend, or abrogate any existing laws, regulations, rights, privileges, immunities, or benefits established in the jurisdiction where the Trust is located and upon which the Trust relies in furtherance of its purposes.

26.

4. Acts of war in jurisdiction of the Settlor, any Donor, any Beneficiary, any Trust Protector, or any holder of a Special Limited Power of Appointment. The declaration or existence of a state of war, in consequence whereof the citizens, nationals, or residents of, or trusts or corporations organized under the laws of the jurisdiction where the Trust is located, are deemed to be enemy aliens of the country of citizenship of the Settlor, any Donor, any Beneficiary, any Trust Protector, or any holder of a Special Limited Power of Appointment.

D. ADDITIONAL POWER TO CHANGE TRUSTEE

Upon the occurrence of a _force majeure_, the Trustee, or in the event of any inability of the Trustee to do so, then the Trust Protector, shall in addition have the power to appoint a successor Trustee in the manner provided in Article VII hereof. The successor Trustee so named shall in all cases satisfy the requirements contained in Section D of Article VII hereof, and shall succeed to all of the previous Trustee's title to the Trust Fund, and all powers, rights, discretions, obligations, and immunities of the Trustee under this Indenture in the manner specified in Section E of Article VII hereof.

E. CONSEQUENTIAL CHANGES IN TRUST INDENTURE

Upon a change in the jurisdiction of the Trust for any of the reasons and in the manner specified in this Article XIII, and until further declaration is made hereunder, the Trustee or any successor Trustee may at any time or times thereafter by deed make such consequential changes in or additions to or deletions from the powers and provisions of this Indenture with respect to such Trust as such Trustee may consider necessary or desirable to insure so far as may be possible that the powers and provisions of such Indenture shall, _mutatis mutandis_, be as valid and effective under the laws of such new jurisdiction in the same manner and with the same effect as under the laws of jurisdiction where the Trust was most recently located. Be it further provided, however, that any such change or addition or deletion shall have as its sole purpose the continued existence and administration of the Trust in the manner intended herein in accordance with the terms and provisions contained in this Indenture, and shall in no case be deemed to permit the Trustee or any successor Trustee to add to, delete from, or change in any way the Beneficiaries named or described in this Indenture, or to give the Trustee the power to make any changes in or additions to or deletions from the provisions governing the powers of the Trustee with respect to the Settlor or the Settlor's spouse. In drafting said deed making such changes or additions, the Trustee shall be required to seek the advice of counsel, and shall be entitled to rely and act upon the opinion of counsel in determining whether the foregoing conditions are met.

## ARTICLE XIV

### CONSTRUCTION

A. SEVERABILITY

If any provision of this Trust Indenture should be found to be invalid or unenforceable, the remaining provisions thereof shall continue to be fully effective.

27.

ET_0000519269

B.   MASCULINE, FEMININE, SINGULAR, PLURAL

All forms used herein shall include both the masculine and feminine and the singular and plural as the context and facts require.

C.   HEADINGS

All headings for Articles, Sections, and Paragraphs are not a part of this Agreement, but are included for convenience only.

ARTICLE XV

EXECUTION OF TRUST INDENTURE

The foregoing Trust Indenture, consisting of 28 pages of text, was executed in triplicate and delivered on the day and year first above written, which date shall be the effective date of this Trust Indenture.

IN WITNESS WHEREOF, the Settlor has set his hand and seal and the Trustee has caused its Common Seal to be hereunto affixed the day and year first above written.

SIGNED, SEALED, AND DELIVERED
in Hamilton, Bermuda
by the above named
A. Eugene Brockman dated
26ᴴ May    , 1981 in
the presence of

_____
Witness

SIGNED, SEALED, AND DELIVERED
in Hamilton, Bermuda
by   J.F. Peniston
and W.F. Maycock
on behalf of Bermuda Trust
Company Limited in the
presence of:

_____
Witnessed

_____
A. EUGENE BROCKMAN

BERMUDA TRUST COMPANY LIMITED

By _____
J. Frank Peniston
Trust Officer

By _____   TRUST OFFICER

28.

# GOV

# EXHIBIT

# 5

IN THE SUPREME COURT OF BERMUDA

COMMERCIAL COURT

COMPANIES ACT (WINDING UP)

2020: No. 300



IN THE MATTER OF POINT INVESTMENTS, LTD.

AND IN THE MATTER OF THE COMPANIES ACT 1981

SPANISH STEPS HOLDINGS LTD.

Petitioner

-and-

POINT INVESTMENTS LTD.

Respondent

---

PETITION

---

TO: The Supreme Court of Bermuda

THE PETITION of the Petitioner, **SPANISH STEPS HOLDINGS LTD.** ("**SSH**)", showeth as follows:

The contents of this Petition is structured as follows:

A.  The Company

B.  The Trust

C.  SSH

D.  Point Investments LLP

E.  The Assets of the Company

F.  The Redemption Requests

G.  James Watlington and Glenn Ferguson Take Control of the Company

**Government Exhibit**

5

1

H.  Mr Watlington and Mr Ferguson Block the Second Redemption

I.  Further Steps Taken by Mr Watlington and Mr Ferguson Through the Company Contrary to the Interests of SSH and the Trust

J.  Conclusion

## A.    The Company

1.  Point Investments, Ltd. (the "**Company**") was incorporated in the British Virgin Islands on 14 July 1999 and continued into Bermuda on 30 November 2009 under the Companies Act 1981 (the "**Act**").

2.  The registered office of the Company is at **Belvedere Building, Ground Floor, 69 Pitts Bay Road, Pembroke HM 08, Bermuda.**

3.  The authorised share capital of the Company is US$5,000 comprising:

    1)  One "Manager Share" in the capital of Company of a par value of US$100, having the rights and being subject to the restrictions specified in the Company's Bye-Laws (the "**Bye-Laws**"), as described in paragraph [5] below.

    2)  4,900,000 of "Shares" (the "**Common Shares**") in the capital of the Company of a par value of US$0.001, having the rights and being subject to the restrictions specified in the Bye-Laws, as described in paragraph [7] below.

4.  Pursuant to bye-law 4(1)(a) of the Bye-Laws, the holder of the Manager Share shall:

    1)  Be entitled to one vote;

    2)  Not be entitled to any dividends in respect of the Manager Share;

    3)  In the event of a winding-up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, be entitled, *pari passu* with the holders of the Common Shares, to an amount

2

equal to the capital paid up on the Manager Share but to no other or further amount; and

4) Not be subject to redemption or repurchase of the Manager Share, whether at the option of the Company or the holder.

5. In the circumstances, the holder of the Manager Share holds no material economic interest in the Company (only voting rights).

6. Pursuant to bye-law 4(1)(b) of the Bye-Laws, the holder of the Common Shares shall:

1) Not be entitled to any votes in respect of such shares;

2) Be entitled to such dividends as the Board of the Company may from time to time declare;

3) In the event of a winding-up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, be entitled, subject to the provisions of the Bye-Laws, to share *pro rata* in the surplus assets of the Company; and

4) Be entitled, and subject, to redemption or repurchase of the Common Shares as provided in the Bye-Laws.

7. In the circumstances, the holder (or holders) of the Common Shares hold effectively all of the economic interest in the Company, including the right to dividends, redemption and any surplus on a winding up (save for US$100), but no voting rights.

8. The Memorandum of Continuance of the Company provides that the Company is an exempted company as defined by the Act and that the Company is to be a mutual fund within the meaning of section 156A of the Act. The objects of the Company are unrestricted.

9. The sole purpose of the Company is to act as an investment vehicle for SSH. The shares in SSH are owned by the A. Eugene Brockman Charitable Trust (the "**Trust**") (SSH is a Trust asset).

3

**B.**   **The Trust**

10.   The Trust is governed by Bermudian law.  The beneficiaries of the Trust are members of the family of the settlor, Mr A. Eugene Brockman (now deceased), and "*any organization qualifying as a charitable organization under the laws of Bermuda, the United States, or Great Britain*".

11.   The Trust has a substantial charitable programme, which is carried out under the name of the Brockman Foundation.

12.   Medlands (PTC) Limited ("**Medlands**") was appointed as trustee of the Trust by an Order of the Supreme Court of Bermuda on 19 December 2019 (the "**19 December 2019 Order**").

13.   Prior to the appointment of Medlands, St John's Trust Company (PVT), Limited ("**SJTC**"), a company incorporated in Bermuda, had purported to act as trustee of the Trust. However, by the 19 December 2019 Order, the Supreme Court found that SJTC had not in fact been duly appointed as trustee of the Trust. Pursuant to recital 3 of the 19 December 2019 Order, the Supreme Court of Bermuda held that SJTC was not a proper and appropriate candidate for appointment as trustee of the Trust and that any new trustee of the Trust should be an entity unrelated and unconnected to Evatt Tamine ("**Mr Tamine**"), who had formerly acted as a director of SJTC. SJTC are seeking permission to file an appeal against the 19 December Order out of time and Mr Tamine is seeking permission to be made a party to such appeal (if an appeal is allowed).

14.   The Trust and SSH are engaged in proceedings against Mr Tamine in the Supreme Court of Bermuda (2018 No. 390), amongst other things, for the recovery of approximately US$28,000,000 of alleged misapplications of Trust property by Mr Tamine.

15.   It is the duty of Medlands, as the Court appointed trustee of the Trust, to bring within its control those Trust assets which it does not yet control, to protect the Trust assets and preserve their value.

**C.**   **SSH**

16.   SSH is a company incorporated in the British Virgin Islands. It is wholly indirectly owned by Medlands as trustee of the Trust through an entity incorporated in Nevis, Spanish Steps Holdings LLC.

17.   SSH is the registered owner of all of the Common Shares in the capital of the Company, which it holds for the benefit of the Trust. SSH has been the registered owner of the Common Shares in the capital of the Company since it was continued into Bermuda.

18.   In these circumstances, as described above, SSH is the holder of effectively all of the economic interest in the Company (which is an indirectly held asset of the Trust).

**D.   Point Investment LLC**

19.   Point Investments LLC ("**Point LLC**") is the holder of the Manager Share. Point LLC is a limited liability company incorporated in Nevis. The shares of Point LLC are held by the Point Purpose Trust, the trustee of which was, and to the best of SSH's knowledge remains, Mr Tamine. The Point Purpose Trust has no beneficiaries, its sole purpose being to acquire and hold the shares of Point LLC. The manager of Point LLC was, and to the best of SSH's knowledge remains, Mr Tamine.

**E.   The Assets of the Company**

20.   At the time of Medlands' appointment as trustee of the Trust, the assets of the Company comprised, in summary, the following:

   1)   The following liquid assets (the "**Liquid Assets**"):

      a.   Two accounts at Mirabaud et Cie ("**Bank Mirabaud**"), a bank in Geneva, namely, a current account and a discretionary portfolio, then worth in excess of US$1.3 billion;

      b.   A discretionary portfolio account with Banque Syz SA ("**Bank Syz**"), also a bank in Geneva, which then held approximately US$110 million;

      c.   An account with Bank of Singapore in Singapore, which then held over US$15 million in cash; and

2) Illiquid assets (the "**Illiquid Assets**") including 11 limited partner private equity interests in Cayman Islands exempted limited partnerships (the "**Cayman Exempted Limited Partnerships**") then valued at approximately US$1.2 billion.

21. The Liquid Assets are the Trust's source of liquidity which it requires in order to be able to meet, amongst other things, its charitable commitments.

## F.   **The Redemption Requests**

22. Shortly after Medlands' appointment as trustee, in January 2020, Medlands and SSH (acting by their respective then sole director James Gilbert ("**Mr Gilbert**")) decided that it would be in the best interests of the Trust and SSH, with a view to protecting its underlying assets, to redeem all of SSH's shareholding in the Company in order to bring the assets held by the Company under the direct control of SSH and to do so via a series of redemptions, first of the Liquid Assets and thereafter of the Illiquid Assets.

23. On 31 January 2020:

1) SSH made a redemption request to the Company (the "**First Redemption Request**"), requiring that the Company redeem such number of its Common Shares as represented SSH's interest in all of the Liquid Assets, by effecting an *in specie* distribution of such assets to SSH (the "**First Redemption "**); and

2) Mr Gilbert, as the then sole director of the Company, approved the First Redemption Request by way of a Written Resolution dated 31 January 2020 which resolved that, in accordance with the First Redemption Request, the proceeds of the redemption be paid *in specie*, and further that the Company would hold any such proceeds until such time as they were paid in full following the date of redemption of 3 February 2020, on trust for the benefit and to the order of SSH.

24. As regard the Liquid Assets:

1) The sums held in the Company's two accounts with Bank Mirabaud have been transferred to accounts in SSH's name at Bank Mirabaud (save for a US$100,000 reserve for winding-up the Company);

6

2)      The funds held by the Company with Bank of Singapore have been transferred to an account in the name of SSH at Bank of Singapore; and

3)      The funds held by the Company with Bank Syz have not been transferred, and remain held in the Company's account with Bank Syz, on trust for SSH.

25.   On 13 April 2020:

1)      SSH made a second redemption request to the Company (the "**Second Redemption Request**"), requiring that the Company redeem all of SSH's remaining Common Shares and make a distribution to SSH on 12 May 2020, or as soon thereafter as reasonably possible (the "**Second Redemption**" and together with the First Redemption the "**Redemptions**"); and

2)      Mr Gilbert, as the then sole director of the Company, approved the Second Redemption Request by way of a Written Resolution dated 13 April 2020 which resolved that, in accordance with the First Redemption Request, the proceeds of the redemption be paid *in specie*, and further that the Company would hold any such proceeds until such time as they were paid in full following the date of redemption of 12 May 2020, on trust for the benefit and to the order of SSH.

26.   By the Redemptions, as the sole effective economic owner of the Company, SSH has sought to effect its desire to end the existing relationship by which the Company acts as an investment vehicle for SSH. As this was the sole purpose of the Company, the Company has no continuing purpose.

**G.   James Watlington and Glenn Ferguson Take Control of the Company**

27.   On 15 April 2020, Mr Tamine in his purported capacity as manager of Point LLC (which, as described above, is the holder of the Manager Share) purported to appoint James Watlington ("**Mr Watlington**") and Glenn Ferguson ("**Mr Ferguson**") as directors of the Company. Mr Watlington and Mr Ferguson are longstanding friends and/or associates of Mr Tamine.

7

28. At a meeting of the board of the Company on 17 April 2020 (called by Mr Watlington and Mr Ferguson) it was resolved that Marshall Diel & Myers (**"MDM"**) (who also act as the attorneys for SJTC and Mr Watlington and Mr Ferguson personally) be appointed as the attorneys for the Company for all purposes, and that the signing authorities on all banking and trading accounts of the Company be rescinded in their entirety and that the authorisation would now be any two of the then three directors.

29. Also on 17 April 2020, letters were sent by MDM to Bank Mirabaud, Bank Syz and Bank of Singapore, inter alia, warning them off recognition of Mr Gilbert's sole signing authority on behalf of the Company.

30. On the evening of Sunday, 26 April 2020, Mr Watlington and Mr Ferguson called an Annual General Meeting of the Company to be held early the following morning on 27 April 2020 (giving less than 9 hours' notice for a meeting taking place at 5.15am Cayman Islands time, where Mr Gilbert is based). At the Annual General Meeting, which Mr Gilbert did not attend, Mr Gilbert was not re-appointed as a director of the Company.

31. In the circumstances, the Company is now under the control of Mr Watlington and Mr Ferguson.

### H.    Mr Watlington and Mr Ferguson Block the Second Redemption

32. On 27 April 2020, SSH wrote to MDM to request, amongst other things, confirmation that Mr Watlington and Mr Ferguson would co-operate in the Company's performance of its obligations to effect the Second Redemption on 12 May 2020.

33. As no response to that letter had been received in the week that followed, on 5 May 2020, SSH's attorneys, Wakefield Quin Limited (**"WQ"**) wrote to MDM to request a response.

34. On 8 May 2020 (two working days before the Second Redemption was due to take effect), Mr Watlington and Mr Ferguson purported to declare a suspension of the determination of the Net Asset Value per Share of the Company (the **"Company's NAV"**) pursuant to bye-law 11(4)(b) and bye-law 11(4)(c) of the Bye-Laws (the **"Purported Suspension"**). The reasons given for the Purported Suspension were set out in a letter from the Company to SSH and Point LLC dated 8 May 2020 which stated as follows:

8

*"The directors consider that the DOJ investigation, and the matters of which the DOJ has informed the directors, are existing circumstances as a result of which, in their opinion:*

*a.    it is not reasonably practicable for the Company to dispose of investments comprised in the Fund (as defined in the Company's Bye-laws); and*

*b.    any disposal would be materially prejudicial to all of the shareholders of the Company.*

*Further, the directors consider that in the circumstances the value of the investments and other assets of the Fund cannot reasonably or fairly be ascertained at the present time.*

*Pursuant to Bye-law 11(4)(b) and/or Bye-law 11(4)(c), the directors have accordingly today suspended, and (by this letter and/or otherwise) declared the suspension of, the determination of the Net Asset Value per Share (as defined in the Bye-laws) with immediate effect and until the Board declare the suspension at an end."*

35.    The reference to the "*DOJ investigation*" is a reference to an ongoing investigation by the United States Department of Justice (the "**DOJ**") and the United States Internal Revenue Service into the alleged failure to pay United States ("**US**") taxes by a US beneficiary of the Trust. Medlands and SSH are engaging with the DOJ in connection with this investigation.

36.    The Company's letter of 8 May 2020 enclosed an email chain between a lawyer at Paul Hastings, the Company's US attorneys, and the DOJ as follows:

1)    On 6 May 2020, Paul Hastings wrote to the DOJ:

*"Thank you for your time earlier today. As advised, Paul Hastings LLP represents [the Company].*

*We understand from our discussion: (1) that the Department of Justice is conducting a criminal investigation as to which assets held by or through [the Company] are of central relevance; (2) that under these circumstances the alienation, transfer or unreasonable expenditure (collectively, "Dissipation") of such assets could be a felony under U.S. law; and (3) Dissipation does not include reasonable and customary expenditures of funds for director fees, counsel's fees, and fees associated with other professional services such as those incurred by auditors involved in the preparation of financial statements.*

*Thank you for confirming by return email."*

2)    Later the same day, the DOJ replied as follows:

*"Confirming your email with regard to the central role that [the Company], and assets distributed to [the Company], have in our ongoing criminal investigation.*

*Please let us know if you have any further questions or comments."*

37. The Purported Suspension was and is unjustified, irrational and not in accordance with the Bye-Laws. In particular, no circumstances existed pursuant to bye-law 11(4)(b) and/or bye-law 11(4)(c) (or otherwise) that entitled Mr Watlington and Mr Ferguson to suspend the determination of the Company's NAV. Further or alternatively, the determination of the Company's NAV and any purported suspension thereof is irrelevant in circumstances where all of the Common Shares are to be redeemed *in specie*.

38. Further or alternatively, the Purported Suspension was effected for an improper purpose, namely to obstruct the Redemptions in order to retain control of (and/or prevent SSH and/or Medlands from controlling) the Liquid and Illiquid Assets and/or to further the interests of SJTC (the board of which is comprised of Mr Watlington and Mr Ferguson and which is controlled at shareholder level by Mr Tamine) and/or Mr Tamine (rather than *bona fide* in the bests interests of the Company in which SSH holds effectively all of the economic interest).

39. As a result of the Purported Suspension, the Company is in breach of its obligations under bye-law 10(1) of the Bye-Laws to redeem the Common Shares. In breach of those obligations, the Company continues to hold the Illiquid Assets, as well as the assets in the Company's bank account with Bank Syz. Despite requests by SSH and WQ, the Company (acting by Mr Watlington and Mr Ferguson) have refused to comply with its obligations under the Bye-Laws and transfer those assets in accordance with the Redemptions.

**I.   Further Steps Taken by Mr Watlington and Mr Ferguson Through the Company Contrary to the Interests of SSH and the Trust**

40. Since the Purported Suspension, Mr Watlington and Mr Ferguson have taken further steps, though the Company, contrary to the interests of SSH and the Trust and in further breach of their duties to the Company. Particulars of those steps are set out below.

*Freeze of SSH's Bank Accounts*

41. On or around 12 May 2020, SSH's Swiss lawyers, Lalive, were informed by Bank Mirabaud that Swiss lawyers appointed on behalf of the Company, Lenz & Staehelin, had approached Bank Mirabaud and made representations as a result of which Bank Mirabaud would not permit any material transfers out of SSH's Bank Mirabaud accounts without the consent of the Company.

42.    On 14 August 2020, Bank of Singapore informed SSH that it had received notice of a potential claim and/or dispute in respect of the sums transferred from the Company's account with Bank of Singapore to SSH's account with Bank of Singapore. As a consequence, Bank of Singapore has refused to comply with SSH's instructions in relation to such sums.

43.    As a consequence, Mr Watlington and Mr Ferguson have, through the Company, in effect, caused the proceeds of the First Redemption in SSH's account with Bank Mirabaud (approximately US$1.3 billion) and SSH's account with Bank of Singapore (approximately US$15 million) to be frozen.

44.    There was no proper basis for Mr Watlington and Mr Ferguson to have taken such steps through the Company (which were not taken *bona fide* in the best interests of the Company but for the purpose of retaining control of (and/or preventing SSH and/or Medlands from controlling) the Liquid Assets that had been transferred to accounts in SSH's name and/or to further the interests of SJTC and/or Mr Tamine).

45.    As a consequence of those steps, the Trust was unable to (or at risk of being unable to) meet certain charitable commitments falling due in the third quarter of 2020 as follows:

1)    US$2,700,000 to Rice University in relation to the Brockman Music and Performing Arts Center due on 1 July 2020;

2)    US$5,014,040 to Texas A&M University in relation to the Brockman Scholars program costs for the 2020-2021 academic year due on 1 August 2020; and

3)    The following medical research grants payments:

a.    $93,527 to fund research by doctors at Memorial Sloan Kettering Cancer Center due on 1 July 2020;

b.    $333,333 to fund research by doctors at Weill Cornell Medicine due on 5 August 2020;

11

    c.    US$1,666,667 to fund research by doctors at University of California, San Francisco due on 25 September 2020;

    d.    US$500,000 to fund research by doctors at Baylor College of Medicine due on 30 September 2020;

    e.    US$266,667 to fund research by doctors at University of South Carolina Research Foundation due on 30 September 2020; and

    f.    US$835,967 to fund research by doctors at University of Pennsylvania School of Medicine due on 30 September 2020 (subject to certain confirmations).

46.    Despite requests, Mr Watlington and Mr Ferguson refused to take steps to cause the Company to allow the release of sufficient funds to meet these charitable commitments.

47.    In the circumstances, Medlands was forced to pursue alternative funding to meet these charitable commitments at an additional cost of approximately US$5 million to the Trust (and, thereby, avoid harm to the relevant institutions, students and medical research supported by the Trust, and irreparable harm to the Trust's reputation). Furthermore, Medlands has had to reduce the level of the Trust's charitable commitments, which would otherwise have involved the Trust making over US$40 million of charitable donations over the following twelve months.

*Failure to Meet Capital Calls*

48.    As a consequence of the conduct of Mr Watlington and Mr Ferguson, the Company has also failed to meet capital calls which the Company has received in connection with its investments in the Cayman Exempted Limited Partnerships.

49.    On 5 August 2020, SSH received a letter from Falcata Capital LLC addressed to the Company and dated 4 August 2020 that had been sent to Mr Tamine "*as the representative of [the Company] as set forth in the books and records of Falcata Tech Investment Fund I, L.P.*". The letter was also provided to Mr Watlington, Mr Ferguson and MDM. The letter concerned a capital call dated 16 June 2020 for US$625,000 (the "**Falcata Capital Call**") that the Company had not met (and in respect of which the Company apparently failed or refused to correspond with Falcata Capital LLC).

12

50. By a letter dated 11 August 2020, MDM has also confirmed that in addition to the Falcata Capital Call, the Company has received more than US$3 million of other capital calls in connection with its investments in the Cayman Exempted Limited Partnerships, which it cannot currently meet.

51. The existence of these unsatisfied capital calls puts in jeopardy the Company's investments in the Cayman Exempted Limited Partnerships and in turn the value of SSH's and the Trust's interest in the Company.

*Requests for Information*

52. SSH, in its capacity as the holder of effectively all of the economic interest in the Company, has made various requests for information in relation to the affairs of the Company. In particular:

    1) On 27 April 2020, SSH wrote to MDM and, amongst other things, requested (in the light of the expansion of the board of the Company and the Company's obligation to fulfil the Second Redemption Request shortly thereafter on 12 May 2020) details of any intended expenditure by the Company.

    2) On 19 May 2020, WQ wrote to MDM to again request, amongst other things, details of the Company's expenditure to date and to be kept informed of any intended expenditure. WQ also requested confirmation that the Company would hold and preserve the investments held in the Company's name with Bank Syz pending SSH's instructions to transfer those investments.

    3) On 21 May 2020, Conyers Dill & Pearman (Medlands' attorneys) wrote to MDM to request, amongst other things, details of the representation made by Mr Watlington and/or Mr Ferguson to Bank Mirabaud which led to SSH's accounts with Bank Mirabaud being suspended.

    4) On 3 July 2020, WQ wrote to MDM to request a response to their letter of 19 May 2020 (to which no response had been provided) and to request that SSH be informed of any capital calls which the Company received from the Cayman Excepted Limited Partnership and confirmation that the Company had not entered into any other commitments or made any other dealings.

13

53.    Without proper justification, Mr Watlington and Mr Ferguson have caused the Company to refuse and/or fail to provide this information and/or full particulars thereof (despite a further a request being made for this information on 7 August 2020).

**J.    Conclusion**

54.    In all these circumstances, it is just and equitable that the Company should be wound up. In particular:

1)    The sole purpose of the Company is to act as an investment vehicle for SSH and SSH holds all of the economic interest in the Company. The Trust owns SSH.

2)    The Trust and SSH desire to terminate the Company's role as investment vehicle for SHH such that the Company has no continuing purpose and/or there has been a failure of the Company's substratum.

3)    Without proper justification and in breach of their duties to the Company, the Board of the Company (i.e. Mr Watlington and Mr Ferguson) have refused to redeem the Common Shares in accordance with the Redemptions by, amongst other things, improperly purporting to suspend the Company's NAV.

4)    Without proper justification and in breach of their duties to the Company, the Board of the Company (i.e. Mr Watlington and Mr Ferguson) have caused SSH's bank accounts with Bank Mirabaud and Bank of Singapore to be frozen (and thereby caused the Trust to incur additional costs of approximately US$5 million in order to meet certain of its charitable commitments and to reduce the level of the Trust's forthcoming charitable commitments).

5)    Without proper justification, the Board of the Company (i.e. Mr Watlington and Mr Ferguson) have caused the Company to refuse and/or fail to provide information to SSH relating to the affairs of the Company in circumstances where SSH holds effectively all the economic interest in the Company.

14

6)   There is at present no effective management in relation to the affairs of the Company and/or SSH has a justifiable lack of confidence in the management of the Company.

7)   Any winding down of the affairs of the Company should be carried out under the control of independent officeholders as officers of the Court.

**YOUR PETITIONER THEREFORE HUMBLY PRAYS AS FOLLOWS:**

(1)   That the Company may be wound up by the Court under the provision of the Act.

(2)   That Michael Morrison and Charles Thresh of KPMG Advisory Limited in Bermuda be appointed as provisional liquidators of the Company.

(3)   Further or alternatively, such orders may be made in the premises as shall be just.

WAKEFIELD QUIN LIMITED

**WAKEFIELD QUIN LIMITED**

It is intended service of the Petition will be effected upon the Company.

The above Petition was presented to the Court on 16 day of September 2020 and it is ordered that this Petition be heard before the Court sitting on 19-20 day of November 2020 at 9:30 am/pm.

29.9.20

15

IN THE SUPREME COURT OF BERMUDA

COMMERCIAL COURT

COMPANIES (WINDING UP)

2020: No. 300

IN THE MATTER OF POINT INVESTMENTS LTD.
AND IN THE MATTER OF THE COMPANIES ACT
1981

SPANISH STEPS HOLDINGS LTD.

Petitioner

-and-

POINT INVESTMENTS LTD.

Respondent

---

PETITION

---

WAKEFIELD QUIN LIMITED
Barristers & Attorneys
Victoria Place, 31 Victoria Street
Hamilton HM 10, Bermuda
Reference: MM/12541-001

T: +1 (441) 494-4079
E: mmason@wq.bm

Attorneys for the Petitioner

SUPREME COURT BERMUDA
2020 SEP 16 AN 11: 31

# GOV

# EXHIBIT

# 6

Form **8938**

Department of the Treasury
Internal Revenue Service

## Statement of Specified Foreign Financial Assets

► Go to *www.irs.gov/Form8938* for instructions and the latest information.
► Attach to your tax return.

For calendar year 20 17 or tax year beginning _____ , 20 ____ and ending _____ , 20 ____

OMB No. 1545-2195

**2017**

Attachment
Sequence No. **175**

If you have attached continuation statements, check here ☐    Number of continuation statements . . . . . . . .

| 1 Name(s) shown on return | 2 TIN |
|---|---|
| ROBERT T BROCKMAN | 3444 |

**3** Type of filer

a ☒ Specified individual    b ☐ Partnership    c ☐ Corporation    d ☐ Trust

**4** If you checked box 3a, skip this line 4. If you checked box 3b or 3c, enter the name and TIN of the specified individual who closely holds the partnership or corporation. If you checked box 3d, enter the name and TIN of the specified person who is a current beneficiary of the trust. (See instructions for definitions and what to do if you have more than one specified individual or specified person to list.)

a Name _____    b TIN _____

### Part I — Foreign Deposit and Custodial Accounts Summary

1  Number of Deposit Accounts (reported in Part V) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ►

2  Maximum Value of All Deposit Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $

3  Number of Custodial Accounts (reported in Part V). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ►

4  Maximum Value of All Custodial Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $

5  Were any foreign deposit or custodial accounts closed during the tax year?. . . . . . . . . . . . . . . . . . . . . ☐ Yes    ☐ No

### Part II — Other Foreign Assets Summary

1  Number of Foreign Assets (reported in Part VI) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ►    1

2  Maximum Value of All Assets (reported in Part VI). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $    3,500,000.

3  Were any foreign assets acquired or sold during the tax year?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☒ Yes    ☐ No

### Part III — Summary of Tax Items Attributable to Specified Foreign Financial Assets (see instructions)

| (a) Asset Category | (b) Tax item | (c) Amount reported on form or schedule | Where reported | |
|---|---|---|---|---|
| | | | (d) Form and line | (e) Schedule and line |
| 1 Foreign Deposit and Custodial Accounts | 1a Interest | $ | | |
| | 1b Dividends | $ | | |
| | 1c Royalties | $ | | |
| | 1d Other income | $ | | |
| | 1e Gains (losses) | $ | | |
| | 1f Deductions | $ | | |
| | 1g Credits | $ | | |
| 2 Other Foreign Assets | 2a Interest | $ | | |
| | 2b Dividends | $ | | |
| | 2c Royalties | $ | | |
| | 2d Other income | $ | | |
| | 2e Gains (losses) | $ | | |
| | 2f Deductions | $ | | |
| | 2g Credits | $ | | |

### Part IV — Excepted Specified Foreign Financial Assets (see instructions)

If you reported specified foreign financial assets on one or more of the following forms, enter the number of such forms filed. You do not need to include these assets on Form 8938 for the tax year.

1 Number of Forms 3520 _____    2 Number of Forms 3520-A _____    3 Number of Forms 5471 _____

4 Number of Forms 8621 _____    5 Number of Forms 8865 _____

### Part V — Detailed Information for Each Foreign Deposit and Custodial Account Included in the Part I Summary (see instructions)

If you have more than one account to report in Part V, attach a continuation statement for each additional account (see instructions).

1  Type of account    ☐ Deposit    ☐ Custodial    **2** Account number or other designation

3  Check all that apply    a ☐ Account opened during tax year    b ☐ Account closed during tax year
c ☐ Account jointly owned with spouse    d ☐ No tax item reported in Part III with respect to this asset

4  Maximum value of account during tax year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $

5  Did you use a foreign currency exchange rate to convert the value of the account into U.S. dollars?. . . . . . . . . . . . . . . ☐ Yes    ☐ No

6  If you answered 'Yes' to line 5, complete all that apply.

| (a) Foreign currency in which account is maintained | (b) Foreign currency exchange rate used to convert to U.S. dollars | (c) Source of exchange rate used if not from U.S. Treasury ___ of the Fiscal Service |
|---|---|---|

**Government Exhibit 6**

**BAA** For Paperwork Reduction Act Notice, see the separate instructions.    FDIA5612L  10/20    Form **8938** (2017)

Form 8938 (2017)                                                                                          Page 2

## Part V   Detailed Information for Each Foreign Deposit and Custodial Account Included in the Part I Summary (see instructions) *(continued)*

**7a** Name of financial institution in which account is maintained   **b** Global Intermediary Identification Number (GIIN) (Optional)

**8** Mailing address of financial institution in which account is maintained. Number, street, and room or suite no.

**9** City or town, state or province, and country (including postal code)

## Part VI   Detailed Information for Each 'Other Foreign Asset' Included in the Part II Summary (see instructions)

If you have more than one asset to report in Part VI, attach a continuation statement for each additional asset (see instructions).

**1** Description of asset
100 SHS OF STOCK IN CAYMAN ISLANDS CO

**2** Identifying number or other designation
01

**3** Complete all that apply. See instructions for reporting of multiple acquisition or disposition dates.

**a** Date asset acquired during tax year, if applicable .............................................................  8/31/2017

**b** Date asset disposed of during tax year, if applicable ..........................................................

**c** ☐ Check if asset jointly owned with spouse   **d** ☒ Check if no tax item reported in Part III with respect to this asset

**4** Maximum value of asset during tax year (check box that applies)

**a** ☐ $0 - $50,000   **b** ☐ $50,001 - $100,000   **c** ☐ $100,001 - $150,000   **d** ☐ $150,001 - $200,000

**e** If more than $200,000, list value ..................................................  $   3,500,000.

**5** Did you use a foreign currency exchange rate to convert the value of the asset into U.S. dollars? ............... ☐ Yes   ☒ No

**6** If you answered 'Yes' to line 5, complete all that apply.

| (a) Foreign currency in which asset is denominated | (b) Foreign currency exchange rate used to convert to U.S. dollars | (c) Source of exchange rate used if not from U.S. Treasury Department's Bureau of the Fiscal Service |
|---|---|---|
| | | |

**7** If asset reported on line 1 is stock of a foreign entity or an interest in a foreign entity, enter the following information for the asset.

**a** Name of foreign entity   FISHERIES RESEARCH FOUNDATION LTD **b** GIIN (Optional)

**c** Type of foreign entity   **(1)** ☐ Partnership   **(2)** ☒ Corporation   **(3)** ☐ Trust   **(4)** ☐ Estate

**d** Mailing address of foreign entity. Number, street, and room or suite no.
CAMPBELLS CORP S. LTD   FLOOR 4, WILLOW HOUSE, CRICKET SQUARE

**e** City or town, state or province, and country (including postal code)
GRAND CAYMAN   KY1-9010 CAYMAN ISLANDS

**8** If asset reported on line 1 is not stock of a foreign entity or an interest in a foreign entity, enter the following information for the asset.

**Note:** *If this asset has more than one issuer or counterparty, attach a continuation statement with the same information for each additional issuer or counterparty (see instructions).*

**a** Name of issuer or counterparty _____

Check if information is for   ☐ Issuer   ☐ Counterparty

**b** Type of issuer or counterparty

**(1)** ☐ Individual   **(2)** ☐ Partnership   **(3)** ☐ Corporation   **(4)** ☐ Trust   **(5)** ☐ Estate

**c** Check if issuer or counterparty is a   ☐ U.S. person   ☐ Foreign person

**d** Mailing address of issuer or counterparty. Number, street, and room or suite no.

**e** City or town, state or province, and country (including postal code)

FDIA5612L  10/20/17                                                                 Form **8938** (2017)

Form **8938**

Department of the Treasury
Internal Revenue Service

## Statement of Specified Foreign Financial Assets

► Go to *www.irs.gov/Form8938* for instructions and the latest information.
► Attach to your tax return.

For calendar year 2018  or tax year beginning _____ , 20 _____ and ending _____ , 20 _____

OMB No. 1545-2195

**2018**

Attachment
Sequence No. **175**

If you have attached continuation statements, check here ☐  Number of continuation statements . . . . . . . . _____

| 1 Name(s) shown on return | 2 Taxpayer Identification Number (TIN) |
|---|---|
| ROBERT T BROCKMAN | ████ 3444 |

**3** Type of filer

a ☒ Specified individual    b ☐ Partnership    c ☐ Corporation    d ☐ Trust

**4** If you checked box 3a, skip this line 4. If you checked box 3b or 3c, enter the name and TIN of the specified individual who closely holds the partnership or corporation. If you checked box 3d, enter the name and TIN of the specified person who is a current beneficiary of the trust. (See instructions for definitions and what to do if you have more than one specified individual or specified person to list.)

**a** Name _____    **b** TIN _____

### Part I  Foreign Deposit and Custodial Accounts Summary

| | | |
|---|---|---|
| **1** | Number of Deposit Accounts (reported in Part V) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► | |
| **2** | Maximum Value of All Deposit Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ |
| **3** | Number of Custodial Accounts (reported in Part V). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► | |
| **4** | Maximum Value of All Custodial Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ |
| **5** | Were any foreign deposit or custodial accounts closed during the tax year?. . . . . . . . . . . . . . . . . . . . . . . . . . . | ☐ Yes   ☐ No |

### Part II  Other Foreign Assets Summary

| | | |
|---|---|---|
| **1** | Number of Foreign Assets (reported in Part VI). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► | 1 |
| **2** | Maximum Value of All Assets (reported in Part VI) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ | 3,500,000. |
| **3** | Were any foreign assets acquired or sold during the tax year?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ☐ Yes   ☒ No |

### Part III  Summary of Tax Items Attributable to Specified Foreign Financial Assets (see instructions)

| (a) Asset Category | (b) Tax item | (c) Amount reported on form or schedule | Where reported (d) Form and line | (e) Schedule and line |
|---|---|---|---|---|
| **1** Foreign Deposit and Custodial Accounts | **1a** Interest | $ | | |
| | **1b** Dividends | $ | | |
| | **1c** Royalties | $ | | |
| | **1d** Other income | $ | | |
| | **1e** Gains (losses) | $ | | |
| | **1f** Deductions | $ | | |
| | **1g** Credits | $ | | |
| **2** Other Foreign Assets | **2a** Interest | $ | | |
| | **2b** Dividends | $ | | |
| | **2c** Royalties | $ | | |
| | **2d** Other income | $ | | |
| | **2e** Gains (losses) | $ | | |
| | **2f** Deductions | $ | | |
| | **2g** Credits | $ | | |

### Part IV  Excepted Specified Foreign Financial Assets (see instructions)

If you reported specified foreign financial assets on one or more of the following forms, enter the number of such forms filed. You do not need to include these assets on Form 8938 for the tax year.

| | | | | | | |
|---|---|---|---|---|---|---|
| **1** | Number of Forms 3520 | _____ | **2** Number of Forms 3520-A | _____ | **3** Number of Forms 5471 | _____ |
| **4** | Number of Forms 8621 | _____ | **5** Number of Forms 8865 | _____ | | |

### Part V  Detailed Information for Each Foreign Deposit and Custodial Account Included in the Part I Summary (see instructions)

If you have more than one account to report in Part V, attach a continuation statement for each additional account (see instructions).

| **1** Type of account | ☐ Deposit    ☐ Custodial | **2** Account number or other designation |
|---|---|---|

**3** Check all that apply  **a** ☐ Account opened during tax year  **b** ☐ Account closed during tax year
**c** ☐ Account jointly owned with spouse  **d** ☐ No tax item reported in Part III with respect to this asset

| | | |
|---|---|---|
| **4** | Maximum value of account during tax year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ | |
| **5** | Did you use a foreign currency exchange rate to convert the value of the account into U.S. dollars?. . . . . . . . . . . . . . . | ☐ Yes   ☐ No |
| **6** | If you answered 'Yes' to line 5, complete all that apply. | |

| (a) Foreign currency in which account is maintained | (b) Foreign currency exchange rate used to convert to U.S. dollars | (c) Source of exchange rate used if not from U.S. Treasury Department's Bureau of the Fiscal Service |
|---|---|---|

**BAA  For Paperwork Reduction Act Notice, see the separate instructions.**    FDIA5612L  08/14/18    Form **8938** (2018)

IRS-001-000973

Form **8938** (2018)                                                                                          Page **2**

| **Part V** | **Detailed Information for Each Foreign Deposit and Custodial Account Included in the Part I Summary** (see instructions) *(continued)* |

**7a** Name of financial institution in which account is maintained     **b** Global Intermediary Identification Number (GIIN) (Optional)

**8** Mailing address of financial institution in which account is maintained. Number, street, and room or suite no.

**9** City or town, state or province, and country (including postal code)

| **Part VI** | **Detailed Information for Each 'Other Foreign Asset' Included in the Part II Summary** (see instructions) |

If you have more than one asset to report in Part VI, attach a continuation statement for each additional asset (see instructions).

**1** Description of asset
   100 SHS OF STOCK IN CAYMAN ISLANDS CO

**2** Identifying number or other designation
   01

**3** Complete all that apply. See instructions for reporting of multiple acquisition or disposition dates.
   **a** Date asset acquired during tax year, if applicable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____
   **b** Date asset disposed of during tax year, if applicable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____
   **c** ☐ Check if asset jointly owned with spouse     **d** ☒ Check if no tax item reported in Part III with respect to this asset

**4** Maximum value of asset during tax year (check box that applies)
   **a** ☐ $0-$50,000     **b** ☐ $50,001-$100,000     **c** ☐ $100,001-$150,000     **d** ☐ $150,001-$200,000
   **e** If more than $200,000, list value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $   3,500,000.

**5** Did you use a foreign currency exchange rate to convert the value of the asset into U.S. dollars? . . . . . . . . . . . . . . . . . ☐ Yes   ☒ No

**6** If you answered 'Yes' to line 5, complete all that apply.

| (a) Foreign currency in which asset is denominated | (b) Foreign currency exchange rate used to convert to U.S. dollars | (c) Source of exchange rate used if not from U.S. Treasury Department's Bureau of the Fiscal Service |
| --- | --- | --- |
| | | |

**7** If asset reported on line 1 is stock of a foreign entity or an interest in a foreign entity, enter the following information for the asset.
   **a** Name of foreign entity     FISHERIES RESEARCH FOUNDATION LTD **b** GIIN (Optional)
   **c** Type of foreign entity     **(1)** ☐ Partnership     **(2)** ☒ Corporation     **(3)** ☐ Trust     **(4)** ☐ Estate
   **d** Mailing address of foreign entity. Number, street, and room or suite no.
   CAMPBELLS CORP S. LTD   FLOOR 4, WILLOW HOUSE, CRICKET SQUARE
   **e** City or town, state or province, and country (including postal code)
   GRAND CAYMAN KY1-9010 CAYMAN ISLANDS

**8** If asset reported on line 1 is not stock of a foreign entity or an interest in a foreign entity, enter the following information for the asset.

   **Note:** *If this asset has more than one issuer or counterparty, attach a continuation statement with the same information for each additional issuer or counterparty (see instructions).*

   **a** Name of issuer or counterparty
   Check if information is for     ☐ Issuer     ☐ Counterparty
   **b** Type of issuer or counterparty
   **(1)** ☐ Individual     **(2)** ☐ Partnership     **(3)** ☐ Corporation     **(4)** ☐ Trust     **(5)** ☐ Estate
   **c** Check if issuer or counterparty is a     ☐ U.S. person     ☐ Foreign person
   **d** Mailing address of issuer or counterparty. Number, street, and room or suite no.

   **e** City or town, state or province, and country (including postal code)

FDIA5612L  08/14/18                                                              Form **8938** (2018)

IRS-001-000974

# GOV

# EXHIBIT

# 7

| Form **9423** (February 2020) | Department of the Treasury - Internal Revenue Service<br>**Collection Appeal Request**<br>(Instructions are on the reverse side of this form) |
|---|---|

| 1. Taxpayer's name | 2. Representative *(attach a copy of Form 2848, Power of Attorney)* |
|---|---|
| Hardwicke Properties L.L.C. (as Alter Ego of Robert T. Brockman) | Buddy Sanders, Tim Johnson and Nick Dickerson |

| 3. SSN/EIN | 4. Taxpayer's business phone | 5. Taxpayer's home phone | 6. Representative's phone |
|---|---|---|---|
| ▮474 | 713-718-1800 | | 713-226-1239 |

7. Taxpayer's street address
One Reynolds Way

| 8. City | 9. State | 10. ZIP code |
|---|---|---|
| Kettering | OH | 45430 |

| 11. Type of tax *(tax form)* | 12. Tax periods being appealed | 13. Tax due |
|---|---|---|
| 1040 (Alter Ego) | 2004-2007, 2010-2018 | $1,418,272,371.71 |

**Collection Action(s) Appealed**

14. Check the Collection action(s) you are appealing

| [x] Federal Tax Lien | [ ] Levy or Proposed Levy | [ ] Seizure |
|---|---|---|
| [ ] Rejection of Installment Agreement | [ ] Termination of Installment Agreement | [ ] Modification of Installment Agreement |

**Explanation**

15. Explain why you disagree with the collection action(s) you checked above and explain how you would resolve your tax problem. Attach additional pages if needed. Attach copies of any documents that you think will support your position. Generally, the Internal Revenue Service Independent Office of Appeals will ask the Collection Function to review, verify and provide their opinion on any new information you submit. We will share their comments with you and give you the opportunity to respond

See Exhibit A attached hereto.

**INTERNAL REVENUE SERVICE
SB/SE COMPLIANCE FIELD
RECEIVED**

**Oct 12 2021**

**GULF STATES AREA
KANSAS CITY TERRITORY
COLLECTION GROUP 34**

Under penalties of perjury, I declare that I have examined this request and any accompanying documents, and to the best of my knowledge and belief, they are true, correct and complete. A submission by a representative, other than the taxpayer, is based on all information of which the representative has any knowledge.

| 16. [ ] Taxpayer's or [x] Authorized Representative's signature *(only check one box)* | 17. Date signed<br>10-11-2021 |
|---|---|

| **IRS USE ONLY** | | |
|---|---|---|
| 18. Revenue Officer's name<br>V.C. SANDLES | 19. Revenue Officer's signature<br>*V.C. Sandles* | 20. Date signed<br>10/13/2021 |
| 21. Revenue Officer's phone<br>817-232-6316 | 22. Revenue Officer's email address<br>Vincent.C.Sandles@irs.gov | 23. Date received<br>10/12/2021 |
| 24. Collection Manager's name<br>James T. Ashton | 25. Collection Manager's signature | 26. Date signed |
| 27. Collection Manager's phone<br>281-721-7700 | 28. Collection Manager's email address | 29. Date received |

| Catalog Number 14169I | www.irs.gov | **Government Exhibit 7** | Form **9423** (Rev. 2-2020) |
|---|---|---|---|

# Instructions for Form 9423, Collection Appeal Request

## For Liens, Levies, Seizures, and Rejection, Modification or Termination of Installment Agreements

A taxpayer, or third party whose property is subject to a collection action, may appeal the following actions under the Collection Appeals Program (CAP):

- a. Levy or seizure action that has been or will be taken.
- b. A Notice of Federal Tax Lien (NFTL) that has been or will be filed.
- c. The filing of a notice of lien against an alter-ego or nominee's property.
- d. Denials of requests to issue lien certificates, such as subordination, withdrawal, discharge or non-attachment.
- e. Rejected, proposed for modification or modified, or proposed for termination or terminated installment agreements.
- f. Disallowance of taxpayer's request to return levied property under IRC 6343(d).
- g. Disallowance of property owner's claim for return of property under IRC 6343(b).

## How to Appeal If You Disagree With a Lien, Levy, or Seizure Action

1. If you disagree with the decision of the IRS employee, and wish to appeal, you must first request a conference with the employee's manager. If you do not resolve your disagreement with the Collection manager, submit Form 9423 to request consideration by Appeals. Let the Collection office know within two (2) business days after the conference with the Collection manager that you plan to submit Form 9423. The Form 9423 must be received or postmarked within three (3) business days of the conference with the Collection manager or collection action may resume.

   **Note:** If you request an appeal after IRS makes a seizure, you must appeal to the Collection manager within 10 business days after the Notice of Seizure is provided to you or left at your home or business.

2. If you request a conference and are not contacted by a manager or his/her designee within two (2) business days of making the request, you can contact Collection again or submit Form 9423. If you submit Form 9423, note the date of your request for a conference in Block 15 and indicate that you were not contacted by a manager. The Form 9423 should be received or postmarked within four (4) business days of your request for a conference as collection action may resume.

3. On the Form 9423, check the collection action(s) you disagree with and explain why you disagree. You must also explain your solution to resolve your tax problem. Submit Form 9423 to the Collection office involved in the lien, levy or seizure action.

4. In situations where the IRS action(s) are creating an economic harm or you want help because your tax problem has not been resolved through normal channels, you can reach the Taxpayer Advocate Service at 877-777-4778.

## How to Appeal An Installment Agreement Which Has Been Rejected, Proposed for Modification or Modified, or Proposed for Termination or Terminated

1. If you disagree with the decision regarding your installment agreement, you should appeal by completing a Form 9423, Collection Appeal Request.

2. You should provide it to the office or revenue officer who took the action regarding your installment agreement, within 30 calendar days.

   **Note:** A managerial conference is not required. However, it is strongly recommended a conference be held with the manager whenever possible.

   **Important:** Never forward your request for an Appeals conference directly to Appeals. It must be submitted to the office which took the action on your installment agreement.

## What Will Happen When You Appeal Your Case

Normally, we will stop the collection action(s) you disagree with until your appeal is settled, unless we have reason to believe that collection or the amount owed is at risk.

## You May Have a Representative

You may represent yourself at your Appeals conference or you may be represented by an attorney, certified public accountant or a person enrolled to practice before the IRS. If you want your representative to appear without you, you must provide a properly completed Form 2848, Power of Attorney and Declaration of Representative. You can obtain Form 2848 from your local IRS office, by calling 1-800-829-3676, or by going to www.irs.gov.

## Decision on the Appeal

Once Appeals makes a decision regarding your case, that decision is binding on both you and the IRS. You cannot obtain a judicial review of Appeals' decision following a CAP. However, there may be other opportunities to obtain administrative or judicial review of the issue raised in the CAP hearing. For example, a third party may contest a wrongful levy by filing an action in district court. See Publication 4528, Making an Administrative Wrongful Levy Claim Under Internal Revenue Code (IRC) Section 6343(b).

**Note:** Providing false information, failing to provide all pertinent information or fraud will void Appeals' decision.

Refer to Publication 594, The IRS Collection Process, and Publication 1660, Collection Appeal Rights, for more information regarding the Collection Appeals Program. Copies of these publications can be obtained online at www.irs.gov.

### Privacy Act

The information requested on this Form is covered under Privacy Acts and Paperwork Reduction Notices which have already been provided to the taxpayer.



Atlanta, Austin, Boston, Brussels, Chicago, Cincinnati, Dallas,
Hartford, Houston, London, Los Angeles, Miami, New Orleans,
New York, Princeton, Providence, San Francisco, Stamford,
Washington DC, West Palm Beach

## Fax Cover Sheet

2021-10-12 16:14:52 CDT

| To: | Organization: | Fax Number: |
|---|---|---|
| | | 18665479116 |

| Subject: | Harwicke Properties L.L.C. - Form 9423-Collection Appeal Request filed 10-12-21 Package |
|---|---|

Message:
Mr. Sandles

Please find attached Form 9423 – Collection Appeal Request for Hardwicke Properties L.L.C.; EIN: ███
███0474.

Please call Buddy Sanders directly with any questions at 713-226-1239 or via e-mail at
bsanders@lockelord.com.

Thank you.

**Theresa Allen**
Assistant to David Patton, Buddy Sanders,
Patrick Beaton, Brandon Lobb and Mike Rutledge
**Locke Lord LLP**
600 Travis, Suite 2800
Houston, Texas 77002
T: 713-226-1271
tallen@lockelord.com
Visit the new and improved www.lockelord.com



Atlanta | Austin | Boston | Brussels | Chicago | Cincinnati | Dallas | Hartford | Houston | London | Los Angeles | Miami | New Orleans | New York |
Princeton | Providence | San Francisco | Stamford | Washington DC | West Palm Beach

This message is intended for the use of the individual or entity to which it is addressed, and may contain information that is privileged,
confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or
agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying
of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and
return the original message to us at the above address via the U.S. Postal Service. Thank you.

For more information visit www.lockelord.com

CONFIDENTIALITY NOTICE:
This e-mail and any attached files from Locke Lord LLP may contain information that is privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you received this e-mail by accident, please notify the sender immediately and destroy this e-mail and all copies of it. We may scan and or monitor emails sent to and from our servers to ensure regulatory compliance to protect our clients and business.

This message is intended for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via the U.S. Postal Service.  Thank you.

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®

9214 7969 0099 9790 1640 4440 25

Certified Mail Fee
$   $3.75

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)   $ $3.05
☐ Return Receipt (electronic)   $
☐ Certified Mail Restricted Delivery   $ $0.00
☐ Adult Signature Required   $
☐ Adult Signature Restricted Delivery $

Postmark
Here

Postage
$0.530

Total Postage and Fees
$ $7.330

Sent To
Mr. VC Sandles
Internal Revenue Service
Small Business/Self-Employment Division
5450 Stratum Drive, Suite 150
Fort Worth, TX 76137

PS Form 3800, April 2015    See Reverse for Instructions

---

Mr. VC Sandles
Internal Revenue Service
Small Business/Self-Employment Division
5450 Stratum Drive, Suite 150
Fort Worth, TX 76131

9214 7969 0099 9790 1640 4440 25

Batch #:   9
Article #:   9214796900999790164044025
Date/Time:
Code: B. Sanders (29) - (10-12-21)
Code2: Hardwicke Properties LLC - Form 9423 Filing

Internal File #:
Internal Code:

---

**SENDER:** COMPLETE THIS SECTION

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse
so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
or on the front if space permits.

1. Article Addressed to:

Mr. VC Sandles
Internal Revenue Service
Small Business/Self-Employment Division
5450 Stratum Drive, Suite 150
Fort Worth, TX 76137

9290 9969 0099 9740 4440 32

2. Article Number (Transfer from service label)
9214 7969 0099 9790 1640 4440 2

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X     ☐ Agent
    ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053    Domestic Return Receipt

Reorder Form LCD-811R rev. 05/15

---

UNITED STATES POSTAL SERVICE

Code: B. Sanders (29) - (10-12-21)
Code2: Hardwicke Properties LLC - Form 9423 Filing

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4® in this box •

**Buddy Sanders**
**Locke Lord LLP**
**600 Travis Street**
**Suite 2800**
**Houston, TX 77002-3095**

9290 9969 0099 9740 4440 32

OPTIONAL LABEL

Batch #:   9
Article #:   9214796900999790164044025
Date/Time:
Code: B. Sanders (29) - (10-12-21)
Code2: Hardwicke Properties LLC - Form 9423 Filing

Internal File #:
Internal Code:

① SEPARATE AT PERFORATION

② REMOVE LABEL AND RECEIPT FROM BACKING. PLACE LABEL AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS

③ LIFT HERE



**Locke Lord** LLP

Attorneys & Counselors

JPMorgan Chase Tower
600 Travis
Suite 2800
Houston, TX 77002
Telephone: 713-226-1200
Fax: 713-223-3717
www.lockelord.com

Buddy Sanders
Direct Telephone: 713-226-1239
Direct Fax: 713-229-2671
bsanders@lockelord.com

October 12, 2021

**Via Certified Mail #9214 7969 0099 9790 1640 4440 25**
**Return Receipt Requested and**
**Via Facsimile:  1-866-547-9116**

Internal Revenue Service
Small Business/Self-Employment Division
5450 Stratum Drive, Suite 150
Fort Worth, TX  76137
ATTN:  Mr. VC Sandles

Re:     Hardwicke Properties L.L.C.
        EIN: ▮▮▮0474

Dear Mr. Sandles:

Enclosed, please find a Form 9423 – Collection Appeal Request for Hardwicke Properties L.L.C. This form is being filed along with supporting documentation in response to the Notice to Alter Ego of Federal Tax Lien Filing in relation to taxpayer:  Robert T. Brockman dated September 9, 2021.

Please do not hesitate to contact me at 713-226-1239 if you have any questions or concerns.

Very truly yours,

Buddy Sanders

Enclosures

Atlanta | Austin | Boston | Brussels | Chicago | Cincinnati | Dallas | Hartford | Houston | London | Los Angeles
Miami | New Orleans | New York | Princeton | Providence | San Francisco | Stamford | Washington DC | West Palm Beach

99243141v.1



**Department of the Treasury**
**Internal Revenue Service**
**Small Business / Self-Employed Division**
5450 STRATUM DR STE 150
FORT WORTH, TX 76137

Date:
09/09/2021
Person to contact:
V C SANDLES
Employee ID number:
1000229640
Contact telephone number:
(817)232-6316
Contact fax number:
(866)547-9116

HARDWICKE PROPERTIES L.L.C.
1 REYNOLDS WAY
KETTERING, OH 45430

**Notice to Alter Ego of Federal Tax Lien Filing**
**In relation to taxpayer: ROBERT T. BROCKMAN**

We identified you as an alter ego of the taxpayer named above. We filed a Notice of Federal Tax Lien for this situation. The enclosed Form 668(Y)(c), *Notice of Federal Tax Lien,* provides information about the tax assessments including type of tax, tax period, and the initial amount of the debt.

This Notice of Federal Tax Lien attaches to the property specified on the notice or, if none is specified, all the property of the above-named taxpayer that is being held in your name. This Notice of Federal Tax Lien may damage your credit rating and hinder your ability to obtain additional credit.

You have a right to appeal the filing of this Notice of Federal Tax Lien through the Collection Appeals Program, which is explained in the enclosed Publication 1660, *Collection Appeal Rights.*

We'll issue a Certificate of Release of the Federal Tax Lien within 30 days of when:
   • the full amount of the tax debt, including penalties and interest, is paid,
   • we accept a bond guaranteeing payment of the amount owed, or
   • we determine that the liability is not owed, or the liability has been reduced to zero.

There may be other ways we can resolve this issue. One option you have is to request a Certificate of Discharge of Property from the Federal Tax Lien. The application process for a discharge is described in Publication 783, *Instructions on How to Apply for a Certificate of Discharge of Property from Federal Tax Lien.*

Another option is to request a Withdrawal of the Filed Notice of Federal Tax Lien. This application process, including the conditions under which a withdrawal may be issued, is described in Form 12277, *Application for Withdrawal of Filed Form 668(Y), Notice of Federal Tax Lien (Internal Revenue Code Section 6323(j)).* One situation in which you may be eligible for a withdrawal is if we receive payment for the value of our lien interest in the taxpayer property being held in your name.

**Letter 3177 (Rev. 2-2014)**
Catalog Number: 26921M

To get more information about these options, visit **www.irs.gov** where you can find the documents described above and instructional videos for them. Other Information about notices of federal tax lien is available on the website by searching the key word "lien."

If you have questions or need assistance resolving this situation, you can contact the person listed at the top of this letter.

Sincerely,

V C SANDLES
REVENUE OFFICER

Enclosures:
Form 668(Y)(c), Notice of Federal Tax Lien
Publication 1660, Collection Appeal Rights

**Letter 3177 (Rev. 2-2014)**
Catalog Number: 26921M

| Form 668(Y) | Department of the Treasury - Internal Revenue Service |
|---|---|
| (Rev. February 2004) | **Notice of Federal Tax Lien** |

| Area: 5 | Serial Number 438758221 | For Optional Use by Recording Office |
|---|---|---|

As provided by sections 6321, 6322, and 6323 of the Internal Revenue Code, we are giving a notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer. We have made a demand for payment of this liability, but it remains unpaid. Therefore, there is a lien in favor of the United States on all property and rights to property belonging to this taxpayer for the amount of $1,418,272,371.71 these taxes, and additional penalties, interest, and costs that may accrue.

**Name of Taxpayer**
HARDWICKE PROPERTIES L.L.C. AS ALTER-EGO OF ROBERT T. BROCKMAN

**Residence**
333 W. FRIAR TUCK LN
HOUSTON, TX 77024

**IMPORTANT RELEASE INFORMATION:** For each assessment listed below, unless notice of lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax (a) | Tax Period Ended (b) | Identifying Number (c) | Date of Assessment (d) | Last Day for Refiling (e) | Unpaid Balance of Assessment (f) |
|---|---|---|---|---|---|
| 1040 | 200412 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $302,227,035.55 |
| 1040 | 200512 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $112,440,309.09 |
| 1040 | 200612 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $123,514,274.31 |
| 1040 | 200712 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $7,487,357.38 |
| 1040 | 201012 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $283,762,611.22 |
| 1040 | 201212 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $52,109,560.33 |
| 1040 | 201312 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $86,034,881.48 |
| 1040 | 201412 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $31,997,046.09 |
| 1040 | 201512 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $116,980,668.21 |
| 1040 | 201612 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $50,280,143.49 |
| 1040 | 201712 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $217,901,484.52 |
| 1040 | 201812 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $33,557,000.04 |

| Place of Filing COUNTY CLERK HARRIS COUNTY HOUSTON, TX 77002 | | | | Total | $1,418,272,371.71 |
|---|---|---|---|---|---|

This notice was prepared and signed at **FORT WORTH, TX**, on this, **9th** day of **SEPTEMBER, 2021**

| Signature V.C. SANDLES Employee #2504-3436 | *V.C. Sandles* | Title REVENUE OFFICER Phone # 817-232-6316 |
|---|---|---|

(NOTE: Certificate of officer authorized by law to take acknowledgement is not essential to the validity of Notice of Federal Tax lien Rev. Rul. 71-466, 1971-2 C.B. 409)

Part 2 – Taxpayer Copy          Form 668(Y)(c) (Rev. 2-2004) CAT. NO 60025X

## Lien

Notice of Federal Tax Lien gives public notice that the government has a lien on all your property (such as your house or car), all your rights to property (such as money owed to you) and to property you acquire after this lien is filed.

### Your Administrative Appeal Rights

If you believe the IRS filed this Notice of Federal Tax Lien in error, you may appeal if any of the following conditions apply:

- You had paid all tax, penalty and interest before the lien was filed;
- IRS assessed tax after the date you filed a petition for bankruptcy;
- IRS mailed your notice of deficiency to the wrong address;
- You have already filed a timely petition with the Tax Court;
- The statute of limitations for collection ended before IRS filed the notice of lien.

### Your appeal request must be in writing and contain the following:

- Your name, current address and SSN/EIN;
- Copy of this notice of lien, if available;
- The specific reason(s) why you think the IRS is in error;
- Proof that you paid the amount due (such as cancelled check);
- Proof that you filed a bankruptcy petition before this lien was filed.

Send your written request to the IRS, Attention: Advisory Group Manager, in the office where this notice of lien was filed.

### When This Lien Can Be Released

The IRS will issue a Certificate of Release of Federal Tax Lien within 30 days after:
- You pay the tax due, including penalties, interest, and any other additions under law, or IRS adjusts the amount due, or;
- The end of the time period during which we can collect the tax (usually 10 years).

Publication 1450, Request for Release of Federal Tax Lien, available at IRS offices, describes this process.

### When a Lien against Property can be Removed

The IRS may remove the lien from a specific piece of property if any of the following conditions apply:

- You have other property subject to this lien that is worth at least two times the total of the tax you owe, including penalties and interest, plus the amount of any other debts you owe on the property (such as a mortgage);
- You give up ownership in the property and IRS receives the value of the government's interest in the property;
- IRS decides the government's interest in the property has no value when you give up ownership;
- The property in question is being sold; there is a dispute about who is entitled to the sale proceeds; and the proceeds are placed in escrow while the dispute is being resolved.

Publication 783, Instructions on How to Apply for a Certificate of Discharge of Property from a Federal Tax Lien, available at IRS offices, describes this process.

## Gravamen

Este Aviso de Gravamen del Impuesto Federal da aviso público que el gobierno tiene un gravamen en todas sus propiedades (tal como su casa o carro), todos sus derechos a propiedad (tales como el dinero que le adeudan a usted) y la propiedad que adquiera después que se presentó este gravamen.

### Sus Derechos de Apelación Administrativos

Si usted cree que el IRS presentó éste Aviso de Gravamen del Impuesto Federal por error, usted puede apelar si cualquiera de las siguientes condiciones le aplican:

- Usted pagó todo el impuesto, multa, interés antes de que el gravamen fuera presentado;
- El IRS tasó el impuesto después del la fecha en que usted presentó una petición de quiebra;
- El IRS le envió por correo el aviso de deficiencia a una dirección incorrecta;
- Usted presentó a tiempo una petición ante la Corte de Impuesto;
- El IRS no presentó el aviso de gravamen dentro del término prescriptivo.

### Su petición de apelación tiene que estar por escrito y debe incluir lo siguiente:

- Su nombre, dirección actual y SSN/EIN;
- Una copia de este aviso de gravamen, si está disponible;
- La razón (o razones) específica(s) por qué piensa que el IRS está erróneo;
- Prueba que pagó la cantidad adeudada (tal como un cheque cancelado);
- Prueba que presentó una petición de quiebra antes de que se presentara el gravamen.

Envíe su petición por escrito al IRS, Atención: "Advisory Group Manager" (Grupo de Gerente-Servicios Técnicos) en la oficina dónde este aviso de gravamen fue presentado.

### Cuándo Este Gravamen Se Puede Cancelar

El IRS emitirá un Certificado de Cancelación de Gravamen del Impuesto Federal dentro de 30 días después que:
- Usted pagué el impuesto adeudado, incluyendo multas, intereses, y otras sumas adicionales según la ley, o el IRS ajusta la cantidad adeudada, o;
- Aceptemos una fianza garantizando el pago de su deuda;
- La expiración del término en que podemos cobrar el impuesto (usualmente 10 años).

La Publicación 1450, en inglés, "Petición Para Cancelar el Gravamen del Impuesto Federal." describe este proceso y está disponible en las oficinas del IRS.

Cuándo un Gravamen en Contra de la Propiedad Puede Eliminarse El IRS puede eliminar el gravamen de una propiedad específica si cualquiera de las siguientes condiciones aplica:

- Usted tiene otra propiedad sujeta a este gravamen cuyo valor es por lo menos dos veces el total del impuesto que usted adeuda, incluyendo intereses y multas, más la cantidad de cualquiera de las otras deudas que adeuda sobre la propiedad (tal como una hipoteca);
- Usted cede su interés en la propiedad y el IRS recibe el valor del interés del gobierno en la propiedad;
- El IRS decide que el interés del gobierno en la propiedad no tiene valor alguno cuando usted cedió su interés en la propiedad;
- La propiedad gravada será vendida; existe una controversia sobre quién tiene derecho al producto de la venta; y se depositan los fondos recibidos en la venta en una cuenta especial en lo que se resuelve la controversia.

La Publicación 783 en inglés, " Instrucciones de Cómo Solicitar un Certificado de Relevo de la Propiedad de un Gravamen del Impuesto eral," describe éste proceso y está disponible en las oficinas del IRS.

## Exhibit A

*Collection Appeal Request re: Notice of Federal Tax Lien No. 438758221*
*Hardwicke Properties LLC as Alleged Alter Ego of Robert T. Brockman*

### Introduction

Hardwicke received a Notice of Federal Tax Lien (Serial No. 438758221) in its alleged capacity as an alter ego of taxpayer Robert Brockman. But Brockman never owned more than 1% of Hardwicke and sold his 1% interest over six months ago. Additionally, Brockman has not held any management position at Hardwicke for nearly a year. Because Hardwicke is a separate entity that Brockman neither owns nor controls, this alter ego claim fails and the lien should be immediately released.

### Background

Hardwicke Properties LLC ("Hardwicke") is a subsidiary of The Reynolds & Reynolds Company ("Reynolds") that owns and operates corporate aircraft. The taxpayer at issue, Robert T. Brockman ("Brockman"), retired as Reynolds' Chief Executive Officer on November 6, 2020 and resigned as Hardwicke's Operating Manager on November 20, 2020. *See Exhibits A-1 & A-2*. Hardwicke's primary asset is a 2016 Bombardier Global 6000 (the "Global").

Before March 24, 2021, Hardwicke was owned 99% by Reynolds and 1% by Brockman. That day, pursuant to a Purchase Agreement and an Assignment of Ownership Interest, Reynolds acquired Brockman's 1% ownership interest in Hardwicke. *See Exhibit A-3*. The Purchase Agreement was negotiated at arm's length between Reynolds and Brockman. Through its aviation counsel, Coats & Evans PC, Reynolds engaged an independent third party to appraise the Global. *See Exhibit A-4*. The purchase price for Brockman's 1% interest was based on 1% of the Global's appraised value plus 1% of Hardwicke's cash on hand less outstanding liabilities.

IRS served the Notice of Federal Tax Lien at issue on Hardwicke only in its capacity as the purported alter ego of Brockman. The lien includes an assessment date of September 7, 2021 for individual taxes allegedly unpaid by Brockman dating back to 2004.

### Discussion

Applicable law prohibits reverse veil piercing to encumber Hardwicke's corporate assets in satisfaction of Brockman's individual debt. Hardwicke is not Brockman's alter ego, and IRS should therefore release the lien.

The alter ego doctrine focuses on the relationship between a debtor and an entity. *Zahra Spiritual Trust v. United States*, 910 F.2d 240, 245 (5th Cir. 1990). An alter ego relationship exists when there is such unity between the entity and the individual that the separateness of the entity has ceased and holding only the individual liable would result in an injustice. *Bollore S.A. v. Import Warehouse, Inc.*, 448 F.3d 317, 325 (5th Cir. 2006). Courts consider the following factors in making an alter ego determination: the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes. *Permian Petrol. Co. v. Petroleos Mexicanos*, 934 F.2d 635, 643 (5th Cir. 1991).

Importantly, to reach corporate assets to satisfy an individual debt by reverse piercing the corporate veil under an alter ego theory in Texas, the individual must have an ownership interest in the entity. *Bollares*, 448 F.3d at 325 ("The great weight of Texas precedent indicates that, for the alter ego doctrine to apply against an individual under this test, the individual must own stock in the corporation."); *Permian*, 934 F.2d at 643 ("Texas courts will not apply the alter ego doctrine to directly or reversely pierce the corporate veil unless one of the 'alter egos' owns stock in the other."); *Zahra*, 910 F.2d at 245-46 ("Texas courts will not treat a corporation and an individual as one and the same [under alter ego doctrine] unless the individual has some ownership interest in the corporation."); *see also Zahra*, 910 F.2d at 242 ("In determining whether the appellants are the alter egos of the taxpayers, and whether the taxpayer has an interest in the property to which the government's tax lien attached, we look to state law.").

It is well established that the alter ego doctrine is "***reserved for exceptional cases***." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 416 (5th Cir. 2006) (emphasis added). In *Zahra*, the Fifth Circuit noted extensive connections between the taxpayers and certain entities subjected to federal tax liens as their alleged alter egos—the entities existed for the sole purpose of holding title to real property that the taxpayers' family lived in without lease agreements or rental obligations; the taxpayers served as officers of the entities; corporate funds were used to pay personal expenses of the taxpayers; and financial transactions of the entities and taxpayers were intertwined without observing corporate formalities. *Zahra*, 910 F.2d at 242, 245. But the court held that even these facts did not give rise to an alter ego relationship justifying the tax liens on the entities because the taxpayers were not direct owners of the entities. *Id.* at 245-46; *see also Bollore*, 448 F.3d at 325-26 (finding evidence insufficient to support alter ego reverse veil piercing where individual performed managerial duties and served on corporate board of directors but held no ownership interest in entity).

Here, no such extensive connections exist between Brockman and Hardwicke. Hardwicke's operations focus on business use of the Global by Reynolds and charters by unrelated third parties. Hardwicke observes corporate formalities, maintains its own books and records, does not pay Brockman's personal expenses, and does not intertwine its business transactions with Brockman's personal finances. Additionally, Brockman has not held a management position at Hardwicke since November 2020, has never owned more than 1% of Hardwicke, and has held no ownership interest in the entity since March 2021. ***See Exhibits A-2 & A-3***. These contacts fall far short of the minimum requirements needed to establish the extraordinary remedy of reverse veil piercing to attach a federal tax lien to Hardwicke's property to satisfy any alleged individual tax liability of Brockman.

### Conclusion

IRS should immediately release Hardwicke Properties LLC from Notice of Federal Tax Lien No. 438758221 because Hardwicke is not the alter ego of taxpayer Robert T. Brockman.

99117878v.3

## EXHIBIT A-1

November 5, 2020

***Via Electronic Mail:***

Universal Computer Systems Holding, Inc.
Attn: M. Craig Moss, Secretary
6700 Hollister St.
Houston, Texas 77040
craig_moss@reyrey.com

Dear Mr. Moss:

This letter notifies you that, pursuant to Section 5.B. of the Amended and Restated Employment Agreement between Universal Computer Systems Holding, Inc. and me dated effective January 1, 2014, I am retiring from my position as Chief Executive Officer of The Reynolds and Reynolds Company as of and effective on November 6, 2020.

I have been privileged to serve as steward of our company from its inception. One of the truly great strengths of our company over the years has been our ability to attract talented people, and I have confidence in the continued success of Reynolds and Reynolds.

This letter shall not affect the validity or enforcement of any other document, agreement, instrument, or consent that I have validly executed and delivered on behalf of The Reynolds and Reynolds Company as CEO thereof.

Sincerely,

*R. T. Brockman*

Robert T. Brockman

## EXHIBIT A-2

November 20, 2020

*Via Electronic Mail*:

Universal Computer Systems Holding, Inc.
Attn: M. Craig Moss, Secretary
6700 Hollister St.
Houston, Texas 77040
craig_moss@reyrey.com

Dear Mr. Moss:

     As you are aware, effective November 6, 2020, I retired from my position as Chief Executive Officer of The Reynolds and Reynolds Company and resigned from my position as a member of the Board of Directors of Universal Computer Systems Holding, Inc. (the "Company"). This letter notifies you that, effective November 20, 2020, I am resigning from any and all other offices and positions (including as a director, manager, officer, committee member or otherwise) I may hold at the Company and any subsidiary or affiliate of the Company, including, without limitation, the companies listed on Exhibit A attached hereto, and without the need of acceptance or any further action by any other individual or entity. To the extent additional documentation is required pursuant to the laws of any foreign or domestic jurisdiction in connection with my resignation, I hereby agree to execute and return to the Company such executed documentation promptly upon request.

Sincerely,

*R. T. Brockman*

Robert T. Brockman

## EXHIBIT A

### Companies

1. Dealer Computer Services, Inc.
2. The Reynolds and Reynolds Company
3. Med-Pass, Incorporated
4. iMakeNews, Inc.
5. Add-On-Auto, Inc.
6. Hardwicke Properties, LLC
7. Secure Title Administration, Inc.
8. International Document Services, Inc.
9. Reverse Risk, LLC
10. AppOne, Inc.
11. Reyna Capital Corporation
12. Reynolds Vehicle Registration, Inc.
13. Auto Data Direct, Inc.
14. Auto Data Direct Services, Inc.
15. Auto Data Direct Financial Services, Inc.
16. GoMoto, Inc.
17. Green Cloud Process, LLC
18. The Appraisal Lane, LLC
19. Who's Calling Holding Corp.
20. Coin Data, LLC
21. Callbright Corporation
22. Key Control Holding, Inc.
23. Wilshire Travel, Inc.
24. Reynolds and Reynolds (Canada) Limited
25. UCS Systems Ltd (UK)
26. UCS European Holdings Ltd. (UK)
27. Reynolds and Reynolds Ltd (UK)
28. Contact Advantage Holdings Limited
29. Contact Advantage Group Limited
30. Conact Advantage Limited
31. Contact Advantage (Russia) Limited

# EXHIBIT A-3

## PURCHASE AGREEMENT

### Between

### Robert T. Brockman and The Reynolds and Reynolds Company

THIS PURCHASE AGREEMENT (the *"Agreement"*) is entered into as of MARCH 24 _____, 2021, by and among, ROBERT T. BROCKMAN (*"Seller"*), with an address of 3465 Overbrook Lane, Houston TX 77027, and THE REYNOLDS AND REYNOLDS COMPANY (*"Buyer"*), with an address of 6700 Hollister, Houston, Texas 77040.

WHEREAS, Seller is the owner of a 1% ownership interest (the *"Units"*) in Hardwicke Properties, LLC, a Delaware limited liability company (the *"Company"*), which constitutes all of Seller's interest in the Company; and

WHEREAS, Buyer desires to purchase the Units from Seller, and Seller desires to sell the Units to Buyer, on the following terms and conditions.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller hereby agree as follows:

### Article 1

### Purchase and Sale

1.1    **Closing**. The consummation of the transactions contemplated in this Agreement shall take place on the date of this Agreement and shall be effective as of 11:59 pm on that date (*"Closing"*).

1.2    **Units**. As of the Closing, Seller shall sell to Buyer, and Buyer shall purchase from Seller, the Units, free and clear of all security interests, liens, claims and other restrictions except those set forth in the Company's Limited Liability Company Agreement dated as of December 27, 1999, as amended by an Amendment dated as of October 10, 2006 (the *"Company Agreement"*).

1.3    **Representations and Warranties**. Seller represents and warrants to Buyer that the statements contained in this Section 1.3 are true and correct as of the date hereof.

(a)    Seller has full power and authority to enter into this Agreement and the other documents referenced hereby to which Seller is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. This Agreement and each document referenced hereby to which Seller is a party constitute legal, valid, and binding obligations of Seller enforceable against Seller in accordance with their respective terms.

(b)    Seller owns the Units free and clear of all security interests, liens, claims and other restrictions except those set forth in the Company Agreement.

1

1.4     **Consideration.** At Closing, Buyer shall pay to Seller $288,858 in cash (the "*Purchase Price*") for the Units and the other rights of Seller under the Company Agreement. The Purchase Price shall be paid by wire transfer of immediately available funds in U.S. Dollars to the bank account designated by Seller.

1.5     **Use Agreement.** In connection with the Closing, Buyer and Seller shall enter into a Use Agreement (the "*Use Agreement*") providing for Seller and his wife to have the right to charter the plane owned by the Company at the owner rates, subject to such plane's availability when not otherwise being used by Buyer; provided, however, that any such rights to charter the plane shall terminate if Buyer or the Company sells the plane owned by the Company.

1.6     **The Closing.** The closing of the transactions contemplated by this Agreement (the "*Closing*") shall take place simultaneously with the execution of this Agreement on the date of this Agreement.

        (a)     At Closing, Buyer shall deliver to Seller the Purchase Price and a Use Agreement duly executed by Buyer.

        (b)     At Closing, Seller shall deliver to Buyer (i) an Assignment of the Units and the Use Agreement, each duly executed by Seller, and (ii) Certificate No. 6 issued to Seller for 10 Units.

1.7     **Further Assurances.** Following the Closing, each of the parties hereto agree to execute and deliver such additional documents and instruments and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other documents referenced hereby.

### Article 2
### General Provisions

2.1     **Amendments.** The parties may amend this Agreement only by a written agreement signed by both of the parties.

2.2     **Entire Agreement; Merger.** This Agreement, the Use Agreement and the Assignment of Units constitutes the sole and entire agreement of the parties with respect to the subject matter of this Agreement and therein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to the subject matter. In the event of any inconsistency between the statements in the body of this Agreement and the Use Agreement, the statements in the body of this Agreement shall control. The parties have not relied on any statement, representation, warranty, or agreement of the other party or of any other person on such party's behalf, including any representations, warranties, or agreements arising from statute or otherwise in law, except for the representations, warranties, or agreements expressly contained in this Agreement or the Use Agreement. The parties to this Agreement each participated substantially in the negotiation and drafting of this Agreement and agree that no ambiguity in this Agreement should be construed against the draftsman.

2.3     **Counterparts.** The parties may execute this Agreement in multiple counterparts, each of which constitutes an original, and all of which, collectively, constitute only one agreement. The signatures of all of the parties need not appear on the same counterpart, and delivery of an executed counterpart signature page by facsimile or as a Portable Document Format ("*PDF*") attached to an e-mail is as effective as executing and delivering this Agreement in the presence of the other parties to this Agreement. This Agreement is effective upon delivery of one executed counterpart from each party to the other party.

2.4     **Assignment and Delegation.** No party may assign any of its rights under this Agreement, except with the prior written consent of the other party, which consent shall not be unreasonably withheld.

2.5     **Successors and Assigns.** This Agreement is binding upon, and inures to the benefit of, the parties and their respective permitted successors and assigns.

2.6     **Third Party Beneficiaries.** This Agreement does not and is not intended to confer any rights or remedies upon any person other than the signatories.

2.7     **Notices.**

(a)     **Writing; Permitted Methods.** Each party giving or making any notice, request, demand, or other communication (each, a "*Notice*") pursuant to this Agreement shall give the Notice in writing and use one of the following methods of delivery, each of which for purposes of this Agreement is a writing: personal delivery, registered or certified mail (in each case, return receipt requested and postage prepaid), or nationally recognized overnight courier (with all fees prepaid).

(b)     **Addressees and Addresses.** Any party giving a Notice shall address the Notice to the appropriate person at the receiving party (the "*Addressee*") at the address listed on the first page of this Agreement, or to another Addressee or another address as designated by a party in a Notice pursuant to this Section.

2.8     **Captions.** The descriptive headings of the articles, sections, and subsections of this Agreement are for convenience only, do not constitute a part of this Agreement, and do not affect this Agreement's construction or interpretation.

2.9     **Further Assurances.** Each party shall use its best efforts to take, or cause to be taken, all actions necessary or desirable to consummate and make effective the transactions this Agreement contemplates.

2.10     **Governing Law.** The laws of the State of Texas (without giving effect to its conflict of laws principles) govern all matters arising out of or relating to this Agreement and the transactions it contemplates, including, without limitation, its interpretation, construction, performance, and enforcement.

To: +18665479116  Page: 19 of 89  2021-10-12 16:16:20 CDT  Locke Lord LLP  From: Allen, Theresa

Case 4:22-cv-00202 Document 21-5 Filed on 01/31/22 in TXSD Page 175 of 211

The parties to this Agreement have executed this Agreement as of the date first written above.

**SELLER:**

_Dorothy Kay Brockman_

Robert T. Brockman, individually, by Dorothy Kay Brockman in her capacity as agent and attorney-in-fact for Robert T. Brockman acting under that certain Durable Power of Attorney Effective Upon Execution, dated July 20, 2020

**BUYER:**

The Reynolds and Reynolds Company

By: _Tommy Barras_

 Tommy Barras
  Chairman/CEO/President

4

**ASSIGNMENT OF OWNERSHIP INTEREST IN**
**Hardwicke Properties, LLC**
**From**
**Robert T. Brockman**
**To**
**The Reynolds and Reynolds Company**

*March 24,*

Pursuant to that certain Purchase Agreement dated as of ~~January 31,~~ 2021 between the undersigned, ROBERT T. BROCKMAN (the "*Assignor*") and THE REYNOLDS AND REYNOLDS COMPANY (the "*Assignee*"), the Assignor, for good and valuable consideration, the receipt of which is hereby acknowledged, does hereby transfer and assign all of his ownership interest (the "*Units*") in Hardwicke Properties, LLC to the Assignee, which Units are represented by Certificate No. 6 issued by Hardwicke Properties, LLC to the Assignee. Such transfer and assignment is hereby made free and clear of all security interests, liens, claims and other restrictions except those set forth in the Company's Limited Liability Company Agreement dated as of December 27, 1999, as amended by an Amendment dated as of October 10, 2006 (the "*Company Agreement*").

In witness whereof, the undersigned has executed this Assignment as of the date first above written.

**ASSIGNOR:**

Robert T. Brockman, individually, by
Dorothy Kay Brockman in her capacity as
agent and attorney-in-fact for Robert T.
Brockman acting under that certain
Durable Power of Attorney Effective
Upon Execution, dated July 20, 2020

**Acceptance**: The Reynolds and Reynolds Company acknowledges and accepts the assignment of the Units as of the Effective Date, and agrees to abide by the terms of the Company Agreement.

**ASSIGNEE:**

The Reynolds and Reynolds Company

By: _____
Tommy Barras
Chairman/CEO/President

*This document may be executed in one or more counterparts, each of which shall be considered*
*an original, all of which together shall constitute one and the same instrument.*

5

# EXHIBIT A-4



# AIRCRAFT APPRAISAL REPORT

**2016 Bombardier Global 6000**
**Serial Number 9675**
**Registration Number N529DB**
USPAP 8-2(b)(iii)

**Prepared for:**
Coats & Evans, P.C.
&
Mr. Gary Evans
P.O. Box 130246
The Woodlands, Texas 77393

**Report Date: March 9, 2021**
**Effective Date: March 9, 2021**
**USPAP 8-2(b)(vi)**

**Project Identification Number:**
Appraisal Report #VREF21-G6000-9675

**VREF Aircraft Value Reference, Appraisal & Litigation Services**
**1411 McHenry Road, Suite 125**
**Buffalo Grove, IL 60089**
**Main Line: (844) 303-VREF**
**Facsimile: (515) 244-7778**



## WWW.VREF.COM

Coats & Evans, P.C.& Mr. Gary Evans/ VREF21-G6000-9675/Effective Date: March 9, 2021



# EXECUTIVE SUMMARY

### Introduction & Appraisal Services Request:

Coats & Evans, P.C.& Mr. Gary Evans, via email evans@texasaviationlaw.com requested this aircraft appraisal assignment via electronic mail on November 19th, 2020. VREF has been retained to provide Coats & Evans, P.C.& Mr. Gary Evans with a representation of Current Fair Market Value for **2016 Bombardier Global 6000, Serial Number 9675, Registration Number N529DB** and provide Coats & Evans, P.C.& Mr. Gary Evans with a written Appraisal Report consistent with the guidelines established by the Uniform Standards of Professional Appraisal Practice (USPAP). This appraisal was prepared in support of potential resale of the subject aircraft to Coats & Evans, P.C.& Mr. Gary Evans.

### Intended Use/Intender User:

The values reported within this report are intended to be utilized for **the resale and/or financing of the subject aircraft** for the sole use and benefit of ***Coats & Evans, P.C.& Mr. Gary Evans*** for determining the *Current Fair Market Value* via a Uniform Standards of Professional Appraisal Practice (USPAP) compliant *"Desktop Appraisal"* on **2016 Bombardier Global 6000, Serial Number 9675, Registration Number N529DB** (2016 Certificate of Airworthiness) for the purpose of potential resale and may not be assigned to any third party without the prior written consent of VREF.

### Scope of Work: (Valuation Assignment)

For this valuation assignment, a narrative *Appraisal Report* has been prepared outlining the appraisal techniques and procedures utilized in evaluating the subject aircraft for certain values as requested below.

This Appraisal Report includes the results of:

A.   An evaluation of the aircraft's photos, maintenance data, equipment lists, and other data as provided by the client.

B.   Determination whether the Sales Comparison, Cost, or Income approach is relevant to the subject aircraft. The Cost and Income approaches were deemed to lack relevance with regard to this aircraft as this type of aircraft is priced based on market activity and numerous sales comparisons exist. No income generating information was provided to support an Income Approach valuation. No replacement cost information was provided to support a Cost Approach valuation The Sales Comparison approach was considered and used because there are like aircraft of similar utility that trade on the open market.

C.   Determination of Current Fair Market Value for the subject aircraft for the purpose of potential resale opportunities.



D.     The appropriate research that includes many sources including, but not limited to, aircraft advertised for sale, published value information and the use of proprietary databases.

E.     The preparation of this appraisal report.

F.     The registered owner of this aircraft was established using the aircraft's registration and FAA records as verification. It appears that the ownership does not have a bearing on the value of this aircraft. The registered owner is assumed to have full and legal title to the aircraft, and it is further assumed that the registered owner has the unconditional power to dispose of the property as it sees fit.

RECEIVED BY IRS-EEFAX    10/12/2021 6:46PM (GMT-05:00)

# GOV

# EXHIBIT

# 8

**S528629**
STEWART TITLE HOUSTON DIVISION

<u>GENERAL WARRANTY DEED</u>       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

STATE OF TEXAS

COUNTY OF HARRIS                    07/03/97  300122609  S528629        $31.00

Grantors:                ALFRED L. DEATON, III and wife, ELIZABETH EVANS
                         DEATON    (hereinafter referred to collectively as "Grantors")

Grantors' Mailing Address:  5847 San Felipe, Suite 4330
                         Houston, Texas 77057

Grantees:                ROBERT T. BROCKMAN and wife, DOROTHY KAY
                         BROCKMAN (hereinafter referred to collectively as "Grantees")

Grantees' Mailing Address:  6700 Hollister
                         Houston, Texas 77024

Property:        (a)      That certain tract or parcel of land in Harris County, Texas,
                         described in <u>Exhibit A</u> hereto, by reference made a part hereof
                         (hereinafter referred to as the "Land");

                (b)      An undivided one-fourth (1/4th) interest in that certain tract
                         or parcel of land in Harris County, Texas, described in
                         <u>Exhibit B</u> hereto, by reference made a part hereof (hereinafter
                         referred to as the "Carter Lake Land");

                (c)      Those two certain access easements described in <u>Exhibit C</u>
                         hereto, by reference made a part hereof (hereinafter referred
                         to as the "Access Easements");

                (d)      All rights, benefits, privileges, easements, tenements,
                         hereditaments and appurtenances in or appertaining to the
                         Land, the Carter Lake Land and the Access Easements
                         (hereinafter referred to collectively as the "Rights"),
                         including, but not limited to, all easements and rights created
                         by the following:

                         (i)    Easement and Boundary Line Agreement dated
                                June 26, 1997, by and among Grantors and
                                Georgio Borlenghi, filed or to be filed for record with
                                the County Clerk of Harris County; and

97 JUL -3 PM 3:38

HOU03A:458548.3                    - 1 -

**Government Exhibit 8**

Hold For.
STEWART TITLE HOUSTON DIVISION

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

(ii)     Boundary Line Agreement dated July 1, 1997 by an among Grantors and Russ Robinson and wife, Leslie Weinstein Wein Robinson, filed for record with the County Clerk of Harris County, Texas, under County Clerk's File No. 5528628

(e)     All structures, buildings, improvements and fixtures located on the Land and Easements (the "Improvements").

The Land, the Carter Lake Land, the Access Easements, the Rights and the Improvements are hereinafter referred to  collectively as the "Property").

For Ten Dollars ($10.00) and other good and valuable consideration paid to Grantors by Grantees, the receipt and sufficiency of which are hereby acknowledged, Grantors have GRANTED, SOLD and CONVEYED, and by these presents do GRANT, SELL and CONVEY, the Property unto the Grantees.

This conveyance, however, is made and accepted subject to the matters described on the attached Exhibit D, by reference made a part hereto, to the extent that the same apply to the Property and are valid and enforceable.

Taxes on the Property for the year 1997 have been prorated between Grantors and Grantees as of the date of the delivery of this Deed, and shall be paid by Grantees when the same become due and payable.

TO HAVE AND TO HOLD the Property and premises, together with all and singular the rights and appurtenances thereto in anywise belonging unto Grantees, their heirs and assigns, forever; and Grantors do hereby bind Grantors, their heirs, and assigns, to warrant and forever defend all and singular the Property and premises unto the Grantees, their heirs, and assigns, against every person whomsoever lawfully claiming, or to claim the same, or any part thereof, subject, however, to the matters set forth in the attached Exhibit D.

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

Dated: July 02 , 1997.

_____
Alfred L. Deaton

_____
Elizabeth Evans Deaton

THE STATE OF TEXAS

COUNTY OF HARRIS

     This instruments was acknowledged before me on July 02 , 1997, by Alfred L. Deaton III.

JANIE BROWN
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 7-15-2000

_____
Notary Public in and for the State of Texas
Name: JANIE BROWN

My commission expires:
7-15-2000 .

THE STATE OF TEXAS

COUNTY OF HARRIS

     This instruments was acknowledged before me on July 02 , 1997, by Elizabeth Evans Deaton.

JANIE BROWN
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 7-15-2000

_____
Notary Public in and for the State of Texas
Name: JANIE BROWN

My commission expires:
7-15-2000 .

HOU03A:458548.3

- 3 -

EXHIBIT A

FIELD NOTES

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

4.0568 ACRE TRACT

All that certain 4.0568 acre tract of land situated in the E.B. Cogswell Survey, Abstract Number 785, Harris County, Texas; said 4.0568 acre tract of land being the same property described in Deed dated October 10, 1991 from Prentis B. Tomlinson, Jr. and wife, Sally Emsinger Tomlinson to Alfred L. Deaton, III and Elizabeth Evans Deaton as recorded under Harris County Clerk's File Number N-365621, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas; said 4.0568 acre tract of land being more particularly described by metes and bounds as follows:

BEGINNING at an old one inch iron pipe found for the most southerly corner of that certain 1.6774 acre tract (called) described in Deed dated May 14, 1992 from M. Russ Robinson to Leslie Weinstein Wein as recorded under Harris County Clerk's File Number N-670851, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas; and being all of Lot 8, Sherwood Forest, Section "D", Subdivision, according to the plat thereof recorded in Volume 23, Page 4 of the Map Records of Harris County, Texas; said point also being the most westerly northwest corner of Clubhouse Private Road (based on a width of 30.00) and the most northerly northeast corner of that certain 2.0024 acre tract (called) described in Deed dated December 5, 1975 to George G. Hancock and wife, Julia Hartman Hancock as recorded under Harris County Clerk's File Number E-633669, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas;

THENCE South 54° 26' 32" West, 234.56 feet along the northwesterly line of the said Hancock 2.0024 acre tract and the northwesterly right-of-way line of that certain 30.0 feet wide West Friar Tuck Lane easement described as Tract 3 in said Deed to Alfred L. Deaton, III and wife, Elizabeth Evans Deaton to a found "X" cut in pea gravel concrete driveway for corner of the 4.0568 acre tract herein described; said point also being the most westerly northwest corner of the said Hancock 2.0024 acre tract and the most easterly northeast corner of that certain 4.229802 acre tract (called) described as Tract Number 1 in Deed dated July 2, 1984 to Gay Alspaugh Roane and recorded under Harris County Clerk's File Number J-583942, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas;

THENCE South 53° 31' 36" West, along the northwesterly line of the said Roane 4.229802 acre tract (called) and the northwesterly right-of-way line of the said 30.00 foot wide West Friar Tuck Lane (private drive) easement at 5.00 feet passing a 5/8 inch iron rod set for the most westerly northwest corner of the said 30.00 foot wide West Friar Tuck Lane (private drive) easement and continuing the northwesterly line of the said Roane 4.229802 acre tract (called) for a total distance of 59.17 feet to a 3/4 inch iron pipe found for corner of the 4.0568 acre tract herein described;

THENCE South 82° 17' 17" West, along the northerly line of the said Roane 4.229802 acre tract (called) at 316.41 passing a found one inch galvanized iron pipe and continuing for a total distance of 317.81 feet to the easterly water's edge of Carter Lake (based on the water level September 19, 1991) for the southwesterly corner of the 4.0568 acre tract herein described and for the northwesterly corner of said Roane 4.229802 acre tract (called);

THENCE Northerly along the meanders of the water's edge of Carter Lake the following courses and distances:

                    North 06° 41' 12" West - 48.09 feet
                    North 35° 54' 32" West - 48.43 feet
                    North 24° 38' 40" East - 21.63 feet
                    North 21° 22' 44" West -  8.53 feet
                    North 34° 04' 27" West - 20.03 feet
                    North 21° 23' 07" West - 16.73 feet

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

```
North 13° 10' 33" West -  9.52 feet
North 39° 11' 33" West -  8.68 feet
North 03° 30' 14" West -  6.79 feet
North 26° 10' 48" East - 13.90 feet
North 13° 56' 04" West - 12.62 feet
North 55° 55' 10" West - 14.20 feet
North 01° 42' 38" West - 15.76 feet
North 86° 37' 46" West -  8.16 feet
North 11° 38' 18" West - 23.34 feet
North 16° 09' 31" East - 20.25 feet
North 41° 23' 40" East - 17.14 feet
North 29° 32' 31" East - 11.62 feet
North 38° 44' 13" East - 21.29 feet
North 05° 14' 20" East - 12.27 feet
North 18° 04' 16" West - 16.91 feet
North 13° 49' 08" East - 15.00 feet
North 30° 52' 21" East - 10.39 feet
North 20° 00' 00" East -  9.96 feet
North 36° 41' 45" East - 20.76 feet
North 28° 12' 52" East -  4.91 feet
North 80° 00' 38" East -  8.56 feet
South 74° 33' 36" East - 15.66 feet
South 61° 45' 02" East - 20.89 feet
North 89° 15' 59" East - 44.57 feet
North 64° 47' 17" East - 40.74 feet
North 73° 34' 59" East - 40.12 feet
North 62° 36' 44" East - 38.87 feet
```

**THENCE** North 18° 52' 03" East, 5.44 feet to the point of intersection of the southeasterly water's edge of Carter Lake (based on the water level September 19, 1991) with the southerly line of that certain tract of land described in Deed dated February 27, 1979 from Robert Adam Mosbacher and wife, Sandra Mosbacher to Giorgio Borlenghi as recorded under Harris County Clerk's File Number F-991504, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas and also being all of Lot 7, of said Sherwood Forest, Section "D", Subdivision, for the most northerly northwest corner of the 4.0568 acre tract herein described; from which point the called most westerly southwest corner of said Lot 7, bears: North 73° 50' 28" West, 38.51 feet;

**THENCE** South 73° 50' 28" East, along the southerly line of said Lot 7 at 126.93 feet passing a found old one inch iron pipe and continuing along the southerly line of said Lot 7 for a total distance of 228.83 feet to a 1/2 inch iron rod found for corner of the 4.0568 acre tract herein described; said point being the recognized common corner for Lot 7 and Lot 8, of said Sherwood Forest, Section "D", Subdivision;

**THENCE** South 46° 29' 30" East, 209.52 feet along the southwesterly line of said Lot 8 to the **POINT OF BEGINNING** and containing 4.0568 acres or 176,714 square feet.



Thomas R. Lyons
Registered Professional Land Surveyor
No. 1628

Job No. 97-10938-R
Revised: June 23, 1997

EXHIBIT B

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

That certain tract of
4.563 acres of land, more or less, in the City of Houston,
Harris County, Texas, now occupied by that lake created by
the present dam on Niemann's Branch (known as Carter's Lake),
and more particularly described as follows, to-wit:

BEGINNING at the Southeast corner of the 5.934 - acre tract
on the North edge of the bed of Buffalo Bayou (said 5.934
acre tract of land being more fully described in that certain
deed from Houston Realty Sales Company to J. Hugh Liedtke,
dated July 30, 1965, recorded in Volume  6016  Page  591
of the Deed Records of Harris County, Texas);

THENCE North 10° 25' West, along the Easterly line of the said
5.934 - acre tract, passing an iron rod on the North bank of
Buffalo Bayou and continuing from said rod 181 feet to a point;

THENCE South 79° 35' West, along the Easterly line of the said
5.934 - acre tract, 13.4 feet to a point;

THENCE North 18° 18' East, along the Easterly line of the said
5.934 - acre tract, 27.5 feet to a point;

THENCE North 7° 06' West, along the Easterly line of the said
5.934 - acre tract, 214.0 feet to a point;

THENCE North 73° 54' West along the Easternmost Northerly line
of the said 5.934 - acre tract, 268.9 feet to an iron pipe;

THENCE South 71° 01' West, along the Northerly line of the said
5.934 - acre tract to the point of intersection of this line
with the Southerly line of Lot 8, Sherwood Forest, Section B, as
shown on the plat of said subdivision recorded in Volume 21
Page 9 of the Map Records of Harris County, Texas;

THENCE in a Northerly and Easterly direction, along the Southerly
and Easterly lines of Lots 8, 9 and 10 of Sherwood Forest,
Section B, to the point in the Southerly line of said Lot 10 shown
on said recorded plat of said subdivision as the point from which
a line is projected South 10° 0' East 27 feet to the thread
of Niemann's Branch as shown on said recorded plat;

THENCE South 10° 0' East 27 feet to a point for the thread of
Niemann's Branch;

THENCE in a Southeasterly direction to the most Northerly North-
west corner of that certain tract of 11.056 acres of land,
more or less, described in that certain deed dated April 12,
1950, from Grantor to Victor N. Carter, recorded in Volume 2080
Page 499 of the Deed Records of Harris County, Texas (hereinafter
called "The Carter Tract"), which corner of Sherwood Forest,
Section "D";

THENCE South 28° 06' East, along the Northerly line of The
Carter Tract, 19.62 feet to a point;

THENCE South 84° 30' West, along the Northerly line of The
Carter Tract, 167.0 feet to a point;

THENCE South 25° 00' West, along the Westerly line of The Carter
Tract, 179.0 feet to a point;

page 2

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

THENCE South 15° 45' East, along the Westerly line of
The Carter Tract, 161.0 feet to a point;

THENCE South 25° 11' East, along the Westerly line of The
Carter Tract, 95.04 feet to a 3/4 inch iron pipe;

THENCE South 19° 05' East, along the Westerly line of The
Carter Tract 44.10 feet to a stake;

THENCE South 09° 42' West along the Westerly line of The
Carter Tract, 159.1 feet to a stake;

THENCE South 10° 25' East along the Westerly line of The
Carter Tract, 175.0 feet to a 3/4 inch iron pipe on the North
bank of Buffalo Bayou, and continuing along said line to the
North edge of the bed of Buffalo Bayou;

THENCE in a Westerly or Southwesterly direction along the North
edge of the bed of Buffalo Bayou to the Southeast corner of
the said 5.934 - acre tract, the PLACE OF BEGINNING.

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

## EXHIBIT C

## ACCESS EASEMENTS

(a)     Access easement thirty feet (30') in width over and across the land described in Schedule I hereto, by reference made a part hereof, created by plat recorded in Volume 23, Page 4 of the Map Records of Harris County, Texas, and by instrument recorded in Volume 2080, Page 499 of the Deed Records of Harris County, Texas; and

(b)     Access easement thirty feet (30') in width over and across the land described in Schedule II hereto, by reference made a part hereof, created by instrument recorded in Volume 2080, Page 503 of the Deed Records of Harris County, Texas, as amended by Quit-Claim Deed filed for record with the County Clerk of Harris County, Texas, under County Clerk's File No. J554478, affecting five feet (5') of the Northeasterly corner of a called 4.125 acre tract of land described in instrument filed for record with the County Clerk of Harris County, Texas under County Clerk's File No. E851484.

UNOFFICIAL COPY

SCHEDULE D1

### FIELD NOTES

30.00 FOOT WIDE CLUBHOUSE PRIVATE ROAD

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

0.2080 ACRE TRACT

All that certain 0.2080 acre tract of land situated in the E.B. Cogswell Survey, Abstract Number 785, Harris County, Texas; said 0.2080 acre tract of land being known as Clubhouse Private Road (based on a right-of-way width of 30.00 feet) as dedicated by Sherwood Forest, Section "D", Subdivision Plat recorded in Volume 23, Page 4 of the Map Records of Harris County, Texas; said 0.2080 acre tract of land being more particularly described by metes and bounds as follows:

BEGINNING at an old one inch iron pipe found at the most southerly southwest corner of Lot 8, of said Sherwood Forest, Section "D", Subdivision; said Lot 8 being described in Deed dated May 14, 1992 (called 1.6774 acres) to Leslie Weinstein Wein as recorded under Harris County Clerk's File Number N-670851, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas, and being the most westerly northwest corner of said Clubhouse Private Road; said point being the most easterly southeast corner of that certain 4.0568 acre tract of land described in Deed dated October 10, 1991, to Alfred L. Deaton, III and Elizabeth Evans Deaton as recorded under Harris County Clerk's File Number N-365621, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas; said point also being the most northerly northeast corner of that certain 2.0024 acre tract (called) described in Deed dated December 5, 1975, to George G. Hancock and wife, Julia Hartman Hancock as recorded under Harris County Clerk's File Number E-633669, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas;

THENCE North 54° 30' 30" East, 50.00 feet along the northwesterly right-of-way line of said Clubhouse Private Road to a "P.K." nail set in asphalt driveway for corner of the 0.2080 acre tract of land herein described;

THENCE North 39° 14' 30" East, 150.00 feet along the northwesterly right-of-way line of said Clubhouse Private Road to a 5/8 inch iron rod set for corner of the 0.2080 acre tract of land herein described;

THENCE North 40° 04' 30" East, 45.00 feet along the northwesterly right-of-way line of said Clubhouse Private Road to a 5/8 inch iron rod set for corner of the 0.2080 acre tract of land herein described;

THENCE North 46° 24' 30" East, 63.07 feet along the northwesterly right-of-way line of said Clubhouse Private Road to a 5/8 inch iron rod found in the westerly right-of-way line of West Friar Tuck Lane (based on a right-of-way width of 60.00 feet at this point) for the most northerly northeast corner of the 0.2080 acre tract of land herein described; said point also being the most easterly southeast corner of said Lot 8;

THENCE in a southeasterly direction along the westerly right-of-way line of said West Friar Tuck Lane and a curve to the left having a radius of 406.05 feet, through a central angle of 04° 47' 36" for an arc distance of 33.97 feet (chord bearing and distance = South 16° 18' 57" East, 33.96 feet) to a 5/8 inch iron rod set for the most southerly southeast corner of the 0.2080 acre tract of land herein described; said point also being the most northerly northeast corner of Lot 9, of said Sherwood Forest, Section "D", Subdivision, said Lot 9 being described in Deed dated June 24, 1996, to Michael Lan Sy Tran and wife, Christine Hao Thi Dinh as recorded under Harris County Clerk's File Number S-000353, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas;

-2-

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

THENCE South 46° 24' 30" West, 44.34 feet along the southeasterly right-of-way line of said Clubhouse Private Road to a "P.K." nail set in asphalt driveway for corner of the 0.2080 acre tract of land herein described;

THENCE South 40° 04' 30" West, 43.56 feet along the southeasterly right-of-way line of said Clubhouse Private Road to a 5/ nch iron rod set for corner of the 0.2080 acre tract of land herein descri d;

THENCE South 39° 14' 30" West, 153.80 feet along the southeasterly right-of-way line of said Clubhouse Private Road to a 5/8 inch iron rod set for corner of the 0.2080 acre tract of land herein described;

THENCE South 54° 30' 30" West, 49.27 feet along the southeasterly right-of-way line of said Clubhouse Private Road to a 5/8 inch iron rod set in the southwesterly line of said Sherwood Forest, Section "D", Subdivision and the northeasterly line of the said 2.0024 acre tract (called) for the most southerly southwest corner of the 0.2080 acre tract of land herein described; said point also being the most westerly northwest corner of said Lot 9;

THENCE North 46° 29' 30" West, 30.64 feet along the northeasterly line of the said 2.0024 acre tract (called) and the southwesterly right-of-way line of said Clubhouse Private Road to the POINT OF BEGINNING and containing 0.2080 acres or 9,062 square feet of land.



Thomas R. Lyons
Registered Professional Land Surveyor No. 1628

Job No. 97-10938-R-A
June 23, 1997

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

WEST FRIAR TUCK LANE (PRIVATE DRIVE)
30.00 FOOT WIDE EASEMENT

0.1674 ACRE TRACT

All that certain 0.1674 acre tract of land situated in the E.B. Cogswell
Survey, Abstract Number 785, Harris County, Texas; said 0.1674 acre tract of
land also being known as West Friar Tuck Lane (Private Drive) based on a right-
of-way width of 30.00 feet; said 0.1674 acre tract being out of and a part of
that certain 2.0024 acre tract (called) described in Deed dated December 5,
1975, to George G. Hancock and wife, Julia Hartman Hancock as recorded under
Harris County Clerk's File Number E-633669, Film Code Number 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 in the
Official Public Records of Real Property in Harris County, Texas, and that
certain 4.229802 acre tract (called) described in Deed dated July 2, 1984 to
Gay Alspaugh Roane as recorded under Harris County Clerk's File Number J-
583942, Film Code Number 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 in the Official Public Records of Real
Property in Harris County, Texas; said 0.1674 acre tract of land being more
particularly described by metes and bound as follows:

**BEGINNING** at an old one inch iron pipe found at the most southerly southwest
corner of Lot 8, of Sherwood Forest, Section "D", Subdivision as recorded in
Volume 23, Page 4 of the Map Records of Harris County, Texas; said Lot 8 being
described in Deed dated May 14, 1992 (called 1.6774 acres) to Leslie Weinstein
Wein as recorded under Harris County Clerk's File Number N-670851, Film Code
Number 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 in the Official Public Records of Real Property in Harris
County, Texas; said point being the most easterly southeast corner of the
4.0568 acre tract of land described in Deed dated October 10, 1991 to Alfred
L. Deaton III and Elizabeth Evans Deaton as recorded under Harris County
Clerk's File Number N-365621, Film Code Number 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 in the Official
Public Records of Real Property in Harris County, Texas; said point also being
the most northerly northeast corner of the said 2.0024 acre tract (called);

**THENCE** South 46° 29' 30" East, 30.64 feet along the northeasterly line of the
said 2.0024 acre tract (called) and the southwesterly right-of-way line of
Clubhouse Private Road (based on a right-of-way width of 30.00 feet) as
dedicated by said Sherwood Forest, Section "D", Subdivision Plat to a 5/8 inch
iron rod set for the most southerly southeast corner of the 0.1674 acre tract
of land herein described;

**THENCE** South 54° 26' 32" West, along the southeasterly right-of-way line of the
30.00 foot wide West Friar Tuck Lane (Private Drive) easement at 240.33 feet
passing the common property line between the said 2.0024 acre tract (called and
the said 4.229802 acre tract (called) and continuing for a total distance of
245.33 feet to a 5/8 inch iron rod set for the most southerly southwest corner
of the said 0.1674 acre tract of land herein described;

**THENCE** North 35° 37' 45" West, 30.00 feet along the southwesterly right-of-way
line for the said 30.00 foot wide roadway easement as established by that
certain Quitclaim Deed dated June 12, 1984 from Prentis B. Tomlinson, Jr. and
wife, Sally Tomlinson to Jasper Newton Warren as recorded under Harris County
Clerk's File Number J-554478, Film Code Number 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 in the Official
Public Records of Real Property in Harris County, Texas; to a 5/8 inch iron rod
set in the southeasterly line of the said 4.0568 acre tract and the
northwesterly line of the said 4.229802 acre tract (called) for the most
westerly northwest corner of the 0.1674 acre tract of land herein described;
from which point found an old 3/4 inch iron pipe bears: South 53° 31' 36" West,
54.17 feet;

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

**THENCE** North 53° 31' 36" East, 5.00 feet along the common property line of the said 4.0568 acre tract, the said 4.229802 acre tract (called) and the northwesterly right-of-way line of the said 30.00 foot wide roadway easement to a found "X" cut in pea gravel concrete driveway for corner of the 0.1674 acre tract herein described; said point also being the common property corner of the said 2.0024 acre tract (called) and the said 4.229802 acre tract (called);

**THENCE** North 54° 26' 32" East, 234.56 feet along the common property line between the said 4.0568 acre tract, the said 2.0024 acre tract (called) and the northwesterly right-of-way line of the said 30.00 foot wide roadway easement to the **POINT OF BEGINNING** and containing 0.1674 acres or 7,292 square feet of land.



Thomas R. Lyons
Registered Professional Land Surveyor No. 1628

Job No. 97-10938-R-B
June 23, 1997

UNOFFICIAL COPY

EXHIBIT D

1.      Restrictive covenants as set out in instrument recorded in Volume 2080, Page 499 of the Deed Records of Harris County, Texas, and in instrument recorded under Harris County Clerk's File No. E-707429.

2.      The terms and provisions of that certain agreement by and between Houston Realty Sales Company and Prentis B. Tomlinson, Jr., and wife, Barbara Tomlinson, as set out in instrument recorded under Harris County Clerk's File No. E-707429.

3.      Sanitary sewer easement five (5) feet along the easterly line of the land described in Schedules I and II to Exhibit C hereto, as set forth in instruments recorded under Harris County Clerk's File Nos. K-730883 and K-868381.

4.      Ordinance No. 85-1878 dated October 23, 1985, by the City of Houston, a certified copy of which was filed August 2, 1991, under Harris county Clerk's File No. N-253886, relating to rules, regulations, procedures and design standards for development and platting and providing for the establishing of building setback lines.

5.      The terms and provisions of the following:

    (i)     Easement and Boundary Line Agreement dated June 26, 1997, by and among Grantors and Georgio Borlenghi, filed or to be filed for record with the County Clerk of Harris County, Texas; and

    (ii)    Boundary Line Agreement dated July 1, 1997 by an among Grantors and Russ Robinson and wife, Leslie Weinstein Wein Robinson, filed for record with the County Clerk of Harris County, Texas, under County Clerk's File No. S52-8628.

6.      Easement for power line and transformer located in east corner of Tract One on Exhibit A hereto, granted by Houston Realty Sales Company to Houston Lighting & Power Company in instrument dated June 30, 1948.

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE, RENTAL, OR USE OF THE DESCRIBED REAL PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW
THE STATE OF TEXAS }
COUNTY OF HARRIS }
    I hereby certify that this instrument was FILED in File Number Sequence on the date and at the time stamped hereon by me; and was duly RECORDED, in the Official Public Records of Real Property of Harris County, Texas on

JUL   3 1997

Beverly B. Kaufman
COUNTY CLERK
HARRIS COUNTY TEXAS

RECORDER'S MEMORANDUM:
At the time of recordation, this instrument was found to be inadequate for the best photographic reproduction because of illegibility, carbon or photo copy, discolored paper, etc. All blockouts, additions and changes were present at the time the instrument was filed and recorded.

HOU03A:458548.3

- 5 -

# GOV

# EXHIBIT

# 9

S864991

5IE-97-3297

## SPECIAL WARRANTY DEED

02/17/98  100676730  S864991          $35.00

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF HARRIS | § | |



That Robert T. Brockman (joined herein by his wife, Dorothy Kay Brockman) (hereinafter referred to as "Grantor"), pursuant to the provisions of that certain Agreement Partitioning Community Property dated December **30**, 1997, by and between the said Robert T. Brockman and Dorothy Kay Brockman, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, has GRANTED and CONVEYED, and by these presents does GRANT and CONVEY, unto the said Dorothy Kay Brockman (hereinafter referred to as "Grantee"), whose mailing address is 6700 Hollister, Houston, Texas 77024, as her sole and separate property, all of the undivided interest of Robert T. Brockman in the following:

Property:

(a)  That certain tract or parcel of land in Harris County, Texas, described in Exhibit A hereto, by reference made a part hereof (hereinafter referred to as the "Land");

(b)  An undivided one-fourth (1/4th) interest in that certain tract or parcel of land in Harris County, Texas, described in Exhibit B hereto, by reference made a part hereof (hereinafter referred to as the "Carter Lake Land");

(c)  Those two certain access easements described in Exhibit C hereto, by reference made a part hereof (hereinafter referred to as the "Access Easements");

(d)  All rights, benefits, privileges, easements, tenements, hereditaments and appurtenances in or appertaining to the Land, the Carter Lake Land and the Access Easements (hereinafter referred to collectively as the "Rights"), including, but not limited to, all easements and rights created by the following:

(i)  Easement and Boundary Line Agreement (hereinafter referred to as the "Borlenghi Agreement") dated June 26, 1997, by and among Alfred L. Deaton III and wife, Elizabeth Evans Deaton, and Georgio Borlenghi, filed for record with the County Clerk of Harris County under County Clerk's File No. S562547; and

HOU03A:505555.1

- 1 -

Government Exhibit

9

Return to:
James L. Read
Baker & Botts
3000 One Shell Plaza
Houston, Texas  77002

STC-97-3298

     (ii)     Boundary Line Agreement (hereinafter referred to as the "Robinson Agreement"), dated July 1, 1997, by an among Alfred L. Deaton III and wife, Elizabeth Evans Deaton, and Russ Robinson and wife, Leslie Weinstein Wein Robinson, filed for record with the County Clerk of Harris County, Texas, under County Clerk's File No. S541812, and refiled under No. S528628.

     (e)     All structures, buildings, improvements and fixtures located on the Land and Easements (the "Improvements").

     The Land, the Carter Lake Land, the Access Easements, the Rights and the Improvements are hereinafter referred to  collectively as the "Property"),

it being hereby agreed that Dorothy Kay Brockman shall henceforth have, hold and possess, as her separate property and estate, free from any and all claims of Robert T. Brockman, 100% of the fee simple estate in the Property.

     This conveyance, however, is made and accepted subject to the matters described on the attached <u>Exhibit D</u>, by reference made a part hereto, to the extent that the same apply to the Property and are valid and enforceable.

     TO HAVE AND TO HOLD the Property and premises, together with all and singular the rights and appurtenances thereto in anywise belonging unto Grantee, her heirs and assigns, forever; and Grantor does hereby bind Grantor, Grantor's heirs, and assigns, to warrant and forever defend all and singular the Property and premises unto the Grantee, her heirs, and assigns, against every person whomsoever lawfully claiming, or to claim the same, or any part thereof, by, through or under Grantor, but not otherwise, subject, however, to the matters set forth in the attached <u>Exhibit D</u>.

     EXECUTED as of the *30TH* day of December, 1997.

                     *R. T. Brockman*
                     Robert T. Brockman

                     *Dorothy Kay Brockman*
                     Dorothy Kay Brockman

51E-97-3299

THE STATE OF TEXAS

COUNTY OF HARRIS

        This instruments was acknowledged before me on ___12/30___, ~~1998~~ 1997,
by Robert T. Brockman.

                                       _Nancy K. Hamilton_
                                    Notary Public in and for the State of Texas
                                    Name: _NANCY K. HAMILTON_

My commission expires:
___1-12-98___

THE STATE OF TEXAS

COUNTY OF HARRIS

        This instruments was acknowledged before me on ___12/30___, ~~1998~~ 1997,
by Dorothy Kay Brockman.

                                       _Nancy K. Hamilton_
                                    Notary Public in and for the State of Texas
                                    Name: _NANCY K. HAMILTON_

My commission expires:
___1-12-98___

UNOFFICIAL COPY

**EXHIBIT A**

FIELD NOTES

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

4.0568 ACRE TRACT

All that certain 4.0568 acre tract of land situated in the E.B. Cogswell Survey, Abstract Number 785, Harris County, Texas; said 4.0568 acre tract of land being the same property described in Deed dated October 10, 1991 from Prentis B. Tomlinson, Jr. and wife, Sally Emsinger Tomlinson to Alfred L. Deaton, III and Elizabeth Evans Deaton as recorded under Harris County Clerk's File Number N-365621, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas; said 4.0568 acre tract of land being more particularly described by metes and bounds as follows:

BEGINNING at an old one inch iron pipe found for the most southerly corner of that certain 1.6774 acre tract (called) described in Deed dated May 14, 1992 from M. Russ Robinson to Leslie Weinstein Wein as recorded under Harris County Clerk's File Number N-670851, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas; and being all of Lot 8, Sherwood Forest, Section "D", Subdivision, according to the plat thereof recorded in Volume 23, Page 4 of the Map Records of Harris County, Texas; said point also being the most westerly northwest corner of Clubhouse Private Road (based on a width of 30.00) and the most northerly northeast corner of that certain 2.0024 acre tract (called) described in Deed dated December 5, 1975 to George G. Hancock and wife, Julia Hartman Hancock as recorded under Harris County Clerk's File Number E-633669, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas;

THENCE South 54° 26' 32" West, 234.56 feet along the northwesterly line of the said Hancock 2.0024 acre tract and the northwesterly right-of-way line of that certain 30.0 feet wide West Friar Tuck Lane easement described as Tract 3 in said Deed to Alfred L. Deaton, III and wife, Elizabeth Evans Deaton to a found "X" cut in pea gravel concrete driveway for corner of the 4.0568 acre tract herein described; said point also being the most westerly northwest corner of the said Hancock 2.0024 acre tract and the most easterly northeast corner of that certain 4.229802 acre tract (called) described as Tract Number 1 in Deed dated July 2, 1984 to Gay Alspaugh Roane and recorded under Harris County Clerk's File Number J-583942, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas;

THENCE South 53° 31' 36" West, along the northwesterly line of the said Roane 4.229802 acre tract (called) and the northwesterly right-of-way line of the said 30.00 foot wide West Friar Tuck Lane (private drive) easement at 5.00 feet passing a 5/8 inch iron rod set for the most westerly northwest corner of the said 30.00 foot wide West Friar Tuck Lane (private drive) easement and continuing along the northwesterly line of the said Roane 4.229802 acre tract (called) for a total distance of 59.17 feet to a 3/4 inch iron pipe found for corner of the 4.0568 acre tract herein described;

THENCE South 82° 17' 17" West, along the northerly line of the said Roane 4.229802 acre tract (called) at 316.41 passing a found one inch galvanized iron pipe and continuing for a total distance of 317.81 feet to the easterly water's edge of Carter Lake (based on the water level September 19, 1991) for the southwesterly corner of the 4.0568 acre tract herein described and for the northwesterly corner of the said Roane 4.229802 acre tract (called);

THENCE Northerly along the meanders of the water's edge of Carter Lake the following courses and distances:

                  North 06° 41' 12" West - 48.09 feet
                  North 35° 54' 32" West - 48.43 feet
                  North 24° 38' 40" East - 21.63 feet
                  North 21° 22' 44" West -  8.53 feet
                  North 34° 04' 27" West - 20.03 feet
                  North 21° 23' 07" West - 16.73 feet

```
North 13° 10' 33" West -  9.52 feet
North 39° 11' 33" West -  8.68 feet
North 03° 30' 14" West -  6.79 feet
North 26° 10' 48" East - 13.90 feet
North 13° 56' 04" West - 12.62 feet
North 55° 55' 10" West - 14.20 feet
North 01° 42' 38" West - 15.76 feet
North 86° 37' 46" West -  8.16 feet
North 11° 38' 18" West - 23.34 feet
North 16° 09' 31" East - 20.25 feet
North 41° 23' 40" East - 17.14 feet
North 29° 32' 31" East - 11.62 feet
North 38° 44' 13" East - 21.29 feet
North 05° 14' 20" East - 12.27 feet
North 18° 04' 16" West - 16.91 feet
North 13° 49' 08" East - 15.00 feet
North 30° 52' 21" East - 10.39 feet
North 20° 00' 00" East -  9.96 feet
North 36° 41' 45" East - 20.76 feet
North 28° 12' 52" East -  4.91 feet
North 80° 00' 38" East -  8.56 feet
South 74° 33' 36" East - 15.66 feet
South 61° 45' 02" East - 20.89 feet
North 89° 15' 59" East - 44.57 feet
North 64° 47' 17" East - 40.74 feet
North 73° 34' 59" East - 40.12 feet
North 62° 36' 44" East - 38.87 feet
```

**THENCE** North 18° 52' 03" East, 5.44 feet to the point of intersection of the southeasterly water's edge of Carter Lake (based on the water level September 19, 1991) with the southerly line of that certain tract of land described in Deed dated February 27, 1979 from Robert Adam Mosbacher and wife, Sandra Mosbacher to Giorgio Borlenghi as recorded under Harris County Clerk's File Number F-991504, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas and also being all of Lot 7, of said Sherwood Forest, Section "D", Subdivision, for the most northerly northwest corner of the 4.0568 acre tract herein described; from which point the called most westerly southwest corner of said Lot 7, bears: North 73° 50' 28" West, 38.51 feet;

**THENCE** South 73° 50' 28" East, along the southerly line of said Lot 7 at 126.93 feet passing a found old one inch iron pipe and continuing along the southerly line of said Lot 7 for a total distance of 228.83 feet to a 1/2 inch iron rod found for corner of the 4.0568 acre tract herein described; said point being the recognized common corner for Lot 7 and Lot 8, of said Sherwood Forest, Section "D", Subdivision;

**THENCE** South 46° 29' 30" East, 209.52 feet along the southwesterly line of said Lot 8 to the **POINT OF BEGINNING** and containing 4.0568 acres or 176,714 square feet.

Thom R Ly

Thomas R. Lyons
Registered Professional Land Surveyor
No. 1628

Job No. 97-10938-R
Revised: June 23, 1997

**EXHIBIT   B**

FIELD NOTES                                    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

CARTER LAKE

4.0771 ACRE TRACT

All that certain 4.0771 acre tract of land situated in the E.B. Cogswell
Survey, Abstract Number 785, Harris County, Texas; said 4.0771 acre tract of
land being the same property called 4.563 acres as described in Exhibit "A" of
Deed dated March 1, 1976 from Houston Realty Sales Company to Prentis B.
Tomlinson, Jr., and wife, Barbara Tomlinson as recorded under Harris County
Clerk's File Number E-707429, Film Code Number 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 in the Official
Public Records of Real Property in Harris County, Texas; said 4.0771 acre tract
of land being now occupied by a lake created by the present dam on Niemann's
Branch (also known as Carter Lake) and being more particularly described by
metes and bounds as follows:

**COMMENCING** at an old one inch iron pipe found at the most southerly southwest
corner of Lot 8, of said Sherwood Forest, Section "D", Subdivision, said Lot
8 being described in Deed dated May 14, 1992 (called 1.6774 acres) to Leslie
Weinstein Wein as recorded under Harris County Clerk's File Number N-670851,
Film Code Number 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 in the Official Public Records of Real Property
in Harris County, Texas; said point being the most easterly southeast corner
of that certain 4.0568 acre tract of land described in Deed dated October 10,
1991, to Alfred L. Deaton, III and Elizabeth Evans Deaton as recorded under
Harris County Clerk's File Number N-365621, Film Code Number 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 in the
Official Public Records of Real Property in Harris County, Texas; said point
also being the most northerly northeast corner of that certain 2.0024 acre
tract (called) described in Deed dated December 5, 1975, to George G. Hancock
and wife, Julia Hartman Hancock as recorded under Harris County Clerk's File
Number E-633669, Film Code Number 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 in the Official Public Records
of Real Property in Harris County, Texas;

**THENCE** North 46° 29' 30" West, 209.52 feet along the common property line
between said Lot 8 and the said 4.0568 acre tract of land to a 1/2 inch iron
rod found for the common property corner of said Lot 8 and Lot 7, of said
Sherwood Forest, Section "D", Subdivision as described in Deed dated
February 27, 1979 to Giorgio Borlenghi as recorded under Harris County Clerk's
File Number F-991504, Film Code Number 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 in the Official Public
Records of Real Property in Harris County, Texas;

**THENCE** North 73° 50' 28" West, along the common property line between said Lot
7 and the said 4.0568 acre tract at 101.93 feet passing a found old one inch
iron pipe and continuing along said line for a total distance of 228.83 feet
to the **TRUE POINT OF BEGINNING** for the 4.0771 acre tract of land herein
described; said point being at the intersection of the southeasterly water's
edge of Carter Lake (based on the water level September 19, 1991) with the
southerly line of said Lot 7; said point also being the most northerly
northwest corner of the said 4.0568 acre tract of land;

**THENCE** southerly along the meanders of the water's edge of Carter Lake the
following courses and distances:

```
South 18° 52' 03" West,  5.44 feet
South 62° 36' 44" West, 38.87 feet
South 73° 34' 59" West, 40.12 feet
South 64° 47' 17" West, 40.74 feet
South 89° 15' 59" West, 44.57 feet
North 61° 45' 02" West, 20.89 feet
North 74° 33' 36" West, 15.66 feet
South 80° 00' 38" West,  8.56 feet
South 28° 12' 52" West,  4.91 feet
South 36° 41' 45" West, 20.76 feet
South 20° 00' 00" West,  9.96 feet
South 30° 52' 21" West, 10.39 feet
```

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

```
South 13° 49' 08" West, 15.00 feet
South 18° 04' 16" East, 16.91 feet
South 05° 14' 20" West, 12.27 feet
South 38° 44' 13" West, 21.29 feet
South 29° 32' 31" West, 11.62 feet
South 41° 23' 40" West, 17.14 feet
South 16° 09' 31" West, 20.25 feet
South 11° 38' 18" East, 23.34 feet
South 86° 37' 46" East,  8.16 feet
South 01° 42' 38" East, 15.76 feet
South 55° 55' 10" East, 14.20 feet
South 13° 56' 04" East, 12.62 feet
South 26° 10' 48" West, 13.90 feet
South 03° 30' 14" East,  6.79 feet
South 39° 11' 33" East,  8.68 feet
South 13° 10' 33" East,  9.52 feet
South 21° 23' 07" East, 16.73 feet
South 34° 04' 27" East, 20.03 feet
South 21° 22' 44" East,  8.53 feet
South 24° 38' 40" West, 21.63 feet
South 35° 54' 32" East, 48.43 feet
```

**THENCE** South 06° 41' 12" East, 48.09 feet along the water's edge of Carter Lake to a point for the common property corner of the said 4.0568 acre tract (southwesterly corner) and the northwesterly corner of that certain 4.229802 acre tract (called) described as <u>Tract Number 1</u> in Deed dated July 2, 1984 to Gay Alspaugh Roane as recorded under Harris County Clerk's File Number J-583942, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas; from which point a found one inch galvanized iron pipe bears: North 82° 17' 17" East, 1.40 feet;

**THENCE** continuing along the meanders of the water's edge of Carter Lake the following courses and distances:

```
North 88° 51' 57" East, 31.67 feet
South 16° 07' 42" East, 37.02 feet
South 29° 10' 59" West, 11.84 feet
South 49° 04' 32" West, 30.62 feet
South 11° 49' 07" West, 56.88 feet
South 17° 00' 35" East, 34.17 feet
South 25° 24' 38" West, 12.71 feet
South 83° 32' 07" West,  7.47 feet
South 36° 19' 47" West, 11.10 feet
South 78° 13' 27" West, 22.10 feet
```

South 75° 46' 56" West, 26.73 feet to a point in the east side of the concrete spillway at water's edge of Carter Lake

South 80° 32' 22" West, 27.75 feet crossing to the west side of the concrete spillway at water's edge of Carter Lake

South 77° 36' 59" West, 13.63 feet to a point in the east side of the concrete dam at water's edge of Carter Lake

South 79° 21' 12" West, 12.25 feet crossing to the west side of the concrete dam at water's edge of Carter Lake

```
South 84° 00' 30" West, 64.27 feet
North 30° 14' 40" West, 72.10 feet
North 07° 00' 12" East, 36.30 feet
North 26° 58' 37" West, 52.36 feet
North 01° 40' 06" West, 38.55 feet
North 39° 26' 11" West, 27.15 feet
```

-3-

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

```
South 78° 05' 44" West, 39.42 feet
North 85° 01' 50" West, 77.87 feet
North 73° 45' 13" West, 53.41 feet
North 21° 42' 00" West, 28.24 feet
North 41° 27' 45" West, 18.64 feet
North 46° 46' 14" West, 40.36 feet
```

North 22° 18' 37" East, 61.80 feet found 1/2 inch iron pipe at water's
edge of Carter Lake

```
South 67° 44' 00" East, 25.88 feet
South 22° 16' 51" East, 26.17 feet
South 73° 48' 14" East, 16.81 feet
South 46° 08' 25" East, 50.46 feet
South 85° 21' 51" East, 29.55 feet
North 84° 38' 10" East, 15.67 feet
North 32° 33' 34" East, 15.24 feet
North 28° 44' 55" East, 17.89 feet
North 24° 53' 32" West, 31.30 feet
North 11° 35' 13" East, 16.53 feet
North 28° 44' 26" West, 57.83 feet
North 24° 43' 11" East, 43.98 feet
North 28° 02' 37" West, 25.13 feet
North 65° 44' 46" West, 39.29 feet
North 19° 53' 13" East, 29.39 feet
South 77° 17' 54" East, 33.71 feet
South 45° 17' 11" East, 46.88 feet
South 12° 11' 55" East, 40.88 feet
South 38° 05' 10" East, 42.02 feet
North 49° 13' 49" East, 13.27 feet
North 15° 50' 33" East, 22.87 feet
North 30° 15' 15" East, 37.16 feet
North 27° 00' 30" East, 38.36 feet
North 54° 28' 45" East, 19.27 feet
North 44° 45' 55" East, 277.82 feet
North 04° 26' 29" West, 14.56 feet
North 36° 21' 48" East, 35.48 feet
North 83° 16' 08" East, 45.49 feet
South 70° 16' 12" East, 41.09 feet
South 37° 30' 19" East, 18.80 feet
South 45° 15' 43" East, 15.19 feet
South 04° 38' 56" East, 64.01 feet
```

**THENCE** South 73° 50' 28" East, 38.51 feet along the southerly line of said Lot
7 and the northeasterly water's edge of Carter Lake to the **TRUE POINT OF
BEGINNING** and containing 4.0771 acres or 177,599 square feet of land.



_____
Thomas R. Lyons
Registered Professional Land Surveyor
No. 1628

Job No. 97-10938-R-E
July 7, 1997

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

## EXHIBIT C

## ACCESS EASEMENTS

(a)   Access easement thirty feet (30') in width over and across the land described in Schedule I hereto, by reference made a part hereof, created by plat recorded in Volume 23, Page 4 of the Map Records of Harris County, Texas, and by instrument recorded in Volume 2080, Page 499 of the Deed Records of Harris County, Texas; and

(b)   Access easement thirty feet (30') in width over and across the land described in Schedule II hereto, by reference made a part hereof, created by instrument recorded in Volume 2080, Page 503 of the Deed Records of Harris County, Texas, as amended by Quit-Claim Deed filed for record with the County Clerk of Harris County, Texas, under County Clerk's File No. J554478, affecting five feet (5') of the Northeasterly corner of a called 4.125 acre tract of land described in instrument filed for record with the County Clerk of Harris County, Texas under County Clerk's File No. E851484.

SCHEDULE I

FIELD NOTES

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

30.00 FOOT WIDE CLUBHOUSE PRIVATE ROAD

0.2080 ACRE TRACT

All that certain 0.2080 acre tract of land situated in the E.B. Cogswell Survey, Abstract Number 785, Harris County, Texas; said 0.2080 acre tract of land being known as Clubhouse Private Road (based on a right-of-way width of 30.00 feet) as dedicated by Sherwood Forest, Section "D", Subdivision Plat recorded in Volume 23, Page 4 of the Map Records of Harris County, Texas; said 0.2080 acre tract of land being more particularly described by metes and bounds as follows:

**BEGINNING** at an old one inch iron pipe found at the most southerly southwest corner of Lot 8, of said Sherwood Forest, Section "D", Subdivision; said Lot 8 being described in Deed dated May 14, 1992 (called 1.6774 acres) to Leslie Weinstein Wein as recorded under Harris County Clerk's File Number N-670851, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas, and being the most westerly northwest corner of said Clubhouse Private Road; said point being the most easterly southeast corner of that certain 4.0568 acre tract of land described in Deed dated October 10, 1991, to Alfred L. Deaton, III and Elizabeth Evans Deaton as recorded under Harris County Clerk's File Number N-365621, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas; said point also being the most northerly northeast corner of that certain 2.0024 acre tract (called) described in Deed dated December 5, 1975, to George G. Hancock and wife, Julia Hartman Hancock as recorded under Harris County Clerk's File Number E-633669, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas;

**THENCE** North 54° 30' 30" East, 50.00 feet along the northwesterly right-of-way line of said Clubhouse Private Road to a "P.K." nail set in asphalt driveway for corner of the 0.2080 acre tract of land herein described;

**THENCE** North 39° 14' 30" East, 150.00 feet along the northwesterly right-of-way line of said Clubhouse Private Road to a 5/8 inch iron rod set for corner of the 0.2080 acre tract of land herein described;

**THENCE** North 40° 04' 30" East, 45.00 feet along the northwesterly right-of-way line of said Clubhouse Private Road to a 5/8 inch iron rod set for corner of the 0.2080 acre tract of land herein described;

**THENCE** North 46° 24' 30" East, 63.07 feet along the northwesterly right-of-way line of said Clubhouse Private Road to a 5/8 inch iron rod found in the westerly right-of-way line of West Friar Tuck Lane (based on a right-of-way width of 60.00 feet at this point) for the most northerly northeast corner of the 0.2080 acre tract of land herein described; said point also being the most easterly southeast corner of said Lot 8;

**THENCE** in a southeasterly direction along the westerly right-of-way line of said West Friar Tuck Lane and a curve to the left having a radius of 406.05 feet, through a central angle of 04° 47' 36" for an arc distance of 33.97 feet (chord bearing and distance = South 16° 18' 57" East, 33.96 feet) to a 5/8 inch iron rod set for the most southerly southeast corner of the 0.2080 acre tract of land herein described; said point also being the most northerly northeast corner of Lot 9, of said Sherwood Forest, Section "D", Subdivision, said Lot 9 being described in Deed dated June 24, 1996, to Michael Lan Sy Tran and wife, Christine Hao Thi Dinh as recorded under Harris County Clerk's File Number S-000353, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas;

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

-2-

**THENCE** South 46° 24' 30" West, 44.34 feet along the southeasterly right-of-way line of said Clubhouse Private Road to a "P.K." nail set in asphalt driveway for corner of the 0.2080 acre tract of land herein described;

**THENCE** South 40° 04' 30" West, 43.56 feet along the southeasterly right-of-way line of said Clubhouse Private Road to a 5/ nch iron rod set for corner of the 0.2080 acre tract of land herein descri d;

**THENCE** South 39° 14' 30" West, 153.80 feet along the southeasterly right-of-way line of said Clubhouse Private Road to a 5/8 inch iron rod set for corner of the 0.2080 acre tract of land herein described;

**THENCE** South 54° 30' 30" West, 49.27 feet along the southeasterly right-of-way line of said Clubhouse Private Road to a 5/8 inch iron rod set in the southwesterly line of said Sherwood Forest, Section "D", Subdivision and the northeasterly line of the said 2.0024 acre tract (called) for the most southerly southwest corner of the 0.2080 acre tract of land herein described; said point also being the most westerly northwest corner of said Lot 9;

**THENCE** North 46° 29' 30" West, 30.64 feet along the northeasterly line of the said 2.0024 acre tract (called) and the southwesterly right-of-way line of said Clubhouse Private Road to the **POINT OF BEGINNING** and containing 0.2080 acres or 9,062 square feet of land.



_____
Thomas R. Lyons
Registered Professional Land Surveyor No. 1628

Job No. 97-10938-R-A
June 23, 1997

SCHEDULE II

FIELD NOTES

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

WEST FRIAR TUCK LANE (PRIVATE DRIVE)
30.00 FOOT WIDE EASEMENT

0.1674 ACRE TRACT

All that certain 0.1674 acre tract of land situated in the E.B. Cogswell Survey, Abstract Number 785, Harris County, Texas; said 0.1674 acre tract of land also being known as West Friar Tuck Lane (Private Drive) based on a right-of-way width of 30.00 feet; said 0.1674 acre tract being out of and a part of that certain 2.0024 acre tract (called) described in Deed dated December 5, 1975, to George G. Hancock and wife, Julia Hartman Hancock as recorded under Harris County Clerk's File Number E-633669, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas, and that certain 4.229802 acre tract (called) described in Deed dated July 2, 1984 to Gay Alspaugh Roane as recorded under Harris County Clerk's File Number J-583942, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas; said 0.1674 acre tract of land being more particularly described by metes and bound as follows:

**BEGINNING** at an old one inch iron pipe found at the most southerly southwest corner of Lot 8, of Sherwood Forest, Section "D", Subdivision as recorded in Volume 23, Page 4 of the Map Records of Harris County, Texas; said Lot 8 being described in Deed dated May 14, 1992 (called 1.6774 acres) to Leslie Weinstein Wein as recorded under Harris County Clerk's File Number N-670851, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas; said point being the most easterly southeast corner of the 4.0568 acre tract of land described in Deed dated October 10, 1991 to Alfred L. Deaton III and Elizabeth Evans Deaton as recorded under Harris County Clerk's File Number N-365621, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas; said point also being the most northerly northeast corner of the said 2.0024 acre tract (called);

**THENCE** South 46° 29' 30" East, 30.64 feet along the northeasterly line of the said 2.0024 acre tract (called) and the southwesterly right-of-way line of Clubhouse Private Road (based on a right-of-way width of 30.00 feet) as dedicated by said Sherwood Forest, Section "D", Subdivision Plat to a 5/8 inch iron rod set for the most southerly southeast corner of the 0.1674 acre tract of land herein described;

**THENCE** South 54° 26' 32" West, along the southeasterly right-of-way line of the 30.00 foot wide West Friar Tuck Lane (Private Drive) easement at 240.33 feet passing the common property line between the said 2.0024 acre tract (called and the said 4.229802 acre tract (called) and continuing for a total distance of 245.33 feet to a 5/8 inch iron rod set for the most southerly southwest corner of the said 0.1674 acre tract of land herein described;

**THENCE** North 35° 37' 45" West, 30.00 feet along the southwesterly right-of-way line for the said 30.00 foot wide roadway easement as established by that certain Quitclaim Deed dated June 12, 1984 from Prentis B. Tomlinson, Jr. and wife, Sally Tomlinson to Jasper Newton Warren as recorded under Harris County Clerk's File Number J-554478, Film Code Number 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 in the Official Public Records of Real Property in Harris County, Texas; to a 5/8 inch iron rod set in the southeasterly line of the said 4.0568 acre tract and the northwesterly line of the said 4.229802 acre tract (called) for the most westerly northwest corner of the 0.1674 acre tract of land herein described; from which point found an old 3/4 inch iron pipe bears: South 53° 31' 36" West, 54.17 feet;

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

-2-

**THENCE** North 53° 31' 36" East, 5.00 feet along the common property line of the said 4.0568 acre tract, the said 4.229802 acre tract (called) and the northwesterly right-of-way line of the said 30.00 foot wide roadway easement to a found "X" cut in pea gravel concrete driveway for corner of the 0.1674 acre tract herein described; said point also being the common property corner of the said 2.0024 acre tract (called) and the said 4.229802 acre tract (called);

**THENCE** North 54° 26' 32" East, 234.56 feet along the common property line between the said 4.0568 acre tract, the said 2.0024 acre tract (called) and the northwesterly right-of-way line of the said 30.00 foot wide roadway easement to the **POINT OF BEGINNING** and containing 0.1674 acres or 7,292 square feet of land.



Thomas R. Lyons
Registered Professional Land Surveyor No. 1628

Job No. 97-10938-R-B
June 23, 1997

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

## EXHIBIT D

1.      Restrictive covenants as set out in instrument recorded in Volume 2080, Page 499 of the Deed Records of Harris County, Texas, and in instrument recorded under Harris County Clerk's File No. E-707429.

2.      The terms and provisions of that certain agreement by and between Houston Realty Sales Company and Prentis B. Tomlinson, Jr., and wife, Barbara Tomlinson, as set out in instrument recorded under Harris County Clerk's File No. E-707429.

3.      Sanitary sewer easement five (5) feet along the easterly line of the land described in Schedules I and II to Exhibit C hereto, as set forth in instruments recorded under Harris County Clerk's File Nos. K-730883 and K-868381.

4.      Ordinance No. 85-1878 dated October 23, 1985, by the City of Houston, a certified copy of which was filed August 2, 1991, under Harris county Clerk's File No. N-253886, relating to rules, regulations, procedures and design standards for development and platting and providing for the establishing of building setback lines.

5.      The terms and provisions of the Borlenghi Agreement and the Robinson Agreement, as those terms are above defined.

6.      Easement for power line and transformer located in east corner of Tract One on Exhibit A hereto, granted by Houston Realty Sales Company to Houston Lighting & Power Company in instrument dated June 30, 1948.

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE, RENTAL, OR USE OF THE DESCRIBED REAL PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW
THE STATE OF TEXAS }
COUNTY OF HARRIS }
    I hereby certify that this instrument was FILED in File Number Sequence on the date and at the time stamped hereon by me; and was duly RECORDED, in the Official Public Records of Real Property of Harris County, Texas on

FEB 17 1998

*Beverly B. Kaufman*
COUNTY CLERK
HARRIS COUNTY TEXAS

98 FEB 17 PM 4: 04
COUNTY CLERK
HARRIS COUNTY, TEXAS
FILED

HOU03A:505555.1

RECORDERS MEMORANDUM
ALL BLACKOUTS, ADDITIONS AND CHANGES
WERE PRESENT AT THE TIME THE INSTRUMENT
WAS FILED AND RECORDED.

# GOV

# EXHIBIT

# 10

 ← Search ≡

← Search   **Overview**   Property Details   Sale & Tax History   Schools

 

Street View

**333 W Friar Tuck Ln,** Houston, TX 77024



**$15,350,000**       **6**        **10**        **17,192**

Save **$46,050** with Redfin ›       Beds       Baths       Sq Ft

**Houston is a hot market**



31% of homes accept an offer within a week. Tour it before it's gone!

Today:   3:00 pm  •  4:00 pm  •  5:00 pm  •  6:00 pm  •  More times

**Buy + Sell = Save**

When you buy & sell with Redfin, we cut our listing fee to 1%—half what others charge. ⊗ Get started



A magnificent colonial estate in the heart of Memorial one of Houston's most prestigious st. The 4 +acre secluded estate is two miles from The Galleria w/ a private lake, tennis courts & pool makes this one a rare find. Grounds have infrared beams surrounding home & security cameras. Soaring

Continue reading ⌄

Listed by Norma Moore • TREC #0612246 • Coldwell Banker Realty
Redfin last checked: 4 minutes ago | Last updated Aug 8, 2021   • Source:  HARMLS

**Government Exhibit**
10

## Home Facts

| | |
|---|---|
| Status | Active |
| Time on Redfin | 155 days |
| Property Type | Single-Family |
| Baths | 8 full, 4 partial |
| Year Built | 1945 |
| Style | Colonial |
| Community | Sherwood Forest |
| Lot Size | 4.06 Acres |
| MLS# | 20114033 |

## Price Insights

| | |
|---|---|
| List Price | $15,350,000 |
| Est. Mo. Payment | $82,103 |
| Redfin Estimate | $13,608,068 |
| Price/Sq.Ft. | $893 |
| Buyer's Brokerage Commission | 3.0% |

 Street View  Directions 

