# GOV

# EXHIBIT

# 21

Charter Title Company
GF# 10160000020000463

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

<u>**GIFT GENERAL WARRANTY DEED**</u>

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS |
| COUNTY OF HARRIS | § | |

THAT **DOROTHY KAY BROCKMAN** ("<u>Grantor</u>"), for and in consideration of love and affection for **ELIZABETH BELLOWS BROCKMAN**, a married individual with an address for notice purposes of 3702 Inwood Drive, Houston, Harris County, Texas 77019 ("<u>Grantee</u>"), the receipt and sufficiency of which consideration is hereby acknowledged, has GRANTED and CONVEYED, and by these presents does hereby GRANT and CONVEY, unto Grantee, as a gift to Grantee, as Grantee's sole and separate property, all of that certain real property more particularly described as follows:

> **LOT 10, BLOCK 85, OF RIVER OAKS, SECTION II, A SUBDIVISION IN HARRIS COUNTY, TEXAS, ACCORDING TO THE MAP OR PLAT THEREOF RECORDED IN VOLUME 18, PAGE 14, OF THE MAP RECORDS OF HARRIS COUNTY, TEXAS.**

This conveyance, however, is made and accepted subject to any and all validly existing encumbrances, conditions, and restrictions, relating to the hereinabove described property as now reflected by the records of the County Clerk of Harris County, Texas.

TO HAVE AND TO HOLD the above described premises, together with all the rights and appurtenances lawfully accompanying it, by the Grantee, Grantee's heirs, executors, administrators, successors, and/or assigns forever; and Grantor does hereby bind Grantor, Grantor's heirs, executors, administrators, successors, and/or assigns to WARRANT AND FOREVER DEFEND all the said premises unto the said Grantee, Grantee's heirs, executors, administrators, successors, and/or assigns, against every person whomsoever claiming or to claim the same or any part thereof.

Current ad valorem taxes on said property having been prorated, the payment thereof is assumed by Grantee.

When the context requires, singular nouns and pronouns include the plural.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows.]*

1

Government Exhibit
21

IN WITNESS WHEREOF, Grantor has executed this Gift General Warranty Deed on the date set forth in the acknowledgement.

GRANTOR:



_Dorothy Kay Brockman_
**DOROTHY KAY BROCKMAN**

ACKNOWLEDGEMENT

STATE OF TEXAS                    §
                                 §
COUNTY OF HARRIS                 §

The foregoing instrument was acknowledged before me on this 6 day of NOV, 2020 by **DOROTHY KAY BROCKMAN**.



Notary Public, State of Texas

X

**After Recording Return To:**

Elizabeth Bellows Brockman
3702 Inwood Drive
Houston, TX 77019

IRENE CALDWELL
Notary ID #129371339
My Commission Expires
April 27, 2021

UNOFFICIAL COPY

RP-2020-554920

2

RP-2020-554920

RP-2020-554920

\# Pages 3

11/12/2020 03:59 PM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

CHRIS HOLLINS

COUNTY CLERK

Fees  $22.00

UNOFFICIAL COPY

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.



COUNTY CLERK
HARRIS COUNTY, TEXAS

# GOV

# EXHIBIT

# 22

RP-2021-37751
01/22/2021  ER  $22.00

21-553813-BW

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**WARRANTY DEED**
**(Cash)**

THE STATE OF TEXAS           §
                             §     KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF TRAVIS             §

THAT THE UNDERSIGNED, **Mary Taylor Bosarge**, hereinafter called "Grantor," whether one or more, for and in consideration of the sum of TEN DOLLARS ($10.00) cash, and other valuable consideration to the undersigned in hand paid by the Grantee herein named, the receipt of which is hereby acknowledged and by these presents does GRANT, SELL AND CONVEY unto, **Dorothy K Brockman, as her sole and separate property,** herein referred to as the "Grantee," **whose mailing address is 3465 Overbrook Lane, Houston, Texas 77027,** one or more, the real property described as follows:

> **Lots One (1) and Two (2), LESS the Easterly ten (10) feet of Lot Two (2), in Block Sixty-two (62) of RIVER OAKS, SECTION SEVEN (7), a subdivision in Harris County, Texas, according to the map or plat thereof, recorded in Volume 14 Page 38 of the Map Records of Harris County, Texas.**

This conveyance is made and accepted without any restrictions, easements or covenants.

Grantor, for the Consideration, grants, sells, and conveys to Grantee the Property, together with all and singular the rights and appurtenances thereto in any way belonging, to have and to hold it to Grantee and Grantee's heirs, successors, and assigns forever. Grantor binds Grantor and Grantor's heirs and successors to warrant and forever defend all and singular the Property to Grantee and Grantee's heirs, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the Reservations from Conveyance and the Exceptions to Conveyance and Warranty.

Current ad valorem taxes on the property having been prorated, the payment thereof is assumed by Grantee.

EXECUTED this 22 day of January, 2021.

**Government Exhibit**

22

**Mary Taylor Bosarge**

By: _____

THE STATE OF TEXAS          §
                            §
COUNTY OF HARRIS            §

The foregoing instrument was acknowledged before me on the 22 day of January, 2021, by **Mary Taylor Bosarge.**



ANSLEY CARTER BUTTRAM
NOTARY PUBLIC - STATE OF TEXAS
ID# 1 0 3 2 4 5 9 8
COMM. EXP. 12-20-2022

_____

**AFTER RECORDING, RETURN TO:**          PREPARED IN THE LAW OFFICE OF
**Dorothy K Brockman**                   Buttram & Associates
**3465 Overbrook Lane**                  5023 Washington Avenue, Ste. 200
**Houston, Texas 77027**                 Houston, Texas 77007

RP-2021-37751

RP-2021-37751

\# Pages 3

01/22/2021 03:48 PM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

TENESHIA HUDSPETH

COUNTY CLERK

Fees   $22.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.



COUNTY CLERK
HARRIS COUNTY, TEXAS

RP-2021-37751

# GOV

# EXHIBIT

# 23

Tax Year: 2021

**HARRIS COUNTY APPRAISAL DISTRICT**
**REAL PROPERTY ACCOUNT INFORMATION**
0601590620001

🖨 Print   ✉ E-mail

| File A Protest | Similar Owner Name | Nearby Addresses | Same Street Name | Related Map 5256A |

**Ownership History**

**Owner and Property Information**

**Government Exhibit 23**

| | | | |
|---|---|---|---|
| Owner Name & Mailing Address: | **BROCKMAN DOROTHY K**<br>**3465 OVERBROOK LN**<br>**HOUSTON TX 77027-4124** | Legal Description: | **LT 1 & TR 2A BLK 62**<br>**RIVER OAKS SEC 7** |
| | | Property Address: | **3465 OVERBROOK LN**<br>**HOUSTON TX 77027** |

**State Class Code**

A1 -- Real, Residential, Single-Family

**Land Use Code**

1001 -- Residential Improved

| Land Area | Total Living Area | Neighborhood | Neighborhood Group | Market Area | Map Facet | Key Map® |
|---|---|---|---|---|---|---|
| 18,994 SF | 9,767 SF | 8324.02 | 1695 | 164 -- 1F River Oaks Area | 5256A | 492T |

**Value Status Information**

| Value Status | Notice Date | Shared CAD |
|---|---|---|
| Noticed | 03/31/2021 | No |

**Exemptions and Jurisdictions**

| Exemption Type | Districts | Jurisdictions | Exemption Value | ARB Status | 2020 Rate | 2021 Rate | Online Tax Bill |
|---|---|---|---|---|---|---|---|
| None | 001 | HOUSTON ISD | | Not Certified | 1.133100 | | |
| | 040 | HARRIS COUNTY | | Not Certified | 0.391160 | | |
| | 041 | HARRIS CO FLOOD CNTRL | | Not Certified | 0.031420 | | |
| | 042 | PORT OF HOUSTON AUTHY | | Not Certified | 0.009910 | | |
| | 043 | HARRIS CO HOSP DIST | | Not Certified | 0.166710 | | |
| | 044 | HARRIS CO EDUC DEPT | | Not Certified | 0.004993 | | |
| | 048 | HOU COMMUNITY COLLEGE | | Not Certified | 0.100263 | | |
| | 061 | CITY OF HOUSTON | | Not Certified | 0.561840 | | |

Texas law prohibits us from displaying residential photographs, sketches, floor plans, or information indicating the age of a property owner on our website. You can inspect this information or get a copy at **HCAD's information center at 13013 NW Freeway.**

**Valuations**

| | Value as of January 1, 2020 | | | Value as of January 1, 2021 | |
|---|---|---|---|---|---|
| | Market | Appraised | | Market | Appraised |
| Land | 2,849,100 | | Land | 2,849,100 | |
| Improvement | 3,150,900 | | Improvement | 3,479,411 | |
| Total | 6,000,000 | 6,000,000 | Total | 6,328,511 | 6,328,511 |

**5-Year Value History**

**Land**

**Market Value Land**

| Line | Land Use | Unit Type | Units | Size Factor | Site Factor | Appr O/R Factor | Appr O/R Reason | Total Adj | Unit Price | Adj Unit Price | Value |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1001 -- Res Improved Table Value<br>SF1 -- Primary SF | SF | 18,994 | 1.00 | 1.00 | 1.00 | -- | 1.00 | 150.00 | 150.00 | 2,849,100.00 |

**Building**

| Building | Year Built | Type | Style | Quality | Impr Sq Ft | Building Details |
|---|---|---|---|---|---|---|
| 1 | 2007 | Residential Single Family | 101 -- Residential 1 Family | Superior | 9,767 * | Displayed |

* All HCAD residential building measurements are done from the exterior, with individual measurements rounded to the closest foot. This measurement includes all closet space, hallways, and interior staircases. Attached garages are not included in the square footage of living area, but valued separately. Living area above *attached* garages is included in the square footage living area of the dwelling. Living area above *detached* garages is not included in the square footage living area of the dwelling but is valued separately. This method is used on all residential properties in Harris County to ensure the uniformity of square footage of living area measurements district-wide. There can be a reasonable variance between the HCAD square footage and your square footage measurement, especially if your square footage measurement was an interior measurement or an exterior measurement to the inch.

**Building Details (1)**

| Building Data | | | Building Areas | |
|---|---|---|---|---|
| Element | Details | | Description | Area |
| Foundation Type | Slab | | OPEN FRAME PORCH PRI | 64 |
| Exterior Wall | Stucco | | OPEN FRAME PORCH PRI | 49 |
| Heating / AC | Central Heat/AC | | FRAME GARAGE PRI | 789 |
| Cost and Design | New / Rebuilt | | OPEN FRAME PORCH PRI | 540 |
| Grade Adjustment | X | | BASE AREA PRI | 5,189 |
| Physical Condition | Average | | BASE AREA UPR | 4,578 |
| Cond / Desir / Util | Average | | CARPORT PRI | 252 |
| Element | Units | | OPEN FRAME PORCH UPR | 60 |
| Elevator Stops | 2 | | OPEN FRAME PORCH PRI | 40 |
| Fireplace: Metal Prefab | 3 | | | |

Case 4:22-cv-00202   Document 21-7   Filed on 01/31/22 in TXSD   Page 11 of 113

Room: Rec
Room: Half Bath                  3
Room: Bedroom                    5
Room: Total                     13
Room: Full Bath                  5

Extra Features

| Line | Description | Quality | Condition | Units | Year Built |
|---|---|---|---|---|---|
| 1 | Custom Outdoor Kitchen | Good | Average | 1 | 2009 |
| 2 | Gunite Pool | Very Good | Average | 196 | 2009 |
| 3 | Pool SPA with Heater | Very Good | Average | 1 | 2009 |

# GOV

# EXHIBIT

# 24

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ROBERT T. BROCKMAN,       )
        Plaintiff,      )
                     )     Case No.  22-cv-00202
v.                      )
                     )
UNITED STATES OF AMERICA   )
        Defendant.     )

**DECLARATION OF REVENUE OFFICER**
**VINCENT C. SANDLES UNDER 28 U.S.C. §1746**

I, Vincent Sandles declare:

1.      My name is Vincent Sandles.  I am over 21 years of age, of sound mind, capable and competent of making this declaration, and have personal knowledge of the facts herein stated, based upon my review of the official records of the Internal Revenue Service.

2.      I am employed by the Internal Revenue Service, as an Abusive Tax Avoidance Transactions ("ATAT") Revenue Officer ("RO") in the Fort Worth, Texas, area.

3.      In general, ROs at the IRS are tasked with collecting taxes owed by taxpayers. An ATAT RO works cases involving unpaid taxes from tax returns filed by taxpayers as well as assisting in tracking down and collecting taxes where no tax returns have been filed. We also engage in financial investigations of a complex nature. The complexity often involves a taxpayer's use of subterfuge and schemes aimed at evading the payment of creditors, including the IRS. Sometimes these activities include complex ownership structures, such as where a taxpayer creates several layers of "ownership" of an asset to obscure and hide the fact that he or she is the true owner. One example includes placing record title to an asset in a limited liability company with the owner/member being a trust, and then that trust is controlled by a nominee of the taxpayer. Additionally, such activities could include placing assets in the names of nominees or

1


Government
Exhibit

24

alter egos or using offshore structures such as foreign trusts and foreign entities to hold assets, all in an effort to avoid the collection of tax liabilities. Because of the complex nature of the investigations that an ATAT RO performs, they regularly work with IRS examination personnel as well as IRS counsel and Department of Justice attorneys.

4. I am an ATAT RO assigned to the investigation of jeopardy assessment and collection actions against Robert T. Brockman ("Brockman") for the 2004 through 2018 tax years and the IRS's jeopardy assessment against Brockman for the 2004-2018 years. I am part of the jeopardy team that made jeopardy determinations and investigated whether Brockman controlled or owned real property in Colorado and Texas. I also investigated Brockman's ownership of his luxury yacht "Albula" and a Bombardier jet.

5. This affidavit is submitted in support of United States in *Robert T. Brockman v. United States*. Specifically, the IRS's jeopardy assessment against Brockman for the 2004-2018 years.

6. This affidavit/declaration does not include every fact or matter observed by me, the IRS or known by the IRS and United States that support a jeopardy determination. The information contained herein is based upon my review the documents contained in the IRS administrative files and information obtained during the examination process.

7. Although Internal Revenue Manual 4.15.1.9.2 provides that the IRS examiner interview the taxpayer, that provision also instructs examiners to exercise caution before interviewing the taxpayer because the government's case may be impeded if the taxpayer has knowledge of a potential jeopardy assessment. Based on information I had reviewed, I believed that if I interviewed Brockman before the IRS issued the jeopardy assessment, he would become aware of the potential of the jeopardy assessment and take further actions to place assets beyond the reach of the IRS.

2

**Summary of Facts**

8.      Attached as Gov. Exhibit 2 is the Robert T. Brockman Jeopardy Report ("Jeopardy Report" or "Report").  I helped create portions of Brockman Jeopardy Report and have knowledge regarding the Report, jeopardy assessments, and Notices of Federal Tax Liens ("NFTL"), IRS levies and responses to IRS levies regarding Brockman's tax liabilities arising from the jeopardy assessments.

9.      Brockman has a long history of using offshore foreign trusts, foreign corporations, foreign financial accounts in other entities names, and multi-layered structures to hide his assets and avoid federal income taxes.  During 2004 through 2018, Brockman used a complex scheme of offshore foreign trusts, foreign and domestic companies, nominee ownership, nominees, and numerous foreign financial accounts to conceal his assets from the United States and avoid reporting over $2.7 billion in income.  Brockman's offshore tax avoidance empire was established in several well-known tax-haven jurisdictions.

10.     Edge Capital Investments ("Edge Investments") was originally formed in the British Virgin Islands ("BVI") but was later redomiciled in Nevis.  Edge Investments maintained foreign accounts at Bermuda Commercial Bank, hereinafter "BCB", (Bermuda), and Mirabaud & Cie Bank (Switzerland).  Gov. Ex. 2 at pgs. 14-15, 24 and Gov. Exs. B-1.30 and B-1.40.

11.     Cabot Global Investments ("Cabot Investments") was originally formed in the BVI but was later renamed and re-incorporated in Nevis.  Cabot Investments maintained foreign accounts at BCB (Bermuda), and Mirabaud & Cie Bank (Switzerland). Gov. Ex. 2 at pgs. 17-19, Gov. Exs. C-7 and C-45.

12.     During 1999-2018, Brockman used funds from Edge Investments' and Cabot Investments' foreign bank accounts for his Colorado real estate holdings contained in the Regency Management offshore structure. Gov. Exs. B-35, C-7, C45 and C-46

13.     Brockman formed the offshore foreign charitable trust, Heraclides Charitable Trust, in Bermuda, to hold a Bermuda foreign corporation (Regency Management).  Regency Management owned three separate U.S. corporations (Henke Holdings LLC, Henke Property LLC, and Mountain Queen Inc.).  These entities held Brockman's ownership of his Colorado properties worth about $36 million.  Gov. Ex. 2 at pgs. 20-21 and 37-39.

14.     The diagram below was created to detail the ownership of Brockman's Colorado real estate held in the Regency Management offshore structure through a complex web of offshore

and domestic entities.



15.     Brockman funded the acquisition, maintenance, and repairs of his Colorado real estate

through at least three offshore foreign bank accounts in Bermuda in the names of Regency

Management, Cabot Investments, and Edge Investments.  Brockman used funds from Edge

Investments' and Cabot Investments' foreign bank accounts held at BCB, then transferred to

Regency Management's foreign account at BCB for his Colorado real estate holdings contained

in the Regency Management offshore structure.  See Gov. Ex. 2, Jeopardy Report at pgs. 20-26,

and Gov. Exs. B-35 and C-7.

16.     From 2010 through 2016, Regency Management transferred $24 million from its BCB

Bermuda bank account Henke Property LLC to purchase and maintain Brockman's Colorado

real estate as follows: Gov. Ex. 2 at pg. 25 and Gov. B-35.

| C. Wire Transfers from Regency Management | | | | |
|---|---|---|---|---|
| | | | | |
| Regency Management Limited (Bermuda Commercial Bank Acct# 200717-01) | | | | |
| Transaction | Date | Amount | Comment* | |
| 1 | 4/28/2010 | 489,344.39 | Henke Property LLC | Balance of purchase price of Prehm Ranch No. 8 |
| 2 | 6/29/2010 | 100,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 3 | 8/2/2010 | 100,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 4 | 9/17/2010 | 150,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 5 | 12/17/2010 | 265,000.00 | Henke Property LLC | Earnest money paid for purchase of Tie Camp Ranch |
| 6 | 12/23/2010 | 4,731,018.63 | Henke Property LLC | Balance of purchase price of Tie Camp Ranch |
| 7 | 5/25/2011 | 100,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 8 | 6/29/2011 | 100,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 9 | 8/15/2011 | 200,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 10 | 2/7/2012 | 150,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 11 | 5/25/2012 | 100,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 12 | 7/16/2012 | 250,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 13 | 9/28/2012 | 250,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 14 | 10/23/2012 | 250,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 15 | 2/11/2013 | 150,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 16 | 3/15/2013 | 250,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 17 | 6/4/2013 | 150,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 18 | 7/11/2013 | 150,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 19 | 8/7/2013 | 150,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 20 | 8/19/2013 | 250,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 21 | 9/9/2013 | 250,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 22 | 10/7/2013 | 600,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 23 | 10/28/2013 | 100,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 24 | 11/18/2013 | 250,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 25 | 12/3/2013 | 500,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 26 | 12/12/2013 | 750,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 27 | 1/24/2014 | 500,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 28 | 3/17/2014 | 350,000.00 | Henke Property LLC | Funding of Henke to meet costs |
| 29 | 4/23/2014 | 600,000.00 | Henke Property LLC | Funding of Henke to meet costs |

17.     $15 million was also routed through Edge Investments and Regency Management to

purchase and develop the Frying Pan Ranch, aka "Tie Camp Ranch," in Colorado, to be used as a

fishing lodge.  It was Brockman's idea to purchase the property to facilitate fishing for him and

his friends.  Gov. Exs. B1.30 (Jan 2011), B-35, B-39, B-40 C-46, C-47 and C-48.

18.     The property located at 230 McFarlane Gulch Rd, Aspen, CO 81611, is titled in

Mountain Queen Inc., and is believed to be Brockman's "Aspen Vacation Home".   It consists of

two residences sitting on 37.97 acres and is valued in excess of $15 million. Gov. Ex. 2 at pg. 37.

Brockman had exclusive right to use the properties.   Brockman directed the management of the

properties, approving tenants and fishing rights.   Brockman received monthly reports on the

properties fand had to approve payment of expenses on the properties of $2,000 or more.   See

Gov. Ex. 2 Jeopardy report at pg. 22.

19.     Another piece of Colorado real estate that was held outside of the Regency Management

offshore structure is located at 10 Popcorn Lane, Aspen, CO 81611 ("Popcorn Lane").   The

Popcorn Lane property is titled in the name of Difficult LLC.   Brockman, through Point

Investments, holds a $4.6 million note against the property.   Gov. Ex. A-33.   On March 30, 2010,

Brockman's foreign entity Point Investments transferred $4 million to Difficult LLC (Al Deaton)

for the Popcorn Lane property.   Point Investments recorded the note as a loan to Al Deaton.   *See*

Gov. Ex. A-10.   On February 7, 2012, Point Investments transferred another $500,000 to

Difficult LLC recording this transfer as an additional loan to Al Deaton.   *Id.*   Al Deaton is

Brockman's business associate.   Brockman even gave Al Deaton his own code name and alias of

"Tarpon".   *See* Gov. Ex. A- 85.   Al Deaton is the 100% owner of Difficult LLC.   The Popcorn

Lane property has an appraised value in excess of $9 million.

20.     Brockman purchased the "super yacht" "Turmoil" in 2016 (later renamed the Albula) for

$32,845,705 using a nominee entity.   In December of 2016, Brockman caused the transfer of

$3.5 million and $29,345,705 from Cabot Investments' Swiss bank account at Mirabaud to

purchase the yacht.   The yacht is 211 feet long and sails under the flag of the Cayman Islands.

Currently, the yacht is somewhere in the Mediterranean off the coast of Spain. The estimated

value of the yacht is between $40 million to $50 million. Gov. Ex. 2 at pgs 27-29, and 41

21.     Brockman purchased a Bombardier BD-700 business jet, tail number N529DB, in the

name of Hardwicke Properties ("Hardwicke") on March 25, 2016.  This type of jet is considered

a long-range aircraft. Brockman signed the bill of sale as the operating manager of Hardwicke.

The Federal Aviation Administration ("FAA") documents indicate the address of Hardwicke is

6900 Hollister St., Houston, TX.  Hardwicke is owned by another Brockman-controlled entity,

Universal Computer Systems Holding Inc.   FAA records also indicate the plane is free of

encumbrances. The tail number of the aircraft was changed after purchase and is the initials of

Dorothy Brockman and her birthday May 29th.  Gov. Ex. 2 at pg. 40.

*IRS liens and levies*

22.     On September 7, 2021, the IRS made a jeopardy assessment against Brockman for taxes,

fraud penalties, and interest totaling $1,418,272,371.71 for the 2004-2018 tax years as follows:

| Year | Tax | Penalty- Fraud | Interest | Total |
|------|-----|----------------|----------|-------|
| 2004 | 82,512,479 | 61,884,359.25 | 157,830,197.30 | 302,227,035.55 |
| 2005 | 32,772,341 | 24,579,255.75 | 55,088,712.34 | 112,440,309.09 |
| 2006 | 38,916,900 | 29,187,675.00 | 55,409,699.31 | 123,514,274.31 |
| 2007 | 2,547,543 | 1,910,657.25 | 3,029,157.13 | 7,487,357.38 |
| 2010 | 110,120,720 | 82,590,540.00 | 91,051,351.22 | 283,762,611.22 |
| 2012 | 21,712,495 | 16,284,371.25 | 14,112,694.08 | 52,109,560.33 |
| 2013 | 36,939,855 | 27,704,891.25 | 21,390,135.23 | 86,034,881.48 |
| 2014 | 14,156,595 | 10,617,446.25 | 7,223,004.84 | 31,997,046.09 |
| 2015 | 53,460,628 | 40,095,471.00 | 23,404,569.21 | 116,960,668.21 |
| 2016 | 23,918,714 | 17,939,035.50 | 8,422,393.99 | 50,280,143.49 |
| 2017 | 108,161,287 | 81,120,965.25 | 28,619,232.27 | 217,901,484.52 |
| 2018 | 17,576,763 | 13,182,572.25 | 2,797,665.79 | 33,557,000.04 |
| **TOTAL** | **542,796,763** | **407,097,240.50** | **468,378,811.71** | **1,418,272,371.71** |

Gov. Ex. 29

23.     The interest due on the jeopardy assessments as set forth in Tax Table 1 was calculated to

September 9, 2021.

24.     In the morning, on September 9, 2021, Brockman was personally served at 3465 Overbrook Ln., Houston, TX, with the IRS Letter 1584, Notice of Jeopardy Assessment and Rights to Appeal; the Jeopardy Report; Attachments A, B, C, D from the Report; Exhibits 1-13 from the Report; IRS Form 12153, Request for Collection Due Process or Equivalent Hearing; Publication 1660, Collection Appeal Process; Publication 1, Your Rights of a Taxpayer; Publication 594, The Collection Process and Notice 609, Privacy Act Notice (collectively "jeopardy package").

25.     Also served on Brockman at the same time was IRS Form 3552 Notice of Tax Due on Federal Return which provided notice that the tax assessments had been made and demanded payment of the amount due.

26.     Despite Notice and Demand, as of December 1, 2021, Brockman has not made any voluntary payments toward his $1.4 billion jeopardy assessments.

27.     Brockman has not pledged his Reynolds and Reynolds stock or any dividends that may be payable on that stock to the IRS to stay collection.

28.     Brockman has not posted a bond as allowed under I.R.C. Section 6863(a) to stay the collection of the jeopardy assessments.

*Liens*

29.     After service of the jeopardy package on Brockman, on September 9, 2021, the IRS filed regular NFTLs and special condition liens in Eagle, Garfield, and Pitkin Counties in Colorado.

30.     On September 9, 2021, the IRS filed eight NFTLs for Brockman's 2004 through 2007, and 2010 through 2018 federal income tax liabilities, including interest and penalties from the jeopardy assessments as follows:  Gov. Ex. 30.

| County and State Lien Filed | Filed Against and Description |
|---|---|
| Eagle County, CO | Henke Properties L.L.C., as Alter Ego of Robert Brockman |
| Garfield County, CO | Robert Brockman |
| Garfield County, CO | Dorothy K. Brockman as Nominee of Robert Brockman |
| Garfield County, CO | Henke Properties L.L.C., as Alter Ego of Robert Brockman |
| Pitkin County, CO | Robert Brockman |
| Pitkin County, CO | Henke Properties L.L.C., as Alter Ego of Robert Brockman |
| Pitkin County, CO | Mountain Queen, Inc., as Alter Ego of Robert Brockman |
| Pitkin County, CO | Difficult LLC as Nominee of Point Investments Ltd., as alter ego of Robert Brockman |

31.    After service of the jeopardy package on Brockman, on September 9, 2021, the IRS filed regular NFTLs and special condition liens in Harris County, Texas.

32.    On September 9, 2021, the IRS filed six NFTLs for Brockman's 2004 through 2007, and 2010 through 2018 federal income tax liabilities, including interest and penalties from the jeopardy assets as follows:

| County and State Lien Filed | Filed Against and Description |
|---|---|
| Harris County, TX | Robert Brockman |
| Harris County, TX | Dorothy K. Brockman as Nominee of Robert Brockman relating to the property located at 333 W. Friar Tuck Ln. Houston TX |
| Harris County, TX | Hardwicke Properties L.L.C., as Alter Ego of Robert Brockman |
| Harris County, TX | Fisheries Research Foundation Ltd., as Alter Ego of Robert Brockman |
| Harris County, TX | Dorothy K. Brockman as Nominee of Robert Brockman relating to the property located at 335 W. Friar Tuck Ln. Houston TX |
| Harris County, TX | Elizabeth Bellows Brockman as Nominee of Robert Brockman |

Gov. Ex. 31.

*Levies*

33.    The U.S. tax laws require that third party payers such as banks and other financial institutions must file information returns to report to the IRS report income earned or certain transactions by the taxpayer.  For example, the financial institution must report interest, dividends, distributions, and sales of securities on certain forms such as a Form 1099.  That form is filed with the IRS and a copy is provided to the taxpayer/recipient.  The IRS can use the form

to match the income reported on an individual's federal tax return.  These third-party information returns must be filed with the IRS by January 31 of the following tax year.  Thus, the information returns for 2020 must have been filed by January 31, 2021.

34.     In part, the IRS used Brockman's third-party information from 2020 to determine what financial institutions to issue levies to collect Brockman's outstanding federal income taxes from the jeopardy assessments.

35.     On September 9, 2021, the IRS issued the following levies for Robert Brockman and the status of each:

| Entity Levied | Status |
|---|---|
| Amegy Bank NA | No funds available.  Account closed as of 5/25/2021 |
| HSA Bank, A Division of Webster Bank NA | Holding/contains $45,981.54 |
| John Hancock Signature Services Inc. | Holding/contains $67,963.07 |
| Morgan Stanley Smith Barney LLC | Holding/contains approximately $3,000 |
| National Financial Services LLC | There is no account balance |
| Lord, Abbot & Co LLC, Affiliated Fund | holding $46,462.18 |
| Wells Fargo Bank NA | No account found |

36.     On September 9, 2021, the IRS issued the following levies naming Dorothy Brockman as the nominee of Brockman with her identifying SSN and the status of each:

| Entity Levied | Status |
|---|---|
| Amegy Bank NA | No funds available.  Account closed as of 5/25/2021 |
| B of K  dba Bank of Texas | Holding/contains   $518,552.14 |
| National Financial Services LLC | Holding/contains  $16,588.05 |
| Bank of America | Holding/contains    $251,061.62 |
| JP Morgan Chase Bank | Holding/contain     $500,044.98 |
| Fidelity Brokerage Services LLC | Holding/contains    $1,000,041.54 |

*Harris County Properties*

37.     Brockman is married to Dorothy Brockman.

38.     In July 2020, Brockman signed a statutory durable of power of attorney to Dorothy Brockman which was recorded in the public record on December 14, 2020.  *See* Gov. Ex. A-95.

39.     The Brockmans acquired their primary residence located at 333 West Friar Tuck Lane, Houston, Texas in 1997 ("333 West Friar Tuck Property"). *See* Gov. Ex. 8.  The Brockmans' residence is a six-bedroom home, with a guest house, private lake, tennis court and pool located on 4 acres.  On December 30, 1997, Brockman partitioned his 333 West Friar Tuck residence into 50% ownership as separate property. *See* Gov. Ex. 9.  On February 17, 1998, Brockman then transferred his 50% separate ownership to interest to his wife.  *Id.* The Brockmans maintained the 333 West Friar Tuck property as their principal residence for 24 years.  But, shortly after Brockman's indictment, the 333 West Friar Tuck property was listed for sale for $15.35 million. *See* Gov. Ex. 10.

40.     In March 2005, the Brockmans acquired a 1.55-acre lot, located at 335 West Friar Tuck Lane, Houston, Texas, 77024 ("335 West Friar Tuck Property"). *See* Gov. Ex. 11.  The 335 West Friar Tuck Property is next to the Brockmans' personal residence.  On October 17, 2019, Brockman partitioned the Sunset Property into separate property between himself and his wife. On the same day, Brockman transferred his 50% (separate) interest in the Sunset Property to his wife. *See* Gov. Exs. 16 and 17.  On December 11, 2020, shortly after his indictment, Brockman through his wife sold the 335 West Friar Tuck Property for $4,100,000. *See* Gov. Exs. 12 and 13.

41.      In May 2011,  the Brockmans, acquired a four-story townhouse located at 1731 Sunset Blvd, Houston TX 77005, ("Sunset Property"). *See* Gov. Ex. 14.  On October 17, 2019, Brockman partitioned the Sunset Property into 50% ownership as separate property. *See* Gov.

Ex. 15.  On October 17, 2019, Brockman transferred his 50% separate ownership in the Sunset Property to his wife. *See* Gov. Ex. 16.  On October 26, 2020, three weeks after Brockman's indictment, the Sunset Property was listed for sale. *See Gov. Ex. 17.*   The Sunset property was sold to a third party in May 2021 for $1.375 million. *See* Gov. Exs. 17 and 18.

42.     On January 21, 2020, Dorothy Brockman acquired property located at 3702 Inwood Drive, Houston, Texas, ("Inwood Property"). *See* Gov. Ex. 19.    Based upon the Harris County records, the Inwood Property has an appraised value of $3,767,173. *See* Gov. Ex. 20.  On November 12, 2020, the Inwood Property was gifted to Elizabeth Bellows Brockman as her sole and separate property. *See* Gov. Ex. 21.    Elizabeth Bellows Brockman is Brockman's daughter in law, wife of his only son.

43.     On January 21, 2021, Dorothy Brockman acquired the property located at 3465 Overbrook Lane, Houston TX 77027 ("Overbrook Property").  *See* Gov. Ex. 22.  The Overbrook Property is a six-bedroom residence with an appraised value of $6,328,511.  Brockman currently resides at the Overbrook Property. *See* Gov. Ex. 23.

***Actions giving rise to jeopardy***

44.     The above paragraphs and the Jeopardy Report show that it reasonably appeared to the IRS that Brockman was taking steps to jeopardize collection of his large tax liabilities by placing assets beyond the reach of the IRS.

45.     Actions supporting or giving rise to jeopardy are Brockman's illegal activities, concealment of his assets using a complex offshore scheme with foreign entities and foreign accounts, Brockman's complete control of his offshore empire, transfers of properties right after his indictment, closing of accounts, lack of funds in known accounts, and maintaining significant control of his assets in foreign tax havens.

46.     A significant amount of Brockman's assets and investments are held in, or controlled by, entities in foreign countries that would make collection difficult, if not impossible.

**Transfer of Assets as Basis for Jeopardy Assessment and Jeopardy Levies**

47.     Brockman was indicted on October 1, 2020, on seven counts of tax evasion under 26 U.S.C. § 7201 for the 2012-2018 years, six counts for failing to file an FBAR under 31 U.S.C. §§ 5314 & 5322(b), reporting his foreign accounts, plus additional counts for wire fraud, money laundering, evidence tampering, and destruction of evidence. *See* Gov. Ex. A-90.

48.     After his indictment, it reasonably appeared to the IRS that Brockman was taking steps to jeopardize collection of his tax liabilities by placing assets out of the reach of the IRS.

49.     In the months following Brockman's criminal indictment, the Brockmans have been selling, gifting, and listing their Harris County properties for sale to place these properties beyond the reach of the government as follows:

- 10/26/2020     - 1731 Sunset Blvd, Houston TX 77005 was listed for sale and sold on May 12, 2021 for $1,375,000

- 11/12/2020     - 3702 Inwood Drive, Houston TX 77019, valued at $3,567,218 million gifted to daughter in law-Elizabeth Brockman

- 12/11/2020     - 335 West Friar Tuck Lane, Houston TX 77024 sold for $4,100,000

- 5/17/2021      - 333 West Friar Tuck Lane, Houston TX 77024, principal home of Mr. and Mrs. Brockman listed for sale for $15,350,000

50.     Brockman engaged in numerous machinations and acts to keep the Harris County Properties out of his name.  Brockman's actions to keep the Harris County Properties out of his name impedes and causes the collection of his tax liabilities from these properties to be more difficult and appears to put collection in jeopardy.

51.     Brockman owned 1% of Hardwicke which holds title to the Bombardier jet that was purchased through funding from an offshore entity, Spanish Steps Holdings' Swiss bank account.

52.     On March 24, 2021, within six months after his indictment, Brockman sold his 1%

interest in Hardwicke to Reynolds and Reynolds for $288,858 in cash. *See* Gov. Ex. 7.  It is

unknown where this cash was deposited or transferred because as of September 7, 2021,

Brockman only held approximately $96,000 in his known accounts.  *See* paragraph 35, above.

53.     At the time of the jeopardy assessment against Brockman, the IRS personnel involved in

the jeopardy investigation were not aware of Brockman's sale of his 1% in Hardwicke which

held title to the jet.

54.     On October 12, 2021, Hardwicke filed a Form 9423 Collection Appeal Request with the

IRS to contest the NFTL that was filed against Hardwicke Properties L.L.C. as Alter Ego of

Robert T. Brockman.  *See* Gov. Ex. 7.   The Form 9423, Collection Appeal Request, included an

appraisal of the jet that valued it $26,250,000.  *Id.*  The Collection Appeal Request asserts that

the IRS cannot collect Brockman's tax liabilities from the jet because Brockman sold his interest

in Hardwicke prior to the IRS filing the tax liens.

55.     Brockman's quick disposal after his indictment of his 1% ownership of Hardwicke (jet)

was an action designed to place his property beyond the reach of the government.  It is unknown

where the cash proceeds from the Hardwicke sale were deposited or transferred.  It reasonably

appears to the IRS that Brockman's actions on this sale and other sales, cause the collection of

his tax liabilities to be in jeopardy.

56.     By March 2021, within six months of his indictment, Brockman and his wife sold two

Houston properties and Brockman's 1% interest in Hardwicke for a total about $5,763,858.[1]  On

September 10, 2021, the IRS levied on all Brockman's and his wife's known U.S. bank accounts.

---

[1]   $1,375,000 (1731 Sunset Blvd., property) + $4,100,000 (335 West Friar Tuck property) +
$288,858 (1% in Hardwicke) = $5,763,858.

The IRS believed it had levied on all of Brockman's and his wife's U.S. financial accounts. However, these IRS levies only secured $1,382,318.42 which is significantly less than the $5,763,858. The IRS does not know what happened to the proceeds from these property sales. It appears funds are being dissipated or transferred to unknown accounts. There is a concern that the sales proceeds would be placed offshore since Brockman has access to many foreign bank accounts. This concern is heightened by Brockman's 20-plus-year history of hiding his assets through the use of foreign trusts, foreign corporations, and nominees to layer up ownership.

### *Withdrawal of funds and closing of bank accounts as Basis for Jeopardy Assessment and Jeopardy Levies*

57.     Third party payor information reported to the IRS that Brockman and his wife had bank accounts at Amegy bank. Amegy Bank responded to the IRS levies of September 9, 2021, that Brockman's and his wife's Amegy bank accounts were closed on May 25, 2021.

58.      Third party payor information reported to the IRS that Brockman maintained bank accounts at Wells Fargo Bank. Wells Fargo Bank responded to the IRS levies of September 9, 2021, that no accounts of Brockman's were found.

59.     Third party payor information reported to the IRS that Brockman had an account at National Financial Services LLC. This third-party payor information indicated that in 2020 Brockman received a distribution of $1,301,319 from National Financial Services LLC. At this time the exact date of the distribution is unknown. See Gov. Ex. 33 at pgs. 30-31.   In June of 2020, Brockman sold securities from his National Financial Services account of $663,655.  Gov. Ex. 33 at pgs. 8 -13.   National Financial Services LLC responded to the IRS levy of September 9, 2021, stating that they were unable to locate any assets because there was **no account balance**.

60.     Around September 15, 2020,  Brockman sold securities from his Morgan Stanley account of $352,288. Gov. Ex. 33 at pgs. 16 and 21.   Yet, Morgan Stanley responded to the IRS levy of September 9, 2021, stating that the bank held approximately $3,000.

61.     In September of 2020, Brockman sold securities from his John Hancock account of $99,999.  Gov. Ex. 33 at pgs. 14 and 15.  Yet, on September 9, 2021, Brockman's John Hancock account only held some $67,963.07.

62.     Based upon third party payor information, in 2020 Great-West Trust Company made a net distribution of $1,217,056 to Brockman.   See Gov. Ex. 33 at pgs. 30-31.  At this time the exact date of the distribution and the location of the proceeds are unknown.

63.     The IRS does not know what happened to the $2,518,375 (1,301,319 + 1,217,056) distributed to Brockman from his National Financial Services and Great-West Trust Company accounts.  Likewise, the IRS does not know what happened to the $663,655 securities sale proceeds.  It appears to the IRS this $3,182,030 in funds are being dissipated or transferred to unknown accounts.  There is a concern that these proceeds would be placed offshore since Brockman has access to many foreign bank accounts.

64.     Since 2020, it reasonably appeared to the IRS that Brockman was recently taking steps to jeopardize collection of his tax liabilities by transferring, selling, and dissipating assets out of the reach of the IRS totaling $9,398,175 as follows:

| Amount | Date | Description of Asset or property |
|---|---|---|
| $1,375,000 | May 2021 | 1731 Sunset Blvd, Houston TX 77005 |
| $4,100,000 | December 2020 | 335 West Friar Tuck Lane, Houston TX 77024 |
| $  288,858 | March 2021 | 1% interest in Hardwicke  (Bombardier jet) |
| $1,301,319 | 2020 | distribution from National Financial Services LLC |
| $1,217,056 | 2020 | distribution Great-West Trust Company |
| $1,115,942 | 6/2020 through 9/2020 | Sales of securities from Morgan Stanley, National Financial Services and John Hancock accounts |

See Gov. Exs. 7, 17, 18, 32 and 33.

65.     Based upon Dorothy Brockman's 2020 tax return, from October 20, 2020, to December 31, 2020, Dorothy Brockman sold securities, stocks, or other non-real estate investments in the gross amount of $9,287,777. Gov. Ex. 32.


I declare under penalty of perjury that the foregoing is true and correct.

        Executed this <u>31st </u>day of January 2022.


                        *V.C. Sandles*
                        _____
                        Vincent Sandles
                        Revenue Officer
                        Internal Revenue Service

# GOV

# EXHIBIT

# 25



BERMUDA
**POLICE**
SERVICE

## STATEMENT OF WITNESS

Government
Exhibit
25

**Statement of:** Patrick Rock
**Date of Birth:** Over 21
**Address:** C/o Police Headquarters, Prospect Devonshire
**Phone:** (h)                                    **Phone:** (w) 441 295 0011
**Phone:** (d) 441 247 1383
Email: prock@bps.bm
**Occupation Detective:** Constable                **Employer:**    Bermuda Police Service

This statement consisting of (3 ) pages each signed by me, is true to the best of my knowledge and belief and I make it knowing that, if it is tendered in evidence, I shall be liable to prosecution if I have willfully stated in it anything, which I know to be false or do not believe to be true.                (Section 29 of Evidence Act 1905)

Date: 1st November 2018

Signed: ...................................................

Witnessed: ...................................................

*States,*

My name is Patrick Rock Detective Constable #537 and I am attached to the Financial Crime Unit of the Bermuda Police Service.

As a result of information received, I was tasked to assist with an investigation of a **Mr. Evatt Tamine** *(hereinafter the Suspect)* involving  Money Laundering and Criminal Tax Evasion.
Pursuant to this investigation I had the occasion to assist in a number of searches sworn under the authority of section (39) of the Proceeds of Crime Act 1997.

On 5th September 2018, I attended the residence of the Suspect which is located at # 2 Hidden Lane, Pembroke in relation to the execution of a search warrant. This operation commenced at 5:17 hrs. on this same date and the Officer-in-Charge was D/ Chief inspector Nicholas Pedro.
Also present were Detective Sergeant 2210 (DS) Ridley (D/SIO), DC 2028 Jones *(Scribe),* DC 308 Hayward *(Forensic Support Officer),* US Special Agents and other BPS Officers.
I was tasked as the *Searched Officer* together with Special Agent Peter Dickerman while DC Jones took contemporaneous notes of the search. The below is the items that were seized by me during the searched and recorded accordingly by the Scribe.

| Time | Item | Exhibit No. |
|------|------|-------------|
| 06:50 | Bank of Butterfield Cheque Book in the name of Tangara Consultants Ltd, 2 x Drivers Licenses, 2x American Express Cards,  2x  miscellaneous  cards,  number  of  Bermuda Government receipts | PR/1 |
| 06:50 | A number of assorted documents | PR/2 |
| 07:00 | A number of assorted documents | PR/3 |
| 07:14 | A number of assorted documents | PR/4 |

Signed: ...................................................    Signature witnessed by:...................................................

- 2 -

**BERMUDA POLICE**

**Continuation of Statement of :**

| | | |
|---|---|---|
| 07:20 | A number of miscellaneous travel documents | PR/5 |
| 07:26 | A number of assorted documents | PR/6 |
| 07:44 | A number of folders with documents | PR/7 |
| 07:54 | An Oxford expandable folder with documents | PR/8 |
| 08:00 | A number of assorted documents | PR/9 |
| 08:59 | A number of assorted documents | PR/10 |
| 09:17 | A number of assorted documents | PR/11 |
| 09:33 | A number of assorted documents | PR/12 |
| 09:41 | A number of assorted documents | PR/13 |
| 09:42 | A number of assorted documents | PR/14 |
| 09:50 | A number of binders | PR/15 |
| 10:19 | A number of compact discs | PR/16 |
| 10:52 | A number of assorted documents | PR/17 |

This search concluded at 11:10 hrs. on this same date.

On 31st October 2018, I attended the residence of the Suspect which is located as aforementioned in relation to the execution of a search warrant. This operation commenced at 11:10 hrs. on this same date and the Officer-in-Charge was DS Paul Ridley.

Also present were DC 2152 Trott *(the Case Officer)* and US Special Agents.

DS Ridley  recorded contemporaneous notes of the search while I was tasked as the Search Officer.  The below is the items that were seized by me during the searched and recorded accordingly by the Scribe.

| Time | Item | Exhibit No. |
|---|---|---|
| 11:30 | A number of DVD's | PR/18 |
| 11:33 | Six *(6)* DVD's | PR/19 |
| 11:39 | One (1) SD Card, Two (2) lap drives & external-hard drive | PR/20 |
| 12:10 | (i)  One Silver/black color Cisco -10- Port gigabit POE Managed Switch | PR/21 |
| 12:10 | (ii) One Silver color Cisco -8- Port Switch | PR/22 |
| 12:10 | (iii)One Cisco -4- Port Switch | PR/23 |
| 12:17 | Two black keys | PR/23 (a) |

This search concluded at 12:20 hrs. on this same date.

On 31st October 2018, I also attended **Island Self Storage** Unit #607 which is located at # 3 Mill Creek Pembroke in relation to the execution of a search warrant. This operation commenced at 12:35 hrs. on this same date and the Officer-in-Charge was DS 2210 Paul Ridley.

Also present were DC 2152 Trott *(the Case Officer)* and US Special Agents.

DS Ridley  recorded contemporaneous notes of the search while I was tasked as the Search Officer.  The below is the items that were seized by me during the searched and recorded accordingly by the Scribe.

Signed:................................................   Signature witnessed by: ....................................................

**BERMUDA POLICE**

- 3 -

Continuation of Statement of :

| Time | Items | Exhibit No. |
|------|-------|-------------|
| 12:40 | Clear plastic container containing two (2) grey Dell laptops 7 Power Supplies:-<br>(i)  Serial No. 9070439834<br>(ii) Serial No. 14586884390 | PR/24 |
| 12:45 | Clear plastic box containing three (3) Dell laptops and power supplies:-<br>(i)  Grey Dell lap top Serial No. 3089373914<br>(ii) Grey Dell laptop Serial No. 30363517478<br>(iii)Silver Dell laptop Serial No. 17271882469 | PR/25 |

This search concluded at 12:53 on this same date.

On 16th October 2018, I attended the residence of the Suspect at # 2 Hidden lane Pembroke in relation to the execution of a search warrant. This operation commenced at 15:11 hrs. on this same date and the Officer-in-Charge was DS 2210 Paul Ridley.
Also present were DC 2355 Kendy Swainson *(Scribe),* DC 861 Damon Hollis *(Search Officer)* & DC  2152 Trott *(Case Officer).*
DC Swainson recorded contemporaneous notes of the search while I assisted with general duties as directed by the  Officer-in-Charge. This search concluded at 16:07 hrs. on this date.

On 16th October 2018, I also attended **Island Self Storage** Unit # 136,129 & 102 which are located at # 3 Mill Creek Pembroke in relation to the execution of a search warrant. This operation commenced at 12:35 hrs. on this same date and the Officer-in-Charge was DS 2210 Paul Ridley.
Also present were DC 2355 Kendy Swainson (Scribe), DC 861 Damon Hollis (Search Officer) & DC  2152 Trott (Case Officer).
DC Swainson recorded contemporaneous notes of the search while I assisted with general duties as directed by the  Officer-in-Charge. This search concluded at 16:07 hrs. on this date.
On the directions of the D/SIO, I subsequently placed all of the above exhibits within the purview of Case Officer in temporary storage facility at the FCU.

Signed:................................................   Signature witnessed by: ...........................................

# GOV

# EXHIBIT

# 26



# In The Supreme Court of Bermuda

## CIVIL JURISDICTION

2020: No. 37

**IN THE MATTER OF A JUDICIAL REVIEW**

**BETWEEN:**

**(1) MEDLANDS (PTC) LIMITED**
(as Trustee of the A. Eugene Brockman Charitable Trust)
**(2) SPANISH STEPS HOLDINGS LIMITED**
**(3) POINT INVESTMENTS LIMITED**

**APPLICANTS**

-and-

**(1) COMMISSIONER OF THE BERMUDA POLICE SERVICE**

**DEFENDANT**

-and-

**EVATT TAMINE**
**ST. JOHN'S TRUST COMPANY (PVT) LIMITED**

**INTERESTED PARTIES**

---

| | |
|---|---|
| **Before:** | Hon. Chief Justice Narinder Hargun |
| **Appearances**: | **Mr. Hodge Malek QC, Jeffrey Elkinson and Benjamin Adamson, Conyers Dill & Pearman Limited, for the Applicants** |
| | **Mr. Aidan Caisey QC and Shakira J. Dill-Francois, Deputy Solicitor General, Attorney-General's Chambers, for the Defendant** |
| | **Mr. David Brownbill QC, Jerome Lynch QC and Paul Harshaw, Canterbury Law Limited, for Evatt Tamine** |

| | |
|---|---|
| **Dates of Hearing:** | **9 – 10 March 2020** |
| **Date of Judgment:** | **26 March 2020** |

**Government Exhibit**

26

# JUDGMENT

*Judicial review; whether protocol to preserve privilege should be set aside; scope of legal professional privilege; right to a copy of the seized material under section 21 (4) of PACE*

1. These proceedings arise out of a US Department of Justice ("**DOJ**") Mutual Legal Assistance request (the "**DOJ Request**") made on 27 April 2018 under the *Treaty between the Government of the* United *States and the Government of Bermuda relating to Mutual Legal Assistance in Criminal Matters* signed on 22 January, 2009 (the "**Treaty**"). The Treaty and the *Criminal Justice (International Co-operation) (Bermuda) Act 1994* provide for this assistance to be given.

2. The Treaty obliges the Government of Bermuda to provide assistance in response to a valid request and requires the Government of Bermuda to use its best efforts to keep requests and their contents confidential, if such confidentiality is requested, as was the case here, by the Requesting Party (Article 5 (5)).

3. Upon the instructions of the Attorney General's Chambers, the Bermuda Police Service (the "**BPS**" or the "**Defendant**") applied for and obtained search warrants pursuant to section 39 of *the Proceeds of Crime Act 1997* ("**POCA**") and evidence (the "**Materials**") was seized from the residence and storage unit of Evatt Tamine, a barrister. The BPS recognised that the material may contain legal professional privilege ("**LPP**") material and proposed a protocol to remove such material.

4. There was lengthy dialogue between the BPS, the Applicants and the Interested Parties as to the appropriate terms of a protocol. This resulted in lengthy correspondence between the parties. On 5 September 2019, the BPS proposed a third version of the protocol (the "**Protocol**") which was further modified by letter of 10 December 2019. In these proceedings the Applicants seek to challenge the lawfulness of the Protocol. It is now nearing two years since the DOJ Request was received by the Bermuda authorities.

2

5. In paragraph 25 of the Originating Motion dated 20 January 2020, the Applicants contend that the Protocol is ultra vires the BPS's statutory powers under the Police and Criminal Evidence Act 2006 ("**PACE**") and/or POCA and/or irrational because the Protocol is plainly inappropriate, defeats the objective of a proper review of LPP material, fails to protect the Applicants' fundamental rights to LPP, and is contrary to the statutory protections in PACE and/or POCA in that:

   1. It is not a workable Protocol, including for the reason that it does not set out an appropriate process for identifying material that falls outside the scope of the Warrant.

   2. It permits Mr Tamine to have access to the Applicants' confidential and or LPP material and/or to take and retain copies of the same, which he has no right to read or take copies of.

   3. The Applicants have legitimate concerns about Mr Tamine's bona fides in participating in the proposed review and/or it is likely that Mr Tamine will subvert the review by delaying the review process and/or wrongly identifying material.

   4. The Protocol may result in the Applicants' LPP and/or confidential material being provided by Mr Tamine to third parties, contrary to the Applicants' fundamental rights to LPP and rights of confidentiality.

   5. The involvement of Mr Tamine will likely cause huge and unreasonable delays, since the huge volume of material seized cannot likely be reviewed by one person in any reasonable time-frame.

6. The Originating Motion also seeks information and documents requested in the Applicants' letters of 13 and 16 January 2020 and 18 February 2020. However, during the hearing of this matter Counsel for the Applicants advised the Court that he no longer pursued this application.

3

7.  Mr Tamine also seeks to review the decision of the Commissioner of Police not to provide to Mr Tamine a copy of all material seized as a result of the searches carried out by the BPS at Mr Tamine's premises. Mr Tamine contends that this decision by the Defendant is inconsistent with the rights granted to Mr Tamine (and the duties imposed on the Defendant) pursuant to section 21 of PACE. At the commencement of the hearing I gave leave to Mr Tamine to proceed with his application for judicial review.

## Background

8.  Mr Tamine was (until September 2018) a director of St John's Trust Company (PVT) Limited ("**SJTC**") and of Spanish Steps Holdings Ltd (the Second Applicant or "**Spanish Steps**") and Point Investments Ltd (the Second Applicant or "**Point Investments**"). Spanish Steps and Point Investments are companies held as part of the A. Eugene Brockman Charitable Trust ("**the Brockman Trust**"), of which Mr Brockman is a beneficiary.

9.  Until 19 December 2019, SJTC acted as trustee of the Brockman Trust. SJTC is wholly owned by Cabarita (PTC) Limited, of which Mr Tamine is the sole member and director. On 19 December 2019 the First Applicant ("**Medlands**") was appointed, in confidential proceedings, by Order of Subair Williams J as the trustee of the Brockman Trust. Mr James Gilbert is the sole member of Medlands and was, until shortly before the hearing, its sole director.

10. The DOJ Request states that the United States Attorney for the Northern District of California and the Internal Revenue Service – Criminal Investigation ("**IRS**" or "**US authorities**") are investigating whether Robert Brockman, Evatt Tamine and others, violated United States criminal laws by engaging in a scheme to defraud the United States government and evade the assessment and payment of Federal income taxes. Those involved in the scheme, according to the Request, created a complex overseas financial structure of foreign trusts and corporations in an effort to keep US authorities from discovering the true ownership and control of assets associated with those entities. The Request states that as a result of Mr Tamine's and Mr Brockman's unlawful conduct, the

4

United States government was defrauded of tax revenue on approximately $1.5 billion of taxable income. The extent of Mr Brockman's control over the Brockman Trust is a key issue in the investigations.

11. The Request seeks banking and transactional records from Bermuda to confirm Mr Brockman's ownership and control over the funds on deposit in Bermuda, and his intent to conceal funds upon which taxes should have been paid. In addition, the US authorities seek to corroborate other evidence that indicates that Mr Brockman and Mr Tamine directed deposits of investment income into accounts in Bermuda for Mr Brockman's benefit, and failed to advise the US authorities of this income, as required under US law.

12. In September 2018, Mr Tamine agreed to become a co-operating witness in respect of the DOJ and IRS investigations.

13. As a result of searches carried out by the BPS at Mr Tamine's home at 2 Hidden Lane, Pembroke HM06 and also at Mr Tamine's storage facility at Island Self Storage, 3 Mills Creek Road, Pembroke HM06, in September and October 2018, a number of electronic devices and hardcopy documents were seized by the BPS (the "**Seized Material**"). According to the affidavit of Michael Padula, a US attorney acting for Mr Tamine, the Seized Material comprised the following:

> 1. Various items of computer equipment belonging to Mr Tamine and his family, used by them personally and containing music, videos, photographs and other personal and private files (including the client files of Ms. Sophie Tod, who is a barrister and married to Mr Tamine). These items cover at least 95% of the total data files in question.

> 2. Various items of computer equipment used by Mr Tamine in the course of his employment with Mr Brockman (including matters concerning SJTC and the Brockman Trust structure). All of this equipment, according to Mr Padula, belongs to Mr Tamine. Among these, the key items are those relating to what is referred to as the "encrypted server". This contains the data sought in the

5

investigations: the encrypted emails passing between Mr Brockman and Mr Tamine which apparently do not concern operational matters in regard to SJTC and the Brockman Trust structure.

14. The affidavit of Detective Superintendent Nicholas Pedro confirms that all of the Seized Material is currently in the possession of the BPS, but has not been reviewed pending the finalisation of the Protocol which has been under discussion between the Deputy Solicitor General, Counsel for Mr Tamine and Counsel for SJTC. The purpose of the Protocol was to provide an avenue in which all of the privileged material could be removed before forwarding the evidence to the US authorities. Additionally, it was decided that since this process was due to take place, any irrelevant material could be removed at this time.

15. The final version of the Protocol is contained in the letters from the Attorney General's Chambers dated 5 September 2019 and 10 December 2019 and it provides:

1. For the purposes of ensuring that no LPP Material is disclosed to the investigating team, all copied material will be forwarded to an independent professional reviewer, retained by the BPS, to ensure that all LPP Material is removed.

2. Given Mr Tamine's familiarity with the Seized Material he will, in the presence of the independent reviewer, remove all irrelevant, confidential and LPP Material. This is intended to be a sifting exercise and is not binding upon the reviewer in any way. Irrelevant material is defined as material that is personal to Mr Tamine and his wife Sophie Tod. Confidential material is considered to be any material which is not material associated with SJTC.

3. The decision of the reviewer in relation to LPP is final and the Protocol does not contemplate the parties making any further submissions to the reviewer or an application to the court in relation to this issue.

**Position of the parties**

16. The Applicants contend that the Protocol is ultra vires the BPS's statutory powers under POCA and/or PACE and/or is Wednesbury irrational, because:

   1. The Protocol interferes with the Applicants' fundamental rights to LPP because it permits Mr Tamine to have access to the Brockman Trust's and/or the Applicants' LPP Material, to review it and/or to take and retain copies of the same, which he has no right to read or take copies of.

   2. The Protocol provides for no process for identifying material falling outside the scope of the two warrants issued by the Court.

   3. There is a risk that Mr Tamine may not participate in the review process in good faith.

   4. The involvement of Mr Tamine will likely cause unreasonably long delays, since it is not likely to be possible for one person to review the huge volume of Seized Material in any reasonable time-frame.

17. The BPS contends that the Protocol complies with the essential requirements of the process designed to ensure that the investigating body does not see any LPP Material. In particular:

   1. Mr Tamine's involvement in the process has to be seen in the context of highly unusual facts in that, over many years, he was the sole or the principal generator and custodian of the Brockman Trust related documents now to be found in the Seized Materials. In particular, so far as there are documents in those materials which attract LPP, it is likely that it would have been him who was relevantly writing to lawyers, and receiving advice and documents from the lawyers (in his capacity as an employee and/or officer of SJTC).

2. What is paramount in search and seizure cases involving the presence, or possible presence, of LPP material is that the police and/or the investigating authority should not have access to such material. In such cases however it is inevitable that someone other than the putative holder of the LPP must look at the material. The Applicants appear to accept the need for an independent reviewer. Mr Tamine's anticipated role in an initial sorting exercise is in the same category.

3. It is no part of the reviewer's function under the Protocol to assess which documents fall properly to be transmitted to the DOJ pursuant to the request. The reviewer's function is to identify and remove LPP Material, and other non-Brockman Trust related material, of Mr Tamine and his wife; and identify and remove personal family material of Mr Tamine.

4. It is no part of the Protocol that Mr Tamine is to take or retain copies of any LPP Material.

5. The alleged lack of good faith on part of Mr Tamine does not give rise to any public law right of complaint and in any event these concerns are groundless as the highly experienced reviewer can be trusted to categorise material correctly.

6. The complaint in relation to undue delay is not understood. If the need arises, the Protocol does not prohibit the engagement of additional counsel to review the Seized Material.

18. Mr Tamine contends that the Applicants are asking the Court in these proceedings to "micromanage" the BPS's decision making with respect to the Protocol. In particular Mr Tamine contends:

1. Medlands has no right whatsoever to be provided with copies of the Seized Material pursuant to section 21 (4) of PACE.

8

2. The Protocol is entirely workable and, aside from the complaint with regard to privilege issues, Medlands' criticisms relate to the minutiae of the operation of the Protocol which there is no need for the BPS to set out in the Protocol itself.

3. In relation to the issue of privilege, Medlands can assert no privilege against Mr Tamine.

4. There is no risk of LPP Material being provided by Mr Tamine to third parties.

5. Mr Tamine's involvement will not cause "huge and unreasonable delays".

## Discussion

### *The relevant legal test*

19. The Applicants' main contention in these proceedings is that the BPS's decision to propose the Protocol is "*Wednesbury irrational*". This is a reference to the test for irrationality established by the English Court of Appeal in *Associated Provincial Picture Houses v Wednesbury Corp* [1948] 1 KB 223, per Lord Greene MR at 230:

> "*once it is conceded, as it must be conceded in this case, that the particular subject-matter dealt with by this condition was one which it was competent for the authority to consider, there, in my opinion, is an end of the case. Once that is granted, Mr. Gallop is bound to say that the decision of the authority is wrong because it is unreasonable, and in saying that he is really saying that the ultimate arbiter of what is and is not reasonable is the court and not the local authority. It is just there, it seems to me, that the argument breaks down. It is clear that the local authority are entrusted by Parliament with the decision on a matter which the knowledge and experience of that authority can best be trusted to deal with. The subject-matter with which the condition deals is one relevant for its consideration. They have considered it and come to a decision upon it. It is true to say that, if a decision on*

9

*a competent matter is so unreasonable that no reasonable authority could ever have come to it, then the courts can interfere."*

20. The Applicants do not contend that the implementation of a protocol designed to remove privileged and irrelevant material by an independent reviewer is, *per se*, unlawful. Indeed, the Applicants have proposed their own version of the protocol which they say is "*workable*" and seek an order "*directing the BPS to adopt and follow a protocol in the form proposed by the Plaintiffs*".

21. In this jurisdiction Subair Williams J sanctioned the use of the protocol in *A Law Firm and Estate of the Deceased v Commissioner of Police* [2018] Bda LR 27. In that case, the BPS had retained various electronic devices which were originally seized from the residence of the Deceased. Two of the three electronic items which were seized, namely a cell phone and a laptop computer, belonged to the First Applicant, a law firm where the Deceased was employed as a practising attorney immediately prior to his death. The third item seized was another laptop computer which belonged to the Deceased personally. At paragraph 58 of the Judgment, Subair Williams J approved procedural terms for the review of the seized electronic devices by an independent counsel which required, *inter alia*, that *"independent Counsel shall identify and isolate all data and information subject to legal professional privilege as defined by section 10 of PACE."*

22. It appears that the use of independent counsel is now routine in all the modern search and seizure cases. At paragraph 8 – 210 of *Privilege, Colin Passmore*, Fourth Edition, it is noted that: *"A practice has developed, apparently first devised by the Customs and Excise Commissioners, of applying to the Attorney General for him to nominate a member of the Bar to assist in resolving privilege disputes as they arise in the course of executing a search warrant. Counsel's role in such situations, as described by Smedley J in R v Customs and Excise Commissioners, Ex p. Popely [1999] S.T.C. 1016, includes sifting through the documents seized before a decision is made as to which of them should be retained."*

10

23. In the circumstances the challenge by the Applicants is not to the concept of utilising an independent counsel to identify and separate out LPP material, but to the detailed application of the concept to the facts of this case.

### *Scope of the Protocol and the Applicants' objections*

24. In considering the proper scope of the protocol, it is relevant to keep in mind the essential purpose of the exercise. In *R v Director of the SFO, ex p. McKenzie* [2016] EWHC 102 (Admin) Burnett LJ emphasised that the essential purpose of the exercise is to ensure that potential LPP material will not be read by members of the investigative team before it has been independently reviewed for LPP:

> *31. It is common ground between the parties that LPP is an important right jealously guarded by the common law. Lord Millett adverts to that proposition in the Bolkiah case and it is supported by a constant line of authority at the highest level. The SFO recognises the fundamental importance of safeguarding the LPP vested in those whose conduct it is investigating and from whom material has been seized or demanded. Both its policy and the 2013 Guidelines reflect that importance. The question remains what criterion should be applied at the sifting stage by an authority lawfully in possession of bulk electronic or hard copy documents which may contain LPP material, given the context in which it came into its possession.*

> *32. The essential aim of the SFO's policy is to ensure that LPP material relevant to an inquiry is not read by anyone involved in the investigation. That aim is uncontroversial, laudable and correct. But it would be imposing too onerous a legal obligation on an investigating authority, in the context of the exercise of statutory powers of seizure and production, to require it to demonstrate that there could be no real risk of that happening. It is inappropriate to equate a public body exercising statutory powers in connection with suspected crime with a solicitor who proposes to act against his former client. The material is lawfully in the possession of that public body acting in the public interest in investigating and prosecuting crime.*

11

*33. In the absence of a former solicitor and client relationship, but bearing in mind the great importance of legal professional privilege, the law must nevertheless require public authorities to have procedures in place which are intended to prevent investigators reading LPP material and which make it very unlikely that they will do so. The adoption of any test which has been developed in connection with the grant of injunctive relief in private law proceedings, particularly when the test is couched in terms that injunctive relief will issue unless a condition is satisfied, is likely be to inapt. The better approach is to identify the positive duty the law imposes upon a seizing authority to guard against the risk that an investigator will read a document protected by LPP.*

25. The essential purpose of the Protocol is to engage an independent reviewer who is professionally qualified to identify LPP Material, so that it is not seen by the BPS and is not included in the material provided to the DOJ pursuant to the Request. That essential purpose, it seems to me, is achieved by the Protocol. All parties appear to accept that the independent reviewer should be Rebecca Chalkley, a senior member of the English Bar, who is well qualified to undertake the responsibility. Indeed, Ms Chalkley acted as the independent reviewer in 2018 in the Bermuda case of *A Law Firm v The Estate of the Deceased* [2018] SC (Bda) 27 Civ. The Protocol provides that any material identified by Ms Chalkley as LPP Material will not be provided to the BPS and will not be forwarded to the DOJ pursuant to the Request. The Protocol complies with the essential requirements referred to by Burnett LJ in *McKenzie*.

26. The Applicants complain that the Protocol is unworkable because it does not provide for a process for identifying material falling outside the scope of the warrants. However, as *McKenzie* shows, it is no part of the reviewer's function to assess which documents fall properly within the scope of the warrant. The reviewer's function, under the present Protocol, is to identify and remove LPP Material of the Applicants; identify and remove LPP material, and other non-Brockman Trust related material, of Mr Tamine and his wife; and identify and remove personal family material of Mr Tamine. The remaining material will then be reviewed by the BPS in conjunction with the Central Authority, who will decide which documents and pieces of evidence fall within the scope of the Request, and

will forward the same to the DOJ. Accordingly, it seems to me, that this ground of challenge is not well founded.

27. The Applicants also complain that the Protocol does not provide any role for the Court in the process and in particular the Applicants contend that the issue of LPP can only finally be determined by the Court. Indeed, in the draft protocol proposed by the Applicants, it is provided that the reviewer's Report will be sent directly to the Court and the Court will consider whether the parties should see any part of the Report and whether to invite any further submissions. It further provides that if the Report categorises any material as coming within the fraud exception, the relevant party which would have been the holder of the LPP but for the fraud exception will have an opportunity to respond and have the issue determined by the Court. This will require the relevant party to see the material and the independent reviewer's reasons as to why the exception applies so that they can make effective submissions.

28. The judgment of Burnett LJ in *McKenzie* shows the obligation on the BPS is to devise and operate a system which can reasonably be expected to ensure that potential LPP material will not be read by members of the investigative team before it has been independently reviewed for LPP. Such a system does not require that the reviewer's decision in relation to LPP be subject to further reviews and/or appeals to the reviewer or the Court. Indeed, the Court should have no direct role to play in such a review carried out by an independent reviewer. A protocol, which provides for further reviews by the reviewer and appeals to the Court, is bound to cause undue delays and should be avoided.

29. There is no suggestion in *McKenzie* that the issue of LPP can only finally be determined by the Court. The Applicants rely on *R. (On the application of Van der Pijl) v Secretary of State for the Home Department* [2014] EWHC 281 (Admin) and *Akhmedova v Akhmedov* [2019] EWHC 3140 (Fam), but these two cases are not in point. These cases were not dealing with a standard review by an independent reviewer to identify and separate out LPP material. These were cases where the Court, for different reasons, necessarily had to decide whether the material in question was privileged. Thus, in *Van der Pijl*, having held that the warrant was unlawful, the Court had to decide whether the material could still be

13

used and in that context had to determine whether it was subject to LPP. These two cases do not support the proposition that in a standard review by an independent reviewer, as is envisaged in this case, the Court is bound to have a direct role to play in determining whether any material is subject to LPP.

30. In the circumstances all Reports of the reviewer should be sent directly to the BPS and the BPS should be able to act upon the findings of the review in relation to LPP.

31. The Applicants also complain about the role of Mr Tamine in the review process. As noted above this case presents unusual facts. Mr Tamine is not a complete stranger to the materials which have been seized by the BPS. It appears that over many years Mr Tamine was the sole or principal generator and custodian of the Trust related document which were kept at his residence together with substantial quantities of files and documents which were purely personal to him and his family.

32. Having regard to this background, it is reasonable that Mr Tamine should provide assistance to the reviewer in the initial sifting of the material. As explained by Counsel for the Defendant it is not anticipated that Mr Tamine will be reviewing individual documents but will be assisting in categorising the material into broad categories.

33. In the circumstances I am satisfied that the implementation of the Protocol will not result in a breach of the Applicants' LPP. In order to allay the Applicants' concerns I would recommend that, in the first instance, Mr Tamine should consider whether such assistance can be provided in writing and it should be left to the reviewer to decide whether a meeting with Mr Tamine is useful and desirable. In the event such a meeting takes place it would be appropriate for a lawyer, from the Applicants' London solicitors, to be present at that meeting.

34. The Applicants object to the Protocol on the additional ground that there is a risk that Mr Tamine does not participate in the review in good faith. I accept the Defendant's submission that these concerns do not give rise to any public law right or complaint. In any event, in the context of the proposed review, they are groundless as it is acknowledged by

14

all parties that Rebecca Chalkley, the reviewer, can be trusted to categorise material correctly. Accordingly, I consider that this ground is without any substance.

35. Finally, the Applicants believe that the involvement of Mr Tamine will likely cause unreasonably long delays. In argument, Counsel for the Applicants emphasised that the Defendant should be looking at engaging more junior barristers to provide the necessary capacity to conduct the review in a reasonable period of time. However, there is nothing in the Protocol which prevents either the Defendant or the reviewer from acquiring this additional capacity. Indeed, Counsel for the Defendant made it clear that the Defendant has an open mind in relation to this issue. Again, I conclude that this ground is without any substance.

36. In all the circumstances I have come to the view that the proposed Protocol provides a workable solution to identify and separate out the Applicants' LPP. Its operation does not breach the Applicants' LPP. I do not consider that the Protocol is irrational in the sense that no reasonable public body could ever agree to it and accordingly there is no proper basis for the Court to interfere with the Defendant's decision to implement it.

*Issue of Privilege*

37. The issue whether privilege asserted by the Applicants against Mr Tamine is relevant in two ways. First, if privilege can be asserted against him, the Applicants argue that to allow Mr Tamine to review the Seized Material interferes with the Applicants' fundamental rights to LPP (an issue dealt with at paragraphs 31 to 33 above).  Second, it affects the scope of Mr Tamine's right to obtain a copy of the material under section 21 (4) of PACE.

38. Mr Tamine's involvement with Mr Brockman and the Brockman Trust dates back to 2004. It appears that, as noted above, he was the principal generator and/or custodian of the Brockman Trust related documents now to be found in the Seized Materials. In relation to those documents in the Seized Materials which attract LPP, it is likely that it would have been Mr Tamine who was relevantly writing to lawyers, and receiving advice and document from the lawyers (in his capacity as an employee and/or officer of SJTC). The

15

Applicants point out, however, that the Brockman Trust has been in existence for approximately 30 years and Mr Tamine only came into the picture in 2004 and therefore there is the potential of existence of LPP Material in respect of which Mr Tamine had no involvement.

39. Counsel for Mr Tamine argues that LPP is not an issue to be burdened upon the BPS, and the BPS must not be made arbiters of third-party rights. LPP, it is said, is a private, civil law claim which, if it has any substance at all, can and should be pursued only in civil proceedings against Mr Tamine.

40. Section 21 of PACE provides:

> **"Access and copying**
>
> 21 (1) A police officer who seizes anything in the exercise of a power conferred by any enactment, including an enactment contained in an Act passed after this Act shall, if so requested by a person showing himself—
>> (a) to be the occupier of premises on which it was seized; or
>> (b) to have had custody or control of it immediately before the seizure, provide that person with a record of what he seized.
>
> (4) Subject to subsection (8), if a request for a photograph or copy of any such thing is made to the officer in charge of the investigation by a person who had custody or control of the thing immediately before it was so seized, or by someone acting on behalf of such a person, the officer shall—
>> (a) allow the person who made the request access to it under the supervision of a police officer for the purpose of photographing or copying it; or
>> (b) photograph or copy it, or cause it to be photographed or copied
>
> (8) There is no duty under this section to grant access to, or to supply a photograph or copy of, anything if the officer in charge of the investigation for the purposes of

16

which it was seized has reasonable grounds for believing that to do so would prejudice—

> (a) that investigation; the investigation of an offence other than the offence for the purposes of investigating which the thing was seized; or
>
> (b) any criminal proceedings which may be brought as a result of—
>
>> (i) the investigation of which he is in charge; or
>>
>> (ii) any such investigation as is mentioned in paragraph (b)."

41. Counsel argues that the terms of section 21 (4) appear to be mandatory and are not qualified by reference to the existence of LPP in respect of the Seized Material. The only requirement that the BPS has to be satisfied with is whether the applicant is "*a person who had custody or control of the thing immediately before it was so seized*".

42. I was initially attracted to this submission. However, it seems to me that PACE is very much concerned with the preservation of LPP. Section 8(1)(d) provides that on an application made by a police officer, a magistrate should only issue a warrant authorising a police officer to enter and search the premises if the magistrate is satisfied, *inter alia*, that the material on the premises does not consist of or include items subject to legal privilege. It is likely that the reason why section 21 (4) makes no reference to LPP is because the draftsman has assumed that the warrant issued by the magistrate could not apply to LPP material and therefore no LPP material has been seized by the Police.

43. In *R v Derby Magistrates' Court, ex p B* [1996] A.C. 487, Lord Taylor said: "*Legal professional privilege is thus much more than an ordinary rule of evidence, limited in its application to the facts of a particular case. It is a fundamental condition on which the administration of justice as a whole rests.*" I accept the submission made by the Applicants' counsel that LPP is not capable of being abrogated by statute unless by express words or necessary implication (See: paragraph 11.09 of *Matthews and Malek on Disclosure* (5th edition) where the cases of *R v IRC ex p. Morgan Grenfell* [2003] A.C. 563 and *Shlosberg v Avonwick Holdings Ltd* [2016] EWHC 1001 (Ch), [65]-[67] are cited). In my judgement the consideration of PACE as a whole and the particular provisions contained in section 21 do not seek to abrogate LPP by necessary implication.

17

44. Second, Counsel for Mr Tamine relies upon the facts that Mr Tamine was previously a director of SJTC, Spanish Steps, and Point Investments and in so far as there are any materials included in the Seized Materials over which those entities can properly assert privilege, Mr Tamine will have previously seen all such documents when he was a director of those entities and would, most likely, have been the very person involved in generating much of this material. In such circumstances, it is argued, that SJTC, Spanish Steps, and Point Investments cannot assert privilege as against Mr Tamine even though he is no longer a director of those companies and reliance is placed upon *Derby v Weldon (No. 10)* [1991] 1 WLR 660.

45. The common law position in relation to the issue of LPP is summarised in paragraph 5-05 of Matthews and Malek on Disclosure (5th edition):

> " *Slade J set out the principles for granting a director access to company records set out in* Conway v Petronius Clothing *[1977] 1 WLR 72 at 89-91: (i) the right of the director to inspect the accounting records of the company is a right conferred by the general law rather than by the provisions of the Companies Acts; (ii) the right is conferred by the general law in order to enable the director to carry out his duties as such; (iii) accordingly the right determines when the director ceases to hold office; (iv) under the general law the court is left with the residue of discretion whether or not to order inspection; (v) in particular, special considerations are likely to apply to the exercise of that discretion in a case where the director who seeks to assert the right is about to be removed from office.* "

46. The common law position was also considered by the Supreme Court of South Australia in *State of South Australia v Barrett* [1995] 13 ACLC 1369, and the court confirmed that a director's ability to access corporate documents at common law continued only as long as the director continued in office. That access was only for limited due diligence purposes, and not for any private or personal reasons. Directors' due diligence powers ceased when they left office.

47. The Supreme Court also held that the directors' common law ability to access corporate documents did not negate the existence of the company's legal professional privilege qua the directors; it only qualified it to the extent of a bone fide exercise of their powers so far as it was necessary to enable them to discharge their legal obligations. Mullighan J stated at 1,377:

> *"Assuming that the privilege did not apply against them when they were directors of the Bank, it does not follow that it could never apply against them. In my view once they ceased to be directors and no longer had the right of inspection, they were placed in the same position as any other person outside the Bank and the privilege applied against them. There is no reason in principle or logic to conclude that the situation which existed when the documents came into existence must remain forever. The appropriate time to consider whether the privilege extends to relevant persons is when it is claimed."*

48. On the basis of the above authorities, Counsel for the Applicants argues that after Mr Tamine ceased to be a director of the relevant companies, he was placed in the same position as any other person outside the relevant company and the Applicants could enforce their LPP against Mr Tamine in the ordinary way.

49. Counsel for Mr Tamine relies upon *Derby v Weldon (No.10)* [1991] 1 WLR 660 in support of the proposition that if a director has seen the privileged document in his capacity as a director then LPP cannot be asserted against him, even after he has ceased to be a director. In that case a senior in-house counsel prepared three memoranda which contained advice as to the steps that needed to be taken by the company to comply with the relevant regulatory body in the United States, the Commodities, Futures and Tradings Commission ("C.F.T.C."). The documents were plainly privileged and the issue was whether that privilege could be asserted against a director who had seen and considered that the documents in his capacity as a director. In relation to that argument Vinelott J said at page 670 F-H:

> *"Mr Purle submitted that privilege is not lost merely because a document is communicated by a company to an officer or employee. That is no doubt true where the question arises in litigation between the company and a third party. But it does not follow that the company can rely on the privilege attaching to, for instance, instructions and advice passing between the company and its solicitors, copies of which have been supplied to the director, if there is subsequently litigation between the company and the director and the advice or instructions are material to an issue raised in the litigation, for instance, if the question is whether the director acted in accordance with the directions of the company. The three documents in this category, as I see it, are material to the question whether Mr Weldon acted within guidelines laid down in negotiations with the C.F.T.C."*

50. It is to be noted that the formulation of the exception in *Derby v Weldon (No. 10)* does not replace the common law rule articulated in *Conway v Petronius Clothing*. The exception only operates when there is litigation between the company and the former director and the documents in question, which the director has previously seen, are *"material to the issue raised in the litigation"*.

51. In *Law of Privilege, Bankim Thanki QC, 3rd edition, Derby v Weldon (No. 10)* is analysed as an example of waiver of privilege. At paragraph 5.10 the general statement is made that *"The position between parties to litigation is more often analysed in terms of waiver of privilege than loss of confidentiality"* and at the end of that paragraph *Derby v Weldon (No. 10)* is cited as an example. That case is also cited as an example of waiver of privilege at paragraph 16.38 in *Matthew and Malek on Disclosure (5th edition)*.

52. On the basis of *Derby v Weldon (No. 10)* Mr Tamine would be able to take the position that privilege has been waived in relation to documents which he has seen whilst he was a director of the Applicant Companies and which are relevant to the issues in the pending proceedings between him and the Applicant Companies. However, it does not follow, in my judgment, that the entirety of the LPP material is the subject of waiver by the Applicant Companies. In this regard it has to be borne in mind that the Brockman Trust has been in existence for approximately 30 years and Mr Tamine has only been employed by Mr

20

Brockman since 2004. In the circumstances there must be a real possibility that there are privileged documents which are not subject to any waiver by the Applicants.

53. Third, Counsel for Mr Tamine argues that SJTC cannot assert privilege as against its member, Cabarita (PTC) Limited, of which Mr Tamine is the sole director and shareholder. The legal position relating to whether a company can assert privilege against a shareholder is summarised by Blackburne J in *Arrow Trading and Investment Est 1920 v Edwardian Group Ltd* [2005] 1 BCLC 696 at [24]:

> 24. *The company, through Mr Collings, opposes the application and does so on two grounds: first relevance and second privilege. I can dispose immediately of the privilege point. It is well established by authority that a shareholder in the company is entitled to disclosure of all documents obtained by the company in the course of the company's administration, including advice by solicitors to the company about its affairs, but not where the advice relates to hostile proceedings between the company and its shareholders: see* Re Hydrosan Ltd *[1991] BCLC 418 and* CAS (Nominees) Ltd & others v. Nottingham Forest Plc & others *[2001] 1 All ER 954. The essential distinction is between advice to the company in connection with the administration of its affairs on behalf of all of its shareholders, and advice to the company in defence of an action, actual, threatened or in contemplation, by a shareholder against the company.*

54. In paragraph 5-02 of *Matthews and Malek on Disclosure* (5th edition), the authors accept that this general rule is well established under English law although its basis is *"distinctly dubious"*. They say that the principle was established in the 19th century before cases such as *Salomon v Salomon* [1897] A.C. 22 drew a clear distinction between a company and its shareholders and held that the shareholders have no interest in the property of the company. Once the separation between the company and the shareholders had been established, the law should have changed but it did not. They point out that the Canadian courts have taken a different view and Australian authority, whilst not clear-cut, also suggests a contrary view.

21

55. Here, Mr Tamine is not a shareholder in SJTC or the Applicants. SJTC is wholly owned by Cabarita (PTC) Limited ("**Cabarita**") and Mr Tamine is the sole shareholder in Cabarita.

56. There is no authority which suggests that the rule should be extended to a shareholder of a shareholder in the company. The rule is partly based on the premise that shareholders are entitled to see the privileged documents in their capacity as shareholders (see the judgement of Simonds J in *W. Dennis and Sons, Limited v West Norfolk Farmers' Manure and* Chemical *Co-Operative Company, Limited* [1943] 1 Ch 220 at page 223). No such entitlement exists in a person in the position of Mr Tamine who is not a shareholder in the relevant company.

57. In the circumstances I conclude that the rule that a company cannot assert privilege as against a shareholder does not apply to Mr Tamine as he is not a shareholder in the relevant company. The rule does not, in my judgment, extend to a shareholder of a shareholder. The same analysis applies to the suggestion that the privilege does not exist because Mr Tamine is the sole director of Cabarita.

58. In conclusion, whilst *Derby v Weldon (No.10)* exception may apply to certain documents, it cannot be concluded with any degree of certainty that it applies to the entirety of the LPP material. Accordingly, there remains a real possibility that the Applicants may be able to assert privilege as against Mr Tamine in respect of some of the LPP material.

**Entitlement to a copy of the Seized Material pursuant to section 21 (4) of PACE**

*Claim to a copy of the Seized Material by Mr Tamine*

59. Counsel for Mr Tamine contends that Mr Tamine had custody or control of all of the Seized Materials immediately before they were seized within the meaning of section 21 (4) of PACE (set out at paragraph 40 above).

60. Counsel contends that leaving aside the issue of privilege, the only circumstance in which the provision of such copies could properly be refused is if the BPS had reasonable grounds for believing that to do so would prejudice a relevant investigation or criminal proceedings pursuant to section 21 (8) of PACE. It has not been suggested by the BPS in the present case that there is any basis for suggesting that any consideration under section 21 (8) of PACE could apply. Counsel for Mr Tamine submits that the BPS's decision not to provide copies to Mr Tamine was unlawful and/or irrational and it should be quashed.

61. In *B v B (Matrimonial Proceedings: Discovery)* [1978] Fam. 181, Dunn J considered the meaning of "custody" and "power" in the context of RSC Order 24 and stated at page 186:

> *""Custody" means" the actual, physical or corporeal holding of the document regardless of the right to its possession," for example, a holding of the document by party as servant or agent of the true owner. "Power" means "an enforceable right to inspect the document or to obtain possession or control of the document from the person who ordinarily has it in fact."*

62. Commenting on the above passage from the judgment of Dunn J in *B v B,* the authors of *Matthews and Malek on Disclosure (5th edition)* state at 5.63 that: "*Thus a company director who had the company's documents in his physical custody was obliged to give discovery of them if relevant, although such custody was only in his capacity as an officer of the company*".

63. It is common ground between the parties that as a result of the searches carried out by the BPS at Mr Tamine's home and at his personal storage facility in September and October 2018, a number of electronic devices and hardcopy documents were seized by the BPS. In the circumstances it must follow that immediately before the seizure of the Seized Materials, Mr Tamine had custody or control of all those materials. In principle, subject to the issue of LPP, Mr Tamine is entitled to a copy of the Seized Materials.

64. Counsel for the Applicants relies upon a passage at paragraph 15–148 in *Archbold: Criminal Pleading, Evidence and Practice*, 2020, stating that " *where company documents*

23

*are seized the person who may ask the police for access to them or for copies of them under s.21(3) and (4) as having had "custody or control" of the documents immediately before their seizure is the company itself, the directors or former directors of the company do not possess the right in their capacity as such: see Re D.P.R. Futures Ltd [1989] 1 W.L.R. 778, Ch D."*

65. Having regard to this passage in *Archbold* and the reliance placed on it by Counsel for the Applicants, it is necessary to consider closely the facts and reasoning in *D.P.R. Futures*. In that case the Securities and Investment Board (the "SIB") issued a notice of prohibition against the company on 11 July 1988. On the same date the SIB authorised an investigation into the company's affairs. On 15 July 1988 a winding up petition was presented to the court by the SIB and on the same day the official receiver was appointed provisional liquidator of the company. On 12 October 1988 a compulsory winding up order was made and on the same date many of the books and records of the company were removed from the company's premises by the Serious Fraud Office.

66. In the circumstances, it is to be noted that by the time the seizure of the company's documents took place on 12 October 1988 the directors of the company had already lost their powers on 15 July 1988 when the official receiver was appointed provisional liquidator. Accordingly, at the time of the seizure of the company's documents, they were not in the custody or control of the directors. Second, the documents were taken not from the premises of the directors but taken from the company's business premises. Third, this case did not involve an application under section 21 (4) of PACE or an application by the directors in their capacity as directors. This was in fact an application in their capacity as contributories of the company in the winding up process under section 155 of the Insolvency Act 1986. Under this section the court has a discretion whether to provide disclosure or not. The application under section 155 was refused on the grounds that contributories were not seeking documents for the purposes of the winding up but to defend their position against the SFO and further because the documents were plainly not in the possession of the company at the time of the application.

24

67. In my judgment this case is of no assistance in relation to an application for a copy of the documents under section 21 (4) of PACE and the facts of this case where documents are plainly in the custody of a director and are taken from the director's residence.

68. In the circumstances, I order that Mr Tamine be provided with a copy of the entire Seized Materials within a reasonable period of time other than documents and information in respect of which the Applicants are able to claim LPP. In this regard I record the undertaking given on behalf of Mr Tamine that all the material delivered to him will be preserved and a copy will be kept by his London solicitors, Mishcon de Reya.

*Claim to a copy of the Seized Material by Medlands*

69. In the Originating Motion, the Applicants seek a direction that the Brockman Trust documents be provided to Medlands and/or the previous trustee pursuant to section 21 (4) of PACE with any disputes about ownership dealt with pursuant to Court directions. At paragraph 15 of the grounds set out in the Originating Motion, Medlands asserts that *"the BPS agreed to provide copies of the Materials to the Trust and/or Mr Tamine pursuant to the right of owners under section 21 (4) PACE to be provided with copies"*.

70. In fact, as Counsel for Mr Tamine correctly submitted, there is no right of owners to be provided with copies of the Seized Materials under section 21 (4) of PACE. The entitlement to a copy of the Seized Material under section 21 (4) is confined to *"a person who had custody or control of the thing immediately before it was seized"*. Ownership of the Seized Material does not qualify a person to obtain a copy of the seized material under section 21 (4). What has to be proved is that the applicant had *"custody or control"* of the Seized Materials immediately before they were seized.

71. I accept the submission that in this case, Medlands cannot have had custody or control of the Seized Materials immediately before they were seized because Medlands was only incorporated in July 2019 and therefore it did not exist at the time when the Seized Materials were seized in September and October 2018.

25

72. Counsel for the Applicants argued that the entitlement to receive a copy of the Seized Material under section 21 (4) was a chose in action which was capable of transmission as with any other right. Counsel argued that any right to obtain a copy of the Seized Materials which belonged to SJTC had been transmitted to Medlands when Medlands was appointed as successor trustee on 19 December 2019. I am unable to accept this submission. It seems to me that the right of a person to make a request for a copy of the Seized Materials under section 21 (4), is a public law right rather than a private law property right which is capable of being transmitted or assigned to a third party. The Court of Appeal decision in *Allen v Chief Cheshire Constable* of [1988] Lexis Citation 2350 makes clear that a claim to enforce rights under section 21 (4) "*is an application to enforce a public law right, whether or not it gives rise to a private right as well*".

73. In the circumstances, I conclude that Medlands has no enforceable rights for a copy of the Seized Materials under section 21 (4) for the reason that Medlands did not have "*custody or control*" of the Seized Materials immediately before they were seized. Any rights possessed by SJTC to obtain a copy under section 21 (4) were public rights and not capable of transmission to Medlands on its appointment as the successor trustee on 19 December 2019.

### Claim to a copy of the Seized Material by SJTC

74. There is no formal application by SJTC for an order that it be provided with a copy of the Seized Materials. Whilst added as an Interested Party, SJTC was not represented at the hearing and did not make any written submissions.

75. It should be noted that the Protocol contemplates that a copy of certain documents would be provided to SJTC. The letter from the Attorney General's Chambers dated 5 September 2019 provides that "*once the irrelevant, confidential and LPP material has been removed, the remaining documents will be forwarded to SJTC.*" Irrelevant material is defined as "*material that is personal to Evatt Tamine and his wife Sophie Tod. This material will be divided into 2 batches; (a) family items such as photos and movies; and (b) Evatt Tamine's financial information such as banking and investment data.*" Confidential material is

26

defined as "*any material which Evatt Tamine knows, considers or ought upon reasonable enquiry or examination, believes is not material associated with SJTC*".

76. Counsel for the Applicants points out that this part of the Protocol has not been challenged by any party and accordingly, stands to be implemented by the BPS. It is of course open to the BPS to comply with the representations made on its behalf in the letter from the Attorney General's Chambers dated 5 September 2019. Barring a change in circumstances, SJTC would have an expectation that the BPS would comply with the representations made in the final paragraph of the letter from the Attorney General's Chambers dated 5 September 2019 and in the ordinary course the BPS would be expected to honour such expectations.

77. It is possible that if an application was made by SJTC for a copy of the Seized Materials, it could establish that it had "*control*" over the documents or information belonging to the Brockman Trust on the basis that it had an immediate right of access to the documents and the information in question. It may also be able to establish "*control*" as a consequence of its alleged ownership of the servers, a factual issue which is in dispute. However, as the issue has not been argued by SJTC, the Court is not in a position to finally determine this issue.

**Conclusion**

78. In the circumstances I reject the Applicants' application that the Defendant's decision to implement the Protocol be quashed. I see no reason why the Protocol should not be implemented.

79. Going forward any representations made by any party to the reviewer should be made on an open basis and the correspondence should be copied to the other parties (other than correspondence in relation to the application of the fraud exception). This applies to any and all representations already made by the parties to the reviewer.

80. All the Reports of the reviewer should only be sent to the BPS and the BPS is entitled to rely upon those Reports in relation to the determinations made concerning the existence of LPP. This also applies to work already carried out by the reviewer and any Reports prepared or to be prepared in relation to that work. I direct the reviewer to provide the existing Report to the BPS without any further delay.

81. If the reviewer considers that the volume of the material to be reviewed justifies the engagement of additional junior barristers, the reviewer should make such a request to the BPS. Given that it is nearly two years since the DOJ Request was received by the Bermuda authorities the Court directs that any remaining steps required to comply with the Request be taken expeditiously.

82. I will hear the parties in relation to the issue of costs, if required.

Dated this 26 March 2020

NARINDER K HARGUN

CHIEF JUSTICE

28

# GOV

# EXHIBIT

# 27

[2021]SC (Bda) 90 Com (17 November 2021)



# In The Supreme Court of Bermuda

**CIVIL JURISDICTION**
**COMMERCIAL COURT**
**COMPANIES ACT (WINDING UP)**
**2020: No. 300**

**BETWEEN:**

**SPANISH STEPS HOLDINGS LTD.**

**Petitioner**

**- and -**

**POINT INVESTMENTS LTD.**

**Respondent**

---

**Before:**          **Hon. Chief Justice Hargun**

**Representation:**   **Mr. Keith Robinson of Carey Olsen Bermuda Limited for the Petitioner**

**Mr. Mark Diel, Ms. Katie Tornari and Mr. Christopher Snell of Marshall Diel & Myers Limited for the Respondent**

**Date of Hearing: 29 October 2021**          **Date of Judgment: 17 November 2021**

**Government Exhibit**
27

# JUDGMENT

**<u>Hargun CJ</u>**

## Introduction

1.  At the conclusion of the hearing on 29 October 2021 the Court ordered that Andrew Childe and Richard Lewis of FFP Limited, Cayman Islands and Mathew Clingerman of Krys Global, Bermuda be appointed as Joint Provisional Liquidators ("**JPLs**") of Point Investments, Ltd ("**the Respondent**") and that the powers of JPLs shall not be limited, pursuant to section 170(3) of the Companies Act 1981 ("**the Act**").

2.  This Judgment sets out the Court's reasons for the appointment of JPLs and also deals with the Respondent's application seeking, *inter alia*, a validation order pursuant to section 166(1) of the Act.

3.  In support of these applications the Petitioner relied upon three affidavits of Kiernan Jane Bell, a former director of the Petitioner, and three affidavits of Peter Goddard, a director of BCT Directors Limited, which is now the sole director of the Petitioner. The Respondent relied upon seven affidavits of James Alexander Fortescue Watlington, a director of the Respondent.

## Background

4.  The background to these winding up proceedings is helpfully set out in the written submissions prepared by Mr. Robinson on behalf of the Petitioner.

5.  The Petitioner is ultimately wholly owned by the trustee of the A. Eugene Brockman Charitable Trust ("**the Trust**"). While the Respondent commenced its existence as a BVI company, it became a Bermuda company on 30 November 2009. The Respondent is thus a corporate investment vehicle for the Petitioner and ultimately the Trust. It continues to

2

hold at the date hereof extremely valuable assets (in the region of US$1.8 billion) the vast majority of which are represented by investments in Cayman Islands funds.

6.   The share structure of the Company is unusual and means that the Petitioner, while holder of all of the economic interest in the Respondent (save for US$100) represented by 4,900,000 common shares of par value US$0.001, has no right to vote its shares. The holder of the single "Manager Share" with par value of US$100 has all of the voting power (bye-law 4(1)).

7.   The Trust has been embroiled in extensive litigation in Bermuda and the United Kingdom since 2018. The beneficiaries of the Trust are certain members of the Brockman family, including Robert Brockman, and charity.

8.   The trustee of the Trust is BCT Limited ("**BCT**" or "**the Trustee**") which is a controlled subsidiary of Maples FS Limited. BCT was appointed as trustee of the Trust in place of Medlands PCT Limited ("**Medlands**") by Order of the Court of Appeal dated 2 February 2021 with its appointment to take effect on such date and on such terms as Justice Subair Williams was to appoint. Justice Subair Williams, by Order dated 26 March 2021, appointed 1 April 2021 as the date on which BCT would commence its trusteeship of the Trust. While BCT is a Cayman Islands company, it has irrevocably submitted to the jurisdiction of this Court with respect to the administration of the Trust.

9.   The Petition was presented on 16 September 2020 at which point in time the shares of the Petitioner were ultimately held by Medlands as trustee of the Trust and the Board of the Petitioner was made up of Medlands' appointees. Medlands had also been appointed by Order of the Supreme Court dated 19 December 2019. Upon BCT's appointment as trustee, the Board of the Petitioner was changed and is now made up of BCT's nominees.

10.   Medlands was appointed as trustee in place of St Johns Trust Company Limited ("**SJTC**") which had been in office since 1995. By Order dated 19 December 2019 Subair Williams J declared that SJTC had not been properly appointed as trustee of the Trust and rather had at all material times been a trustee *de son tort*.

11. Prior to 28 September 2018, Mr. Evatt Tamine had been a director of SJTC together with Mr. James Gilbert. Mr. Tamine was also, until 28 September 2018, a director of the Respondent. On that date, Mr Tamine resigned, *inter alia* , from these directorships. Mr. Tamine had been a director of SJTC from 2010 until 28 September 2018 and the sole director of SJTC between 2013 and 23 June 2017.

12. While Mr. Tamine had resigned his directorship of SJTC, he had not relinquished control of the shareholding of SJTC that was held via a Nevis company called Cabarita. In events which have been examined in the Judgment of this Court dated 26 March 2020 (2019 No. 447), Mr. Tamine used his ultimate control of SJTC to appoint Mr. James Watlington and Mr. Glenn Ferguson as directors of SJTC. Messrs. Watlington, and Ferguson remain in this position today.

13. The Petitioner and BCT are pursuing proceedings in this Court against Mr. Tamine and his associated company, Tangarra Consultants Limited (2018 No. 300), for the return of approximately US$28 million which it is alleged to have been taken wrongfully by Mr Tamine from the Trust while he had control over SJTC. Mr. Tamine has denied any wrongdoing in this regard.

14. SJTC unsuccessfully appealed the order of 19 December 2019 to the Court of Appeal. It was in these Court of Appeal proceedings in which BCT was appointed as an independent fiduciary to take over the trusteeship. The Court of Appeal has dismissed SJTC's appeal with reasons which are awaited. Mr. Tamine intervened in the Court of Appeal proceedings and supported SJTC's (unsuccessful) appeal.

15. SJTC has filed an application seeking leave to appeal to the Privy Council. Accordingly, the present position is that whilst Mr. Watlington and Mr. Ferguson are continuing with SJTC's proposed appeal (in which Marshall Diel & Myers Limited ("**MDM**") are SJTC's counsel) by which they seek to remove BCT as trustee of the Trust, they also remain the sole directors of the Company and thus control one of the Trust's most valuable assets.

16. Mr. Watlington and Mr. Ferguson also owe their position as directors of the Respondent to Mr. Tamine, mirroring the position with SJTC. The holder of the Manager Share in the

4

Respondent is another Nevis company, Point Investments LLC ("**PI LLC**"). The shares of PI LLC are held by the Point Purpose Trust the trustee of which the Petitioner understands to be or to be controlled by Mr. Tamine.

17. Mr. Tamine has denied in correspondence that the Manager Share is held ultimately and beneficially for the Trust but does accept that the Respondent is an asset of the Trust. In a memorandum sent by Mr. Tamine, in his capacity as a director of the Respondent, to PwC dated 13 August 2017 Mr. Tamine advised PwC that "*Point Investments Limited ... is a closely held investment vehicle for Spanish Steps Holdings Ltd, which in turn is an asset and investment holding vehicle for the A. Eugene Brockman Charitable Trust*."

18. Mr. Tamine is presently a co-operating witness with the United States Department of Justice in respect of the prosecution of one of the beneficiaries of the Trust, Mr. Robert Brockman. It appears that Mr. Tamine has received immunity from prosecution by the United States' authorities.

19. The directors of the Respondent have made it clear in the affidavit evidence filed by Mr. Watlington that they consider that it is their duty to remain in office so that they, rather than the JPLs as officers of the Court, can deal with any claim, which has yet to be brought, but which may be brought by the United States authorities against the Respondent.

**The Petition**

20. The winding up Petition in this matter was presented by the Petitioner on 16 September 2020. The Court should note that there is an outstanding application filed by the Respondent on 11 August 2021 seeking a declaration that the parties agreed that the Petition will be withdrawn and in the circumstances the Court should either dismiss or alternatively strike out these proceedings on the grounds that they or vexatious and/or an abuse of process. Mr. Watlington in his third affidavit accepts that it would be open to the Petitioner to withdraw this Petition, on the terms agreed *inter partes* in December 2020 and file a fresh Petition making the same allegations.

21. It appears to the Court that it is a pointless exercise to require the Petitioner to withdraw this Petition and to refile a fresh Petition in identical terms. Such a course would be wholly wasteful of the parties' resources and contrary to the Overriding Objective. The Court of course accepts that the Respondent may wish to, if so advised, pursue an application for wasted costs or agreed costs arising out of the alleged agreement to withdraw the Petition.

22. The Court should also mention that there is an outstanding application dated 11 August 2021 seeking leave to amend the Petition. Some of the proposed amendments seek to update the Petition to plead circumstances giving rise to change of control over the Petitioner.

23. Paragraph 19A of the draft Amended Petition pleads that, subsequent to BCT's appointment, it called upon Mr. Tamine (via his ultimate control of the holder of the Manager Share in the Respondent) to transfer the Manager Share to a nominee of BCT's choosing. Mr. Tamine has refused to do so asserting that BCT has no right to demand the transfer of Manager Share and asserting that his role in respect of the Manager Share did not arise as a result of his role as a director of SJTC.

24. Paragraphs 57-59 of the draft Amended Petition plead that by letter dated 12 May 2021 MDM forwarded to the Petitioner's counsel a letter from Mr. Tamine's counsel by which he asked for an indemnity against the Respondent purportedly pursuant to bye-law 99 the Respondents bye-laws. It is in excess of US$10 million and relates to Mr. Tamine's legal fees in respect of the DOJ's investigation, the Bermuda police service investigation, an investigation conducted in Switzerland, and proceedings before the Supreme Court of Bermuda 2018 No. 390 and 2020 No. 37.

25. The Petition alleges that given that Mr. Watlington and Mr. Ferguson were appointed by PI LLC, a company controlled by Mr. Tamine, they owe their office to, and could be removed by, Mr. Tamine procuring the voting of the Manager Share. The Petitioner alleges that Mr. Watlington and Mr. Ferguson thus operate under a disabling and incurable conflict of interest and the Board of the Respondent is thus unable to adjudicate on the claim for an indemnity made by Mr. Tamine.

26. Whilst the application to amend the Petition remains outstanding it is highly unlikely that the Court can properly refuse the Petitioner's application to amend the Petition.

27. In addition to the amendment sought in the draft Amended Petition, the evidence filed in support of the Petition asserts that as a result of steps taken by the current directors of the Respondent:

   (1) The Petitioner has been prevented from withdrawing its investment in the Respondent;

   (2) The Petitioner and the Trustee are unable to access US$3 billion of the Trust's assets, including effectively all of the Trust's liquid assets (more than US$1.4 billion), which are the source of the liquidity required for payment of the Trust's routine operational and legal outgoings and expenses as well as meeting the Trust's charitable commitments;

   (3) The former Trustee was forced to pursue alternative funding to meet the charitable commitments due in Q3 2020 at an additional cost to the Trust of US$5 million to avoid harm to the institutions, students and medical research supported by the Trust, and irreparable damage to the Trusts reputation;

   (4) The Trust has had to reduce the level of charitable commitments, which would have involved making over US$40 million of charitable donations during the period September 2020 to  September 2021;

   (5) The Respondent has failed to meet the capital call in respect of at least one of the funds in which it is invested which would have serious consequences for it, and accordingly to the assets of the Petitioner and the Trust.

28. The Petitioner prays that in all the circumstances, it is just and equitable that the Respondent should be wound up. In particular:

(1) The sole purpose of the Respondent is to act as an investment vehicle for the Petitioner and the Petitioner holds all of the economic interest in the Respondent. The Trust owns the Petitioner.

(2) The Trust and the Petitioner desired to terminate the Respondent's role as an investment vehicle for the Petitioner such that the Respondent has no continuing purpose and/or there has been a failure of the Respondent's substratum.

(3) Without proper justification and in breach of their duties to the Respondent, the Board of the Respondent (Mr. Watlington and Mr. Ferguson) have refused to redeem the Common Shares in accordance with the redemptions by, amongst other things, improperly purporting to suspend the Respondent's NAV.

(4) Without proper justification and in breach of their duties to the Respondent, the Board of the Respondent have caused the Petitioner's bank accounts with Bank Mirabaud and Bank of Singapore to be frozen (and thereby caused the Trust to incur additional costs of approximately US$5 million in order to meet certain of its charitable commitments and to reduce the level of the Trusts charitable commitments).

(5) Without proper justification, the Board of the Respondent have caused the Respondent to refuse and/or fail to provide information to the Petitioner relating to the affairs of the Respondent in circumstances where the Petitioner holds effectively all the economic interest in the Respondent.

(6) There is at present no effective management in relation to the affairs of the Respondent and the Petitioner has a justifiable lack of confidence relating to the affairs of the Respondent.

(7) Any winding down of the affairs of the Respondent should be carried out under the control of independent officeholders as officers of the Court.

**Jurisdiction to appoint provisional liquidators**

29. Legal principles with respect to the appointment of provisional liquidators following the presentation of the winding up petition were recently summarised by the Court in *Raswant v Centaur Ventures Ltd & Ors* [2019] SC (Bda) 55 Com (a contributory's petition) as follows:

> ***"The legal regime for the appointment of provisional liquidators***
>
> > 7. *The statutory basis for the appointment of provisional liquidators is to be found in section 170(2) of the Act and rule 23(1) of the Companies (Winding-Up) Rules 1982.*
> >
> > 8. *Section 170(2) provides that:*
> >
> > > *"the Court may on the presentation of a winding-up petition or at any time thereafter and before the first appointment of a liquidator appoint a provisional liquidator who may be the Official Receiver or any other fit person"*
> >
> > 9. *Rule 23(1) of the Companies (Winding-Up) Rules 1982 provides that:*
> >
> > > *"After the presentation of a petition for the winding-up of a company by the Court, upon the application of a creditor, or a contributory, or of the company, and upon proof by affidavit of sufficient ground for the appointment of a provisional liquidator, the Court, if it thinks fit and upon such terms as in the opinion of the Court shall be just and necessary, may make the appointment."*
> >
> > 10. *The appointment of provisional liquidators is an exercise of judicial discretion.  In exercising that discretion, the courts in Bermuda (<u>Re CTRAK Ltd</u> [1994] Bda LR 37 (Ground CJ); <u>Discover</u> <u>Reinsurance Co</u>*

*v PEG Reinsurance Co Ltd [2006] Bda LR 88 (Kawaley J); and BNY AIS Nominees Ltd v Stewarship Credit Arbitrage Fund Ltd [2008] Bda LR 67 (Bell J)), have followed the guidance given in the judgment of Sir Robert Megarry in Re Highfield Commodities Ltd [1984] 3 All ER 884, at 892-893 in following terms:*

> *"At the outset let me say that I accept that the court will be slow to appoint a provisional liquidator unless there is at least a good prima facie case for saying that a winding-up order will be made: see Re Mercantile Bank of Australia [1892] 2 Ch 204 at 210, Re North Wales Gunpowder Co [1892] 2 QB 220 at 224.  Founding himself on cases such as Re Clifoden Benefit Building Society (1868) LR 3 CH app 462 (where the words 'in general' should be noted) and Re London and Manchester Industrial Association (1875) 1 Ch D 466, counsel for HCL contended that if the company opposed the application for the appointment of a provisional liquidator, no appointment would be made (and any ex parte appointment would be terminated) unless either the company was obviously insolvent or it was otherwise clear that it was bound to be wound up, or else the company's assets were in jeopardy, as seems to have been the case in Re Marseilles Extension Rly and Land Co [1867] WN 68.*

> *……………*

> *I do not think that the old authorities, properly read, had the effect of laying down any rule that the power to appoint a provisional liquidator is to be restricted in the way for which counsel for HCL contends. No doubt a provisional*

*liquidator can properly be appointed if the company is obviously insolvent or the assets are in jeopardy; but I do not think that the cases show that in no other case can a provisional liquidator be appointed over the company's objection.   As the judge said, s. 238 is in quite general terms.   I can see no hint in it that it is to be restricted to certain categories of cases.   The section confers on the court a discretionary power, and that power must obviously be exercised in a proper judicial manner. The exercise of that power may have serious consequences for the company, and so a need for the exercise of the power must overtop those circumstances.   In particular, where the winding-up petition is presented because the Secretary of State considers that it is expedient in the public interest that the company should be wound up, the public interest must be given full weight, though it is not to be regarded as being conclusive.*

11. *I accept the submission that Highfield Commodities makes clear that the categories of cases in which it would be appropriate to appoint a provisional liquidator are not closed.   Indeed this is demonstrated by the practice in this Court of appointing provisional liquidators to facilitate restructuring where the Company is in the "zone of insolvency" (see Discover Reinsurance, per Kawaley J at [18], [19])."*

## Application for the appointment of JPLs

### *Ability of the Trustee to manage Trust property*

30. In his oral submissions Mr. Robinson referred to the fundamental duty of a trustee to gather, control and manage trust property. Mr. Robinson referred to Mr. Tamine's decision not to

transfer the Management Share to the Trustee of the Trust which results in an entirely unsatisfactory position that the Trust assets are not managed by the Trustee or individuals appointed by the Trustee but by individuals whom the trustees consider "*lack bona fides…have profited very considerably from the personal fees that they have disgorged from [the Respondent] while at the same time committing serious breaches of fiduciary duty*"[1]. In paragraph 41 his first affidavit Mr. Goddard states that the Petitioner considers that "*Mr. Watlington and Mr. Ferguson had breached their fiduciary duties as directors of [the Respondent] and should be personally accountable to [the Respondent] for all of the legal costs incurred in [the Respondent's] opposition to this Petition*."

31. As Mr. Goddard explains in his first affidavit, the renewed pursuit of this Petition by the Petitioner (under its new management) has been necessitated by the conduct of Mr. Tamine, the Respondent, and its directors, Mr. Watlington and Mr. Ferguson. Faced with the concerted resistance by the parties that have no material economic interest in the shares of Respondent, the winding up of the Respondent represents the only legal mechanism by which the Petitioner (on behalf of the Trust) can recover over US$3 billion of assets (according to the financial statements prepared by the Respondent) to which the Petitioner is lawfully entitled as the sole economic shareholder of the Respondent.

32. As noted earlier, Mr. Tamine has acknowledged in his memorandum of 13 August 2017 and to PwC that the Respondent "*is a closely held investment vehicle for Spanish Steps Holdings Ltd, which in turn is an asset and investment holding vehicle for the A. Eugene Brockman Charitable Trust*." In the circumstances it is difficult to understand the sworn evidence of Mr. Watlington when he says in his second affidavit at paragraph 17: "*Ms. Bell in her evidence proceeds on the misconception that we as directors owe duties to [the Petitioner] (which we do not) and that the assets of [the Respondent] are trust assets (which they are not)."*

---

[1] Paragraph 6 of the letter from Carey Olsen Bermuda Limited ("**Carey Olsen**"), attorneys for the Petitioner, to Marshall Diel & Myers, attorneys for the Respondent dated 24 September 2021.

33. I accept Mr. Robinson's submission that in order to hold a trustee accountable as a trustee the Court must ensure that the trustee is able to gather, control and manage the trust property. It would be an abdication of this Court's inherent jurisdiction to supervise the administration of trusts to allow a situation to arise and/or continue where the entire corpus of the trust (in excess of US$3 billion) is managed by individuals whom the trustee considers, by sworn evidence before the Court, not to be fit and proper individuals to be in that position.

*Opposition to the Petition by the Respondent in these proceedings*

34. Bermuda and English authorities dealing with unfair prejudice petitions establish the position that in principle a company should take a neutral position in relation to the relief sought in the petition and should avoid the expenditure of the company's funds in opposition to the petition. I accept Mr. Robinson's submission that the same principles apply to a contributory's petition based upon the just and equitable ground.

35. The position under Bermuda law is made clear in the judgment of Kawaley J (as he then was) in *Westport Trust Co Ltd v Paragon Trust Ltd* [2010] Bda LR 35 at [16]-[18]:

> *"16. The proposition that a company ought not expend its funds save for legitimate corporate purposes was supported as a broad general principle by reference to the principle articulated in <u>Pickering v Stephenson</u> (1872) LR 14 Eq 322 at 340 , "that the governing body of a corporation, that is in fact a trading partnership, cannot, in general, use the fund of the community for any purpose other than those for which they were contributed." However, the narrower principle of the impropriety of a company expending its funds to respond to a section 111 petition was supported by a number of dicta, most robustly the following observations of Harman J in <u>Re a Company No. 004502 of 1988, ex parte Johnson</u> [1991] BCC 234 at 236-237: "**The train of authority being well established, it seems to me quite clear that, if it is shown that directors of a company have been causing the company's money to be spent on financing the company's resistance either to a 'pure' sec. 459 petition or, according to Plowman J in Re A &BC Chewing Gum and myself in***

*Re Hydrosan*, **in financing the company's resistance to a member's winding-up petition based on the just and equitable ground, the court should prevent such expenditure. Such expenditure is a misfeasance, there is no excuse for it in law and it is not a question of an arguable case being raised showing that it may be right to permit misfeasances. Misfeasances are not matters that are permitted by the courts and there is no question of an arguable case at all**."

17. *Implicit from a reading of the earlier portions of Harman J's judgment is that* **the company's participation at its own expense is not justified where it is "a nominal party to the sec 459 petition, but in substance the dispute is between two shareholders"**: *per Hoffman J in* <u>Re Crossmore Electrical and Civil Engineering Ltd.</u> *(1989) 5 BCC 37 at 38. The question of whether or not "in substance the dispute is between two shareholders" clearly turns on the facts of each case, a point which the principal authority relied upon by Mr. Marshall clearly illuminated. The following principles apply to deciding whether a company's participation in the English equivalent of our own section 111 petitions, according to Lindsay J in* <u>Re a company (No. 1126 of 1992)</u> *[1994] 2 BCLC 146: "Firstly, there may be cases (although it is unlikely nowadays when wide objects clauses are the norm) where a company's active participation in or payment of its own costs in respect of active participation in a s459 petition as to its own affairs is ultra vires in a strict sense. Secondly, leaving aside that possible class, there is no rule that necessarily and in all cases such active participation and such expenditure is improper. Thirdly, that the test of whether such participation and expenditure is proper is whether it is necessary or expedient in the interests of the company as a whole (to borrow from Harman J in ex p Johnson). Fourthly, that in considering that test the court's starting point is a sort of rebuttable distaste for such participation and expenditure, initial scepticism as to its necessity or expediency.* **The chorus of disapproval in the cases puts a heavy onus on a company which has actively participated or has so incurred costs to satisfy the court with evidence of the necessity or expedience in the particular case**. *What will be necessary to discharge that onus will obviously vary greatly from case to case. Fifthly, if a company seeks approval by the court of*

14

*such participation or expenditure in advance then, in the absence of the most compelling circumstances proven by cogent evidence, such advance approval will obviously vary greatly from case to case."*

*18. Although the fifth point is not applicable to the present case, I find the above statement of principles to be highly persuasive and the fourth point to be of particular relevance to the present case. The starting point is for this Court to be sceptical about the need for the Company's participation."*

36. Following the presentation of the Petition to the Court MDM set out the position of the Respondent (as determined by Mr. Watlington and Mr. Ferguson) in a letter to Wakefield Quin, the Petitioner's then attorneys, that the Respondent would be opposing the application to appoint JPLs and would also oppose the winding up petition:

> *"**Following discussions with the US Department of Justice (the DOJ), our client has instructed us that they wish to contest both Spanish Steps Holdings Ltd's (SSH's) application for the appointment of Joint Provisional Liquidators (the JPLs) and SSH's Winding Up Petition**...the DOJ has never agreed to, acquiesced or concurred with the proposed liquidation of [the Respondent] and that the **DOJ does in fact object to the liquidation and/or dissipation of assets currently held in the [Respondent's] name**..."*

> *"There is no risk at all of [the Respondent] being insolvent so there can be no sensible objection to a Validation Order - which of course is only required because of **your client's misconceived ruse of presenting its Winding Up Petition**."*

37. In paragraph 36 of his first affidavit Mr. Goddard states that in a short 6-week period between 24 September 2020 and 7 November 2020, the Respondent spent a "*staggering*" amount of $261,062.44 in legal costs which the Petitioner considers is a totally unwarranted and constitutes misfeasance on the part of Mr. Watlington and Mr. Ferguson.

38. In paragraph 24 of his first affidavit dated 27 October 2020 Mr. Watlington advises the Court that "*In terms of an estimate of future legal fees, **I estimate that they will be approximately $900,000 to the hearing of the Petition. This estimate includes the costs of MDM and Leading Counsel in preparing for the hearing relating to the Petitioner's application to appoint JPLs on the 20 November 2020, preparing replies to the Petition and three affidavits of Kiernan Bell and preparing for the hearing of the Petition in early 2021***, and advising [the Respondent] throughout*."

39. In his fourth affidavit sworn on 23 August 2021 Mr. Watlington advises that of the $2 million transferred to MDM's trust account on 1 February 2021, the sum of $915,439.13 had been paid out in respect of the Respondent's fees and expenses. The schedule provided shows that the sum of $625,588.72 was in respect of the legal fees incurred by MDM, Paul Hastings (US lawyers instructed by the Respondent to "*liaise with*" the DOJ) and English leading counsel. By way of explanation Mr. Watlington advised that the fees paid included "***Defending the Petition and the [Petitioner's] application to appoint JPLs (the JPL Application), in particular working on detailed evidence responding to the Petition and the JPL application… Preparing for Leading Counsel to be called to the Bermuda Bar to appear at the JPL Application…***"

40. In his fifth affidavit dated  10 September 2021 Mr. Watlington states that "***the dispute on the Petition (and the Summons for appointment of JPLs) centres on who ought to be entrusted with control over the underlying assets of [the Respondent] pending the outcome of the DOJ Investigation, rather than any financial issues***." Mr. Watlington does not explain why he considers it appropriate that the Respondent should be involved in that dispute and why the Respondent's funds should be expended by its directors in relation to that "*dispute*".

41. In paragraph 10 of the same affidavit that Mr. Watlington states that; "*in my view, it would be a breach of the duties of the current Board to permit all or a significant proportion of its assets to be paid over to any of its members before the indebtedness to potential creditors were established and quantified. **To permit the assets to be disbursed**, **whether by way of redemption, dividend or <u>supine acquiescence in</u> <u>the winding up petition</u>**, would*

*leave [the Respondent] and indeed its directors open to a charge of putting assets beyond the reach of creditors or even, potentially, accusations of committing a crime under the Proceeds of Crime legislation…*" The highlighted passage shows that Mr. Watlington is under the impression that to allow assets to be administered under a court ordered winding up of the Respondent is in fact a breach of his duty and therefore he must take action to oppose the Petition.

42. In paragraph 21 of his fifth affidavit Mr. Watlington says that he believes that the Respondent's future estimated costs (calculated from 10 September 2021) until the hearing of the Petition will be in the region of **$800,000 to $900,000**. This is apparently on the basis that in addition to engaging MDM and English Counsel to advise the Respondent in relation to the Petition and all the various hearings that will take place prior to the hearing of the Petition, the Respondent wishes to take advice from Paul Hastings in the US who are "*liaising with*" the DOJ.

43. A review of the correspondence and the evidence filed (including the evidence of Mr. Watlington himself) shows that he is completely oblivious of the legal position that in circumstances such as the Petition presented by the Petitioner, the Respondent must maintain a neutral position. The fact that the Respondent has taken such a strong position in opposition to the Petition presented by the Petitioner, presumably upon the instructions of Mr. Watlington and Mr. Ferguson, is a matter of concern to this Court. It is also a matter of concern to this Court that substantial amounts have been paid on account of legal fees in opposing the Petition by the Respondent. As Mr. Tamine acknowledged in his memorandum to PwC, these funds ultimately belong to the Trust.

### Duty to the foreign tax authority

44. Section 97(1) of the Act requires that every director of a company in exercising its powers and discharging his duties shall act honestly and in good faith with a view to the best interests of the company and exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances. These duties are owed to the company not merely as an abstract notion but for the benefit of the shareholders as a general body.

In the case of a solvent company directors' decisions are guided, as a general proposition, by what is in the best interest of the shareholders as a general body.

45. However, Mr. Robinson submits that in this case the directors of the Respondent, Mr. Watlington and Mr. Ferguson, appear to be under the misapprehension that they owe some form of undefined duty to the US tax authorities and the DOJ. Mr. Goddard complains in his first affidavit that Mr. Watlington appears to think he owes a greater duty to the DOJ then he does to the Respondent and its sole economic shareholder, the Petitioner.

46. Soon after their appointments as directors of the Respondent, Mr. Watlington and Mr. Ferguson instructed Paul Hastings to "*liaise with*" the DOJ in relation to the DOJ investigation in relation to the tax liability of one of the beneficiaries of the Trust, Mr. Robert Brockman. In this context it is to be noted that Mr. Tamine is a co-operating witness with the DOJ in respect of the prosecution of and as such has received immunity from prosecution by the US authorities.

47. On 10 July 2020 Paul Hastings sent the following email to Mr. Corey J. Smith, Senior Litigation Counsel, Tax Division, US DOJ, on behalf of the Respondent:

> "*Dear Mr. Smith:*
>
> *As you know, Paul Hastings LLP represents Point Investments, Ltd. ("Point"), which acts through Messrs. James Watlington and Glenn Ferguson, the duly appointed Directors of the company.*
>
> *Point has been working to gather documents and otherwise understand efforts to effect the alienation, redemption, transfer, change in custody over and/or unexplained expenditure of Point's assets. **As we have previously advised, at least until this work is completed Point under its current leadership intends only to draw on the company's assets for the payment of reasonable and customary expenses**, including for banking fees, director fees, counsel's fees, and fees*

*associated with other professional services such as those incurred by auditors involved in the preparation of financial statements.*

*We have provided your office with both documentation reflecting the appointment of Messrs. Watlington & Ferguson and relevant Court decisions out of Bermuda. One of Point's banks has asked that we refresh and reaffirm our understanding of the Department of Justice's position as follows:*

    *(1)* **that the Department of Justice is conducting a criminal investigation as to which assets held by or through Point are of central relevance***;*

    *(2) that the Department of Justice is aware of the appointment of Messrs. Watlington and Ferguson as directors of Point and the decision of the Chief Justice of Bermuda approving the empowerment of these gentlemen as directors of a related entity; and*

    *(3) that the persons and actions of Messrs Watlington and Ferguson form no part of the Department's ongoing criminal investigation"*

48. Mr. Smith responds on 13 July 2020 stating *"Matt: This is fine and accurate".*

49. It is not readily apparent why Mr. Watlington and Mr. Ferguson thought it was necessary to voluntarily advise the DOJ that the Respondent did not intend to draw on the Respondent's assets other than for customary expenses given that no formal claim has been asserted by the DOJ against the Respondent. Further, it appears that no analysis has been carried out by Mr. Watlington and Mr. Ferguson as to the enforceability of such a claim against the Respondent in Bermuda. This communication was made to the DOJ on behalf of the Respondent without any discussion with the sole economic shareholder of the Respondent, the Petitioner. Further, it is extraordinary for a company itself to seek confirmation from the DOJ that the DOJ *"is conducting a criminal investigation"* into the company's affairs.

50. In his second affidavit Mr. Watlington sets out his further engagement with the DOJ following the presentation of the current Petition. At paragraph 115 he states:

> "115. **Following the receipt of SSH's Petition and the Application for the appointment of the JPLs on 24 September 2020, [the Respondent] instructed Paul Hastings to make contact with the DOJ to discuss its position as regards the Petition.** On 1 October 2020, Paul Hastings was copied into an email from Mr. Smith of the DOJ… that **the DOJ had never agreed to, acquiesced or concurred with the proposed liquidation of [the Respondent] and that the DOJ did in fact object to the liquidation and/or dissipation of assets currently held in the [Respondent's] name…**
>
> 116…Further, through Paul Hastings, the Independent Directors **[Mr. Watlington and Mr. Ferguson] have advised the prosecution team at the DOJ that, pending resolution of the DOJ's criminal investigation, they will continue to preserve [the Respondent's] assets** and only draw on [the Respondent's] assets for the payment of reasonable and customary expenses… The prosecution team at DOJ does not object to this assurance."

51. Again, Mr. Watlington does not explain why it was thought necessary to obtain the instructions from the DOJ in relation to the present Petition presented by the Petitioner to this Court in circumstances where there was no formal claim against the Respondent. He also does not explain why he thought it was necessary or appropriate to advise the prosecution team at the DOJ that pending resolution of the DOJ's criminal investigation the current directors will continue to preserve the Respondent's assets without any discussion with its sole economic shareholder.

52. In paragraph 119 of the same affidavit Mr. Watlington states that "*The dispute between [the Respondent] and [the Petitioner] is essentially about whether [the Petitioner] ought to have the right to redeem its shares in [the Respondent] and leave the cupboard bare in circumstances where there is a good reason to be concerned that [the Respondent] has a considerable liability to the US authorities*." As noted earlier, this statement by Mr.

Watlington is made in the context where there is no formal claim against the Respondent by any US authority and no proper analysis has been carried out by the Respondent as to whether such a claim would be enforceable against the Respondent in Bermuda. Further, Mr. Watlington does not explain how it can be said that the "*cupboard would be left bare*" in circumstances where the Court appoints its own officers, the JPLs, to wind up the Respondent under the supervision of this Court. As Mr. Robinson rightly submitted any legitimate interest of any creditor of the Respondent recognised under Bermuda law would be fully protected in a Court ordered winding up of the Respondent.

53. In a letter dated 24 September 2021 from Carey Olsen, attorneys for the Petitioner, to MDM, Carey Olsen pointed out that Mr. Watlington and Mr. Ferguson appeared to be under the misapprehension that they have duties to the DOJ. They also pointed out that any tax claim by the DOJ against the Respondent would have to be considered in light of the decision of the House of Lords in *Government of India v Taylor* [1955] AC 491 (taxes due under the laws of a foreign country are unenforceable in English courts and a foreign judgment seeking to recover taxes under foreign law is likewise unenforceable). This Court would expect the directors of the Respondent to have carefully considered this issue before "*liaising with*" the DOJ and before making any representations as to what they intended to do in relation to the assets of the Respondent. In any event this letter clearly required a proper response from the directors of the Respondent.

54. In response to this letter MDM, in their letter of 29 September 2021, stated that the Board of the Respondent is "*well aware that it has no duty to the DOJ, contrary to your insistence - but equally, it can hardly simply ignore a serious and powerful potential creditor which might cripple or even sink [the Respondent]."* There was no direct response to the *Government of India* point raised in the letter from Carey Olsen. This omission was picked up in the further letter from Carey Olsen dated 8 October 2021. In response to that letter MDM stated the directors' position in the following terms:

> "*We are not sure why you are focused on the possibility of enforcement in Bermuda or to the Bermudian courts and the simple rule about foreign tax claims given the nature and place of the claims being made and threatened, and the location of the*

*underlying assets. As you are no doubt aware, there are various exceptions and limitations to the rule about foreign claims which you do not address and we have little doubt that the US authorities would be quite prepared to seek enforcement of their claims in places other than Bermuda.*"

55. As noted at the outset Mr. Watlington has filed seven affidavits in relation to this Petition. There is no evidence relating to what, if any, analysis was carried out by Mr. Watlington and Mr. Ferguson and or their advisors in relation to the enforcement of any claims by the DOJ in Bermuda or in any foreign jurisdiction where assets of the Respondent may be located.

56. Review of the affidavit evidence filed in these proceedings in relation to the interaction on behalf of the directors of the Respondent and the DOJ has left the Court with serious concerns as to whether the directors fully appreciate that their duties are owed solely to the Respondent and not to the DOJ. The directors' decision to start "*liaising with*" the DOJ prior to having conducted any serious review of (i) the potential liability of the Respondent to the DOJ in respect of any tax or other claims; (ii) the enforceability of any tax claims in Bermuda or other jurisdictions where the Respondent's assets may be located, leaves the Court with a real sense of unease. The Court is also perplexed as to why it was thought advisable to make voluntary representations on behalf of the Respondent that the Respondent will not dispose of its assets other than its ordinary fees and expenses. The fact that the interaction between the directors of the Respondent and the DOJ took place without any meaningful discussion with and input of the Respondent's sole economic shareholder, the Petitioner, is equally disturbing. In the circumstances, bearing in mind that the assets of the Respondent are trust assets, the Court is clear that Mr. Watlington and Mr. Ferguson should play no further part in the resolution of any tax or other claims made by the DOJ against the Respondent and any such claims must be resolved by the JPLs under the supervision of this Court.

**Mr. Tamine's request for an indemnity under the bye-laws of the Respondent**

57. By letter dated 27 April 2021 Canterbury Law Limited made a claim, on behalf of Mr. Tamine, asserting that Mr. Tamine be indemnified by the Respondent under bye-law 99 of the Respondent's bye-laws. The letter enclosed a draft writ of summons claiming costs and expenses in respect of (i) Mr. Tamine's response to the investigation conducted by the DOJ concerning the Trust structure; (ii) Mr. Tamine's response to an investigation conducted by the Bermuda Police Service which arose as a result of the DOJ investigation; (iii) the judicial review proceedings identified in the draft writ; (iv) Mr. Tamine's response to the investigation conducted by the public prosecutor, Switzerland; and (v) Mr. Tamine's defence of the allegations which formed part of civil proceedings against him in Bermuda.

58. Mr. Goddard, in his first affidavit, states that the claim for indemnity is in excess of $10 million. Mr. Goddard expresses concern on behalf of the Petitioner and the Trust that Mr. Tamine has effective control over PI LLC and thus, just as he was able to arrange for the appointment of Mr. Watlington and Mr. Ferguson as directors of the Respondent, it is to be assumed he can arrange for their removal and replacement if he is displeased with the handling of his claim for $10 million against that the Respondent.

59. Having regard to the unease expressed by the Court in relation to (i) the failure by Mr. Watlington and Mr. Ferguson to ensure that the Respondent remained neutral in relation to this Petition; and (ii) their apparent failure to fully appreciate that their duties are solely owed to the Respondent and not to the DOJ, the Court accepts the submission made by Mr. Robinson that it is not appropriate for Mr. Watlington and Mr. Ferguson to deal with the claim for indemnity made by Mr. Tamine. The Court orders that the claim made on behalf of Mr. Tamine for indemnity from the Respondent under its bye-laws must be considered and dealt with by the JPLs under the supervision of this Court.

*Dysfunction and lack of trust*

60. The Court accepts Mr. Robinson's submission that the relationship between the Respondent and its sole economic shareholder is dysfunctional, as illustrated by the freezing of the Petitioner's account with the Bank of Singapore. The Court has already referred to the Petitioner's complete lack of trust in relation to the conduct of Mr. Watlington and Mr.

23

Ferguson. The Court has already expressed its view that it is wholly untenable to have a position where the Trust assets (the assets held by the Respondent) are managed by persons in whom the trustee has no trust.

61. The Court notes that the structure providing for the Manager Share in the name of PI LLC (allowing it to appoint directors of SJTC and the Respondent) made commercial sense when SJTC was the trustee of the Trust and the Respondent held the assets of the Trust. It clearly makes no sense when SJTC is no longer the trustee of the Trust for PI LLC (Mr. Tamine) to insist that the directors of the Respondent (which holds the assets of the Trust) must be appointed by PI LLC and against the express wishes of the Trustee.

62. The Court also notes that the Court of Appeal Order dated 2 February 2021 expressly provides that at the hearing before Subair Williams J to determine the terms upon which BCT should become the Trustee no parties other than those provided for in the Order shall have "*standing to appear or present evidence or submissions in relation to the matter*". The Court of Appeal was clearly of the view that SJTC and/or Mr. Tamine should play no further part in the life of the Trust. The suggestion that the assets of the Trust, held by the Respondent, should in perpetuity be managed by directors appointed by Mr. Tamine and contrary to the express wishes of the Trustee is obviously unsustainable and cannot be accepted by this Court.

63. It was for these reasons that at the conclusion of the hearing on 29 October 2021 the Court made an order for the appointment of the JPLs.

**Application for validation**

64. Now that the JPLs have been appointed by the Court it is appropriate that they should be given an opportunity to consider, on behalf of the Respondent, the scope of any application to validate the payments pursuant to section 166 of the Act. Accordingly, the Court orders that the present application made by the Respondent by amended summons dated 8 September 2021 be adjourned *sine die* with liberty to apply. The application for a restraining order against the Respondent is no longer pursued by the Petitioner.

65. The Court will hear the parties in relation to any application for costs, if required.

Dated this 17th day of November 2021.

_____
NARINDER K HARGUN
CHIEF JUSTICE

# GOV

# EXHIBIT

# 28

| efile GRAPHIC print - DO NOT PROCESS | LATEST DATA - Production | DLN: 16211688699311 |

Form **8938**

Department of the Treasury
Internal Revenue Service

**Statement of Specified Foreign Financial Assets**

▶ Go to *www.irs.gov/Form8938* for instructions and the latest information.
▶ Attach to your tax return.
For calendar year 2020 or tax year beginning  01-01-2020 , ending and ending

OMB No. 1545-2195

**2020**

Attachment
Sequence No. **175**

If you have attached continuation statements, check here ☐     Number of continuation statements _____

**1** Name(s) shown on return
ROBERT T<BROCKMAN

**2** Taxpayer Identification Number (TIN)
▉▉▉3444

**3** Type of filer

**a** ☑ Specified individual   **b** ☐ Partnership   **c** ☐ Corporation   **d** ☐ Trust

**4** If you checked box 3a, skip this line 4. If you checked box 3b or 3c, enter the name and TIN of the specified individual who closely holds the partnership or corporation. If you checked box 3d, enter the name and TIN of the specified person who is a current beneficiary of the trust. (See instructions for definitions and what to do if you have more than one specified individual or specified person to list.)

**a** Name _____     **b** TIN _____

### Part I  Foreign Deposit and Custodial Accounts Summary

| | | | |
|---|---|---|---|
| **1.** | Number of Deposit Accounts (reported in Part V) . . . . . . . . . . . . . . . . . ▶ | | 2 |
| **2.** | Maximum Value of All Deposit Accounts . . . . . . . . . . . . . . . . . $ | | 200,000 |
| **3.** | Number of Custodial Accounts (reported in Part V) . . . . . . . . . . . . . . . ▶ | | |
| **4.** | Maximum Value of All Custodial Accounts . . . . . . . . . . . . . . $ | | |
| **5.** | Were any foreign deposit or custodial accounts closed during the tax year? . . . . . . . . ☑ Yes | ☐ No | |

### Part II  Other Foreign Assets Summary

| | | | |
|---|---|---|---|
| **1.** | Number of Foreign Assets (reported in Part VI) . . . . . . . . . . . . . . . . ▶ | | |
| **2.** | Maximum Value of All Assets (reported in Part VI) . . . . . . . . . . . . . . $ | | |
| **3.** | Were any foreign assets acquired or sold during the tax year? . . . . . . . . . . . ☑ Yes | ☐ No | |

### Part III  Summary of Tax Items Attributable to Specified Foreign Financial Assets (see instructions)

| (a) Asset Category | (b) Tax item | (c) Amount reported on form or schedule | Where reported | |
|---|---|---|---|---|
| | | | (d) Form and line | (e) Schedule and line |
| 1 Foreign Deposit and Custodial Accounts | **1a** Interest | $ | | |
| | **1b** Dividends | $ | | |
| | **1c** Royalties | $ | | |
| | **1d** Other income | $ | | |
| | **1e** Gains (losses) | $ | | |
| | **1f** Deductions | $ | | |
| | **1g** Credits | $ | | |
| 2 Other Foreign Assets | **2a** Interest | $ | | |
| | **2b** Dividends | $ | | |
| | **2c** Royalties | $ | | |
| | **2d** Other income | $ | | |
| | **2e** Gains (losses) | $ | | |
| | **2f** Deductions | $ | | |
| | **2g** Credits | $ | | |

### Part IV  Excepted Specified Foreign Financial Assets (see instructions)

If you reported specified foreign financial assets on one or more of the following forms, enter the number of such forms filed. You do not need to include these assets on Form 8938 for the tax year.

**1.** Number of Forms 3520 _____2_____   **2.** Number of Forms 3520-A _____   **3.** Number of Forms 5471 _____
**4.** Number of Forms 8621 _____   **5.** Number of Forms 8865 _____

**Government Exhibit**

28

**Part V**   **Detailed Information for Each Foreign Deposit and Custodial Account Included in the Part I Summary** (see instructions)

If you have more than one account to report, attach a continuation sheet with the same information for each additional account (see instructions).

| 1 | Type of account | ☐ Deposit   ☐ Custodial<br>See Additional Data Table | 2 | Account number or other designation |
|---|---|---|---|---|

| 3 | Check all that apply | **a** ☐ Account opened during tax year | **b** ☐ Account closed during tax year |
|---|---|---|---|
| | | **c** ☐ Account jointly owned with spouse | **d** ☐ No tax item reported in Part III with respect to this asset |

4   Maximum value of account during tax year  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   $

5   Did you use a foreign currency exchange rate to convert the value of the account into U.S. dollars?  .   .   ☐ Yes   ☐ No

6   If you answered "Yes" to line 5, complete all that apply.

| **(a)** Foreign currency in which account is maintained | **(b)** Foreign currency exchange rate used to convert to U.S. dollars | **(c)** Source of exchange rate used if not from U.S. Treasury Department's Bureau of the Fiscal Service |
|---|---|---|

For Paperwork Reduction Act Notice, see the separate instructions.    Cat. No. 37753A    Form **8938** (2020)

Form 8938 (2020)    Page **2**

**Part V**   **Detailed Information for Each Foreign Deposit and Custodial Account Included in the Part I Summary** (see instructions) (continued)

7a   Name of financial institution in which account is maintained    **b**   Global Intermediary Identification Number (GIIN) (Optional)

8   Mailing address of financial institution in which account is maintained. Number, street, and room or suite no.

9   City or town, state or province, and country (including postal code)

---

**Part VI**   **Detailed Information for Each "Other Foreign Asset" Included in the Part II Summary** (see instructions)

If you have more than one asset to report in Part VI, attach a continuation statement for each additional asset (see instructions).

| 1 | Description of asset | 2 | Identifying number or other designation |
|---|---|---|---|

3   Complete all that apply. See instructions for reporting of multiple acquisition or disposition dates.

**a**   Date asset acquired during tax year, if applicable   .   .   .   .   .   .   .   .   .   .

**b**   Date asset disposed of during tax year, if applicable   .   .   .   .   .   .   .   .   .   .

**c**   ☐ Check if asset jointly owned with spouse   **d** ☐ Check if no tax item reported in Part III with respect to this asset

4   Maximum value of asset during tax year (check box that applies)

**a**   ☐ $0 - $50,000   **b** ☐ $50,001 - $100,000   **c** ☐ $100,001 - $150,000   **d** ☐ $150,001 - $200,000

**e**   If more than $200,000, list value   .   .   .   .   .   .   .   .   .   .   .   .   .   .   $

5   Did you use a foreign currency exchange rate to convert the value of the asset into U.S. dollars?  .   .   .   ☐ Yes   ☐ No

6   If you answered "Yes" to line 5, complete all that apply.

| **(a)** Foreign currency in which asset is denominated | **(b)** Foreign currency exchange rate used to convert to U.S. dollars | **(c)** Source of exchange rate used if not from U.S. Treasury Department's Bureau of the Fiscal Service |
|---|---|---|

7   If asset reported on line 1 is stock of a foreign entity or an interest in a foreign entity, enter the following information for the asset.

**a**   Name of foreign entity    **b**   GIIN (Optional)

**c**   Type of foreign entity   **(1)** ☐ Partnership   **(2)** ☐ Corporation   **(3)** ☐ Trust   **(4)** ☐ Estate

**d**   Mailing address of foreign entity. Number, street, and room or suite no.

**e**   City or town, state or province, and country (including postal code)

8   If asset reported on line 1 is not stock of a foreign entity or an interest in a foreign entity, enter the following information for the asset.

**Note.** If this asset has more than one issuer or counterparty, attach a continuation statement with the same information for each additional issuer or counterparty (see instructions).

**a**   Name of issuer or counterparty

Check if information is for   ☐ Issuer   ☐ Counterparty

**b**   Type of issuer or counterparty

**(1)** ☐ Individual   **(2)** ☐ Partnership   **(3)** ☐ Corporation   **(4)** ☐ Trust   **(5)** ☐ Estate

**c**   Check if issuer or counterparty is a   ☐ U.S. person   ☐ Foreign person

**d**   Mailing address of issuer or counterparty. Number, street, and room or suite no.

**e**   City or town, state or province, and country (including postal code)

Form **8938** (2020)

**Additional Data**

Software ID:
Software Version:
SSN: 3444
Spouse SSN: 2155
Name: ROBERT T<BROCKMAN

**Part V Detailed Information for Each Foreign Deposit and Custodial Account Lines 1-9**

Form 8938 (2020)                                                                 Page _____

**(Continuation Statement)**

Name(s) shown on return                              Identifying number
ROBERT T<BROCKMAN                                    3444

**Part V**  **Detailed Information for Each Foreign Deposit and Custodial Account Included in the Part I Summary**
(see instructions)

If you have more than one account to report in Part V, attach a continuation statement with the same information for each additional account (see instructions)

1  Type of account    ☑ Deposit    ☐ Custodial    **2** Account number or other designation
                                                        F042

3  Check all that apply  a ☑ Account opened during tax year  b ☑ Account closed during tax year
   c ☐ Account jointly owned with spouse   d ☐ No tax item reported in Part III with respect to this asset
4  Maximum value of account during tax year . . . . . . . . . . . . . . . . .        100,000
5  Did you use a foreign currency exchange rate to convert the value of the account into U.S. dollars? . .   ☐ Yes  ☑ No
6  If you answered "Yes" to line 5, complete all that apply.

| (a) Foreign currency in which account is maintained | (b) Foreign currency exchange rate used to convert to U.S. dollars | (c)Source of exchange rate used if not from U.S. Treasury Department's Bureau of the Fiscal Service |
|---|---|---|
| | | |

7a  Name of financial institution in which account is maintained    b  Global Intermediary Identification Number (GIIN) (Optional)
    BESSEMER TRUST

8  Mailing address of financial institution in which account is maintained. Number, street, and room or suite no.
   CRICKET SQUARE ELGIN AVEPO BOX 225

9  City or town, state or province, and country (including postal code)
   GEORGE TOWN
   , CJ,

Form 8938 (2020)                                                                 Page _____

**(Continuation Statement)**

Name(s) shown on return                              Identifying number
ROBERT T<BROCKMAN                                    3444

**Part V**  **Detailed Information for Each Foreign Deposit and Custodial Account Included in the Part I Summary**
(see instructions)

If you have more than one account to report in Part V, attach a continuation statement with the same information for each additional account (see instructions)

1  Type of account    ☑ Deposit    ☐ Custodial    **2** Account number or other designation
                                                        F042

3  Check all that apply  a ☑ Account opened during tax year  b ☑ Account closed during tax year
   c ☐ Account jointly owned with spouse   d ☐ No tax item reported in Part III with respect to this asset
4  Maximum value of account during tax year . . . . . . . . . . . . . . . . .        100,000
5  Did you use a foreign currency exchange rate to convert the value of the account into U.S. dollars? . .   ☐ Yes  ☑ No
6  If you answered "Yes" to line 5, complete all that apply.

| (a) Foreign currency in which account is maintained | (b) Foreign currency exchange rate used to convert to U.S. dollars | (c)Source of exchange rate used if not from U.S. Treasury Department's Bureau of the Fiscal Service |
|---|---|---|
| | | |

7a  Name of financial institution in which account is maintained    b  Global Intermediary Identification Number (GIIN) (Optional)
    BESSEMER TRUST

8  Mailing address of financial institution in which account is maintained. Number, street, and room or suite no.
   CRICKET SQUARE ELGIN AVEPO BOX 225

9  City or town, state or province, and country (including postal code)
   GEORGE TOWN
   , CJ,

# GOV

# EXHIBIT

# 29



**Department of the Treasury
Internal Revenue Service
Small Business/Self Employed**
1919 Smith St 4020HOU
Houston TX 77002

Robert T. Brockman
333 W Friar Tuck Lane
Houston, TX
77024-5741

**Date:**
  09/09/2021
**Taxpayer ID number (last 4 digits):**
  3444
**Form:**
  1040
**Tax years:**
  2004, 2005, 2006, 2007, 2010, 2012,
  2013, 2014, 2015, 2016, 2017, 2018
**Deficiency:**
  $82,512,479.00; $32,772,341.00;
  $38,916,900.00; $2,547,543.00;
  $110,120,720.00; $21,712,495.00;
  $36,939,855.00; $14,156,595.00;
  $53,460,628.00; $23,918,714.00;
  $108,161,287.00; $17,576,763.00
**Person to contact:**
  Janice C Stevens
**Employee ID number:**
  1001023370
**Contact number:**
  228-213-5032
**Refer reply to:**
  SE:S:E:FE:TS:W:G27
**Last date to file for administrative review:**
  October 9, 2021

**Certified Mail Number:**

**Notice of Jeopardy Assessment and Rights to Appeal**

> **Government
> Exhibit**
> ———
> 29

Dear Mr. Robert Brockman:

**Why we're contacting you**
This letter is your notification that we've found the collection of income tax for the taxable years referenced above to be jeopardized or impeded under Internal Revenue Code (IRC) Section 6861.

The Internal Revenue Service has determined that you are or appear to be designing quickly to place your property or property controlled by you beyond the reach of the Government either by removing it from the United States, by concealing it, by dissipating it, or by transferring it to other persons.

For example, and as more fully detailed in the attached Jeopardy Report, for over 30 years, you have has engaged in a complex strategy of concealing your ownership of assets the effect of which is to conceal the correct amount of your taxable income and underreport your tax liabilities.  While under criminal investigation for federal tax evasion, wire fraud, money laundering and evidence tampering, you transferred your community property interests in one of your Houston, Texas properties to your wife.  After the October 1, 2020 indictment, at your direction, your wife then sold this property $,1,375,000.  Additionally, you and your wife sold another Houston, Texas property for $3,999,000 and the residence which is your address of record with the Internal Revenue Service, is currently listed for sale for $15,350,000.  Also since being indicted, your wife gifted another property valued at $3,767,173 to your daughter-in-law.  Your wife, acting on your behalf, filed suit in Bermuda seeking to remove the current Bermuda-based Trustee of the A. Eugene Brockman Charitable Trust, and appoint a Cayman Islands-based Trustee.  This action has the effect of both dissolving the Bermuda-based activities of the Trust and moving the activities and transferring assets to yet another offshore location.

By your actions, you have tended to prejudice or render, ineffectual, normal, and customary assessment and collection procedures for the taxable years referenced above.  Through the jeopardy assessment procedures authorized under the IRC, the Internal Revenue Service will now be able to preserve, safeguard, or collect part or all your tax liabilities.

Accordingly, based on information available at this time, I have approved assessment of your tax liabilities and additional amounts determined to be due as reflected in the attached Jeopardy Report.  The income taxes, including interest and penalties, for the taxable years referenced above are immediately due and payable.

For the reasons set forth above and in the attached Jeopardy Report, jeopardy levies are also being made under IRC Section 6331(a) immediately after notice and demand for payment, absent your payment or provision for the assessed tax liabilities.  Your appeal rights for jeopardy levies are described in IRC Section 7429 and are like the following appeal rights for jeopardy assessments.

**What you need to know**
Based on the above facts and information available, we've made a jeopardy assessment of tax and additional amounts determined to be due as shown below, and in the attached computation. The amounts have been assessed and the **total is due immediately**.

| Taxable Period | Tax | Penalty | Interest |
|---|---|---|---|
| 2004 | $82,512,479.00 | $61,884,359.25 | $157,830,197.30 |
| 2005 | $32,772,341.00 | $24,579,255.75 | $55,088,712.34 |
| 2006 | $38,916,900.00 | $29,187,675.00 | $55,409,699.31 |
| 2007 | $2,547,543.00 | $1,910,657.25 | $3,029,157.13 |
| 2010 | $110,120,720.00 | $82,590,540.00 | $91,051,351.22 |
| 2012 | $21,712,495.00 | $16,284,371.25 | $14,112,694.08 |
| 2013 | $36,939,855.00 | $27,704,891.25 | $21,390,135.23 |
| 2014 | $14,156,595.00 | $10,617,446.25 | $7,223,004.84 |
| 2015 | $53,460,628.00 | $40,095,471.00 | $23,404,569.21 |
| 2016 | $23,918,714.00 | $17,939,035.50 | $8,422,393.99 |
| 2017 | $108,161,287.00 | $81,120,965.25 | $28,619,232.27 |
| 2018 | $17,576,763.00 | $13,182,572.25 | $2,797,664.79 |
| | Total Tax: $542,796,320.00 | Total Penalty: $407,097,240.00 | Total Interest: $468,378,811.71 |

Visit **www.irs.gov/payments** to review payment options and requirements. If you choose to pay with check or money order, please send your payment with a copy of this letter to the address and person shown above. Make your payment payable to the U.S. Treasury; don't send cash in the mail.

This action doesn't relieve you of the responsibility of filing returns for your usual annual accounting periods under IRC Section 6012. When filing returns for the referenced tax periods, *don't* send them to your normal IRS filing location. Send completed returns with required supporting documentation and a copy of this letter to your Area Director **using the address and person to contact shown above.** This will help ensure any amounts collected because of this jeopardy assessment are applied, credited, or refunded correctly.

A notice of deficiency will be issued to you within 60 days from the jeopardy assessment date under IRC Section 6861(b).

**What if you disagree**

You're entitled to request administrative and judicial reviews of this assessment action under IRC Section 7429.

***For an administrative review,*** you must file a written request for review with the Area Director **using the address and person to contact shown at the top of this letter** within 30 calendar days from the date of this letter, requesting a redetermination of whether:

- • our making the assessment is reasonable under the circumstances,
- • and the amount so assessed or demanded because of the action is appropriate under the circumstances.

When possible, a conference will be held on an expedited basis with the IRS Independent Office of Appeals (Appeals) to consider your protest. If you submit information or documentation for the first time at an Appeals conference, Appeals may request comment from the Area Director on such evidence or documents.

We may proceed with enforced collection action during any administrative appeal process unless you've made arrangements regarding collection of the amount assessed. To make arrangements, please contact Revenue Officer Vincent Sandles at 817-232-6316.

***For a judicial review of this assessment,*** you may bring a civil suit against the United States in the U.S. District Court in the judicial district in which you reside or in which your principal office is located. However, to have this action reviewed by the District Court, you must first request the administrative review explained above. You must file a civil suit in writing within 90 calendar days after the earlier of:

- • the day the IRS notifies you of its decision on your request for administrative review,
- • or the 16th day after your request for administrative review.

The Court will make an early determination of the same points raised in your protest to determine whether the making of the assessment is reasonable under the circumstances and to determine whether the amount assessed or demanded as a result of the action is appropriate under the circumstances. The Court's determination is final and not reviewable by any other court.

- • ***Appeal to the United States Tax Court in case of Income, Estate, Gift, and certain Excise taxes under IRC Section 6861***
  - o As noted above, a notice of deficiency is required by law to be issued within 60 calendar days from the date the jeopardy assessment is made. You then have 90 calendar days from the date the notice is mailed to petition the United States Tax Court, 150 days if you are outside the United States when the notice is mailed to you or the notice is mailed to an address outside the United States.

- • ***Appeal to the Court in case of Other taxes assessed under IRC Section 6862***
  - o Claim for credit or refund of taxes assessed under IRC Section 6862 may be filed in accordance with IRC Section 6511(a) for administrative and judicial review of the merits of the liability assessed. An administrative decision on the claim may be appealed to the Court under the provisions of IRC Section 7422(a).

**Additional Information**

The Taxpayer Advocate Service (TAS) is an independent organization within the IRS that helps taxpayers and protects taxpayers' rights. TAS can offer you help if your tax problem is causing a financial difficulty, you've tried but been unable to resolve your issue with the IRS, or you believe an IRS system, process, or procedure isn't working as it should. If you qualify for TAS assistance, which is always free, TAS will do everything possible to help you. To learn more, visit **www.taxpayeradvocate.irs.gov** or call 877-777-4778.

Thank you for your cooperation.

If you have questions, you can call or write the contact person shown at the top of this letter.

Sincerely,

Judith A.
McNamara

Digitally signed by Judith A.
McNamara
Date: 2021.09.07 09:16:37
-05'00'

Judith A. McNamara
Director of Field Operations, IIC


Sincerely,

Digitally signed by Carlo
R. Sanchez-Garcia
Date: 2021.09.02
12:14:44 -07'00'

Carlo R. Sanchez-Garcia
Team Manager, Team 1597


Enclosures:
Computation - Form 4549-A
Jeopardy Recommendation - Narrative
Publication 1, Taxpayer Bill of Rights
Notice 609, Privacy Act Notice
Publication 1660, Collection Appeal Rights
Publication 594, The IRS Collection Process
Form 12153, Request for a Collection Due Process or Equivalent Hearing


**Letter 1584 (4-2021)**
Catalog Number 74870S

# GOV

# EXHIBIT

# 30

Janice K. Vos Caudill
Pitkin County Clerk and Recorder
534 East Hyman Avenue
Aspen, CO 81611
(970)429-2716





## Certified Copy

State of Colorado
County of Pitkin

I, Janice K. Vos Caudill, County Clerk and Recorder in and for said Pitkin County, in the State of Colorado aforesaid, do hereby certify that the foregoing is a full, true and correct certified copy of:

| Reception # | Document Type | Record Date |
|---|---|---|
| 680331 | FED TAX LIEN | 09/09/2021 |

Given under my hand and official seal on 09/09/2021 9:06A.M.

_Janice K. Vos Caudill_
Clerk & Recorder

_Patricia Nadon_
Deputy Patricia Nadon

SEAL

**Government Exhibit**

30

**Form 668(Y)**
(Rev. February 2004)

Department of the Treasury - Internal Revenue Service
# Notice of Federal Tax Lien

| Area: 5 | Serial Number 438686521 | For Optional Use by Recording Office |
|---|---|---|

As provided by sections 6321, 6322, and 6323 of the Internal Revenue Code, we are giving a notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer. We have made a demand for payment of this liability, but it remains unpaid. Therefore, there is a lien in favor of the United States on all property and rights to property belonging to this taxpayer for the amount of $1,418,272,371.71 these taxes, and additional penalties, interest, and costs that may accrue.

**Name of Taxpayer**
ROBERT T. BROCKMAN

RECEPTION#: 680331, R: $8.00, D: $0.00
DOC CODE: FED TAX LIEN
Pg 1 of 1, 09/09/2021 at 09:03:01 AM
Janice K. Vos Caudill, Pitkin County, CO

**Residence**
333 W. FRIAR TUCK LN
HOUSTON, TX 77024

**IMPORTANT RELEASE INFORMATION:** For each assessment listed below, unless notice of lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax (a) | Tax Period Ending (b) | Identifying Number (c) | Date of Assessment (d) | Last Day for Refiling (e) | Unpaid Balance of Assessment (f) |
|---|---|---|---|---|---|
| 1040 | 200412 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $302,227,035.55 |
| 1040 | 200512 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $112,440,309.09 |
| 1040 | 200612 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $123,514,274.31 |
| 1040 | 200712 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $7,487,357,38 |
| 1040 | 201012 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $283,762,611.22 |
| 1040 | 201212 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $52,109,560.33 |
| 1040 | 201312 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $86,034,881.48 |
| 1040 | 201412 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $31,997,046.09 |
| 1040 | 201512 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $116,960,668.21 |
| 1040 | 201612 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $50,280,143.49 |
| 1040 | 201712 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $217,901,484.52 |
| 1040 | 201812 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $33,557,000.04 |

| Place of Filing PITKIN COUNTY CLERK and RECORDER PITKIN COUNTY, CO 81611 | Total | $1,418,272,371.71 |
|---|---|---|

This notice was prepared and signed at FORT WORTH, TX, on this, 2nd day of SEPTEMBER, 2021

| Signature V.C. SANDLES  *V.C. Sandles*  Employee # 1000229640 | Title REVENUE OFFICER  Phone # 817-232-6316 |
|---|---|

(NOTE: Certificate of officer authorized by law to take acknowledgements is not essential to the validity of Notice of Federal Tax Lien Rev. Rul. 71-466, 1971-2 C.B. 409)

Part 1 — Recording Office            Form 668(Y)(c) (Rev. 2-2004) CAT. NO 60025X

SEAL

Janice K. Vos Caudill
Pitkin County Clerk and Recorder
534 East Hyman Avenue
Aspen, CO 81611
(970)429-2716





## Certified Copy

State of Colorado
County of Pitkin
I, Janice K. Vos Caudill, County Clerk and Recorder in and for said Pitkin County, in the State of Colorado aforesaid, do hereby certify that the foregoing is a full, true and correct certified copy of:

| Reception # | Document Type | Record Date |
|---|---|---|
| 680332 | FED TAX LIEN | 09/09/2021 |

Given under my hand and official seal on 09/09/2021 9:07AM.

_____
Clerk & Recorder

_____
Deputy   Patricia Nadon



**Form: 668(Y)**
(Rev. February 2004)

**Department of the Treasury - Internal Revenue Service**

## Notice of Federal Tax Lien

| Area: 5 | Serial Number 438765821 | For Optional Use by Recording Office |
|---|---|---|

As provided by sections 6321, 6322, and 6323 of the Internal Revenue Code, we are giving a notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer. We have made a demand for payment of this liability, but it remains unpaid. Therefore, there is a lien in favor of the United States on all property and rights to property belonging to this taxpayer for the amount of $1,418,272,371.71 these taxes, and additional penalties, interest, and costs that may accrue.

**Name of Taxpayer**
HENKE PROPERTY L.L.C. AS ALTER-EGO OF ROBERT T. BROCKMAN

**Residence**
333 W. FRIAR TUCK LN
HOUSTON, TX 77024

RECEPTION#: 680332, R: $8.00, D: $0.00
DOC CODE: FED TAX LIEN
Pg 1 of 1, 09/09/2021 at 09:03:02 AM
Janice K. Vos Caudill, Pitkin County, CO

**IMPORTANT RELEASE INFORMATION:** For each assessment listed below, unless notice of lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax (a) | Tax Period Ending (b) | Identifying Number (c) | Date of Assessment (d) | Last Day for Refiling (e) | Unpaid Balance of Assessment (f) |
|---|---|---|---|---|---|
| 1040 | 200412 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $302,227,035.55 |
| 1040 | 200512 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $112,440,309.09 |
| 1040 | 200612 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $123,514,274.31 |
| 1040 | 200712 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $7,487,357.38 |
| 1040 | 201012 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $283,762,611.22 |
| 1040 | 201212 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $52,109,560.33 |
| 1040 | 201312 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $86,034,881.48 |
| 1040 | 201412 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $31,997,046.09 |
| 1040 | 201512 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $116,960,668.21 |
| 1040 | 201612 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $50,280,143.49 |
| 1040 | 201712 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $217,901,484.52 |
| 1040 | 201812 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $33,557,000.04 |

| Place of Filing PITKIN COUNTY CLERK PITKIN COUNTY, CO 81611 | Total | $1,418,272,371.71 |
|---|---|---|

This notice was prepared and signed at FORT WORTH, TX, on this, 9th day of SEPTEMBER, 2021

| Signature V.C. SANDLES   *V.C. Sandles*   Employee # 2504-3436 | Title REVENUE OFFICER   Phone # 817-232-6316 |
|---|---|

(NOTE: Certificate of officer authorized by law to take acknowledgements is not essential to the validity of Notice of Federal Tax Lien Rev. Rul. 71-466, 1971-2 C.B. 409)

Part 1 — Recording Office

Form 668(Y)(c) (Rev. 2-2004) CAT. NO 60025X

Janice K. Vos Caudill
Pitkin County Clerk and Recorder
534 East Hyman Avenue
Aspen, CO 81611
(970)429-2716





## Certified Copy

State of Colorado
County of Pitkin
I, Janice K. Vos Caudill, County Clerk and Recorder in and for said Pitkin County, in the State of Colorado aforesaid, do hereby certify that the foregoing is a full, true and correct certified copy of:

| Reception # | Document Type | Record Date |
|---|---|---|
| 680333 | FED TAX LIEN | 09/09/2021 |

Given under my hand and official seal on 09/09/2021 9:08AM.

_Janice K Vos Caudill_
Clerk & Recorder

_Patricia Nadon_
Deputy Patricia Nadon



**Form 668(Y)**
(Rev. February 2004)

**Department of the Treasury - Internal Revenue Service**

## Notice of Federal Tax Lien

| Area: 5 | Serial Number 438768021 | For Optional Use by Recording Office |
|---|---|---|

As provided by sections 6321, 6322, and 6323 of the Internal Revenue Code, we are giving a notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer. We have made a demand for payment of this liability, but it remains unpaid. Therefore, there is a lien in favor of the United States on all property and rights to property belonging to this taxpayer for the amount of $1,418,272,371.71 these taxes, and additional penalties, interest, and costs that may accrue.

**Name of Taxpayer**
MOUNTAIN QUEEN INC. AS ALTER-EGO OF ROBERT T. BROCKMAN

RECEPTION#: 680333, R: $8.00, D: $0.00
DOC CODE: FED TAX LIEN
Pg 1 of 1, 09/09/2021 at 09:03:03 AM
Janice K. Vos Caudill, Pitkin County, CO

**Residence**
333 W. FRIAR TUCK LN
HOUSTON, TX 77024

**IMPORTANT RELEASE INFORMATION:** For each assessment listed below, unless notice of lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax (a) | Tax Period Ending (b) | Identifying Number (c) | Date of Assessment (d) | Last Day for Refiling (e) | Unpaid Balance of Assessment (f) |
|---|---|---|---|---|---|
| 1040 | 200412 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $302,227,035.55 |
| 1040 | 200512 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $112,440,309.09 |
| 1040 | 200612 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $123,514,274.31 |
| 1040 | 200712 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $7,487,357.38 |
| 1040 | 201012 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $283,762,611.22 |
| 1040 | 201212 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $52,109,560.33 |
| 1040 | 201312 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $86,034,881.48 |
| 1040 | 201412 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $31,997,046.09 |
| 1040 | 201512 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $116,960,668.21 |
| 1040 | 201612 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $50,280,143.49 |
| 1040 | 201712 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $217,901,484.52 |
| 1040 | 201812 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $33,557,000.04 |

| Place of Filing PITKIN COUNTY CLERK PITKIN COUNTY, CO 81611 | Total | $1,418,272,371.71 |
|---|---|---|

This notice was prepared and signed at FORT WORTH, TX, on this, 9th day of SEPTEMBER, 2021

| Signature V.C. SANDLES  *V.C. Sandles*  Employee # 2504-3436 | Title REVENUE OFFICER Phone # 817-232-6316 |
|---|---|

(NOTE: Certificate of officer authorized by law to take acknowledgements is not essential to the validity of Notice of Federal Tax Lien Rev. Rul. 71-466, 1971-2 C.B. 409)

Part 1 – Recording Office          Form 668(Y)(c) (Rev. 2-2004) CAT. NO 60025X

SEAL

Janice K. Vos Caudill
Pitkin County Clerk and Recorder
534 East Hyman Avenue
Aspen, CO 81611
(970)429-2716





## Certified Copy

State of Colorado
County of Pitkin
I, Janice K. Vos Caudill, County Clerk and Recorder in and for said Pitkin County, in the State of Colorado aforesaid, do hereby certify that the foregoing is a full, true and correct certified copy of:

| Reception # | Document Type | Record Date |
|---|---|---|
| 680334 | FED TAX LIEN | 09/09/2021 |

Given under my hand and official seal on 09/09/2021 9:09AM.

_____
Clerk & Recorder

_____
Deputy   Patricia Naden

SEAL

**Form 668(Y)**
(Rev. February 2004)

**Department of the Treasury - Internal Revenue Service**

## Notice of Federal Tax Lien

| Area: 5 | Serial Number 438761421 | For Optional Use by Recording Office |
|---|---|---|

As provided by sections 6321, 6322, and 6323 of the Internal Revenue Code, we are giving a notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer. We have made a demand for payment of this liability, but it remains unpaid. Therefore, there is a lien in favor of the United States on all property and rights to property belonging to this taxpayer for the amount of $1,418,272,371.71 these taxes, and additional penalties, interest, and costs that may accrue.

**Name of Taxpayer**
DIFFICULT L.L.C. AS NOMINEE OF POINT INVESTMENTS LTD.
AS ALTER-EGO OF ROBERT T. BROCKMAN

RECEPTION#: 680334, R: $13.00, D: $0.00
DOC CODE: FED TAX LIEN
Pg 1 of 2, 09/09/2021 at 09:03:04 AM
Janice K. Vos Caudill, Pitkin County, CO

**Residence**
333 W. FRIAR TUCK LN
HOUSTON, TX 77024

**IMPORTANT RELEASE INFORMATION:** For each assessment listed below, unless notice of lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax (a) | Tax Period Ending (b) | Identifying Number (c) | Date of Assessment (d) | Last Day for Refiling (e) | Unpaid Balance of Assessment (f) |
|---|---|---|---|---|---|
| 1040 | 200412 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $302,227,035.55 |
| 1040 | 200512 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $112,440,309.09 |
| 1040 | 200612 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $123,514,274.31 |
| 1040 | 200712 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $7,487,357.38 |
| 1040 | 201012 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $283,762,611.22 |
| 1040 | 201212 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $52,109,560.33 |
| 1040 | 201312 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $86,034,881.48 |
| 1040 | 201412 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $31,997,046.09 |
| 1040 | 201512 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $116,960,668.21 |
| 1040 | 201612 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $50,280,143.49 |
| 1040 | 201712 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $217,901,484.52 |
| 1040 | 201812 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $33,557,000.04 |

The lien(s) identified on this special condition Notice of Federal Tax Lien attaches/attach to the following property: see Exhibit A

| Place of Filing PITKIN COUNTY CLERK PITKIN COUNTY, CO 81611 | Total | $1,418,272,371.71 |
|---|---|---|

This notice was prepared and signed at FORT WORTH, TX, on this, 9th day of SEPTEMBER, 2021

| Signature V.C. SANDLES Employee # 2504-3438 | *V.C. Sandles* | Title REVENUE OFFICER Phone # 817-232-6316 |
|---|---|---|

(NOTE: Certificate of officer authorized by law to take acknowledgements is not essential to the validity of Notice of Federal Tax Lien Rev. Rul. 71-466, 1971-2 C.B. 409)

Part 1 — Recording Office          Form 668(Y)(c) (Rev. 2-2004) CAT. NO 60025X

SEAL

RECEPTION#: 68...

EXHIBIT A TO NOTICE OF FEDERAL TAX LIEN

This exhibit is an attachment to the Notice of Federal Tax Lien, 438761421 dated September 9, 2021 for DIFFICULT L.L.C. AS NOMINEE OF POINT INVESTMENTS LTD. AS ALTER-EGO OF ROBERT T. BROCKMAN.

Description of Property:

The property to which the federal tax lien attaches includes, but is not limited to, real properties listed below, as well as all proceeds, increases, substitutions, replacements, additions, and accessions to those assets:

COMMON ADDRESS:  10 POPCORN LANE, ASPEN, PITKIN COUNTY, CO 81611


COUNTY IDS: R022546

LEGAL DESCRIPTION:

A TRACT OF LAND SITUATED IN THE SOUTHWEST 1/4 OF THE SOUTHWEST 1/4 OF SECTION 28, TOWNSHIP 10 SOUTH, RANGE 84 WEST OF THE 6TH PRINCIPAL MERIDIAN, PITKIN COUNTY, COLORADO.



**Form 668(Y)**
(Rev. February 2004)

Department of the Treasury - Internal Revenue Service

Eagle County, CO   2021204...
Rec: ...09/2021
Pg: 1   03:57:54 AM
DOC: $0.00

## Notice of Federal Tax Lien

| Area:<br>5 | Serial Number<br>438765421 | For Optional Use by Recording Office |
|---|---|---|

As provided by sections 6321, 6322, and 6323 of the Internal Revenue Code, we are giving a notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer. We have made a demand for payment of this liability; but it remains unpaid. Therefore, there is a lien in favor of the United States on all property and rights to property belonging to this taxpayer for the amount of $1,418,272,371.71 these taxes, and additional penalties, interest, and costs that may accrue.

**Name of Taxpayer**
HENKE PROPERTY L.L.C. AS ALTER-EGO OF ROBERT T. BROCKMAN

**Residence**
333 W. FRIAR TUCK LN
HOUSTON, TX 77024

**IMPORTANT RELEASE INFORMATION:** For each assessment listed below, unless notice of lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax<br>(a) | Tax Period Ending<br>(b) | Identifying Number<br>(c) | Date of Assessment<br>(d) | Last Day for Refiling<br>(e) | Unpaid Balance of Assessment<br>(f) |
|---|---|---|---|---|---|
| 1040 | 200412 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $302,227,035.55 |
| 1040 | 200512 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $112,440,309.09 |
| 1040 | 200612 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $123,514,274.31 |
| 1040 | 200712 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $7,487,357.38 |
| 1040 | 201012 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $283,762,611.22 |
| 1040 | 201212 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $52,109,560.33 |
| 1040 | 201312 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $86,034,881.48 |
| 1040 | 201412 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $31,997,046.09 |
| 1040 | 201512 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $116,960,688.21 |
| 1040 | 201612 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $50,280,143.49 |
| 1040 | 201712 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $217,901,484.52 |
| 1040 | 201812 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $33,557,000.04 |

| Place of Filing<br>EAGLE COUNTY CLERK AND RECORDER<br>EAGLE COUNTY, CO 81621 | Total | $1,418,272,371.71 |
|---|---|---|

This notice was prepared and signed at FORT WORTH, TX, on this, 9th day of SEPTEMBER, 2021

| Signature<br>V.C. SANDLES<br>Employee # 2504-3436 | *V.C. Sandles* | Title<br>REVENUE OFFICER<br>Phone # 817-232-6316 |
|---|---|---|

(NOTE: Certificate of officer authorized by law to take acknowledgements is not essential to the validity of Notice of Federal Tax Lien Rev. Rul. 71-466, 1971-2 C.B. 409)

Part 1 – Recording Office

Form 668(Y)(c) (Rev. 2-2004) CAT. NO 60025X

Certified to be a true and complete copy or the document recorded in my office:

Regina O'Brien, Clerk, Eagle County CO

By: _____

Julie A Salaz, Deputy          Date

**Form 668(Y)**
(Rev. February 2004)

Department of the Treasury - Internal Revenue Service
## Notice of Federal Tax Lien

| Area: 5 | Serial Number 438687621 | For Optional Use by Recording |
|---|---|---|

As provided by sections 6321, 6322, and 6323 of the Internal Revenue Code, we are giving a notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer. We have made a demand for payment of this liability, but it remains unpaid. Therefore, there is a lien in favor of the United States on all property and rights to property belonging to this taxpayer for the amount of these taxes, and additional penalties, interest, and costs that may accrue. $542,796,320.00

**Name of Taxpayer**
ROBERT T. BROCKMAN

**Residence**
333 W. FRIAR TUCK LN
HOUSTON, TX 77024

**IMPORTANT RELEASE INFORMATION:** For each assessment listed below, unless notice of lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax (a) | Tax Period Ending (b) | Identifying Number (c) | Date of Assessment (d) | Last Day for Refiling (e) | Unpaid Balan. of Assessment (f) |
|---|---|---|---|---|---|
| 1040 | 200412 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $302,227,035.55 |
| 1040 | 200512 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $112,440,309.09 |
| 1040 | 200612 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $123,514,274.31 |
| 1040 | 200712 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $7,487,357.38 |
| 1040 | 201012 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $283,762,611.22 |
| 1040 | 201212 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $52,109,560.33 |
| 1040 | 201312 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $86,034,881.48 |
| 1040 | 201412 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $31,997,046.09 |
| 1040 | 201512 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $116,960,668.21 |
| 1040 | 201612 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $50,280,143.49 |
| 1040 | 201712 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $217,901,484.52 |
| 1040 | 201812 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $33,557,000.04 |

| Place of Filing GARFIELD COUNTY CLERK GARFIELD COUNTY, CO 81623 | Total | $1,418,272,371.71 |
|---|---|---|

This notice was prepared and signed at FORT WORTH, TX, on this, 2nd day of SEPTEMBER, 2021

| Signature V.C. SANDLES  *V.C. Sandles*  Employee #1000229640 | Title REVENUE OFFICER Phone # 817-232-6316 |
|---|---|

(NOTE: Certificate of officer authorized by law to take acknowledgements is not essential to the validity of Notice of Federal Tax Lien Rev. Rul. 71-466, 1971-2 C.B. 409)

Part 1 – Recording Office                Form 668(Y)(c) (Rev. 2-2004) CAT. NO 60025X

9/9/2021  By C. Ziegler-Doran Deputy Clerk
Christina Ziegler - Doran

**Form 668(Y)**
(Rev. February 2004)

Department of the Treasury - Internal Revenue Service
# Notice of Federal Tax Lien

| Area:<br>5 | Serial Number<br>438765621 | For Optional Use by Recording ( |
|---|---|---|

As provided by sections 6321, 6322, and 6323 of the Internal Revenue Code, we are giving a notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer. We have made a demand for payment of this liability, but it remains unpaid. Therefore, there is a lien in favor of the United States on all property and rights to property belonging to this taxpayer for the amount of $1,418,272,371.71 these taxes, and additional penalties, interest, and costs that may accrue.

**Name of Taxpayer**
HENKE PROPERTY L.L.C. AS ALTER-EGO OF ROBERT T. BROCKMAN

**Residence**
333 W. FRIAR TUCK LN
HOUSTON, TX 77024

**IMPORTANT RELEASE INFORMATION:** For each assessment listed below, unless notice of lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax<br>(a) | Tax Period Ending<br>(b) | Identifying Number<br>(c) | Date of Assessment<br>(d) | Last Day for Refiling<br>(e) | Unpaid Balance of Assessment<br>(f) |
|---|---|---|---|---|---|
| 1040 | 200412 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $302,227,035.55 |
| 1040 | 200512 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $112,440,309.09 |
| 1040 | 200612 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $123,514,274.31 |
| 1040 | 200712 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $7,487,357,38 |
| 1040 | 201012 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $283,762,611.22 |
| 1040 | 201212 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $52,109,560.33 |
| 1040 | 201312 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $86,034,881.48 |
| 1040 | 201412 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $31,997,046.09 |
| 1040 | 201512 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $116,960,668.21 |
| 1040 | 201612 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $50,280,143.49 |
| 1040 | 201712 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $217,901,484.52 |
| 1040 | 201812 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $33,557,000.04 |

| Place of Filing<br>GARFIELD COUNTY CLERK<br>GARFIELD COUNTY, CO 81601 | Total | $1,418,272,371.71 |
|---|---|---|

This notice was prepared and signed at FORT WORTH, TX, on this, 9th day of SEPTEMBER, 2021.

| Signature<br>V.C. SANDLES     *V.C. Sandles*<br>Employee # 2504-3436 | Title<br>REVENUE OFFICER<br>Phone # 817-232-6316 |
|---|---|

(NOTE: Certificate of officer authorized by law to take acknowledgements is not essential to the validity of Notice of Federal Tax Lien Rev. Rul. 71-466, 1971-2 C.B. 409)

Part 1 — Recording Office                    Form 668(Y)(c) (Rev. 2-2004) CAT. NO 60025X

Jean Alberico, Clerk and Recorder of Garfield County certifies this is a full, true and correct copy of the original record/document in my custody.
Date: 9/9/2021   By: C. Ziegler Doran, Deputy Clerk

*Christina Ziegler Doran*

Department of the Treasury - Internal Revenue Service

**Form 668(Y)**
(Rev. February 2004)

# Notice of Federal Tax Lien

| Area: 5 | Serial Number 438761821 | For Optional Use by Recording Office |
|---|---|---|

As provided by sections 6321, 6322, and 6323 of the Internal Revenue Code, we are giving a notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer. We have made a demand for payment of this liability, but it remains unpaid. Therefore, there is a lien in favor of the United States on all property and rights to property belonging to this taxpayer for the amount of $1,418,272,371.71 these taxes, and additional penalties, interest, and costs that may accrue.

**Name of Taxpayer**
DOROTHY K. BROCKMAN AS NOMINEE OF ROBERT T. BROCKMAN

**Residence**
333 W. FRIAR TUCK LN
HOUSTON, TX 77024

**IMPORTANT RELEASE INFORMATION:** For each assessment listed below, unless notice of lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax (a) | Tax Period Ending (b) | Identifying Number (c) | Date of Assessment (d) | Last Day for Refiling (e) | Unpaid Bala of Assessme... (f) |
|---|---|---|---|---|---|
| 1040 | 200412 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $302,227,035.55 |
| 1040 | 200512 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $112,440,309.09 |
| 1040 | 200612 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $123,514,274.31 |
| 1040 | 200712 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $7,487,357.38 |
| 1040 | 201012 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $283,762,611.22 |
| 1040 | 201212 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $52,109,560.33 |
| 1040 | 201312 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $86,034,881.48 |
| 1040 | 201412 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $31,997,046.09 |
| 1040 | 201512 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $116,960,668.21 |
| 1040 | 201612 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $50,280,143.49 |
| 1040 | 201712 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $217,901,484.52 |
| 1040 | 201812 | XXX-XX-3444 | 09/07/2021 | 10/07/2031 | $33,557,000.04 |

The lien(s) identified on this special condition Notice of Federal Tax Lien attaches/attach to the following property: see attachment.

| Place of Filing GARFIELD COUNTY CLERK GARFIELD COUNTY, CO 81623 | Total | $1,418,272,371.71 |
|---|---|---|

This notice was prepared and signed at FORT WORTH, TX, on this, 9th day of SEPTEMBER, 2021.

| Signature *V.C. Sandles* V.C. SANDLES Employee #2504-3436 | Title REVENUE OFFICER Phone # 817-232-6316 |
|---|---|

(NOTE: Certificate of officer authorized by law to take acknowledgements is not essential to the validity of Notice of Federal Tax Lien Rev. Rul. 71-466, 1971-2 C.B. 409)

Part 1 — Recording Office                                           Form 668(Y)(c) (Rev. 2-2004) CAT. NO 60025X

Jean Alberico, Clerk and Recorder for Garfield County, certify this to be a full, true and correct copy of the original record as recorded in my custody.

Date 9/9/2021 By: *C. Ziegler Dorath* Deputy Clerk
Christina Ziegler Dorath

2

EXHIBIT A TO NOTICE OF FEDERAL TAX LIEN

This exhibit is an attachment to the Notice of Federal Tax Lien 438761821 , dated September 9, 2021 for DOROTHY K. BROCKMAN AS NOMINEE OF ROBERT T. BROCKMAN.

Description of Property:

The property to which the federal tax lien attaches includes, but is not limited to, real properties listed below, as well as all proceeds, increases, substitutions, replacements, additions, and accessions to those assets:

COMMON ADDRESS:  11 RIVER PARK LANE, CARBONDALE, GARFIELD COUNTY, CO 81623

COUNTY IDS: R083390

LEGAL DESCRIPTION:

LOT F1A, AMENDED FINAL PLAT OF LOT F1 AND F1, ASPEN GLEN, FILING NO. 1, ACCORDING TO THE PLAT THEREOF RECORDED DECEMBER 18, 2013 AT RECEPTION NO. 844418, COUNTY OF GARFIELD, STATE OF COLORADO.

Reception#: 962848
09/09/2021 10:41:46 AM  Jean Alberico
2 of 2 Rec Fee:$0.00 Doc Fee:0.00 GARFIELD COUNTY CO