# EXHIBIT

# A-16

Exhibit A-16

Dated this 10th day of October 2014

THE POINT PURPOSE TRUST

DECLARATION OF TRUST

ET_0002012319

Exhibit A-16

1.  Definitions and Construction ............................................................................ - 1 -

2.  Name and Proper Law ..................................................................................... - 4 -

3.  Purpose of the Trust ........................................................................................ - 4 -

4.  Trusts Regarding Capital and Income ............................................................. - 6 -

5.  Trust on Termination Date ............................................................................... - 6 -

6.  Provision in Event of Failure of Trusts ........................................................... - 7 -

7.  Trustee's Discretions ....................................................................................... - 7 -

8.  Administrative Powers ..................................................................................... - 7 -

9.  Remuneration of Trustee ................................................................................. - 8 -

10. Trustee's Exemption from Liability ................................................................. - 9 -

11. Appointment and Retirement of Trustee ......................................................... - 9 -

12. Power to Change Proper Law and Forum ....................................................... - 12 -

13. Powers of Amendment and Variation .............................................................. - 12 -

14. Power to Declare Termination Date ................................................................ - 13 -

15. Irrevocability .................................................................................................... - 13 -

ET_0002012320

Exhibit A-16

**THIS DECLARATION OF TRUST** is made this Tenth day October 2014

**BY:**

**PROVIDENCE TRUST COMPANY (PVT) LIMITED**, private trust company duly incorporated under the laws of Nevis and having its registered office at Hunkins Plaza, Main Street, Charlestown, Nevis, British West Indies ("the Trustee").

**WHEREAS** the Trustee has received the Property with the intention that it should create a trust for certain purposes under the provisions of the Trusts (Special Provisions) Act 1989 and, pursuant to such intention, the Trustee wishes to make such declaration with respect to the Property as hereinafter appears.

**NOW THIS DECLARATION WITNESSES** as follows:

1.      **DEFINITIONS AND CONSTRUCTION**

   (a)      In this Declaration, wherever the context permits, the following definitions and rules of construction shall apply:

   "**Act**" means the Trusts (Special Provisions) Act 1989 as amended;

   "**charity**" means any trust, foundation, institution or other organisation which is established exclusively for purposes regarded as charitable under

- 1 -

ET_0002012321

Exhibit A-16

the Proper Law of this Trust and "**charitable**" shall bear a corresponding meaning;

"**the Company**" means **POINT INVESTMENTS LLC**, a limited liability company existing under the laws of Nevis;

"**deed**" means any instrument in writing which is signed, witnessed and dated, or otherwise validly executed in accordance with the law of the place where it is executed;

"**person**" includes any individual, company, partnership and unincorporated association and any person acting in a fiduciary capacity;

"**Proper Law of this Trust**" means the law of the jurisdiction under which questions affecting the validity, construction and effect of this Declaration and each and every provision hereof are to be determined;

"**Purpose**" means the purpose described in Clause 3;

"**Termination Date**" means the day on which the earlier shall occur of the following:

> (i)     the date of the expiration of the longest period as may be permitted under the Proper Law of this Trust so as not to violate any rules against perpetuities or excessive accumulations of income applicable to this Trust; or

- 2 -

ET_0002012322

Exhibit A-16

(ii)     such date, if any, as the Trustee may declare to be the Termination Date in accordance with the power conferred on it by Clause 14;

"**Trust**" means the trust created by this Declaration;

"**Trust Fund**" means:

(i)     all of the issued and outstanding shares in the Company;

(ii)     all property hereafter paid, transferred to or otherwise placed under the control of and accepted by the Trustee as additions to the Trust Fund and in respect of which a memorandum signed by the Trustee shall be conclusive evidence;

(iii)     all income which shall be accumulated by the Trustee and added to the capital of the Trust Fund; and

(iv)     the money, investments and other property from time to time representing the said additions and accumulations;

"**Trustee**" means the trustee for the time being of this Trust;

"**written**" or "**in writing**" includes typewriting, printing, facsimile transmission, lithography, photography, e-mail and other modes of representing or reproducing words in a legible and non-transitory form;

(b)     words denoting any gender shall include both the other genders;

- 3 -

ET_0002012323

Exhibit A-16

(c)      words denoting the singular shall include the plural and vice versa;

(d)      the headings in this Declaration are inserted for convenience of reference only and shall have no legal effect, nor shall they affect in any way the construction of any clause contained herein;

(e)      any reference to a sub-clause or paragraph shall, unless the context precludes such a construction, be read as a reference to the particular sub-clause or paragraph of the clause or sub-clause in which the reference occur.

2.      **NAME AND PROPER LAW**

(a)      This Trust shall be known as "**THE POINT PURPOSE TRUST**" or by such other name as the Trustee may from time to time determine.

(b)      Subject to Clause 12, this Trust is established under, and the Proper Law of this Trust shall be, the laws of Bermuda and the courts of Bermuda shall be the forum for the administration thereof.

3.      **PURPOSE OF THE TRUST**

(a)      This Trust is established under the Act and subject to Clause 12 hereof, shall be operated and maintained in Bermuda for the single purpose, to wit, to subscribe for, or otherwise acquire, whether by purchase or receipt of a contribution or gift, (whether through a nominee or otherwise)

- 4 -

ET_0002012324

# Exhibit A-16

ownership or effective control of all of the issued and outstanding shares in **POINT INVESTMENTS LLC**, the Company, and to hold and retain the shares in the capital of the Company.

(b)   The Trustee, it's directors and officers shall do all such things as the Trustee deems necessary in order to support the activities of the Company in the fulfilment of its objects and in such other commercial activities as the Company shall engage from time to time by (without prejudice to the generality of the foregoing) the exercise of rights as shareholder thereof and providing such support and assistance as considered advisable by the Trustee in its absolute discretion;

(c)   The Trustee, it's directors and officers shall enter into all such documents to which it may be necessary or desirable for the Trustee to be a party to enable the Company to perform the obligations it undertakes in pursuance of its objectives.

(d)   Notwithstanding the foregoing, if at any time the Trustee shall determine, in its absolute discretion, that the performance of the Trustee's obligations (or any of them) under this Trust in respect of the Company shall:

(i)   cause the Trustee or the Company to be in contravention of any relevant anti-money laundering or anti-terrorist financing laws or regulations;

(ii)   be illegal in any relevant jurisdiction;

- 5 -

ET_0002012325

# Exhibit A-16

then the Trustee shall, where practicable, refuse to execute the performance of the said obligations and, further, shall take such actions as it is required by any relevant law or regulation to take.

4.      **TRUSTS REGARDING CAPITAL AND INCOME**

The Trustee shall until the Termination Date hold the Trust Fund and the income thereof, if any, upon trust to disburse, pay or apply the whole or any part or parts thereof respectively in or towards the fulfilment of the Purpose and to accumulate the whole or such part of the income as shall not have been paid or applied as aforesaid by investing the same in or upon any of the investments hereby authorised for the investment of trust monies and hold the same as an accretion to the capital of the Trust for all purposes.

5.      **TRUST ON TERMINATION DATE**

The Trustee shall on the Termination Date hold any of the capital and income of the Trust Fund which shall not have been disposed of pursuant to the foregoing trusts upon trust for such other purpose trust having purposes similar to the Purpose, or such charitable purposes or charities as the Trustee shall determine.

- 6 -

ET_0002012326

Exhibit A-16

**6.     PROVISION IN EVENT OF FAILURE OF TRUSTS**

Subject as aforesaid, the Trust Fund and the income thereof shall, subject to the powers by this Declaration or by law vested in the Trustee and to each and every exercise thereof, be held by the Trustee upon trust for such charitable purposes or charities as the Trustee shall determine.

**7.     TRUSTEE'S DISCRETIONS**

Except as otherwise herein expressly provided, every discretion or power hereby conferred on the Trustee shall be an absolute and unfettered discretion or power and the Trustee shall not be obliged to give to any person any reason or justification for the exercise or non-exercise of any such discretion or power and the Trustee hereof shall (except in respect of wilful default or individual fraud or wrongdoing on the part of the trustee who is sought to be made liable) be held liable for any loss or damage occurring as a result of his concurring or refusing of failing to concur in any exercise of any such discretion or power.

**8.     ADMINISTRATIVE POWERS**

The Trustee shall (in addition and without prejudice to all other powers and protections at law conferred upon it) have the powers and protections set out in the Schedule to the Act the provisions of which shall be deemed incorporated herein by reference, provided that all references to a beneficiary or beneficiaries in such Schedule shall, if and so far as the context so admits, be deemed to refer

- 7 -

ET_0002012327

Exhibit A-16

to the Purpose and any reference therein to "the Settlor" shall have no application in relation to this Declaration.


9.     **REMUNERATION OF TRUSTEE**

(a)     The Trustee shall not be entitled to charge and be paid professional fees unless the Trustee is:

    (i)     a lawyer, accountant, or other person engaged in any profession or business in which case the Trustee shall be entitled to charge and be paid all usual professional and other charges for business transacted, time spent and acts done by him or his firm in relation to the trusts hereof, including acts which a trustee not being in any profession or business could have done personally.

    (ii)     a company licensed to provide trust services in which case the Trustee shall be entitled to remuneration for its services in accordance with its published terms and conditions from time to time in force.

(b)     In any event, the Trustee shall be entitled to reimburse itself from the Trust Fund for expenses and liabilities properly and reasonably incurred in the conduct or administration of this Trust.

ET_0002012328

Exhibit A-16

10.   **TRUSTEE'S EXEMPTION FROM LIABILITY**

(a)     The Trustee shall be fully indemnified out of the Trust Fund during and after their trusteeship in respect of all liabilities which they may incur as Trustee save such liabilities caused by their own fraud, wilful misconduct or gross negligence.

(b)     No Trustee shall be liable for any loss to the Trust Fund however arising except as a result of the wilful default, recklessness, fraud or dishonesty of such Trustee.

(c)     Any release or indemnity in respect of the liability of a corporate Trustee shall cover its officers and employees.

(d)     No Trustee shall be bound to take any proceedings against another Trustee or former trustee hereof or the personal or estate representatives of such other Trustee or former trustee for any breach or alleged breach of trust committed or suffered by such other Trustee or former trustee.

11.   **APPOINTMENT AND RETIREMENT OF TRUSTEE**

(a)     The Trustee may, by deed, appoint any person, wherever resident, to be an additional or new Trustee hereof.  In the event that there are two or more Trustees, a quorum of two (2) Trustees shall be required to hold any meeting and any decision made by the Trustees at such meeting shall require the consent of the majority of the Trustees, provided that in the event that there are only two Trustees such decision must be unanimous.

- 9 -

ET_0002012329

Exhibit A-16

(b)     If any Trustee shall at any time desire to withdraw and be discharged from the trusts hereof, he may do so by notice in writing signed by him (or in the case where the Trustee is a corporation, by any of its officers):

(i)     where there is one Trustee, served on the Company and, upon the expiration of thirty days from the posting or personal delivery of such notice, or such shorter period as may be agreed in writing between the Trustee and the Company, the Trustee so doing shall cease to be a trustee to all intents and purposes, except as to acts and deeds necessary for the proper vesting of the Trust Fund in the new trustee or otherwise as the case may require PROVIDED THAT the Trustee has appointed a new trustee in its place, and that new trustee has accepted the appointment.

(ii)    where there is more than one Trustee, served on any co-trustee and, upon the expiration of thirty days from the posting or personal delivery of such notice, or such shorter period as may be agreed in writing between any co-trustee and the retiring Trustee, the Trustee so doing shall cease to be a Trustee to all intents and purposes, except as to acts and deeds necessary for the proper vesting of the Trust Fund in the continuing or new Trustee or otherwise as the case may require PROVIDED THAT no Trustee may withdraw unless there will remain at least one Trustee of the Trust at all times.

(c)     If, there being one trustee, the Trustee shall die or, being a company, shall be dissolved or shall give notice of his desire to withdraw and be

- 10 -

ET_0002012330

Exhibit A-16

discharged from the trusts hereof under the provisions of Clause 11(b) or shall refuse or become unfit to act, AND such Trustee is, in the opinion of the Company, incapable or unwilling to appoint a new Trustee, then the Company shall by deed appoint a new Trustee, wherever resident, to be a Trustee in place of the Trustee so deceased, dissolved, desiring to withdraw and be discharged, refusing or becoming unfit to act or being removed as aforesaid.

(d)     If there being more than one Trustee, any Trustee shall die or, being a company, shall be dissolved or shall give notice of his desire to withdraw and be discharged from the trusts hereof under the provisions of Clause 11(b) or shall refuse or become unfit to act, then the remaining Trustee may by deed appoint any person, wherever resident, to be a Trustee in place of the Trustee so deceased, dissolved, desiring to withdraw and be discharged, refusing or becoming unfit to act or being removed as aforesaid.

(e)     Acts and deeds done or executed for the proper vesting of the Trust Fund in new or additional Trustees shall be done and executed by the continuing or retiring Trustees at the expense of the income or capital of the Trust Fund, provided always that, in the event of the retirement or removal of any Trustee hereunder, such outgoing Trustee shall be entitled to receive from the new Trustee and from the continuing Trustees (if any) an indemnity against any and all liabilities in respect of any debts, duties, impositions or taxes of whatever nature which are then or may thereafter become payable out of the capital or income of the Trust Fund and shall

- 11 -

Exhibit A-16

not be bound to do or to execute any such acts or deeds as aforesaid except upon his receipt of such indemnity.

12.   **POWER TO CHANGE PROPER LAW AND FORUM**

The Trustee may, at any time and from time to time by deed, declare that the trusts powers and construction and effect of this Declaration shall from the date of such declaration take effect in accordance with the law of some other jurisdiction in any part of the world and, as from the date of such deed, the law of the jurisdiction named therein shall be the Proper Law of this Trust and the courts of that jurisdiction shall be the forum for the administration thereof, but subject to the powers conferred by this Clause 12 and until any further declaration is made hereunder, provided that, notwithstanding anything herein contained, the Trustee shall not exercise such power in any way which might directly or indirectly result in this Declaration becoming according to the law applicable thereto illegal, void or voidable or which might change the beneficial interests hereunder.

13.   **POWERS OF AMENDMENT AND VARIATION**

(a)      For the avoidance of all doubt, the Trustee is hereby appointed as a person entitled to make an application for the variation of this Declaration for the purposes of Section 12(B)(2) of the Act.

- 12 -

Exhibit A-16

(b)     Without prejudice to the provisions of Clause 13(a) and of Section 12(B)(2) of the Act, the Trustee may, at any time and from time to time, by deed supplemental hereto, amend in whole or in part any or all of the provisions of this Declaration.

14.     **POWER TO DECLARE TERMINATION DATE**

The Trustee may, at any time by written instrument, declare that the day specified therein (not being a day earlier in time than the date of such instrument) shall be the Termination Date for all the purposes of this Declaration.

15.     **IRREVOCABILITY**

This Declaration shall be irrevocable.

**IN WITNESS WHEREOF** the Trustee has executed this Declaration as a Deed on the day and year first above written.

**EXECUTED this 10th day**            )
**of October, 2014 by Providence**    )
**Trust Company (PVT)**               )
**Limited in the presence of:**       )

- 13 -

ET_0002012333

# EXHIBIT

# A-47

Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Subject:** | FW: Vista Foundation Fund I (Parallel) Capital Call |
| **Date:** | Thursday, December 9, 2010 8:43:00 AM |

OK

BB

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Wednesday, December 08, 2010 9:41 PM
**To:** permit1@lambdaprime.org
**Subject:** FW: Vista Foundation Fund I (Parallel) Capital Call

Bob,

We have received a VFF I Capital Call re Big Machines.  I assume this is fine to proceed with, however could you confirm.

Evatt

**From:** Deon Graham [mailto:deon.graham@jpmchase.com]
**Sent:** Wednesday, 8 December 2010 3:44 PM
**To:** 'etamine@logic.bm'
**Subject:** Vista Foundation Fund I (Parallel) Capital Call

Dear Evatt,

Attached is a Capital Call Notice from Vista Foundation Fund I (Parallel), LP.  Please contact me or John Warnken-Brill if you have any questions.

Regards,

Deon

**Deon Graham** | Private Equity Fund Services | **J.P. Morgan**
131 Front Street, Hamilton Bermuda HM 12
T: 441.298.3039 | F: 441.296.1262 | deon.graham@jpmorgan.com| jpmorgan.com

This communication is for informational purposes only. It is not intended as an offer or solicitation for the purchase or sale of any financial instrument or as an official confirmation of any transaction. All market prices, data and other information are not warranted as to completeness or accuracy and are subject to change without notice. Any comments or statements made herein do not necessarily reflect those of JPMorgan Chase & Co., its subsidiaries and affiliates. This transmission may contain information that is privileged, confidential, legally privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and

Exhibit A-47

no responsibility is accepted by JPMorgan Chase & Co., its subsidiaries and affiliates, as applicable, for any loss or damage arising in any way from its use. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, whether in electronic or hard copy format. Thank you. Please refer to http://www.jpmorgan.com/pages/disclosures for disclosures relating to European legal entities.

# Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Subject:** | RE: |
| **Date:** | Friday, December 17, 2010 2:31:00 PM |

OK

BB

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Friday, December 17, 2010 7:26 AM
**To:** permit1@lambdaprime.org
**Subject:**

 Bob,

Attached is the capital call for VEPFIII management fees for the first half of 2011.

Is this OK for payment?

I expect that we will see the VFFI call today, as well.  Robert Smith is holding the second closing for VFFI today.

Evatt

MLATSW_001537

# Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Subject:** | RE: |
| **Date:** | Wednesday, December 22, 2010 6:13:00 AM |

OK

BB

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Tuesday, December 21, 2010 2:09 PM
**To:** permit1@lambdaprime.org
**Subject:**

Bob,

As expected, attached is the capital call for VFFI management fees.

Can we proceed with this payment?

Evatt

Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Subject:** | RE: Vista Equity Partners Fund III (Parallel) Capital Call Notice |
| **Date:** | Tuesday, August 9, 2011 8:38:00 AM |

OK

BB

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Thursday, August 04, 2011 10:20 AM
**To:** permit1@lambdaprime.org
**Subject:** FW: Vista Equity Partners Fund III (Parallel) Capital Call Notice

Bob,

We have a capital call for a VEPFIII follow-on investment to Aderant – CompuLaw LLC.

The amount we need to contribute is $1,180,097.

The capital call notice and summary are attached.

Can we proceed with this?

Evatt

**From:** John Warnken-Brill [mailto:JWarnken-Brill@vistaequitypartners.com]
**Sent:** Thursday, 28 July 2011 6:29 PM
**To:** 'etamine@logic.bm'
**Subject:** Vista Equity Partners Fund III (Parallel) Capital Call Notice

Attached is a Capital Call Notice from Vista Equity Partners Fund III (Parallel), LP.  Please contact me if you have any questions.

Regards,

John Warnken-Brill
Chief Financial Officer
Vista Equity Partners
(415) 765-6500

Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Subject:** | RE: |
| **Date:** | Monday, September 12, 2011 4:05:00 PM |

OK

BB

**From:** redfish@lambdaprime.org [mailto:redfish@lambdaprime.org]
**Sent:** Monday, September 12, 2011 10:43 AM
**To:** Permit
**Subject:**

Bob,

While you were away I received the attached capital call from VEPF III.

It seems that the call notice went to Grosvenor by mistake.  The first I heard of it was on Sep 7 when it was due.  John Warnken-Brill called me to ask why our money had not come through.

I went ahead and made the payment on the call.  I would never have done this without your permission if we weren't under the time pressure to meet the call.

I hope this was OK.

Evatt

MLATSW_002323

# Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Subject:** | RE: |
| **Date:** | Wednesday, October 12, 2011 4:58:00 PM |

OK

BB

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Tuesday, October 11, 2011 9:14 AM
**To:** permit1@lambdaprime.org
**Subject:**

Bob,

Attached is a new capital call for VEPF III.

Is it OK to proceed?

Evatt

MLATSW_002378

# Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Subject:** | RE: |
| **Date:** | Sunday, November 6, 2011 6:26:00 PM |

OK

BB

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Thursday, November 03, 2011 6:55 PM
**To:** permit1@lambdaprime.org
**Subject:**

Bob,

Last week I sent you the latest VEPFIII capital call for the Zywave acquisition of Emerging Information Systems.

The documents were still password protected.

I have attached the documents with the passwords removed.

Evatt

MLATSW_002398

# Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Subject:** | RE: |
| **Date:** | Saturday, January 7, 2012 8:16:00 AM |

OK

BB

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Tuesday, January 03, 2012 9:16 PM
**To:** permit1@lambdaprime.org
**Subject:**

Bob,

Attached are capital calls for VEPF IV and VFF I management fees.

I expect that we will see the VEPF III capital call in the next few days.

I can meet these calls?  The numbers look right given the level of commitment.

Evatt

MLATSW_002458

# Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Subject:** | RE: |
| **Date:** | Saturday, January 7, 2012 8:44:00 AM |

OK

BB

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Friday, January 06, 2012 1:41 PM
**To:** permit1@lambdaprime.org
**Subject:**

Bob,

Attached is the VEPF III capital call for 1st half of 2012 management fees.

Evatt

MLATSW_002460

Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Subject:** | RE: |
| **Date:** | Tuesday, January 17, 2012 7:27:00 AM |

OK

BB

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Tuesday, January 10, 2012 9:48 PM
**To:** permit1@lambdaprime.org
**Subject:**

Bob,

We have received a capital call from VEPF IV for the Thomson Reuters' Trade and Risk Management Business investment.

Can I pay this call?

Call and accompanying memo are attached.

Evatt

# Exhibit A-47

**From:** Permit
**To:** "redfish@lambdaprime.org"
**Subject:** RE:
**Date:** Thursday, January 26, 2012 12:19:00 PM

OK

BB

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Tuesday, January 24, 2012 8:16 AM
**To:** permit1@lambdaprime.org
**Subject:**

Bob,

Attached is a further VEPF III capital call for a public company investment.

Evatt

MLATSW_002490

# Exhibit A-47

| | |
|---|---|
| **From:** | <u>Permit</u> |
| **To:** | <u>"redfish@lambdaprime.org"</u> |
| **Subject:** | RE: |
| **Date:** | Thursday, March 8, 2012 6:33:00 AM |

OK

BB

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Wednesday, March 07, 2012 8:05 AM
**To:** permit1@lambdaprime.org
**Subject:**

Bob

We have received a capital call notice from VEPFIV for the acquisition of 87% of the Class B shares of CDC Software.  The memo and capital call are attached.

Can I go ahead and fund this?  Our contribution is $39,529,884.00.

Evatt

MLATSW_002571

Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Subject:** | RE: |
| **Date:** | Sunday, April 15, 2012 4:54:00 AM |

OK

BB

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Monday, April 09, 2012 6:00 AM
**To:** permit1@lambdaprime.org
**Subject:**

Bob,

Attached is a capital call from Vista Foundation Fund I.  The company is Essential Learning LLC.  Our share of the call is $5,219,383.

I've also attached the funding memo.

I have stripped out the password protection, however the password is "vista" in case you need it.

Can I fund this capital call?

Evatt

MLATSW_002621

# Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Subject:** | RE: Vista Equity Partners Fund IV Parallel Capital Call Notice |
| **Date:** | Monday, June 4, 2012 6:41:00 AM |

OK

BB

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Wednesday, May 30, 2012 6:44 PM
**To:** permit1@lambdaprime.org
**Subject:** FW: Vista Equity Partners Fund IV Parallel Capital Call Notice

Bob,

Attached is a capital call from VEPF IV re a public company investment.

There is no funding accompanying memo.

Can I fund this capital call?


Evatt

MLATSW_002847

# Exhibit A-47

**From:** Permit
**To:** "redfish@lambdaprime.org"
**Subject:** RE: Vista Equity Partners Fund III Parallel Capital Call Notice
**Date:** Monday, June 4, 2012 6:42:00 AM

OK

BB

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Thursday, May 31, 2012 4:37 PM
**To:** permit1@lambdaprime.org
**Subject:** FW: Vista Equity Partners Fund III Parallel Capital Call Notice

Bob,

Attached is another VEPF III capital call  - for an investment in an undisclosed public company.

Can I fund this one?

Evatt

# Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Subject:** | RE: |
| **Date:** | Saturday, July 14, 2012 6:09:00 PM |

OK

BB

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Tuesday, July 10, 2012 6:24 PM
**To:** permit1@lambdaprime.org
**Subject:**

Bob,

Attached is the capital call for VEPFIII management fees.

Is it OK to fund this?

Evatt

MLATSW_002905

Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Subject:** | RE: |
| **Date:** | Tuesday, September 25, 2012 3:32:00 PM |

OK

BB

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Sunday, September 23, 2012 11:05 AM
**To:** permit1@lambdaprime.org
**Subject:**

Bob,

Attached is a capital call from VEPF IV following Point's additional subscription.  This payment is required on the final closing.

John Warnken-Brill is very keen to close the fund as soon as possible.  I will wait for confirmation from you approving the payment however I know that you are going to be in Aspen and might not log in over the weekend.

Given that this capital call is only an update of previous capital calls which Point met, I'll make the payment on Monday if I don't hear from you.

Evatt

Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Subject:** | RE: |
| **Date:** | Tuesday, September 25, 2012 4:36:00 PM |

OK

BB

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Sunday, September 23, 2012 11:34 AM
**To:** permit1@lambdaprime.org
**Subject:**

Bob,

Attached is a capital call from VFF I regarding an add-on to Big Machines.

The investment memorandum is also attached.

Can I fund this call?

Evatt

MLATSW_003181

# Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Subject:** | RE: |
| **Date:** | Saturday, December 1, 2012 9:49:00 AM |

OK

BB

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Friday, November 30, 2012 6:24 PM
**To:** permit1@lambdaprime.org
**Subject:**

Bob,

Attached is a capital call from VEPF IV for a public company investment.

Is it OK to fund this?  There is no funding memorandum.

Evatt

MLATSW_003281

# Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Subject:** | RE: |
| **Date:** | Sunday, December 9, 2012 6:37:00 PM |

OK

BB

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Sunday, December 09, 2012 1:41 PM
**To:** permit1@lambdaprime.org
**Subject:**

Bob,

Attached is a capital call from VFF I.  The funding summary is also attached.

Can I fund this?

Evatt

# Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Subject:** | RE: |
| **Date:** | Thursday, March 21, 2013 6:18:00 PM |

OK – but only after they explain to you exactly what the income tax expense is all about.

BB

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Thursday, March 21, 2013 7:11 PM
**To:** permit1@lambdaprime.org
**Subject:**

Bob,

Attached is a VFF I capital call for partnership expenses.

Can I fund this?

Evatt

MLATSW_003494

Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@proventusconstans.com" |
| **Subject:** | RE: |
| **Date:** | Wednesday, July 10, 2013 7:28:00 AM |

OK

BB

**From:** Redfish PC [mailto:redfish@proventusconstans.com]
**Sent:** Wednesday, July 10, 2013 5:59 AM
**To:** permit@proventusconstans.com
**Subject:**

Bob,

I have two capital calls from Vista – one each from VEPF III and VFF I – for an add-on to Bullhorn Inc.

The funding memo and capital call notices are attached.

Can I pay these?

Evatt

MLATSW_004147

# Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@proventusconstans.com" |
| **Subject:** | RE: |
| **Date:** | Saturday, July 13, 2013 6:50:00 AM |

OK

BB

---

**From:** Redfish PC [mailto:redfish@proventusconstans.com]
**Sent:** Friday, July 12, 2013 7:49 AM
**To:** permit@proventusconstans.com
**Subject:**

Bob,

I have a VEPF III capital call notice for $1,574,481.00 to fund a public company investment.

Can I fund this?

Evatt

MLATSW_004164

# Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@proventusconstans.com" |
| **Subject:** | RE: |
| **Date:** | Saturday, July 13, 2013 6:57:00 AM |

OK to fund

BB

---

**From:** Redfish PC [mailto:redfish@proventusconstans.com]
**Sent:** Friday, July 12, 2013 7:55 AM
**To:** permit@proventusconstans.com
**Subject:**

Bob,

As I mentioned in an earlier email, Robert Smith decided to fund Vitera's acquisition of SuccessEHS Inc through equity.

Attached is a capital call notice and funding memo from VEPF IV for that purpose.

Can I fund this?

Evatt

MLATSW_004165

Exhibit A-47

**From:** Permit
**To:** "redfish@proventusconstans.com"
**Subject:** RE:
**Date:** Saturday, July 13, 2013 6:58:00 AM

OK

BB

---

**From:** Redfish PC [mailto:redfish@proventusconstans.com]
**Sent:** Friday, July 12, 2013 8:32 AM
**To:** permit@proventusconstans.com
**Subject:**

Bob,

I have received the Vista capital call notices for management fees for the second half of 2013.

These are fees for:

- VEPF III - $1,086,702
- VFF I - $1,189,120
- VEPF IV - $3,252,268
- VFF II - $734,411 (for period May 17th until year-end)

Can I pay these?

Evatt

MLATSW_004166

Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@proventusconstans.com" |
| **Subject:** | RE: Vista Equity Partners Fund IV (Parallel) Capital Call Notice |
| **Date:** | Tuesday, October 29, 2013 7:48:00 PM |

OK to fund

BB

---

**From:** Redfish PC [mailto:redfish@proventusconstans.com]
**Sent:** Thursday, October 24, 2013 3:32 PM
**To:** 'Permit'
**Subject:** FW: Vista Equity Partners Fund IV (Parallel) Capital Call Notice

Bob,

Here is the capital call and memo for Greenway.  It sets out all the details on this company.

I have spoken with Robert Smith and he anticipates a co-invest opportunity in the order of $60-120 mm for Greenway.

On that basis I have turned down the debt opportunity.

Can I fund this capital call?

Evatt

MLATSW_005694

# Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@proventusconstans.com" |
| **Subject:** | RE: Vista Equity Partners Fund IV (Parallel) Capital Call Notice |
| **Date:** | Tuesday, October 29, 2013 7:54:00 PM |

OK

BB

---

**From:** Redfish PC [mailto:redfish@proventusconstans.com]
**Sent:** Thursday, October 24, 2013 3:33 PM
**To:** 'Permit'
**Subject:** FW: Vista Equity Partners Fund IV (Parallel) Capital Call Notice

Bob,

Here is the capital call and memo for Omnitracs.

Can I fund this capital call?

Evatt

MLATSW_005695

# Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@proventusconstans.com" |
| **Subject:** | RE: |
| **Date:** | Sunday, December 15, 2013 12:55:00 PM |

OK

BB

---

**From:** Redfish PC [mailto:redfish@proventusconstans.com]
**Sent:** Friday, December 13, 2013 6:52 PM
**To:** 'Permit'
**Subject:**

Bob,

Attached is a new capital call from Vista Foundation Fund II in the sum of $651,905.

The investment memorandum is also attached.

Can I fund this?

Evatt

MLATSW_006244

# Exhibit A-47

| | |
|---|---|
| **From:** | <u>Permit</u> |
| **To:** | <u>"Redfish"</u> |
| **Subject:** | RE: |
| **Date:** | Monday, June 16, 2014 6:18:00 PM |

Recommend approval

BB

---

**From:** Redfish [mailto:redfish@hannah.com]
**Sent:** Thursday, June 12, 2014 5:02 AM
**To:** 'Permit'
**Subject:**

**Bob,**

**Attached is a capital call from VFF II re the acquisition of Autotask.**

**Can I go ahead and pay this?**

**Evatt**

MLATSW_008992

Exhibit A-47

| | |
|---|---|
| **From:** | Permit |
| **To:** | "Redfish" |
| **Subject:** | RE: Recommend yes |
| **Date:** | Tuesday, June 24, 2014 11:53:00 AM |

Recommend yes
BB

---

**From:** Redfish [mailto:redfish@hannah.com]
**Sent:** Friday, June 20, 2014 8:27 AM
**To:** 'Permit'
**Subject:**

**Bob,**

**Attached is a capital call from VEPF IV re Convery Compliance Systems.**

**Should I fund this?**

**Evatt**

MLATSW_009075

# Exhibit A-47

| | |
|---|---|
| **From:** | <u>Permit</u> |
| **To:** | <u>"Redfish"</u> |
| **Subject:** | RE: |
| **Date:** | Friday, December 26, 2014 5:06:00 PM |

Recommend ok.

BB

**From:** Redfish [mailto:redfish@hannah.com]
**Sent:** Thursday, December 25, 2014 10:39 AM
**To:** 'Permit'
**Subject:**

Bob,

Attached is a co-invest capital call for Vista V's investment in TIBCO.

Can I fund this?

Evatt

MLATSW_012193

# Exhibit A-47

| | |
|---|---|
| **From:** | <u>Permit</u> |
| **To:** | <u>"Redfish"</u> |
| **Subject:** | RE: |
| **Date:** | Saturday, March 28, 2015 3:57:00 PM |

Recommend yes

BB

---

**From:** Redfish [mailto:redfish@hannah.com]
**Sent:** Friday, March 27, 2015 6:59 PM
**To:** 'Permit'
**Subject:**

Bob,

Attached is a capital call from VFF II.  Should I fund this?

Evatt

MLATSW_013018

Exhibit A-47

**From:** Permit
**To:** "Redfish"
**Subject:** FW:
**Date:** Monday, October 26, 2015 4:28:00 PM
**Attachments:** 20150930 Asset Report.xls

Evatt,

In the Asset report – Summary section….

Since 11/30/2014, there is no Point, Liquid Sub-Total, and no Total

BB

**From:** Redfish [mailto:redfish@hannah.com]
**Sent:** Friday, October 23, 2015 4:22 AM
**To:** 'Permit'
**Subject:**

Bob,

Please see attached the September cash report.

We are still awaiting the VEF II 2014 audit and the Point audit.  I can't plug VEF II into the spreadsheet yet.

Other than that and the Vista Q3 financial statements, all should be up to date.

Evatt

MLATSW_016264

Exhibit A-47

**From:** Permit
**To:** "Redfish"
**Subject:** RE:
**Date:** Monday, April 18, 2016 4:44:00 PM

Evatt,

My recommendation is to proceed.

BB

**From:** Redfish [mailto:redfish@hannah.com]
**Sent:** Thursday, April 14, 2016 9:05 AM
**To:** 'Permit'
**Subject:**

Bob,

Please see attached a new capital call from VFF II-A.  Do you recommend funding?

Evatt

MLATSW_018840

Exhibit A-47

**From:** Permit
**To:** "Redfish"
**Subject:** RE:
**Date:** Tuesday, July 5, 2016 11:57:00 AM

Recommend payment

BB

**From:** Redfish [mailto:redfish@hannah.com]
**Sent:** Sunday, July 03, 2016 5:53 AM
**To:** 'Permit'
**Subject:**

Bob,

Please see the attached capital call notices from Vista.  They all relate to management fees.

I have Bruce Lim looking at the accuracy of the management fees against the LP Agreements.

Subject to Bruce's check, do you recommend payment?

Evatt

# EXHIBIT

# A-48

Exhibit A-48

Sworn on behalf of Cabarita (PTC) Limited
Name of deponent: Evatt Anthony Tamine
First affidavit
Exhibit EAT 1
Sworn on 14th July 2020

## IN THE SUPREME COURT OF BERMUDA

## COMMERCIAL COURT

## CIVIL JURISDICTION

### 2018 : No.376

IN THE MATTER OF THE "B" TRUST

BETWEEN:

### ST JOHN'S TRUST COMPANY (PVT) LIMITED

### MEDLANDS (PTC) LIMITED

<u>Plaintiff</u>

-and-

### (1) THE ATTORNEY GENERAL
### (2) ROBERT THERON BROCKMAN
### (3) BERMUDA TRUST COMPANY LIMITED
### (4) HSBC PRIVATE BANK (CI) LIMITED
### (5) MARTIN LANG
### (6) GROSVENOR TRUST COMPANY LIMITED

<u>Defendants</u>

---

## AFFIDAVIT OF EVATT ANTHONY TAMINE

---

I, **EVATT ANTHONY TAMINE**, of 2 Framfield Place, Hammonds Green, Framfield, TN22 5QH MAKE OATH and SAY as follows:

1

Exhibit A-48

1.   I am a barrister called to the Bar of Bermuda.  Between early 2004 and September 2018, in the manner which I describe in detail below, I was involved in the administration of the trust known as the A. Eugene Brockman Charitable Trust which was established pursuant to a Trust Indenture dated 26 May 1981 ("**the Brockman Trust**").

2.   Insofar as the contents of this affidavit are within my own personal knowledge, they are true, otherwise, they are true to the best of my information, knowledge and belief.

3.   There is now produced and shown to me marked **Exhibit EAT 1** a bundle of documents to which reference is made below.  References to page numbers in this affidavit are to the pages of that exhibit.

**The purpose of this affidavit**

4.   I make this affidavit in support of my applications:

   (1)   In the Supreme Court, to be joined as a party to these proceedings ("**the Trust Proceedings**") for the purpose of setting aside the seriously adverse findings apparently made against me which resulted in the Court determining (as recorded in a recital to an Order dated 19 December 2019, which I have only seen in redacted form ("**the Redacted Order**") at pages 1 to 16) that St John's Trust Company (PVT) Limited ("**SJTC**") was not a proper and appropriate candidate to serve as trustee of the Brockman Trust and that "*any new trustee should be an entity unrelated and unconnected to Mr Evatt Tamine*".  I also seek access to the Court file (save for any material in respect of Beddoe relief which I accept that I am not entitled to see).

   (2)   In the Court of Appeal, to be joined as a party to SJTC's appeal against the Redacted Order and to be served with the appeal documents.

5.   The critically important context to the Trust Proceedings (which I believe was not fully and properly drawn to the Court's attention before the Redacted Order was made) is that the Second Defendant ("**Mr Brockman**") is presently the target of a major tax investigation by the US Department of Justice which is investigating alleged tax evasion

Exhibit A-48

in relation to unreported gains made through the Brockman Trust structure in the region of USD 2 billion ("**the DoJ Investigation**").

6.     One of the issues with which the DoJ Investigation is concerned is the extent to which Mr Brockman, who is a named beneficiary of the Brockman Trust, has control over the Brockman Trust.

7.     I have been informed by my US attorney that if the DoJ Investigation proceeds to trial, this will be one of the largest tax evasion cases in relation to an individual in US history.

8.     I have been a cooperating witness in the DoJ Investigation since the end of September 2018.  Since I became a cooperating witness, Mr Brockman has coordinated attacks on me in several sets of proceedings in Bermuda and in England (including these Trust Proceedings) which I believe are designed, *inter alia*, to damage my credibility and improperly interfere in the DoJ Investigation.

9.     Until very recently, however, I have not been in a position to defend myself against these attacks as strongly as I would have wished because (as Mr Brockman well knew) I did not have access to important contemporaneous documents which show that the allegations made against me, particularly allegations of dishonesty and theft, are without foundation and at the very least should never have been made in unqualified terms.

10.    My knowledge of the Trust Proceedings is necessarily limited since I am not yet a party to, and I have not previously been invited to participate in, these proceedings notwithstanding that it is apparent that the Court has been invited to make (and apparently has made) very serious adverse findings against me.

11.    For the avoidance of doubt, I accept that to the extent that *Beddoe* relief has been sought to authorise the use of funds from the Brockman Trust to pursue claims against me, as a defendant to those claims I was not entitled to participate in any such application and I do not seek (and have never sought) access to any information relating to such applications since I acknowledge that such material is privileged as against me.

Exhibit A-48

12. However, it is clear from the (limited and carefully drawn) description of the Trust Proceedings that has previously been given in other proceedings by Mr James Gilbert, as well as the terms of the Redacted Order, that the matters which have been considered in the Trust Proceedings extend well beyond what might properly be called *Beddoe* relief into determining such trust administration matters as the proper law of the Brockman Trust, the validity and effectiveness of the various changes of trustee and other constitutional changes to the Brockman Trust, and the appointment of Medlands (PTC) Limited ("**Medlands**") as the new trustee of the Brockman Trust.

13. In determining those trust administration issues (including the appointment of Medlands and procedural issues as to whether SJTC was properly represented in the Trust Proceedings), it is apparent that the Court has made adverse findings concerning my conduct (including in relation to my honesty) which I was not given any opportunity to address and which apparently played a significant role in the Court's decision making process in the Trust Proceedings.

14. On the basis of the information I have been provided with so far, it seems clear that up until now the Court has been presented with a one-sided and highly misleading version of events by Mr Gilbert (in serious breach of his duties to this Court) although, without having seen the materials that have been placed before the Court, it is not possible for me to know the full extent to which this Court has been misled.

15. However, having regard to the conduct of Mr Gilbert in other related proceedings which I describe briefly below, as well as what he has so far disclosed about the Trust Proceedings, it is now clear that Mr Gilbert has systematically misled both the Bermudian Courts and the English Courts in relation to the allegations of dishonesty and theft that have been made against me.

16. In those circumstances, I seek to be joined to the Trust Proceedings (and to the appeal against the Redacted Order) in order to correct the record and to ensure that the serious adverse findings made against me are set aside.

.

Exhibit A-48

**Other Proceedings**

17.   Before explaining the background to my role (and that of Mr Brockman and Mr Gilbert) in the Brockman Trust structure and addressing the allegations of dishonesty that have been made against me, I briefly summarise below the related proceedings in which I (and Mr Gilbert) have been involved.

*The Tangarra Proceedings*

18.   As the Court will now be aware (since the proceedings are referred to directly in the Redacted Order), Mr Gilbert has previously caused SJTC to commence proceedings against me and my company Tangarra Consultants Limited ("**Tangarra**") with the case number 2018: No.390 ("**the Tangarra Proceedings**"). Mr Gilbert and the lawyers he has instructed have previously indicated in hearings in England and in Bermuda that the Tangarra Proceedings have been authorised by this Court.

19.   In the Tangarra Proceedings, I have been accused, *inter alia*, of stealing USD 5.395m from the Brockman Trust in March 2016 and a further USD 16.8m in August 2018. A financial claim for £5m is also made against me in relation to monies paid to my then solicitors Herbert Smith Freehills ("**HSF**") in September 2018. There is also a sweeping claim made against me for an account. A copy of the Statement of Claim in the Tangarra Proceedings is at pages 17 to 56.

20.   In my Defence in the Tangarra Proceedings (see pages 57 to 80) I have made clear that these payments were all received in good faith and were authorised by Mr Brockman, whose role I explain in more detail below. Nonetheless I have, in my Defence, agreed to repay all these sums but my claims against Mr Brockman remain.

21.   Mr Gilbert also caused SJTC and one of its subsidiaries, Spanish Steps Holdings Ltd, to seek injunctive relief against me in England in support of the claims made against me in the Tangarra Proceedings. This has resulted in a wide-ranging order for disclosure being made against me by Mr Stephen Jourdan QC on 18 December 2018 (see pages 81 to 89) as well as an *ex parte* worldwide freezing injunction in relation to the financial claims

that have been pursued against me which was made on 19 June 2019 (see pages 90 to 100).

22.   All of the sums claimed have now been secured either by means of payment into Court in England or monies being held subject to solicitors' undertakings.

23.   As I explain in detail below, the allegations of theft that have been made against me in the Tangarra Proceedings are unfounded and, at the very least, those allegations should never have been made against me in unqualified terms.

24.   Those allegations have also been deployed in a highly misleading way by Mr Gilbert (who I believe is acting at the direction of Mr Brockman) to obtain injunctive relief in other proceedings and it therefore seems likely that they have also been deployed in a misleading way in the Trust Proceedings.

*The Cabarita Proceedings*

25.   On 25 October 2019, SJTC's sole shareholder Cabarita (PTC) Limited ("**Cabarita**") (of which I am the sole shareholder and director) appointed Mr James Watlington and Mr Glenn Ferguson ("**the Independent Directors**") as additional directors of SJTC in order to ensure that SJTC was properly managed.

26.   By the time that the Independent Directors were appointed, I had become seriously concerned that SJTC was not responding appropriately to the DoJ Investigation, including in relation to a dispute about what should happen to documents which had been seized from my home following a search by the Bermuda Police Service ("**BPS**") in September 2018.   It was for this reason that I caused the Independent Directors to be appointed.   However, for the avoidance of doubt, I have always been clear that the Independent Directors should form their own independent views as to whether or not to pursue the claims made against me in the Tangarra Proceedings and that if they felt there was any substance in those claims then they should be fully and properly pursued.

27.   Shortly after Mr Gilbert learned of the appointments of the Independent Directors, in early November 2019 he caused proceedings to be commenced (with the case number

Exhibit A-48

2019: No.447 ("**the Cabarita Proceedings**")) in the name of SJTC in which he sought urgent injunctive relief to restrain the Independent Directors from acting and to obtain an order permitting him to act as if he was the sole director of SJTC. Mr Gilbert has indicated in the course of the Cabarita Proceedings that the Cabarita Proceedings were authorised by this Court.

28. Following an *ex parte* hearing (short notice of which was given to the Independent Directors but not to me or to Cabarita), the Chief Justice granted an interim injunction on 6 November 2019 ("**the Injunction**") (see pages 101 to 103).

29. In support of the application for the Injunction, Mr Gilbert swore an affidavit dated 5 November 2019 (see pages 104 to 111) in which he relied heavily on the allegations of theft and dishonesty that had been made against me in the Tangarra Proceedings and he stated that he was seeking the Injunction to "*hold the ring*".

30. In the submissions made in support of the Injunction, the lawyers instructed by Mr Gilbert in the name of SJTC also relied heavily on the allegations of theft that had been made against me in the Tangarra Proceedings. A copy of the skeleton argument relied on in support of the application for the Injunction is at pages 112 to 119, the transcripts from the hearing on 5 and 6 November 2019 are at pages 120 to 178, and the Chief Justice's short ex tempore judgment of 6 November 2019 is at pages 179 to 182.

31. Thereafter, Cabarita was joined as a defendant to the Cabarita Proceedings. The Amended Writ and Statement of Claim in the Cabarita Proceedings are at pages 183 to 199.

32. Cabarita then applied on 29 November 2019 to discharge the Injunction and strike out the Cabarita Proceedings on the basis that, *inter alia*, Mr Gilbert had commenced the proceedings in the name of SJTC without authority. Cabarita relied on the affidavit of my US attorney, Michael Padula which is at pages 200 to 221. Mr Padula's evidence was largely based on my instructions and I confirm that it is true, save for those statements which are made from Mr Padula's own knowledge which are true to the best of my knowledge, information, and belief. As Mr Padula explained in his affidavit,

7

Exhibit A-48

before the Independent Directors were appointed both the DoJ and the Attorney General were given prior notice and an opportunity to raise any objections but neither objected.

33. Before the hearing of Cabarita's application (which was eventually heard in February 2020) and without informing the Chief Justice, the Independent Directors, or Cabarita, on 19 December 2019 Mr Gilbert obtained the Redacted Order having apparently persuaded the Court in the Trust Proceedings that it was not necessary to notify any other person of that hearing or of the application to appoint Medlands as trustee of the Brockman Trust.

34. As directors of SJTC the Independent Directors ought to have been notified of the hearing on 19 December 2019 (and indeed of the hearing on 1 November 2019 since Mr Gilbert had been notified of the appointments of the Independent Directors before that hearing took place) and of the application for the appointment of Medlands since SJTC's position was being determined at that hearing. However, it seems that Mr Gilbert succeeded in persuading the Court in the Trust Proceedings to, in effect, determine that the Independent Directors had not been properly appointed so that no notice of the hearing had to be given to them. This was of course before their status had been determined in the Cabarita Proceedings, thus pre-judging (incorrectly, as matters turned out) that issue.

35. Mr Gilbert did not disclose, in the Cabarita Proceedings (either in his first affidavit dated 5 November 2019 or in his second affidavit dated 29 November 2019 pages 222 to 234) the fact that the hearing on 19 December 2019 was due to take place and that the identity of the trustee of the Brockman Trust was to be determined at that hearing.

36. The first time that Mr Gilbert revealed that there had been any change of trustee to the Independent Directors and to Cabarita was at the end of his third affidavit dated 3 January 2020 (and served on 6 January 2020) (see pages 235 to 244) where this crucially important development was referred to, nonchalantly, at the end of the affidavit.

37. Following an application by Cabarita for disclosure of further information about these developments, Mr Gilbert swore a fourth affidavit dated 24 January 2020 (see pages 245 to 262) in which he belatedly gave a carefully worded account of what had happened in the Trust Proceedings although he did not at that stage even provide a copy of the

8

Exhibit A-48

Redacted Order (which was not ultimately provided until 15 April 2020, more than 2 weeks after the Amended Writ in the Cabarita Proceedings had been struck out).

38. Mr Gilbert has so far failed to explain why he delayed in providing a copy of the Redacted Order for so long even though there was no restriction preventing him from doing so. I can only assume that he chose not to provide a copy at an earlier stage because he knew that the terms of the Redacted Order would have revealed to the Court in the Cabarita Proceedings the extraordinary lengths to which he has gone to prevent the Independent Directors and SJTC from finding out what has happened in the Trust Proceedings.

39. On 26 March 2020, the Chief Justice gave judgment discharging the Injunction and striking out the Amended Writ in the Cabarita Proceedings (see pages 263 to 299), thereby confirming the validity of the appointments of the Independent Directors. The Chief Justice also determined that he had no jurisdiction to make an order permitting Mr Gilbert to act as if he was the sole director of SJTC and that this part of the Injunction should never have been made.

40. The Chief Justice has since given directions for the determination of applications for consequential relief in the Cabarita Proceedings.

*The JR Proceedings*

41. Shortly after I left Bermuda to move to England at the start of September 2018, my home in Bermuda was searched by the BPS pursuant to a search warrant that had been obtained against me. This search warrant was prompted by the DoJ's Investigation in relation to which, as I have already explained, I am now a cooperating witness. The true target of the DoJ Investigation is (and always has been) Mr Brockman.

42. Amongst the materials seized from my Bermuda home were certain items of computer equipment which contained encrypted email communications passing between me and Mr Brockman from May 2014 until August 2018. This has become known as the "encrypted server".

43. As I go on to explain below, the emails on the "encrypted server" provide critical contemporaneous evidence which shows that the allegations of theft that that have been

Exhibit A-48

made against me are unfounded and should never have been made in unqualified terms because the payments I received were authorised by Mr Brockman.

44.   However, following the search by the BPS I was not able to access the material on the "encrypted server" and therefore (until recently) I was not in a position to use that material to defend myself against the allegations of theft that Mr Gilbert (acting at Mr Brockman's direction) has pursued against me.

45.   Although (as the Chief Justice has ultimately confirmed) I have always had a right to a copy of the materials seized from my home by the BPS pursuant to section 21(4) of the Police and Criminal Evidence Act 2006, there was a lengthy period of delay before I was able to obtain copies of the emails on the "encrypted server" because Mr Gilbert would not agree to copies of the materials seized by the BPS being provided to me or to the terms of a protocol to remove privileged documents from the seized materials before they were reviewed by the BPS.

46.   In late 2019 the Attorney General decided to impose a protocol for the review of the seized materials but Mr Gilbert caused further delay by causing Medlands to commence judicial review proceedings in January 2020 to challenge the Attorney General's decision in proceedings with the case number 2020: No.37 ("**the JR Proceedings**").

47.   Following a hearing in the JR Proceedings on 9 and 10 March 2020, the Chief Justice delivered judgment in those proceedings on 26 March 2020 (see pages 300 to 326) (on the same day as judgment was delivered in the Cabarita Proceedings).  In his judgment, the Chief Justice dismissed Medlands' challenge to the Attorney General's protocol and also determined that I was entitled to copies of the materials seized by the BPS (subject to the removal of any materials in respect of which Medlands could properly assert privilege against me).

48.   Thereafter, the BPS provided me with copies of some documents they had seized, including emails from the "encrypted server".  As a result I am now in a position to provide further evidence that was not previously available to me which shows that Mr Gilbert has systematically misled the Bermudian and English Courts by making unfounded allegations of theft against me which should never have been made, at least not in unqualified terms.

Exhibit A-48

49.   I therefore address below what I consider to be some of the most egregious and unfair examples of unqualified allegations that Mr Gilbert (and the lawyers to whom he provided instructions) have made against me in other proceedings and which it appears that he has relied on in these Trust Proceedings in order to persuade this Court to make serious adverse findings against me.

## My employment by Mr Brockman

50.   Before I address the allegations against me directly, it is necessary to explain some of the background to my involvement in the Brockman Trust, and in particular my employment relationship with Mr Brockman, to put my explanations for the payments I received into their proper context.

51.   As I go on to explain in further detail below, Mr Gilbert has a longstanding connection to Mr Brockman's off-shore entities going back to May 2003 and he has always known that Mr Brockman has been directing the administration of those entities, originally through Don Jones and then through me.  Furthermore, since the first quarter of 2019 Mr Gilbert has had copies of my email communications with Mr Brockman (including email between Mr Brockman and Don Jones) covering the period between January 2004 and May 2014 (some of which I refer to below) as a result of the Order for delivery up which was made against me in England on 20 December 2018 by Mr Jourdan QC.

52.   In circumstances where Mr Gilbert knew from my Defence in the Tangarra Proceedings that my defence arose from the fact that Mr Brockman had always directed the administration of the Brockman Trust, and that Mr Brockman had authorised the payments that were made to me, Mr Gilbert ought to have drawn these matters to the Court's attention in the Cabarita Proceedings but he did not do so.  I therefore assume that Mr Gilbert has also failed to give a full account of these matters to the Court in the Trust Proceedings and that Mr Brockman (who is also a party to the Trust Proceedings) has also failed to correct the position.

Exhibit A-48

*My first involvement with Mr Brockman*

53.   I first became aware of Mr Brockman when I was working as an attorney at Cox Hallett Wilkinson between 1999 and 2001.  During that period I carried out some work in relation to the Brockman Trust structure and as a result I met Don Jones who worked for Mr Brockman in a role which was very similar to the one which I later assumed and which I describe in more detail below.  I explain Don Jones' background and role in more detail below.

54.   The particular matter that I was working on while I was at Cox Hallett Wilkinson was dealing with requests for information from the Bermudian authorities concerning SJTC and the Brockman Trust which had arisen as a result of an audit being carried out by the US Internal Revenue Service ("**IRS**") into Mr Brockman's financial affairs.  We were ultimately able to satisfy the requests of the authorities without the IRS taking any further action in relation to the Brockman Trust at that time.

55.   I understood from subsequent conversations I had with Don Jones and Mr Brockman that Mr Brockman was impressed with my work on the matter and that is why I was subsequently recruited by Mr Brockman.

*The role of Gordon Howard*

56.   Although the director of SJTC at the time when I was at Cox Hallett Wilkinson was Gordon Howard, I received all of my instructions from Don Jones who was in turn being directed by Mr Brockman (I believe this was also the case in respect of work done for SJTC by other firms, for example Conyers marked its invoice to SJTC dated 8 May 1998 (see page 624) for the attention of Don Jones even though Don was never a director of SJTC).

57.   To the best of my knowledge, Mr Brockman has always directed the administration of the Brockman Trust both before and after my involvement.

Exhibit A-48

58.    Gordon Howard was originally a trust manager at Bermuda Trust Company Limited, the original trustee of the Brockman Trust and was the principal officer concerned in the administration of the Brockman Trust since its creation in 1981.  He subsequently left Bermuda Trust Company with three of his colleagues and founded Grosvenor Trust Company Limited ("**Grosvenor**") which acted as trustee of the Brockman Trust from December 1994 onwards.  When SJTC first started acting as trustee in March 1995, Grosvenor continued to provide administration services through Gordon Howard who was the first director of SJTC.

59.    Aside from a period between the establishment of Grosvenor and Grosvenor beginning to act as the trustee of the Brockman Trust, I believe that Gordon Howard was pretty much continuously involved in the administration of the Brockman Trust between its creation in 1981 and his death in August 2010.

60.    Gordon Howard did not perform any executive role at all.  All decisions were made by Mr Brockman and implemented by Don Jones, with Mr Howard providing the corporate formalities where required, acting entirely on Don Jones' instructions.  This continued after I later took on Don Jones' role.

61.    Mr Brockman's attitude towards Gordon Howard is recorded in an email that he sent to me on 24 October 2004 (see page 327) in which he discussed the possibility of Gordon Howard leaving his role (which was a possibility at that time as a result of Grosvenor's business being bought by Butterfield Bank in 2004) and noted that if that happened "*the day to day administration of St. John's can be carried on by the administrator lady – keeping of records, payments of fees, etc.*" and he went so far as to say that "*Gordon's presence in regards to the [Brockman Trust] is desirable for making things smell good in the course of an inquiry, but is not absolutely necessary*".

62.    In my experience, whenever something needed to be done formally by Gordon Howard, Mr Brockman would just direct him to do it (through me or Don Jones) and then it would be done without question.

63.    By way of example, I refer to an email dated 25 July 2010 that Mr Brockman sent to me (see page 328) to which he attached a draft letter (see page 329) to be sent out by Gordon

13

Exhibit A-48

Howard in the name of SJTC to Centre College, which was the recipient of charitable donations from the Brockman Trust. In his email, Mr Brockman said that the letter "*is ready to be sent by Gordon*". There was never any suggestion that Gordon Howard would have any discretion in the matter. He just did what he was told to do.

64.   This was also the case in relation to financial transactions within the Brockman Trust structure. I refer by way of example to an email dated 25 July 2010 (see page 330) from Mr Brockman to me in which he asked me to get Gordon Howard to sign some documentation on behalf of Spanish Steps Holdings Ltd required in order to approve loans being made to certain executives at a company within the Brockman Trust structure. As Mr Brockman said in his email "*[i]mportantly, it is just his signature that is required – along with a bunch of places to be initialed. All dates are already filled in*". This was a typical example of the way that Mr Brockman operated.

65.   It can be seen from the emails that I describe above that Mr Brockman used the email address "permit1@lambdaprime.org" and that my email address was "redfish@lambdaprime.org". As I go on to explain below in more detail, Mr Brockman was obsessed with data security and over the years he used a number of different secure email systems for the purpose of communicating with me and others involved in running the structure.

66.   We also used other aliases in some of our email communications but, for the most part, my email address was "redfish" and his was "permit" or "permit1" on whichever email system we were using.

*Universal Computer Systems*

67.   In around 2001, Mr Brockman came to Bermuda to attend a dinner for the various service providers who did work relating to the Brockman Trust. I was invited to that dinner and this was the first time that I met Mr Brockman.

68.   Later in 2001 I resigned from my position at Cox Hallett Wilkinson to take up a role in Mr Brockman's company, Universal Computer Systems and one of its subsidiaries,

14

Exhibit A-48

Kalamazoo.  Universal Computer Systems is held through the Brockman Trust structure. I was recruited for this role by Mr Brockman.

69.  Initially I worked in Houston for a month but after that I moved to Birmingham in the UK to take up a role as in-house counsel.  However, after I moved to Birmingham I still travelled regularly to Universal Computer Systems' head office in Houston so that on average I spent around 2 weeks of every month in Houston.

*Working directly for Mr Brockman*

70.  In around May or June of 2003, on one of my trips to Houston, I was invited to attend a meeting with Mr Brockman in his office on the 6th floor of Universal Computer Systems' head office in Houston.

71.  In that meeting, Mr Brockman asked me if I would be interested in taking up a new role working directly for him which he told me would involve working with Don Jones in Bermuda with the potential to take over from him in due course when he retired.  At that stage I did not know Don Jones very well although as I have explained I had dealt with him when I was at Cox Hallett Wilkinson.

72.  Mr Brockman told me that if I was interested in the position, I would have to consent to a background check being carried out on me.  I agreed to this condition and, after that check was completed, I agreed to take up the new role.

73.  Mr Brockman told me that Don Jones used a company named Pilot Management Ltd to employ him so that he could obtain a work permit in Bermuda.  Don Jones advised me to set up equivalent arrangements.  Therefore, for the purpose of my new role working for Mr Brockman I incorporated Tangarra on 23 July 2003 which was the entity that formally employed me so that I could obtain a Bermudian work permit.  I understand this to be a commonly used arrangement for obtaining a work permit in Bermuda.

74.  Tangarra in turn had a consultancy agreement with Wedge Consulting Limited, another company operated by Don Jones which was ultimately owned by Don Jones' family trust, although I always reported directly to Mr Brockman and was in very regular contact with

Exhibit A-48

him by email and telephone.  I also had face to face meetings with Mr Brockman about 3 or 4 times per year.

75.  Subsequently, in around January 2004, I moved to Bermuda to formally start my new role.  This role involved work relating not only to the Brockman Trust but also to various other structures connected with Mr Brockman.

76.  Between 2004 and October 2007, I was based in Bermuda although the role always involved a lot of international travel.  Between October 2007 and August 2010, I was based in Geneva where my wife was working for a Swiss law firm.  In around August 2010 we moved back to Bermuda and I was based there until, as I explain below, we decided to relocate to England in the course of 2018.

77.  In the period between 2004 and August 2010 I was paid, through Tangarra, by entities associated with Mr Brockman which were outside of the Brockman Trust structure.  From August 2010, when I became a director of SJTC, a part of my salary was paid directly to me from SJTC for the work I was carrying out in Bermuda as a director of SJTC.

78.  Throughout my employment with Mr Brockman I acted in accordance with his instructions and, as I explain below, Mr Brockman also determined my remuneration package.

*Working with Don Jones*

79.  Don Jones had been working with Mr Brockman since the early 1980s, originally as the CFO of Universal Computer Systems (or possibly a predecessor company).

80.  Based on my conversations with Mr Brockman and Don Jones, I understand that in the course of the 1980s Don Jones began to take on a role assisting Mr Brockman in directing the administration of the various off-shore entities associated with Mr Brockman, including the Brockman Trust.

81.  In around 1994 or 1995, Don Jones had moved to Bermuda to be Mr Brockman's man on the ground to deal with the off-shore structures.

Exhibit A-48

82.   When I started working full time with Don Jones it would be fair to say that we had a difficult relationship.  There were a number of reasons for this.

83.   First of all, I was not Don Jones' first choice to be his potential successor.  Don's preferred choice had been someone called Andrew Keuls who had worked at ATU General Trust, which was a trust company in the BVI owned by VP Bank.  Don had developed a close working relationship with Andrew Keuls as they worked together on administering the non-Brockman Trust entities in the BVI.

84.   However, Andrew Keuls left VP Bank suddenly in the first half of 2003.  As I explain below, Mr Gilbert was in fact recruited by VP Bank to take over from Andrew Keuls in May 2003 which was how Mr Gilbert first came to be involved with the Brockman related entities.  Andrew Keuls had been the contact for many of the nominee directors in Mr Brockman's off-shore entities and Mr Gilbert took over that role when he replaced Andrew Keuls.

85.   The second major reason why there was tension between me and Don Jones was that Don Jones liked to travel regularly to meet the service providers who were working on the Brockman related entities.  In the early years I felt like I was barely in Bermuda because Don Jones was always travelling and I had to go with him.  In 2004 alone we went to the BVI six times, each trip being for at least a week.

86.   Don Jones rented an office in VP Bank's building in the BVI which was where we spent most of our time when we were in the BVI.  All of the BVI files for the Brockman entities were kept in that office.  Mr Gilbert worked in the same building so he was the person we saw most often when we were there.

87.   Don Jones thought that personal meetings were important to build relationships and he seemed to enjoy going to visit service providers in their offices, collecting and passing on local gossip.

88.   I also recall that in these meetings with service providers, including several meetings with Mr Gilbert, Don Jones was not very discreet about referring to Mr Brockman's involvement in directing the affairs of the entities he was dealing with.  He would often

17

Exhibit A-48

go on at length about what "*Bob wants*" or (referring to Mr Brockman) what our "*mutual client*" wanted. No one who attended these meetings could have been left in any doubt that Don Jones was relaying Mr Brockman's instructions.

89. By around 2007 I had begun to replace Don Jones but it was a gradual process. Mr Brockman only directly addressed the issue of Don Jones' retirement in December 2008.

90. I refer to two emails that Mr Brockman sent to me on 8 December 2008 (see pages 331 to 339) in which he set out the text of an email he had sent to Don Jones in which he indicated that it was time for Don Jones to reduce his workload and effectively retire and subsequently Don Jones' response.

91. In his email to Don Jones, Mr Brockman wrote that:

> "*The goal is to make the amount of time that you have to be involved to be minimized. Your value is historical knowledge and the ability to act as standby de facto trustee in the event something should happen to me.*"

92. My understanding based on my years of experience of working for Mr Brockman is that Mr Brockman has always viewed himself as the "*de facto trustee*" of the Brockman Trust and has directed its administration accordingly.

93. Thereafter, Don Jones' involvement in the Brockman related entities reduced substantially and I took over his role as he moved into retirement, Don Jones finally retiring in around 2010 (although even after 2010 Don Jones still did some work and occasionally made some trips with me). He subsequently died in 2016.

*Performance reviews by Mr Brockman*

94. While I was working for him, every year Mr Brockman would review my performance and determine my remuneration.

95. By way of example, I refer to a performance review for the year ending 31 December 2005 and my response to the review which are at pages 340 to 345. In that review, Mr Brockman set my annual remuneration for 2005 at USD 155,000 plus a bonus of USD

50,000 and he determined that my annual remuneration for 2006 would be increased to USD 175,000 plus a bonus opportunity of USD 60,000.

96.    Although the performance review was written by Mr Brockman, he signed it off as being from Wedge Consulting Limited even though he had no formal connection to that company.

*Mr Brockman's working methods*

97.    Mr Brockman's standard method of working was that he would give me and Don Jones directions by email and telephone as to the tasks he wanted us to carry out in relation to the Brockman Trust structure and other entities associated with Mr Brockman. Many of these instructions would then be recorded in more formal "to do" lists which Mr Brockman would send to me and Don Jones. We would work through these lists until the tasks that we had been directed to do by Mr Brockman had been completed. When we met Mr Brockman in person we would have long meetings where we would go through the latest "to do" list in detail.

98.    By way of example, I refer to an email that Mr Brockman sent to me on 18 September 2004 (see page 346) to which he attached one of these "to do" lists (see pages 347 to 359). As can be seen from that "to do" list, Mr Brockman gave very detailed instructions directing the administration of the Brockman Trust and all of the other entities that were associated with him. The "to do" lists were updated from time to time with some items being removed as they were completed and new items being added along the way.

99.    In my experience, as I believe the matters set out below in this affidavit demonstrate, Mr Brockman was intimately involved in every aspect of the administration of the Brockman Trust and it was administered exclusively at his direction. He made all of the substantive and strategic decisions and he directed others to implement them. Nothing material ever happened in relation to the Brockman Trust that was not ordered or approved by Mr Brockman, either in writing or orally (although the process of obtaining instructions from him could be slow as Mr Brockman was always behind on his emails and I often needed to press him for an instruction by telephone).

Exhibit A-48

*Creation and maintenance of the electronic database*

100. One of my earliest tasks when I was working for Mr Brockman (as can be seen from the above mentioned performance review (see paragraph 95 above) and the email and "to do" list (see paragraph 98 above)) was putting together an electronic database of all historical documentation relating to the Brockman Trust structure and other entities associated with Mr Brockman.

101. When I first started working for Mr Brockman, the entity records were mainly in hard copy format and had not been well organised which meant that it could be difficult to find relevant documentation. As I explain in more detail below, Mr Brockman was also keen to ensure that the entity documentation was held securely and that no documentation was retained unless there was a legal requirement to do so.

102. Mr Brockman considered the creation of an electronic database to replace the haphazard hard copy filing system which preceded it to be a very important task and he took an active role in directing and overseeing my work on the project.

103. I refer to an email that Mr Brockman sent to me on 1 November 2004 (see page 360) to which he attached a document (see pages 361 to 362) setting out a very detailed critique of an early version of the database that I had produced.

104. Mr Brockman was very keen that the database should be organised in a particular way using file naming conventions in accordance with a system which he had devised. Mr Brockman set out his directions in this regard in an email to me on 21 January 2005 (see page 363) to which he attached a detailed document (see pages 364 to 366) setting out the naming conventions that I was to use.

105. I completed the initial project of creating a database of the Brockman Trust structure documents in around February 2005. Mr Brockman was pleased with my work and considered that it had achieved his objectives. This was recorded in an email that Mr Brockman sent to me on 10 February 2005 (see page 367) in which he stated:

> "*After reviewing the DATA file with the [Brockman Trust] documents in it – my comment is "simply brilliant result".*

20

Exhibit A-48

> *It is exactly the execution of what I have been dreaming of these last couple of years. It will enable you to have on a [encrypted] on a disk drive easy access to all documents from everywhere while retaining no physical copies in Bermuda. Only the absolute bare minimum legally required physical documents will have to be retained in any jurisdiction."*

106. Once I had scanned all the old hard copy materials, I continued to maintain a fully organised electronic database of the records from the structure which was organised in accordance with a modified version of the filing system that Mr Brockman had first suggested and which I endeavoured to develop and improve over time. I provided a copy of this database to Mr Brockman and kept his copy updated on a regular basis.

107. Initially it was possible to provide the data files on the Brockman Trust entities to Mr Brockman by email but as the files grew larger that was no longer practical so I would transfer the data onto an SD card which I would provide to Mr Brockman either by courier or in person when we met. Mr Brockman anticipated this problem which he described in another email to me dated 10 February 2005 (see page 368) in which he stated that:

> *"I think the files will very shortly become too big to transmit. They will also overrun a CD.*
>
> *An encrypted DVD by post will work for awhile - maybe quite a while, but it eventually will also become overrun.*
>
> *Then it will be an encrypted disk drive.*
>
> *In any case hard copies will be in custody here, so I will only need the DATA files for ease of reference and cross checking to make sure the hard copies are here.*
>
> *The principal reason for looking at it now is to make sure that it is coming out right."*

108. As Mr Brockman indicated in that email, he personally kept hard copies of many of the entity documents but he wanted to have regular updates of the electronic version of the database for ease of reference and cross-checking against the hard copies which he held to make sure he had the hard copy versions. There were, however, many more documents on the electronic database which he would not have had in hard copy because they had been held by Don Jones or one of the various service providers that carried out work on

Exhibit A-48

the Brockman entities.  Getting access to the documents he did not have hard copies of was one of the main reasons why he wanted me to set up the electronic database.

109.  As indicated above, Mr Brockman was obsessed with ensuring that the database remained secure.  I refer by way of example to an email exchange between me and Mr Brockman in early September 2010 (see pages 369 to 371) where we discussed the security arrangements for travelling with a copy of the database on various different devices.  It can be seen from that email that one of Mr Brockman's concerns was the possibility that a device containing the database could be seized by US customs.  The email refers to an old laptop that had been used by Mr Gilbert from when he had carried out some accountancy work in relation to the Brockman entities between 2008 and 2010 which I refer to in more detail below.

110.  There was one occasion in October 2010 when I sent an unencrypted copy of the electronic database to Mr Brockman by courier to Houston.  Mr Brockman was very unhappy that I had done this and in an email dated 30 October 2010 (see pages 372 to 373) he said "*[g]iven the seriousness of the content, don't ever send anything like this un-encrypted again.  A compromise of this data could have been disastrous.*"

111.  There was also an incident in May 2011 when I attached a copy of a list of the documents held by Mr Brockman to an email that I sent using one of my personal email addresses which was not encrypted.  Mr Brockman was very angry about this as he considered it to be a serious breach of security which he made clear in an email that he sent to me on 24 May 2011 (see page 374).

112.  Mr Brockman took this latter "*breach of security*" so seriously that it was still referred by him almost 5 years later as being "*the worst breach of security ever to happen to date*" in a section at the end of one of his "*to do*" lists dated 13 January 2016 dealing with matters which he called "*Dangling Threads*" (see page 389).

113.  I therefore had to find inventive ways to protect any SD Card that I sent to Mr Brockman by courier, for example I refer to an email exchange between me and Mr Brockman from late January 2012 (see pages 391).

22

Exhibit A-48

114. Up until March 2013, I used to provide a spreadsheet to Mr Brockman with a comparison of the number of file directories and files on my external hard drive and the SD card that I was providing to him to demonstrate that he had a complete copy of everything I had. I refer by way of example at pages 392 to 393 to an email that I sent to Mr Brockman on 18 November 2012 to which I attached such a spreadsheet. After March 2013 I no longer produced these spreadsheets but I continued to provide Mr Brockman with an SD card containing the up to date entity files as described above.

115. The last time that I provided a copy of the database to Mr Brockman was in the middle of June 2018 when I met him in Rome and we were staying on a boat, the Albula.  On that occasion, I gave Mr Brockman an SD card containing a copy of the database I had maintained which was up to date to that time.  I refer to an email exchange with a hotel concerning my trip to Rome on 15 and 16 June 2018 (see pages 394 to 400), cancelling my hotel booking.  A room had become available on the Albula and Mr Brockman insisted that I must stay there.

*Mr Brockman's methods of secure communication*

116. As will be apparent from some of my communications with Mr Brockman which I have referred to above, establishing secure methods of communication was very important to Mr Brockman throughout the time that I was working for him.

117. From the time of the IRS audit in the late 1990s onwards, Mr Brockman was always worried that there might be another IRS audit in the future which could affect the Brockman Trust. He was extremely concerned about this possibility and therefore took steps to ensure that his communications with those who were working for him were carried out in a secure way.

118. As an example of Mr Brockman's attitude to these matters, I refer to an email that he sent to me on 12 June 2013 (see page 401) in which he wrote:

> *"I don't know how much you hear about the Big Brother activities of the US government.*
>
> *However it is as big and as bad as we ever dreamed off. Even the Post Office takes pictures of the front and back of all mail pieces (probably just first class.*

23

Exhibit A-48

*It all points up the need to figure out a good video conferencing piece of software that will run over a VPN from one dedicated IP address to another.*"

119. Mr Brockman did not want there to be any records of our telephone conversations. He made this clear to me in an email dated 19 October 2004 (see page 402) in which he instructed me to call him through the Universal Computer Systems switchboard so that there would be no permanent record of our calls. In later years we used a secure application called Silent Phone when we spoke to each other.

120. In terms of email communications, when I first started working for Mr Brockman, we used aliases. I was known as "Michael Gilbert", Mr Brockman was known as "John Barnes" and Don Jones was known as "Harry Andrews".

121. When I first started, Mr Gilbert had already been assigned one of these aliases and was using encrypted email for communications. He was known as "Tina Nash" (see by way of example two emails from 3 September 2004 at pages 403 to 404).

122. In January 2005 we switched to a domain named "houstonfishingservice.com" which was when we started to use the "permit" and "redfish" names, as well as other fish related codenames for other individuals working for Mr Brockman. The switch to this system is recorded in an email that Mr Brockman sent to me and Don Jones on 1 January 2005 (see pages 405 to 406) in which he set out all of the codenames and passwords for the new system and to which he attached instructions for how to set up and use the new system (see pages 407 to 411).

123. Mr Gilbert was initially known as "chum" under this system until he left ATU General Trust in May 2005 (see for example an email sent by Mr Gilbert on 22 April 2005 at pages 412 to 413).

124. He was subsequently assigned the name "snapper" when he started working on the Brockman related entities again in 2008. This was the name that Mr Brockman directed me to assign to him in an email on 16 November 2008 (see page 414). I refer to an example of Mr Gilbert using the "snapper" email address on 24 November 2008 at page 415.

24

Exhibit A-48

125. In the years following 2005 we used a number of different email systems as Mr Brockman insisted on upgrading security whenever he came across a new system which he felt was more secure. The "@lambdaprime.org" domain which I have mentioned above, and which we were using in 2010, came into use with one such system.

126. Between 2005 and 2010 Mr Brockman also required us to use an encryption system called PGP. My usual practice during this period was to decrypt any email I received using the PGP system and save the text into an MS Word document under a file name which recorded the date and topic of the email. I still have the encrypted versions of the emails from this period but I no longer have the encryption keys so at this time I cannot decrypt the emails again. My records of emails from that period are therefore kept in the MS Word files I created at the time, many of which only contain the text of the main body of the email and not the details of the sender and recipients or the timing of the email.

127. In May 2014 Mr Brockman established the "encrypted server" which was a secure email system that I could only access if certain devices in Bermuda were connected in the right way. This secure email system was created by Mr Brockman's son and one of his son's friends. Mr Brockman and his son personally came to Bermuda to set this system up. This system used the domain name "@hannah.com". I lost access to the emails on this system as a result of the seizure of my equipment by the BPS in September 2018 and was unable to access any of them again until after the BPS provided copies to me following the Chief Justice's decision in the JR Proceedings.

*Mr Brockman's collection of pre-signed undated resignation letters and electronic signatures*

128. One of the ways in that Mr Brockman secured his control over the Brockman Trust and other entities was to procure undated signed resignation letters from people who assumed roles within these entities.

129. In some cases, he also procured copies of electronic signatures so that he could use them to sign documentation relating to the entities if he needed to.

25

Exhibit A-48

130. For example, in an email which Mr Brockman sent to me on 23 September 2006 (see page 416), Mr Brockman instructed me to "*verify that there are letters of resignation from all trustees – and that I have the originals*".

131. I also refer to an email exchange between me and Mr Brockman in from December 2010 (see page 417) in which I explained that I was having difficulty in sending my digital signature to him and I asked whether I should just sign a sheet of paper and scan it and email it to him or keep trying to export the file containing my electronic signature from my computer. Mr Brockman instructed me to keep trying to export my electronic signature. I was subsequently able to provide my electronic signature to him and, so far as I am aware, Mr Brockman still retains that electronic signature to this day.

132. Mr Brockman also required undated and pre-signed resignation letters from the directors of the Brockman Trust's corporate protector in case Mr Brockman ever needed to replace the protector for some reason. I refer to an email that Mr Brockman sent to me on 14 November 2010 (see pages 418 to 420) which records this practice.

133. The instruction to maintain copies of undated pre-signed resignation letters was also eventually recorded in the "to do" lists that Mr Brockman produced. For example I refer to an email that Mr Brockman sent to me on 19 May 2012 to which he attached a "to do list" dated 16 May 2012 (see pages 421 to 435)).

134. In that "to do" list, in a section headed "*PROJECTS – OTHER*", one of the items was:

> "*-doomsday documents - need wet-ink signed documents that establish control over such that there is one envelope of documents each for:*
> *-St. John's structures*
> *-entities that have funds in Cabot*
> *-entities that have funds in Edge*
> *-entities that control Regency*"

135. Later in the same document, under the heading "*PROJECTS – TRUSTEES & TRUST PROTECTORS*", Mr Brockman set out the following items:

> "*-establish Graham Wood as Trust Protector personally for the AEBCT, he then resigns and Acquitaine becomes the corporate Trust Protector where Graham Wood is Director*

> *-document telephone conversation with Trevor Lloyd prior to his death where he resigns and concurs with your suggestion as Graham Wood personally as successor – provide an original wet-ink signed copy of this memo to Bob*
>
> *-have Graham Wood personally resign and do a formal deed appointing his corporation signed in wet ink*
>
> *-for backup purposes, secure a wet-ink signed letter of resignation and appointment of a new Trust Protector with date and appointee left blank – send this to Bob*
> *-secure a digital signature from Graham Wood along with a wet-ink signed authorization to use it, provide this signature to Bob along with an original of this authorization*
>
> *-prepare an Adobe version of the formal deed with date and appointee left blank ready for use with the digital signature – send a copy of this to Bob"*

*Becoming a director of SJTC*

136.  Initially, I did not have any formal role with SJTC although I was involved in dealing with SJTC and the Brockman Trust structure generally from when I first started working for Mr Brockman in 2004.  As indicated above, everything in relation to these entities was done at Mr Brockman's direction.

137.  As also explained above, I was based in Bermuda between 2004 and October 2007.  I got married on 21 October 2007 and my wife had a job starting at a law firm in Geneva immediately after our honeymoon, so we moved to Geneva and lived there until we returned to Bermuda in around August 2010.  While I was living in Geneva I carried out my work for Mr Brockman from there.

138.  The fact that I did not have a formal role in SJTC became increasingly problematic over time because I was often asked about my relationship to the Brockman Trust, SJTC, and the entities within the structure by third parties in the course of performing my duties for Mr Brockman.

139.  In July 2010, I raised this issue with Mr Brockman and suggested I should take on a formal role in SJTC.  Mr Brockman approved my suggestion in an email dated 26 July 2010 that I would become a consultant or employee of SJTC and my salary would be split so that some was paid by SJTC.  I refer to the full email chain at pages 436 to 437.

Exhibit A-48

140. In early August 2010, Gordon Howard (who was at that time a director of SJTC) died suddenly in a house fire so Mr Brockman instructed me to take up a role as director of SJTC. I complied with Mr Brockman's instructions and I was formally appointed as a director of SJTC.

141. The other director of SJTC at that time was Duncan Hall who had been appointed in January 2009 but he, like Gordon Howard, performed no independent executive function and followed my and Don Jones' instructions (which emanated from Mr Brockman). Mr Brockman wanted two directors in Bermuda and Don Jones could not act because he was a US citizen.

142. After my appointment as a director of SJTC, Mr Brockman continued (as he always had done before) to direct the administration of the Brockman Trust. For example, in an email dated 7 October 2010 (see page 438) he directed me to draft letters to two colleges that had received donations from the Brockman Trust to announce myself as Gordon Howard's replacement and he told me that the purpose of the letter was "*towards continuing the dialog started by Gordon*". After I had prepared a draft, Mr Brockman sent me his approved version on 13 October 2010 (see pages 439 to 441) which, on his instructions, I sent out.

143. Mr Brockman also continued to direct the administration of the entities in the Brockman Trust with regard to financial matters. By way of example, I refer to an email that he sent to me on 4 May 2014 to which he attached an employment contract setting out the terms of Mr Brockman's role as an executive of Universal Computer Systems (see pages 442 to 459). Mr Brockman instructed me to sign the document on behalf of Spanish Steps Holding Ltd to guarantee the payments due under the agreement from Universal Computer Systems to Mr Brockman. As always, I did as I was instructed to do and signed the document and returned it to Mr Brockman.

28

Exhibit A-48

*Increased responsibility and remuneration package*

144.   As mentioned above, over the time I was working for Mr Brockman I took on more responsibilities and between around 2007 and 2010 Don Jones was phased into retirement so that by around 2010 I had taken over from him completely.

145.   During my employment with Mr Brockman my remuneration package increased. I was always paid a lot less than Don Jones (although I only discovered this later on when I took over from him) but as I became more experienced I also became more assertive in my negotiations and in 2014 I pressed Mr Brockman to improve my remuneration package.

146.   In 2014 Mr Brockman determined that my remuneration package would be substantially increased, with my salary rising from USD 420,000 to USD 700,000 and my bonus potential increasing from USD 175,000 to USD 800,000. A separate retirement fund was also established in 2014 into which Mr Brockman agreed to pay USD 1 million per year every December. These increases in my remuneration package are recorded in the attachments to an email which I sent to Mr Brockman on 5 April 2014 at page 460. That email attached a performance review (see pages 461 to 466) and a compensation memo (see pages 467 to 468). Notwithstanding these increases, throughout my employment with Mr Brockman I continued to be paid a lot less than Don Jones had been paid.

147.   The performance review and the compensation memo in 2014 produced by Mr Brockman were stated to be *"On Behalf of St. John's Trust Company (PVT) Ltd"* although it was not limited to my directorship of SJTC and covered everything I did for Mr Brockman. As I have explained above, only part of my remuneration was paid by SJTC.

*Litigation contingency fund*

148.   Another point I was discussing with Mr Brockman in 2014 was the need to establish a litigation contingency fund that I could use to deal with a renewed IRS audit or similar investigation in relation to the Brockman Trust.

29

Exhibit A-48

149.  As I have already mentioned, ever since the IRS audit in the late 1990s, Mr Brockman
had always been extremely concerned that there might be another audit in the future
which might affect the Brockman Trust.  I took the view that if there ever was such an
audit which led to an IRS Investigation then I would want to be sure that there were funds
available to deal with any litigation arising from such an investigation in order to protect
the Brockman Trust.  This was clearly in my interests too because it would give me the
opportunity to preserve my position in the structure.

150.  This point was recorded at the end of the compensation memo produced by Mr Brockman
and which I have referred to at paragraph 146 above where it was stated that:

>  "*With regards to the litigation contingency fund, this is a subject for further
>  discussion as to how this is best accomplished – as it is in the interest of all
>  parties for you not to be exposed or under pressure.*"

151.  Clearly, if the structure came under attack, my own position would be threatened and that
is what I understood Mr Brockman to mean when he made that comment.

152.  I was not satisfied with Mr Brockman's comments on this issue and I sent him an email
on 6 April 2014 (see page 469) attaching my comments in response to this and other
issues raised by the compensation memo (see pages 470 to 472).

153.  Mr Brockman replied with an email on 3 May 2014 (see page 473) to which he attached
his reply to my comments (see pages 474 to 475).  In that document, Mr Brockman stated
that:

>  "*Regarding the litigation contingency issue – for the sake of all parties
>  concerned – this issue must be satisfactorily concluded. Based upon your
>  comments, it seems that regarding legal expenses that the best answer is that
>  you be indemnified without limit as long as you are defending the structures.
>  How this should be memorialized beyond this document is unclear.*"

*Recruitment of a successor and severance package*

154.  In the same document, Mr Brockman went on to deal with the need for me to recruit a
potential successor and the arrangements for my severance package, stating that:

Exhibit A-48

"4) One of your annual goals (that reflect on your bonus attainment) will be to make progress towards finding, recruiting, and then training a backup for yourself that will ultimately replace you upon your retirement. I think that you can agree that the current mode of operation where you have no backup places an unusual degree of pressure on yourself. Plus from a business standpoint the current status can only be described as unwise.

5) Certainly to have your backup replace you prematurely would then cause a return to the current fragile situation would make no business sense for any party. However to remove this worry, a severance agreement that provides three years compensation if you should be terminated for any reason other than "for cause" would be in order."

## Mr Gilbert's involvement with Mr Brockman

155. To put matters into their proper context, I must also explain Mr Gilbert's involvement with Mr Brockman's off-shore entities.

156. The impression given by reading Mr Gilbert's affidavits in the Cabarita Proceedings is that he did not become involved with Mr Brockman's entities until 2017 and that his only role was as a director of SJTC and its subsidiaries. However, Mr Gilbert's involvement with Mr Brockman in fact goes back to May 2003 when he replaced Andrew Keuls at ATU General Trust in the BVI and he has performed a much wider role than simply acting as a director of SJTC and its subsidiaries. I refer to an email from Don Jones dated 29 May 2003 in which he explained to another service provider that Andrew Keuls had left VP Bank and that James Gilbert was the new contact there (see page 476).

157. As I have already explained, it was during this period in 2003, even before I started, that Mr Gilbert assumed the "Tina Nash" alias for email communications and I also recall visiting Mr Gilbert on multiple occasions in the BVI in 2004 and 2005 when Don Jones would openly refer to Mr Brockman as the source of his instructions in relation to the entities that Mr Gilbert was dealing with.

158. One of the projects that Mr Gilbert worked on for Mr Brockman in 2004 and 2005, while at ATU General Trust, was the financing of the construction of a property in Aspen called Mountain Queen. I refer to an email that Mr Gilbert sent to me about that project on 24 June 2004 (see page 477). Mr Gilbert acted on instructions provided by Don Jones which, as Don Jones made clear in the meetings with Mr Gilbert which I attended, were

Exhibit A-48

derived from Mr Brockman. Mr Gilbert told me in later years that he had even visited the Mountain Queen property, which was intended to be (and subsequently became) one of Mr Brockman's homes where he spends about six months a year.

159. In May 2005, Mr Gilbert left ATU General Trust. On his last day there he sent an email to me and Don Jones setting out his personal email address and telephone number so that we could contact him about an on-going project if we needed him as he was intending to travel back to New Zealand before taking on a new job at UBS in Cayman (see page 478).

160. In August 2008, when Mr Gilbert was still at UBS in Cayman, Mr Gilbert agreed to undertake some accountancy work in relation to the Brockman entities. He did this work privately rather than through UBS. I refer to an email that Mr Brockman sent to me on 24 August 2008 in which he approved the engagement of Mr Gilbert (see page 479). It was during this period that Mr Gilbert was assigned the "snapper" email alias.

161. By January 2010, Mr Brockman took the view that we could probably manage without Mr Gilbert's assistance and that I should take over Mr Gilbert's role. I refer to Mr Brockman's email to me on 19 January 2010 where he set out his views in this regard (see page 480).

162. I ultimately gave Mr Gilbert his notice in March 2010 which he was good natured about as, coincidentally, he had already given notice on his job at UBS to spend a year travelling. As I reported to Mr Brockman at the time, this was a fortunate outcome because it would have been difficult to contact him while he was travelling and he would have been travelling with his computer and data through the US and other tax-aggressive countries which I knew would have been a security concern for Mr Brockman. Mr Brockman agreed that this was a "*good outcome*" (see his email to me dated 9 March 2010 at page 481).

163. In accordance with Mr Brockman's comments quoted at paragraph 154 above, one of my tasks was looking for someone to act as my backup and potential successor. I was originally looking for someone much younger than me who could potentially take over from me when I eventually retired but by the end of 2016 I had not been able to identify

Exhibit A-48

anyone suitable for that role.  However, Mr Brockman needed someone to at least act as a backup for me and Mr Gilbert was identified as a suitable candidate for this role.

164. As I have explained above, by the end of 2016, Mr Gilbert had had a longstanding connection to Mr Brockman and entities associated with Mr Brockman.

165. He had departed his role on friendly terms in 2010 and from time to time Mr Gilbert had been considered for further involvement in the Brockman Trust thereafter.

166. In a "to do" list dated 16 May 2012 (see pages 422 to 435) under the heading "*PROJECTS – OTHER*" it is recorded that Mr Brockman instructed me to enlist Mr Gilbert as a backup signatory for Point Investments, Ltd (an extremely valuable investment holding company within the Brockman Trust structure).

167. Mr Gilbert duly became a back-up signatory for Point Investments, Ltd in October 2012 and this position was recorded in a "to do" list dated 29 September 2014 (see pages 482 to 497).   Mr Gilbert came to Bermuda in October 2012 and met with Bermuda Commercial Bank for this purpose (see pages 498 to 499).  I refer also to an email that I sent to Bermuda Commercial Bank attaching a resolution appointing Mr Gilbert as a backup signatory for the accounts held at that bank (see pages 500 to 501).

168. Also in the "to do" list dated 16 May 2012, under the heading "*PROJECTS – TRUSTEES & TRUST PROTECTORS*", Mr Brockman wrote:

> "*-begin to consider how to provide backup to Evatt – qualifications are:*
> *-accounting background*
> *-not a US citizen*
> *-capable of acquiring a Bermuda work permit of at least 10 years*
> *-might discover someone thru the scholarship program*
>
> *-James Gilbert is an interim backup for Evatt, should the emergency need arise.*
> *-he is from NZ and currently works for UBS in Cayman – age 40 +- very familiar with Edge and Cabot – wife is English -*
>
> *-Evatt is going to seek assistance from Kalamazoo to locate a more junior accountant preferably from NZ or Australia that is interested in a long term career in the offshore world*"

33

Exhibit A-48

169. In a subsequent "to do" list dated 19 March 2013 under this section the instruction "*need James Gilbert contact information*" (emphasis in original) was recorded (see page 505).

170. On 22 March 2013, I sent an email to Mr Gilbert asking for his contact information to which he responded later that day (see pages 515 to 516). I provided Mr Gilbert's personal contact information to Mr Brockman on the same day (see page 517).

171. I also raised the possibility of Mr Gilbert coming to work for Mr Brockman in an email to Mr Brockman on 20 March 2015 (see page 518) when I referred to a meeting I had with Mr Gilbert and mentioned that he might be an option for employment with the Brockman structure and that I knew he would like to move on from UBS.

172. The possibility of Mr Gilbert acting as my back-up remained on the "to do" lists thereafter. For example this item remained in the "to do" list dated 13 January 2016 (see pages 375 to 390) under the heading "*PROJECTS - TRUSTEES & TRUST PROTECTORS*".

173. I had some discussions with Mr Gilbert about him coming to work as my backup in November 2016. I refer to an email exchange we had following the birth of his second child, in which we discussed how to deal with work permit issues and agreed that a Tangarra entity would be incorporated in Cayman for this purpose. He sent me a copy of his then current employment contract as an example of how his employment contract for his new role might be structured (see pages 519 to 539).

174. Mr Gilbert was subsequently engaged to act as my backup and began working with me on the Brockman Trust structure in March 2017.

175. Mr Gilbert's primary occupation was described as financial controller in the Cayman Temporary Work Permit he obtained in May 2017 (see pages 540 to 543). His role was to look after all accounting and investing in the Brockman Trust structure. He was also a backup to me, which meant that he had to be added to all the bank accounts as a signatory (and accordingly had full access to all bank statements).

Exhibit A-48

176. He immediately became involved in the operation of the structures. I refer, for example, to an email exchange between us on 11 and 12 March 2017 (see pages 544 to 545) and to a subsequent email exchange from 19 April 2017 where we discussed some accounting work he was doing to do in relation to Point Investments, Ltd (see pages 546 to 547). I also refer to a detailed email discussion we had concerning the audit of Point Investments, Ltd between 26 and 28 April 2017 (see pages 548 to 551).

177. We also set up a dropbox account so that I could share documents with him that he needed to carry out the tasks he was working on. This is recorded in an email exchange between me and Mr Gilbert on 21 and 22 March 2017 (see pages 552 to 553).

178. Subsequently, in June 2017, he was appointed an additional director of SJTC and the underlying companies. However, just as my appointment as a director of SJTC was incidental to my broader role working for Mr Brockman so too Mr Gilbert's position as a director of SJTC or the other entities in the Brockman Trust structure was incidental to his role.

179. Mr Gilbert has also given the impression in his evidence that his role prior to my departure in September 2018 was purely on the charitable side of the Brockman Trust structure. For example, at paragraph 7 of his second affidavit in the Cabarita Proceedings he stated that:

> "In March 2017, Mr. Tamine hired me as a Financial Controller to provide services to St. John's and the Trust. This was a full time role. I began assisting with some of the accounts and working to oversee the charitable activities of the Trust. I was drawn to the role because it offered an opportunity to make a meaningful difference in the world through the management and expansion of the charitable activities of the Trust, including supporting the next generation of leaders and supporting cutting edge medical research. In June 2017 (when Mr Tamine was the sole director since his co-director Duncan Hall had resigned on 6 April 2013), Mr. Tamine indicated that he wished to appoint me as a second director of St. John's and he adopted a resolution doing so (pages 74-75). We served as co-directors from that time until his resignation on 28th September 2018. While we served as codirectors, Mr. Tamine focused on the investment and business side and frequently interacted with third parties on investment and business matters while I focused in the first instance primarily on the charitable activities."

35

180. This is nonsense.  As indicated above, Mr Gilbert was hired to work on the investment and business activities of the structure.  Indeed, he told me that the opportunity to work on the investment side was one of the reasons he was attracted to the position.  Other than a short period of time when we were flooded with scholarship applications (which were handled not only by Mr Gilbert but also by me and my wife and anyone else we could find to rope into the task), any involvement he may have had with charitable activities during the time that we were both involved in the Brockman Trust was minimal.

*Mr Brockman's continued involvement in the Brockman Trust*

181. Mr Gilbert has made a number of carefully worded statements in his evidence in the Cabarita Proceedings and in the JR Proceedings to try and give the impression that following my departure in September 2018 he does not have any communication (directly or indirectly) with Mr Brockman or receive directions from him with regard to the administration of the Brockman Trust, and to minimise his own connections to Mr Brockman.

182. At paragraph 15 of his third affidavit in the Cabarita proceedings, for example, he stated that:

> "*Mr. Padula says that Mr. Tamine has always acted on the basis that Mr. Brockman controlled the Trust. That has not been my experience as director of St. John's. I have been on conference calls in relation to the Trust's charitable activities, specifically the Brockman Scholarship Program and the Medical Research Grant Program and Mr Brockman has also been on those calls. Mr. Brockman has never given me instructions or directions regarding the operation of the Trust and I have always been guided by my duties as a director and St. John's' fiduciary duties to the Trust.*"

183. On the basis of my experience working for Mr Brockman, and dealing with the Brockman Trust structure for over 14 years, I believe that these statements, in so far as they suggest that Mr Brockman does not continue to direct the administration of the Brockman Trust to this day, are untrue.

184. Even if, today, Mr Brockman's directions in relation to the Brockman Trust structure are communicated through intermediaries such as the US law firm Miller & Chevalier (whom I know from personal experience have been working closely with Mr Brockman

36

Exhibit A-48

for many years – see for example my email exchange with Mr Brockman from June 2013 in which Mr Brockman confirmed that he had communicated with George Hani at Miller & Chevalier to deal with a conflict issue (see page 554)) rather than through direct communications between Mr Brockman and Mr Gilbert, as I have already said Mr Brockman has throughout the life of the Brockman Trust made all material decisions in relation to it and it is not realistic to suggest that he has suddenly stopped doing so. I believe that Mr Brockman will have continued to make all important decisions in the administration of the Brockman Trust, including the decision to pursue the Tangarra Proceedings, the Cabarita Proceedings, and the JR Proceedings. It is simply not in Mr Brockman's nature to take a back seat and leave these decisions in the hands of others.

185. Mr Brockman's association with Miller & Chevalier is deep and longstanding. By way of example I refer to an email Mr Brockman sent to me on 17 October 2006 (see pages 555 to 556) in which he described an occasion on which he personally went to Miller & Chevalier's offices in Washington DC to "*inquire after their retention of documents related to the 1992-1996 tax issues*".

186. He went on to explain how he had reviewed a large number of their files "*a page at a time*" because he "*wanted to shred personally anything that was super sensitive before turning them over to the outside document shredding and destruction service*" before urging me and Don Jones to exercise caution before providing any documents to law firms in the future because of the likelihood that they would be retained. He concluded by stating that "*[i]n general, I was super-impressed with the organization and thoroughness of M&C*".

187. I have been informed by my Bermudian attorneys that representatives of Miller & Chevalier (who also acted for me personally between 2016 and 2018) have been present at every significant hearing in the Cabarita Proceedings, the JR Proceedings, and the Tangarra Proceedings, as well as some minor hearings such as directions hearings.

188. I have no doubt that Mr Brockman continues to have a very close working relationship with Miller & Chevalier to this day and that he has used that relationship to direct the proceedings that have been brought against me and against Cabarita, as well as the JR Proceedings.

Exhibit A-48

*Mr Brockman's involvement in the Cabarita Proceedings*

189.  I note that Mr Brockman has intervened in the Cabarita Proceedings through the letter of support for Mr Gilbert which was sent on his behalf by Cox Hallett Wilkinson and which was exhibited to Mr Gilbert's second affidavit (see pages 557 to 558).  That letter can only have been sent as a result of communications (directly or indirectly) between Mr Gilbert and Mr Brockman.

190.  Moreover, even Mr Gilbert acknowledges that Mr Brockman was formally joined to the Trust Proceedings in July 2019 and that, apparently in the capacity as a representative of the individual beneficiaries, he was represented at the hearings which took place before Justice Subair Williams on 1 November 2019 and 19 December 2019.

191.  Therefore, at the very least, Mr Gilbert has at all material times had a formal mechanism for communicating with Mr Brockman and consulting with him (if necessary through his Bermudian counsel, Cox Hallett Wilkinson) as to whether what I said in my Defence in the Tangarra Proceedings about Mr Brockman's role in the payments I received from the Brockman Trust structure was correct.

192.  This point is even more pertinent in circumstances where Mr Gilbert has since confirmed that he sought and obtained Beddoe relief in the Trust Proceedings authorising the use of funds held on the terms of the Brockman Trust to pursue the Cabarita Proceedings.

193.  Since Mr Brockman has been a party to the Trust Proceedings throughout the relevant period, at the very least in that context he would have been formally on notice of the allegations made against me which must surely have been used to justify the pursuit of the Cabarita Proceedings and yet it appears very unlikely that the Court in the Trust Proceedings was told by Mr Brockman or Mr Gilbert that Mr Brockman had approved all of my remuneration that I now am now wrongly accused of stealing.

*Delaying access to the emails on the "encrypted server"*

194.  Lastly, Mr Brockman has always been aware that the emails I needed to defend myself against the allegations of theft, to which I refer in detail below, were contained on the

38

"encrypted server". He would also have been aware that I would not have access to those emails for so long as a protocol for reviewing the materials seized by the BPS could not be agreed.

195. It was clearly in Mr Brockman's interests to delay the release of those documents to me (so that I would not have the materials to be able to defend myself and Mr Gilbert could continue trying to destroy my credibility as a potential witness in any prosecution against Mr Brockman in the meantime), and to the US authorities (so that the materials seized by the BPS could not be used in their investigations against Mr Brockman). I believe that Mr Gilbert sought to delay the release of the BPS documents on Mr Brockman's instructions in order to further Mr Brockman's interests.

**Allegations that I stole money from the Brockman Trust**

196. As I have indicated above, a very prominent part of the evidence and submissions put forward by Mr Gilbert at the *ex parte* hearing in support of the Injunction was the allegation that I have stolen money from the Brockman Trust. I can only assume that these same allegations have been made against me in the Trust Proceedings.

197. For the reasons set out below I am now in a position to demonstrate that these very serious allegations of dishonesty and theft, which were of central importance to Mr Gilbert's case and had a decisive influence on the Court's decision to grant the Injunction in the Cabarita Proceedings, should never have been made, at least not in unqualified terms.

198. In particular, in his first affidavit in the Cabarita Proceedings, Mr Gilbert:

    (1)    (at paragraph 9) stated that SJTC "*has been engaged in significant litigation with Mr Tamine regarding, among other things...his **theft** of more than $20 million of Trust funds*" (emphasis added).

    (2)    (at paragraph 10) referred to a worldwide freezing injunction obtained against me in England in response to which I "*agreed to deposit $16.8 million into court*", that SJTC "*discovered a further **unexplained transfer** of $5.395 million to Tangarra*" (emphasis added) in the course of preparing the application for that freezing

injunction, and he went on to refer to my agreement to repay "*an additional UK£5million that [Mr Tamine] authorized to be transferred to Herbert Smith Freehills for his personal legal fees*".

(3)   (at paragraph 11) he said that "*[t]he fact that Mr Tamine has recently agreed to repay well over $25 million to the Plaintiff without admitting that he should never have taken such funds is extraordinary*" (suggesting that there is no honest explanation for the payments).

199.   The skeleton argument in the name of SJTC for the *ex parte* hearing in the Cabarita Proceedings also stated at paragraph 4 (see pages 112 to 113) that:

> "*St John's has commenced litigation against Evatt Tamine, a former (and, for a number of years, sole) director, for, in part, **stealing trust assets of a value of more than $20 million** and St John's seeks a full accounting to determine whether Mr Tamine has stolen additional trust assets.*"

(emphasis added)

200.   The skeleton argument returned to this theme at paragraph 23 (ironically in the section headed "*Full and Frank*"), where it was stated (see page 118) that:

> "*After a year of contentious litigation with St John's over the **more than $20 million that he stole from the trust funds**, Mr Tamine on the same day that St John's was given notice of these purported appointments agreed to repay all the money while claiming that he was entitled to it.  In his defence, Mr Tamine **now** claims that most of the money was for future services over a period of 6 years, though he previously told the bank that it was in satisfaction of money owed to hum under a contract based on percentage of assets.  Mr Tamine offered no explanation as to why, if the money was for future services, he refused to return it upon his resignation...The concern is that this is an attempt by Mr Tamine to temporarily repay the money to St John's until his self-appointed directors can reconsider the litigation against him (or avoid repaying it at all).*"

(emphasis added)

201.   Mr Adamson developed this point in his oral submissions on 6 November 2019 (see page 141), stating that:

Exhibit A-48

> *"So you have someone who has removed $20 million of assets or more, given differing explanations for why he has done it **in circumstances which appear to cry out that this was dishonest**, you have got someone who has given explanations for why he has refused to hand over Trust documents which have been found to be wrong or incorrect, or simply untruthful by an English High Court Judge; in other words, my Lord, we have serious concerns about Mr. Tamine."*

(emphasis added)

202. These unqualified allegations of theft and dishonesty were also recorded in the Court's judgment dated 26 March 2020 at paragraph 4 (see page 264) where it is stated that:

> *"Mr Adamson advised that SJTC has commenced litigation against a Mr Evatt Tamine, a former director of SJTC, for, in part, stealing trust assets of the value of more than $20 million and SJTC is currently seeking, in separate proceedings pending in this Court, a full accounting to determine whether Mr Tamine has stolen additional trust assets."*

203. The allegations against me also formed an important part of the Chief Justice's reasoning for granting the Injunction, with the Chief Justice stating in his short judgment on 6 November 2019 (see page 181) that:

> *"Having regard to the underlying background of this matter, in that St. John's Trust Company is engaged in substantial litigation and the recovery of assets from Mr Tamine and it has been suggested, and I put it no higher, that the appointment of these two Directors may end up seriously affecting the course of that litigation and the course of those proceedings pending, I think, on balance, the appropriate order to make is to restrain the new Directors from acting as Directors pending the determination of the inter partes hearing."*

204. I set out below in turn the evidence which shows that unqualified allegations of theft and dishonesty should never have been made, relating to:

(1) The payment of USD 5.395 million which I received (through Tangarra) in March 2016 ("**the USD 5.395m Payment**").

(2) The payment of USD 16.8 million which I received (through Tangarra) in August 2018 ("**the USD 16.8m Payment**").

Exhibit A-48

(3)   The payments totalling £5 million which were paid to Herbert Smith Freehills ("**HSF**") on my behalf in September 2018 ("**the HSF Monies**").

(4)   The repeated insinuation that there may be further, as yet unspecified, assets from the Brockman Trust structure that could have been dishonestly misappropriated by me and in relation to which I am said to have refused to provide an account ("**the Accounting Allegation**").

The USD 5.395m Payment

205.  The context in which the USD 5.395m Payment was made is as follows.

206.  In the course of 2015, Mr Brockman and I were discussing potential locations for the headquarters of the Brockman Trust.  One option that we were discussing was Bewdley, a property that was owned by my wife's family through a trust in which both my wife and her mother were beneficiaries.

207.  In a visit to Bermuda in May 2014, Mr Brockman and his son, Robert T Brockman II, visited Bewdley for the purpose of inspecting the property and assessing its suitability for the headquarters for the Brockman Trust.  The visit was arranged through a local real estate agent.  Bewdley had by that point been on the market for several years with an asking price in excess of USD 8 million but no one had been interested at that price level. On the same trip, Mr Brockman and his son set up the encrypted email server using the domain name "@hannah.com".

208.  The idea was that my wife would acquire Bewdley and then SJTC would enter into a lease to use it as the headquarters of the Brockman Trust.  Mr Brockman sent an email to me (using the "encrypted server") about this possibility on 30 June 2015 (see pages 559 to 560) in which he listed some of the pros and cons of the possibility of buying Bewdley for this purpose.

209.  I pressed Mr Brockman for a decision on this issue on 14 November 2015, by which time, as I understood matters, my wife had reached a preliminary agreement with her mother to purchase Bewdley for a price of USD 5,202,000 (or USD 5,523,000 on an instalment payment scheme).

42

Exhibit A-48

210. Mr Brockman responded with his views on the proposal in an email on 3 December 2015.

211. I responded by email on 4 December 2015, summarising the proposal for the purchase of Bewdley using a loan from the Brockman Trust structure to me (which would be repaid from my remuneration package) in the following terms:

> "- *Interest on the loan to acquire the property and the landlord's contribution to the refurbishment is set at 3.5%.*
> *- No drawdown on bonus or December investment allowance until the loan is paid in full.*
> *This should ensure that the loan is paid in full sometime in 2017.*
> *- These sums are deemed as paying down the loan on the following dates:*
> *Bonus – 1 January (regardless of when bonus is declared).*
> *Investment allowance – 1 December*
> *- Tenant is obliged to pay interest monthly in advance. This is made easier with the set pay down dates.*"

212. Mr Brockman replied on 6 December 2015 approving my summary save for pointing out that the tenant (i.e. SJTC) would pay rent rather than interest.

213. The email exchange between me and Mr Brockman which is described at paragraphs 209 to 211 above is at pages 561 to 564.

214. Following that discussion, the transaction progressed and I sent an update by email to Mr Brockman on 26 March 2016 (see page 565) explaining that we were close to completing the acquisition of Bewdley for a purchase price of USD 4.8 million (plus various other costs including anticipated stamp duty). I attached to that email a draft loan agreement between Spanish Steps Holdings Ltd (a company within the Brockman Trust structure) and me (see pages 566 to 574), a promissory note (see pages 575 to 577) and a spreadsheet showing the source of the funds for the transaction as well as the schedule for repayment (see pages 578 to 579).

215. Ultimately, the transaction resulted in a payment of USD 4.25 million to my wife's mother, upon which no stamp duty was payable. The additional monies were used for the renovation of the property because it cost a lot more than I had originally anticipated to renovate Bewdley to bring it up to the standard that Mr Brockman expected for the property to serve as the headquarters of the Brockman Trust.

43

Exhibit A-48

216. On the basis explained above, until I was notified of the Tangarra Proceedings in which the USD 5.395m Payment was claimed, I had considered that the outstanding loan had been repaid by the end of 2017, having been off-set against my remuneration for 2016 and 2017.  Mr Brockman also considered that the full amount had been repaid as we discussed and agreed in 2017 how much the payments in respect of my remuneration had to be reduced to take into account the repayment of the USD 5.395m Payment.

217. I believe the emails referred to above (to which I did not have access until after the Court's judgment in the JR Proceedings) make clear that I received the USD 5.395m Payment in good faith and with the express agreement and authorisation of Mr Brockman.

218. Before Mr Gilbert permitted the serious accusations to be made against me he ought, at least, to have made enquiries of Mr Brockman and Mr Brockman ought to have confirmed his authorisation of the payment.  Given that Mr Gilbert says that the Cabarita Proceedings were authorised by the Court in the Trust Proceedings I can only assume that either Mr Gilbert failed to make enquiries or Mr Brockman has failed to confirm the true position (despite Mr Brockman being a party to the Trust Proceedings).

The USD 16.8m Payment

219. The context in which the USD 16.8m Payment was made is set out below.

220. It has been falsely implied by Mr Gilbert that I "fled" Bermuda to go to the UK after a search warrant had been executed at the home office of a Houston-based lawyer, Mr Carlos Kepke.  This is untrue.

221. My wife and I had first decided that we wanted to move to the UK in the course of 2017. The reason for the move was that we wanted to send our daughters to school in the UK but we wanted them to attend as day students rather than going to boarding school.  We were therefore planning to re-locate to the UK while our daughters were at school there.

44

Exhibit A-48

222. As was well known to Mr Gilbert, my family was already living in the UK from April 2018 as my children had by then started attending school there as day students and from then onwards I spent a great deal of time there. I had actually planned to move to the UK full time from September 2018, something which James Gilbert knew better than anyone.

223. Mr Gilbert and I had extensive conversations from at least April 2018 about me working from the UK (I refer to an email exchange at pages 580 to 582 by way of example) and how, in time, I would support his move from the Cayman Islands to live and work in the UK or New Zealand once his children were older and would need better schools. Mr Gilbert and I scheduled work calls to suit both UK and Cayman times. In July 2018, Mr Gilbert and I also arranged a mutually convenient time for a work trip where we would meet in London in September 2018 (I refer to the email correspondence between us on this issue at pages 583 to 586), with Mr Gilbert knowing that I was in the UK.

224. Therefore, as I made clear in my Defence in the Tangarra Proceedings, I had been planning to move to the UK with my family for several months before September 2018.

225. In the course of preparing to move to the UK full time, I considered my personal tax position and realised that if I was to continue being remunerated every year at the level which I had been paid in the years leading up to 2018 then I would be likely to incur very substantial UK income tax.

226. I therefore took some tax advice in late 2017 (in which I do not waive privilege) as to how my remuneration could be structured in the most tax efficient way. The upshot was that the most tax efficient way forward was for Mr Brockman to pay me an advance of six years' salary (since I was planning to remain in the UK for six years) which I could then, entirely lawfully, remit to the UK as needed and upon which remitted sum I would pay tax as a non-domiciled resident of the UK. Since my total annual remuneration package at that time amounted to USD 2.6 million, an advance of 6 years' salary amounted to USD 15.6 million.

227. I had raised the proposal of a salary advance with Mr Brockman orally in telephone conversations going back as far as the spring of 2018 but in early August 2018 Mr Brockman asked me to put the request in writing.

Exhibit A-48

228. I did this in an email which I sent to Mr Brockman on 11 August 2018, setting out the tax position as I understood it to be and making my request for an advance of USD 15.6 million (see pages 587 to 588). I attached to that email a copy of the compensation memo that Mr Brockman had sent me in July 2015 to show that my total annual remuneration had been agreed at USD 2.6 million (see page 589).

229. At the end of my email to Mr Brockman I stated that if he was in agreement with my proposal, I suggested that the funds should come from Point Investments, Ltd through Spanish Steps. I also explained that there was time pressure because I needed to have the position sorted out before the start of September 2018 (i.e. before I moved to the UK).

230. Mr Brockman did not respond immediately to my email (as explained above, it would often take him several weeks and sometimes months to respond to my requests and I might have to chase him several times before I would get a response either by email or by telephone).

231. On 15 August, subsequent to sending Mr Brockman the email on 11 August 2018, a search warrant was executed on the home of Mr Kepke, a US attorney who had previously provided advice to Mr Brockman in relation to the Brockman Trust. Mr Kepke called me that day to inform me that Mr Brockman's name was listed in the warrant as was mine as well as a number of entities and other people. I immediately called Mr Brockman to inform him.

232. Mr Brockman had given me a standing instruction that if a situation such as this were ever to occur then I should call George Hani (at Miller & Chevalier) and inform him. I did this very shortly after I had spoken to Mr Brockman.

233. In the days after the raid of Mr Kepke's offices, Mr Brockman and I had a number of conversations via the secure telephone application, Silent Phone, about Mr Kepke and the potential ramifications of that development. Mr Brockman's fear was how Carlos Kepke's knowledge of the Brockman Trust's arrangements might damage him and the Trust and trigger an investigation from the IRS. I cannot now recall precisely how many times I spoke to Mr Brockman. I no longer have access to the mobile phone I was using at the time and in any event I believe that the Silent Phone system does not keep a record

Exhibit A-48

of communications, so I have no way of checking the call history. However, I do recall that each time I spoke to Mr Brockman in the days after the raid he sounded extremely worried, in a way which I had never heard before.

234. During one of those conversations on either 16 or 17 August 2018 (I cannot now recall which day it was), as the matter was time critical, I pressed for an answer to the request set out in my email of 11 August 2018. Mr Brockman agreed to the proposal and authorised the payment of the USD 15.6 million and he said something along the lines of "*in the circumstances, it is the right thing to do*". This was not the main purpose of our call, which was mainly taken up dealing with the aftermath of the raid on Mr Kepke, but was a short point of house-keeping which we did not discuss at any great length.

235. I should say that in my Defence in the Tangarra Proceedings I stated that the amount was USD 15.4 million but that is an error and I confirm that the correct amount is USD 15.6 million as supported by my contemporaneous email request from 11 August 2018.

236. However, given how worried Mr Brockman sounded on the phone when I spoke to him in the aftermath of the raid on Mr Kepke, I became concerned that the Brockman Trust structure could be challenged by the US authorities. I knew that if that happened, I would need substantial funds (as I had previously discussed with Mr Brockman) to cover legal expenses, but that this could become difficult if the assets of the Brockman Trust structure were ever frozen in the course of an investigation.

237. I therefore took the decision, in accordance with my agreement with Mr Brockman as recorded in the quotation at paragraphs 153 above, to withdraw additional funds of USD 1.2 million, in addition to the USD 15.6 million which was an advance on my remuneration, for the purpose of establishing a litigation contingency fund. Accordingly, the USD 16.8m Payment was made on 17 August 2018.

238. Mr Gilbert has sought to make something of the fact that he was not informed of this payment. There is nothing in this. There was no universal practice of informing Mr Gilbert of every payment. Furthermore, Mr Brockman had a strict policy that employees should not discuss or disclose their compensation arrangements with other employees. Mr Brockman took this very seriously and considered a breach of this rule to be a sackable offence (I only found out what Don Jones had been earning many years after

Exhibit A-48

the event when I was looking through some old documents and Mr Brockman was very unhappy about that).

239. For the reasons set out above, I received the USD 16.8m Payment in good faith as the payment had been authorised by Mr Brockman.

The HSF Monies

240. It was wrong for Mr Gilbert to imply that I had misappropriated the HSF Monies since Mr Gilbert personally authorised those payments.

241. I acknowledge that I requested the HSF Monies, which I believe I was entitled to under the bye-laws of SJTC and/or Spanish Steps, but the key point is that Mr Gilbert knew about those payments from the outset and there was nothing secretive or underhand about them. I refer to the payment instructions Mr Gilbert gave on 6 September 2018 and 8 September 2018 respectively authorising the payment of a total of £5 million to HSF (see pages 590 to 593).

242. The mere fact that Mr Gilbert has now changed his mind as to my entitlement to those payments does not justify the insinuation that I had somehow stolen that money and, at the very least, Mr Gilbert ought to have made it clear (in the Cabarita Proceedings and in all other proceedings) that he was personally involved in paying the HSF Monies so that there could be no suggestion that those monies had been stolen or taken without his knowledge.

243. Instead, he referred to the HSF Monies in the Cabarita Proceedings in such a way as to give the impression that I might have stolen that money. That was entirely wrong and unfair.

244. Furthermore, I consider that it is deeply ironic that Mr Gilbert himself now seeks to rely (in his submissions in relation to costs issues) in the Cabarita Proceedings on the very same bye-law of SJTC which I relied on in order to claim an indemnity from SJTC so as to avoid liability for the costs he has incurred by acting without authority in the name of SJTC.

Exhibit A-48

245. On 7 September 2018, Mr Gilbert also arranged for a payment of USD 2.5 million to be paid to Miller & Chevalier, the purpose of the payment being described as "*Evatt Tamine retainer*" (see pages 594 to 595). Mr Gilbert has never complained about this payment or suggested that I am obliged to repay it. As this transfer makes clear, Miller & Chevalier have advised me personally and therefore should not have been working with Mr Gilbert to pursue claims against me.

The Accounting Allegation

246. Mr Gilbert has also repeatedly insinuated that, in addition to the sums referred to above, there is somehow a possibility that I could have stolen other funds from the Brockman Trust structure.

247. As Mr Gilbert well knows, that insinuation is completely unjustified. The simple fact of the matter is that from before I left SJTC and at all material times since then, Mr Gilbert has had complete and unfettered access to the bank accounts and bank statements of all relevant bank accounts of entities within the structure.

248. Therefore, if there are any payments or transfers recorded in those bank statements which Mr Gilbert genuinely considered are not properly explained he could at any time have sought to raise such transactions with me and sought an explanation.

249. The fact of the matter is that Mr Gilbert did not question any other transactions in the period of almost 14 months between the start of his review of those bank statements following my departure in September 2018 and the *ex parte* hearing in the Cabarita Proceedings in November 2019 (and has not done so since).

250. In those circumstances, I believe it is grossly unfair and misleading for Mr Gilbert to insinuate that he has somehow been deprived by me of the information he needs to investigate and identify possible misappropriations of trust funds. At the very least, any fair presentation of his case would have required him to make it very clear that he has (and has always had) access to all of the relevant bank accounts and statements for those accounts and was therefore in a position to query any payment which he did not consider had been properly explained.

49

Exhibit A-48

**Allegations that I left SJTC with no access to its documents**

251. Another misleading theme of Mr Gilbert's evidence is that after I moved to London he was left with none of the documentation he needed to administer the Brockman Trust.

252. By way of example at paragraph 23 of his second affidavit in the Cabarita Proceedings, he stated that:

> "*After Mr Tamine's resignation on 28th September 2018, St John's repeatedly asked him to provide at least copies of the Trust's documents since all other copies had been taken by the Bermuda Police in their search of Mr Tamine's house.*"

253. This implies that aside from the copies of the documents that I had, there were no other copies of the documents. That is simply untrue.

254. I accept that I did not hand over my copies of the documents to Mr Gilbert until I was ordered to do so by the English Court. The period from September 2018 onwards was very difficult for me. My circumstances had changed radically in the space of a few weeks. Throughout the relevant period from September 2018 onwards I took advice from HSF and also from Leading Counsel (in which privilege is not waived). Ultimately I felt I had no option but to be extremely cautious about providing information to Mr Gilbert.

255. As I have already mentioned above, Mr Gilbert always had access to the relevant bank accounts in the structure and to the statements for those accounts.

256. Furthermore, Mr Brockman has at all times had a full copy of the data relating to the Brockman Trust structure which I kept regularly updated. As I have already explained, the copy of that data which was in Mr Brockman's possession when I resigned from SJTC in September 2018 was updated to the middle of June 2018 when I met him in Rome and gave him an SD card containing a full copy of the database I had maintained up until then.

257. In truth, Mr Gilbert could have obtained all of this data from Mr Brockman very easily. Mr Gilbert certainly did not need to pursue litigation against me to obtain documents relating to the Brockman Trust structure.

Exhibit A-48

258. Since Mr Gilbert says that the proceedings in England, including the application for delivery up of documents, were authorised in the Trust Proceedings in this jurisdiction I can only assume that Mr Brockman was, at the very least, formally notified that Mr Gilbert claimed not to have the trust documentation. If Mr Brockman was notified in this way, it is truly extraordinary that he did not tell this Court that he had a copy of the documentation that was complete up until the middle of June 2018.

**Insinuation that I am the target of the DoJ's Investigations**

259. Mr Gilbert has also insinuated that I was originally the true target of the DoJ's investigations.

260. It is now clear that this insinuation was incorrect in view of the letter that the DoJ sent to Miller & Chevalier dated 4 March 2020 (see page 596). As the DoJ stated in that letter:

> "*As we discussed at our meeting in December 2018, and as you are aware, the primary target of this criminal investigation is Mr. Tamine 's former employer, and the entities that this individual controls, including St. John's Trust Company, Spanish Steps, Point Investments and the A. Eugen Brockman Charitable (Children's) Trust. Evatt Tamine was never a primary target of our investigation. Previously, he was a subject of our investigation only as a nominee/employee/agent of his employer. As you know he is no longer a target, and instead is a cooperating witness with statutory immunity. Representations to the Court in Bermuda to the contrary by Conyers, Dill & Pearman Limited (Conyers) are inaccurate and disingenuous. Specifically, representations that Evatt Tamine is the target of this criminal investigation, or that St. John's Trust Company is an uninvolved third party, are false.*"

261. In the circumstances, Mr Gilbert can have no excuse for continuing to falsely assert that he believed I was the target of the DoJ investigations at any time after December 2018.

**The Trust Proceedings**

262. It is also clear that, in the Cabarita Proceedings, Mr Gilbert has systematically misled the Chief Justice in relation to what has happened in the Trust Proceedings. I also have serious concerns that Mr Gilbert has misled the Court in the Trust Proceedings themselves.

51

Exhibit A-48

263. At this point, the only information I have about the Trust Proceedings is Mr Gilbert's self-serving account in his fourth affidavit and the Redacted Order (which, as indicated above, was provided only on 15 April 2020 even though there was nothing to prevent Mr Gilbert from providing a copy of the Redacted Order immediately after it was made).

264. As I have explained above, I only became involved directly in the structure in 2004 so I was not involved in any of the constitutional changes in relation to the Brockman Trust in the course of the 1990s.

265. However, I do have a record of the constitutional documents for the Brockman Trust from the period before I became involved including the following documents:

    (1)   A Deed of Retirement and Appointment and Change of Proper Law dated 10 August 1993 (see pages 597 to 600).

    (2)   An Order of the Royal Court of Guernsey dated 28 October 1993 (see page 601).

    (3)   A Deed of Removal and Appointment and Indemnity dated 20 December 1994 (see pages 602 to 604).

    (4)   A Deed of Removal, Appointment and Indemnity dated 6 March 1995 (see pages 605 to 607).

    (5)   A Deed of Removal, Appointment and Indemnity dated 29 October 1997 (see pages 608 to 610).

    (6)   A Deed of Removal, Appointment and Indemnity dated 15 April 1998 (see pages 611 to 613).

    (7)   A Deed of Removal, Appointment and Indemnity dated 17 March 1999 (see pages 614 to 616).

    (8)   An Order of the Supreme Court of Belize dated 16 April 1999 (see pages 617 to 618).

Exhibit A-48

(9)     A Deed of Retirement and Appointment and Change of Proper Law dated 10 May 1999 (see pages 619 to 621).

266.   I do not yet know why Mr Gilbert says any of these instruments was partially or wholly ineffective but I do know that Conyers twice considered the trust documents in the late 1990s when Mr Brockman was considering a potential sale of Universal Computer Systems (so that the identity of the proper trustee would have been important for the purposes of any transaction) and yet Conyers raised no concerns at that time as to the validity of SJTC's appointment as trustee of the Brockman trust (see pages 622 to 624).

267.   Miller & Chevalier (and in particular George Hani who has been heavily involved in the proceedings brought against me and Cabarita to the extent that I am informed by my Bermuda attorneys that he sat next to Mr Gilbert for most of the hearing in the Cabarita Proceedings on 19 and 20 February 2020) had access to all of the Brockman Trust constitutional documents during the IRS audit in the late 1990s. The Brockman Trust constitutional documents had also been provided to Miller & Chevalier in 2013 in relation to a potential charitable donation to Centre College which they were involved with at that time. The constitutional documents were again provided to Miller & Chevalier in the course of 2017 or 2018 at which time we were considering establishing a new trust structure.

268.   Such information as Mr Gilbert has so far provided about the Trust Proceedings is extremely troubling.

269.   First, it will be apparent from the face of the Redacted Order that Mr Gilbert has gone to extraordinary lengths to impose procedural hurdles and difficulties in the way of the Independent Directors and SJTC so as to prevent them from getting access to the Court file in the Trust Proceedings so as to find out what has gone on in those proceedings.

270.   It is quite remarkable that a company which has acted as trustee for over 20 years should be deprived in this way of any information about its own business during that period. So far as I understand the position, that is not the usual approach on a change of trustee.

Exhibit A-48

271. There can be no good reason why the issues which the Court considered in relation to the validity or otherwise of these constitutional changes to the Brockman Trust should be confidential (or why these issues should have been intermingled in the same proceedings as the properly confidential Beddoe proceedings) and therefore I do not understand why Mr Gilbert has apparently gone to such great lengths to resist providing the documentation at least relating to that aspect of the Trust Proceedings to Cabarita and to the Independent Directors.

272. Secondly, I note that Mr Gilbert has given misleading, inconsistent, and confusing accounts about the position of Mr Martin Lang who was apparently found not to have been appointed as protector of the Brockman Trust prior to 19 December 2019 but was on that date appointed by the Court to that role.

273. At paragraphs 16 and 28 of his second affidavit in the Cabarita Proceedings which is dated 29 November 2019 (i.e. 3 weeks before the hearing on 19 December 2019), Mr Gilbert referred to the supposed fact of Mr Lang's appointment as protector of the Brockman Trust as the successor to Aquitaine without any qualification or indication that this appointment was subject to any doubt.

274. However, by the time of his fourth affidavit in the Cabarita Proceedings dated 24 January 2020, Mr Gilbert (in attempting to justify why he considered that it was appropriate for the hearing in the Trust Proceedings to go ahead on 19 December 2019 before the return date in the Cabarita Proceedings) indicated at paragraph 34 that he believed that it was not in the best interests of the Brockman Trust for what he described as the "*uncertainty*" as to the identity of its protector to continue.

275. That is to say, Mr Gilbert acknowledged that he was aware of the "*uncertainty*" as to Mr Lang's position before the hearing on 19 December 2019 and yet he chose to refer to Mr Lang's position as supposed protector in unqualified terms in his evidence in the Cabarita Proceedings.  No doubt he considered that it was helpful to his case in the Cabarita Proceedings to do so because he had obtained a supportive letter from Mr Lang which he relied on in in his second affidavit in the Cabarita Proceedings and which was contained in the exhibit to that affidavit (see pages 625 to 626).

Exhibit A-48

276. On this same subject, I note that Mr Gilbert (and more recently Mr Lang himself) have sought to justify the appointment of Medlands on the basis that Mr Lang applied for the appointment of Medlands as well as Mr Gilbert (purportedly in the name of SJTC).

277. Any application made by Mr Lang in that regard is irrelevant since on Mr Lang's own case he was not the protector of the Brockman Trust when he made any such application and he cannot "boot-strap" himself into a position to make an effective application any more than Mr Gilbert could do so with regard to the control of SJTC in the Cabarita Proceedings.

278. I also understand, although this will be a matter for legal submission, that as a matter of law a protector has no standing to apply to the Court for the replacement of a trustee.

279. Thirdly, I note that paragraph 27(1) of the Redacted Order contains what is, on its face, an extraordinary provision which purports to provide for the retrospective deletion of the words "*and comfort*" from Article VI.A of the Brockman Trust Indenture with effect from 28 October 1993 (i.e. more than 26 years before the hearing on 19 December 2019).

280. I have obtained an opinion from US tax counsel as to the significance of this change from a US tax law perspective. A copy of that opinion is at pages 627 to 635. As will be apparent from that opinion, the deletion of these words from Article VI.A could have very significant consequences in relation to the tax treatment of the Brockman Trust under US law. The retrospective nature of this change appears unlikely to be effective for US tax purposes and therefore it would appear this retrospectivity has been introduced merely to give Mr Brockman a US tax reporting position.

281. I understand, although this will be a matter for legal submission, that there may be some doubt as to whether such a retrospective order can in fact properly be made.

282. Nonetheless, I believe that it is remarkable that Mr Gilbert could have sought such relief without apparently giving any prior notice to the IRS given that its interests could be affected by the order being sought, and (as I understand matters) contrary to the usual practice in well-established trust jurisdictions. This is all the more so when, to Mr

Exhibit A-48

Gilbert's knowledge, the Brockman Trust structure is under heavy scrutiny from what could be one of the largest tax investigations into an individual in US history.

**Conclusion**

283.  For the reasons set out above, I respectfully ask the Court to grant my application to be joined as a party to the Trust Proceedings in order to challenge the serious adverse findings that have apparently been made against me and also to grant my application to be joined as a party to SJTC's appeal against the Redacted Order.

Sworn by the said          )

EVATT ANTHONY TAMINE    )

at     *Browcroft Church Road*        )
        *Rotherfield*
        *TN6 3LA  U.K.*              )
on the *4th* day of July 2020          )

Before me:

CHRISTOPHER JOHN LANGRIDGE
NOTARY PUBLIC
BROWCROFT, CHURCH ROAD
ROTHERFIELD, EAST SUSSEX
TN6 3LA
UNITED KINGDOM

# EXHIBIT


# A-49

Exhibit A-49

Message

| | |
|---|---|
| **From**: | Permit [permit1@lambdaprime.org] |
| **Sent**: | 7/13/2011 1:27:44 AM |
| **To**: | redfish@lambdaprime.org |
| **Subject**: | RE: |

Evatt,

Your note brought to mind something – a new report that I need for you to keep.

Historically I have had to endeavor to remember major movements of cash.

Therefore please create a new report in the form of a push-down spreadsheet  (most recent transaction on top).

Name it the "Significant Transaction Report".

Every time a transaction in excess of $100K is made, make an entry that contains date, amount, entity the cash came out of, entity that the cash wen to, and explanation of transaction.

Please make a separate tab for each of the four major structures.

Send the current  updated version along with the cash report every month.

Bob

---

**From:** redfish@lambdaprime.org [mailto:redfish@lambdaprime.org]
**Sent:** Sunday, July 10, 2011 12:38 PM
**To:** Permit
**Subject:**

Bob,

Attached is the June cash report.  We don't have Vista June numbers, so Point has not been completed.

Also, please note that $14.5 million dollars was paid out to Centre and Rice.

Evatt

Exhibit A-49

Message

| | |
|---|---|
| **From:** | Redfish [redfish@lambdaprime.org] |
| **Sent:** | 7/13/2011 11:28:04 AM |
| **To:** | 'permit1@lambdaprime.org' [permit1@lambdaprime.org] |
| **Subject:** | RE: |

Bob,

In order to build the first report, how many years back do you wish me to go?

Evatt

---

**From:** Permit [mailto:permit1@lambdaprime.org]
**Sent:** Tuesday, July 12, 2011 9:28 PM
**To:** redfish@lambdaprime.org
**Subject:** RE:

Evatt,

Your note brought to mind something – a new report that I need for you to keep.

Historically I have had to endeavor to remember major movements of cash.

Therefore please create a new report in the form of a push-down spreadsheet (most recent transaction on top).

Name it the "Significant Transaction Report".

Every time a transaction in excess of $100K is made, make an entry that contains date, amount, entity the cash came out of, entity that the cash wen to, and explanation of transaction.

Please make a separate tab for each of the four major structures.

Send the current updated version along with the cash report every month.

Bob

---

**From:** redfish@lambdaprime.org [mailto:redfish@lambdaprime.org]
**Sent:** Sunday, July 10, 2011 12:38 PM
**To:** Permit
**Subject:**

Bob,

Attached is the June cash report. We don't have Vista June numbers, so Point has not been completed.

Also, please note that $14.5 million dollars was paid out to Centre and Rice.

Evatt

Exhibit A-49

Message
_____

**From:**        Permit [permit1@lambdaprime.org]
**Sent:**        7/13/2011 7:29:48 PM
**To:**          redfish@lambdaprime.org
**Subject:**     RE:

Evatt,

Just 2010

Bob

_____

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Wednesday, July 13, 2011 6:28 AM
**To:** permit1@lambdaprime.org
**Subject:** RE:

Bob,

In order to build the first report, how many years back do you wish me to go?

Evatt

_____

**From:** Permit [mailto:permit1@lambdaprime.org]
**Sent:** Tuesday, July 12, 2011 9:28 PM
**To:** redfish@lambdaprime.org
**Subject:** RE:

Evatt,

Your note brought to mind something – a new report that I need for you to keep.

Historically I have had to endeavor to remember major movements of cash.

Therefore please create a new report in the form of a push-down spreadsheet  (most recent transaction on top).

Name it the "Significant Transaction Report".

Every time a transaction in excess of $100K is made, make an entry that contains date, amount, entity the cash came out of, entity that the cash wen to, and explanation of transaction.

Please make a separate tab for each of the four major structures.

Send the current  updated version along with the cash report every month.

Bob

_____

**From:** redfish@lambdaprime.org [mailto:redfish@lambdaprime.org]
**Sent:** Sunday, July 10, 2011 12:38 PM
**To:** Permit
**Subject:**

Bob,

# Exhibit A-49

Attached is the June cash report.  We don't have Vista June numbers, so Point has not been completed.

Also, please note that $14.5 million dollars was paid out to Centre and Rice.

Evatt

Exhibit A-49

Message

**From**: Redfish [redfish@lambdaprime.org]
**Sent**: 1/11/2012 2:56:16 AM
**To**: 'permit1@lambdaprime.org' [permit1@lambdaprime.org]
**Subject**:
**Attachments**: 20120110 Significant Transaction Report.pdf; 20120110 Significant Transaction Report.xls

Bob,

Attached is the significant transaction report for the years 2010 and 2011.

I have set out the report several different ways:

- by year in chronological order
- all transactions combined in push down order
- broken up into groups for AEBCT, Regency, Edge, Cabot, Point and Legend (all in push down order)

Both the PDF and Excel files are attached.

I'll send this report at the end of each month.

Evatt

ET_0000053275

# Exhibit A-49

Message

**From**:        Redfish [redfish@lambdaprime.org]
**Sent**:         1/27/2012 8:28:06 PM
**To**:          'permit1@lambdaprime.org' [permit1@lambdaprime.org]
**Subject**:
**Attachments**:   20120131 Significant Transaction Report.xls

Bob,

Attached is the significant transaction report for the end of January 2012.

It is not likely that any transaction will arise between now and the end of the month.

Evatt

ET_0000053352

# Exhibit A-49

Message
_____

| | |
|---|---|
| **From**: | Redfish [redfish@lambdaprime.org] |
| **Sent**: | 6/5/2012 1:10:11 PM |
| **To**: | 'permit1@lambdaprime.org' [permit1@lambdaprime.org] |
| **Subject**: | |
| **Attachments**: | 20120531 Significant Transaction Report.xls |

Bob,

Attached is the significant transaction report to May 31st, 2012.

Evatt

ET_0000054555

# Exhibit A-49

Message
_____

**From**:         Redfish [redfish@lambdaprime.org]
**Sent**:         7/15/2012 9:35:21 PM
**To**:           'permit1@lambdaprime.org' [permit1@lambdaprime.org]
**Subject**:
**Attachments**:  20120731 Significant Transaction Report.xls


Bob,

Attached is an updated significant transaction report.

Evatt

ET_0000054612

Exhibit A-49

Message

| | |
|---|---|
| **From**: | Redfish [redfish@lambdaprime.org] |
| **Sent**: | 1/9/2013 5:49:08 PM |
| **To**: | 'permit1@lambdaprime.org' [permit1@lambdaprime.org] |
| **Subject**: | |
| **Attachments**: | 20121231 Significant Transaction Report.xls |

Bob,

Attached is the significant transaction report to December 31st, 2012.

Evatt

ET_0001957437

# Exhibit A-49

Message

| | |
|---|---|
| **From**: | Redfish PC [redfish@proventusconstans.com] |
| **Sent**: | 5/23/2013 9:02:44 AM |
| **To**: | 'Permit' [permit@proventusconstans.com] |
| **Subject**: | |
| **Attachments**: | 20130523 Significant Transaction Report.xls |

Bob,

Attached is an updated significant transaction report.

Evatt

ET_0000059184

Exhibit A-49

Message
_____

**From**:        Redfish PC [redfish@proventusconstans.com]
**Sent**:        11/1/2013 1:57:20 AM
**To**:          'Permit' [permit@proventusconstans.com]
**Subject**:
**Attachments**:  20131031 Vista Equity Partners Contributions and Distributions Report.xls

Bob,

Attached is the Significant Transaction Report completed to the end of October including some of the Vista transactions which will be completed next week.

Evatt

ET_0000059896

# EXHIBIT

# A-50

# Exhibit A-50

| | |
|---|---|
| **From:** | Redfish PC |
| **To:** | "Permit" |
| **Date:** | Wednesday, May 22, 2013 1:56:27 PM |
| **Attachments:** | 20130430 Asset Report.xls |

Bob,

Attached is the cash report to the end of April with the exception of Point Investments where I am still waiting for the first quarter reports.

I believe these should be delivered soon.

Evatt

MLATSW_003616

# Exhibit A-50

| | |
|---|---|
| **From:** | Redfish PC |
| **To:** | "Permit" |
| **Date:** | Sunday, October 27, 2013 9:45:40 PM |
| **Attachments:** | 20130831 Asset Report.xls |

Bob,

Attached is the cash report until the end of August.

I will have the report up to the end of October available by the end of this week with the exception of Point.

Evatt

MLATSW_005679

# Exhibit A-50

| | |
|---|---|
| **From:** | Redfish PC |
| **To:** | "Permit" |
| **Date:** | Wednesday, November 6, 2013 8:38:31 PM |
| **Attachments:** | 20131031 Asset Report.xls |

Bob,

Attached is the asset report to the end of October.

Point is not complete for September or October as I don't have the quarterly financial reports.

Evatt

MLATSW_005726

# Exhibit A-50

| | |
|---|---|
| **From:** | <u>Redfish PC</u> |
| **To:** | <u>"Permit"</u> |
| **Date:** | Thursday, December 5, 2013 1:53:58 PM |
| **Attachments:** | <u>20131130 - Asset Report - RN.xls</u> |

Bob,

Would you please the attached report onto Rob Nalley.

Evatt

**MLATSW_006154**

# Exhibit A-50

| | |
|---|---|
| **From:** | Redfish PC |
| **To:** | "Permit" |
| **Date:** | Tuesday, December 10, 2013 3:06:30 AM |
| **Attachments:** | 20131130 Asset Report.xls |

Bob,

Attached is the November cash report.  Here are some points to note:

-       Vista is yet to send me the VEPF IV Co-Invest 1A third quarter financials.  In the cash report I have used the second quarter valuation as a place holder.  We'll see a material bump in that value once the financials arrive.  Based on the Q3 operating report, Vista values the Co-Investment at $496.7 million of which we hold about 95.5%.  I think we'll see a Point interest valued at about $474.36 million – which is about $75 million more than the cash report.  Once I have confirmation of these numbers I'll update the report.

-       Bristol has made an second interim distribution of about $136k.  We've not had updated asset valuations since the end of September so I can only guess at current valuations.  This is the problem of having to wait on a third party (in this case Bermuda Commercial Bank) to collect and distribute information.  The Bank sat on the email advising of the distribution for about six weeks.

Evatt

MLATSW_006181

# Exhibit A-50

| | |
|---|---|
| **From:** | Redfish PC |
| **To:** | "Permit" |
| **Date:** | Wednesday, January 22, 2014 9:29:03 AM |
| **Attachments:** | 20131231 Asset Report.xls |

Bob,

Attached is the December 31st cash report without the Vista fund valuations.

Everything else is complete.

Evatt

# Exhibit A-50

| | |
|---|---|
| **From:** | Redfish PC |
| **To:** | "Permit" |
| **Date:** | Wednesday, January 22, 2014 9:33:26 AM |
| **Attachments:** | 20131231 - Asset Report - RN.xls |

Bob,

Attached is Rob Nalley's cash report for December 2013.

Evatt

MLATSW_006541

# Exhibit A-50

| | |
|---|---|
| **From:** | Redfish PC |
| **To:** | "Permit" |
| **Date:** | Tuesday, February 4, 2014 8:30:46 AM |
| **Attachments:** | 20140131 - Asset Report - RN.xls |

Bob,

Attached is Rob Nalley's cash report.

I am just waiting on Heather's report for the main cash report.  Hopefully, those numbers will be in sometime this week.

Evatt

# Exhibit A-50

**From:**          Redfish PC
**To:**            "Permit"
**Date:**          Sunday, February 9, 2014 7:50:28 PM
**Attachments:**   20140131 Asset Report.xls

Bob,

Attached is the cash report through the end of January with the exception of Vista valuations.

Evatt

MLATSW_006594

# Exhibit A-50

| | |
|---|---|
| **From:** | Redfish PC |
| **To:** | "Permit" |
| **Date:** | Thursday, March 13, 2014 6:30:05 AM |
| **Attachments:** | 20140228 Asset Report.xls |

Bob,

Attached is the February 28th cash report.

I am still waiting on the Vista financials for December 31st so Point's numbers are not complete.

Evatt

MLATSW_006847

# Exhibit A-50

| | |
|---|---|
| **From:** | <u>Redfish PC</u> |
| **To:** | <u>"Permit"</u> |
| **Date:** | Thursday, March 13, 2014 6:36:02 AM |
| **Attachments:** | <u>20140228 - Asset Report - RN.xls</u> |

Bob,

Attached is Rob Nalley's asset report.

Evatt

**MLATSW_006849**

# Exhibit A-50

**From:**        Redfish PC
**To:**          "Permit"
**Date:**        Sunday, April 27, 2014 2:25:21 PM
**Attachments:** 20140331 Asset Report.xls

Bob,

Attached is the March 31st cash report save for the Point numbers.  Once I receive all of the Vista audits for 2013 I should be able to bring Point up to the end of April.

Evatt

# Exhibit A-50

**From:**        Redfish PC
**To:**          "Permit"
**Date:**        Sunday, April 27, 2014 2:28:37 PM
**Attachments:** 20140331 - Asset Report - RN.xls

Bob,

Attached is Rob Nalley's cash report for the end of March.

Evatt

MLATSW_007469

# Exhibit A-50

| | |
|---|---|
| **From:** | Redfish |
| **To:** | permit@hannah.com |
| **Date:** | Saturday, September 6, 2014 10:50:48 AM |
| **Attachments:** | 20140831 Asset Report.xls |

Bob,

Attached is the cash report through to August 31st, 2014.

At this stage I don't have Q2 financials for any of the Vista funds with the exception of VEF II.  Nor do I have any Bristol Fund details since June.

The estimates are based on capital calls and distributions made in the past three months without regard to unrealized gain/loss, net investment loss etc.

Evatt

**MLATSW_009766**

# Exhibit A-50

| | |
|---|---|
| **From:** | Redfish |
| **To:** | permit@hannah.com |
| **Date:** | Thursday, September 11, 2014 1:53:02 PM |
| **Attachments:** | 20140831 Asset Report.xls |

Bob,

The updated August asset report.  All numbers are up to date with a few minor exceptions in Point as per my last email.

Evatt

MLATSW_010461

# Exhibit A-50

**From:**       <u>Redfish</u>
**To:**          <u>"Permit"</u>
**Date:**        Thursday, October 9, 2014 8:18:45 AM
**Attachments:**  <u>20140930 Asset Report.xls</u>

Bob,

Attached is the Cash report through September 30.

The missing numbers are the Vista valuations for the end of the quarter and Bristol Fund, which is a very minor sum these days.

Evatt

MLATSW_010593

# Exhibit A-50

| | |
|---|---|
| **From:** | <u>Redfish</u> |
| **To:** | <u>"Permit"</u> |
| **Date:** | Monday, December 8, 2014 10:26:08 AM |
| **Attachments:** | <u>20141130 Asset Report.xls</u> |

Bob,

Attached is the asset report to the end of November.  I am still waiting on most of the Vista third quarter reports.  These should be coming this week.

Evatt

MLATSW_011304

# Exhibit A-50

| | |
|---|---|
| **From:** | Redfish |
| **To:** | "Permit" |
| **Date:** | Wednesday, January 7, 2015 7:47:22 PM |
| **Attachments:** | 20141231 Asset Report.xls |

Bob,

Attached is the cash report for December 2014 with the exception of the December Vista numbers.

Evatt

MLATSW_012241

# Exhibit A-50

| | |
|---|---|
| **From:** | <u>Redfish</u> |
| **To:** | <u>"Permit"</u> |
| **Date:** | Saturday, March 21, 2015 7:24:44 PM |
| **Attachments:** | <u>20150228 Asset Report.xls</u> |

Bob,

The February Cash report is attached.

Evatt

MLATSW_013007

# Exhibit A-50

| | |
|---|---|
| **From:** | Redfish |
| **To:** | "Permit" |
| **Date:** | Saturday, April 18, 2015 7:57:04 AM |
| **Attachments:** | 20150331 Asset Report.xls |

Bob,

Attached is the March cash report.

I still don't have the VEF II year-end audit, but I thought I would get this out to you anyway.

Evatt

MLATSW_013181

# Exhibit A-50

| | |
|---|---|
| **From:** | Redfish |
| **To:** | "Permit" |
| **Date:** | Wednesday, June 10, 2015 7:54:53 PM |
| **Attachments:** | 20150531 Asset Report.xls |
| | 20150531 Asset Report.xls |

Bob,

Please see attached the cash report through the end of May.

The only missing pieces of information are:

-        VEF II - I still have not seen the 2014 audit.  While the value will be small, I am interested to see how Vista will carry the loan.

-        I've not see any Sirsi-Dynix financials for the first quarter of 2015.  Until February, I carried it at cost.

Evatt

MLATSW_015177

# Exhibit A-50

| | |
|---|---|
| **From:** | <u>Redfish</u> |
| **To:** | <u>"Permit"</u> |
| **Date:** | Thursday, June 11, 2015 4:30:00 PM |
| **Attachments:** | <u>20150611 Active Bank Accounts.xls</u> |

Bob,

As requested please see the report on the active bank accounts together with the May 31st balances.

This also lists the signatories and contact details of the contact person in the bank.

The lines are color-coded for the different banks.

This might be a little redundant given the asset report, but would you like to received this report for each month end?

Evatt

MLATSW_015197

# Exhibit A-50

| | |
|---|---|
| **From:** | <u>Redfish</u> |
| **To:** | <u>"Permit"</u> |
| **Date:** | Friday, June 12, 2015 3:15:55 PM |
| **Attachments:** | <u>20150611 Active Bank Accounts.xls</u> |

Bob,

As requested please see the report on the active bank accounts together with the May 31st balances.

This also lists the signatories and contact details of the contact person in the bank.

The lines are color-coded for the different banks.

There is still further information I need to add into this report, e.g. method of ordering wire transfers etc.

This might be a little redundant given the asset report, but would you like to received this report for each month end?

Evatt

MLATSW_015203

# Exhibit A-50

| | |
|---|---|
| **From:** | Redfish |
| **To:** | "Permit" |
| **Date:** | Friday, September 4, 2015 8:34:21 PM |
| **Attachments:** | 20150831 Asset Report.xls |

Bob,

Here is the cash report to the end of August.  While most of the details are in, I am still waiting the 2014 audit for VEFII.

Everything else is here.


Evatt

# Exhibit A-50

| | |
|---|---|
| **From:** | Redfish |
| **To:** | "Permit" |
| **Date:** | Friday, October 23, 2015 3:21:22 AM |
| **Attachments:** | 20150930 Asset Report.xls |

Bob,

Please see attached the September cash report.

We are still awaiting the VEF II 2014 audit and the Point audit.  I can't plug VEF II into the spreadsheet yet.

Other than that and the Vista Q3 financial statements, all should be up to date.

Evatt

MLATSW_016136

Exhibit A-50

| | |
|---|---|
| **From:** | <u>Redfish</u> |
| **To:** | <u>"Permit"</u> |
| **Subject:** | RE: |
| **Date:** | Monday, October 26, 2015 4:25:29 PM |

Bob,

This is because I still don't have the VEF II audit for 2014.  I need to know how the outstanding loan has been handled in the financials.

I spoke with the PWC audit manager at the end of last week.  They promise VEF II will be released later this week and Point next week.

They claim they were waiting for information from Vista, though I think this an excuse.

Once I have the audit I can complete the information for the cash report and the 2015 NAV reports which await the same information.

Evatt

**From:** Permit [mailto:Permit@hannah.com]
**Sent:** Monday, October 26, 2015 7:32 PM
**To:** 'Redfish'
**Subject:** FW:

Evatt,

In the Asset report – Summary section….

Since 11/30/2014, there is no Point, Liquid Sub-Total, and no Total

BB

**From:** Redfish [mailto:redfish@hannah.com]
**Sent:** Friday, October 23, 2015 4:22 AM
**To:** 'Permit'
**Subject:**

Bob,

Please see attached the September cash report.

We are still awaiting the VEF II 2014 audit and the Point audit.  I can't plug VEF II into the spreadsheet yet.

Other than that and the Vista Q3 financial statements, all should be up to date.

Evatt

MLATSW_016263

# Exhibit A-50

**From:** <u>Permit</u>
**To:** <u>"Redfish"</u>
**Subject:** FW:
**Date:** Monday, October 26, 2015 4:28:00 PM
**Attachments:** <u>20150930 Asset Report.xls</u>

Evatt,

In the Asset report – Summary section....

Since 11/30/2014, there is no Point, Liquid Sub-Total, and no Total

BB

---

**From:** Redfish [mailto:redfish@hannah.com]
**Sent:** Friday, October 23, 2015 4:22 AM
**To:** 'Permit'
**Subject:**

Bob,

Please see attached the September cash report.

We are still awaiting the VEF II 2014 audit and the Point audit.  I can't plug VEF II into the spreadsheet yet.

Other than that and the Vista Q3 financial statements, all should be up to date.

Evatt

MLATSW_016264

# Exhibit A-50

| | |
|---|---|
| **From:** | Redfish |
| **To:** | "Permit" |
| **Date:** | Tuesday, November 24, 2015 6:18:55 AM |
| **Attachments:** | 20151031 Asset Report.xls |

Bob,

Please see attached the cash report completed to the end of 31st October.

Evatt

MLATSW_016698

# Exhibit A-50

**From:** Redfish
**To:** "Permit"
**Date:** Friday, January 29, 2016 6:15:00 AM
**Attachments:** 20151231 Asset Report.xls

Bob,

Please see attached the cash report.

All is up to date except for Point's December Vista numbers.  I am still waiting for the audits.

Evatt

**MLATSW_017181**

# Exhibit A-50

| | |
|---|---|
| **From:** | Redfish |
| **To:** | "Permit" |
| **Date:** | Saturday, April 16, 2016 1:11:00 PM |
| **Attachments:** | 20160331 Asset Report.xls |

Bob,

Please see attached the cash report to the end of March.  There are a couple of other small pieces still outstanding, but most of the report is up to date.

I am still awaiting the audit for SD Rollover LP (the Sirsi-Dynix vehicle).  I answered some questions for the auditors well over a month ago and was promised the audit before the end of March.


Evatt

MLATSW_018786

# Exhibit A-50

| | |
|---|---|
| **From:** | Redfish |
| **To:** | "Permit" |
| **Date:** | Sunday, July 3, 2016 1:49:00 PM |
| **Attachments:** | 20160630 Asset Report.xls |

Bob,

Please see attached the cash report to June 30th.

The only missing pieces are the Vista second quarter valuations.

Evatt

MLATSW_020116

# Exhibit A-50

| | |
|---|---|
| **From:** | <u>Redfish</u> |
| **To:** | <u>"Permit"</u> |
| **Date:** | Sunday, June 11, 2017 7:04:00 AM |
| **Attachments:** | <u>20170531 Asset Report.xls</u> |

Bob,

Attached is the latest asset report.

Evatt

**MLATSW_020392**

# Exhibit A-50

| | |
|---|---|
| **From:** | <u>Redfish</u> |
| **To:** | <u>"Permit"</u> |
| **Date:** | Thursday, September 14, 2017 7:02:24 PM |
| **Attachments:** | <u>20170831 Asset Report.xls</u> |

Bob,

Here is the cash report to August 31st.  The highlighted numbers in Point are estimates at this time.

Evatt

MLATSW_021839

# Exhibit A-50

| | |
|---|---|
| **From:** | <u>Redfish</u> |
| **To:** | <u>"Permit"</u> |
| **Date:** | Thursday, December 21, 2017 12:51:08 PM |
| **Attachments:** | <u>20171130 Asset Report.xls</u> |

Bob,

The cash report until the end of November 2017 is attached.

Please note that the number of shares held by SSH Ltd in Point has reduced as SSH Ltd made a redemption of $30 mm to meet a Rice funding request.

James has taken over the Point accounting, but is still finding his feet a little and hasn't got to November at this stage.

Also please note that the BCB numbers are still in this report.  Those adjustments will come in the December report.

Evatt

MLATSW_022540

# Exhibit A-50

| | |
|---|---|
| **From:** | Redfish |
| **To:** | "Permit" |
| **Date:** | Sunday, January 7, 2018 6:43:17 AM |
| **Attachments:** | 20171231 Asset Report.xls |

Bob,

Please see attached the asset report up to the end of 2017 with the exception of the Vista numbers for Point.

Evatt

MLATSW_022555