# EXHIBIT

# A-51

# Exhibit A-51

Memo to:      Evatt Tamine

Date:          February 5, 2010

Subject:       Performance Review

## What went well:

Once again your self evaluation is remarkably accurate.  This in itself is a compliment to your logical evaluation of circumstances.

Overall you had a very excellent year which results in full attainment of your $100,000 target bonus.

## Goals for 2010

1) Endeavor to deal with the Founding Partners and Arboria issues as best you can. This will include participating in any mediation.  However there is ongoing need to be cautious about acquiring too high a profile.

2) Monitor the ongoing legislative process in the USA and other jurisdictions and facilitate whatever restructuring ends up being required.

3) Take over the financial reporting processes from James Gilbert.  The goal to be achieved is:
   -establish use of an accounting software package that is a true double entry accounting system with proper journals, schedules, and general ledger with financial reports are produced
   -where the financials have columns for the previous 5 years that show all amounts for all lines on the P&L and Balance sheet – as well as for the current 6 month period

4) Conduct a semi-annual financial review of all entities face to face by the end of the first half of the year

5) Scan the box of miscellaneous documents and add them to the image database

6) Reorganize the boxes of original documents such that historical files of discontinued entities are segregated into their own box(es)

7) Request an asset ledger from Mountain Queen, Inc. that details all of the real estate, improvements, and furnishings.  They should be keeping this for purposes of calculating depreciation – but they need to be asked.

Exhibit A-51

8) Endeavor to continue to harden the RADMIN and email server reliability by acquiring additional UPS power sources – and if possible – provide for monitoring while you are away.

9) Continue to address the projects on the To-Do List.

10) Arrange for audited financials for those entities that need to have audits

11) Annually verify that there are letters of resignation from all trustees and that Bob has the originals

12) Update the To-Do list at least monthly


## General Goals for Every Year

1) Continue to work to reduce the number of entities as this makes all processes simpler creating more time to focus on investment programs.

2) Continue to keep the document image database up to date constantly

3) Continue to keep the entity/significant transaction database up to date constantly

4) Publish the Cash Report monthly

13) Convert to keeping all email and financial records on an encrypted USB dongle carried in a different location in luggage when traveling abroad

14) Continue to update the accounting reports to the document image database

15) Operate as much as possible in a paperless manner – such that if someone were to come in your door unannounced everything would be in encrypted digital form

16) Complete adding the documents and significant transactions for superseded entities to the respective databases on a piecemeal basis during the year

17) Run Evidence Eliminator at least weekly on your computer

18) Keep your computer system running perfectly – get whatever you need for maximum productivity and backup

19) Get Don's computer environment operating on RADMIN

20) Continue basic education in accounting, bookkeeping, auditing, and financial controls

Exhibit A-51

21) Maintain all working entities in good standing so that their legal existence can not be questioned

22) Maintain relationships with service providers – bearing in mind that not a lot should be expected from them – never take for granted that they are doing what they should be doing which will require constant monitoring of their reports, primarily their financial reporting – Gordon Howard being the key service provider that would be most problematic to replace – look to Peter Mitchell potentially being a successor to Gordon should Gordon no longer be capable

23) To the extent possible, no service provider should become crucial – always be thinking about portability and alternate providers should the need arise

24) Regardless of the level of non-performance of a service provider, a cordial professional relationship should be maintained – unless a high level policy decision to do otherwise is made

25) In the event of non-performance of a service provider or investment, the policy will always be to withdraw quietly – unless a high level policy decision to do otherwise is made

26) Continue the excellent work on the spreadsheet for expenses of each service provider such that detail entries by type of expense are kept so as to support the annual expenses for each service provider

27) Coordinate the charitable giving initiatives of the AEBCT

28) Monitor your levels of daily effort so as to avoid burn-out.  Engage in a regular fitness program with proper diet so as to stay in top physical condition.

29)  Other than your personal vacation travel, I recommend that you conserve the amount of travel that you do for business as your control of everything will be directly related to the amount of time you spend in front of your multi-monitor computer system at home in France.

30) Plan your life for healthy, balanced, stable, long-term productivity

31) Although you have several personal friends in Houston that I am sure you want to maintain, please restrict your contact with the USA generally such that except for these few – you tend to fade into the background

# Exhibit A-51

**Compensation**

Your annual remuneration for 2010 will be increased to an annual salary of $325,000 plus a bonus opportunity of $125,000.

**Conclusion**

Your continued excellent performance in all aspects of your job are noted and appreciated.

On Behalf of Spanish Steps Holding LTD

ET_0000019749

# EXHIBIT

# A-52

Exhibit A-52

Memo to:     Evatt Tamine

Date:         April 6, 2014

Subject:      Compensation Memorandum

The capabilities that you have and the duties that you perform are as you describe.

They are considerably better than ever expected – especially in the accounting, computer knowledge, and record keeping.

That being said, there was risk that you could in fact perform them all.  Happily, given the environment to try – you were in fact able to pull it off.

Certainly this became much more apparent in 2013.

What also that has become more apparent is the uncertainty of liquidity events and the ultimate disposition of the corpus of the trusts.

It is unlikely that there will be liquidity event for Reynolds any time soon.  Vista is off the mark – no transaction is expected to happen there.  The growth record of Reynolds will need to become more firmly established than just one year.  While many challenges continue to exist, the opportunities are substantial – and better than alternative investments in Vista funds.

What also has become more apparent is that your needs are such that you need a more predictable income base due to family responsibilities that have dramatically increased.

The following is designed with the intent to provide for you and your family for the next 20 years to your retirement.

Therefore your compensation structure for 2014 is as follows:

Salary – increased from $420,000 to $700,000
Bonus potential – increased from $175,000 to $800,000

These salary and bonus amounts will be subject to annual review.

A separate retirement fund will be established into which a $1,000,000 per year contribution will be made every December.  The investments of this fund will be at your direction.  Five percent of this fund will become vested for each year of service.  At the end of 20 years, it will be 100% vested.  If you depart prior to 20 years for any reason, the percentage vested will be computed as the years of service from 2014 forward x 5%.

Exhibit A-52

With regards to the litigation contingency fund, this is a subject for further discussion as to how this is best accomplished – as it is in the interest of all parties for you not to be exposed or under pressure.

On Behalf of St. John's Trust Company (PVT) Ltd

Message

**From**:        Redfish PC [redfish@proventusconstans.com]
**Sent**:        4/6/2014 3:12:17 AM
**To**:          'Permit' [permit@proventusconstans.com]
**Subject**:
**Attachments**: 20140405 ET Response to Comp Plan.doc

Bob,

Attached is a preliminary response to the compensation memo.  I know it is going to sound harsh, but I thought it better to get it out to you as soon as possible.  It could probably have used a few more re-reads.

I did try to get you on Skype a number of times this evening to clarify some points, so some items might have easy answers and wouldn't have been included had we spoken.

I am around all day tomorrow though I have ▮▮▮▮ to look after.  With a little notice I can find something for her to do while we discuss this.

Evatt

Exhibit A-52

5th April, 2014

Bob,

Thank for you for your consideration of the matters I raised concerning my compensation package.  I appreciate your efforts in trying to find a solution.

I still need to think this through because a whole bunch of issues are swirling around in my head, but I think it is fair to both of us to give you my immediate and more obvious concerns:

- I am disappointed to lose the incentive plans.  I had hoped that the ceiling would have been removed rather than the plans dispensed with altogether.  While I appreciate your proposal re salary and bonus, I had hoped that I would have had an opportunity (like Don before me) to receive some fully vested share of investment returns which I could then absolutely depend on and know would be fully available my Sophie and the girls.

- You have described the issue left to discuss as the litigation contingency fund.  I look at this litigation contingency fund as having two components:  a sizeable ring-fenced cash fund that would support my family (it can't be used to pay legal fees because then it would be subject to a freezing order) and a suitable house for Sophie and the girls.  Specifically, this is a property in Sydney which is where Sophie will take the girls to live should I be subjected to proceedings.  The property would have to be suitable to the needs of Sophie and the girls as well as being of the quality equal to the house in Bermuda.  I need to raise this now as I do not want you to be surprised by how I envisaged this safety net.

- I think the proposal you have made for the pension fund is reasonable (subject to the next paragraph) provided the litigation contingency fund is satisfactory.  If we cannot

Exhibit A-52

agree a suitable litigation contingency fund, then this component must also address the risk element.

-       In the pension fund there are no provisions in the event that you decide you no longer need my services or I die.  There needs to be some guarantee that the contributions to the fund would continue for the full 20 years if you dismiss me (unless you dismiss me for cause).  There also needs also to be some provision in the event of my death whereby the fund becomes fully vested in favour of Sophie and the girls.

-       Likewise there must be a guaranteed minimum period of employment should I find a replacement and you prefer the replacement takes over fully.  Otherwise, there is no real incentive for me to find a replacement.  This should be the equivalent of a change of control provision.  Of course, it would be my goal to work as long as you will allow me.

-       As drafted, I am unclear whether the returns on the invested fund accrued into the pension fund.  I assume so, but this needs to be spelled out.

-       My package right now is capped at $1,000,000.  Less the 2013 bonus, the non-discretionary compensation would have been $825,000.  A bonus is completely in your discretion.  Currently, if investments went well - bonus aside - I would be worse off under the new plan.  Everything turns on your discretion with the bonus.  I might earn more each month, but potentially I could be worse off at the end of the year - a non-discretionary potential of $700,000 for 2014 versus $825,000 for 2013.  Will the exercise of the discretion re the payment of the bonus be as it always has been?

-       The loan I have with you is not addressed at all.  I still pay way over the prevailing bank rates.  I ask that you consider some level of loan forgiveness each year on the existing loan and a review of the applicable interest rate.  Really damaging to me - and a major worry to Sophie - is that we cannot borrow.  We can't invest in property.  In Australia, negative gearing of property would allow me to buy and then rent.  The mortgage interest would be offset against rental income.  This is the same position in the United Kingdom.  We both believe strongly in real estate (whether that is smart or not), but we

can't invest in it simply because we cannot walk into a bank and borrow while rates are at historically low levels.


- I appreciate that you have given me an additional $150,000 bonus for 2013, but I have capped out the maximum in any event.  I know you meant well, but I would ask that if this gesture is a reflection of an extraordinary year, then it be paid over and above the 2013 compensation plan limit.


- Some additional relatively minor points are:

  - Once a year business class fares to Australia for the family.  As my mother gets older this is becoming more important particularly since she can no longer travel.

  - A reasonable number of business class fares to the UK for Sophie and myself and the younger children to visit the older girls (or just myself as will be the case for the next three months while all the family is in the UK).  Whenever the older girls are travelling, e.g. to or from Bermuda, then all children would travel in economy.

There should be no concern that productivity will ever drop off during these trips - the only issue is re-booting computers.



Evatt

Exhibit A-52

Message

| | |
|---|---|
| **From**: | Permit [permit@proventusconstans.com] |
| **Sent**: | 5/3/2014 1:06:38 AM |
| **To**: | redfish@proventusconstans.com |
| **Subject**: | |
| **Attachments**: | Compensation Memo 140502 concerns and reply.doc |

Exhibit A-52

Compensation Memo concerns and replies                    5/2/2014

1) Regarding the litigation contingency issue – for the sake of all parties concerned – this issue must be satisfactorily concluded.  Based upon your comments, it seems that regarding legal expenses that the best answer is that you be indemnified without limit as long as you are defending the structures.  How this should be memorialized beyond this document is unclear.

2) With regards to a fund set aside to provide a property in Sydney suitable for Sophie and the girls (as well as to provide for their reasonable needs in a manner to which they are accustomed) should you be subjected to proceedings, this is a reasonable request.  The question then becomes – what is a reasonable amount?

3) With regards to the pension fund, the amount contributed to date would fully vest 100% if you were to die or become permanently disabled at some point during the next 20 years before your retirement.  To protect your family completely in the event of your death should be structured with life insurance.  What the funds in the pension fund are invested in would be at your discretion.  These investment returns would accrue to the pension fund.

    For example, this fund could be invested in real estate.   However, investments in Vista funds would appear to be more liquid and provide vastly better returns.  This could be a "friends and family" type of investment that I am sure that Robert Smith would be amicable to.  This could also be achieved in the debt investments – that would also be more liquid and provide better returns than real estate.

4) One of your annual goals (that reflect on your bonus attainment) will be to make progress towards finding, recruiting, and then training a backup for yourself that will ultimately replace you upon your retirement.  I think that you can agree that the current mode of operation where you have no backup places an unusual degree of pressure on yourself.  Plus from a business standpoint the current status can only be described as unwise.

5) Certainly to have your backup replace you prematurely would then cause a return to the current fragile situation would make no business sense for any party.  However to remove this worry, a severance agreement that provides three years compensation if you should be terminated for any reason other than "for cause" would be in order.

6) With regard to your annual bonus, it will continue to be discretionary.  Given your history of high performance that has in most years resulted in a bonus payment in excess of your potential, this should not be a worry to you.

Exhibit A-52

7) With regard to the interest rate paid on your house loan, it is reasonable that this should be at market rates and terms – whatever they might be in your area.

8) With regard to airfare, your expenditures in this area appear to be quite staggering and only tangentially caused by your work.  However it is possible to rationalize that these are expenses that a Bermuda-based organization might ordinarily face so an annual allowance of $100,000 would be reasonable.

# EXHIBIT

# A-53

Exhibit A-53

## MEMORANDUM

**From:**       **Evatt**

**To:**          **Bob**

**Date:**       **March 10th, 2014**

In addition to the performance review, I also wanted to send you this note regarding a review of my compensation package.  The issue has been a great concern for quite some time and I hope that it can be resolved very soon.

## INTRODUCTORY ISSUES:

Before addressing the specific concerns, I need to anticipate, and address, your possible responses so that you know I have tried to consider where I stand from your point of view.

1.       I do not want you to feel like you are being backed into a corner.  I believe that I have a very strong basis for my concerns.  I do not intend for this review to suggest any threats or ultimatums.

2.       It is not possible to state my worth without sounding conceited.  Obviously I make errors, but I also have a strong skills set which should be viewed as adding great value.

3.       I have not spent the previous four or five years making myself indispensable before coming to you for a comprehensive review of my compensation.  You

Exhibit A-53

once hinted at this and I'll make the same answer now that I did then.  There are very simple, but powerful, reasons why I have undertaken direct fiduciary roles with respect to the various entities:

(i)     Control:       This is entirely to your benefit and protection.  By reducing the involvement of outside service providers and individuals, we control information.  With FATCA's implementation, I have reduced the prospect that banks, law firms, accountants etc will report that you, as a US person, have a connection with the trusts and companies.  Mirabaud, for example, does not know about you.

(ii)    Efficiency:     Again, to your benefit, but also to mine.  I do not have to ferry papers around to third-rate people in different countries for signature or wait for reporting etc.  Tasks can be completed immediately when required.  I do not waste time chasing people for action.

4.      I carry a load of obligations and functions that is probably unique.  I do more and, frankly, I do it better than most people in a similar position.  The difference is that most people (Don included) outsource most of what I do or have family offices with a number of people performing different functions.  All of this involves must greater cost with the loss of control and efficiency I addressed above.

Four years ago you wrote to me:

> A lot of your views of Don are correct.  In his defense I would point out that these views were taken pretty much at the end of his career where his health problems had begun to overtake him.

> In his earlier times he made significant contributions – not everything to perfection – but significant nonetheless.

ET_0000024213

Exhibit A-53

It turned out that his style of working thru service providers due to his US citizenship had some serious inadequacies.

Hopefully we have learned from these experiences – and that these resulting decisions turn out to be correct – so that when we are in our dotage – no younger person can come along to point out everything that went wrong.

I have not forgotten that, but the comments weren't entirely fair to me.  From my perspective, it was not an attack on Don.  The difference between Don and myself doesn't turn on Don being at the end of his career or having health issues. It was simply that I do a better job because I have a much broader skill set.  You get much more out of me, but at a fraction of Don's compensation.

I act as a lawyer, an accountant, an independent trustee, an investment manager and an IT specialist.  Getting all that in one person is a huge boon for you.

5.    I am mindful that you said that you were angered on the last occasion I raised a comparison between my compensation and Don's.  I am sorry about this, but I need to raise the comparison.  The fact is that the comparison suggests that either you undervalue my work and worth or have obtained my services as at a large discount.

It also sticks badly in my throat that even now Don's annual payment of $200,000 is a little less than half my base salary.  Given what I do, there ought to be a very great difference between my base salary and Don's annual payment.

ET_0000024214

Exhibit A-53

**CONCERNS:**

Turning now to the specifics of my concerns:

A.      My base salary has not increased in four years.  It is true that I have received
bonuses and incentive payments, but none of that addresses my ongoing
financial obligations.

For example, I now support one girl at boarding school and that is about to
become two girls. ███████ is at boarding school because we cannot move to
England with her because of my job.  Her boarding fees are about $65,000 each
year as opposed to $20,000 at the same school if she was a day student.  When
████████ starts at boarding school I will see about one third of my salary spent just
on school fees.  The schools in Bermuda are just not good enough (like the
hospital services).  Sophie's plan was always to move to England for the girls'
education when they got to high school.  She can't do that now because I need to
be here.  That is acceptable to her because she is understanding, but it causes
massive problems for the family through the separation from the girls and the
crippling financial burden.

Further, we were forced to buy a flat near ████████ school so that Sophie could
spend time with her on a regular basis, particularly when her exams are on.  I
had to borrow money from you to buy the flat.  The applicable interest rate is
5.5% while rates in the UK are much lower (many banks are offering rates under
2%).

I can't even borrow money from a bank because I can't disclose anything about
the nature of my employment.  So I end up paying higher interest rates.  I've
proved a better investment return for you than many investments over the years.

Exhibit A-53

B.      I am at an age when my opportunities to earn an appropriate level of compensation will start to dry up.  I am about to turn 50 years old with two very young children and the full financial responsibility for two others.  I do not have the luxury of waiting until I am 65 or 70 years old to ensure that my family are provided with all that I am able to deliver.   You said in 2010:

>       "I would expect that your earnings would ultimately significantly eclipse Don's over your career."

As matters stand this will never happen.  The incentive payment (even with the $1,000,000 cap) is illusory.  In only one year did I receive anything that was material.  Even that was cut down by you, though I understood and accepted the reasoning.  This year should prove better, but again I will be capped.  The fact is that we will never have a VEF II relationship again.  That means the returns will never again be there to achieve Don's level of earnings let alone "significantly eclipse" them.  A cap on my earnings is redundant.  Most years I will never get near the cap of $1 million.  It will only be managed this year because Robert Smith made a concerted effort to off-load some companies ahead of raising VEPF V.

C.      I carry all the risk for you.  If I am targeted, the IRS would come after my assets to pressure me.  That is exactly what they have done to a whole bunch of bankers, investments advisors and lawyers.  You have the assets of Cabot and Edge to provide financial support in the event they go after the AEBCT.  I have nothing and I would not be able to tap into Cabot and Edge as it would draw attention to those entities.  If I am targeted I have to be cut loose by you in relation to Cabot and Edge.  I understand and accept that risk, but I am badly exposed.  My family home in Bermuda is necessarily owned in my name with Sophie.  As a foreigner, I am unable to own property using a trust.  I need to

Exhibit A-53

have a back-up plan of my own so that my family has a home and ongoing financial support beyond the reach of the IRS.

The level of compensation that trust companies, law firms, banks etc achieve is in part for the risk they assume.  These days most trust companies in Bermuda would start with a trust fee of 10 basis points of trust assets in addition to hourly rates for time spent.  Assuming a total AEBCT asset pool of $6 billion, that would be $6 million per year.  Mirabaud charges a custody fee of 10 basis points.  That also reflects the risk.  Yet in all of this I do all that a trust company does and more, but I earn much less.

D.      If I compare myself to others doing a similar family office role, I do substantially more work and carry more responsibility and risk.  All the while you have better protection and efficiency.  For example, Graham Jack, a useless fellow who once spent a few months as a trust officer for the AEBCT in the 1990s is now a protector on a committee of protectors associated with a trust holding far less trust asset value than the AEBCT.  For his job, Graham plays golf and turns up at a few meetings a year.  He averages about $2 million a year, but has an absolute base of $1 million.  He screws up his few tasks and was recently a terrible witness in a court case where he was questioned about what he actually did for his money (that is how I learned of his salary level).  People like Graham are far more common in this trust game than you might think.

E.      I have no pension in place.  Any usual employment situation would include a contribution to a pension plan.  When my employment with you ends, I will be without any further income other than what I manage to save and invest.  As matters stand now, I have no prospect of saving anything.  I cannot depend on a hope that you might extend to me the same annual payment you have provided Don.  I certainly cannot depend on you making that available for the life of my widow and the lives of my children as you have with Don.

ET_0000024217

Exhibit A-53

**COMPENSATION:**

Having regard to the foregoing, here is what I believe is a fair compensation package:

1.      A substantial increase in base salary.  There should also be an annual increase based on some formula which obviates the need to discuss this again.

2.      Bonus declared and awarded in your discretion.  I would hope that as a minimum the bonus potential of the last years would be maintained and increased over the years, but this is a matter for you.

3.      A straight incentive plan of 1% on net gains each year without a threshold and without a cap of any sort.  You should not be too concerned about what this might cost.  It won't be much more than I get now (and in most years will be less than 2013's potential payment).

For Cabot, assuming the return this year of about $15,720,000.00, this would be $157,200,00.  On the current plan, for Cabot I would be at about $60,000.  Given that most years I don't even get near the $1,000,000 cap, this would be a relatively modest bump.

Either way, I would still be way behind Don without the potential to significantly eclipse his earnings.

4.      Finally, the most important is some plan similar in pay-out to the plans A, B or C that you have contemplated for the senior managers at Reynolds.

ET_0000024218

Exhibit A-53

What is different and essential in my position is that the plan is properly weighted with front-ended protection to cover the risk associated with my position.  The risk is not something to which the Reynolds people are exposed.  I need to know that if I get subjected to proceedings or detention or seizure of assets, my family has somewhere to live and has financial support.  It is essential that some ring fenced asset or fund is available automatically should the need arise.

There also needs to be a back-ended fund which would see me out to retirement at such time when you no longer need my services.

**CONCLUSION:**

I would hope that by now you know my worth.  You once made the comment that Robert Smith wishes he had someone like me.  Without meaning to sound arrogant, Robert needs someone exactly like me.  I know who he has now and they are, frankly, a little better than useless.  People who do what I can do with the requisite level of trust and honesty are very rare.

I am here to provide a level of service and protection that you could not otherwise readily achieve.

These matters have weighed heavily on me and I would hope that we can put something in place that would mean we need never have to review the situation again unless there has been some very material changes.

# EXHIBIT

# A-54

Exhibit A-54

**TO DO LIST – TANGARRA**

revised May 21, 2011

**VISTA EQUITY FUND`**

-consider $200M initial committement to VEPFIV – awaiting partnership agreement from Vista

-also consider debt fund that uses leverage and buys debt of Vista portfolio companies

-also consider co-invest fund that invests alongside Vista deals

**PROJECTS – NEW – Investment Management Advisory Company**

-this should be an LLC owned directly by RTB that provides investment advice to Point

-this entity could also provide management services to portfolio companies allowing further income that is tax deductible to the portfolio companies

-the LLC should be US based with a year-to-year contract with Point such that at some point a new entity that included RTB II could be formed to take over the business

-investments should be made directly by Point as this is an already established entity through which SSHLTD has historically made investments  – which have provided the AEBCT with a further liability shield

-fee percentage should be industry standard and may be different based upon the investment mix

-fee is adjusted annually

-amount of fee is regulated by how much capital is committed

-endeavor to find the original draft document for Debevoise

-consider Debevoise for drafting the investment management company contract

-this entity only provides recommendations to Point, it does not act for Point so as to avoid any FBAR requirements

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**        **page** [ PAGE ] of  [ NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

Exhibit A-54

**PROJECTS – OTHER**

**-build combined structure charts for the AEBCT structure**

**-republish structure charts after the reorganization of the three non-AEBCT structures are done**

-create master document by entity of all bank accounts, signatories, and contact persons within the banks – republish when any changes occur

-this should include all information necessary to be able to log on to these accounts to verify balances

-remaining sets of externally kept books are – Rome, Spartacus, Augustus (Dan Jenkins), SSHLTD (Jim Collins), Point (now Evatt with Dan Voth for backup)

-need to find a way that someone else runs Point in order to satisfy the auditors

ET_0000048798

Exhibit A-54

**PROJECTS - TRUSTEES & TRUST PROTECTORS**

-establish Graham Wood as Trust Protector personally for the AEBCT, he then resigns and Acquitaine becomes the corporate Trust Protector where Graham Wood is Director

-document telephone conversation with Trevor Lloyd prior to his death where he resigns and concurs with your suggestion as Graham Wood personally as successor – provide an original wet-ink signed copy of this memo to Bob

-have Graham Wood personally resign and do a formal deed appointing his corporation signed in wet ink

-for backup purposes, secure a wet-ink signed letter of resignation and appointment of a new Trust Protector with date and appointee left blank – send this to Bob

-secure a digital signature from Graham Wood along with a wet-ink signed authorization to use it, provide this signature to Bob along with an original of this authorization

-prepare an Adobe version of the formal deed with date and appointee left blank ready for use with the digital signature – send a copy of this to Bob

-Chris Smith becomes Trust Protector for the new true charitable trusts

-convert Heather to part-time work (part of new year review) – where she continues to handle St. John's, AEBCT, SSHLTD, signatory on Point accounts, books for SSHLTD, Rome Investments, and the local Bermuda scholarship activities

-visit Al Thorpe to establish record of trustee visiting one of the directors of UCSH

-annual review of Carlos Kepke files

-annual trust meeting to be set at a new date and time – perhaps mid-semester break where RTB II can come to Bermuda

-cultivate Mark Patterson as a future successor to Trevor Lloyd, perhaps a golf trip to Bermuda

-have RTB II visit Bermuda to meet Heather, Bill Dolan, BCB, BNTB

-begin to consider how to provide backup to Evatt – qualifications are:
      -accounting background
      -not a US citizen
      -Bermuda permanent resident status

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**      **page** [ PAGE ] of [ NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]   [ TIME \@ "h:mm AM/PM" ]

ET_0000048799

# Exhibit A-54

-might discover someone thru the scholarship program

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**          **page** [ PAGE ] of  [
NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

# Exhibit A-54

**PRIVATE MUTUAL FUND ADMINISTRATION**

**-liquidate Arboria - $3.1M recovered**

**-liquidate Founding Partners - ongoing**

**CURRENT INVESTMENTS – this section is starting to be re-opened due to Reynolds refinancing, Ventyx sale, and the improving environment**

-Investment Policy for Mutual Fund Investments
    -Class 4 – 0% - money market – hold for emergency transfers
    -Class 3 – 50-60% low risk equity
    -Class 2 – 20-25% medium risk equity
    -Class 1 – 15-20% higher risk equity

-TradeTrakker
    Furnish new copies of portfolio whenever buy/sell events take place

-monitor current investment performance
    -30 day deposits getting .25%

-follow for any potential recovery
    -Bristol – write-off – continue to follow for recovery – partial distribution of $1.7M received

-complete losses
    -STIR – liquidated at $5M loss in total
    -Core Digital – write-off
    -Rosefaire FCS 10% interest $1.8M
    -A/R from Gate –

ET_0000048801

# Exhibit A-54

**NEW INVESTMENTS**

-periodically think about asset allocation

-receipt of cash from sale of Reynolds is unlikely for the next 3 years according to current thinking – then the amount will be around $2B

-VFF $50M commitment

-Sunquest 2nd lien debt $23.3M ?

-Vision Solutions 2nd lien debt $26M?

-new investment with VEPFIV, debt fund, co-invest fund

-if management buyout of Reynolds does not take place and an outright sale takes place, start a private equity type operation focusing on software companies like Vista does using former Reynolds personnel

-set up an investment management firm that advises Point (and if advisable – SSHLTD)

**POTENTIAL CHARITABLE DONATIONS**
        -Stuart Yudofsky - $15M more

**CHARITABLE DONATIONS**
        -Rice University – Physics Building - $20M
        -Centre College $19.5M
        -Lance Gould $4.5M
        -Stuart Yudofsky - $10M

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**          **page** [ PAGE ] of  [ NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

ET_0000048802

# Exhibit A-54

**DOCUMENTS**

-preparation of doomsday groups of documents for former Edge and Cabot structures once their re-organization is done

**RECORDS**

-St. John's has two boxes – Evatt and Heather sign on them

**TRIPS**

-trips to Danville, Houston, and Rice

-trip to Alaska – Labor Day 2011 – arrive in Houston by Sunday Sept 4th at the latest

-Nevis – meet Ernie Dover once every few years

-USA – quarterly

**EVATT**

-working on a larger family

-Sophie has gone back to work as manager of the trust department at Appleby's

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**          **page** [ PAGE ] of  [ NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

ET_0000048803

Exhibit A-54

**STRATEGIC LONG-TERM**

-Bob & Dorothy redo wills for US estate setting US testamentary trust for care of
    Robert II

-Evatt sends to Bob academic articles on the Testamentary Power of Appointment

-in the event of premature demise of RTB, offshore world (other than AEBCT and its
affiliates) should be held for RTB II to eventually manage (Dorothy will be involved in
the AEBCT structure)

-the long term vision is as follows:

        -RTB hopefully lives a long, healthy life
        -after Reynolds RTB engages in private equity investments much like Vista
        -former Reynolds key personnel join this organization
        -RTBII finishes his education in a technical area and also gets an MBA
        -RTBII eventually finds the right lady and starts a family
        -RTBII joins RTB in private equity operation
        -the private equity operation earns fees for managing AEBCT funds at industry
            standard rates providing a living for RTB and RTBII
        -the AEBCT continues to engage in charitable giving in the areas of higher
            education and medical research
        -the corpus of AEBCT is eventually rolled over to AEBGCT

-the disaster scenario where something untoward happens to RTB is as follows:

        -a US-based trusted person holds the ownership papers of the trust protector
            Corporations
        -this US-based person endeavors to guide RTBII in the long term vision laid out
            Above
        -there is a backup person to the US-based trusted person referred to above

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**          **page** [ PAGE ] of  [
NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

ET_0000048804

Exhibit A-54

**ENTITY STRUCTURE**

**Cabot Structure – Reorganization**

-create a new charitable trust – purpose medical research
-Choice and Barrier divend shares in Cabot up to Inverness and Shetland Trusts
-Inverness and Shetland Trusts gift their Cabot shares up to Aberdeen Trust
-Aberdeen Trust transfers these Cabot shares to Addington Trading
-Performance dividends its cash up to Endurance Trust
-Endurance Trust gifts this cash to Aberdeen which places the cash into Addington
-Aberdeen gifts the shares in Addington to the new charitable trust
-Addington has all the shares of Cabot, plus cash, plus share in Edge liquid and ill-liquid
-Lineage II Trust – holds some shares of Edge – what to do?

**Edge Structure – Reorganization**

-The Benevolent
      -Software Ltd pays off as much as it can on its loan to Plattoon
      -Plattoon's cash from the liquid portion of Edge goes to Regency
      -Advertising Services – as soon as one remaining account is closed

-create new charitable trust – for educational purposes

-Plattoon (Legend Trust) gifts its ill-liquid Edge to Legend (Heritage Trust)
-Cascade (Service Trust II) gifts its liquid and ill-liquid Edge to Legend (Heritage Trust)

-reduce the number of entities - or at least focus on getting rid of inactive entities

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**       page [ PAGE ] of [ NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

ET_0000048805

Exhibit A-54

**COMMUNICATIONS/PC ISSUES**

**-find a good double entry accounting system with the following requirements**
- **-GL detail records must contain date, name/address account number, memo number, document number, control number, and description field as well as G/L account number and transaction amount**
- **-traditional journals**
    - **-cash receipts**
    - **-cash disbursements**
    - **-general journal**
- **-no money entries can be made except by journal entry**
- **-lots of historical data in the GL account records**
- **-maintains detail history forever on selected accounts**
- **-ability to suppress print when detail entries with the same control number zero balance**
- **-possessing standard G/L reports as well as P&L**
- **-ability to map all fields including historical monthly, quarterly, and yearly fields into Excel**
- **-Sage PeachTree is one to start the search with**

**-no usage of logic.bm   no unencrypted usage of houstonfishingservice.com except in emergency when lambdaprime.org is down**

**-document boot-up process for the email server**

**-send a copy of the boot CD to Bob**

**-transition all third parties to use this email address, leaving only personal email on logic.com**

**-LPG generator with one-week's supply of fuel**

**-build a 3rd email laptop – lower in priority than other "hardening" processes**

**-fire extinguishers for new house**

-standards for files saved as part of the document database
- -relevant emails should be saved in .msg format
- -spreadsheets should be saved in .xls format
- -quarter and year-end reports should be saved in .pdf format
- -emails and reports from accounting systems should be saved as part of the regular data archiving process

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**          **page** [ PAGE ] of [ NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

ET_0000048806

Exhibit A-54

**STANDARD MEETING AGENDA**

-review cash balances
-review investment performance
-review structure documentation
-discuss status of each structure
-review status of files **– need new inventory of files now that inactive files are segregated**
-review status of PC systems and software

**PROJECTS – NEW – Aircraft Charter Company – now postponed indefinitely**

-seek bids for the cash sale of the RJ to independent 3rd parties, then set the price of the RJ a little above that to compensate for the "orderly sale" delay

-sell RJ to a new US-based C-corp – with preferably RTB owning 1% so he can fly at cost

-the sale must be of a depreciated asset so as to achieve the EBITDA gain intended

-investigate the potential tax consequences of the sale and subsequent purchase by a 1% owner – does this impact the ability of the new entity to depreciate the aircraft?

-after this change, the RJ is chartered to Reynolds and other third parties at the going $5500/hour rate – and to RTB at the owner's $2500 rate

**ENTITIES IN WIND-DOWN MODE – BUT STILL NOT GONE**

-shut down Software BV – in liquidation process – final complete in 2017

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**          page [ PAGE ] of [ NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]   [ TIME \@ "h:mm AM/PM" ]

Exhibit A-54

**DANGLING THREADS**

-CITGO - used to be in BVI, but now Heritage documents that they have are in Georgetown, will be retained forever - used to own CTL, Master, Kojak, Micro-Mainframe, Peters - left there is correspondence with Don, trust deed copies, being returned to BVI hopefully – status is that they cannot find these files

-Bank of Bermuda - there will be some left over internal memos written by bank officers in their personal file at least and there are microfilm copies of incoming mail

-Carlos' correspondence, billing, multiple destination, and computer files (gone)

-files of Ken, Robert, Craig - Mexico

-Brook Voght=s files -  whatever is left on their network server and its backups, same for what is at his new law firm

George Hani=s files - same issue as Brook

Ben's Jiltec and SFL records - initial reply was 10 years - find out what is the situation on Ben=s correspondence files (maybe destroyed by hurricane)

Butterfield Cayman - computerized accounting records of everything - CTL, Jiltec, SFL, Kojak

Baring Bros. - TIL audit reports, Carlos' correspondence, trust variance documents

VP-Bank copying of structure files and who knows what else – Glen Godfrey

VP-Bank bank records

ATU – files left behind

Malta – DBA, Providian – they will not destroy the copy of anything they ever sent out to us

Edge involvement in VEFII

Don's paper files that still may be about

Don's miscellaneous computer files

Peter Poole's office

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**          **page** [ PAGE ] of  [
NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

ET_0000048808

# Exhibit A-54

While I was in Houston a question came up as to the Edge connection to VEFII.

I can report that by way of Sale and Purchase agreement dated August 24, 2004, $154,582,366 was paid by Point in  consideration for Edge's interest in VEFII.

What we cannot tell is how this and Edge's other connection with VEFII was recorded by Vista.

It might be a worthwhile project in the future to review Vista's records and request destruction to the extent that we can.

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**          **page** [ PAGE ] of  [
NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

ET_0000048809

# EXHIBIT

# A-55

Exhibit A-55

Message

**From:**      John Barnes [johnbarnes@fcsresearch3.com]
**Sent:**      10/24/2004 8:29:14 PM
**To:**        Harry Andrews [harryandrews@fcsresearch3.com]; Michael Gilbert [michaelgilbert@fcsresearch3.com]
**Subject:**

Evatt,

Concerning the situation with Gordon my further thoughts are:

-the non-compete issue will likely be less if Gordon is no longer
employed by the bank after 3 to 6 months - out of sight, out of mind

-whatever Gordon would need to do with St. John's would likely draw
very little local attention - off hand, I can't see how it would ever
come up as  his name would only be on replies to queries from the IRS

-the day to day adminstration of St. John's can be carried on by the
administrator lady - keeping of records, payment of fees, etc.

-in any case if the non-compete issue came up in some sort of a suit
with the bank, the damages to the bank could be no more than whatever
fees Gordon derives from St. John's - which in the scheme of things
could not be very much - probably hardly likely to be worth the
bank's legal expense to obtain

-if things follow their normal course, the inevitable inquiry from
the house will not come for a couple of years - which means that
Gordon's official signature on things will not be needed until then -
which means that there is not the immediate requirement for a
solution

-Gordon's presence in regards to the AEBCT is desirable for making
things smell good in the course of an inquiry, but is not absolutely
necessary.  Trust personnel do in fact turn over from time to time -
this has no effect on the absolute legal position.

Therefore in your quest to have Gordon involved is that of trying to
perfect the position - not that the situation is irretrievably lost
if
Gordon cannot participate.

Bob

cc Don

ET_0001392171

# EXHIBIT

# A-56

# Exhibit A-56

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Date:** | Monday, August 30, 2010 12:33:00 PM |

Evatt,

After sufficient consideration to an important issue, you should replace Gordon Howard in his former position as director of St. John's.

Let me know what kind of paperwork that must be done by the parent of St. John's that it takes to make this official.

This will also require your replacing Gordon on all kinds of signature cards.

Bob

**MLATSW_000835**

Exhibit A-56

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Subject:** | RE: |
| **Date:** | Sunday, September 19, 2010 7:05:00 AM |

Evatt,

Glad to hear you all are still in operation.

Given that you are now in the role of trustee, I think that it is ok for there to be more communication between us in the "open" – as long as there is no sensitive information involved.

Let me know when you lose power.  I recommend that when this occurs that you immediately power down all computer equipment – that way you can use your UPS to keep your Blackberry working.

Bob

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Sunday, September 19, 2010 7:59 AM
**To:** permit1@lambdaprime.org; king@lambdaprime.org
**Subject:**

Bob and Don,

Power is still going here, however we are definitely in the storm now with worse to come.

We have heard that some parts of the island have already lost power.

Assuming that the mobile phone towers continue to operate, I'll send Don an email from the Blackberry when we lose power.

My mobile number is 1 441 333 2405 in case there is a need to get through.

The real battle right now is stopping the children from eating all the snacks that we bought for the post-hurricane loss of power!

Evatt

Exhibit A-56

Message

| | |
|---|---|
| **From**: | Redfish [redfish@lambdaprime.org] |
| **Sent**: | 8/30/2010 6:40:16 PM |
| **To**: | 'permit1@lambdaprime.org' [permit1@lambdaprime.org] |
| **Subject**: | RE: |

Bob,

The first step is for me to replace Gordon on the Waterford trust, which owns St John's.

That would be a simple Deed of Appointment executed by the other Trustee, Duncan Hall (there being no Protector of that Trust).

I would then replace Gordon as Director on St John's by a shareholder resolution.

All other appointment as Director:  to SSH LLC, SSH Ltd, Forum, Rome and Point would be straightforward.

The signatory issues will take a little more time, however all the banks involved know of Gordon's death and will be cooperative in making the changes.

It should be very quickly done – in fact before I leave France this Saturday.

Evatt

---

**From:** Permit [mailto:permit1@lambdaprime.org]
**Sent:** Monday, 30 August 2010 3:34 PM
**To:** redfish@lambdaprime.org
**Subject:**

Evatt,

After sufficient consideration to an important issue, you should replace Gordon Howard in his former position as director of St. John's.

Let me know what kind of paperwork that must be done by the parent of St. John's that it takes to make this official.

This will also require your replacing Gordon on all kinds of signature cards.

Bob

Exhibit A-56

Message

| | |
|---|---|
| **From**: | Permit [permit1@lambdaprime.org] |
| **Sent**: | 11/9/2010 1:40:32 AM |
| **To**: | redfish@lambdaprime.org |
| **Subject**: | RE: |

Evatt,

Let's just think about it for a bit.

I am thinking more about how the trail of change would look afterwards.

The question will be "how did Mark Patterson come to be the trust protector?" and who assisted in this process.  The fact that I have a personal relationship with Mark, while comforting to me, does not look as good.

It should not be you – as you are now effectively the Trustee.

It also should not be me – as doing any more than suggesting his name to someone.

I am almost thinking that Carlos (as the attorney that originally set up the AEBCT) should come into possession of the documents that appoint the new Protector.  He should then ask me (as a potential beneficiary of the trust) who a good Protector would be.

This line of thought is less than perfect, which brings me back around to thinking that Ben is the right person to own the protector company.  He is in Cayman, he was friends of Trevor.  He is in the trust business.  It is logical that he should own a protector company on the side.

We should take time to come up with a clearly reasoned decision.

Bob

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Monday, November 08, 2010 7:09 PM
**To:** permit1@lambdaprime.org
**Subject:** RE:

Bob,

I think that it might be worthwhile making a short term appointment until you are ready to push forward with Mark Patterson.

I can have someone stand in for a few months – appointed under Trevor's letters.

At year end that person would resign and appoint Mark or a company I set up for Mark.

This way we are never involving Mark in the dealings surrounding Trevor's death.

He remains untainted.

Evatt

---

**From:** Permit [mailto:permit1@lambdaprime.org]
**Sent:** Monday, 8 November 2010 9:00 PM

Exhibit A-56

**To:** redfish@lambdaprime.org
**Subject:** RE:

Evatt,

We already have signed original undated letters of resignation – all that has to be filled in the successor's name.

Bob

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Monday, November 08, 2010 6:56 PM
**To:** permit1@lambdaprime.org
**Subject:**

Bob,

I have looked at the amendment to the AEBCT.

There is provision for the Protector to resign and appoint a successor.  We could do this if the people in Nevis are difficult about changing Trevor as the contact person for Aquitaine.  I'll have to take the view that the death of the principal of the Protector amounts to a resignation.

I've left a message for our contact in Nevis and will report back.

Evatt

ET_0001761590

# EXHIBIT

# A-57

# Exhibit A-57

**TO DO LIST – TANGARRA**

revised May 16, 2012

**VISTA EQUITY FUND`**

-considering debt fund that uses leverage and buys debt of Vista portfolio companies

**PROJECTS – NEW – Investment Advisory Company**

-this should be an LLC owned directly by RTB that provides investment advice to Point

-the LLC should be US based with a year-to-year contract with Point such that at some point a new entity that included RTB II could be formed to take over the business

-investments should be made directly by Point as this is an already established entity through which SSHLTD has historically made investments  – which have provided the AEBCT with a further liability shield

-fee percentage should be industry standard and may be different based upon the investment mix, fee is adjusted annually, amount of fee is regulated by how much capital is committed

-consider Debevoise for drafting the investment advisor company contract

-this entity only provides recommendations to Point, it does not act for Point so as to avoid any FBAR requirements

-RTB must register as an investment advisor

**Private Equity entity**

-a separate entity which would be a Private Equity manager could also provide management services to portfolio companies allowing further income that is tax deductible to the portfolio companies

-when Point wants to directly invest in a US company, it should do with the Private Equity manager described above – to avoid getting entangled with a US trade or business regs

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**          **page** [ PAGE ] of  [ NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

Exhibit A-57

**PROJECTS – OTHER**

**-need details on Evatt expenses for 2011**

**-doomsday documents - need wet-ink signed documents that establish control over such that there is one envelope of documents each for:**
>        **-St. John's structures**
>        **-entities that have funds in Cabot**
>        **-entities that have funds in Edge**
>        **-entities that control Regency**

**-there are documents stored in a storage unit in Bermuda – need instructions on how to find it and keys**

**-need a floorplan of Evatt's house and directions where everything is**

**-need inventory of St. John's two safe deposit boxes, where they are located, where the keys are, who signatories are**

**-build combined structure charts for the AEBCT structure (RTB needs to review)**

**-republish structure charts after the reorganization of the three non-AEBCT structures are done (RTB needs to review)**

**-keep a running spreadsheet on private equity commitments (RTB needs to review)**

**-keep a running spreadsheet on charitable contributions forever to date, that also includes commitments that have not yet been funded**

**-build a complete description of all the 2011 organizational changes (RTB needs to review)**

**-build for the years 2010-2011 a log of significant transactions – and continue to update this log forever – so that it is easy to see how asset balances move around  (RTB needs to more thoroughly review)**

-create master document by entity of all bank accounts, signatories, and contact persons within the banks – republish when any changes occur – **add section for comments – such as relationship details – key people, needs more updates to online access, add new accounts**

-this should include all information necessary to be able to log on to these accounts to

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**           **page** [ PAGE ] of  [ NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

ET_0000054301

# Exhibit A-57

verify balances, **need fresh update on passwords**

-remaining sets of externally kept books are – Spartacus, Augustus (Dan Jenkins), SSHLTD (Jim Collins – now in Scotland), Point (now Evatt with Dan Voth for advice, enlist James Gilbert as backup signatory)

-need to find a way that someone else runs Point in order to satisfy the auditors

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**      **page** [ PAGE ] of  [ NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

ET_0000054302

Exhibit A-57

**PROJECTS - TRUSTEES & TRUST PROTECTORS**

-establish Graham Wood as Trust Protector personally for the AEBCT, he then resigns and Acquitaine becomes the corporate Trust Protector where Graham Wood is Director

-document telephone conversation with Trevor Lloyd prior to his death where he resigns and concurs with your suggestion as Graham Wood personally as successor – provide an original wet-ink signed copy of this memo to Bob

-have Graham Wood personally resign and do a formal deed appointing his corporation signed in wet ink

-for backup purposes, secure a wet-ink signed letter of resignation and appointment of a new Trust Protector with date and appointee left blank – send this to Bob

-secure a digital signature from Graham Wood along with a wet-ink signed authorization to use it, provide this signature to Bob along with an original of this authorization

-prepare an Adobe version of the formal deed with date and appointee left blank ready for use with the digital signature – send a copy of this to Bob

-Heather now works part-time – where she continues to handle St. John's, AEBCT, SSHLTD, signatory on Point accounts, books for SSHLTD, Rome Investments, and the local Bermuda scholarship activities

-annual review of Carlos Kepke files

-annual trust meeting to be set at a new date and time – by phone this summer

-cultivate Mark Patterson as a future Trust Protector, perhaps a golf trip to Bermuda

-have RTB II visit Bermuda to meet Heather, BCB, BNTB

-begin to consider how to provide backup to Evatt – qualifications are:
    -accounting background
    -not a US citizen
    -capable of acquiring a Bermuda work permit of at least 10 years
    -might discover someone thru the scholarship program

-James Gilbert is an interim backup for Evatt, should the emergency need arise.
    -he is from NZ and currently works for UBS in Cayman – age 40 +- very familiar with Edge and Cabot – wife is English -

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**          **page** [ PAGE ] of  [ NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

ET_0000054303

# Exhibit A-57

-Evatt is going to seek assistance from Kalamazoo to locate a more junior accountant preferably from NZ or Australia that is interested in a long term career in the offshore world

ET_0000054304

Exhibit A-57

**PRIVATE MUTUAL FUND ADMINISTRATION**

**-liquidate Arboria  - $3.1M recovered, rest is tied up on the backend of Madoff**

**-liquidate Founding Partners – ongoing – awaiting judge's order to take over operations**

**CURRENT INVESTMENTS – this section is starting to be re-opened due to, and the improving environment**

**-best option for investments seems to be LIBOR-based second lien debt in Vista companies**

-follow for any potential recovery
        -Bristol – write-off – continue to follow for recovery – partial distribution of $1.7M received – some potential for minor recovery $140-150K

-complete losses
        -STIR – liquidated at $5M loss in total
        -Core Digital – write-off
        -Rosefaire FCS 10% interest $1.8M
        -A/R from Gate –

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**          **page** [ PAGE ] of  [
NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

ET_0000054305

Exhibit A-57

**NEW INVESTMENTS**

-periodically think about asset allocation

-receipt of cash from sale of Reynolds is unlikely for the next 2 years according to current thinking – then the amount will be around $2B

-made $600M initial committement to VEPFIV, made $400M commitment to the VEPFIV co-invest fund to purchase MiSys

-VFF $50M commitment

-Sunquest 2nd lien debt $29.487M plus 13.75M

-Vision Solutions 2nd lien debt $26M

-Applied 2nd lien debt $20.524M

-if management buyout of Reynolds does not take place and an outright sale takes place, start a private equity type operation focusing on software companies like Vista does using former Reynolds personnel

-set up an investment management firm that advises Point (and if advisable – SSHLTD)

**POTENTIAL CHARITABLE DONATIONS**
    -Stuart Yudofsky - $15M more

**CHARITABLE DONATIONS**
    -Rice University – Physics Building - $20M
    -Centre College $19.5M committment
    -Lance Gould $4.5M
    -Stuart Yudofsky - $10M

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**      **page** [ PAGE ] of [
NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

ET_0000054306

Exhibit A-57

**DOCUMENTS**

-preparation of doomsday groups of documents for former Edge and Cabot structures once their re-organization is done

**RECORDS**

-St. John's has two boxes – **send me the inventory on these – so as to make a final decision as to whether to re-locate their contents to Houston**

**TRIPS**

-trips to Danville (Oct 19, 2012 is likely date of Residential Commons dedication), Houston, and Rice – include Sophie and the girls

-trip to Alaska – Labor Day Sept 3, 2012 – arrive in Houston by Sunday Sept 2th at the latest

-BVI with Don Q3 2012 – to retrieve Peter Poole documents

-summer 2012 – visit France and Scotland – finish Cabot/Edge bank accounts in Switzerland

-USA – quarterly

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**          **page** [ PAGE ] of  [ NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

ET_0000054307

Exhibit A-57

**STRATEGIC LONG-TERM**

-Bob & Dorothy redo wills for US estate setting US testamentary trust for care of
 Robert II

-need a document describing what to do in the event of my demise – similar to the one
prepared for the company

-in the event of premature demise of RTB, offshore world (other than AEBCT and its
affiliates) should be held for RTB II to eventually manage (Dorothy will be involved in
the AEBCT structure)

-the long term vision is as follows:

      -RTB hopefully lives a long, healthy life
      -after Reynolds RTB engages in private equity investments much like Vista
      -former Reynolds key personnel join this organization – or alternatively
          participate in a LBO/Preferred Stock bailout/MBO
      -RTBII finishes his education in a technical area and also gets an MBA
      -RTBII eventually finds the right lady and starts a family (and stays in Houston)
      -RTBII joins RTB in private equity operation – or investment advisory operation
      -the private equity operation earns fees for managing AEBCT funds at industry
          standard rates providing a living for RTB and RTBII
      -the AEBCT continues to engage in charitable giving in the areas of higher
          education and medical research
      -the corpus of AEBCT is eventually rolled over to AEBGCT or one of the PBB
          trusts

-the disaster scenario where something untoward happens to RTB is as follows:

      -a US-based trusted person holds the ownership papers of the trust protector
          Corporations
      -this US-based person (Al Deaton) endeavors to guide RTBII in the long term
          Vision laid out above

      -there is a backup person (Robert Burnett) to the US-based trusted person
          referred to above

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**       **page** [ PAGE ] of [
NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

ET_0000054308

Exhibit A-57

**ENTITY STRUCTURE**

**Cabot Structure – Reorganization**

-create a new charitable trust – purpose medical research
-Choice and Barrier divend shares in Cabot up to Inverness and Shetland Trusts
-Inverness and Shetland Trusts gift their Cabot shares up to Aberdeen Trust
-Aberdeen Trust transfers these Cabot shares to Addington Trading
-Performance dividends its cash up to Endurance Trust
-Endurance Trust gifts this cash to Aberdeen which places the cash into Addington
-Aberdeen gifts the shares in Addington to the new charitable trust
-Addington has all the shares of Cabot, plus cash, plus share in Edge liquid and ill-liquid
-Lineage II Trust – holds some shares of Edge – what to do?

**Edge Structure – Reorganization**

-The Benevolent
          -Software Ltd pays off as much as it can on its loan to Plattoon
          -Plattoon's cash from the liquid portion of Edge goes to Regency
          -Advertising Services – as soon as one remaining account is closed

-create new charitable trust – for educational purposes

-Plattoon (Legend Trust) gifts its ill-liquid Edge to Legend (Heritage Trust)
-Cascade (Service Trust II) gifts its liquid and ill-liquid Edge to Legend (Heritage Trust)

-reduce the number of entities - or at least focus on getting rid of inactive entities

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**          page [ PAGE ] of  [ NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

ET_0000054309

Exhibit A-57

**COMMUNICATIONS/PC ISSUES**

**-need old paper set aside and marked as such**

**-need step by step instructions on how to use digital signatures**

**-need the digital signatures and passwords**

**-find a good double entry accounting system with the following requirements**
> **-GL detail records must contain date, name/address account number, memo number, document number, control number, and description field as well as G/L account number and transaction amount**
> **-traditional journals**
> > **-cash receipts**
> > **-cash disbursements**
> > **-general journal**
> **-no money entries can be made except by journal entry**
> **-lots of historical data in the GL account records**
> **-maintains detail history forever on selected accounts**
> **-ability to suppress print when detail entries with the same control number zero balance**
> **-possessing standard G/L reports as well as P&L**
> **-ability to map all fields including historical monthly, quarterly, and yearly fields into Excel**
> **-Sage PeachTree is one to start the search with**

**-no usage of logic.bm   no unencrypted usage of houstonfishingservice.com except in emergency when lambdaprime.org is down**

**-document boot-up process for the email server, CD is already here**

**-create another email server and transition all third parties to use this email address, leaving only personal email on logic.com**

**-build a 3rd email laptop – lower in priority than other "hardening" processes**

**-fire extinguishers for new house – need two more**

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**                **page** [ PAGE ] of  [
NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

ET_0000054310

Exhibit A-57

**STANDARD MEETING AGENDA**

-review cash balances
-review charitable gift history and open commitments
-review Vista open committments
-review other investments
-review structure documentation
-discuss status of each structure
-review status of files **– need new inventory of files now that inactive files are
    segregated**
-review status of PC systems and software

**PROJECTS – NEW – Aircraft Charter Company – now postponed indefinitely**

-seek bids for the cash sale of the RJ to independent 3rd parties, then set the price of
the RJ a little above that to compensate for the "orderly sale" delay

-sell RJ to a new US-based C-corp – with preferably RTB owning 1% so he can fly at
cost

-the sale must be of a depreciated asset so as to achieve the EBITDA gain intended

-investigate the potential tax consequences of the sale and subsequent purchase by a
1% owner – does this impact the ability of the new entity to depreciate the aircraft?

-after this change, the RJ is chartered to Reynolds and other third parties at the going
$5500/hour rate – and to RTB at the owner's $2500 rate

**ENTITIES IN WIND-DOWN MODE – BUT STILL NOT GONE**

-shut down Software BV – in liquidation process – final complete in 2017

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**          page [ PAGE ] of  [
NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

ET_0000054311

Exhibit A-57

**DANGLING THREADS**

-CITGO - used to be in BVI, but now Heritage documents that they have are in Georgetown, will be retained forever - used to own CTL, Master, Kojak, Micro-Mainframe, Peters - left there is correspondence with Don, trust deed copies, being returned to BVI hopefully – status is that they cannot find these files

-Bank of Bermuda - there will be some left over internal memos written by bank officers in their personal file at least and there are microfilm copies of incoming mail

-Carlos' correspondence, billing, multiple destination, and computer files (gone)

-files of Ken, Robert, Craig - Mexico

-Brook Voght=s files -  whatever is left on their network server and its backups, same for what is at his new law firm

George Hani=s files - same issue as Brook

Ben's Jiltec and SFL records - initial reply was 10 years - find out what is the situation on Ben=s correspondence files (maybe destroyed by hurricane)

Butterfield Cayman - computerized accounting records of everything - CTL, Jiltec, SFL, Kojak

Baring Bros. - TIL audit reports, Carlos' correspondence, trust variance documents

VP-Bank copying of structure files and who knows what else – Glen Godfrey

VP-Bank bank records

ATU – files left behind

Malta – DBA, Providian – they will not destroy the copy of anything they ever sent out to us

Nevis – Willow activity in the 2000-2001 timeframe

Edge involvement in VEFII

Don's paper files that still may be about – unknown for sure

Don's miscellaneous computer files – allegedly he is putting the hammer to them 5/12

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**          **page** [ PAGE ] of  [ NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

# Exhibit A-57

Peter Poole's office – allegedly he is going to give us all of these


While I was in Houston a question came up as to the Edge connection to VEFII.

I can report that by way of Sale and Purchase agreement dated August 24, 2004, $154,582,366 was paid by Point in  consideration for Edge's interest in VEFII.

What we cannot tell is how this and Edge's other connection with VEFII was recorded by Vista.

It might be a worthwhile project in the future to review Vista's records and request destruction to the extent that we can.  Allegedly according to RS, all of this has been destroyed

-On May 23, 2011 Evatt (once again) sent and email through the [ HYPERLINK "mailto:etamine@logic.bm" ] email account.  This message contained an attachment of an Excel spreadsheet listing of all the original documents kept in Houston.  This email will be kept in perpetuity in the backup tapes of logic.bm.  This is the worst breach of security ever to happen to date.

**CONFIDENTIAL - ATTORNEY/CLIENT WORK PRODUCT**          **page** [ PAGE ] of  [ NUMPAGES ]
[ DATE \@ "M/d/yyyy" ]  [ TIME \@ "h:mm AM/PM" ]

# EXHIBIT

# A-58

# Exhibit A-58

| | |
|---|---|
| **From:** | <u>Redfish</u> |
| **To:** | <u>permit1@lambdaprime.org</u> |
| **Date:** | Thursday, May 3, 2012 10:12:56 AM |

Bob,

I have created my digital signature on your Radmin computer.  When you are ready let me know and I'll talk you through how to add my signature to documents.

I'm preparing Graham Wood's signature so that you can also sign on behalf of the Protector.

Evatt

MLATSW_002661

# Exhibit A-58

| | |
|---|---|
| **From:** | <u>Permit</u> |
| **To:** | <u>"Redfish"</u> |
| **Subject:** | RE: |
| **Date:** | Saturday, June 20, 2015 6:42:00 AM |

Evatt,

That is all that I can think of for now.

Bob

**From:** Redfish [mailto:redfish@hannah.com]
**Sent:** Saturday, June 20, 2015 8:06 AM
**To:** 'Permit'
**Subject:**

Bob,

I am putting together the encrypted drive that I will send you from Dallas.

I have included:

- the full data folder as it stood at May 31, 2015 including all superseded entities.
- the newly named data folders from June 1, 2015.
- the updated structure charts
- Graham Wood's signature image
- my signature image
- the SecureDoc key (though this is redundant if you can't access the drive)

Is there anything else you would like sent to you?

Where do you want the drive sent?

Evatt

MLATSW_015268

# Exhibit A-58

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Subject:** | RE: |
| **Date:** | Sunday, November 14, 2010 4:30:00 PM |

Evatt,

I agree.

Bob

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Saturday, November 13, 2010 8:38 PM
**To:** permit1@lambdaprime.org
**Subject:**

Bob,

Thinking about the best way to provide you with control over the trusts, I think you should consider a deposit with you (or me to be passed onto you) of digital signatures.

We are confronted with the practical complications of signed but undated letters of resignations, e.g. the newly added details will never quite line up.  This is something that I should have anticipated earlier.

There is legislation most places now dealing with affixing digital signatures.  With the proper authority in place, this would be a very neat way of producing pristine documents of resignation, appointment etc.

It will take a little thought to find the rock solid way of doing this, however it is a very achievable goal.

I could start by providing you with my digital signature.

What do you think?

Evatt

MLATSW_001169

# EXHIBIT

# A-59

Exhibit A-59

*** PGP SIGNATURE VERIFICATION ***
*** Status:   Good Signature from Invalid Key
*** Alert:    Please verify signer's key before trusting signature.
*** Signer:   King <king@houstonfishingservice.com> (0xBCB39719)
*** Signed:   12/17/2008 12:45:56 AM
*** Verified: 12/19/2008 6:14:24 PM
*** BEGIN PGP DECRYPTED/VERIFIED MESSAGE ***

Evatt:

As I believe you are aware, Bob and I have been communicating as to my ongoing
responsibilities after my move back to the U.S. Obviously, I cannot actively work giving
"consultation directives" from within the U.S. and will be required to travel periodically
to justify my consulting agreements with Pilot and Wedge. Still, I can receive emails and
talk with clients and colleagues while in the U.S. to keep current as to their activities,
which certainly would allow me to communicate with you as to our common clients'
needs.

Bob and I agreed to my participation as follows:

1) Maintain the accounts for Legend until James completes his probation period.

2) Move the Screen financials to James (probably sometime this month, although it may
be better to complete the yearend to give him a good "cut-off" for accounting purposes.
The problem is that I do not have copies of the 1st Caribbean bank statements for the
company and certainly have that cash account overstated. If you have those statements
for 2008, it would help in cleaning up that company.

3) Be available to assist you with any questions or difficulties that you might encounter
regarding accounting or auditing matters.

4) Assist you over the next 3 to 6 months in reviewing the monthly financials for
Addington and Cascade as you begin to maintain those accounting records. The purpose
is to assist you in properly setting up such accounting records. Therefore, please provide
me with whatever you have to date, and let's work together on this matter.

5) Be available to answer any questions on history–be it transactions, documents, or
companies.

6) Maintain the existence of the various trusts and companies that are "Jones /
Massengill" entities within their offshore structures.

7) Move all computer records for the offshore entities to the remote computer located
outside the U.S. Access them via RADMIN when traveling with the D420 laptop.

8) Undertake special projects should there be a need.

ET_0001566540

Exhibit A-59

9) Make necessary overseas trips to keep Pilot and Wedge active and involved to support their activities. These trips and any supporting expenses will be reimbursable.

10) Costs to operate Pilot and Wedge will be reimbursable. Such costs would include annual fees, computer and communications costs, etc.

11) Income will be $200,000 per year to an entity of my choice as long as the Jones / Massengill entities are involved with the Brockman entities in any way. When they are only handling their affairs the compensation will cease. As such this compensation will be paid even if I am disabled or deceased as Melissa or Kelly / Dru would represent those entities and work with you to be sure they are viable. The payment was agreed to be made to an entity of my choice. I intend to have those payments made by Point to Pilot, billed in the first quarter of each year. That process will give substance to Pilot which is the entity I intend to make the primary payments to me in the future.

12) You will maintain all of the Jones / Massengill entities as well as assisting with any deals in which these entities might be involved so as to minimize my direct participation which will help to "distant" me from those deals or activities.

13) According to the above, I need to ask you to consider how to document the changes in fees earned by Pilot and Wedge. Pilot should have an agreement to receive the $200,000 annual fee from Point, canceling any previous fee arrangements. Wedge needs to cancel the 1 percent net income fee with its varous clients. I am not sure how to accomplish that cancellation while still having it be a viable consultant to the client companies (and be the "flow through" consultant for Tangarra).

The end purpose of all of the above is to provide for me to assist you in any way I can. The intention is that I will step further into the background and allow you to take the lead in all matters while I am available to help where needed.

The further intent is to allow me the freedom to step away from the 60-hour weeks at the computer into a more sane pace so that I can go off and deal with a couple of rather serious health issues before I get too far along with them and am unable to seek a cure, or at least, some relief. In short I am to move into "semi-retirement" while being partially involved as you require.

One matter in which I fully agreed to be willing to participate is if something happens to Bob is to step into his role as the "de facto" trustee and work with you to handle whatever is necessary to keep the trust structures in the Brockman empire functional.

Between the two of us, you are welcome to call or email me about any issues you face, to include issues, which will surely arise, regarding your working relationship with Bob. I have been there and have some idea of his idiosyncracies, his priorities, etc. Maybe I can help.

# Exhibit A-59

Likely we will need to discuss some of the above issues. I will be in Oxford on Wednesday and Thursday and travel to Houstonon Friday until Tuesday when we go to Charlotte until Dec. 26th when we return to Oxford until we depart to Dallas for the Cotton Bowl (meeting Texas Tech) on Dec. 31st until our return to Oxford on January 3rd. We go to Florida on January 6th. I will be on my U.S. cell during all of these trips.

Don


\*\*\* END PGP DECRYPTED/VERIFIED MESSAGE \*\*\*

# EXHIBIT

# A-60

# Exhibit A-60

| | |
|---|---|
| **From:** | Permit |
| **To:** | "Redfish" |
| **Subject:** | RE: |
| **Date:** | Monday, December 25, 2017 7:16:00 PM |

Evatt,

I think the tax consequences of such a distribution would be way greater than ordinary US tax to me – based upon the rules as I understand them.   Plus it draws attention to my personal returns.

Bob

**From:** Redfish [mailto:redfish@hannah.com]
**Sent:** Monday, December 18, 2017 6:46 AM
**To:** 'Permit'
**Subject:**

Bob,

Another idea for your consideration.

Right now we are thinking that the trustee of the AEBCT could transfer **all** of the assets into the new trust.

What if we transferred most assets – not all.

We leave a sum of cash, which would be distributed to you as a beneficiary.

There are tax consequences, of course.

However, you would at least get something out of the AEBCT.

To minimize any attribution by the IRS, we would **first** clear most of the assets into the new Trust – hopefully beyond the reach of the IRS.

I would then make a final distribution to you.  That would clear out the AEBCT.

I can easily deal with the exclusion of beneficiaries by Gordon.  All I need to do, at the right time, is acknowledge that Gordon never had the power to strip out the named beneficiaries.

It would be wrong to not at least consider a distribution to yourself.

Evatt