# EXHIBIT

# A-85

# EXHIBIT A-85

**From:** Permit
**To:** "redfish@lambdaprime.org"
**Subject:** RE: ABCO Seminar October 20th, 2011
**Date:** Thursday, October 20, 2011 5:03:00 AM

I agree that it would be worth your time.  If possible under an assumed identity.

Bob

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Friday, October 14, 2011 6:58 AM
**To:** permit1@lambdaprime.org
**Subject:** FW: ABCO Seminar October 20th, 2011

Bob,

I had not given any thought to attending the training seminar below however the idea of understanding the "tradecraft" might be well worth the time.

It is being held within walking distance of the office which helps.

Evatt

**From:** Elizabeth Kempe Brown [mailto:EKempeBrown@meritustrust.com]
**Sent:** Thursday, October 13, 2011 4:19 PM
**To:** Undisclosed recipients:
**Subject:** ABCO Seminar October 20th, 2011

Dear  Members,

Over the past 10 years the failures in Compliance controls have indicated  that continuous training is critical in the fight towards combating Money Laundering and Terrorist Financing.

The Association of Bermuda Compliance Officers will be providing a training seminar on **Thursday 20  October 9.30 -3.30pm** to be delivered by Ken Rijock, a well known Financial Crime Consultant. The 1 day event will be held at the HSBC Bank Bermuda Limited, Habourview Boardroom, Front Street, Hamilton.

There will be 3 separate topics covered:

**TRADECRAFT**, which explains the advanced and esoteric money laundering techniques, together with the methods of detecting them on a real time basis;

**EMERGING THREATS,** which covers all the new and potential issues that have evolved in 2011, and which may appear in 2012 ; and

**LIFE EXPERIENCES,** which reviews the life experiences of Mr. Rijock .  This session in the past has always proven to be an exciting topic for attendees as  Mr. Rijock is believed to be the only former

EXHIBIT A-85

banking attorney-turned career money launderer who actively consults with law enforcement and the financial services community. He has more than 25 years experience in the field of money laundering, as a practicing laundryman, financial institution compliance consultant, and trainer/lecturer to law enforcement and the intelligence services of both the United States and Canada.

The cost of all 3 sessions is $125.00 for STEP members.   Please contact  Tanya Esdaille @ tesdaille@applebyglobal.com  for registration information.


Many thanks
Regards
Cheryl-Ann Mapp

Consultant
C.A.M.S. Ltd.
3 Burnaby Street
1st Flr. T. J. Pearman Building
Hamilton HM12
Bermuda

Tel:  (441) 292-9400
Fax: (441) 292-9404
Cell: (441) 505-4172

E-mail compliance@bermuda.com

MLATSW_002381

EXHIBIT A-85

*** PGP SIGNATURE VERIFICATION ***
*** Status:   Good Signature from Invalid Key
*** Alert:    Please verify signer's key before trusting signature.
*** Signer:   Bonefish <bonefish@houstonfishingservice.com> (0x25E1D8D0)
*** Signed:   10/28/2007 1:50:59 PM
*** Verified: 12/9/2007 2:02:42 PM
*** BEGIN PGP DECRYPTED/VERIFIED MESSAGE ***

Bob:

Fully agree.  As mentioned in my earlier response, the AEBCT has no
"name" officially included in the trust deed.  I have looked at the
deed which states it is "unamendable" except being associated with a
change of jurisdiction of the change of trustee.  However, since the
name was not included, there should be no problem.  We have already
changed the name of The Jones Family Trust to The Legacy Charitable
Trust with no problems (and was done while under the trusteeship of
Grosvenor / Gordon so no problem should exist for him in this
matter).

Concerning document retention, Evatt will spend a couple of weeks in
January at which time we intend to destroy anything not needed and
leaving in Bermuda any information which needs to stay here.  I
intend to take nothing to the UP.SO. except, possibly, the originals
of the Jones and Massengill trust deeds which I have every right to
maintain.  I will not retain a copy of the inventory of documents as
maintained by Evatt; nor, will I keep a computer copy of the
documents as scanned in by Evatt.  My intention is to be able to
honestly response to any query or request for documents is "Sorry, I
do not have anything".  Of course the best defense is a low profile,
which I intend to maintain with a vengeance.

Don


Don,

Evatt,

Given the continuing noise from the Congress regarding the Wyly
situation, I think that the name of the AEBCT should have
"Children's" removed and replaced with "Charitable".

Evatt, hopefully you can find authority within the trust document to

# EXHIBIT A-85

allow this to be done.

I would think that Gordon would have no problem with this.

Other than that I can think of nothing else we can do to prepare for the onslaught - other than be vigorously pursuing the document retention policy already in place as Don prepares to leave Bermuda.

Bob

*** END PGP DECRYPTED/VERIFIED MESSAGE ***

# EXHIBIT A-85

Message
_____

**From**:      Permit [permit1@lambdaprime.org]
**Sent**:      11/28/2010 1:02:42 AM
**To**:        redfish@lambdaprime.org
**Subject**:

Evatt,

Please purchase 5 copies of Invisible Secrets 4.

What I am interested in is Steganography – which is the process of embedding an already encrypted message into a photo.  One can take a 50K message and embed into a 3MB photo file without disturbing the appearance of the photo (assuming that there is enough irregularity in the photo (a waterfall picture would be a perfect choice).

The reason that I am interested is that my computer is subject to physical seizure here.  Even though it is encrypted, I could be subjected to what RTB II calls "rubber hose decryption".

While the critical files are with you, I have passwords and access information still here for things like RADMIN, bank accounts, and brokerage accounts.

If I were able to embed this information in pictures, all I would have to remember is one password (probably my PGP password).

I would be one step more secure against physical seizure of my computer (and backup hard drives).

Please install one of these copies and try it out.  It comes from Romania which is good.  The Smart Computing recommendation is good as well.

If you can get it to work, please send me a copy as well by putting it into my Transfer Out directory on my D-Drive on my RADMIN server laptop.

Bob

ET_0000045167

# EXHIBIT A-85

Message

| | |
|---|---|
| **From**: | Permit [permit1@lambdaprime.org] |
| **Sent**: | 9/2/2010 4:49:57 PM |
| **To**: | redfish@lambdaprime.org |
| **Subject**: | RE: |

Evatt,

I would try to do 3).

I would also create two copies on a Mico SD chip that are the size of less than a postage stamp.

I would then carry one concealed somewhere in luggage and I would FED-X the other with some misc correspondence to yourself in Bermuda.

I would not do 1) or 2).

Bob

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Wednesday, September 01, 2010 5:51 PM
**To:** permit1@lambdaprime.org
**Subject:** RE:

Bob,

I have no files whatsoever on the laptop itself.  There are three options for me:

(1)      I can place the external hard drive with all files elsewhere in my luggage.  I did this on the last trip without a problem.
(2)      I can transfer all files onto a USB key drive, which can be well hidden.  At the Bermuda end, I can restore the files to a larger drive.
(3)      Attached a drive with all files to James computer and then do a Radmin file transfer to a drive in Bermuda.  This will be a long process and is dependent on everything working here in France.  Once the file transfer is complete I can wipe the drive using EE.

Evatt

---

**From:** Permit [mailto:permit1@lambdaprime.org]
**Sent:** Wednesday, 1 September 2010 7:34 PM
**To:** redfish@lambdaprime.org
**Subject:** RE:

Evatt,

I will copy off all of my files and run EE on my RADMIN starting tomorrow.  I will be clean by Friday morning – when I shut down to transition to Houston.

Your reply here did not address your files or the big document image file.

Bob

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Wednesday, September 01, 2010 5:16 PM

ET_0000044709

EXHIBIT A-85

**To:** permit1@lambdaprime.org
**Subject:** RE:

Bob,

I have considered this issue.  I am not going through the US.  Your computer and the email server will be carried by me.

There is no issue transiting through London since I am only in the country for a few hours.  The only concern in Bermuda is duty, however provided I make full declaration of the value it is unlikely I will even be stopped.  I took Don's laptop and the backup email server on the trip back for Gordon's funeral and encountered not a hint of a problem.

Still, it would not hurt to transfer your files off your laptop and then restore them on Sunday.

You are right that the email server is a problem to boot.  Anyone trying to do so would think the laptop broken since nothing appears on the monitor – even with the power plugged in.

 The S and T drives here in France are powered, but I will need to unplug them on Friday to check the voltage.  If they cannot be used on 110, then I will copy the backup files onto a smaller drive that runs off the USB without AC power.

I have a very early start on Saturday (4 am) so I will need to power down everything for packing on Friday night.

The server will probably go down from about 2 or 3 pm your time.

Is there any advice regarding the settings for the email server.

I intend connecting James Gilbert's old laptop to the internet though the Draytek router with a Radmin server set up allowing you, me or Robbie to access the router remotely should we need to check any settings.

I had James download and install the Radmin server last year so that I could work on his laptop while he was in the Cayman Islands so this should be straightforward to get working.

Evatt

---

**From:** Permit [mailto:permit1@lambdaprime.org]
**Sent:** Wednesday, 1 September 2010 7:04 PM
**To:** redfish@lambdaprime.org
**Subject:**

Evatt,

Have you considered the security issues involved in moving the laptops to Bermuda?

Especially the big documents image file.

I should hate for them to get tied up in Customs or have them seized for any reason.

For sure I would expect that you would not be connecting thru the USA.

Bob

PS:  As a thought, I can easily transfer my files back to my computer here as they are relatively small.  I would then PGP wipe them off my RADMIN laptop and then run EE on the entire laptop.  That would solve some of the problem.  I could probably do yours as well.  However the big document image file could not be done that way.  The email server is also problematic – although if it were seized, they might have difficulty with it since it has a rather balky reboot process.

# EXHIBIT A-85

Don,                    8/2/08
Evatt,

Regarding telephone calls to the BVI and Cayman - I believe that it is quite likely that as a fishing expedition that the house will analyze call records for all calls to those areas from the USA (or France).

Therefore we must eliminate direct calls to these areas from landline or cell phones.

I think that the best solution is to have Vonage accounts with BVI telephone numbers with the Vonage accounts set up and billed to someone like Chris Smith.

This will have the effect of looking like a BVI person on the road calling back into the BVI or Cayman - which when the house scans all of the Vonage activity will look innocent.

Obviously in the Vonage records, they will likely store the IP address of where the Vonage phone was at when it made the call (or was called) - however it will take another layer of programming for the house to figure that one out.

The best solution is to use TelSIP.

Bob

# EXHIBIT A-85

Don,
Evatt,

On page 78 of the Senate Investigations Committee report, it talks about tax authorities scanning telephone records and initiating tax audits on anyone making at call to or receiving a call from a Liechstenstein area code.

While I think we have always been cautious about this - we need to be doubly so - especially calls to/from the BVI.  An most especially from the US.

Where calls to brokers are necessary, they should be made from France, not Switzerland - or preferably using a Vonage phone with a US number.

Bob

ET_0001568634

# EXHIBIT A-85

Evatt,

This is the list as I know it.  I would double check with Don to make sure that this is the most current.  If you find that I need updates to my list, please let me know.

Bob

Account names and passwords

Permit            purple         Bob Brockman (obsolete)

Permit1 thru Permit10 password is Wrigley    Bob Brockman

Bonefish         sxp0493        Don Jones

Redfish          cf6yhap        Evatt Tamine

Seatrout         opwc9km        Heather Corbett

Coho             zilchp0m       Cris Ruffel-Smith

King             varnish1       Don Jones backup

Chum             jhonen81       Mara Alido

Sockeye          yazoth767      Dan Voth

Pink             cthulu666      PWC Malta (Franchesca Dimech)

Rainbow          disinf00       Belize (Amir Sosa)

Browntrout       ulix1es        Jaimie McPherson

Grayling         ghun811        Peter Poole

Whitefish        ronjermi

Shark            prism99        Rob Nalley

Tarpon           electra32      Al Deaton

Snapper          gralph54

# EXHIBIT A-85

Dolphin      jkeldor

Whale      unikolm

Stingray      draskl

Flounder      ornith

Remora      stindc4

Stonefish      pmaster9

Cobia      daoloth      Laura Douglass

Ling      jerker18      Tom Kilburg

Cod      fuukasakurai

Grouper      93chilean

Steelhead      sf67903      Robert Smith

# EXHIBIT A-85

| | |
|---|---|
| **From:** | John Barnes |
| **To:** | Michael Gilbert |
| **Date:** | 19 October 2004 17:31:11 |

Evatt,

When you call me with Vonage, be sure to call through the UCS switch - as this sanitizes where the call really goes - as UCS does not retain call details except short term.  You have ample reason to still be calling UCS.  This assumes that it becomes known that the Vonage unit really resides in Bermuda - which they can figure out if Vonage keeps the IP address associated with each call - which the probably do.

If you call me direct through Vonage, those records stay around forever.

Bob

# EXHIBIT A-85

*** PGP Signature Status: good
*** Signer: Harry Andrews <harryandrews@fcsresearch3.com> (Invalid)
*** Signed: 3/9/2004 2:05:29 PM
*** Verified: 6/10/2004 2:48:50 PM
*** BEGIN PGP DECRYPTED/VERIFIED MESSAGE ***

Francesca:

You should have an encrypted email from James Gilbert (shown as Tina
Nash) with a fund redemption form to be completed on behalf of
Providian. We need to have Providian redeem $8,000,000 (or
approximately that amount). Please sign the redemption document, to
include bank transfer information, and return it by email to James.

Please confirm to me when you have received the redemption, and I
will give you further instructions. If necessary, you may need to
contact Amir Sosa at Cititrust International, Inc. in order to
receive his bank transfer information.

Don


*** END PGP DECRYPTED/VERIFIED MESSAGE ***

| **From:** | John Barnes |
| **To:** | Harry Andrews; Michael Gilbert |
| **Date:** | 01 January 2005 17:18:38 |
| **Attachments:** | attach5.doc |

Don,

I have gotten Evatt up and running on the houstonfishingservice.com server.  Evatt will be coming by this afternoon to help you get up on it as well.

These are the account names and passwords.  Please make this into a word document to keep track of who they are issued out to.

Bob

cc Evatt

Account names and passwords

Permit          purple

Bonefish        sxp0493

Redfish         cf6yhap

Seatrout        opwc9km

Coho            zilchp0m

King            varnish1

Chum            jhonen81

Sockeye         yazoth767

Pink            cthulu666

Rainbow         disinf00

Browntrout      ulix1es

Grayling        ghun811

Whitefish       ronjermi

Shark           prism99

Tarpon          electra32

Snapper         gralph54

Dolphin         jkeldor

Whale           unikolm

# EXHIBIT A-85

Stingray      draskl

Flounder      ornith

Remora        stindc4

Stonefish     pmaster9

Cobia         daoloth

Ling          jerker18

Cod           fuukasakurai

Grouper       93chilean

**HOUSTON FISHING SERVICE EMAIL SETUP**

This is the first step in moving to the new email server.  We will begin slowly to test out its reliability.

Please perform the following steps:

1)  Open permit.asc and then import this public key into your PGP keyring

 2)  Using the the examples below in the this document, go into Outlook (not Outlook Express) and set up an email account exactly as the example shows - except use the account name Bonefish and the email address bonefish@houstonfishingservice.com   The password must be sxp0493 (must be lower case letters).

3)  Go into PGP Keys - generate a new key pair with 4096 bit encryption using the name Bonefish and the email address bonefish@houstonfishingservice.com

4)  Establish another Identity inside Outlook Express that is Bonefish.  This will give you two identities in Outlook Express – Harry Andrews and Bonefish.  Switch to Bonefish Identity at this point.

5)  set up a new email address in your Outlook Express address book permit@houstonfishingservice.com  This is my new pseudonym that you will use to send messages to me.

5)  create a test message (internally identify it as test message #1) to permit and encrypt it with permit's public key that you have just imported into your PGP keyring - send it to me at permit's email address

7)  Email to me at the permit address as an attachment - the public key for bonefish so that I can import it into my keyring.  I will then endeavor to send you an encrypted message.

8)  When sending messages to Permit (or anyone else using the houstonfishingservice.com server, always switch to the Redfish identity.

# EXHIBIT A-85

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Date:** | Monday, May 23, 2011 5:58:00 PM |

Evatt,

I am beside myself on your breach of security.

The only thing I can think of is to close the etamine@logic.bm account today.

I should have insisted on this before now.  As this error has happened multiple times before, you have assured me that it would not happen again – yet it did.

Kill this account today!!!!!

Eliminate all email accounts from your main computer other than redfish@lambdaprime.org

Even doing all this will not mitigate the damage – as your email and the Excel attachment will be on record forever.

Bob

# EXHIBIT A-85

Evatt,

Don,

The following is what needs to be done this fall:

DON'S WIND-DOWN TO THE USA

-Evatt to visit Don in MS this late fall to accomplish the following:

-Evatt to set Don up with two Dell desktop PC's – one in MS and the other in FL with the following characteristics

     -absolutely no files kept on these machines

     -scrubbed routinely with EE – so as to eliminate work files left on the C-drive

     -all files kept on removable USB drives including Outlook

     -dual monitors

# EXHIBIT A-85

-Evatt to purge all computer files that are held by Don that involve offshore entities including hammering disks, shredding CDâ€™s etc.

-Donâ€™s offshore files are transferred to a PC operating in France that is dedicated to him

-only offshore files that are retained by Don in the USA are ones relating to his personal entities (even this is not recommended, but is his choice)

-absolutely no paper records in the USA â€" other than that related to personal entities

-absolutely no copies of the structure maps or the image library in the USA

-reference to all offshore files including structure maps and image library to be done using RADMIN software into a PC in France that has these files

# EXHIBIT A-85

Bob

ET_0001568727

EXHIBIT A-85

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Date:** | Friday, May 27, 2011 5:52:00 AM |

Evatt,

I will be largely busy the next few days as I celebrate my birthday and transition to Colorado.

I may have a chance for a SKYPE call tomorrow morning.

In the meantime, please do the following for me:

-there is a function in the Internet that allows one to see the various hops – or re-transmission points that an email message takes

-this function is invoked by going to Start, Run, cmd – and then typing in tracert logic.bm

-it will return a series of IP addresses and times in milliseconds between each hop

-copy down the list of IP addresses and send them to me

This will help tell us if your wayward email actually went outside Bermuda – which would be helpful – as perhaps the NSA is not monitoring local intra-island email traffic.  They are most certainly monitoring US-Bermuda email traffic.

Secondly, please look at your Outlook setup for the etamine@logic.bm email address.  Does it use SSL? This would tell us if your email was at least encrypted as it went to Logic.  Since it would get decrypted at logic.bm, it still does not help the fact that it sat unencrypted on their server and got put on their backup tapes that night.

Bob

# EXHIBIT A-85

| | |
|---|---|
| **From:** | <u>Permit</u> |
| **To:** | "king@lambdaprime.org"; "redfish@lambdaprime.org" |
| **Subject:** | RE: |
| **Date:** | Tuesday, February 7, 2012 5:21:00 PM |

Don,
Evatt,

The technology of SKYPE is peer-to-peer – this means that the video and voice go directly between the two IP addresses.

That means that SKYPE itself cannot record the actual session.

However SKYPE can keep track of the fact that a session existed between two IP addresses.

Since Evatt now represents St. John's, that is a normal and explainable reasons for sessions existing.

In order for sessions to be recorded, there would have to be traps of the sessions done at either my ISP or the ISP in Bermuda – or some point in between.

My understanding is that the session itself is encrypted.

One of the benefits of RADMIN that I specifically looked for – is that there is no entity that keeps track of the sessions – since with RADMIN we communicate directly to an IP address.  In order to know that they are even taking place, there would have to be traps at my ISP or the ISP in Bermuda.

Bob

---

**From:** King [mailto:king@lambdaprime.org]
**Sent:** Thursday, February 02, 2012 6:09 PM
**To:** permit1@lambdaprime.org; redfish@lambdaprime.org
**Subject:**

Bob / Evatt:

I know that you two communicate periodically by Skype.  However, I have stumbled across a notice about which you both are probably aware.

I have read that, although Skype was once thought to be private and secure, now it is owned by Microsoft – meaning that Skype chats (like yours) are recorded and available to courts and legal agencies.

Be careful,

Don

MLATSW_002507

# EXHIBIT A-85

Message

| | |
|---|---|
| **From**: | Permit [permit1@lambdaprime.org] |
| **Sent**: | 11/25/2012 9:12:04 PM |
| **To**: | redfish@lambdaprime.org |
| **Subject**: | |

Evatt,

I am continuing to get some rumbling about Skype not being secure since it was sold to Microsoft.

It sounds like that they may opening the door to government access to audio.

Back in 2005, SKYPE was regarded as extremely secure, but that no longer may be the case.

In terms of storing SKYPE video, the storage and the compute power to decrypt it will continue for some time to be pretty massive.  However the voice traffic is most likely able to be separated out – which would then take much less storage and much less compute power to decrypt.

Plus it would be susceptible to speech to text analysis to decide who they want to track based upon key words.

I have poked around looking for other secure point-to-point video chat solutions – but am not seeing very much that looks like it has potential.

Therefore what I am suggesting is that we turn off our microphone and speaker in SKYPE and go back to our RADMIN voice chat headsets.  That way we are communicating two different ways simultaneously.  I don't know that this will work, but at least it is worth a try.

RADMIN has 256 AES encryption which is very strong.  Famatech, developer of RADMIN, is solely owned by Dmitry Znosko, the chief developer of RADMIN.

Famatech is a Russian company located in Moscow.

While that in itself is not without worry, at least it is not Microsoft – over which the US government has substantial influence.

Bob

ET_0000054764

# EXHIBIT A-85

Evatt,

The remote access software that we will be using is called RADMIN.

I would go ahead an purchase it now - very inexpensive.

Have you gotten a Linksys router yet?  The reason that this is important is that for us to help you with the router settings, it will greatly facilitate things to be able to work with a familiar router.

There is a special setting called "port forwarding" that takes incoming traffic and directs it to your main system that has to be set up in your router.

Secondly, since switching Internet providers, please run the speed test again.  Also please run the ping test again and report results of both.

The configuration goal is to have your main multi-monitor system stay at home and for you to travel with a stripped down laptop that has no files on it.

Given that you are going to be in Bermuda for an extended period this fall, this configuration may not be workable - as your computer system or Internet connection at home in France could suffer outage.

Bob

EXHIBIT A-85

| | |
|---|---|
| **From:** | Permit |
| **To:** | redfish@proventusconstans.com |
| **Date:** | 12 June 2013 01:32:25 |

Evatt,

I don't know how much you hear about the Big Brother activities of the US government.

However it is as big and as bad as we ever dreamed off.  Even the Post Office takes pictures of the front and back of all mail pieces (probably just first class.

It all points up the need to figure out a good video conferencing piece of software that will run over a VPN from one dedicated IP address to another.

Bob

# EXHIBIT

# A-88

# EXHIBIT A-88

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Subject:** | RE: |
| **Date:** | Friday, September 3, 20:0 6:08:00 AM |

Evatt,

I am also moving outlook.pst to the SD card.  As well as the SecureDoc emergency file and the SecureDoc key.

I trust that the SD card is also encrypted.

Regarding the backup drives – they have everything on them – so they cannot be carried unless they have been wiped first.  If they cannot be wiped, I would take a hammer to them – as they should not be left behind in any case.  Replacement of them in Bermuda is a de minimis issue.

I was able to get about 2/3 of the bobdocs directories copied – I will try to get the rest – some this morning, some this afternoon before you have to wipe my D-drive and run EE on the C-drive.

Bob

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Thursday, September 02, 2010 7:08 PM
**To:** permit1@lambdaprime.org
**Subject:** RE:

Bob,

I have transferred the folder entitled "bobdocs" onto a SD card.  I won't be able to copy the "data" folder onto the card as there isn't enough room.  I can restore that folder and the "structure" folder when I am in Bermuda.

I have left the SD card folder open on your desktop in case there is anything you want to add.

The backup drives attached to your computer will work in Bermuda (100-240 volt adapters).

I could add a bunch of photos to one drive and a lot of music to the other and present them, if asked, as storage drives for my person files.

Alternatively we can just replace the drives in Bermuda and start again with the backups when I get there.

If the latter, then I would have to wipe the drives here tomorrow night.

Evatt

---

**From:** Permit [mailto:permit1@lambdaprime.org]

MLATSW_000851

EXHIBIT A-88

**Sent:** Thursday, 2 September 2010 8:30 PM
**To:** redfish@lambdaprime.org
**Subject:**

Evatt,

I was unsuccessful in transferring my files.

Therefore I recommend you take the Micro SD card approach to transferring them.

Plus there is the question of the backup drives that my RADMIN laptop backs up to. How do they get to
Bermuda securely?

Bob

MLATSW_000852

# EXHIBIT A-88

Evatt,

Given your recent experiences, you need to be extra careful in carrying data as you travel.

Be sure to use PGP-wipe (7 passes) on the files on your hard drive after you transfer the data to the USB dongle.

Plus Evidence Eliminator.

Warning - this takes quite a while.

Regular delete just doesn't get it.

Bob

ET_0000015139

# EXHIBIT A-88

Message

| From: | Redfish [redfish@lambdaprime.org] |
|---|---|
| Sent: | 9/3/2010 3:57:51 PM |
| To: | 'permit1@lambdaprime.org' [permit1@lambdaprime.org] |
| Subject: | RE: |

Bob,

I have destroyed the two external hard drives.

I am running EE now.

I am not sure if you will access the computer again however I'll be disconnecting the email server at 2 pm your time (10 pm my time).

Evatt

---

**From:** Permit [mailto:permit1@lambdaprime.org]
**Sent:** Friday, 3 September 2010 11:24 AM
**To:** redfish@lambdaprime.org
**Subject:**

Evatt,

I have been successful in completing the  transferring of bobdocs and my outlook.pst files from my RADMIN laptop to my laptop here.

This means that I feel pretty secure that I have a backup of everything – which means that you do not need to send a separate MicroSD card by FED-X – you just need the one you carry yourself.

I am counting on the the Data and Structure files to be carried safely yourself.  Those need a backup on MicroSD card send by FED-X.

My RADMIN laptop is now ready for 1) deletion of all files on the D-Drive and 2) run EE on the whole machine which will clean up the deleted files on the D-Drive as well as clean up the C-drive.  To make sure you get done before plane time on Saturday – I would reduce the number of overwrites to 3 – down from the usual 7.

As far as I am concerned, I do not believe you need the Backup Drives – they should be wiped clean – or destroyed.

Bob

EXHIBIT A-88

Message

| | |
|---|---|
| **From**: | King [king@lambdaprime.org] |
| **Sent**: | 8/18/2011 3:08:00 PM |
| **To**: | redfish@lambdaprime.org |
| **Subject**: | |

Evatt:

Bob called concerned about the Robert Smith situation and what effect a nasty divorce might have on us.  We agreed that if his business is dissected by her attorney, Point would be an initial target.  I told him I would review my paper records to make sure there is nothing here to give any of Point's details.  However, I need to transfer my confidential computer records to Radmin.  You told me you would help me do so in a manner which would not require that I send each file separately using the file transfer method.

Please get back to me as to how I might transfer those files.

For your information, we will be flying to Houston tomorrow (Friday) for my physical and Cameron's third birthday.  We will be back Tuesday evening.

Don

EXHIBIT A-88

Message
_____

**From**:         Permit [permit@proventusconstans.com]
**Sent**:         4/2/2013 4:29:36 PM
**To**:           redfish@proventusconstans.com
**Subject**:
**Attachments**:  Cyberscrub.pdf


Evatt,

For some time I have been somewhat suspicious of Evidence Eliminator.

There have been articles about it on the web.  They have been getting increasingly specific.

-there are really no enhancements or updates for years

-the links that I have had for downloads are no longer valid

-I recently ran it – and it ate some Windows files that caused my laptop to no longer be able to talk to the docking station – fortunately
System Suite has a recovery facility that snapshots critical Windows files – miraculously this was good enough to put back what EE had eaten

-one of the technical criticisms posted is that because EE is written in Visual Basic, their method for securing open disk space is to write 60MB files filled with alternating 0's and 1's repeatedly over all vacant space – and then delete the files – which is better than nothing – but not really technically correct way to wipe things

Periodically I have wandered around looking for a replacement – and I believe that I have found it in
Cyberscrub.  Literature is attached.

Additionally I like the name better – just having the Evidence Eliminator software on my laptop is an issue – as there is a case on record where the judge took affront.

Cyberscrub sales features are aimed at data protection of things like passwords, account numbers, files with PIN (personal information), etc.

Further Cyberscrub has a lot of the same certifications as SecureDoc.

Please buy a copy of this package and try it out.

Bob

# EXHIBIT A-88

Evatt,

Don,


The following is what needs to be done this fall:


DONâ€™S WIND-DOWN TO THE USA


-Evatt to visit Don in MS this late fall to accomplish the following:


-Evatt to set Don up with two Dell desktop PCâ€™s â€" one in MS and the other in FL with the following characteristics

     -absolutely no files kept on these machines

     -scrubbed routinely with EE â€" so as to eliminate work files left on the C-drive

     -all files kept on removable USB drives including Outlook

     -dual monitors

# EXHIBIT A-88

-Evatt to purge all computer files that are held by Don that involve offshore entities including hammering disks, shredding CD's etc.

-Don's offshore files are transferred to a PC operating in France that is dedicated to him

-only offshore files that are retained by Don in the USA are ones relating to his personal entities (even this is not recommended, but is his choice)

-absolutely no paper records in the USA – other than that related to personal entities

-absolutely no copies of the structure maps or the image library in the USA

-reference to all offshore files including structure maps and image library to be done using RADMIN software into a PC in France that has these files

ET_0001568726

EXHIBIT A-88

Bob

ET_0001568727

# EXHIBIT A-88

| | |
|---|---|
| **From:** | Permit |
| **To:** | "redfish@lambdaprime.org" |
| **Date:** | Tuesday, March 2, 2010 8:13:00 AM |

Evatt,

The SecureDoc logon process now seems to be working correctly as it requires me to logon every time I come in.

Please purchase the latest release of Evidence Eliminator for me.

I think that will be just a code that you use with a download.  I will download it to this machine, and then do a file transfer over to my machine here in Houston and then install it.

Bob

MLATSW_000070

# EXHIBIT A-88

Don,
Evatt,

I would like very much while Evatt is there - to clean up all the various spare drives and backups of all files.

The only exception should be Don's personal files that he wants to keep a backup in-country for (although I don't recommend this).

The goal is to get everything converted to a completely RADMIN form of access.

Those drives that do not get the hammer treatment, should be wiped with Evidence Eliminator.

PGP is not good enough as it will only get the current copy of the file, not previous copies that are laying around hidden on the disk.

EE is the only tool we have that wipes free space.

It is easy to set the EE options so that it does nothing except wipe disk space.

Bob

# EXHIBIT

# A-90

# United States District Court

## FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

## VENUE: SAN FRANCISCO

**FILED**

Oct 01 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

---

UNITED STATES OF AMERICA,

V.

ROBERT T. BROCKMAN

---

DEFENDANT(S).

---

## INDICTMENT

18 U.S.C. § 371 – Conspiracy
26 U.S.C. § 7201 – Tax Evasion
31 U.S.C. §§ 5314 & 5322(b) –FBAR Violations
18 U.S.C. § 1343 – Wire Fraud Affecting a Financial Institution;
18 U.S.C. § 1956(a)(1)(B)(i) – Concealment Money Laundering;
18 U.S.C. § 1956(a)(1)(A)(ii) – Tax Evasion Money Laundering;
18 U.S.C. § 1956(a)(2)(B)(i) – International Concealment Money Laundering;
18 U.S.C. § 1512(b)(2)(B) – Evidence Tampering;
18 U.S.C. § 1512(c)(1) – Destruction of Evidence

---

A true bill.

---

/s/ Foreperson of the Grand Jury

Foreman

---

Filed in open court this ___1st___ day of

___October 2020___.

Clerk

Bail, $ ___Summons___

Hon. Nathanael Cousins, United States Magistrate Judge

**FILED**

Oct 01 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

1  DAVID L. ANDERSON (CABN 149604)
   United States Attorney

2

3

4

5

6

7

8                 UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10                   SAN FRANCISCO DIVISION

11  UNITED STATES OF AMERICA,              CASE NO. 3:20-cr-00371 WHA

12          Plaintiff,                     VIOLATIONS:
                                           18 U.S.C. § 371 – Conspiracy to Defraud the United
13      v.                                 States and Commit Tax Evasion;
                                           26 U.S.C. § 7201 – Tax Evasion;
14  ROBERT T. BROCKMAN,                    31 U.S.C. §§ 5314 & 5322(b) – FBAR Violations;
                                           18 U.S.C. § 1343 – Wire Fraud Affecting a Financial
15          Defendant.                     Institution;
                                           18 U.S.C. § 1956(a)(1)(B)(i) – Concealment Money
16                                         Laundering;
                                           18 U.S.C. § 1956(a)(1)(A)(ii) – Tax Evasion Money
17                                         Laundering;
                                           18 U.S.C. § 1956(a)(2)(B)(i) – International
18                                         Concealment Money Laundering;
19                                         18 U.S.C. § 1512(b)(2)(B) – Evidence Tampering;
                                           18 U.S.C. § 1512(c)(1) – Destruction of Evidence;
20                                         and
                                           18 U.S.C. §§ 982(a)(1), 982(a)(2)(A) & 28 U.S.C. §
21                                         2461(c) – Forfeiture Allegations
22

23                                         SAN FRANCISCO VENUE

24                                         ████████

25

26                        **I N D I C T M E N T**

27  The Grand Jury charges:

28

    INDICTMENT

**Introduction**

At all times relevant to this Indictment:

1.     Defendant ROBERT T. BROCKMAN was a United States citizen residing in Houston, Texas and Pitkin County, Colorado.

2.     Universal Computer Systems Holding, Inc. ("UCSH"), was a Delaware corporation. UCSH was the holding company for a group of companies involved in the software business.  During all relevant periods, BROCKMAN was the Chief Executive Officer of UCSH.

3.     Universal Computer Systems, Inc. ("UCS"), which had offices in Houston, Texas, was a subsidiary of UCSH and was in the business of servicing the software needs of automobile dealerships. During all relevant periods, BROCKMAN was the Chief Executive Officer of UCS.

4.     Dealer Computer Services, Inc. ("DCS"), another UCSH subsidiary, was a Delaware corporation.  During all relevant periods, BROCKMAN was the Chief Executive Officer of DCS.

5.     The Reynolds and Reynolds Company ("Reynolds & Reynolds") was an Ohio corporation.  Reynolds & Reynolds was in the business of servicing the software needs of automobile dealerships.  In or about 2006, UCS and Reynolds & Reynolds merged, retaining the name Reynolds & Reynolds.  The stock of the new Reynolds & Reynolds was held by UCSH.  Beginning in approximately August 2006, BROCKMAN was the Chief Executive Officer of Reynolds & Reynolds.

6.     The A. Eugene Brockman Charitable Trust ("AEBCT"), formerly the A. Eugene Brockman Children's Trust, was a trust settled on or about May 26, 1981 in Bermuda.  The four named beneficiaries were BROCKMAN, BROCKMAN's wife, BROCKMAN's brother, and BROCKMAN's sister-in-law.

7.     Spanish Steps Holdings, LLC, was a Nevisian company, originally formed by BROCKMAN in or about 1997 in Nevis and wholly owned by the AEBCT.  Spanish Steps Holdings, Ltd., was a British Virgin Islands ("BVI") company, originally formed by BROCKMAN in or about 1989 in the BVI, whose shares were wholly owned by Spanish Steps Holdings, LLC (collectively "Spanish Steps").  Spanish Steps owned 93% of the shares of UCSH, as well as 100% of the investment shares of Point Investments, Ltd.

INDICTMENT                                    2

8.  Point Investments, Ltd., was a Bermudian entity, originally incorporated by BROCKMAN on or about July 14, 1999 in the BVI.  On or about November 30, 2009, BROCKMAN re-incorporated Point Investments, Ltd., in Bermuda.  After that date, Point Investments, Ltd., was wholly owned by the Point Purpose Trust, a Bermudian trust (collectively "Point"), and Spanish Steps.  Point had bank accounts in Bermuda and Switzerland.  Point was created to invest in private equity funds managed by Vista Equity Partners ("Vista"), a private equity firm which was formed in or about March 2000 by Individual Two, and which maintained its principal place of business in the Northern District of California.  Vista invested primarily in United States–based software companies ("portfolio companies").  A portion of the capital that BROCKMAN invested, through Point, in various Vista funds came from UCS's retained earnings.

9.  On or about March 6, 1995, BROCKMAN created The St. John's Trust Company ("SJTC"), a Bermudian entity, to act as the Trustee for the AEBCT.  BROCKMAN caused various individuals to be appointed and serve as the Directors of SJTC.  In or about 2010, BROCKMAN caused Individual One to become a Director of SJTC.

10.  From 1995 through the date of this Indictment, BROCKMAN's foreign entities ("offshore structure"), were managed by various individuals, each of whom was appointed by, and answerable to, BROCKMAN.  In or about 2007, AEBCT, Spanish Steps, SJTC, and Point were all managed, in part or in whole, by Individual One.  Individual One was compensated on an annual basis by BROCKMAN for his management of BROCKMAN's offshore structure and had periodic performance and salary reviews.

11.  Edge Capital Investments, Ltd. ("Edge"), was a Nevisian corporation.  Edge was managed by Individual One to create the appearance that Edge was not associated with BROCKMAN in any way.  In reality, Individual One was employed, paid, and supervised by BROCKMAN, and BROCKMAN retained full dominion and control over Edge.

12.  Cabot Global Investments, Ltd. ("Cabot"), was a Nevisian corporation.  Cabot was managed by Individual One to create the appearance that Cabot was not associated with BROCKMAN in any way.  In reality, Individual One was employed, paid, and supervised by BROCKMAN, and BROCKMAN retained full dominion and control over Cabot.

INDICTMENT                                                    3

13.     Tangarra Consultants, Ltd. ("Tangarra"), was a Bermudian corporation.  Tangarra was organized, formed, and managed by Individual One.

14.     In or about March 2000, BROCKMAN, through Point, committed $300 million to Vista's first private equity fund – Vista Equity Fund II ("VEF II").  In or about 2004, this commitment to VEF II was increased to $1 billion.

15.     BROCKMAN, through Point and Edge, was the only limited partner in VEF II.

16.     BROCKMAN, through Point, invested in numerous Vista funds in addition to VEF II.  BROCKMAN only invested in Vista funds that were organized outside the United States.

17.     In the private equity fund industry, when profits are distributed to investors, the amount distributed to each investor is determined based on each investor's share of the total investment in the underlying fund, as reflected in the applicable Partnership Agreement, and is termed a "Waterfall Calculation," or simply "the Waterfall."

18.     In or about 2006, DCS borrowed $2.4 billion to finance the merger of UCS and Reynolds & Reynolds ("the Debt").

19.     Deutsche Bank Securities, Inc., together with its subsidiaries including Deutsche Bank Trust Company Americas (collectively "Deutsche Bank"), was the Administrative Agent for the Debt, and acted as a Joint Lead Arranger and Joint Book Manager for the Debt.

20.     The Debt was a syndicated loan, also known as a syndicated bank facility, meaning that the financing was offered by a group of lenders – referred to as a syndicate – who worked together to fund the loan.

21.     The Debt was issued in three different tiers, also known as tranches.  Among other things, the tiers had different rates of return and conditions for repayment in the event of default.

22.     Each of the three different tiers of the Debt was controlled by a separate contract ("Credit Agreement").

23.     All three of the Credit Agreements were dated October 26, 2006, and all three Credit Agreements were signed by BROCKMAN as Chief Executive Officer of DCS and, under a separate signature block, by BROCKMAN as Chief Executive Officer of UCSH.

INDICTMENT                                        4

24.     All three Credit Agreements contemplated that the Debt would be traded on the secondary market after it had been issued, and all three Credit Agreements included restrictions on which individuals and entities would be permitted to purchase the Debt on the secondary market. Among other things, all three of the Credit Agreements contained a material provision excluding any "Affiliate" of DCS from purchasing the Debt on the secondary market.

25.     All three of the Credit Agreements defined an "Affiliate" of DCS to include any individual or entity directly or indirectly under common control with DCS.  Because BROCKMAN was the Chief Executive Officer of DCS, and retained full dominion and control over Edge, Edge was an "Affiliate" of DCS under all three of the Credit Agreements.

26.     All three of the Credit Agreements required DCS to periodically provide Deutsche Bank with certain financial information, including audited financial statements for UCSH and its subsidiaries, and quarterly compliance certificates; the Agreements further required Deutsche Bank to promptly distribute that financial information to holders of the Debt.

27.     United States citizens who had authority over certain foreign bank accounts, and/or a financial interest in such foreign bank accounts, had reporting obligations to the United States.  The Bank Secrecy Act and its implementing regulations required United States citizens to report to the United States Treasury any financial interest in, or signatory authority over, any bank account or other financial account held in foreign countries, for every calendar year in which the aggregate balance of all such foreign accounts exceeded $10,000 at any point during the year, using United States Treasury Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts.  This form is commonly known as a Foreign Bank Account Report, or "FBAR."  The FBAR for an applicable year was due by June 30 of the following year.

COUNT ONE:          (18 U.S.C. § 371 – Conspiracy to Defraud the United States & Commit
                            Tax Evasion)

28.     The allegations set forth in paragraphs 1 through 27 of this Indictment are re-alleged and incorporated as if set forth fully herein.

29.     From on or about December 1, 1999, and continuing through on or about October 15, 2019, in the Northern District of California and elsewhere, the defendant,

INDICTMENT                                     5

ROBERT T. BROCKMAN,

with others known and unknown to the grand jury, did unlawfully, voluntarily, and willfully conspire to:

(a) defraud the United States government through dishonest and deceitful means, to wit: the Department

of the Treasury, Internal Revenue Service ("IRS"), in the ascertainment, assessment, computation, and

collection of revenue, particularly individual federal income taxes due and owing by BROCKMAN for

the tax years 2000 through and including 2018; and (b) commit tax evasion, in violation of Title 26,

United States Code, Section 7201, of the individual federal income taxes due and owing by

BROCKMAN for the tax years 2000 through and including 2018.

**Objective of the Conspiracy**

30.     The objective of the conspiracy was for BROCKMAN, from December 1, 1999, through

October 15, 2019, to conceal from the IRS capital gain income BROCKMAN earned as a result of his

investments in Vista funds through Point; deposit some of this income in unreported foreign bank

accounts; and evade the payment of United States federal income tax on this income.

31.     It was further the objective of the conspiracy for BROCKMAN, using nominees,

including Individual One, to create a false paper trail regarding his offshore structure, including by filing

materially false United States Individual Income Tax Returns, Forms 1040, to give the appearance that

BROCKMAN did not own or control AEBCT, Spanish Steps, SJTC, and Point, when, in reality,

BROCKMAN had complete dominion and control over these entities, their Directors, Officers, and

Trustees, and received the benefit of all the income deposited into the foreign bank accounts in these

entities' names.

32.     It was further the objective of the conspiracy for BROCKMAN, using nominees,

including Individual One, to create a false paper trail giving the appearance that BROCKMAN did not

have any relationship with Point, Edge, or Cabot, when, in reality, BROCKMAN exercised full

dominion and control over Point, Edge, and Cabot, and used them to purchase the "Frying Pan Canyon

Ranch," the "Mountain Queen" vacation home, and the luxury yacht "Turmoil" (later renamed

"Albula") with unreported taxable income, for his personal use, and to conceal BROCKMAN's control

over Point, Edge, and Cabot from the IRS by failing to file truthful and accurate FBARs.

INDICTMENT                                   6

EXHIBIT A-90

**Manner and Means**

The manner and means by which BROCKMAN and his co-conspirators sought to achieve these objectives included, among others, the following:

33.     It was part of the conspiracy and scheme and artifice to defraud that, in an attempt to conceal a portion of his taxable income, primarily capital gains earned as a result of his investments in Vista funds through Point, in or about 2000, BROCKMAN, with assistance from other individuals known and unknown to the Grand Jury, created a complex network of offshore companies and trusts, and appointed nominees to manage these entities for him.  These nominees were compensated and employed by BROCKMAN to act as Directors, Officers, and Trustees of BROCKMAN's offshore structure, when, in reality, BROCKMAN completely controlled these entities and made all substantive decisions in their regard.

34.     It was further part of the conspiracy and scheme and artifice to defraud that BROCKMAN created and used a proprietary, encrypted email system to communicate with the nominees he appointed and employed to manage his offshore structure and foreign entities.  Each of the users of this encrypted email system was given a code name to be used when communicating with BROCKMAN and each other.  BROCKMAN's email code name was "Permit" or "Permit1."  Individual One's code name was "Redfish."  Other code names given by BROCKMAN to nominees he appointed to manage his offshore structure included "King," "Bonefish," and "Snapper."  Individual Two was given the code name "Steelhead."  In these encrypted emails, BROCKMAN often referred to the IRS as "the house."

35.     It was further part of the conspiracy and scheme and artifice to defraud that, "on paper," Spanish Steps owned approximately 93% of the preferred stock, or investment shares, of BROCKMAN's company UCSH.  Since Spanish Steps was owned by the AEBCT, the Trustee of which was the SJTC, this arrangement created the appearance that Directors of the SJTC controlled UCSH, UCS, and Reynolds & Reynolds.  In reality, Directors of the SJTC were employed by, and served at the pleasure of, BROCKMAN.  BROCKMAN made all substantive decisions regarding UCSH, UCS, and Reynolds & Reynolds.  From 2010, and continuing through about September 2018, Individual One was a Director of SJTC.

36.     It was further part of the conspiracy and scheme and artifice to defraud that, in or about March 2000, BROCKMAN, through Point and in agreement with Individual Two, committed approximately $300 million to VEF II.  Subsequently, in or about 2004, this commitment was increased to $1 billion.  From 2000, and continuing through 2014, funds were invested by BROCKMAN, through Point, in VEF II, as needed to purchase portfolio companies.  BROCKMAN funded these investments, in part, using retained earnings from UCS.

37.     It was further part of the conspiracy and scheme and artifice to defraud that, in addition to investments in VEF II, BROCKMAN, through Point, invested in numerous other Vista funds.

38.     It was further part of the conspiracy and scheme and artifice to defraud that BROCKMAN earned approximately $2 billion in capital gains as a result of his investments in Vista funds through Point.

39.     It was further part of the conspiracy and scheme and artifice to defraud that the capital gains distributed by Vista to Point for BROCKMAN's benefit were directed by BROCKMAN and his nominees, including Individual One, to be wired from Vista's bank accounts in the Northern District of California and elsewhere, to bank accounts in Point's name in Bermuda and Switzerland.

40.     It was further part of the conspiracy and scheme and artifice to defraud that capital gains BROCKMAN earned as a result of his investments in Vista funds through Point, as directed by BROCKMAN, were not reported to the IRS by BROCKMAN on his United States Individual Income Tax Returns, Forms 1040, although BROCKMAN enjoyed complete dominion and control over these earnings.  No United States federal income tax was paid on these capital gains.

41.     It was further part of the conspiracy and scheme and artifice to defraud that, in an attempt to conceal BROCKMAN's ownership and control over foreign bank accounts held in the name of Point, BROCKMAN did not report his interest and ownership over those foreign bank accounts as required by Title 31, United States Code, Sections 5314 & 5322 and Title 31, Code of Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b), despite the fact that BROCKMAN enjoyed complete dominion and control over those accounts.

42.     It was further part of the conspiracy and scheme and artifice to defraud that, in an attempt to conceal BROCKMAN's ownership and control over foreign bank accounts held in the name of Edge

and Cabot, BROCKMAN did not report his interest and ownership over those foreign bank accounts as required by Title 31, United States Code, Sections 5314 & 5322 and Title 31, Code of Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b), despite the fact that BROCKMAN enjoyed complete dominion and control over those accounts.

### Overt Acts

In furtherance of the conspiracy, and to effect the objectives thereof, the following overt acts were committed within the Northern District of California and elsewhere:

43. In or about September 1999, BROCKMAN directed and caused the opening of a bank account for Point at the Bermuda Commercial Bank, account number ***4132, with an initial deposit of more than $10 million.

44. On or about July 7, 2004, BROCKMAN directed and caused a transaction to be completed, code named "Hotrod," in which approximately $635 million of UCS's retained earnings were distributed to Spanish Steps, for transfer to Point and eventual investment in Vista funds, without properly reporting the transactions to the IRS.

45. On or about August 27, 2006, BROCKMAN, using his encrypted email system, informed his nominees, code named "Bonefish" and "Redfish," that he had read the United States Senate's Permanent Subcommittee on Investigations' report entitled "Tax Haven Abuses: The Enablers, The Tools and Secrecy" and, based on this report, BROCKMAN subsequently directed his nominees to change the name of the "A. Eugene Brockman Children's Trust" to the "A. Eugene Brockman Charitable Trust."

46. On or about September 23, 2006, BROCKMAN instructed Individual One that BROCKMAN was to be given: 1) quarterly reports on "all portfolio companies;" 2) amendments to the VEF II partnership agreement; and 3) copies of annual audits of VEF II and another Vista fund named Vista Equity Fund III.

47. On or about June 3, 2007, BROCKMAN, using his encrypted email system, directed Individual One to purchase a computer program called "Evidence Eliminator" for Individual One's computers.

INDICTMENT                                          9

48.     On or about July 23, 2008, BROCKMAN, using his encrypted email system, directed Individual One on the methods necessary to create more convincing backdated documents. BROCKMAN notified Individual One that "[a]s a reminder - we need to also remember that all copy machine/laser printer paper has encoded into it the manufacturer of that paper as well as the year and month of manufacture.  For that reason I always set aside some packets of copy paper with dates on them - for potential future use."

49.     On or about August 2, 2008, BROCKMAN, using his encrypted email system, directed Individual One "to eliminate direct calls to [the BVI and Cayman Islands] from landline or cell phones." He further directed Individual One to have a BVI resident establish multiple Vonage accounts for their use which "will have the effect of looking like a BVI person on the road calling back to the BVI . . . which when the house scans all of the Vonage activity will look innocent."

50.     On or about December 11, 2009, BROCKMAN, using his encrypted email system, instructed Individual One that BROCKMAN wanted to authorize any expenses relating to the "Mountain Queen" property that exceeded $2,000, and BROCKMAN did, in fact, subsequently review and approve such expenditures.

51.     On or about February 19, 2010, BROCKMAN, using his encrypted email system, directed Individual One to pursue the purchase of a "fishing lot" for $500,000 through an entity named "Henke Properties."

52.     On or about February 26, 2010, BROCKMAN, using his encrypted email system, instructed Individual One that he should not pay more than $500,000 for the fishing lot property through Henke Properties.

53.     On or before April 30, 2010, BROCKMAN directed Individual One, together with a second nominee, to open a bank account at Mirabaud & Cie Banquiers Prives, Geneva, Switzerland ("Mirabaud Bank") in the name of Point, account number ***463.  BROCKMAN further directed that Individual One was to be a signatory on this bank account.

54.     On or about May 20, 2010, BROCKMAN directed Individual One to move most of the remaining balance of funds on deposit in the Point account at Bermuda Commercial Bank, account ***4132, approximately $1 million, to the Point Mirabaud Bank account ***463 in Switzerland.

1   55.   On or about May 24, 2010, BROCKMAN directed that a distribution from Vista to Point,

2   in the amount of $799,008,883, from VEF II's sale of a portfolio company, was to be deposited in the

3   Point account at Mirabaud Bank.

4   56.   On or about May 26, 2010, BROCKMAN, using his encrypted email system, directed

5   Individual One to make specific edits, changes, and amendments to the VEF II Limited Partnership

6   Agreement on behalf of Point.

7   57.   On or about May 27, 2010, BROCKMAN, using his encrypted email system, instructed

8   Individual One to pose questions to Individual Two regarding fees payable from Point to Vista in

9   association with the sale of a portfolio company.

10   58.   On or about June 5, 2010, at BROCKMAN's direction, Individual One provided

11   BROCKMAN with the user identification and password to directly access the Point bank account at

12   Mirabaud Bank, account ***463.

13   59.   On or about July 8, 2010, BROCKMAN, using his encrypted email system, directed an

14   additional investment, through Point, of $3,163,833 in a Vista fund named Vista Equity Partners Fund

15   III.

16   60.   On or about July 13, 2010, BROCKMAN, using his encrypted email system, informed

17   Individual One that due to the "Ventyx transaction," he wished to restructure "two major structures,"

18   which "cleans up these two structures forever – yet leaves them available for charitable giving,

19   investment management fee income, investments in real estate, investments in companies, and in the

20   case of dire emergency – for loans to individuals or other entities."

21   61.   On or about July 23, 2010, BROCKMAN, using his encrypted email system, instructed

22   Individual One that Edge and Cabot should not be added under the AEBCT umbrella because, "[w]e

23   never can tell what crazy things the house is going to do – and the AEBCT is exposed to them."

24   62.   On or about August 30, 2010, BROCKMAN, using his encrypted email system, directed

25   Individual One to become a Director of SJTC.

26   63.   On or about September 27, 2010, BROCKMAN, using his encrypted email system, gave

27   Individual One instructions regarding Point's investment in VEF II.  Specifically, with regard to the

28   purchase of a portfolio company called Sunquest, BROCKMAN told Individual One that he was not

INDICTMENT                                  11

1   satisfied with the proposed "management and programming structure," and that the proposed purchase

2   was not a "reasonable thing for us to be involved [in]."

3        64.    On or about October 30, 2010, BROCKMAN, using his encrypted email system,

4   corresponded with Individual One about using Point to purchase a "Swiss private bank."

5        65.    On or about November 1, 2010, BROCKMAN, using his encrypted email system,

6   corresponded with Individual One about Point's August 24, 2004 purchase of Edge's investment in VEF

7   II for $154,582,366, and the destruction of records at Vista reflecting the purchase.

8        66.    On or about November 10, 2010, BROCKMAN, using his encrypted email system,

9   directed Individual One to invest $50 million, through Point, in a Vista fund named Vista Foundation

10  Fund.

11       67.    On or about December 6, 2010, BROCKMAN, using his encrypted email system,

12  notified Individual One that Point had approximately $1,414,658,673 in assets, which differed from

13  internal reports, and directed Individual One to make several corrections to Point's financial statements.

14       68.    On or about December 28, 2010, BROCKMAN directed Individual One to fabricate a

15  backdated memorandum memorializing a fictitious conversation with a deceased former nominee

16  "where he resigns and concurs with your suggestion as [a replacement nominee] – provide an original

17  wet-ink signed copy of this memo to Bob."

18       69.    On or about July 12, 2011, BROCKMAN, using his encrypted email system, directed

19  Individual One to prepare for BROCKMAN a monthly "Significant Transaction Report" regarding

20  Point, and to include any transaction exceeding $100,000.

21       70.    On or about October 20, 2011, BROCKMAN, using his encrypted email system, directed

22  Individual One to attend a money laundering conference "if possible under an assumed identity."

23       71.    On or about January 7, 2012, BROCKMAN, using his encrypted email system, directed

24  Individual One to make additional investments, through Point, in Vista funds named Vista Equity

25  Partners Fund IV, Vista Foundation Fund I, and Vista Equity Partners Fund III.

26       72.    On or about February 14, 2012, BROCKMAN, using his encrypted email system,

27  informed Individual One that he was interested in investing, through Point, $400 million in a Vista fund

28  named Vista Equity Partners Fund IV, provided Point obtained a percentage of direct ownership in the

INDICTMENT                                    12

1   company purchased as part of the deal.

2       73.   On or about May 1, 2012, BROCKMAN, using his encrypted email system, instructed

3   Individual One on how to structure BROCKMAN'S investment in the "debt market" in such a way to

4   avoid IRS scrutiny of the AEBCT.

5       74.   On or about May 3, 2012, BROCKMAN directed Individual One to invest, through

6   Point, $400 million in a Vista fund named Vista Equity Partners Fund IV.

7       75.   On or about August 12, 2012, BROCKMAN, using his encrypted email system, directed

8   Individual One to invest, through Point, $16.71 million in a Vista fund named Vista Equity Partners

9   Fund IV, to which BROCKMAN, through Point, had already committed $600 million.

10       76.   On or about November 25, 2012, BROCKMAN, using his encrypted email system,

11   instructed Individual One to "register our disappointment" with a Vista employee regarding tax

12   withholding on expected dividends from Vista.

13       77.   On or about December 9, 2012, BROCKMAN, using his encrypted email system,

14   directed Individual One to change the structure in which the shares of Point were held, moving them to a

15   "purpose trust" with a "dressed up charitable purpose" to avoid inquiries from banks and "the house"

16   about the "ultimate beneficial owners" of Point.

17       78.   On or about February 17, 2013, BROCKMAN, using his encrypted email system,

18   provided Individual One talking points regarding the negotiation of a gift from BROCKMAN to Centre

19   College in the name of the AEBCT.

20       79.   On or about March 19, 2013, BROCKMAN instructed Individual One: 1) that if Point

21   were to invest directly in a United States company, it needed to do so through a private equity manager;

22   and 2) to secure a "wet-ink signed letter of resignation and appointment of a new trust protector" and

23   send the document to BROCKMAN.

24       80.   On or about May 2, 2013, BROCKMAN, using his encrypted email system, directed

25   Individual One to commit, through Point, $50 million to a Vista fund named Vista Foundation Fund II.

26       81.   On or about July 12, 2013, BROCKMAN, using his encrypted email system, directed

27   over $7 million of additional investments, through Point, to various Vista funds.

28

INDICTMENT             13

Case 4:22-cv-00202   Document 24   Filed on 01/31/22 in TXSD   Page 54 of 123
EXHIBIT A-90
Case 3:20-cr-00371-WHA   Document 1   Filed 10/01/20   Page 17 of 44

82.     On or about July 24, 2013, BROCKMAN, using his encrypted email system, instructed Individual One on a press release for a contemplated $250 million gift from BROCKMAN to Centre College in the name of the AEBCT.

83.     On or about August 22, 2013, BROCKMAN, using his encrypted email system, sent Individual One detailed instructions regarding a gift from BROCKMAN to Centre College in the name of the AEBCT, including talking points, and directed Individual One to threaten to "pull[] the plug on the project" if BROCKMAN's demands were not met.

84.     On or about August 31, 2013, BROCKMAN, using his encrypted email system, instructed Individual One to cancel the gift to Centre College, and instructed Individual One what to tell Centre College as to why the gift was cancelled.

85.     On or about November 19, 2013, BROCKMAN, using his encrypted email system, instructed Individual One not to make a commitment, through Point, to a Vista fund named Vista Equity Partners Fund V, and that an existing investment commitment, through Point, must be "reeled back to $100 million," from $150 million.

86.     On or about December 1, 2013, BROCKMAN, using his encrypted email system, gave Individual One specific instructions to correct the record for distributions of profits from Vista to Point - "the waterfall."  Specifically, BROCKMAN directed that the return of capital in a specific distribution should be $8,489,317, and the total return should be $41,364,185.

87.     On or about January 23, 2014, BROCKMAN, using his encrypted email system, directed Individual One to make additional investments, through Point, in Vista funds named Vista Foundation Fund I, Vista Equity Partners Fund IV, and Vista Foundation Fund II.

88.     On or about February 16, 2014, BROCKMAN directed Individual One to draft a letter to BROCKMAN on behalf of SJTC requesting that BROCKMAN negotiate a sale of Reynolds & Reynolds to Vista.

89.     On or about April 5, 2014, Individual One requested BROCKMAN purchase a house for Individual One in Australia where Individual One's family could live if Individual One were to "be subjected to proceedings."

INDICTMENT                                    14

90.     On or about May 2, 2014, BROCKMAN, using his encrypted email system, sent Individual One a memorandum informing Individual One of BROCKMAN's decisions regarding Individual One's annual bonus and a loan to Individual One to purchase a home in Sydney, Australia.

91.     On or about May 4, 2014, BROCKMAN, using his encrypted email system, instructed Individual One that BROCKMAN's annual salary from Reynolds & Reynolds must be increased to permit him to "charter" the luxury yacht "Turmoil" (later renamed "Albula") for 10 weeks per year at $150,000 per week plus fuel.

92.     On or about May 10, 2014, BROCKMAN, using his encrypted email system, instructed Individual One to open a bank account in Switzerland for the AEBCT and to respond to inquiries regarding BROCKMAN's relationship to the AEBCT and the derivation of its assets.  BROCKMAN also informed Individual One that his initial investment in VEF II came from a "substantial dividend" without the payment of any withholding tax.

93.     On or about June 29, 2014, BROCKMAN, using his encrypted email system, agreed to provide Individual One with $3 million to purchase a home in Australia.

94.     On or about July 21, 2014, BROCKMAN authorized a $75 million loan from BROCKMAN to Individual Two.

95.      On or about October 3, 2014, BROCKMAN, using his encrypted email system, instructed Individual One regarding "buying out" Vista's investment in Reynolds & Reynolds.

96.     On or about October 9, 2014, BROCKMAN, using his encrypted email system, requested and received from Individual One the username and password necessary to access the secure Vista website, which allowed him to download "all financials, calls and distribution notices etc."

97.     On or about December 26, 2014, BROCKMAN, using his encrypted email system, directed Individual One to invest, through Point, $63.89 million in a Vista fund named Vista Equity Partners Fund V.

98.     On or about January 2, 2015, BROCKMAN, using his encrypted email system, directed Individual One to make additional investments, through Point, in Vista funds named Vista Equity Partnership Fund IV, Vista Foundation Fund I, and Vista Foundation Fund II.

INDICTMENT                                    15

99.     On or about January 18, 2015, BROCKMAN directed Individual One to explore having BROCKMAN'S son renounce his United States citizenship and assume management of the offshore structure.

100.     On or about May 9, 2015, BROCKMAN, using his encrypted email system, directed Individual One to make an additional investment, through Point, in a Vista fund named Vista Equity Partners Fund IV.

101.     On or about June 2, 2015, BROCKMAN, using his encrypted email system, instructed Individual One to determine the value of Point's investment in Vista Equity Partners Fund IV, and why it was reported as about 11% of the fund (or about $40 million), when BROCKMAN recalled that Point's investment in the fund was 17.9% (valued at approximately $70 million).

102.     On or about February 13, 2016, BROCKMAN, using his encrypted email system, directed Individual One to invest, through Point, $33.08 million in a Vista fund named Vista Equity Partners Fund IV.

103.     On or about February 24, 2016, BROCKMAN, using his encrypted email system, directed Individual One to purchase, through Cabot and Edge, $20 million of "first lien debt in a Vista software company."

104.     On or about April 18, 2016, BROCKMAN, using his encrypted email system, directed Individual One to make an additional investment, through Point, in a Vista fund named Vista Foundation Fund II-A.

105.     On or about June 9, 2016, BROCKMAN, using his encrypted email system, instructed Individual One that before Individual One committed to make an additional investment, through Point, in a Vista fund named Vista Equity Partners Fund IV for the purpose of purchasing a company named Misys, BROCKMAN needed a list of additional information including: 1) complete details about the current operation of Misys; 2) complete details about the sale of Misys; 3) documentation as to the valuation of Misys; and 4) a seven-year forecast of the operation proformas of Misys.

106.     On or about July 3, 2017, BROCKMAN, using his encrypted email system, directed Individual One to make additional investments, through Point, in Vista funds named Vista Equity Partners Fund III, Vista Equity Partners Fund IV, Vista Equity Partners Fund VI, Vista Foundation Fund

INDICTMENT                                    16

I, and Vista Foundation Fund II-A.

107.    On or about July 26, 2017, BROCKMAN, using his encrypted email system, directed Individual One how to playact an upcoming "negotiation" with BROCKMAN including which points to contest and which points to concede.  BROCKMAN directed Individual One to "continue to gripe about co-invests - but then give in."

108.    On or about December 25, 2017, BROCKMAN, using his encrypted email system, directed Individual One to position the luxury yacht "Albula" in Barcelona for BROCKMAN'S upcoming vacation so that BROCKMAN did not get billed for the costs of moving the yacht. BROCKMAN further directed Individual One "[f]or appearances sake it would probably be good for you [and your family] to take some vacation in that time frame before we get there."

109.    On or about April 20, 2018, BROCKMAN directed and caused the creation of a private equity fund named "Falcata Tech Investment Fund I, L.P.," and directed Individual One to commit, through Point, approximately $1 billion to the fund.

110.    On or about May 17, 2005, BROCKMAN directed and caused a transfer of approximately $15 million from a bank account at VP Bank in the BVI, account ***221, in the name of Edge Investment Fund, Ltd., to bank account ***690 at VP Bank in the BVI in the name of Regency Management, Ltd., for the purchase of the "Mountain Queen" property located in Pitkin County, Colorado for BROCKMAN's personal use.

111.    On or about December 16, 2010, BROCKMAN directed Individual One to transfer approximately $15 million from a bank account at Bermuda Commercial Bank, account ***703-01, in the name of Edge, to another bank account at Bermuda Commercial Bank, account ***717-01, in the name of Regency Management, Ltd., for the purchase of the "Frying Pan Canyon Ranch" property located in Pitkin County, Colorado for BROCKMAN's personal use.

112.    On or about March 9, 2012, BROCKMAN was informed by email that the IRS required reporting of "foreign assets" through the filing of FBARs.

113.    On or about April 16, 2013, BROCKMAN caused Individual One to transfer approximately $80 million from a bank account at Bermuda Commercial Bank, account ***703-01, in the name of Edge, to bank account ***951 at Mirabaud Bank in Switzerland, also in the name of Edge.

114.    On or about January 24, 2014, BROCKMAN caused Individual One to transfer $75,000 from a bank account at Bermuda Commercial Bank in Bermuda, account ***717-01, in the name of Regency Management, Ltd., to a bank account at Wells Fargo Bank, account ***891, to be used for the maintenance of "Mountain Queen" for BROCKMAN's personal use.

115.    In or about January 2014 and continuing through December 2014, BROCKMAN directed Individual One to transfer approximately $8.2 million from a bank account at Bermuda Commercial Bank, account ***717-01, in the name of Regency Management, Ltd., to a bank account at Wells Fargo Bank, account ***8029, in the name of Henke Properties, to be used primarily for the improvement of the "Frying Pan Canyon Ranch" for BROCKMAN's personal use.

116.    On or about November 8, 2016, BROCKMAN directed Individual One to transfer approximately $3.5 million from a bank account at Mirabaud Bank in Switzerland, account ***017, in the name of Cabot, to bank account ***800 at Florida Community Bank, NA, for the purchase of the luxury yacht "Turmoil" (later renamed "Albula") for BROCKMAN's personal use.

117.    On or about December 22, 2016, BROCKMAN directed Individual One to transfer approximately $ 29,345,705 from a bank account at Mirabaud Bank in Switzerland, account ***017, in the name of Cabot, to bank account ***800 at Florida Community Bank, NA, for the purchase of the luxury yacht "Turmoil" (later renamed "Albula") for BROCKMAN's personal use.

118.    On or about June 11, 2017, BROCKMAN directed Individual One to forward to him a "Significant Transaction Report," which Individual One had been maintaining for BROCKMAN since 2011, which detailed every transfer of funds involving $100,000 or more regarding the foreign bank accounts of Point, Edge, and Cabot.

119.    On or about February 26, 2011, BROCKMAN, using his encrypted email system, prepared and delivered a "Performance Review" to Individual One, in which BROCKMAN reviewed Individual One's work during the 2010 year, and described expectations and goals for the 2011 year. Namely, BROCKMAN directed Individual One to "take over the accounting and reporting processes for Point" and "maintain the same processes as are currently in effect."

120.    On or about February 26, 2011, BROCKMAN, using his encrypted email system, increased Individual One's annual salary from $325,000 to $420,000, and granted Individual One a

INDICTMENT                                    18

bonus of $275,000.

121.    On or about April 5, 2012, BROCKMAN prepared and delivered a "Performance Review" to Individual One in which BROCKMAN reviewed Individual One's work during the 2011 year and described expectations and goals for the 2012 year.  Namely, BROCKMAN directed Individual One: "investments should be made directly by Point;" to maintain minimum bank balances in Bermuda to avoid Bermuda freezing assets; to build new banking relationships in Switzerland; and "maintain files for each Vista Fund."

122.    On or about April 5, 2012, BROCKMAN granted Individual One a bonus of $225,000.

123.    On or about April 7, 2013, BROCKMAN, using his encrypted email system, prepared and delivered a "Performance Review" to Individual One in which BROCKMAN reviewed Individual One's work during the 2012 year and described expectations and goals for the 2013 year.  Namely, BROCKMAN directed Individual One: to review the "Doomsday Materials" – undated letters of resignation for all nominees for BROCKMAN's offshore structure; move funds out of Bermuda Commercial Bank; and continue to monitor and keep files on Point's investments in Vista funds.

124.    On or about April 7, 2013, BROCKMAN granted Individual One a bonus of $225,000.

125.    On or about April 6, 2014, BROCKMAN granted Individual One a bonus of $325,000.

126.    On or about April 6, 2014, BROCKMAN, using his encrypted email system, prepared and delivered a "Performance Review" to Individual One in which BROCKMAN reviewed Individual One's work during the 2013 year and described expectations and goals for the 2014 year.  Namely, BROCKMAN directed Individual One to: maintain files for each Vista fund; provide a monthly report of business expenses; create a new computer layout including encrypted email servers; and "[o]perate as much as possible in a paperless manner – such that if someone were to come in your door unannounced everything would be in encrypted digital form."

127.    On or about January 18, 2015, BROCKMAN sent Individual One a "To Do List" which included: 1) begin the formation of a new Private Equity Management Company and Private Equity Fund that BROCKMAN and his son would manage; 2) notice that BROCKMAN will lease the luxury yacht "Turmoil" (later renamed "Albula") for 10 weeks a year for $150,000 per week plus fuel; and 3) "find a way that someone else runs Point in order to satisfy the auditors."

INDICTMENT                                            19

128.    On or about October 14, 2013, BROCKMAN directed and caused to be prepared and filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2012, which he knew to be false, to wit: BROCKMAN failed to accurately report and pay income tax on capital gain income he earned as a result of his investments in Vista funds through Point during the 2012 calendar year.

129.    On or about October 11, 2014, BROCKMAN directed and caused to be prepared and filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2013, which he knew to be false, to wit: BROCKMAN failed to accurately report and pay income tax on capital gain income he earned as a result of his investments in Vista funds through Point during the 2013 calendar year.

130.    On or about October 14, 2015, BROCKMAN directed and caused to be prepared and filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2014, which he knew to be false, to wit: BROCKMAN failed to accurately report and pay income tax on capital gain income he earned as a result of his investments in Vista funds through Point during the 2014 calendar year.

131.    On or about October 14, 2016, BROCKMAN directed and caused to be prepared and filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2015, which he knew to be false, to wit: BROCKMAN failed to accurately report and pay income tax on capital gain income he earned as a result of his investments in Vista funds through Point during the 2015 calendar year.

132.    On or about October 24, 2017, BROCKMAN directed and caused to be prepared and filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2016, which he knew to be false, to wit: BROCKMAN failed to accurately report and pay income tax on capital gain income he earned as a result of his investments in Vista funds through Point during the 2016 calendar year.

133.    On or about October 15, 2018, BROCKMAN directed and caused to be prepared and filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2017, which he knew to be false, to wit: BROCKMAN failed to accurately report and pay income tax on capital gain

1  income he earned as a result of his investments in Vista funds through Point during the 2017 calendar

2  year.

3       134.    On or about October 15, 2019, BROCKMAN directed and caused to be prepared and

4  filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2018, which he

5  knew to be false, to wit: BROCKMAN failed to accurately report and pay income tax on capital gain

6  income he earned as a result of his investments in Vista funds through Point during the 2018 calendar

7  year.

8       All in violation of Title 18, United States Code, Section 371.

9  COUNT TWO:      (26 U.S.C. § 7201 – Tax Evasion – 2012)

10      135.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this

11  Indictment are re-alleged and incorporated as if set forth fully herein.

12      136.    From on or about December 1, 1999, and continuing through on or about October 14,

13  2013 in the Northern District of California and elsewhere, the defendant,

14                        ROBERT T. BROCKMAN,

15  willfully attempted to evade and defeat income tax due and owing to the United States of America, for

16  the tax year 2012, by committing the following affirmative acts, among others:

17           a.    The acts described in paragraphs 43 through 134 of this Indictment; and

18           b.    On or about October 14, 2013, preparing and causing to be prepared, and signing

19  and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form

20  1040, for the calendar year 2012, which was submitted to the IRS.

21      All in violation of Title 26, United States Code, Section 7201.

22  COUNT THREE:      (26 U.S.C. § 7201 – Tax Evasion – 2013)

23      137.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this

24  Indictment are re-alleged and incorporated as if set forth fully herein.

25      138.    From on or about December 1, 1999, and continuing through on or about October 11,

26  2014 in the Northern District of California and elsewhere, the defendant,

27                        ROBERT T. BROCKMAN,

28  willfully attempted to evade and defeat income tax due and owing to the United States of America, for

INDICTMENT                          21

1  the tax year 2013, by committing the following affirmative acts, among others:

2          a.     The acts described in paragraphs 43 through 134 of this Indictment; and

3          b.     On or about October 11, 2014, preparing and causing to be prepared, and signing

4  and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form

5  1040, for the calendar year 2013, which was submitted to the IRS.

6       All in violation of Title 26, United States Code, Section 7201.

7  COUNT FOUR:     (26 U.S.C. § 7201 – Tax Evasion – 2014)

8       139.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this

9  Indictment are re-alleged and incorporated as if set forth fully herein.

10       140.    From on or about December 1, 1999, and continuing through on or about October 14,

11  2015 in the Northern District of California and elsewhere, the defendant,

12                     ROBERT T. BROCKMAN,

13  willfully attempted to evade and defeat income tax due and owing to the United States of America, for

14  the tax year 2014, by committing the following affirmative acts, among others:

15          a.     The acts described in paragraphs 43 through 134 of this Indictment; and

16          b.     On or about October 14, 2015, preparing and causing to be prepared, and signing

17  and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form

18  1040, for the calendar year 2014, which was submitted to the IRS.

19       All in violation of Title 26, United States Code, Section 7201.

20  COUNT FIVE:     (26 U.S.C. § 7201 – Tax Evasion – 2015)

21       141.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this

22  Indictment are re-alleged and incorporated as if set forth fully herein.

23       142.    From on or about December 1, 1999, and continuing through on or about October 14,

24  2016 in the Northern District of California and elsewhere, the defendant,

25                     ROBERT T. BROCKMAN,

26  willfully attempted to evade and defeat income tax due and owing to the United States of America, for

27  the tax year 2015, by committing the following affirmative acts, among others:

28          a.     The acts described in paragraphs 43 through 134 of this Indictment; and

1          b.      On or about October 14, 2016, preparing and causing to be prepared, and signing

2    and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form

3    1040, for the calendar year 2015, which was submitted to the IRS.

4          All in violation of Title 26, United States Code, Section 7201.

5    COUNT SIX:          (26 U.S.C. § 7201 – Tax Evasion – 2016)

6          143.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this

7    Indictment are re-alleged and incorporated as if set forth fully herein.

8          144.    From on or about December 1, 1999, and continuing through on or about October 24,

9    2017 in the Northern District of California and elsewhere, the defendant,

10                         ROBERT T. BROCKMAN,

11   willfully attempted to evade and defeat income tax due and owing to the United States of America, for

12   the tax year 2016, by committing the following affirmative acts, among others:

13         a.      The acts described in paragraphs 43 through 134 of this Indictment; and

14         b.      On or about October 24, 2017, preparing and causing to be prepared, and signing

15   and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form

16   1040, for the calendar year 2016, which was submitted to the IRS.

17         All in violation of Title 26, United States Code, Section 7201.

18   COUNT SEVEN:        (26 U.S.C. § 7201 – Tax Evasion – 2017)

19         145.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this

20   Indictment are re-alleged and incorporated as if set forth fully herein.

21         146.    From on or about December 1, 1999, and continuing through on or about October 15,

22   2018 in the Northern District of California and elsewhere, the defendant,

23                         ROBERT T. BROCKMAN,

24   willfully attempted to evade and defeat income tax due and owing to the United States of America, for

25   the tax year 2017, by committing the following affirmative acts, among others:

26         a.      The acts described in paragraphs 43 through 134 of this Indictment; and

27         b.      On or about October 15, 2018, preparing and causing to be prepared, and signing

28   and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form

INDICTMENT                    23

1 | 1040, for the calendar year 2017, which was submitted to the IRS.

2 |      All in violation of Title 26, United States Code, Section 7201.

3 | <u>COUNT EIGHT</u>:    (26 U.S.C. § 7201 – Tax Evasion – 2018)

4 |     147.   The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this

5 | Indictment are re-alleged and incorporated as if set forth fully herein.

6 |     148.   From on or about December 1, 1999, and continuing through on or about October 15,

7 | 2019 in the Northern District of California and elsewhere, the defendant,

8 |              ROBERT T. BROCKMAN,

9 | willfully attempted to evade and defeat income tax due and owing to the United States of America, for

10 | the tax year 2018, by committing the following affirmative acts, among others:

11 |        a.    The acts described in paragraphs 43 through 134 of this Indictment; and

12 |        b.    On or about October 15, 2019, preparing and causing to be prepared, and signing

13 | and causing to be signed, a false and fraudulent United States Individual Income Tax Return, Form

14 | 1040, for the calendar year 2018, which was submitted to the IRS.

15 |     All in violation of Title 26, United States Code, Section 7201.

16 | <u>COUNT NINE</u>:    (31 U.S.C. §§ 5314 & 5322(b) – Failure to File FBAR – 2013)

17 |     149.   The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this

18 | Indictment are re-alleged and incorporated as if fully set forth here.

19 |     150.   On or about June 30, 2014, in the Northern District of California and elsewhere, the

20 | defendant,

21 |              ROBERT T. BROCKMAN,

22 | did unlawfully, willfully, and knowingly fail to file with the United States Department of the Treasury,

23 | an FBAR for the 2013 calendar year disclosing that he had a financial interest in, and signatory and

24 | other authority over, bank, securities, and other financial accounts in foreign countries which had

25 | aggregate values of more than $10,000, while violating another law of the United States and as part of a

26 | pattern of any illegal activity involving more than $100,000 in a 12-month period, to wit: accounts at

27 | Mirabaud Bank in Switzerland and Bermuda Commercial Bank in Bermuda, in the names of Edge and

28 | Point.

INDICTMENT          24

1    All in violation of Title 31, United States Code, Sections 5314 & 5322(b); and Title 31, Code of

2  Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b) (formerly Title 31, Code of

3  Federal Regulations, Sections 103.24, 103.27(c, d) & 103.59(b)).

4  COUNT TEN:        (31 U.S.C. §§ 5314 & 5322(b) – Failure to File FBAR – 2014)

5    151.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this

6  Indictment are re-alleged and incorporated as if fully set forth here.

7    152.    On or about June 30, 2015, in the Northern District of California and elsewhere, the

8  defendant,

9                          ROBERT T. BROCKMAN,

10  did unlawfully, willfully, and knowingly fail to file with the United States Department of the Treasury,

11  an FBAR for the 2014 calendar year disclosing that he had a financial interest in, and signatory and

12  other authority over, bank, securities, and other financial accounts in foreign countries which had

13  aggregate values of more than $10,000, while violating another law of the United States and as part of a

14  pattern of any illegal activity involving more than $100,000 in a 12-month period, to wit: accounts at

15  Mirabaud Bank in Switzerland and Bermuda Commercial Bank in Bermuda, in the names of Edge,

16  Cabot and Point.

17    All in violation of Title 31, United States Code, Sections 5314 & 5322(b); and Title 31, Code of

18  Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b) (formerly Title 31, Code of

19  Federal Regulations, Sections 103.24, 103.27(c, d) & 103.59(b)).

20  COUNT ELEVEN:    (31 U.S.C. §§ 5314 & 5322(b) – Failure to File FBAR – 2015)

21    153.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this

22  Indictment are re-alleged and incorporated as if fully set forth here.

23    154.    On or about June 30, 2016, in the Northern District of California and elsewhere, the

24  defendant,

25                          ROBERT T. BROCKMAN,

26   did unlawfully, willfully, and knowingly fail to file with the United States Department of the Treasury,

27  an FBAR for the 2015 calendar year disclosing that he had a financial interest in, and signatory and

28  other authority over, bank, securities, and other financial accounts in foreign countries which had

INDICTMENT                          25

1  aggregate values of more than $10,000, while violating another law of the United States and as part of a

2  pattern of any illegal activity involving more than $100,000 in a 12-month period, to wit: accounts at

3  Mirabaud Bank in Switzerland, and Bermuda Commercial Bank in Bermuda in the name of Edge, Cabot

4  and Point.

5       All in violation of Title 31, United States Code, Sections 5314 & 5322(b); and Title 31, Code of

6  Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b) (formerly Title 31, Code of

7  Federal Regulations, Sections 103.24, 103.27(c, d) & 103.59(b)).

8  COUNT TWELVE:   (31 U.S.C. §§ 5314 & 5322(b) – Failure to File FBAR – 2016)

9       155.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this

10  Indictment are re-alleged and incorporated as if fully set forth here.

11       156.    On or about April 15, 2017, in the Northern District of California and elsewhere, the

12  defendant,

13                       ROBERT T. BROCKMAN,

14  did unlawfully, willfully, and knowingly fail to file with the United States Department of the Treasury,

15  an FBAR for the 2016 calendar year disclosing that he had a financial interest in, and signatory and

16  other authority over, bank, securities, and other financial accounts in foreign countries which had

17  aggregate values of more than $10,000, while violating another law of the United States and as part of a

18  pattern of any illegal activity involving more than $100,000 in a 12-month period, to wit: accounts at

19  Mirabaud Bank in Switzerland and Bermuda Commercial Bank in Bermuda, in the name of Edge, Cabot

20  and Point.

21       All in violation of Title 31, United States Code, Sections 5314 & 5322(b); and Title 31, Code of

22  Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b) (formerly Title 31, Code of

23  Federal Regulations, Sections 103.24, 103.27(c, d) & 103.59(b)).

24  COUNT THIRTEEN: (31 U.S.C. §§ 5314 & 5322(b) – Failure to File FBAR – 2017)

25       157.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this

26  Indictment are re-alleged and incorporated as if fully set forth here.

27       158.    On or about April 15, 2018, in the Northern District of California and elsewhere, the

28  defendant,

INDICTMENT                26

1                                 ROBERT T. BROCKMAN,

2 did unlawfully, willfully, and knowingly fail to file with the United States Department of the Treasury,

3 an FBAR for the 2017 calendar year disclosing that he had a financial interest in, and signatory and

4 other authority over, bank, securities, and other financial accounts in foreign countries which had

5 aggregate values of more than $10,000, while violating another law of the United States and as part of a

6 pattern of any illegal activity involving more than $100,000 in a 12-month period, to wit: accounts at

7 Mirabaud Bank in Switzerland and Bermuda Commercial Bank in Bermuda, in the name of Edge, Cabot

8 and Point.

9       All in violation of Title 31, United States Code, Sections 5314 & 5322(b); and Title 31, Code of

10 Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b) (formerly Title 31, Code of

11 Federal Regulations, Sections 103.24, 103.27(c, d) & 103.59(b)).

12 COUNT FOURTEEN:       (31 U.S.C. §§ 5314 & 5322(b) – Failure to File FBAR – 2018)

13       159.    The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this

14 Indictment are re-alleged and incorporated as if fully set forth here.

15       160.    On or about April 15, 2019, in the Northern District of California and elsewhere, the

16 defendant,

17                                   ROBERT T. BROCKMAN,

18 did unlawfully, willfully, and knowingly fail to file with the United States Department of the Treasury,

19 an FBAR for the 2018 calendar year disclosing that he had a financial interest in, and signatory and

20 other authority over, bank, securities, and other financial accounts in foreign countries which had

21 aggregate values of more than $10,000, while violating another law of the United States and as part of a

22 pattern of any illegal activity involving more than $100,000 in a 12-month period, to wit: accounts at

23 Mirabaud Bank in Switzerland, in the name of Edge, Cabot and Point.

24       All in violation of Title 31, United States Code, Sections 5314 & 5322(b); and Title 31, Code of

25 Federal Regulations, Sections 1010.350, 1010.306(c, d) & 1010.840(b) (formerly Title 31, Code of

26 Federal Regulations, Sections 103.24, 103.27(c, d) & 103.59(b)).

27 \\

28 \\

INDICTMENT                27

1   COUNTS FIFTEEN TO THIRTY-FOUR:         (18 U.S.C. § 1343 – Wire Fraud Affecting a

2                                          Financial Institution)

3         161.   The allegations set forth in paragraphs 1 through 27, and 30 through 134 of this

4   Indictment are re-alleged and incorporated as if set forth fully herein.

5         162.   From on or about October 8, 2008, and continuing through on or about April 21, 2010, in

6   the Northern District of California and elsewhere, the defendant,

7                         ROBERT T. BROCKMAN,

8   did knowingly, and with the intent to defraud, participate in, devise, and intend to devise, a scheme and

9   artifice to defraud purchasers and sellers of the Debt as to a material matter, and to obtain money and

10  property by means of materially false and fraudulent pretenses, representations, and promises, and by

11  means of omission and concealment of material facts with a duty to disclose, all affecting a financial

12  institution, to wit: Deutsche Bank.

13        163.   On or about October 8, 2008, a Deutsche Bank employee advised BROCKMAN by email

14  that there was an opportunity to purchase a portion of the Debt at a discount.  At the time, timely interest

15  payments were being made by Reynolds & Reynolds, UCSH, and DCS on the Debt as required by the

16  Credit Agreements.

17        164.   On or about November 24, 2008, a Reynolds & Reynolds employee emailed a Deutsche

18  Bank employee and advised that BROCKMAN "would like to find a way to purchase the 2nd & 3rd lien

19  debt" and was willing to invest $300 million.

20        165.   From on or about October 8, 2008, and continuing through on or about April 21, 2010,

21  BROCKMAN, together with others known and unknown to the Grand Jury, engaged in a fraudulent

22  scheme to deceive the purchasers and sellers of the Debt, through the Administrative Agent Deutsche

23  Bank, using Edge and Tangarra to purchase Debt, and concealing the fact that Edge, Tangarra, and

24  Individual One were controlled by BROCKMAN, and otherwise affiliated with DCS, UCSH and

25  Reynolds & Reynolds.

26                         **The Scheme and Artifice to Defraud**

27        166.   It was part of the scheme and artifice to defraud for BROCKMAN, through Individual

28  One, to affirmatively conceal from sellers of the Debt the valuable economic information that the Debt

INDICTMENT                           28

purchasers Edge and Tangarra were under common control with DCS, by BROCKMAN, by making material misrepresentations to Deutsche Bank.

167.    It was further part of the scheme and artifice to defraud for BROCKMAN to circumvent material provisions of the Credit Agreements, which prohibited any individual or entity directly or indirectly under common control with DCS and Reynolds & Reynolds from purchasing any of the Debt without prior notice, full disclosure, and amendments to the Credit Agreements.

168.    It was further part of the scheme and artifice to defraud for BROCKMAN to cause sellers of the Debt to sell portions of the Debt without informing them that the ultimate purchasers of the Debt were affiliated with DCS, Reynolds & Reynolds, and BROCKMAN.

169.    It was further part of the scheme and artifice to defraud for BROCKMAN to use material, non-public information about Reynolds & Reynolds to make decisions about purchasing portions of the Debt through Edge and Tangarra.

170.    It was further part of the scheme and artifice to defraud for BROCKMAN to cause and direct DCS, UCSH, and Reynolds & Reynolds to provide Deutsche Bank misleading financial information for distribution to holders of the Debt, including audited financial statements for UCSH and its subsidiaries, as well as quarterly compliance certificates, concealing the fact that an entity under common control with DCS and Reynolds & Reynolds had purchased portions of the Debt.

171.    It was further part of the scheme and artifice to defraud for BROCKMAN to expose sellers of the Debt, including Deutsche Bank, to multiple risks, including civil and regulatory liability, as well as reputational damage.

172.    It was further part of the scheme and artifice to defraud that, from on or about October 8, 2008, and continuing through on or about April 21, 2010, and thereafter, BROCKMAN used a proprietary, encrypted email system to communicate with Individual One and others.

173.    It was further part of the scheme and artifice to defraud that, on or about December 29, 2008, BROCKMAN, having noticed that the price for all three tiers of the Debt on the secondary market had dropped significantly, sent Individual One an encrypted email indicating that BROCKMAN wanted to purchase second and third tiers of the Debt using Edge as the purchasing entity.

INDICTMENT                                    29

1  174. It was further part of the scheme and artifice to defraud that, on or about January 9, 2009,

2 BROCKMAN sent Individual One an encrypted email indicating that Reynolds & Reynolds was likely

3 to incur an accounting loss of approximately $1 billion for the 2008 calendar year which would cause

4 the price of the Debt to drop further.  On January 9, 2009, this fact was not available to the public

5  175. It was further part of the scheme and artifice to defraud that, on or about January 10,

6 2009, BROCKMAN sent Individual One an encrypted email instructing Individual One to open an

7 account with Deutsche Bank and purchase the second and third tiers of the Debt using Edge as the

8 purchasing entity, and informed Individual One that BROCKMAN hoped to eventually purchase all of

9 the second and third tiers of the Debt, which had a face value of $770 million.

10  176. It was further part of the scheme and artifice to defraud that, in or about January 2009,

11 Individual One falsely represented to employees of Deutsche Bank that he represented a Swiss client

12 interested in purchasing debt of United States companies, particularly the Debt.  As part of these false

13 representations, Individual One sent Deutsche Bank employees at least three emails purporting to

14 describe the ownership and control of Edge and Tangarra, none of which identified BROCKMAN as the

15 person in control of Edge and Tangarra.  Individual One never disclosed to Deutsche Bank that

16 Individual One was employed by BROCKMAN, or that BROCKMAN retained full dominion and

17 control over Edge and Tangarra with respect to transactions involving the Debt.

18  177. It was further part of the scheme and artifice to defraud that, on or about January 26,

19 2009, BROCKMAN directed and caused Individual One to open an account at Deutsche Bank for Edge.

20  178. It was further part of the scheme and artifice to defraud that, on or about March 5, 2009,

21 BROCKMAN directed and caused Individual One to use Edge to purchase portions of the third tier of

22 the Debt with a face value of $10,228,750.  Edge purchased this portion of the Debt from Deutsche

23 Bank, which had purchased it from an investor in the Northern District of California specifically to sell

24 it to Edge.

25  179. It was further part of the scheme and artifice to defraud that, on or about March 9, 2009,

26 BROCKMAN directed and caused Individual One to use Edge to purchase portions of the third tier of

27 the Debt with a face value of $6,921,500.  Edge purchased this portion of the Debt from Deutsche Bank,

28 which had purchased it from an investor in the Northern District of California specifically to sell it to

INDICTMENT         30

1  Edge.

2      180.    It was further part of the scheme and artifice to defraud that, on or about April 6, 2009, in

3  connection with the trades on March 5, 2009, and March 9, 2009, Individual One executed an

4  "Assignment and Assumption" on behalf of Edge, falsely certifying that Edge was an "Eligible

5  Assignee" under the third lien Credit Agreement.

6      181.    It was further part of the scheme and artifice to defraud that, on or about March 9, 2009,

7  BROCKMAN sent Individual One an encrypted email indicating that he wanted to purchase all of the

8  second and third tiers of the Debt.

9      182.    It was further part of the scheme and artifice to defraud that, on or about March 11, 2009,

10  a Deutsche Bank employee emailed BROCKMAN a seven-page presentation entitled, "Loan

11  Repurchase Follow-Up Discussion Materials."  The presentation discussed various strategies through

12  which Reynolds & Reynolds, or an affiliated entity, could purchase portions of the Debt in compliance

13  with the applicable Credit Agreements, and noted that ownership of the second and third tiers of the

14  Debt was concentrated among several investors, including an investor located in the Northern District of

15  California.  At this time, Deutsche Bank was unaware that BROCKMAN had already purchased

16  portions of the second and third tiers of the Debt through Individual One, Edge, and Tangarra.

17      183.    It was further part of the scheme and artifice to defraud that, on or about March 30, 2009,

18  BROCKMAN directed and caused Individual One to use Edge to purchase portions of the second tier of

19  the Debt with a face value of $3 million.  Edge purchased this Debt from Deutsche Bank, which had

20  purchased it from an investor in the Northern District of California specifically to sell it to Edge.

21      184.    It was further part of the scheme and artifice to defraud that, on or about August 7, 2009,

22  in connection with the trade on March 30, 2009, Individual One executed an "Assignment and

23  Assumption" on behalf of Edge, falsely certifying that Edge was an "Eligible Assignee" under the

24  second lien Credit Agreement.

25      185.    It was further part of the scheme and artifice to defraud that, from on or about March 5,

26  2009, and continuing through on or about April 22, 2009, BROCKMAN directed and caused Individual

27  One to use Edge to purchase portions of the second and third tiers of the Debt with an aggregate face

28  value of more than $67 million.

INDICTMENT                          31

Case 4:22-cv-00202   Document 24   Filed on 01/31/22 in TXSD   Page 72 of 123
EXHIBIT A-90
Case 3:20-cr-00371-WHA   Document 1   Filed 10/01/20   Page 35 of 44

186.    It was further part of the scheme and artifice to defraud that, from about April 2009, and continuing through April 2010, BROCKMAN directed and caused materially false information about Reynolds & Reynolds's financial performance to be distributed to holders of the Debt, including holders in the Northern District of California.  Specifically, each of the following documents, made available to all holders of the Debt on the dates indicated, were materially false because they did not disclose the fact that Edge, an Affiliate of DCS and Reynolds & Reynolds, and under the dominion and control of BROCKMAN, had purchased portions of the Debt, contrary to the terms of the Credit Agreements:

| Date | Description |
|---|---|
| April 1, 2009 | Reynolds & Reynolds's 2008 Audited Financial Statements |
| May 14, 2009 | Reynolds & Reynolds's March 31, 2009 Quarterly Compliance Certificate |
| August 11, 2009 | Reynolds & Reynolds's June 30, 2009 Quarterly Compliance Certificate |
| November 12, 2009 | Reynolds & Reynolds's September 30, 2009 Quarterly Compliance Certificate |
| March 24, 2010 | Reynolds & Reynolds's December 31, 2009 Quarterly Compliance Certificate |
| April 6, 2010 | Reynolds & Reynolds's 2009 Audited Financial Statements |

187.    It was further part of the scheme and artifice to defraud that, on or about April 21, 2010, pursuant to a complete refinancing of the Debt through Deutsche Bank, the Debt was repaid in its entirety, at full face value, including a payment of approximately $67,835,129 to Edge.

188.    It was further part of the scheme and artifice to defraud that, on or about April 21, 2010, BROCKMAN had full dominion and control over the approximately $67,835,129 paid to Edge in connection with the retirement of the portions of the Debt purchased by Edge.

**The Use of the Wires**

189.    It was further part of the scheme and artifice to defraud that, on or about the dates set forth below, in the Northern District of California and elsewhere, for the purpose of executing the aforementioned scheme, and attempting to do so, the defendant,

ROBERT T. BROCKMAN,

did knowingly transmit and cause to be transmitted in interstate and foreign commerce, by means of a wire communication, certain writings, signs, signals, pictures, and sounds, specifically:

INDICTMENT                                    32

| Count | Date | Description |
|---|---|---|
| FIFTEEN | March 12, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche AG |
| SIXTEEN | March 12, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| SEVENTEEN | March 16, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| EIGHTEEN | March 9, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| NINETEEN | March 9, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| TWENTY | March 9, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| TWENTY-ONE | March 11, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| TWENTY-TWO | March 12, 2009 | Email to employees of Entity One, in the Northern District of California, regarding Entity One's sale of third tier Debt to Deutsche Bank AG |
| TWENTY-THREE | March 31, 2009 | Email to employee of Entity Two, in the Northern District of California, regarding Entity Two's sale of second tier Debt to Deutsche Bank AG |
| TWENTY-FOUR | April 1, 2009 | Email to employee of Entity Two, in the Northern District of California, regarding Entity Two's sale of second tier Debt to Deutsche Bank AG |
| TWENTY-FIVE | April 1, 2009 | Email to employee of Entity Two, in the Northern District of California, regarding Entity Two's sale of second tier Debt to Deutsche Bank AG |
| TWENTY-SIX | April 1, 2009 | Email to employee of Entity Two, in the Northern District of California, regarding Entity Two's sale of second tier Debt to Deutsche Bank AG |

EXHIBIT A-90

| TWENTY-SEVEN | April 7, 2009 | Email to employee of Entity Two, in the Northern District of California, regarding Entity Two's sale of second tier Debt to Deutsche Bank AG |
|---|---|---|
| TWENTY-EIGHT | April 7, 2009 | Email to employee of Entity Two, in the Northern District of California, regarding Entity Two's sale of second tier Debt to Deutsche Bank AG |
| TWENTY-NINE | April 1, 2009 | IntraLinks wire transmission of Reynolds & Reynolds's 2008 Audited Financial Statements to Entity One in the Northern District of California |
| THIRTY | May 14, 2009 | IntraLinks wire transmission of Reynolds & Reynolds's March 31, 2009 Quarterly Financial Statements to Entity One in the Northern District of California |
| THIRTY-ONE | August 11, 2009 | IntraLinks wire transmission of Reynolds & Reynolds's June 30, 2009 Quarterly Financial Statements to Entity One in the Northern District of California |
| THIRTY-TWO | November 12, 2009 | IntraLinks wire transmission of Reynolds & Reynolds's September 30, 2009 Quarterly Financial Statements to Entity One in the Northern District of California |
| THIRTY-THREE | March 24, 2010 | IntraLinks wire transmission of Reynolds & Reynolds's December 31, 2009 Quarterly Financial Statements to Entity One in the Northern District of California |
| THIRTY-FOUR | April 6, 2010 | IntraLinks wire transmission of Reynolds & Reynolds's 2009 Audited Financial Statements to Entity One in the Northern District of California |

All in violation of Title 18, United States Code, Section 1343.

COUNTS THIRTY-FIVE AND THIRTY-SIX:     (18 U.S.C. § 1956(a)(1)(B)(i) – Concealment Money Laundering); (18 U.S.C. § 1956(a)(1)(A)(ii) – Tax Evasion Money Laundering)

190.    The allegations set forth in paragraphs 1 through 27, 30 through 134, and 163 through 189 of this Indictment are re-alleged and incorporated as if fully set forth here.

191.    Among other transactions, on or about March 2, 2016, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

INDICTMENT                                34

did knowingly conduct and attempt to conduct the financial transactions described below on the dates

and the amounts indicated, affecting interstate and foreign commerce, which involved the proceeds of a

specified unlawful activity, namely violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1344

(Bank Fraud), knowing that the property involved in these financial transaction represented the proceeds

of some form of unlawful activity, with the intent to: (A) conceal and disguise the nature, source,

ownership and control of the proceeds of said specified unlawful activity; and (B) to engage in conduct

constituting a violation of 26 U.S.C. §§ 7201 and 7206(1).

In furtherance of his objectives, BROCKMAN, among others, intentionally and knowingly

directed, caused, and engaged in the following financial transactions:

a.      BROCKMAN engaged in a scheme and artifice to defraud purchasers and sellers

of the Debt, including financial institutions whose deposits are insured by the Federal Deposit Insurance

Corporation ("FDIC"), Deutsche Bank, and others, which included the financial transactions described

in COUNTS FIFTEEN through THIRTY-FOUR, paragraphs 163 through 189, of this Indictment;

b.      On or about April 21, 2010, BROCKMAN directed and otherwise caused the

Debt to be refinanced by Deutsche Bank in the approximate amount of $1.8 billion, resulting in a

payment to Edge in the approximate amount of $67,835,129, which amount was deposited in Edge's

account at Bermuda Commercial Bank, account number ***703-01, as more particularly described in

paragraphs 187 and 188 of this Indictment ("the Proceeds");

c.      On or about December 16, 2010, BROCKMAN directed and otherwise caused

approximately $15 million of the Proceeds to be transferred from the Edge account at Bermuda

Commercial Bank, account number ***703-01, to the Regency Management, Ltd., account at Bermuda

Commercial Bank, account ***717-01, to be used for the December 28, 2010 purchase and subsequent

development of the "Frying Pan Canyon Ranch" in Pitkin County, Colorado;

d.      On or about November 16, 2012, BROCKMAN directed and otherwise caused

approximately $49,100,000 of the Proceeds to be transferred from Edge's account at Bermuda

Commercial Bank, account ***703-01, to an account in the United States at Bank of America, for

investment in a Vista Equity Partners Fund III-Parallel ("VEPF III-Parallel") portfolio company named

Sumtotal;

INDICTMENT                                             35

1          e.      On or about November 19, 2012, BROCKMAN directed and otherwise caused

2  approximately $26,369,672 of capital gains and profits payable on BROCKMAN's investment, through

3  Point, in Sumtotal to be paid from the VEPF III-Parallel account at First Caribbean International Bank

4  ("FCIB"), account ***696, to Point's account at Mirabaud Bank in Switzerland, account ***463, said

5  amount representing a portion of the Proceeds previously invested by BROCKMAN, through Edge and

6  VEPF III-Parallel, in Sumtotal on November 16, 2012;

7          f.      On or about December 3, 2012, BROCKMAN directed and otherwise caused

8  approximately $14,282,618 of the Proceeds to be transferred from Point's account at Mirabaud Bank in

9  Switzerland, account ***463, to an account held in the name of a Vista fund named Vista Equity

10  Partners Fund IV-Parallel ("VEPF IV-Parallel"), at FCIB, account ***960, for investment in a VEPF

11  IV-Parallel portfolio company named Sovos;

12          g.      On or about March 2, 2016, BROCKMAN, as more particularly described below,

13  directed and otherwise caused approximately $47,686,187 of capital gains and profits payable on

14  BROCKMAN's investment, through Point, in Sovos, and derived from the Proceeds, to be paid from the

15  VEPF IV-Parallel account at First Republic Bank in San Francisco, account ***447, to VEPF IV-

16  Parallel's account at FCIB, account ***960, concealing BROCKMAN's dominion and control over the

17  Proceeds, Point, and his liability to the IRS for income taxes due and owing on the capital gains realized

18  by him through Point; and

19          h.      On or about March 2, 2016, BROCKMAN, as more particularly described below,

20  directed and otherwise caused approximately $41,545,359 of capital gains and profits payable on

21  BROCKMAN's investment, through Point, in Sovos, and derived from the Proceeds, to be paid from the

22  VEPF IV-Parallel account at FCIB, account ***960, to Point's account at Mirabaud Bank in

23  Switzerland, account ***463, concealing BROCKMAN's dominion and control over these proceeds,

24  Point, and his liability to the IRS for income taxes due and owing on capital gains realized by him

25  through Point.

26  \\

27  \\

28  \\

INDICTMENT              36

EXHIBIT A-90

| Count | Date | Amount | Origin of Proceeds | Destination of Proceeds |
|---|---|---|---|---|
| THIRTY-FIVE | March 2, 2016 | $47,686,187 | VEPF IV-Parallel First Republic Bank, Account No ***447 | VEPF IV-Parallel FCIB, Account No. ***960 |
| THIRTY-SIX | March 2, 2016 | $41,545,359 | VEPF IV-Parallel FCIB, Account No. ***960 | Point Investment, Ltd., Mirabaud Bank, Account No. ***463 |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(ii), 1956(a)(1)(B)(i), and 2.

COUNT THIRTY-SEVEN:   (18 U.S.C. § 1956(a)(2)(B)(i) – International Concealment Money Laundering)

The allegations set forth in paragraphs 1 through 27, 30 through 134, 163 through 189, and 191 of this Indictment are re-alleged and incorporated as if fully set forth here.

192.    Among other transactions, on or about March 2, 2016, in the Northern District of California and elsewhere, the defendant,

ROBERT T. BROCKMAN,

did knowingly transfer and attempt to transfer funds, that is $41,545,359, from a place in the United States, namely San Francisco, California, to a place outside the United States, namely, Switzerland, in a series of financial transactions, as described in COUNTS THIRTY-FIVE and THIRTY-SIX, paragraph 191 of this Indictment, knowing that the funds involved in the transfer represented the proceeds of some form of unlawful activity, and knowing that the transfer was designed in whole and in part to conceal and disguise, the nature, ownership, and control of the proceeds of specified unlawful activity, namely violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1344 (Bank Fraud).

All in violation of Title 18, United States Code, Sections 1956(a)(2)(B)(i) and 2.

COUNT THIRTY-EIGHT:          (18 U.S.C. § 1512(b)(2)(B) – Evidence Tampering)

193.    The allegations set forth in paragraphs 1 through 27, 30 through 134, 163 through 189, and 191 of this Indictment are re-alleged and incorporated as if fully set forth here.

INDICTMENT                                    37

1    194.    In or about June 2016, BROCKMAN knew it was likely that there would be a federal

2   grand jury investigation in the Northern District of California to determine whether violations of, among

3   other things, Title 26, United States Code, Section 7201, had been committed involving Point.

4   BROCKMAN further knew that his relationship to AEBCT, Spanish Steps, SJTC, and Point, and their

5   Directors, Officers, and Trustees, would be material to that investigation.

6    195.    From on or about June 10, 2016, and continuing through on or about October 14, 2016, in

7   the Northern District of California and elsewhere, the defendant,

8                      ROBERT T. BROCKMAN,

9   did knowingly and corruptly persuade Individual One to alter, destroy, and mutilate documents and

10   computer evidence with the intent to impair their integrity and availability for use in an official

11   proceeding, to wit: a federal grand jury investigation in the Northern District of California.

12    196.    BROCKMAN's corrupt actions included:

13        a.    In or about June 2016, BROCKMAN learned that Individual Three, who was the

14   widow of a former nominee, was in possession of materials including documents and electronic media

15   which could reveal that BROCKMAN had complete dominion and control over AEBCT, Spanish Steps,

16   SJTC, and Point, as well as their Directors, Officers, and Trustees, and that BROCKMAN received the

17   benefit of all the income deposited into the bank accounts in these entities' names;

18        b.    Beginning in or about June 2016, and continuing until in or about October 2016,

19   BROCKMAN engaged in a scheme to obstruct justice by destroying evidence, and causing others to

20   destroy evidence, in an effort to prevent law enforcement authorities from learning of BROCKMAN's

21   true relationship with AEBCT, Spanish Steps, SJTC, and Point, as well as their Directors, Officers, and

22   Trustees;

23        c.    BROCKMAN engaged in multiple instances of obstructive conduct, including:

24   causing Individual One to make several trips from places outside the United States into the United States

25   for the purpose of destroying documents and electronic media; causing Individual One to physically

26   destroy documents and electronic media, which Individual One did using shredders, hammers, and other

27   means; and causing Individual One to transfer documents and electronic media from Individual Three's

28   possession to BROCKMAN's possession.

1      All in violation of Title 18, United States Code, Sections 1512(b)(2)(B) and 2.

2    <u>COUNT THIRTY-NINE</u>:        (18 U.S.C. § 1512(c)(1) – Destruction of Evidence)

3        197.    The allegations set forth in paragraphs 1 through 27, 30 through 134, 163 through 189,

4    191 and 196 of this Indictment are re-alleged and incorporated as if fully set forth here.

5        198.    From on or about June 10, 2016, and continuing through on or about October 14, 2016, in

6    the Northern District of California and elsewhere, the defendant

7                       ROBERT T. BROCKMAN,

8    did knowingly and corruptly alter, destroy, and mutilate documents and computer evidence, with the

9    intent to impair their integrity and availability for use in an official proceeding, to wit: a federal grand

10    jury investigation in the Northern District of California.

11        All in violation of Title 18, United States Code, Sections 1512(c)(1).

12    <u>FORFEITURE ALLEGATION</u>:      (18 U.S.C. 982(a)(2)(A) and 28 U.S.C. § 2461(c) (Forfeiture of

13                       Wire Fraud Proceeds))

14        199.    The allegations contained in this Indictment are re-alleged and incorporated by reference

15    for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(2)(A) and

16    Title 28, United States Code, Section 2461(c).

17        200.    Upon conviction for any of the offenses alleged in COUNTS FIFTEEN through

18    THIRTY-FOUR, the defendant,

19                       ROBERT T. BROCKMAN,

20    shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A) and

21    Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes, or is

22    derived from, proceeds the defendant obtained, directly or indirectly, as a result of said offenses.  Such

23    property shall include approximately $67,835,129 in United States currency.

24        201.    If any of the property described in paragraph 200 above, as a result of any act or omission

25    of the defendant:

26            a.      cannot be located upon the exercise of due diligence;

27            b.      has been transferred or sold to, or deposited with a third party;

28            c.      has been placed beyond the jurisdiction of this Court;

INDICTMENT                   39

1      d.    has been substantially diminished in value; or

2      e.    has been commingled with other property which cannot be divided without

3                 difficulty,

4   it is the intention of the United States, pursuant to 18 U.S.C. § 982(b) and 28 U.S.C. § 2461(c),

5   incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendant's up to the

6   value of the property described above.

7      All pursuant to Title 18, United States Code, Section 982(a)(2)(A) and Title 28, United States

8   Code, Section 2461(c), and Federal Rule of Criminal Procedure 32.2.

9   <u>FORFEITURE ALLEGATION</u>:      (18 U.S.C. § 982(a)(1) and 28 U.S.C. § 2461(c) (Forfeiture of

10                                       Money Laundering Proceeds))

11      202.    The allegations contained in this Indictment are re-alleged and incorporated by reference

12   for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(1) and

13   Title 28, United States Code, Section 2461(c).

14      203.    Upon conviction for any of the offenses alleged in COUNTS THIRTY-FIVE through

15   THIRTY-SEVEN, the defendant,

16                            ROBERT T. BROCKMAN,

17   shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1) and Title

18   28, United States Code, Section 2461(c), all property, real or personal, involved in such an offense, or

19   any property traceable to such property.  Such property shall include approximately $47,686,187 in

20   United States currency.

21      204.    If any of the property described in paragraph 203 above, as a result of any act or omission

22   of the defendant:

23      a.    cannot be located upon exercise of due diligence;

24      b.    has been transferred or sold to, or deposited with, a third party;

25      c.    has been placed beyond the jurisdiction of the court;

26      d.    has been substantially diminished in value; or

27      e.    has been commingled with other property which cannot be divided without

28                 difficulty,

INDICTMENT                         40

1    the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21,

2    United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

3         All pursuant to Title 18, United States Code, Section 982(a)(1), Title 28, United States Code,

4    Section 2461(c), and Federal Rule of Criminal Procedure 32.2.

5

6    DATED: October 1, 2020                         A TRUE BILL.

7

8                                        /s/
                                _____

9                                  FOREPERSON

10    DAVID L. ANDERSON
      United States Attorney

11

12

13    COREY J. SMITH
      Senior Litigation Counsel

14    Tax Division

15

16

17    MICHAEL G. PITMAN
      Assistant United States Attorney

18

19

20

21

22

23

24

25

26

27

28

INDICTMENT                   41

# EXHIBIT

# A-92

EXHIBIT A-92

**Dayton Daily News**
Local. In-Depth. Always updated.

 Log In

Worth knowing. Worth supporting.
**Subscribe today for 99¢**



## Reynolds & Reynolds CEO facing federal charges steps down

LOCAL NEWS | Nov 9, 2020

By Thomas Gnau

**Bob Brockman out at chairman also; Tommy Barras now chief leader of Dayton-area company.**

Bob Brockman, who is facing federal tax evasion charges, has stepped down as chief executive of Kettering-based auto dealer software company Reynolds & Reynolds, with a new executive being named to take the helm.

Reynolds President and Chief Operating Officer Tommy Barras has been named CEO, effective immediately, Reynolds said in a release.

EXHIBIT A-92

Brockman also stepped down as chairman, a company spokesman said.

A Reynolds spokesman did not respond to questions about whether Brockman has any daily management role and what, if anything, this change portends for Brockman's ownership stake in the company he bought 14 years ago.

"I am both humbled and excited by the opportunity to lead this company," Barras said in the announcement Friday. "I have the benefit of the most talented senior executive leadership team with decades of automotive experience to lean on."



EXHIBIT A-92

Last month, federal prosecutors in San Francisco announced that a federal grand jury returned a 39-count indictment charging Brockman with tax evasion, wire fraud, money laundering, and other alleged offenses.

Explore   Last month: Company says Reynolds CEO to remain in leadership spot

Prosecutors have presented a portrait of Brockman of operating a secret web of Caribbean business entities to conceal $2 billion in investment income, evading taxes on the income. The charges comprise what is said to be the largest prosecution of its kind in U.S. history.

Recently, Bloomberg reported that Swiss prosecutors froze more than $1 billion in bank accounts belonging to Brockman

Brockman, a resident of Texas and Colorado, has a history of being an aggressive, successful businessman who has made bold moves.



EXHIBIT A-92



In 2006, the then-65-year-old entrepreneur ran Universal Computer Systems, a Houston company he started in his living room more than three decades before, when he took over what was then a much larger competitor, Dayton-based Reynolds and Reynolds Co., in a $2.8 billion deal.

In their indictment last month, prosecutors said a Brockman subsidiary, Dealer Computer Services Inc., borrowed $2.4 billion to finance the merger of Universal Computer Systems and Reynolds, paving the way to his ownership of the local company.

Barras, 61, is a long-time company executive who joined Reynolds in 1976, Reynolds said. He was named a company officer over software development in 1988 and has held the position of executive vice president of software development since 2008. In June, Barras was named president and COO.

Barras will retain those titles along with his CEO role, the local company said.

EXHIBIT A-92

Reynolds is based on a Miami Valley Research Park campus near County Line Road in Kettering, where it has more than 1,000 employees.

# In Other News



**LOCAL NEWS** | 3m ago

LISTEN: 6 local protestors on achieving racial equity



**LOCAL NEWS** | 57m ago

Hospitals say most COVID-19 patients admitted now have not had a vaccine



**LOCAL NEWS** | 1h ago

Local defense contractor wins global role in $1B EPIC contract



**LOCAL NEWS** | 2h ago

Miami County offers vaccinations at Strawberry Jam event, business park



**LOCAL NEWS** | 3h ago

Chris Janson to headline Military Appreciation Night at Fraze Pavilion



**LOCAL NEWS**

Wright State athletics committee will hear from a trio of possible consultants



**LOCAL NEWS**

NEW DETAILS: Business owner restoring Oakwood's Sugar Camp guard house



**LOCAL NEWS**

Kettering Health offers COVID-19 on-demand care locations

**CONTENT BY**

**BetterBe** | Sponsored

## 20 Stunning Female Athletes

# EXHIBIT

# A-93

# EXHIBIT A-93



U.S. Department of Justice

Tax Division

*Western Criminal Enforcement Section*
*P.O. Box 972*
*Washington, D.C. 20044*
*202-514-5762 (v)*
*202-514-9623 (f)*

REZ:LJW:CJSmith
DJ 5-11-24264
CMN 2019200585

October 9, 2020

Mark Filip
Kirkland & Ellis, LLP
1301 Pennsylvania Avenue, NW
Washington, D.C. 20004

                    Re:     Robert F. Smith – Non-Prosecution Agreement

Dear Mr. Filip,

        As you know, the U.S. Department of Justice Tax Division, the United States Attorney's Office for the Northern District of California, and the Internal Revenue Service-Criminal Investigation ("IRS-CI") have been investigating your client, Robert F. Smith, in regard to suspected criminal violations of the Internal Revenue Code, Title 26, United States Code and related violations of Title 31, Report of Foreign Bank and Financial Accounts ("FBAR"). After careful consideration of Robert F. Smith's conduct and all of the surrounding circumstances, the Tax Division and the United States Attorney's Office for the Northern District of California hereby extends this Non-Prosecution Agreement (the "Agreement") to Robert F. Smith per the following terms and conditions:

        1.     **Term of the Agreement.** The term of this Agreement shall be five (5) years, beginning on the date of signing this agreement, unless there is a breach as set forth in paragraph 4 and 5. Obligations hereunder survive the term of this Agreement only where this Agreement expressly so provides.

        2.     **Acknowledgment of Facts.** Robert F. Smith acknowledges and agrees that the Statement of Facts as set forth in Attachment A, is truthful and accurate. He acknowledges and agrees that the Statement of Facts accurately describes the tax evasion scheme in which he participated, namely that he used the Excelsior Trust and Flash Holdings entities to willfully conceal taxable income paid to those entities, that he completely and unilaterally controlled said income which he knew was taxable to him, and further, that he affirmatively acted to conceal the income from the Internal Revenue Service ("IRS") (the "Scheme"). In addition, Robert F. Smith acknowledges that as a part of the Scheme, he willfully did not timely and accurately

# EXHIBIT A-93

Robert F. Smith
Non-Prosecution Agreement
Page - 2 -

report to the IRS and the United States his financial interest in, and signatory authority over, the foreign bank accounts described in the Statement of Facts.

     3.     **Cooperation.** It is understood that during and under the terms of this Agreement Robert F. Smith shall continue to cooperate by:

     (a) truthfully and completely disclosing all information with respect to the activities of himself, and others, concerning all matters about which the United States including but not limited to the Department of Justice Tax Division, IRS-CI, and the United States Attorney's Office for the Northern District of California inquires of him, which information can be used for any purpose;

     (b) truthfully and completely providing full and meaningful cooperation to the United States, including but not limited to the Department of Justice, IRS-CI, and the United States Attorney's Office for the Northern District of California regarding other individuals involved in the Scheme, and other similar schemes of which he has knowledge, and such other matters that the United States may inquire of him. Any assistance Robert F. Smith may provide to federal criminal investigators shall be pursuant to the specific instructions and control of the United States and its designated investigators. Robert F. Smith's cooperation under this Agreement shall continue for a period of five (5) years from the date this Agreement is fully executed, however, he shall cooperate fully with the United States in all matters the United States inquires of him during this Agreement until the conclusion of such matters, whether those matters are concluded within the five-year term of this Agreement;

     (c) withdrawing from any and all joint defense agreements previously entered into with other individuals who were involved in the Scheme, or were involved in similar schemes;

     (d) attending all meetings at which the United States requests his presence, at a mutually convenient location;

     (e) providing to the United States, upon request, any document, record, or other tangible evidence, except for those subject to valid claims of attorney-client privilege, work product protections, or other privileges, if any, other than those expressly waived including those described in Paragraph 3(g), relating to matters about which the United States, or any designated law enforcement agencies, inquire of him;

     (f) truthfully testifying before the grand jury, at any trial, and other court proceeding as requested by the United States, except for testimony subject to valid claims of attorney-client privilege, work product protections, or other privileges, if any, other than those expressly waived including those described in Paragraph 3(g);

     (g) withdrawing, and otherwise waiving, any and all objections in proceedings involving the review of evidence, both electronic and documentary, seized by IRS-CI including signing and filing in the respective federal district courts at the time of execution of this Agreement, the attached pleadings entitled, "Robert Smith's Withdrawal of Objections and Waiver of Privilege" (Attachments B and C), said pleadings intended to constitute a full waiver of any and all attorney/ client and attorney work product privileges applicable to this evidence, and otherwise abandoning any litigation contesting the United States' requests for this evidence, and waiving attorney-client privilege, work product protection, and other applicable privileges, if any, as to the Scheme, including the creation, operation and concealment of the Excelsior / Flash structure and to any aspect of his relationship or dealings with Individuals A and B, as defined in

EXHIBIT A-93

Robert F. Smith
Non-Prosecution Agreement
Page - 3 -

Attachment A – Statement of Facts.  For avoidance of doubt, nothing herein shall be construed as a waiver of attorney-client privilege, work product protection, or other applicable privileges, if any, during the representation of Robert F. Smith by any of the counsel or law firms that have advised him in this criminal investigation;

(h) paying all federal income tax, penalties, and interest owed to the IRS, as determined by the IRS, pursuant to his participation in the Scheme, in the amount of $56,278,125 for calendar years 2000 through 2014, and waiving any objection to the imposition of the civil fraud penalty, under Title 26 U.S.C. § 6663, on the tax due as determined by the IRS. A partial payment to the United States totaling one-half of this amount owed to the IRS shall be made at or before the execution of this Agreement with equal quarterly payments made thereafter to the United States, and payment in full no later than eighteen (18) months after the execution of this Agreement. The amount of tax, penalty, and interest due pursuant to this sub-paragraph shall not be reduced by a carryback, deduction, loss, credit, or other tax benefit of any kind which is, or may become available.  A separate payment of tax associated with the 2015 calendar year will be made by Robert F. Smith to the IRS, together with an Amended Income Tax Return for the 2015 calendar year, reflecting previously unreported income from the Scheme.  Robert F. Smith shall also waive any objection to the imposition of the civil fraud penalty, under Title 26, U.S.C. § 6663, on the additional tax due and paid for the 2015 calendar year as reflected on the Amended Income Tax Return that Robert F. Smith will file.

(i) paying all penalties and interest computed by the IRS, pursuant to Title 31 U.S.C. §§5314 and 5322, in the amount of $82,930,165, related to Robert F. Smith's failure to timely file truthful and accurate Foreign Bank Account Reporting Forms TD F 90-22.1 ("FBARs"), reporting his financial interest in the foreign bank accounts referenced in the Statement of Facts for the calendar years 2012, 2013, and 2014. A partial payment to the United States totaling one-half of this amount of the FBAR penalties and interest shall be made at or before the execution of this Agreement with equal quarterly payments made thereafter to the United States, and payment in full no later than eighteen (18) months after the execution of this Agreement. The amount of tax, penalty, and interest due pursuant to this sub-paragraph shall not be reduced by a carryback, deduction, loss, credit, or other tax benefit of any kind which is, or may become available.

(j) beginning in 2019, fully and accurately reporting to the IRS and United States all of his offshore financial interests, transactions, and income, as required by United States statutes and regulations;

(k) abandoning his protective, or tentative, claims for refund totaling $182,138,000 filed with the IRS consisting of a (i) a protective refund claim submitted to the IRS on May 12, 2017 for amounts paid in connection with the submission pursuant to the Streamlined Domestic Offshore Procedures, and (ii) protective refund claims filed with the IRS for charitable contribution deductions on September 21, 2018, and October 11, 2019, in connection with the contributions to Fund II Foundation, and any other claims related to the disposition of unreported income that was part of the Scheme, and take no further direct or indirect tax benefit from such claims;

(l) cooperating with the IRS, including signing at the time of execution of this Agreement the attached closing agreements with the IRS relating to his tax liabilities and FBAR liabilities (Attachments D and E), and cooperating with the IRS in all audits of Robert F. Smith's federal income tax returns, to ensure Robert F. Smith is in full compliance with all applicable federal income tax statutes;

(m) bringing to the Department of Justice Tax Division's or the United States' attention

Robert F. Smith
Non-Prosecution Agreement
Page - 4 -

all other crimes, in addition to those committed as part of the Scheme, which Robert F. Smith
has committed, and all other criminal proceedings, investigations, or prosecutions in which he
has been or is a subject, target, party, or witness; and

(n) committing no crimes whatsoever.

4.  **Violation of Agreement.**  It is understood that should the Department of
Justice Tax Division or the United States Attorney's Office for the Northern District of
California determine in its sole discretion that Robert F. Smith has knowingly given false,
incomplete, or misleading testimony or information, or otherwise violated any provision of this
Agreement, then:

(a) Robert F. Smith shall thereafter be subject to prosecution for any federal
criminal violation of which the United States has knowledge, including crimes relating to the
Scheme set forth in the Statement of Facts (Attachment A), perjury, and obstruction of justice;
and any such prosecution that is not time-barred by the applicable statute of limitations on the
date of the signing of this Agreement, notwithstanding the expiration of the statute of limitations
between the signing of this Agreement and the commencement of such prosecution. It is the
intent of this Agreement for Robert F. Smith to waive all defenses based on the statute of
limitations and the Speedy Trial Act (18 U.S.C. § 3161) with respect to any prosecution that is
not time-barred on the date that this Agreement is signed. Robert F. Smith further agrees to the
tolling of any applicable statute of limitations from August 13, 2020 until all the terms of this
Agreement are fulfilled.

(b) All statements made by Robert F. Smith to the United States, or other
designated law enforcement agents, and any testimony given by Robert F. Smith before a grand
jury or other tribunal, whether prior or subsequent to the signing of this Agreement, and any
leads from such statements or testimony shall be admissible in evidence in any criminal
proceeding brought against Robert F. Smith.

(c) Robert F. Smith shall assert no claim under the United States Constitution, any
statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule or regulation that
such statements or any leads derived therefrom should be suppressed. It is the intent of this
Agreement to waive all rights in the foregoing respects.

(d) Robert F. Smith agrees to be subject to the jurisdiction of, and venue in, the
United States District Court for the Northern District of California for any perjury, obstruction of
justice, or false statement prosecutions related to any testimony or oral or written statements
given in accordance with this Agreement. Robert F. Smith appoints his attorney, Mark Filip, as
his agent to accept service of legal process, including subpoenas and summonses, in any
proceeding instituted by the United States or IRS, or to which the United States or IRS is a party
with respect to the crimes described above.

5.  **No Repudiation or Contradiction of Statement of Facts.** Robert F. Smith
agrees that he shall not, himself or through any agent or representative, make any statement, in
litigation or otherwise, repudiating or contradicting the Statement of Facts associated with this
Agreement (Attachment A). Any contradictory statement by Robert F. Smith or his agent shall
constitute a violation of this Agreement. If such a contradictory statement is determined to
constitute a violation of this Agreement, then Robert F. Smith thereafter shall be subject to

EXHIBIT A-93

Robert F. Smith
Non-Prosecution Agreement
Page - 5 -

prosecution for his participation in the Scheme, as described in the Statement of Facts
(Attachment A), and waives his right to contest or object to these facts set forth therein. The
decision as to whether any contradictory statement will be imputed to Robert F. Smith for the
purpose of determining whether Robert F. Smith has committed a violation of this Agreement
shall be at the sole discretion of the United States. Upon the United States reaching a
determination that a contradictory statement has been made by Robert F. Smith, the United
States shall promptly notify Robert F. Smith in writing, and Robert F. Smith may avoid a
violation of this Agreement by repudiating the statement in question both to the recipient of the
statement and to the United States within seven (7) days after Robert F. Smith's receipt of notice.
Robert F. Smith consents to the public release by the United States, in its sole discretion, of any
repudiation.

6.    **Public Record.** Robert F. Smith and the United States agree that upon execution
of this Agreement, the Agreement and the associated Statement of Facts (Attachment A) and
Closing Agreements with the IRS (Attachments D and E) shall be a matter of public record.
Moreover, Robert F. Smith agrees to waive any and all statutory rights afforded to him under
Title 26 U.S.C. § 6103 regarding the public disclosure of information contained in the Statement
of Facts.

7.    **Agreement Not to Prosecute.** If the Department of Justice Tax Division and the
United States Attorney's Office for the Northern District of California determine that Robert F.
Smith has fully complied with the terms of this Agreement, then the Department of Justice Tax
Division and the United States Attorney's Office for the Northern District of California agree not
to criminally prosecute Robert F. Smith for any federal crimes arising from the Scheme, as
generally described in the Statement of Facts (Attachment A) to include (i) any attempt to
defraud the United States, evade or defeat tax, or any fraud or false statements on any documents
subscribed to the Internal Revenue Service ("IRS") for the tax years 2000 through 2015; and (ii)
Robert F. Smith's failure to timely file truthful and accurate Foreign Bank Account Reporting
Forms TD F 90-22.1 ("FBARs"), reporting his financial interest in the foreign bank accounts for
the calendar years 2012 through 2019. This Agreement does not provide any protection against
prosecution for any future conduct by Robert F. Smith, or for any misconduct not disclosed by
Robert F. Smith during this investigation.

8.    **Limits on this Agreement.**    Other than the Department of Justice Tax Division,
the United States Attorney's Office for the Northern District of California, and IRS-CI, this
Agreement does not bind any other component of the Department of Justice or any other federal,
state, or local law enforcement or regulatory authority.

9.    **Totality of this Agreement.** This Agreement sets forth all of the terms of the
Non-Prosecution Agreement between Robert F. Smith and the United States. It constitutes the
complete and final agreement between the United States and Robert F. Smith in this matter.
There are no other agreements, written or otherwise, modifying the terms, conditions, or
obligations of this Agreement. No future modifications or additions of this Agreement, in whole
or in part, shall be valid unless they are set forth in writing and signed by the United States,
Robert F. Smith, and Robert F. Smith's counsel.

EXHIBIT A-93

*Robert F. Smith*
*Non-Prosecution Agreement*
*Page - 6 -*

RICHARD E. ZUCKERMAN
Principal Deputy Assistant
Attorney General
Tax Division

Date ___10/10/2020___

DAVID L. ANDERSON
United States Attorney
Northern District of
California

Date ___10/13/2020___

AGREED AND CONSENTED TO:

Robert F. Smith

Date ___OCT 9, 2020___

APPROVED:

Mark Filip
Kirkland & Ellis LLP
Attorney for Robert F. Smith

Date signed ___Oct 9, 2020___

W. Neil Eggleston
Kirkland & Ellis LLP
Attorney for Robert F. Smith

Date signed ___Oct 9, 2020___

Emily P. Hughes
Kirkland & Ellis LLP
Attorney for Robert F. Smith

Date signed ___October 9, 2020___

EXHIBIT A-93

*Robert F. Smith*
*Non-Prosecution Agreement*
*Page - 7 -*

Mark E. Matthews
**Caplin & Drysdale, Chartered**
**Attorney for Robert F. Smith**

Date signed ____Oct 9, 2020____

Scott D. Michel
**Caplin & Drysdale, Chartered**
**Attorney for Robert F. Smith**

Date signed ____October 9, 2020____

EXHIBIT A-93

## EXHIBIT A TO ROBERT F. SMITH
## NON-PROSECUTION AGREEMENT

## STATEMENT OF FACTS

1.    Robert F. Smith ("Smith"), age 57, is a resident of Austin, Texas and a citizen of the United States. From 2000 through May 2015, Smith engaged in an illegal scheme to conceal income and evade taxes he owed by using an offshore trust structure with related foreign corporations and offshore bank accounts, and by willfully filing a series of false documents with the Internal Revenue Service ("IRS") and the Treasury Department.

2.    Beginning in or about 1997, while working as an investment banker at a leading global investment bank and securities firm, Smith met and developed a business relationship with Individual A, the CEO of a corporation that produces and markets computer software ("Company A"), located in Houston, Texas. Smith, who received an MBA from Columbia University in 1994, worked extensively with Individual A in 1997 and 1998 regarding the potential sale of Company A. During that process, Smith learned that Company A was purportedly owned by a foreign holding company that, in turn, was purportedly owned by a foreign trust located in Bermuda. Individual A told Smith that the foreign trust was created by Individual A's father in the 1980s. Individual A, and others who worked for Individual A, told Smith that because Company A was owned by the offshore trust, no United States income tax would be owed on the profits gained from the sale of Company A's stock.

3.    The contemplated sale of Company A did not occur. Instead, Individual A approached Smith about the prospect of creating a private equity fund ("Fund 1") in which Individual A would be the sole limited partner investor, through his foreign trust structure. Smith left his employment with the investment bank and in 2000, founded a private equity firm located in San Francisco, California. Smith has been the CEO of the private equity firm since that time. Individual A initially made a $300 million commitment to Fund 1, which was later increased to $1 billion. Although the Fund 1 partnership agreement listed Individual A's foreign trust entity as its sole limited partner, it became apparent to Smith that Individual A completely controlled this foreign trust structure and made all final and substantive decisions regarding its investments in Fund 1.

4.    Individual A personally dictated the terms under which he would invest in Fund 1, including that Fund 1 had to be located in the Cayman Islands and that Smith hold half his carried interest in Fund 1 through a "perfected foreign trust" similar to the one used by Individual A. Specifically, Smith would personally receive an 8 percent general partnership interest in Fund 1, holding 4 percent through his LLC and the other 4 percent through an offshore trust that Smith controlled. All Fund 1 profits Smith earned were to be paid through these entities. Individual A told Smith that a portion of the general partner income and distributions from Fund 1 had to be held offshore because Individual A did not want to bring his foreign trust, and related foreign companies, into United States courts to litigate claims if Fund 1 failed to perform. Smith understood from Individual A, that Individual A did not want the United States Internal Revenue Service ("IRS") to know about his own foreign trust's participation in Fund 1. Individual A presented this unconventional business proposal as a "take-it-or-leave-it" offer, dictating the unique terms and unorthodox structure to the arrangement. Despite any misgivings, Smith

EXHIBIT A-93

accepted Individual A's offer, viewing it as a unique business opportunity he eagerly wanted to pursue. It became apparent to Smith that despite paperwork that indicated to the contrary, Individual A completely controlled Individual A's foreign trust and related foreign companies, and made all substantive decisions regarding all of its transactions and investments.

5.     For the purpose of forming a similar foreign trust, Individual A referred Smith to Individual B, a lawyer in private practice in Houston, Texas who specialized in foreign trusts and "asset protection" planning. Smith understood that Individual B previously assisted Individual A's father in creating Individual A's trust in the 1980s.

6.     Individual B told Smith that he could form a foreign trust that could hold assets for Smith, and that Smith could use and benefit from these assets without paying United States income tax. In order to avoid United States income and estate tax, Smith was to have a foreign U.K. relative of his then-spouse ("nominee settlor") appear to fund the creation of the foreign trust with an initial "donation" of $7,500. Individual B told Smith that he and his family could be named beneficiaries of the foreign trust, and that the foreign trust must also include charitable beneficiaries in order to assure the tax-free nature of the trust. Despite representations and paperwork to the contrary, the charitable aspects of the trust were discretionary, not mandatory. Individual B also told Smith that the paperwork he and Smith prepared would make it appear as if the income and assets of the trust were not owned or taxable to Smith. Smith knew that the nominee settlor would not be involved in the creation of this foreign trust, and would neither contribute assets to the trust, nor pay any fees. Despite appearing too good to be true, Smith did not consult with other reputable tax attorneys or legal advisors he knew and trusted to verify the validity, or legal soundness, of what Individual B told him. In fact, Individual A told Smith that aside from Individual B, he should not to discuss his offshore structure with other attorneys.

7.     Smith paid nearly all the costs and fees associated with the trust. In 2000, Smith purported to have the nominee settlor settle his Belizean trust, called Excelsior Trust ("Excelsior"). Smith personally paid nearly half the $7,500 to settle the trust and paid the entire $30,000 in administrative fees required to form and create Excelsior. Smith's foreign relative, the nominee settlor of Excelsior, paid none of the administrative fees. Further, from 2000 through 2014, Smith paid annual fees of approximately $5,000 to maintain Excelsior in Belize. The nominee settlor was not involved in the payment of these fees. From 2000 through 2014, Smith also paid Individual B approximately $800,000 in fees for Individual B's assistance with the creation of a false paper trail, regarding the maintenance and operation of Excelsior and its related entities. Smith falsely told the Belizean nominee trustee that the initial donation of $7,500 came from the nominee settlor to create the false impression that Excelsior was an independent foreign trust being created and formed by someone other than Smith.

8.     Individual B further told Smith that the foreign trust could own foreign corporations to hold various assets in foreign jurisdictions, similar to Individual A's foreign trust. Smith understood from Individual B that although assets would be held and titled under the foreign trust and foreign corporate names, Smith could continue to control the assets and use them for his personal benefit.

9.     With the assistance of Individual B, Smith created a foreign limited liability company named Flash Holdings, LLC ("Flash"), in Nevis. At Individual B's direction, Smith

EXHIBIT A-93

falsely represented to the Belizean nominee trustee for Excelsior that Flash was formed under the direction of the nominee settlor, using bearer shares, and that Flash was purportedly owned by Excelsior.[1] In reality, Smith paid the fees and costs to form Flash and made all substantive decisions regarding Flash's operations, transactions, income, investments, and assets.

10.     Following the formation of Excelsior and Flash, Smith held a 4% general partnership interest in Fund 1 under his own name and a 4% general partnership interest in the name of Flash. Smith was at all times in control of and the beneficial owner of Flash's 4% general partnership interest in Fund 1. Smith understood from Individual B that he controlled both the investment decisions for Flash and its assets, but he felt obligated to honor any claims Individual A made against Flash's tax-free funds held in a foreign jurisdiction if Fund 1 was not successful. Smith understood that Individual A could assert claims over the assets of Fund 1 if the fund were to lose money. Individual A had the power to remove Smith and the general partners from Fund 1 by forcing a sale of general partner interests to Individual A at Individual A's valuation.

11.     In 2000, when Smith formed Excelsior and Flash, Smith knew that Excelsior and Flash were intended, and would be used, to avoid the payment of United States income tax on income earned from investments in Fund 1 and other private equity funds. Smith knowingly and intentionally used Excelsior and Flash and their associated foreign bank accounts to conceal from the IRS, and the United States Treasury Department, income earned and/or distributed to Flash from Fund 1 and other private equity funds.

12.     At all times from their formation, Smith knowingly and intentionally controlled Excelsior and Flash for his use, benefit, and enjoyment, subject only to a claim Individual A could assert to Fund 1. Although Excelsior had a nominee trustee in Belize, that trustee exercised no independent judgment and made no decisions regarding Excelsior other than those that Smith directed. Similarly, although Flash had a nominee corporate manager and resident agent in Nevis, these managers and agents exercised no independent judgment over Flash, and made no decisions regarding Flash other than those that Smith directed.

13.     Individual B recommended that Smith work through him to create a paper record for purposes of creating a false impression that Excelsior's trustees and Flash's managers made independent decisions for these entities when in fact, Smith made all substantive decisions in their regard. Individual B advised Smith to communicate with the nominee trustees and nominee managers of Excelsior and Flash through Individual B for greater confidentiality, which Individual B knew was intended to, and did, conceal Smith's control and beneficial ownership of the income concealed in bank accounts under Flash's name.

14.     Beginning in approximately 2005, Flash began to earn and receive general partnership carried interest income from Fund 1. Distributions of this income were initially made to Flash's bank account at bank in the British Virgin Islands ("BVI Account"). Although Smith was not a signatory on the BVI Account, Smith was its beneficial owner and controlled all transactions concerning the account through Flash's nominee manager. Smith did not report this

---

[1] A bearer instrument is a document that entitles the holder of the document rights of ownership or title to the underlying property.

EXHIBIT A-93

income to the IRS.

15.     In 2007, Smith caused an account in Flash's name to be opened at Banque Bonhôte in Switzerland into which additional carried interest income earned by Flash from Fund 1 and later from additional private equity funds were deposited (the "Bonhôte Account"). At all times, Smith was the sole signatory on the Bonhôte Account, fully controlled the Bonhôte Account, and was listed in Banque Bonhôte records as the beneficial owner of the Bonhôte Account. Smith was, in fact, the beneficial owner of the Bonhôte Account.

16.     In 2005, Smith and his then-wife purchased a vacation home in Sonoma, California. Smith titled the property they selected in Flash's name. Smith directed that the purchase price of $2.5 million be paid with untaxed funds from the BVI Account. Smith and his then-wife renovated the Sonoma property and paid for the renovation costs with untaxed funds deposited in the BVI Account and the Bonhôte Account. Smith and his family used the Sonoma property and had unfettered access to it from 2005 to 2014. Smith knowingly and willfully neither timely reported to the IRS nor timely paid income tax on these funds.

17.     In 2010, after Smith and his then-wife moved to Switzerland, they acquired two ski properties in Megève, France and later a Megève commercial property using untaxed funds to make the purchases, and with Individual B's advice, titled the properties in the names of foreign entities. Smith directed the payment of more than 13 million Euros from the Bonhôte Account to purchase and furnish the properties. Smith and his family had control of the Megève ski properties and had priority access to them from 2010 to 2014 unless rented to third parties. Smith knowingly and willfully neither timely reported to the IRS, nor timely paid income tax on these funds.

18.     From 2005 to 2013, Smith withdrew untaxed funds from the BVI Account and the Bonhôte Account for his personal use and benefit. In 2011 and 2012, Smith transferred more than $13 million from the Bonhôte Account to a United States bank account for his benefit. Smith used these funds to build a home and make improvements to property that he owned in Colorado and to fund charitable activities on that property for inner city children and wounded veterans. Smith knowingly and willfully neither timely reported to the IRS, nor timely paid income tax on these funds.

19.     From 2000 until 2014, Smith knowingly and intentionally did not advise his tax return preparer about Excelsior, Flash, and the BVI Account and the Bonhôte Account. Smith knowingly and intentionally did not tell his return preparer that he controlled these entities and bank accounts and that he had placed a portion of his general partnership income from Fund 1 and other private equity funds into those entities and accounts. Smith knowingly and intentionally did not tell his return preparer that he used untaxed income deposited into these foreign accounts for his own personal benefit.

20.     From in or about 2006 through 2015, Smith willfully filed false United States Individual Income Tax Returns, Forms 1040, for the tax years 2005 through 2014 in which he failed to disclose his beneficial interest in, and control over the BVI Account and the Bonhôte Account. In addition, Smith willfully failed to report on these income tax returns the income he earned from Fund 1, and other private equity funds, a portion of which he directed to be deposited into the BVI Account and Bonhôte Account. Smith willfully understated his income on these tax

EXHIBIT A-93

returns and willfully evaded more than $43,000,000 in U.S. federal income taxes for the tax years 2005 through 2014.

21.     Smith knew that United States laws and regulations require United States citizens who have signatory authority over, or a financial interest in, a foreign bank account[s] to annually file a Foreign Bank Account Reporting Form TD F 90-22.1 ("FBAR"), with the United States government reporting either this signatory authority and/or financial interest. Prior to 2011, Smith knowingly and intentionally did not file an FBAR as required by law. In or around September 2011, Smith filed an FBAR for the 2010 calendar year that willfully failed to report his financial interest in the BVI Account and the Bonhôte Account Smith also willfully failed to file an FBAR for 2011 as required by law. In or around June 2013, Smith filed an FBAR for 2012 calendar year that willfully failed to report his financial interest in the BVI Account and the Bonhôte Account for purposes of concealing his ownership and control of these accounts.

22.     In or around November 2013 and January 2014, Smith received letters from Banque Bonhôte regarding the bank's intended participation in the United States Department of Justice "Swiss Bank Program" which required participant banks to report all United States-related accounts to the United States government (the "Bank Program Letters"). Smith received these letters relating to the Bonhôte Account. The Bank Program Letters noted that the Bonhôte Account was held by a United States person, and requested Smith to waive Swiss bank secrecy related to it. It further recommended that Smith consider applying to the IRS's Offshore Voluntary Disclosure Program ("OVDP") to report his non-compliance. The Bank Program Letters also informed Smith that if he failed to take one of these actions that Banque Bonhôte would close the Bonhôte Account. In March 2014, Smith filed a preclearance request with the IRS seeking entry into OVDP. In April 2014, the IRS denied Smith's preclearance application into OVDP.

23.     In or around June 2014, after receiving the OVDP preclearance denial, Smith willfully filed a false 2013 FBAR. Smith listed both the BVI Account and the Bonhôte Account on the 2013 FBAR, but only reported signature authority over these accounts while willfully omitting both his financial and beneficial interest in the accounts as well. Smith willfully omitted these disclosures to further conceal his taxable income deposited into these accounts.

24.     In or around October 15, 2014, Smith willfully filed a false United States Individual Income Tax Return, Form 1040, for the tax year 2013, with the IRS, which misrepresented and willfully failed to disclose his income from, beneficial interest in, and control over Excelsior and Flash. Smith's 2013 federal income tax return also willfully failed to disclose Smith's financial interest in the BVI Account and Bonhôte Account. In addition, Smith willfully filed a false Form 8275, attached to his income tax return, in which he represented that the Excelsior / Flash structure had corporate trustees and managers and willfully concealed his control over those entities. Smith attempted to conceal from the IRS that he controlled and beneficially owned the offshore entities Excelsior and Flash. Smith also willfully failed to disclose on the Form 8275 his beneficial ownership of the BVI Account and Bonhôte Account and falsely claimed that income distributed to Flash from Fund 1, and other private equity funds, was required to be donated to charity.

25.     In December 2014, Smith directed Excelsior to contribute all of the shares of Flash, and all of its assets, to a U.S. 501(c)(3) charitable organization. Smith knowingly and intentionally falsely claimed that this charitable contribution was required as part of an agreement with Individual A, the limited partner investor in Fund 1.

# EXHIBIT A-93

26.     In or around May 2015, Smith willfully filed false FBARs for the calendar years 2008 through 2013 ("Streamlined FBARs") and false amended United States Individual Income Tax Returns, Forms 1040X, for tax years 2010 through 2013 ("Streamlined Tax Returns") as part of the Streamlined Domestic Offshore Procedures. Smith's Streamlined FBARs continued to represent that Smith only had signatory authority over the BVI Account and Bonhôte Account, while willfully omitting Smith's true beneficial ownership of these accounts.

27.     Smith's Streamlined Tax Returns continued to willfully include a false Form 8275 which concealed his true beneficial ownership and control of Excelsior and Flash. Smith's Streamlined Tax Returns falsely reported that only small portions of income distributed to him in the United States from Flash's foreign bank accounts, were taxable to him. Smith willfully failed to report on his Streamlined Tax Returns over $200 million of partnership income distributed to Flash from Fund 1 and other private equity funds, over which Smith had beneficial ownership during the calendar years 2005 through 2014. Smith knew that the earned income attributed to Flash was in fact taxable to him when he filed the Streamlined Tax Returns.

28.     The acts taken by Smith, including acts described above, were done willfully and knowingly with the specific intent to violate United States law. Smith acknowledges that the foregoing statement of facts does not describe all of his conduct relating to the offenses stated herein and does not identify all of the persons with whom he may have engaged in unlawful conduct.

29.     The foregoing is a summary of relevant facts and is not a complete recitation of every relevant fact known.


**AGREED AND CONSENTED TO:**


Robert F. Smith                                Date signed   OCT 9, 2020


Mark Filip
Kirkland & Ellis LLP
Attorney for Robert F. Smith                   Date signed   OCT. 9, 2020


W. Neil Eggleston
Kirkland & Ellis LLP
Attorney for Robert F. Smith                   Date signed   Oct 9, 2020


Page 6 of 6

# EXHIBIT A-93

Date signed   _October 9, 2020_

Emily P. Hughes
Kirkland & Ellis LLP
Attorney for Robert F. Smith

Date signed   _Oct 9, 2020_

Mark E. Matthews
Caplin & Drysdale, Chartered
Attorney for Robert F. Smith

Date signed   _october 9, 2020_

Scott D. Michel
Caplin & Drysdale, Chartered
Attorney for Robert F. Smith

Date signed   _10/10/2020_

Richard E. Zuckerman,
Principal Deputy Assistant Attorney General
Department of Justice
Tax Division

# EXHIBIT

# A-94

EXHIBIT A-94

# United States District Court

### FOR THE
### NORTHERN DISTRICT OF CALIFORNIA

## VENUE: SAN FRANCISCO

**FILED**

Apr 15 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

---

## UNITED STATES OF AMERICA,

## V.

## CARLOS E. KEPKE

### DEFENDANT(S).

---

# INDICTMENT

18 U.S.C. § 371  – Conspiracy to Defraud the United States;
26 U.S.C. § 7206(2) – Aiding and Assisting the Filing of a Materially False Income
Tax Return

---

A true bill.

/s/ Foreperson of the Grand Jury

Foreman

Filed in open court this 15th day of

April, 2021.

Ada Means

Clerk

Bail, $ Summons

Hon. Jacqueline Scott Corley

EXHIBIT A-94

1   STEPHANIE M. HINDS (CABN 154284)
    Acting United States Attorney
2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11  UNITED STATES OF AMERICA,              Case No.   3:21-cr-00155 JD

12         Plaintiff,                      VIOLATIONS:  18 U.S.C. § 371 –
                                           Conspiracy to Defraud the United States;
13         v.                              26 U.S.C. § 7206(2) – Aiding and
                                           Assisting in the Preparation of a
14  CARLOS E. KEPKE,                       Materially False Income Tax Return

15         Defendant.                      SAN FRANCISCO VENUE

16

17

18                        I N D I C T M E N T

19  The Grand Jury charges:

20                          **Introduction**

21         At all times relevant to this Indictment:

22         1.      Defendant CARLOS E. KEPKE was a United States citizen working and residing in

23  Houston, Texas.

24         2.      KEPKE was employed as an attorney specializing in creating and maintaining foreign

25  trusts and companies for his clients.  Beginning in or about 1999, through December 31, 2014, Robert F.

26  Smith was one of KEPKE's clients.  Smith was a United States citizen residing at various times in

27  California, Switzerland, and Texas.

28

INDICTMENT                    1

**FILED**

Apr 15 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

EXHIBIT A-94

3.       From in or about 2000 to the date of this Indictment, Smith was the Chairman and Chief Executive Officer of Vista Equity Partners ("Vista"), a private equity firm which conducted business in the Northern District of California.

4.       Vista formed private equity fund partnerships that purchased companies for the purpose of increasing their value and selling them for a profit.

5.       Private equity funds raise money to invest from investors which are usually designated as general partners or limited partners.  Limited partners commit in advance to provide pre-determined amounts of investment capital when the fund "calls" capital to make an investment.  Limited partners generally do not participate in the management of the fund or the formation of investment strategy.

6.       General partners generally manage the fund and make investment decisions.  General partners are normally paid a fee for their managerial services in the form of a percentage of invested capital.  General partners can also be compensated in the form of "carried interest."  Carried interest often consists of a percentage of the fund's net profits.  In the United States, carried interest is taxable to recipients as capital gains income under Title 26, United States Code, Sections 1223 & 1061.

7.       Vista's first fund was Vista Equity Fund II, L.P. ("VEF II"), a private equity fund partnership formed by Smith, and others, in the Cayman Islands in or about March 2000.  VEF II was initially called "Emerging Technologies Investment Fund, L.P.," but its name was changed to VEF II shortly after it was formed.

8.       Smith received an 8 percent general partnership interest in VEF II, which had three general partners: Combs Young, LLC; Partner 2; and Flash Holdings, LLC ("Flash Holdings").  Smith held half of his 8 percent interest through Combs Young, LLC, his single-member LLC.  Smith held the other half of his 8 percent interest through Flash Holdings.  Flash Holdings was a Nevisian limited liability company created by KEPKE for Smith on or about March 9, 2000.  Flash Holdings had no employees, no offices, and never provided any service to Vista or any Vista fund.  Flash Holdings had no business purpose other than holding assets for the benefit of Smith, and its primary initial asset was a 4 percent general partnership interest in VEF II.

9.       Excelsior Trust was a Belizean entity formed by KEPKE for Smith on or about March 29, 2000 to be the owner of Flash Holdings.  Excelsior Trust had no employees, no offices, and never

EXHIBIT A-94

1  provided any service to Vista or any Vista fund.  Excelsior Trust had no business purpose other than

2  holding assets for the benefit of Smith.  KEPKE and Smith caused an individual with the initials of HW

3  to be designated as the creator, or "Settlor," of Excelsior Trust.  HW was a citizen and resident of the

4  United Kingdom, and the elderly uncle of Smith's spouse at the time.  Smith was designated as the

5  "Trust Protector" of the Excelsior Trust, which gave him the power to appoint and remove the Trustee.

6  The Beneficiaries of Excelsior Trust were Smith, members of Smith's family, and unnamed charities.

7        10.       The initial Trustee of Excelsior Trust was Cititrust, International, Inc. ("Cititrust"), a

8  Belizean corporation.  Cititrust was eventually replaced as the Trustee of Excelsior Trust by another

9  Belizean entity, Orion Corporate & Trust Services, Ltd ("Orion").  Both Cititrust and Orion were in the

10  business of acting as an institutional, non-custodial, trustees for trusts formed in Belize by third parties.

11        11.       The Managing Director of Flash Holdings was Serco Management, Ltd ("Serco").  Serco

12  is a subsidiary of ATU General Trust (BVI), Ltd. ("ATU"), both of which were companies in the British

13  Virgin Islands ("BVI") that provided trust management services.

14        12.       As a general partner of VEF II, Flash Holdings received distributions, including carried

15  interest, during the calendar years 2010, 2011, 2012, 2013, and 2014.  The distributions to Flash

16  Holdings were transferred to bank accounts in Switzerland and the BVI, and were not timely reported to

17  the United States Department of the Treasury, Internal Revenue Service ("IRS"), as income on any

18  United States income tax return.

19  COUNT ONE:          (18 U.S.C. § 371 – Conspiracy – 1999-2015)

20        13.       The allegations set forth in paragraphs 1 through 12 of this Indictment are re-alleged and

21  incorporated as if set forth fully herein.

22        14.       From on or about December 1, 1999, to on or about October 20, 2015, in the Northern

23  District of California and elsewhere, the defendant,

24                                CARLOS E. KEPKE,

25  did unlawfully, voluntarily, and willfully conspire and agree with Smith, and others known and

26  unknown to the Grand Jury, to defraud the United States by impeding, impairing, obstructing, and

27  defeating the lawful Government functions of the Internal Revenue Service of the Department of the

28  Treasury in the ascertainment, computation, assessment, and collection of the revenue: namely,

INDICTMENT                            3

EXHIBIT A-94

individual federal income taxes due and owing by Smith for the tax years 2005 through and including 2014.

### Object of the Conspiracy

15.    It was the object of the conspiracy for KEPKE and Smith to conceal a portion of Smith's income from the IRS, thus evading the statutory assessment of the appropriate tax due and owing on this income.  This was accomplished using offshore entities including Excelsior Trust and Flash Holdings, which were created and managed with KEPKE's direction and assistance to hold assets including a portion of Smith's investments in Vista funds, and to create the appearance that income generated by those investments, which was deposited into foreign bank accounts held in the name of Flash Holdings, but for the benefit of Smith, was not taxable to Smith, when in reality, as KEPKE knew, Smith actually earned this income, and retained full dominion and control over it.

### Manner & Means

The manner and means by which the scheme was sought to be accomplished included, among others, the following:

16.    It was part of the conspiracy that in or about 1999, KEPKE was retained and paid by Smith to create and manage offshore entities to conceal from the IRS income Smith earned as a result of his investments in Vista funds through Flash Holdings.

17.    It was further part of the conspiracy that in or about 1999, KEPKE was retained and paid by Smith to create Excelsior Trust in Belize and Flash Holdings in Nevis.  The purposes of forming these entities included: Concealing the fact that Smith held investments in Vista funds through Flash Holdings; creating and maintaining a false paper trail indicating that HW was the true Settlor of Excelsior Trust; creating and maintaining a false paper trail indicating that Flash Holdings and Excelsior Trust were independently managed by Cititrust, Orion, Serco, and other offshore service providers rather than by Smith, directly or through KEPKE; and opening offshore bank accounts in the name of, or for the benefit of, Flash Holdings, into which Smith could deposit income and assets he wished to conceal from the IRS – all for the purpose of evading the payment of income taxes.

18.    It was further part of the conspiracy that half of Smith's 8 percent general partnership interest in VEF II was assigned to Flash Holdings.

INDICTMENT                                        4

EXHIBIT A-94

19.     It was further part of the conspiracy that KEPKE directed Smith to designate, and assisted Smith in designating, an elderly, foreign relative who would never live in the United States to act as Settlor of Excelsior Trust.  KEPKE and Smith caused an individual with the initials of HW to fill that role.  In reality, HW had nothing more than a nominal role in the formation, management, or maintenance of Excelsior Trust, and Smith was the true creator of Excelsior Trust.

20.     It was further part of the conspiracy that KEPKE directed Smith to hire and pay, and assisted Smith in hiring and paying, Cititrust and Orion to serve as nominal Trustees of Excelsior Trust.  In reality, Smith was the beneficial owner of Excelsior Trust and he retained complete dominion and control over Excelsior Trust and all of its assets, either directly or through KEPKE.  Neither Cititrust nor Orion independently managed or controlled assets held in the names of Excelsior Trust or Flash Holdings.  Instead, Cititrust and Orion at all times took direction from Smith, either directly or through KEPKE, with respect to assets held in the names of Excelsior Trust or Flash Holdings.

21.     It was further part of the conspiracy that KEPKE directed Smith to hire and pay, and assisted Smith in hiring and paying, Serco to serve as the nominal Managing Director of Flash Holdings.  In reality, Smith was the beneficial owner of Flash Holdings and he retained complete dominion and control over Flash Holdings and all of its assets, either directly or through KEPKE.  Serco did not independently manage or control assets held in the names of Excelsior Trust or Flash Holdings.  Instead, Serco at all times took direction from Smith, either directly or through KEPKE, with respect to assets held in the names of Excelsior Trust or Flash Holdings.

22.     It was further part of the conspiracy that on or about November 19, 2004, KEPKE directed Smith to open, and assisted Smith in opening, a bank account at a bank in the BVI, account ***920, in the name of "Flash Holdings LLC" ("the BVI Account"), for the purpose of concealing from the IRS income earned by Smith.  The signatories on this account were individuals employed by Serco who, at all times took direction from Smith, either directly or through KEPKE, with respect to the BVI Account.  Smith was the beneficial owner of the BVI Account.

23.     It was further part of the conspiracy that on or about February 14, 2007, Smith opened, and caused to be opened, a bank account at Banque Bonhôte in Neuchâtel, Switzerland, account ***808, in the name of "[VEF II] FBO Flash Holdings, LLC" ("the Banque Bonhôte Account") for the purpose

EXHIBIT A-94

1   of concealing from the IRS income earned by Smith.  Smith had sole signatory authority over, and was

2   the beneficial owner of, the Banque Bonhôte Account.

3       24.     It was further part of the conspiracy that, over time, Flash Holdings became a partner or

4   member of many Vista funds in addition to VEF II.  As a partner and member of Vista funds, Flash

5   Holdings received distributions, including carried interest, during the calendar years 2010, 2011, 2012,

6   2013, and 2014.  The distributions to Flash Holdings were transferred from Vista to the BVI Account

7   and the Banque Bonhôte Account.  From in or about 2005, through and including 2014, the amount of

8   carried interest and capital gain income distributed by Vista to these bank accounts was approximately

9   $225,000,000.  In reality, these funds represented income earned by Smith, but this income was not

10  timely reported on any United States income tax return.

11      25.     It was further part of the conspiracy that KEPKE directed Smith to use, and assisted

12  Smith in using, assets held in the names of Excelsior Trust and Flash Holdings for his own personal

13  benefit, including to purchase and improve a home in Sonoma, California, a ranch complex in Gilpin

14  County, Colorado, and several properties in Megève France.

15      26.     It was further part of the conspiracy that Smith retained a professional income tax return

16  preparation firm in the Northern District of California which prepared his 2012, 2013, and 2014 United

17  States Individual Income Tax Returns, Forms 1040.  Based on KEPKE's advice, Smith did not disclose

18  to his income tax return preparers his true ownership and control of assets held in the names of Excelsior

19  Trust and Flash Holdings, or the income distributed by Vista to the BVI Account and the Banque

20  Bonhôte Account.

21      27.     It was further part of the conspiracy that from in or about 2007 through and including

22  2015, Smith paid KEPKE approximately $1,000,000 to compensate KEPKE for creating, managing, and

23  maintaining Excelsior Trust, Flash Holdings, and other related services and expenses.

24      28.     It was further part of the conspiracy that, beginning no later than 2009, KEPKE charged

25  Smith an annual fee to purge, or "Securitize," his file related to Smith, Excelsior Trust, and Flash

26  Holdings by destroying records.

27

28

INDICTMENT                                   6

EXHIBIT A-94

**Overt Acts**

In furtherance of the scheme, and to effect the objects thereof, the following overt acts were committed within the Northern District of California, and elsewhere:

29.     On or about December 8, 1999, KEPKE sent Cititrust a draft Trust Indenture which he had drafted to be used to establish a trust in Belize for the benefit of Smith and his family, for which Smith would pay Cititrust $30,000.

30.     On or about March 6, 2000, KEPKE informed Cititrust that HW was to be the Settlor of Smith's trust, which was to be named Excelsior Trust, and instructed Cititrust to finalize the Trust Indenture, and forward three copies to Smith at his personal residence in California for execution.

31.     On or about March 9, 2000, KEPKE, and others, caused Flash Holdings to be incorporated in Nevis, and caused Serco to be designated as the Managing Director of Flash Holdings.

32.     On or about March 10, 2000, KEPKE instructed Cititrust that Smith would send Cititrust a check for $30,000 in payment of its fees for the creation of Excelsior Trust, and that $15,000 of this fee was to be wired to an account KEPKE maintained in the name of "Garfield Investments."

33.     On or about March 13, 2000, KEPKE directed Smith to send $7,500 worth of money orders to Cititrust as the initial corpus of Excelsior Trust.

34.     On or about March 29, 2000, KEPKE directed and caused the Excelsior Trust Indenture to be executed.

35.     On or about March 30, 2000, the Partnership Agreement for VEF II (initially called "Emerging Technologies Investment Fund, L.P.,") was executed listing "Flash Holdings, LLC," as a general partner in the fund with a 4 percent general partnership interest.

36.     On or about April 8, 2000, as directed by KEPKE, Smith sent a $30,000 personal check, drawn on his account at Citibank in New York to Cititrust as payment for the creation of Excelsior Trust in Belize.

37.     On or about January 16, 2003, KEPKE requested and received from Cititrust eleven (11) unsigned and unexecuted bearer shares for Flash Holdings.

38.     On or about November 19, 2004, KEPKE advised and assisted Smith in opening, and causing to be opened, the BVI Account.

EXHIBIT A-94

39.     On or about February 14, 2007, Smith opened, and caused to be opened, the Banque Bonhôte Account.

40.     On or about February 10, 2009, KEPKE directed and caused the shares of Flash Holdings to be changed from bearer shares to registered shares.

41.     On or about May 7, 2009, KEPKE forwarded to Cititrust a document entitled "Written Resolution of the Sole Member" of Flash Holdings changing the title of Serco from "Managing Director" of Flash Holdings to "Sole Manager" of Flash Holdings, and instructed Cititrust to sign and execute the document "on behalf of Excelsior Trust as the Sole Member" of Flash Holdings.

42.     On or about November 25, 2009, KEPKE advised and assisted Smith in notifying Cititrust in writing that he was terminating their position as Trustee of Excelsior Trust, and that Orion had been designated the successor Trustee.

43.     From in or about November 2010 through and including January 2011, KEPKE advised and assisted Smith in forming Flash Property Holding, LLC, in Nevis, White Mulberry SARL in Luxembourg, and SCI Thisbe and SCI Pyramus in France, for the purpose of holding title to two ski condominiums and a commercial building in Mègeve, France ("Mègeve Properties").

44.     In or about December 2010, Smith transferred approximately €5.3 million from the Banque Bonhôte Account to a third party as payment for the purchase of the Mègeve Properties.

45.     On or about May 2, 2012, KEPKE falsely informed a third party that Smith was not a beneficial owner of Flash Holdings.

46.     From in or about 2005 through and including 2014, as advised by KEPKE, Smith directed personnel and employees at Vista to distribute approximately $225,000,000 in capital gains and carried interest income to Flash Holdings, including the following:

EXHIBIT A-94

| Approximate Date | Approximate Amount | Distribution From | Distribution To |
|---|---|---|---|
| December 24, 2010 | $2,023,788 | VEF II | Banque Bonhôte account ***808-1 |
| December 14, 2011 | $1,482,875 | Vista Equity Partners III, LLC | Banque Bonhôte account ***808-1 |
| December 23, 2011 | $1,975,279 | VEF II | Banque Bonhôte account ***808-1 |
| March 2, 2012 | $2,009,710 | VEF II | Banque Bonhôte account ***808-1 |
| August 24, 2012 | $4,000,000 | Vista Equity Partners Fund III, GP, LLC | The BVI Account |
| August 24, 2012 | $8,861,414 | Vista Equity Partners Fund III, GP, LLC | Banque Bonhôte account ***808-1 |
| November 20, 2012 | $7,664,553 | Vista Equity Partners Fund III, GP, LLC | Banque Bonhôte account ***808-1 |
| December 24, 2012 | $8,615,133 | Vista Equity Partners Fund III, GP, LLC | Banque Bonhôte account ***808-1 |
| November 7, 2013 | $16,734,975 | Vista Equity Partners Fund III, GP, LLC | Banque Bonhôte account ***808-1 |
| November 22, 2013 | $2,123,427 | VEF II | Banque Bonhôte account ***808-1 |
| November 22, 2013 | $237,149 | VEF II | Banque Bonhôte account ***808-1 |
| November 18, 2014 | $7,060,603 | Vista Equity Partners Fund III, GP, LLC | Banque Bonhôte account ***808-1 |

47.     From in or about 2007 through and including 2015, Smith directed and caused approximately $1,000,000 to be transferred to KEPKE's bank account at Amegy Bank of Texas in Houston, Texas, in payment of KEPKE's fees and expenses, including the following:

| Approximate Date | Approximate Amount | Distribution From | Distribution To |
|---|---|---|---|
| July 13, 2012 | $75,000 | Banque Bonhôte account ***808-1 | Amegy Bank |
| March 19, 2013 | $20,000 | Banque Bonhôte account ***808-1 | Amegy Bank |
| May 23, 2013 | $40,000 | Banque Bonhôte account ***808-1 | Amegy Bank |
| September 23, 2013 | $70,000 | Domestic Bank Account | Amegy Bank |
| November 8, 2013 | $57,000 | Domestic Bank Account | Amegy Bank |

INDICTMENT                                    9

EXHIBIT A-94

| January 7, 2014 | $75,000 | Domestic Bank Account | Amegy Bank |
|---|---|---|---|
| January 22, 2014 | $57,000 | Domestic Bank Account | Amegy Bank |
| July 31, 2014 | $71,000 | Domestic Bank Account | Amegy Bank |
| February 20, 2015 | $84,000 | Domestic Bank Account | Amegy Bank |

48.     On or about October 16, 2013, in the Northern District of California, Smith directed and caused to be prepared and filed with the IRS a joint U.S. Individual Income Tax Return, Form 1040, for the tax year 2012, which he knew to be false, to wit: Based on KEPKE's advice, Smith failed to accurately report and pay income tax on capital gains and carried interest income distributed and deposited into foreign bank accounts held in the name of, or for the benefit of, Flash Holdings.

49.     On or about October 17, 2014, in the Northern District of California, Smith directed and caused to be prepared and filed with the IRS a joint U.S. Individual Income Tax Return, Form 1040, for the tax year 2013, which he knew to be false, to wit: Based on KEPKE's advice, Smith failed to accurately report and pay income tax on capital gains and carried interest income distributed and deposited into foreign bank accounts held in the name of, or for the benefit of, Flash Holdings.

50.     On or about October 20, 2015, in the Northern District of California, Smith directed and caused to be prepared and filed with the IRS a joint U.S. Individual Income Tax Return, Form 1040, for the tax year 2014, which he knew to be false, to wit: Based on KEPKE's advice, Smith failed to accurately report and pay income tax on capital gains and carried interest income distributed and deposited into foreign bank accounts held in the name of, or for the benefit of, Flash Holdings.

All in violation of Title 18, United States Code, Section 371.

COUNTS TWO TO FOUR:   (26 U.S.C. § 7206(2) – AIDING AND ASSISTING IN THE PREPARATION OF MATERIALLY FALSE TAX RETURNS)

51.     The United States re-alleges the facts set forth in paragraphs 1 through 12 and 16 through 50 as if fully set forth herein.

52.     From on or about December 1, 1999, through on or about October 20, 2015, in the Northern District of California and elsewhere, the defendant,

CARLOS E. KEPKE,

INDICTMENT                                    10

EXHIBIT A-94

willfully aided and assisted in, and procured, counseled, and advised the preparation and presentation to the Internal Revenue Service of United States Individual Income Tax Returns, Form 1040, for the taxpayer and calendar years set forth below, which were false and fraudulent as to a material matter. The tax returns failed to report income distributed and deposited into foreign bank accounts held in the name of Flash Holdings, for the benefit of the taxpayer, as part of a foreign trust structure created by KEPKE, devised to conceal the taxpayer's true ownership and control over said income.

| Count | Approximate Filing Date | Taxpayer | Year | False Item |
|-------|------------------------|----------|------|------------|
| **Two** | October 16, 2013 | Smith | 2012 | Line 13, Capital Gains or Losses |
| **Three** | October 17, 2014 | Smith | 2013 | Line 13, Capital Gains or Losses |
| **Four** | October 20, 2015 | Smith | 2014 | Line 13, Capital Gains or Losses |

All in violation of Title 26, United States Code, Section 7206(2); Title 18, United States Code, Section 2; and *Pinkerton v. United States*, 328 U.S. 640 (1946) (coconspirator liability).


DATED:  April 15, 2021                    A TRUE BILL

                                          /s/
                                          FOREPERSON

STEPHANIE M. HINDS
Acting United States Attorney

s/ Michael G. Pitman
MICHAEL G. PITMAN
Assistant United States Attorney


Approved as to Form

s/ Corey J. Smith
COREY J. SMITH
Senior Litigation Counsel
Tax Division, U.S. Department of Justice

INDICTMENT                    11

# EXHIBIT A-94

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☐ INFORMATION  ☒ INDICTMENT

☐ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location

**NORTHERN DISTRICT OF CALIFORNIA**

SAN FRANCISCO DIVISION

### OFFENSE CHARGED

18 U.S.C. § 371 – Conspiracy
26 U.S.C. § 7206(2) – Aiding and Assisting the Filing of a Materially False Income Tax Return

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY: 18 U.S.C. § 371- 5 yrs prison, $250k fine, 3 yrs sup. rel., $100 special assessment; 26 U.S.C. § 7206(2) - 3 yrs prison, $250k fine, 1 yr sup. rel., $100 special assessment

──────── DEFENDANT - U.S ────────

CARLOS E. KEPKE

DISTRICT COURT NUMBER
3:21-cr-00155 JD

**FILED**

Apr 15 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

INTERNAL REVENUE SERVICE

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40.  Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:        SHOW
  ☐ U.S. ATTORNEY  ☐ DEFENSE    DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant        MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person
Furnishing Information on this form    STEPHANIE M. HINDS

☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)    Michael G. Pitman, AUSA

### DEFENDANT

IS *NOT* IN CUSTODY
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

IS IN CUSTODY
4) ☐ On this charge

5) ☐ On another conviction      ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges
  If answer to (6) is "Yes", show name of institution

Has detainer  ☐ Yes    If "Yes"
been filed?   ☒ No     give date filed

DATE OF
ARREST          Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED      Month/Day/Year
TO U.S. CUSTODY

☐ This report amends AO 257 previously submitted

## ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☒ SUMMONS  ☐ NO PROCESS*  ☐ WARRANT    Bail Amount:

If Summons, complete following:
☒ Arraignment  ☒ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

Date/Time: 4/22/21 at 10:30 am    Before Judge: Jacqueline Corley

Comments:

# EXHIBIT

# A-95

EXHIBIT A-95

RP-2020-613130
12/14/2020  ER  $34.00

## STATUTORY DURABLE POWER OF ATTORNEY
### EFFECTIVE UPON EXECUTION

<u>NOTICE:</u>   THE POWERS GRANTED BY THIS DOCUMENT ARE BROAD AND SWEEPING. THEY ARE EXPLAINED IN THE DURABLE POWER OF ATTORNEY ACT, SUBTITLE P, TITLE 2, TEXAS ESTATES CODE.   THIS DOCUMENT DOES NOT AUTHORIZE ANYONE TO MAKE MEDICAL AND OTHER HEALTH CARE DECISIONS FOR THE PRINCIPAL.  THIS POWER OF ATTORNEY MAY BE REVOKED AT ANY TIME.  IF YOU WANT YOUR AGENT TO HAVE THE AUTHORITY TO SIGN HOME EQUITY LOAN DOCUMENTS ON YOUR BEHALF, THIS POWER OF ATTORNEY MUST BE SIGNED BY YOU AT THE OFFICE OF THE LENDER, AN ATTORNEY AT LAW, OR A TITLE COMPANY.

You should select someone you trust to serve as your agent.  Unless you specify otherwise, generally the agent's authority will continue until:

(1)    you die or revoke the power of attorney;
(2)    your agent resigns, is removed by court order, or is unable to act for you; or
(3)    a guardian is appointed for your estate.

I, Robert Theron Brockman, live at 333 W. Friar Tuck Lane, Houston, Texas 77024.  I appoint Dorothy Kay Brockman as my agent to act for me in any lawful way with respect to all of the following powers, except for any I have crossed out below.  If Dorothy Kay Brockman dies, becomes incapacitated, resigns, or refuses to act, I name Robert Theron Brockman II as my agent to act for me in any lawful way with respect to all of the following powers, except for any I have crossed out below.

Real Property Transactions;
Tangible Personal Property Transactions;
Stock and Bond Transactions;
Commodity and Option Transactions;
Banking and Other Financial Institution Transactions;
Business Operating Transactions;
Insurance and Annuity Transactions;
Estate, Trust, and Other Beneficiary Transactions;
Claims and Litigation;
Personal and Family Maintenance;
Benefits from Social Security, Medicare, Medicaid, or Other Governmental
    Programs or Civil or Military Services;
Retirement Plan Transactions;
Tax Matters; and
Digital Assets and the Content of an Electronic Communication.

IF NO POWER LISTED ABOVE IS CROSSED OUT, THIS DOCUMENT SHALL BE CONSTRUED AND INTERPRETED AS A GENERAL POWER OF ATTORNEY AND MY AGENT SHALL HAVE THE POWER AND AUTHORITY TO PERFORM OR UNDERTAKE ANY ACTION I COULD PERFORM OR UNDERTAKE IF I WERE PERSONALLY PRESENT.

YDK:4852-6723-8843.2

CTT20734026

RP-2020-613130

## EXHIBIT A-95

RP-2020-613130

I.   **Additional Specific Powers.**

A.   <u>Trust for My Benefit.</u>  My agent shall have the power to transfer any of my property to a revocable or irrevocable trust I created for my own benefit.  In addition, my agent may establish (and, if permitted, amend) a revocable or irrevocable trust for my benefit, upon such terms and for such purposes as my agent determines are in my best interest and consistent with my estate plan then in existence, and may transfer any of my property to such a trust.  I specifically authorize my agent to amend the trust agreements establishing the Robert T. Brockman Charitable Trust and the Robert T. Brockman Management Trust to the same extent I could have done so under each such agreement.

B.   <u>Insurance and Retirement Plans.</u>  My agent shall have the power to designate or change the beneficiary of an insurance contract, annuity contract or retirement plan, except that an agent may be a named beneficiary of the contract or plan or an extension, renewal, or substitute for the contract or plan only to the extent the agent was a beneficiary named under a contract or plan before this Power of Attorney became effective.

C.   <u>Ratification and General Grant of Power.</u>  I hereby ratify and confirm all that my agent may do pursuant to this Power of Attorney.  I recognize that powers of attorney are sometimes strictly construed and it is not my intention by listing the above-enumerated powers to limit the power and authority of my agent.  In addition to the above-enumerated powers, except as specifically provided above, my agent is authorized and empowered, for me and in my name, to do any and every act and exercise any and every power that I might or could do or exercise through any other person and that my agent shall deem proper or advisable.  I intend to vest in my agent a full and universal power of attorney.

II.   **Other Powers of Attorney.**  The validity of this Power of Attorney shall not be affected in any manner by reason of the execution, at any time, of powers of attorney by me in favor of persons other than those named herein.

III.   **Reliance on Affidavit of Lack of Knowledge of Termination of Power.**  My agent may execute an affidavit stating that he did not have actual knowledge of revocation of this Power of Attorney by reason of my death, the qualification of a guardian of my estate, divorce, marriage annulment, or pursuant to the following Paragraph at the time he exercised this Power of Attorney, and such affidavit shall be conclusive proof as between my agent and another person of my agent's lack of actual knowledge of the revocation of this Power of Attorney.

IV.   **Revocation.**  I agree and represent to those dealing with my agent that this Power of Attorney may be voluntarily revoked only by written revocation recorded in the Official Public Records of Real Property (Deed Records) of Harris County, Texas.  Revocation of this Power of Attorney is not effective as to a third party until the third party receives actual notice of the revocation.

YDK:4852-6723-8843.2

# EXHIBIT A-95

V. **Agreement as to Third Party Reliance.** I agree that any third party who receives a copy of this Power of Attorney may act under it.

VI. **Indemnities.** I agree to indemnify the third party for any claims that arise against the third party because of reliance on this Power of Attorney. I authorize my agent to indemnify and hold harmless any third party who accepts and acts under this Power of Attorney.

VII. **Self-Dealing and Exculpation.** My agent may enter into any transaction authorized by this Power of Attorney despite the fact that another party to such transaction may be my agent (or a person related thereto) acting individually or in some other capacity. My agent shall be released and held harmless for any action taken under this Power of Attorney or for failing to take any action as my agent if such act or omission is done in good faith and without gross negligence.

VIII. **Effective Date.** This Power of Attorney shall be effective immediately. It is not affected by my subsequent disability or incapacity and shall remain effective in the event of my disability or incapacity.

Signed this 20 day of JULY, 2020.

_R. T. Brockman_
Robert Theron Brockman

STATE OF COLORADO

COUNTY OF PITKIN

This instrument was acknowledged before me on July 20, 2020 by Robert Theron Brockman.

_Lori Moschet_
Notary Public in and for
the State of Colorado

Lori Moschet
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID# 20074040500
MY COMMISSION EXPIRES 10/29/2023

RP-2020-613130

-3-

YDK:4852-6723-8843.2

EXHIBIT A-95

## IMPORTANT INFORMATION FOR AGENT

**Agent's Duties**

When you accept the authority granted under this power of attorney, you establish a "fiduciary" relationship with the principal. This is a special legal relationship that imposes on you legal duties that continue until you resign or the power of attorney is terminated, suspended, or revoked by the principal or by operation of law. A fiduciary duty generally includes the duty to:

(1)   act in good faith;
(2)   do nothing beyond the authority granted in this power of attorney;
(3)   act loyally for the principal's benefit;
(4)   avoid conflicts that would impair your ability to act in the principal's best interest; and
(5)   disclose your identity as an agent when you act for the principal by writing or printing the name of the principal and signing your own name as "agent" in the following manner:
(Principal's Name) by (Your Signature) as Agent

In addition, the Durable Power of Attorney Act (Subtitle P, Title 2, Estates Code) requires you to:

(1)   maintain records of each action taken or decision made on behalf of the principal;
(2)   maintain all records until delivered to the principal, released by the principal, or discharged by a court; and
(3)   if requested by the principal, provide an accounting to the principal that, unless otherwise directed by the principal or otherwise provided in the Special Instructions, must include:
    (A)   the property belonging to the principal that has come to your knowledge or into your possession;
    (B)   each action taken or decision made by you as agent;
    (C)   a complete account of receipts, disbursements, and other actions of you as agent that includes the source and nature of each receipt, disbursement, or action, with receipts of principal and income shown separately;
    (D)   a listing of all property over which you have exercised control that includes an adequate description of each asset and the asset's current value, if known to you;
    (E)   the cash balance on hand and the name and location of the depository at which the cash balance is kept;
    (F)   each known liability;
    (G)   any other information and facts known to you as necessary for a full and definite understanding of the exact condition of the property belonging to the principal; and
    (H)   all documentation regarding the principal's property.

YDK:4852-6723-8843.2

EXHIBIT A-95

**Termination of Agent's Authority**

You must stop acting on behalf of the principal if you learn of any event that terminates or suspends this power of attorney or your authority under this power of attorney. An event that terminates this power of attorney or your authority to act under this power of attorney includes:

(1)    the principal's death;

(2)    the principal's revocation of this power of attorney or your authority;

(3)    the occurrence of a termination event stated in this power of attorney;

(4)    if you are married to the principal, the dissolution of your marriage by a court decree of divorce or annulment or declaration that your marriage is void, unless otherwise provided in this power of attorney;

(5)    the appointment and qualification of a permanent guardian of the principal's estate unless a court order provides otherwise; or

(6)    if ordered by a court, your removal as agent under this power of attorney.

An event that suspends this power of attorney or your authority to act under this power of attorney is the appointment and qualification of a temporary guardian unless a court order provides otherwise.

**Liability of Agent**

The authority granted to you under this power of attorney is specified in the Durable Power of Attorney Act (Subtitle P, Title 2, Estates Code). If you violate the Durable Power of Attorney Act or act beyond the authority granted, you may be liable for any damages caused by the violation or subject to prosecution for misapplication of property by a fiduciary under Chapter 32 of the Texas Penal Code.

**THE AGENT, BY ACCEPTING OR ACTING UNDER THIS POWER OF ATTORNEY, ASSUMES THE FIDUCIARY AND OTHER LEGAL RESPONSIBILITIES OF AN AGENT.**

RP-2020-613130

YDK:4852-6723-8843.2

EXHIBIT A-95

RP-2020-613130

# Pages 6

12/14/2020 02:40 PM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

TENESHIA HUDSPETH

COUNTY CLERK

Fees   $34.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.

COUNTY CLERK
HARRIS COUNTY, TEXAS