# EXHIBIT

# C-32

Exhibit C-32

[EXECUTION COPY]

## AMENDED AND RESTATED

## EMPLOYMENT AGREEMENT

This AMENDED AND RESTATED EMPLOYMENT AGREEMENT (the "Agreement"), was originally entered into on July 7, 2004 (the "Original Effective Date"), was amended and restated on September 1, 2009, was amended and restated on August 1, 2013, and is hereby amended and restated effective January 1st, 2014, (the "Effective Date") by and between UNIVERSAL COMPUTER SYSTEMS HOLDING, INC., a Delaware corporation (formerly Universal Computer Consulting Holding, Inc., and hereafter, with any successor, the "Company"), and ROBERT T. BROCKMAN (the "Executive").

## W I T N E S S E T H:

WHEREAS, the Company recognizes the valuable services rendered to the Company by the Executive; and

WHEREAS, in October, 2006, The Reynolds and Reynolds Company merged into a wholly-owned subsidiary of the Company in a transaction valued at approximately $2.8 billion which substantially increased the size and complexity of the Company's business and generated significant integration requirements that are ongoing; and

WHEREAS, the Company recognizes that the impact of the national economic recession on the automotive industry led to substantial additional challenges faced by the Company; and

WHEREAS, the Company, under the leadership of the Executive, achieved a 40% increase in EBITDA ($364M to $512M) in the years 2006 to 2012 in spite of a loss in sales revenues of 23% caused by the effects of the worst recession in the past 50 years; and

WHEREAS, the Company recognizes that the above performance is extraordinary; and

WHEREAS, the Company recognizes that the financial plan that has been in place since October, 2006 has been to maximize cash flow to pay down the $2.6 billion in debt that was incurred in the acquisition of Reynolds; and

WHEREAS, the Company recognizes that under the leadership of the Executive, this debt has been successfully paid down such that the final payoff is expected at the end of the first quarter of 2016; and

WHEREAS, the Company recognizes that now the valuation of the Company depends largely on its annual EBITDA and its ability to increase annual EBITDA steadily; and

WHEREAS, the Company has put into place a KEY OFFICER LONG-TERM INCENTIVE PROGRAM for eight officers that are the leaders for the next phase of growth that gives them incentive to grow annual EBITDA; and

ET_0001976309

Exhibit C-32

WHEREAS,   the Company is now amending this Agreement to focus the efforts of the Executive on increasing annual EBITDA rather than pre-tax income; and

WHEREAS, the Company believes it is prudent to secure the continuity of current leadership to provide the skills and experience necessary to meet the challenges that are expected to face the Company in uncertain economic conditions for the foreseeable future; and

WHEREAS, the Company desires to secure the experience, abilities and continued service of the Executive by entering into this Agreement upon the terms and conditions specified herein; and

WHEREAS, the Executive is willing to enter into this Agreement upon the terms and conditions specified herein; and

WHEREAS, Spanish Steps Holding Ltd. is the principal stockholder of the Company and for that reason is concerned with the continuity of employment of the Executive due to the fact that the Executive is the Chairman/CEO of the Company; and

WHEREAS, Spanish Steps Holding Ltd. is executing this Agreement for the purpose of acknowledging its guarantee pursuant to Section 17 herein;

NOW, THEREFORE, in consideration of the promises, the terms and provisions set forth herein, the mutual benefits to be gained by the performance thereof and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

SECTION 1.   Employment.  The Company hereby extends the Executive's term of employment, and the Executive hereby accepts such extended employment term, all upon the terms and conditions set forth herein.

SECTION 2.   Term.  Subject to the terms and conditions of this Agreement, the Executive shall be employed by the Company for a period commencing on the Original Effective Date and terminating on December 31, 2023 (the "Primary Term"), unless sooner terminated pursuant to Section 5 of this Agreement.  Following the Primary Term, in the absence of 90 days' written notice from either party, this Agreement shall be automatically extended for consecutive one-year terms ("Secondary Terms").

SECTION 3.   Duties and Responsibilities.

A.   Capacity.  The Executive shall serve in the capacity of Chairman of the Board of Directors and Chief Executive Officer of the Company; provided that the Board of Directors may ask the Executive to step down as Chairman of the Board of Directors at any time. The Executive shall be responsible for the general management of the Company's affairs, shall perform the duties ordinarily expected of a Chairman and Chief Executive Officer and shall also perform such other duties consistent therewith as the Board of Directors of the Company (the "Board") shall, from time to time, reasonably determine.

[ if    PAGE \* Arabic    = 16"834770.04-NYCSR05A - MSW" "" ]

ET_0001976310

## Exhibit C-32

B.     Full-Time Duties.  Excluding any periods of vacation or sick leave to which the Executive is entitled, the Executive shall devote substantially his full business time, attention and energies to the business of the Company.  Notwithstanding anything herein to the contrary, the Executive shall be allowed to (1) manage the Executive's personal investments and affairs, and (2) (a) serve on boards or committees of civic or charitable organizations or trade associations, (b) serve on the board of directors of any corporation or as an advisory director of any corporation, and (c) provide outside business consulting services; provided that such activities do not materially interfere with the proper performance of his duties and responsibilities specified in Section 3(A).

SECTION 4.   Compensation.

A.     Base Salary.  From the Effective Date until the expiration of the term of this Agreement, Executive shall receive an annual base salary (the "Base Salary") of not less than the annual base salary in effect on the Effective Date.  The Base Salary shall be payable by the Company in accordance with the general payroll practices of the Company in effect from time to time.  During the term of this Agreement, the Base Salary shall be reviewed prior to the beginning of each fiscal year of the Company for increase in the discretion of the Board; provided, however, that the Executive shall receive an annual increase not less than the greater of (1) the Consumer Price Index for the Houston SMSA or (2) the average percentage increase during the immediately preceding calendar year in the salaries of those executives of the Company reporting directly to the Executive.

B.     Annual Bonus.  In addition to the Base Salary, the Executive shall be awarded, for each fiscal year or portion thereof during the Primary Term and any Secondary Terms, an Annual Bonus (the "Annual Bonus") equal to 3% of the annual EBITDA of the Company and its subsidiaries for such fiscal year (or applicable portion thereof).  A draw against the estimated Annual Bonus shall be paid monthly during the year.  In the event that the final calculation of the Annual Bonus is greater than the aggregate of the estimated amounts paid, then, within 30 days after the accounting records of the Company are closed for the year-end, but in no event later than March 15th of the calendar year following the year in which such Annual Bonus is earned, an amount equal to such difference will be paid by the Company to the Executive.  In the event that the estimated amounts paid as the Annual Bonus are greater than the Annual Bonus as finally calculated, then the Executive shall, within 30 days after he is informed of the final calculation of the Annual Bonus after the Company's accounting records are closed for the year-end, which notice shall occur no later than the end of the calendar year following the fiscal year to which such Annual Bonus relates, pay an amount equal to such difference to the Company.

C.     Benefits and Bonus Plans.  During the Primary Term and any Secondary Terms, the Executive shall be entitled to participate in all incentive, savings and retirement plans, practices, policies and programs applicable generally to other executive officers of the Company.  The Executive and/or his family, as the case may be, shall be eligible for participation in and shall receive all benefits under welfare benefit plans, practices, policies and programs provided by the Company (including, without limitation, medical, dental, prescription drug, disability, salary continuance, employee life, group life, accidental death and travel insurance plans and programs) to the extent applicable generally to other executive officers of the Company.

-[ PAGE ]-

[ if    PAGE \* Arabic    = 16"834770.04-NYCSR05A - MSW" "" ]

Exhibit C-32

D.     Vacation.   During the Primary Term and any Secondary Terms, the Executive shall be entitled to paid vacation in accordance with the plans, practices, programs and policies of the Company to the extent applicable generally to other executive officers of the Company, but in no event less than twelve weeks each calendar year.

E.     Club Memberships.   The Company will pay the Executive's membership initiation fees, monthly dues and all business-related expenses incurred by the Executive at country and dining clubs of the Executive's choice located within 50 miles of the Company's principal office; provided that no more than three such clubs may be selected by the Executive without prior Company approval.  Any reimbursement provided hereunder shall be paid no later than the earlier of (i) the time prescribed under the Company's applicable policies and procedures, or (ii) the last day of the calendar year following the calendar year in which Executive incurred the reimbursable expense.

F.     Fringe Benefits and Other Perquisites.

(1)     During the Primary Term and any Secondary Terms, the Executive shall be entitled to fringe benefits and perquisites in accordance with the most favorable plans, practices, programs and policies of the Company.

(2)     During the Primary Term and any Secondary Terms, the Executive shall be entitled to receive prompt reimbursement for all reasonable expenses incurred by the Executive in accordance with the most favorable policies, practices and procedures of the Company.  Any reimbursement provided hereunder shall be paid no later than the earlier of (i) the time prescribed under the Company's applicable policies and procedures, or (ii) the last day of the calendar year following the calendar year in which Executive incurred the reimbursable expense.

SECTION 5.   Termination of Employment.

Notwithstanding the provisions of Section 2, the Executive's employment hereunder may terminate under any of the following conditions:

A.     Death.   The Executive's employment under this Agreement shall terminate automatically upon his death.

B.     Disability.   The Executive's employment under this Agreement may be terminated due to his Disability.  "Disability" shall mean the Executive's complete inability to substantially perform his duties for any period of at least 180 consecutive days due to physical or mental incapacity.  The date of termination due to Disability shall be the date the Executive elects to terminate service due to Disability or, if earlier, 30 days from the date that an independent physician selected by the vote of not less than two-thirds of all members of the Board (counting the Executive if he is at such time a member of the Board) determines in good faith and notifies the Executive in writing that the Executive has met the definition of Disability.

-[ PAGE ]-

ET_0001976312

Exhibit C-32

C.    Termination by Company Without Cause.  The Company may terminate the Executive's employment hereunder without Cause (as hereinafter defined) on 90 days' prior written notice to the Executive.

D.    Termination by Company for Cause.    The Executive's employment hereunder may be terminated for Cause by the Company.  For purposes of this Agreement, "Cause" means:

(1)    the final conviction of the Executive for a felony involving moral turpitude (excluding any felony relating to the operation of a motor vehicle) that, at the time of commission, the Executive knew had a reasonable probability of causing a material adverse effect on the Company; or

(2)    the Executive's serious, willful gross misconduct or willful gross neglect of his duties under this Agreement, which, in either case, has resulted, or in all probability is likely to result, in material economic damage to the Company; provided, however, that no action or failure to act by the Executive will constitute "Cause" if the Executive believed in good faith that such action or failure to act was in the best interest of the Company.

Any termination of the Executive's employment by the Company for Cause under this Section 5(D) must be authorized by a vote of at least two-thirds of the members of the Board (counting the Executive if he is at such time a member of the Board).  The Executive shall be given notice by the Board specifying in detail the particular act or failure to act on which the Board is relying in proposing to terminate him for Cause and offering the Executive an opportunity, on a date at least 30 days and not later than 90 days after receipt of such notice, to have a hearing, with counsel, before two-thirds of all members of the Board (counting the Executive if he is at that time a member of the Board), including each of the members of the Board who authorized the termination for Cause.  In the event the Executive accepts the opportunity for a hearing, the Executive's termination under this Section 5(D) shall not be final until the hearing has occurred and the Executive's termination of employment under this Section 5(D) has been reaffirmed by a vote of at least two-thirds of all members of the Board (counting the Executive if he is at that time a member of the Board) following the hearing.

E.    Termination by Executive for Good Reason.    The Executive may terminate his employment hereunder for "Good Reason."  For purposes of this Section 5(E), "Good Reason" for termination shall exist if, without the consent of the Executive, any of the following events occur:

(1)    a reduction in the Executive's Base Salary, a failure to pay an Annual Bonus in accordance with Section 4(B), or the termination or reduction of a benefit under any employee benefit plan or program of the Company in which he participates unless, in the case of a benefit, there is substituted a comparable benefit that

-[ PAGE ]-

ET_0001976313

Exhibit C-32

is economically equivalent to such benefit prior to its termination or reduction, as the case may be;

(2)     either (a) the failure by the Company to continue in effect any incentive or other compensation plan or program in which the Executive is to participate under the terms of this Agreement or (b) the taking of any action by the Company that would adversely affect the Executive's participation in, or materially reduce his benefits under, any such plan or program, unless, in the case of either clause (a) or (b) above, there is substituted a comparable plan or program that is economically equivalent, in terms of the benefit offered to the Executive, to the plan or program being altered, reduced, affected or ended;

(3)     the loss of any of the Executive's titles or positions as described in Section 3(A);

(4)     a significant diminution in the Executive's duties and responsibilities or the assignment to the Executive of duties and responsibilities inconsistent with his positions;

(5)     the relocation of the Company's principal office, or the Executive's own office location as assigned to him by the Company, to a location more than 30 miles from the present location of the Company's principal office;

(6)     the failure of the Company to obtain the unconditional assumption in writing or by operation of law of the Company's obligations to the Executive under this Agreement by any successor prior to or at the time of a reorganization, merger, consolidation, disposition of all or substantially all of the assets of the Company or similar transaction;

(7)     a breach by the Company of this Agreement, which breach continues for more than 30 days following written notice given by the Executive to the Company; or

(8)     a Change of Control of the Company.

F.     <u>Termination by Executive Without Good Reason</u>.  The Executive may terminate his employment hereunder at any time on 6 months written notice to the Company.

SECTION 6.   <u>Change of Control</u>.

A.     A "Change of Control" means the occurrence of any of the following events: (1) the Company shall not be the surviving entity in any merger, consolidation or other reorganization (or survives only as a subsidiary of an entity other than a previously wholly owned subsidiary of the Company), (2) the Company sells, leases or exchanges a majority or

-[ PAGE ]-

ET_0001976314

Exhibit C-32

more (based upon fair market value) of its assets to any other person or entity (other than a wholly owned subsidiary of the Company), (3) the Company is or is to be dissolved and liquidated, (4) any person or entity (including a "group" as contemplated by Section 13(d)(3) of the Securities Exchange Act of 1934, as amended (the "1934 Act"), or persons acting as a group within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), and U.S. Treasury Regulations) acquires or gains ownership or control (including, without limitation, power to vote) of more than 50% of the outstanding shares of the Company's voting stock (based upon voting power), or (5) the first time the following occurs: as a result of or in connection with an election of directors, the persons nominated by Spanish Steps Holding Ltd. shall cease to constitute at least 80% of the members of the Board. It is understood and agreed that the consummation of the transactions as generally described and contemplated in the presentation by Skadden Arps dated as of July 17, 2013 shall constitute a Change of Control under provision (5) above. A "409A Change of Control" is a Change of Control that also constitutes (i) a "change in the ownership," (ii) "change in effective control," or (iii) "change in the ownership of a substantial portion of the assets" of the Company, as those terms are defined in U.S. Treasury Regulations Section 1.409A-3(i)(5).

B.      Upon a Change of Control (1) during the Primary Term or any Secondary Terms and prior to the Executive's termination of employment or (2) within six months of Executive's termination of employment if such termination is prior to the end of the Primary Term or any Secondary Terms and by the Company without Cause or by the Executive for Good Reason, in addition to compensation due and owing under any other section of this Agreement, the Executive shall be paid, on the date of the closing of the transaction that constitutes a Change of Control (other than a Change of Control due solely to a change in the members of the Board of Directors or a Change of Control that does not involve receipt of "Proceeds"), a lump-sum cash payment in an amount equal to 1% of the "Proceeds." "Proceeds" means, in connection with a Change of Control, the sum of the values of all cash, securities, and other property or consideration paid directly or indirectly to the Company or its stockholders by or on behalf of the buyer or party to the merger or reorganization, including the aggregate amount of all debt paid or assumed in connection with such Change of Control (including any debt required to be repaid as a result of such Change of Control and any debt repaid in order to remove any restrictions contained in the documents governing such debt on the ability of the Company to make the payment under this Section 6(B)), or in the event of a dissolution or liquidation, the value distributed to stockholders, but excluding (i) any commissions, fees and expenses incurred or payable by the Company or the selling stockholders of the Company, as applicable, in connection with such Change of Control and (ii) any taxes incurred by the Company in connection with the Change of Control.

SECTION 7.   Payments Upon Termination.

A.      Upon termination of the Executive's employment for any reason prior to the expiration of the Primary Term or any Secondary Terms, the Company shall be obligated to pay, and the Executive shall be entitled to receive:

(1)      all accrued and unpaid Base Salary under Section 4(A) to the date of termination, to be paid in a lump sum within 30 days of termination;

-[ PAGE ]-

ET_0001976315

Exhibit C-32

(2)     any unpaid bonus under Section 4(B) for the fiscal year or performance cycle ending prior to the date of termination, to be paid in a lump sum at the time specified in Section 4(B);

(3)     payment for all accrued but unused or unpaid time off with pay under Section 4, to be paid in a lump sum within 30 days of termination;

(4)     all incurred but unreimbursed expenses for which the Executive is entitled to reimbursement under Section 4, to be paid in a lump sum within 30 days of termination;

(5)     any benefits to which the Executive is entitled under the terms of any applicable incentive, savings and retirement plans, or any other employee benefit plans, practices, policies or programs, or applicable law; and

(6)     the Retirement Benefits and Medical Benefits described under Section 7E, payable in accordance with Section 7E.

(7)     a pro-rata portion of the Annual Bonus for the year in which termination occurs, to be paid no later than March 15th of the calendar year following the year to which such Annual Bonus relates.

B.     Upon termination of the Executive's employment upon the death of Executive pursuant to Section 5(A), the Company shall be obligated to pay, and the Executive shall be entitled to receive:

(1)     all of the amounts and benefits described in Section 7(A); and

(2)     any death benefit payable under a plan or policy provided by the Company.

C.     Upon termination of the Executive's employment upon the Disability of the Executive pursuant to Section 5(B), the Company shall be obligated to pay, and the Executive shall be entitled to receive:

(1)     all of the amounts and benefits described in Section 7(A); provided, however that notwithstanding the foregoing, the Executive shall not be entitled to a pro-rata bonus as described in Section 7(A)(7);

(2)     the Base Salary, at the rate in effect immediately prior to the date of his termination of employment due to Disability, for a period of one year following such termination,

-[ PAGE ]-

ET_0001976316

Exhibit C-32

offset by any payments the Executive receives under the Company's long-term disability plan and any supplements thereto, whether funded or unfunded, which are adopted by the Company for the Executive's benefit, to be paid in accordance with the general payroll practices of the Company in effect immediately prior to termination, but with the first payment to be made on the sixtieth (60th) day following the date of termination, which payment shall consist of all amounts otherwise payable to the Executive pursuant to this subsection (2) between the date of termination and the sixtieth (60th) day following termination of Executive's employment; and

(3)     a bonus award for the fiscal year in which the Executive's termination due to Disability occurs, in an amount equal to the Annual Bonus under Section 4(B) awarded to the Executive in the immediately prior fiscal year, to be paid on the sixtieth (60th) day following the date of termination of the Executive's employment, but not later than March 15th of the year following termination.

In the event a 409A Change of Control occurs after the Executive's termination of employment due to Disability, the Executive shall be entitled to a lump-sum payment of the aggregate amounts (i) specified under clause (2) and (3) of this Section 7(C) and (ii) relating to the Retirement Benefits (as applicable to Executive in this Section 7(C) by virtue of Section 7(C)(1)) that have not been paid to the Executive (with the present value of payments under clauses (1), (2) and (3), as applicable, calculated using a discount rate equal to interest at the prime rate published in the *Wall Street Journal* for the first business day of the month in which the 409A Change of Control occurs, and the mortality table used to determine actuarial equivalents under the Company's qualified defined benefit plan payable within five days after the 409A Change of Control, and all other benefits payable pursuant to this Section 7(C), including, without limitation, all benefits payable pursuant to Section 7(A)(5) under plans subject to the Employee Retirement Income Security Act, shall continue to be paid in accordance with the terms hereof.

Payments under Section 7(C), with the exception of amounts due pursuant to Section 7(C)(1), are conditioned on the execution by the Executive of the release attached hereto as Exhibit A of all employment-related claims within sixty (60) days following the date of the Executive's termination of employment, which release shall be provided to Executive within seven (7) days of termination of employment and shall be substantially in the form attached hereto as Exhibit A; provided, however, that such release shall be contingent upon the Company's satisfaction of all terms and conditions of this Agreement.

D.     Upon termination of the Executive's employment: (1) by the Company without Cause pursuant to Section 5(C); or (2) by the Executive for Good Reason pursuant to Section 5(E), the Company shall be obligated to pay, and the Executive shall be entitled to receive:

ET_0001976317

Exhibit C-32

(1)     all of the amounts and benefits described in Section 7(A);

(2)     Base Salary for the remaining Primary Term or, if applicable, the Secondary Term in which the date of termination occurs, to be paid in accordance with the general payroll practices of the Company in effect immediately prior to termination;

(3)     Bonuses for each fiscal year during the remainder of the Primary Term or, if applicable, the Secondary Term in which the date of termination occurs (each, a "Severance Bonus"), with each Severance Bonus to be equal to the Annual Bonus awarded under Section 4(B) to the Executive for the fiscal year ending immediately prior to the year in which the Executive's termination occurs, and with such Severance Bonuses to be paid on each March 15th in respect of the applicable prior fiscal year.

In addition to the benefits mentioned above, a termination by the Company without Cause or by the Executive with Good Reason shall be deemed an approved early retirement for purposes of any retirement or pension plans of the Company.

E.     Following a termination of the Executive's employment for any reason, the Company shall provide the Executive with a "Retirement Benefit" of a monthly payment equal to one twelfth of 50% of the sum of the amounts described in Sections 4(A) and 4(B) during Executive's life and, if the Executive predeceases his wife, the Executive's wife's life.  In addition, the Company shall provide continued coverage for the rest of the Executive and his wife's life under the Company health plans, as in effect from time to time and to the extent applicable generally to other executive officers of the Company (the "Medical Benefits"); provided that notwithstanding the above, in the event such continued coverage, by reason of change in the applicable law, may, in the Company's reasonable view, result in tax or other penalties on the Company, this provision shall terminate and the parties shall, in good faith, negotiate for a substitute provision that provides substantially similar benefit to Employee but does not result in such tax or other penalties.  For purposes of this Section 7E, the amounts described in Section 4(A) and 4(B) shall be equal to those that were paid to the Executive in respect of the fiscal year immediately preceding the year in which the Executive's termination of employment occurred.  The cash component of the Retirement Benefit described in Section 7(E)(i) shall be paid in monthly installments  beginning 30 days after the date of termination of the Executive's employment.

F.     <u>Certain Additional Payments by the Company</u>.

(1)     Anything in this Agreement to the contrary notwithstanding, in the event it shall be determined that any payment, benefit or distribution by the Company to or for the benefit of the Executive (whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise,

[ if    PAGE \* Arabic    = 16"834770.04-NYCSR05A - MSW" "" ]

ET_0001976318

# Exhibit C-32

but determined without regard to any additional payments required under this Section 7(F)) (a "Payment") would be subject to the excise tax imposed by Section 4999 of the Code or any interest or penalties are incurred by the Executive with respect to such excise tax (such excise tax, together with any such interest and penalties, are hereinafter collectively referred to as the "Excise Tax"), then the Executive shall be entitled to receive an additional payment (a "Gross-Up Payment") in an amount such that after payment by the Executive of all taxes (including any interest or penalties imposed with respect to such taxes), including, without limitation, any income taxes (and any interest and penalties imposed with respect thereto) and Excise Tax imposed upon the Gross-Up Payment (the "Total Excise Tax"), the Executive retains an amount of the Gross-Up Payment equal to the Total Excise Tax imposed upon the Payments.  The Gross-up Payment to Executive shall be made in accordance with Section 7(f)(2) and shall be made no earlier than the date of the Payment to which such Gross-up Payment relates and no later than December 31 of the year following the year during which Executive remits the related taxes.

(2)     All determinations required to be made under this Section 7(F), including whether and when a Gross-Up Payment is required and the amount of such Gross-Up Payment and the assumptions to be utilized in arriving at such determination, shall be made by the Company's independent auditors (the "Accounting Firm"), which shall provide detailed supporting calculations both to the Company and the Executive within 15 business days after the receipt of notice from the Executive that there has been a Payment, or such earlier time as is requested by the Company.  The determination of tax liability made by the Accounting Firm shall be subject to review by the Executive's tax advisor, and, if the Executive's tax advisor does not agree with the determination reached by the Accounting Firm, then Deloitte & Touche LLP or such other nationally recognized public accounting firm as the Accounting Firm and the Executive's tax advisor shall jointly agree upon shall make the termination.  Any determination by such jointly designated public accounting firm shall be binding upon the Company and the Executive.   All fees and expenses of the accountants and tax advisors retained by both the Executive and the Company shall be borne solely by the Company.  Any Gross-Up Payment, as determined pursuant to this Section 7(F), shall be paid by the Company to the Executive within five days after the agreement by the Executive's tax advisor that the determination by the Accounting Firm is correct or the receipt of the determination by the jointly designated public accounting firm, whichever is applicable.  As a result of the uncertainty in the application of Section 4999 of the Code, at the time of the initial determination

ET_0001976319

hereunder, it is possible that Gross-Up Payments will not have been made by the Company that should have been made, consistent with the calculations required to be made hereunder. In such case, additional Gross-up Payments shall be due, and each such additional Gross-up Payment due shall be an "Underpayment." In the event that after the initial determination the Executive is required to make a payment of any Excise Tax, any such Underpayment shall be promptly paid by the Company to or for the benefit of the Executive.

G.     In the event of any termination of employment under this Section 7, the Executive shall be under no obligation to seek other employment, and there shall be no offset against amounts due the Executive under this Agreement on account of any remuneration attributable to any subsequent employment that he may obtain.

SECTION 8.   Indemnification.

A.     The Company agrees to indemnify the Executive to the fullest extent permitted by applicable law consistent with the Company's Certificate of Incorporation and By-Laws in effect as of the date hereof with respect to any acts or non-acts he may commit or may have committed during the period during which he is or was an officer, director and/or employee of the Company, or of any other entity of which he serves or served as an officer, director or employee at the request of the Company. The obligations of the Company under this Section 8(A) shall survive the termination or expiration of the Primary Term and any Secondary Terms.

B.     The Company agrees to obtain a directors' and officers' liability insurance policy covering the Executive and to continue and maintain such policy. The amount of coverage shall be reasonable in relation to the Executive's position and responsibilities during the Primary Term and any Secondary Terms.

SECTION 9.   Amendment; Waiver.  The terms and provisions of this Agreement may be modified or amended only by a written instrument executed by each of the parties hereto, and compliance with the terms and provisions hereof may be waived only by a written instrument executed by each party entitled to the benefits thereof. No failure or delay on the part of any party in exercising any right, power or privilege granted hereunder shall constitute a waiver thereof, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege granted hereunder.

SECTION 10. Entire Agreement.  Except as contemplated herein, this Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any and all prior written or oral agreements, arrangements or understandings between the Company and the Executive respecting such matters. The Employment Agreement entered into between the Executive and the Company effective July 7, 2004, as amended and restated on September 1, 2009, is hereby superseded and revoked by execution of this Agreement.

[ if    PAGE \* Arabic    = 16"834770.04-NYCSR05A - MSW" "" ]

ET_0001976320

# Exhibit C-32

SECTION 11. <u>Notices</u>.   All notices or communications hereunder shall be in writing, addressed as follows or to any address subsequently provided to the other party:

To the Company:

Universal Computer Systems Holding, Inc.
6700 Hollister
Houston, TX  77040

To the Executive:

Robert T. Brockman
333 West Friar Tuck Lane
Houston, TX  77024

All such notices shall be conclusively deemed to be received and shall be effective, (A) if sent by hand delivery or overnight courier, upon receipt, (B) if sent by telecopy or facsimile transmission, upon confirmation of receipt by the sender of such transmission or (C) if sent by registered or certified mail, on the fifth day after the day on which such notice is mailed.

SECTION 12. <u>Severability</u>.   In the event that any term or provision of this Agreement is found to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining terms and provisions hereof shall not be in any way affected or impaired thereby, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained therein.

SECTION 13. <u>Binding Effect; Assignment</u>.   This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns (it being understood and agreed that, except as expressly provided herein, nothing contained in this Agreement is intended to confer upon any other person or entity any rights, benefits or remedies of any kind or character whatsoever).   No rights or obligations of the Company under this Agreement may be assigned or transferred by the Company, except that such rights or obligations may be assigned or transferred pursuant to a merger or consolidation in which the Company is not the continuing entity, or the sale or liquidation of all or substantially all of the assets of the Company; provided that the assignee or transferee is the successor to all or substantially all of the assets of the Company and such assignee or transferee assumes the liabilities, obligations and duties of the Company, as contained in this Agreement, either contractually or as a matter of law.   The Company further agrees that, in the event of a sale of assets or liquidation as described in the preceding sentence, it shall take whatever action it legally can in order to cause such assignee or transferee to expressly assume the liabilities, obligations and duties of the Company hereunder.

SECTION 14. <u>Governing Law; Dispute Resolution</u>.   This Agreement shall be governed by and construed in accordance with the laws of the State of Texas (except that no effect shall be given to any conflicts of law principles thereof that would require the application of the laws of another jurisdiction).   Any dispute or misunderstanding arising out of or in connection with this Agreement shall first be settled, if possible, by the parties themselves

[ if    PAGE \* Arabic    = 16"834770.04-NYCSR05A - MSW" "" ]

ET_0001976321

Exhibit C-32

through negotiation and, failing success at negotiation through mediation and, failing success at mediation, shall be arbitrated at Houston, Texas.  Unless otherwise agreed upon by the Company and the Executive, the arbitration shall be had before three arbitrators, each party designating an arbitrator and the two designees naming a third arbitrator experienced in employment-related controversies.   The procedure shall be in accordance with the rules and regulations of the American Arbitration Association.

SECTION 15. Headings.   The headings of the sections contained in this Agreement are for convenience only and shall not be deemed to control or affect the meaning or construction of any provision of this Agreement.

SECTION 16. Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

SECTION 17. Guarantee.   Spanish Steps Holding Ltd. hereby absolutely, irrevocably and unconditionally guarantees the full payment and performance of all obligations of the Company under this Agreement as same may hereafter be amended from time to time by Executive and Company.  Spanish Steps Holding Ltd.'s guarantee and undertakings hereunder shall continue in force until all of Company's obligations under this Agreement and all of Spanish Steps Holding Ltd.'s obligations have been duly performed.

SECTION 18. Code Section 409A.  This Agreement is intended to comply with Section 409A of the Code and ambiguous provisions, if any, shall be construed in a manner that is compliant with or exempt from the application of Section 409A, as appropriate.   This Agreement shall not be amended in a manner that would cause the Agreement or any amounts payable under the Agreement to fail to comply with the requirements of Section 409A, to the extent applicable, and, further, the provisions of any purported amendment that may reasonably be expected to result in such non-compliance shall be of no force or effect with respect to the Agreement.  Notwithstanding any provision to the contrary in this Agreement, if the Company is a public company and Executive is deemed on the date of his "separation from service" within the meaning of that term under Code Section 409A and Treasury Regulation § 1.409A-1(h), to be a "specified employee" within the meaning of that term under Code Section 409A(a)(2)(B), and the Company determines, in good faith, that immediate payment of any amounts or benefits would cause a violation of Section 409A, then any amounts or benefits which are payable under this Agreement upon the Executive's "separation from service" which (i) are subject to the provisions of Section 409A, (ii) are not otherwise excluded under Section 409A, and (iii) would otherwise be payable during the first six-month period following such separation from service, shall be paid on the first business day next following the earlier of (x) the date that is six months and one day following the Executive's "separation from service" or (y) the date of Executive's death.

The Company shall neither cause nor permit any payment, benefit or consideration to be substituted for a benefit that is payable under this Agreement if such action would result in the failure of any amount that is subject to Section 409A to comply with the applicable requirements of Section 409A.

[ if    PAGE \* Arabic   = 16"834770.04-NYCSR05A - MSW" "" ]

ET_0001976322

Exhibit C-32

For purposes of Section 409A, each payment under this Agreement shall be deemed to be a separate payment.

IN WITNESS WHEREOF, the undersigned have executed this Agreement effective as of the date set forth above.

**UNIVERSAL COMPUTER SYSTEMS HOLDING, INC.**

_____

Kenneth Bunney
Vice President

[ if    PAGE \* Arabic    = 16"834770.04-NYCSR05A - MSW" "" ]

ET_0001976323

Exhibit C-32

**APPROVED:**

_____

Alfred L. Deaton III
Director

**EXECUTIVE**

_____

Robert T. Brockman

[ if    PAGE \* Arabic    = 16"834770.04-NYCSR05A - MSW" "" ]

ET_0001976324

Exhibit C-32

In accordance with Section 17 of this Agreement, Spanish Steps Holding Ltd. fully, unconditionally and absolutely guarantees the payment(s), if any, provided for in this Agreement.

**SPANISH STEPS HOLDING LTD.**

_____

[ if    PAGE \* Arabic   = 16"834770.04-NYCSR05A - MSW" "" ]

ET_0001976325

# EXHIBIT

# C-33

# Exhibit C-33

**From:** Redfish PC
**To:** "Permit"
**Subject:** FW: Turmoil Contract
**Date:** Wednesday, May 14, 2014 4:26:34 PM

Bob,

FYI

Evatt

-----Original Message-----
From: Jason Dunbar [mailto:jason@lukebrown.com]
Sent: Wednesday, May 14, 2014 6:19 PM
To: Tangarra Consultants Ltd
Subject: Re: Turmoil Contract

Hi Evatt,

 I had a nice talk with the sellers representative,  he will be tendering
the offer this evening and thinks we'll have a reply tomorrow evening, or by
the morning of the 16th.

Thank you,
Jason Dunbar

On May 14, 2014, at 4:43 PM, "Tangarra Consultants Ltd" <tangarra@logic.bm>
wrote:

> Jason,
>
> Please find attached my offer to buy the Turmoil.
>
> Would you please note that this offer is open until 6 pm EST Friday 16th
May.
>
> Kind regards
>
> Evatt
>
>
> <Turmoil Contract 05 14 14 - Signed.pdf>

# EXHIBIT

# C-34

Exhibit C-34

| | |
|---|---|
| **From:** | Redfish |
| **To:** | "Permit" |
| **Subject:** | RE: Evatt, |
| **Date:** | Tuesday, June 3, 2014 4:45:09 PM |

**Bob,**

**I had a call from Graham Thomson today asking if he can help in negotiating the other boat I am looking at.**

**I thanked him for his offer and said that the vessel is in Europe (this didn't dissuade him) and that Sophie's uncle - a retired admiral - was looking into it for me.**

**He told me that the Turmoil has a new captain, someone to whom Graham is very close.  He'll keep us up to date on what is happening with the Turmoil.**

**Evatt**

---

**From:** Permit [mailto:Permit@hannah.com]
**Sent:** Thursday, May 22, 2014 4:35 PM
**To:** 'Redfish'
**Subject:** RE:Evatt,

I recommend telling them that the offer is withdrawn – and that you intend to pursue another boat that you have been looking at thru another broker.

That way this lady will understand that the deal is gone – which is the only way that she will get reasonable on price.

Plus it will get these brokers out of the story for now – which will solidify the position to the widow.

Plus you can bet that they will still be calling you to see what you bought.

Bob

---

**From:** Redfish [mailto:redfish@hannah.com]
**Sent:** Wednesday, May 21, 2014 9:20 AM
**To:** 'Permit'
**Subject:**

Bob,

This is in re the Turmoil.  The offer is rejected and we've been told the owner won't start negotiating unless we start in the 30s.

Graham and Jason suggested that maybe we could go ahead and have a survey done and then chisel down the price.  The cost of a survey would be between $10,000 and $12,000 all up including the report.  The time to prepare and deliver the report could be about 2 weeks.

The vessel is scheduled for a refit in September. That will cost in the order of $3 million.  Graham and Jason suggested that we could use this to bring down the price, but I suspect the owner has factored this refit cost into her asking price.  She will probably still want at least $30 million even if we take on the cost of the refit.  So, she might be seeking $33-35 million if we bought it today.

Jason tells me that the only comparable that comes close to this vessel is the Ulysses, which is about 12% smaller, has no elevators and sold this year for $25 million.  You can see the vessel on YachtCharterFleet.com

Would it be worth arranging the survey and then trying to reduce her expectations on price?

Evatt

MLATSW_008861

# Exhibit C-34

**From:** Michael Rafferty [mailto:mrafferty@camperandnicholsons.com]
**Sent:** Tuesday, May 20, 2014 7:59 PM
**To:** Jason Dunbar
**Subject:** Re: Your offer on Turmoil

As I suspected, they will not entertain any offers less than 30. I could not even get a counter. I received an email from the president of the company and he spoke with the owner and they are firm that the offer has to start in the 30's before they will negotiate. I wish I had better news, but I have tried my best.
My only suggestion is try an offer in the thirties, survey the hell out of the boat, and see what needs addressing.
It is a great boat but a little difficult to put an exact value on.

Best regards,
Michael Rafferty
Camper & Nicholsons
450 Royal Palm Way
Palm Beach, Florida 33480
561 655-2121 office
561 758-5608 mobile

Sent from my iPhone

On May 20, 2014, at 4:04 PM, "Jason Dunbar" <jason@lukebrown.com> wrote:

> Thank you Michael



This e-mail (including any attachments), may be confidential and intended only for the use of the addressee(s). If you are not an addressee, please inform the sender immediately and destroy this e-mail. Do not copy, use or disclose this e-mail. E-mail transmission cannot be guaranteed to be secure or error free. The sender does not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. If verification is required please request a hard copy version. C&N trademarks are registered marks used under license by CNI.

DO YOU REALLY NEED TO PRINT THIS EMAIL?

**From:** Michael Rafferty [mailto:mrafferty@camperandnicholsons.com]
**Sent:** Tuesday, May 20, 2014 3:54 PM
**To:** Jason Dunbar
**Subject:** Your offer on Turmoil

Hi Jason,
I apologize for the delay in getting back to you with a response from the owner of Turmoil. I did get an email from the president of the company yesterday saying he hoped to meet with the owner late yesterday and have a response today. So far, I have not heard anything.
The way you presented the offer with allowing her to use the boat for the summer certainly should have been attractive. The one problem we may encounter is that they have said to me all

MLATSW_008862

Exhibit C-34

along; the offer will have to start with a three. However, I have strongly "gone to bat" to have them consider a lower offer. Regardless, I would hope we hear back from them soon so we can decide if we have some common ground that we can work with. I will let you know the second I hear. Thanks, Michael

Best regards,

Michael Rafferty

Camper & Nicholsons USA
450 Royal Palm Way, Suite 100
Palm Beach, FL 33480  USA

(561) 655-2121 office
(561) 655-2202 fax
(561) 758-5608 cell

mrafferty@camperandnicholsons.com
www.camperandnicholsons.com

<image001.png>

................................................................................................................

This e-mail (including any attachments), may be confidential and intended only for the use of the addressee(s). If you are not an addressee, please inform the sender immediately and destroy this e-mail. Do not copy, use or disclose this e-mail. E-mail transmission cannot be guaranteed to be secure or error free. The sender does not accept liability for any errors or omissions in the contents of this message which may arise as a result of e-mail transmission. If verification is required please request a hard copy version. C&N trademarks are registered marks used under license by CNI.

DO YOU REALLY NEED TO PRINT THIS EMAIL?

# EXHIBIT

# C-35

Exhibit C-35

| | |
|---|---|
| **From:** | Permit |
| **To:** | "Redfish" |
| **Subject:** | RE: MY Dione Sky, donate to charity |
| **Date:** | Thursday, August 28, 2014 11:22:00 AM |

Evatt,

The key to my usage of a boat is for Dorothy to accompany me.

The key to her reliably being able to accompany me – is an elevator.

This boat does not have one.

Putting one in after the fact is extremely difficult technically – in order to maintain the safety issues.

Therefore this boat is not a prospect.

Bob

**From:** Redfish [mailto:redfish@hannah.com]
**Sent:** Saturday, August 16, 2014 6:44 PM
**To:** permit@hannah.com
**Subject:** FW: MY Dione Sky, donate to charity

Bob,

FYI

Evatt

**From:** Graham Thomson [mailto:graham@mtsyachts.com]
**Sent:** Monday, August 11, 2014 3:15 PM
**To:** tangarra@logic.bm
**Subject:** MY Dione Sky, donate to charity

Hi Evatt,

I trust all is well.

A while ago I sent information on Dione Sky (the first Turmoil). The owner of this vessel is extremely keen to sell this yacht, so much so, that the listing broker has informed us that the owner is exploring the option of donating the vessel to a chartable cause for tax reasons.

The owner of Dione Sky, we believe is British. If there was an organization that was performing philanthropic work, ocean research etc., legitimate and beneficial to him, then we believe it is possible that the vessel could be donated to such a cause.

MLATSW_009694

# EXHIBIT

# C-36

# EXHIBIT C-36

| | |
|---|---|
| **From:** | Permit |
| **To:** | "Redfish PC" |
| **Subject:** | RE: |
| **Date:** | Monday, May 5, 2014 5:44:00 AM |

Evatt,

Please send to the office.

I agree with your thoughts here.

Bob

---

**From:** Redfish PC [mailto:redfish@proventusconstans.com]
**Sent:** Sunday, May 04, 2014 12:25 PM
**To:** Permit
**Subject:** Re:

Bob,

Will do.  Do you want this sent to your home address rather than the office?

I have had a thought about chartering the vessel.  Does it always need to be you?  To demonstrate a variety of charterers could we have occasions where Al Deaton or Robert Smith charter the vessel?   There might be safe ways we could reimburse them - particularly Robert as the transaction could be entirely offshore.

Evatt

On 4 May 2014, at 14:42, "Permit" <permit@proventusconstans.com> wrote:

> Evatt,
>
> Please print off this attachment, sign all three, and then FED-X them back to me.
>
> By basing my comp plan off of EBITDA rather than pre-tax income, this will give me sufficient additional funds to be able to charter Turmoil for a block of 10 weeks per year at $150K per week plus fuel.
> That would cover almost completely the $4500/day that it costs to keep her.
>
> As you can see from the Whereas section, this is an opportune time to make this change due to the 8 key officers being put on an EBITDA based plan.  Not to mention the logic that the value of Reynolds is no longer overshadowed by debt – and will be valued by EBITDA completely going forward.
>
> Bob
>
> <Employment Agreement for RTB 140101.doc>

MLATSW_007905

EXHIBIT C-36

| | |
|---|---|
| **From:** | Permit |
| **To:** | "Redfish" |
| **Subject:** | RE: |
| **Date:** | Monday, June 19, 2017 4:34:00 PM |

Evatt,

I agree with your concerns.  The position I have taken so far with friends has caused no further questions – however the crew is a different story.

I think the best course of action is for you to tell Tom that I am a minority owner with certain exclusive rights of usage.  This and any further details are confidential for him only.
.
As far as the crew is concerned with the relationship, I should be described as "an owner", similar to the relationship I enjoyed on the Trevia.

Bob

**From:** Redfish [mailto:redfish@hannah.com]
**Sent:** Sunday, June 18, 2017 7:06 PM
**To:** 'Permit'
**Subject:**

Bob,

I need to raise with you a matter which is causing me concern.

Today, Tom Henshilwood asked to see me privately to get "clarity" about a few things.

The main thing he wanted clarity about was ownership of the Albula.  It took me by surprise that he would raise the issue, but we have seen a great deal of speculation about the owner of the boat.  In fact, one of the occupants of the Savannah – the grey, modern boat at the marina - asked me on Friday evening if Bob Brockman was on the Albula.  He would like to have given you a tour of the Savannah.  His name is Bas Nederpelt, the commercial director of Feadship, the Dutch shipyard.  Savannah was opened up to people with the potential to order a boat from Feadship. You are already tagged as the owner of the Albula in the superyacht community.

I don't mind that Tom put me on the spot, though the only thing I could say is the following:

-         I represent the Foundation that is the majority owner.
-         That Foundation is engaged in supporting marine research conducted by leading universities.
-         Bob Brockman is a minority owner with rights of exclusive use
-         Other than the philanthropic aspect, I have zero interest in boats and much prefer to be on land, which is why I don't sleep on the Albula and leave you and Dorothy to decide many matters to do with the boat.

MLATSW_020479

EXHIBIT C-36

What Tom's question tells me is that you are already accepted as the sole and absolute owner of the Albula.  The only way the director of Feadship could have your name is through crew members of the Albula and crews of the different boats talking to each other.

I am doing what I can to dispel this idea where it can cause you harm.  When asked about the ownership, as I was by Tom, I explained the marine research objective.

I try to use the boat in ways that would suggest that you are not the sole owner, but this is disruptive to my work and family time.  Frankly, my efforts are lame since you are – as far as Tom is concerned – the chief decision maker while I am an infrequent user who has never slept on the boat and avoids going out on it.  Sophie has been carrying a lot of this for me.

Tom even asked me today what the stewardesses should say to Dorothy about me using the boat.  He said that he would prefer to not have the girls lie about me using the boat.  This was absolute confirmation that you are the owner.  Clearly Tom believed I had lied about the ownership of the boat.  Tom also told me today that Dorothy believed the Albula was returning to Florida as soon as you left Bermuda.  I guess he was gently accusing me of keeping the boat here and using it without permission from you and Dorothy.

The problem with all of this is that it elevates your profile in a way that I struggle to address.  If questioned by a regulator, I would have no trouble explaining Mountain Queen or the Henke properties.  I am confident I can protect you and I say that knowing that it was Robert Smith buying property through a trust that has triggered the DOJ problems.

The boat is different.  It is not in my hands to control the loose lips of itinerant crew members.  I cannot argue that the acquisition of the boat is an investment that will enhance in value in the same way as I can point to the enhanced asset value of the Aspen property.

You asked me to use the boat before and after your use to justify the Foundation bearing the cost of positioning the boat. This would also reinforce that you are not the sole or majority owner thereby explaining why the Foundation contributed about 90% of the acquisition cost. If I have Tom and the crew effectively saying that I am using the boat without your permission, then obviously we have failed.

The crux of the matter is this:  unless I can find a way to allow you to openly declare the boat is yours and yours alone, I need to present you as a minority owner.  Right now the only way I can think of doing the former is for you to buy all shares in the Cayman company and pay the annual operating costs.  That is not acceptable.  I'll keep working on a better way to do that.

In order to provide sufficient cover for you, it would greatly help me if you could get Tom and the crew to accept what I told him today.  I hate to ask, but I think it is also important, if at all possible, for Dorothy to understand better the situation with the ownership issues and the need for the Fisheries Research Foundation to cover costs and the positioning of the boat for you.

I would very much like to find a way for you to have full use of the boat year round with all costs

MLATSW_020480

EXHIBIT C-36

covered by the Foundation. As matters stand today, the risk to you and me is high because of Robert Smith. I do believe we are being monitored – I certainly am. The boat has placed an even bigger target on us.

Evatt

MLATSW_020481