# EXHIBIT

# D-9

# EXHIBIT D-9

| | |
|---|---|
| **Message** | |

| | |
|---|---|
| **From**: | Redfish [redfish@lambdaprime.org] |
| **Sent**: | 7/28/2010 6:50:01 PM |
| **To**: | 'permit1@lambdaprime.org' [permit1@lambdaprime.org] |
| **Subject**: | RE: |

Bob,

I think that on the Cabot side these suggestions work, although I think you can go one step further and clear out the whole Cabot structure at the same time.

When you roll Addington, Choice and Barrier into Performance (or something like that), effectively you kill off the need for Cabot.

Addington is a sizeable shareholder in Edge, however those holdings can roll into Performance, as well. Some of the Trusts also have shares in Edge, but, again, these would be easy to clear.

I can put something together which would show how this all plays out.

You should note that Endurance is now a Cayman Islands trust, which was established when CIBC took over from Belize. The same applies to Companion which owns Regency down to MQ and Henke.

So far, primarily because of Ben Gilloolly, we have never been pushed to identify the assets of either Endurance or Companion. It is only a matter of time before this changes.

Most trust companies such as CIBC would want to know all about the assets and then want a fee commensurate with the value of those assets. We have avoided that so far, however Ben might not be all that far off retirement. Unlike Gordon, Ben as an employed person, will have little choice about his retirement and less control over disclosure.

You should also consider that CIBC must sign all documents pertaining to rolling the assets into Endurance.

We need to get rid of the third party provider.

I think we should consider a new charitable trust established in a known jurisdiction such as Bermuda or the Cayman Islands. Bermuda is the natural choice. Guernsey and Jersey might be options however both are too close to the UK tax system. Already the UK mainland banks operating in those jurisdictions are disclosing details of clients.

We should start with a new private trust company – it is better to get rid of the others. The private trust company could be owned by a purely charitable. There is no benefit or advantage to a purpose trust. The US recognizes the existence of purpose trusts (unlike 10 years ago) however there is still some lingering doubt. Why do anything that would attract attention?

Evatt

---

**From:** Permit [mailto:permit1@lambdaprime.org]
**Sent:** Wednesday, 28 July 2010 2:37 PM
**To:** redfish@lambdaprime.org
**Subject:**

Evatt,                                         7/28/2010

This is the along the lines that I am thinking about:

# EXHIBIT D-9

-roll the ownership of Addington, Choice, and Barrier into Performance – or just could roll their assets into Performance and kill them completely

-that eliminates the following trusts and all their appendages – Aberdeen, Inverness, Shetland, Legacy, Oxford, and Evergreen

-Endurance is already a pure charitable trust that has some age on it, although it was formed in Belize – which may raise an issue

-Lineage stays in place with Commitment holding multiple options to buy Performance which may/may not ever be exercised – and therefore are silent

-this leaves Cabot and Spartacus still in place

What do you think about this as a step forward?

Further steps could be taken later such as doing away with CABOT

Bob

ET_0001761070

# EXHIBIT D-9

Message
_____

**From**:       Permit [permit1@lambdaprime.org]
**Sent**:       7/29/2010 6:38:22 PM
**To**:        redfish@lambdaprime.org
**Subject**:

Evatt,

Let's focus on the Cabot structure clean up for now.

Once we get that figured out, it will be time to address the Edge structure, which is more complex to unwind.

Bob

ET_0001761072

# EXHIBIT

# D-10

# EXHIBIT D-10

Message

| | |
|---|---|
| **From**: | Permit [permit1@lambdaprime.org] |
| **Sent**: | 12/11/2012 1:31:52 AM |
| **To**: | redfish@lambdaprime.org |
| **Subject**: | RE: |

Evatt,

No change desired.

Bob

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Monday, December 10, 2012 7:42 AM
**To:** permit1@lambdaprime.org
**Subject:** RE:

Bob,

I do not know your preference regarding Don's compensation, however the annual payment is structured as a royalty fee paid by Tangarra to Wedge.

This is part of the agreement whereby Wedge sold its book of business to Tangarra.

If you wish to keep Don's compensation going, changing the ownership of the fund companies won't impact on the payment.

If not or if you wish to reduce the payment, then I will talk to Don.

Evatt

---

**From:** Permit [mailto:permit1@lambdaprime.org]
**Sent:** Sunday, December 09, 2012 9:15 PM
**To:** redfish@lambdaprime.org
**Subject:** RE:

Evatt,

I agree.  Plus I think that Don would agree also – as he does not need to have his trusts come to the attention of the house.

The only issue is that we have to consider Don's compensation with regards to these trusts.

Bob

---

**From:** Redfish [mailto:redfish@lambdaprime.org]
**Sent:** Sunday, December 02, 2012 5:53 AM
**To:** permit1@lambdaprime.org
**Subject:**

Bob,

ET_0000054773

# EXHIBIT D-10

As part of a general clean-up, one area that causes me some concern with FATCA looming is the ownership of the common shares in Edge, Cabot and Point. This would also apply to the new entity, Proventus Constans Limited, should that be incorporated as a fund structure rather than a straight tightly held investment vehicle.

The common shares of those there funds are owned by either the Massengill Children's Trust, the Massengill Grandchildren's Trust or the Louise C. Massengill Trust.

Obviously, in each case we have an U.S. person, albeit deceased, as settlor. In each case, we have U.S. beneficiaries notwithstanding that these are fully discretionary trusts. Legally, our position is clear and clean. However, under FATCA we need to assume that banks will decide to play it safe and report the fact of a U.S. settlor and beneficiaries. Neither the banks nor the House will care much about legal niceties.

For the most part, in the now regular due diligence exercises, I get away with disclosing these trusts as the ultimate beneficial owners. In the case of Point where the most disclosures are required because of the Vista activity, I am asked for details of the owners of the common shares even though the substance of the fund links to the AEBCT.

To us, it is clear that the ownership of the common shares means little since the value in the fund is linked to the investment shares which are owned by other companies. For Cabot and Edge, all holders of investment shares (with the exception of Lakewood) are companies that are ultimately owned by the new pure charitable trusts.

Having the common shares owned by these trusts does not add in any way to the protection of the assets. The use of the trusts was simply an expedient at the time of the creation of the funds. To change to a different ownership structure – and I recommend a simple purpose trust with the existing trustee and protector – would strip out an unnecessary complication of the U.S. settlor and beneficiaries. I can't see any downside.

Further, if the funds were subject to a review by the House, they would work backwards to Don through these existing family-connected trusts.

In the past year we have cleaned up the investor side of these funds (excepting Point) to put them in purely charitable trusts.

I think we should now clean up the common share side.

Should you agree and should you think that a purpose trust is the right way to go, I would propose creating the trusts and then transferring the shares of each underlying company from the existing trust to the new purpose trust. The purpose trust itself would have charitable objects and a beneficiary clause that provides that at the end of its life/purpose, the assets of the trust would be applied to recognized charities.

Of course, at the end of the life of the purpose trust there would be no assets, but this is a fudge so that we have a dressed up charitable purpose.

The change would be very simple and could all be completed in a few days.

I would then contact the banks, Vista etc. to advise that the new ownership.

Evatt

# EXHIBIT

# D-11

EXHIBIT D-11

Message

**From**: Redfish [redfish@lambdaprime.org]
**Sent**: 3/6/2013 5:54:06 PM
**To**: 'permit1@lambdaprime.org' [permit1@lambdaprime.org]
**Subject**:

Bob,

As part of the clean up ahead of the many changes brought in by FATCA and other increased KYC scrutiny, I have moved the ownership of the common shares (i.e. non-investment shares) in Edge, Cabot and Point to new charitable purpose trusts.

In each case this takes out any connection to Melissa Jones' parents.

We had discussed this some months back.  I also spoke to Don who was in complete agreement and would prefer not to have the Massengill name associated with potential IRS scrutiny.

The changes have minimal impact as there is no value attached to the common shares.

I will bring hard copies of the signed trust deeds to Houston for filing.

Evatt

ET_0001959205

# EXHIBIT

# D-17

EXHIBIT D-17

UNIVERSAL COMPUTER CONSULTING
HOLDING, INC.


STOCK PURCHASE
AND
REPURCHASE AGREEMENT


JULY 7, 2004

EXHIBIT D-17

**UNIVERSAL COMPUTER CONSULTING
HOLDING, INC.**

━━━━━━━━━━━━━━━━━━━━

**STOCK PURCHASE
AND
REPURCHASE AGREEMENT**

━━━━━━━━━━━━━━━━━━━━

**JULY 7, 2004**

━━━━━━━━━━━━━━━━━━━━

**INDEX OF DOCUMENTS**


**STOCK PURCHASE AND
REPURCHASE AGREEMENT
AND RELATED AGREEMENTS
AND CLOSING DOCUMENTS**

<u>Document</u>                                                                                     Item

Stock Purchase and Repurchase Agreement ...................................................... 1

Indemnification Agreement ............................................................................ 2

Stockholders Agreement ............................................................................... 3

Management Agreement ............................................................................... 4

Registration Rights Agreement ...................................................................... 5

Executive Stock Repurchase Agreements ....................................................... 6

Closing Certificates ..................................................................................... 7

UCCH CEO Certificate ................................................................................ 8

UCCH Secretary's Certificate ....................................................................... 9

Spanish Steps Secretary's Certificate ............................................................ 10

New UCCH Stock Certificates ...................................................................... 11

HOUOI:855482.1

# EXHIBIT D-17

**STOCK PURCHASE AND REPURCHASE AGREEMENT**

This STOCK PURCHASE AND REPURCHASE AGREEMENT (this "Agreement") is made as of July 7, 2004, by and among VISTA EQUITY FUND III, L.P., a Cayman Islands exempted limited partnership ("VEF"), the individuals set forth on Exhibit A (the "Executives" and together with VEF, the "Purchasers"), UNIVERSAL COMPUTER CONSULTING HOLDING, INC., a Delaware corporation (the "Company"), and SPANISH STEPS HOLDINGS, LTD., a corporation organized under the laws of the British Virgin Islands ("Spanish Steps"). The Purchasers, the Company and Spanish Steps are individually referred to herein as a "Party" and are collectively referred to herein as the "Parties." Capitalized terms used and not otherwise defined herein are defined in Article I below.

WHEREAS, Spanish Steps, owns 1,000 shares of Common Stock (as defined below), representing all of the outstanding shares of Capital Stock (as defined below) of the Company; and

WHEREAS, the Purchasers desire to purchase from the Company, and the Company desires to sell to the Purchasers, an aggregate of 204.2106 shares of Common Stock upon the terms and subject to the conditions set forth herein (the "Stock Sale"); and

WHEREAS, the Company desires to purchase from Spanish Steps, and Spanish Steps desires to sell to the Company, 803.7975 shares of Common Stock upon the terms and conditions set forth herein (the "Stock Repurchase"); and

WHEREAS, immediately after the Stock Sale and the Stock Repurchase, Spanish Steps and the Purchasers will own 49% and 51%, respectively, of the total number of outstanding shares of Common Stock; and

WHEREAS, immediately after the Stock Sale and Stock Repurchase the capital stock of the Company will be split in a ratio of 2.4974 shares of Common Stock for each share of Common Stock outstanding; and

WHEREAS, the Parties intend that consummation of the Stock Repurchase be conditioned upon consummation of the Stock Sale (and vice-versa), that the consummation of the Stock Repurchase and the Stock Sale occur simultaneously, and that the Stock Repurchase be treated for federal income tax purposes as a "distribution in exchange for stock" within the meaning of Section 302(a) and (b)(2) of the Internal Revenue Code of 1986, as amended.

NOW, THEREFORE, in consideration of the mutual covenants, agreements and understandings herein contained, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1     <u>Definitions.</u> For the purposes of this Agreement, the following terms have

EXHIBIT D-17

the meanings set forth below:

I

# EXHIBIT D-17

"Accounting Principles" means, with respect to any Person, the following: (i) each accounting term used herein shall have the meaning that is applied thereto in accordance with GAAP, unless a different meaning is set forth herein for such term; (ii) the calculation of the levels of the accounts shall be done based on a consistent application of accounting principles as utilized in the preparation of the most recent balance sheet of such person included in the Schedules, including with respect to the nature or classification of accounts, closing proceedings, levels of reserves or levels of accruals, other than as a result of objective changes in the underlying business; and (iii) for purposes of the preceding clause, the "consistent application of accounting principles" shall exclude changes in accounting principles, policies, practices, procedures or methodologies with respect to financial statements, their classification or their presentation, as well as all changes in practices, methods, conventions or assumptions used in making accounting estimates.

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, contract or otherwise.

"Affiliated Group" means any affiliated group within the meaning of Code § 1504(a) or any similar group defined under a similar provision of state, local, or foreign law.

"Applicable Law" means, with respect to any Person, any statute, law, regulation, ordinance, rule, injunction, order, decree, governmental approval, directive, requirement, or other governmental restriction or any similar form of decision of, or determination by, or any interpretation or administration of any of the foregoing by, any government authority, applicable to such Person or its subsidiaries or their respective assets.

"Arbitration Law" has the meaning set forth in Section 10.16 (c)

"Audited Balance Sheet" has the meaning set forth in Section 3.4.

"Basis" means any past or present fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction that forms or could form the basis for any specified consequence.

"Board" means the board of directors of the Company.

"Business Day" means any day other than Saturday or Sunday and any other day on which commercial banks located in San Francisco, California or New York, New York are required or authorized by law to remain closed.

"Capital Stock" means all shares, interests, participations or other equivalents of capital stock of the Company, however designated (including, but not limited to, Common Stock).

"Closing" has the meaning set forth in Section 2.3.

"Closing Date" has the meaning set forth in Section 2.3.

EXHIBIT D-17

"Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Common Stock" means the Company's Common Stock, no par value.

"Company Financial Statements" has the meaning set forth in Section 3.4.

"Dispute" has the meaning set forth in Section 10.16(a).

"Dispute Notice" has the meaning set forth in Section 10.16(a).

"Executive Bonus" has the meaning set forth in Section 2.2 (b).

"Executive Stock Repurchase Agreement" means each Executive Stock Repurchase Agreement by and between the Company and each individual set forth on Exhibit A hereto and each such individual's spouse in the form attached hereto as Exhibit B.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Governmental Entity" means individually, and "Governmental Entities" means collectively, the United States of America or any other nation, any state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government, including any court, in each case having jurisdiction over the Company.

"HSR Act" has the meaning set forth in Section 3.2.

"Indemnification Agreement" means that certain Indemnification Agreement by and between Spanish Steps and VEF in the form attached hereto as Exhibit C.

"Intellectual Property" means all of the following in any jurisdiction throughout the world: (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, slogans, trade names, corporate names and Internet domain names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith, (d) all mask works and all applications, registrations, and renewals in connection therewith, (e) all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (f) all computer software (including source code, executable code, data, databases, and related documentation), (g) all material advertising and promotional materials, (h) all other proprietary rights, and (i) all copies and tangible embodiments thereof (in whatever form or medium).

EXHIBIT D-17

"Knowledge" means actual knowledge of any executive officer of the applicable Party specified on Schedule 1.1 after reasonable investigation.

"Liabilities" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for taxes.

"Lien" or "Liens" means any mortgage, pledge, security interest, encumbrance, encroachment, claim, lease, right of possession, other defect in title or lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof), any sale of receivables with recourse against the Company, any filing or agreement to file a financing statement as debtor under the Uniform Commercial Code or any similar statute (other than to reflect ownership by a third party of property leased to the Company under a lease which is not in the nature of a conditional sale or title retention agreement), or any subordination arrangement in favor of another Person.

"Management Agreement" means the Management Agreement by and between the Company and VEP, in the form attached hereto as Exhibit D.

"Material Adverse Effect" means, with respect to any Person, any occurrence, event, or effect that either individually or in the aggregate with all other such changes or effects is, or could reasonably be expected to be (whether or not such occurrence, event or effect has, at the time in question, manifested itself in such Person's historical financial statements), materially adverse to the business, operations, results of operations, properties, condition, financial or otherwise, assets or liabilities of such Person and its Subsidiaries on a consolidated basis, except for such occurrences, events or effects (i) in general economic, capital market, regulatory or political conditions, (ii) that affect generally the industry of such Person or (iii) arising out of the announcement of this Agreement.

"Party" and "Parties" has the meaning set forth in the introductory paragraph to this Agreement.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Registration Rights Agreement" means the Registration Rights Agreement by and among the Company, VEF and Spanish Steps, in the form attached hereto as Exhibit E.

"Regulatory Filings" has the meaning set forth in Section 3.2.

"Relatives" means, with respect to any individual, such individual's spouse (whether current or former), ancestors, descendents, or siblings.

"Securities Act" means the Securities Act of 1933, as amended.

# EXHIBIT D-17

"Stockholders Agreement" means the Stockholders Agreement by and among the Company, the VEF, Spanish Steps, and the other signatories thereto, in the form attached hereto as Exhibit F.

"Stock Repurchase" has the meaning set forth in the recitals hereto.

"Stock Sale" has the meaning set forth in the recitals hereto.

"Stock Sale Purchase Price" has the meaning set forth in Section 2.2(a).

"Stock Split" shall mean the 2.4974 to one split of the Company's outstanding Common Stock to be effected immediately following consummation of the Stock Sale and Stock Repurchase.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the lime owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing director or general partner of such limited liability company, partnership, association or other business entity.

"Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any amendment thereof.

"Termination Date" means October 1, 2004.

"Transaction Documents" means this Agreement, the Stockholders Agreement, the Registration Rights Agreement, the Indemnification Agreement, the Management Agreement, each Executive Stock Repurchase Agreement and all other agreements, instruments, certificates and other documents to be entered into or delivered by any Party pursuant to this Agreement.

EXHIBIT D-17

"Unaudited Balance Sheet" has the meaning set forth in Section 3.4.

"VEP" means Vista Equity Partners, LLC, a Delaware limited liability company.

ARTICLE II
SALE **AND REPURCHASE OF STOCK**

2.1 <u>The Stock Repurchase.</u> Upon the terms and subject to the conditions of this Agreement, at the Closing, Spanish Steps will sell to the Company, and the Company will purchase from Spanish Steps, as treasury stock, 803.7975 shares of Common Stock (80.37975 % of the shares of Common Stock outstanding) at a purchase price of $635,000,000 in cash by wire transfer of immediately available funds to an account or accounts designated by the Spanish Steps prior to the Closing.

2.2     <u>The Stock Sale.</u>

(a)     Upon the terms and subject to the conditions of this Agreement, at the Closing, the Company will issue and sell to each Purchaser from the treasury shares purchased from Spanish Steps pursuant to Section 2.1 hereof, and each Purchaser will purchase from the Company treasury shares, the number of shares of Common Stock set forth on <u>Exhibit</u> A hereto opposite the name of such Purchaser at the purchase price set forth on <u>Exhibit A</u> hereto opposite the name of such Purchaser in cash by wire transfer of immediately available funds to an account or accounts designated by the Company prior to the Closing. The aggregate purchase price, as set forth on <u>Exhibit A</u> hereto, for all of the shares of Common Stock to be purchased by the Purchasers hereunder is hereinafter referred to as the "Stock Sale Purchase Price."

(b)     The Company agrees to pay to each Executive for the purpose of purchasing Common Stock in accordance with the terms and provisions of this Agreement a bonus ("Executive Bonus") in an amount sufficient, after providing for payment of Taxes relating to such bonus, to equal $1,960,784. The purchase price set forth in <u>Exhibit A</u> to be paid by each Purchaser that is an Executive shall be paid by offsetting the amount of such purchase price against such portion of the Executive Bonus as is necessary to pay such purchase price to the Company in full. The Executive shall have no obligation to purchase Common Stock hereunder or pay the purchase price therefor except by offset against the Executive Bonus as provided in the immediately preceding sentence.

2.3 <u>Closing.</u> Upon the terms and subject to the conditions set forth in this Agreement, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place at 10:00 a.m., New York time, on the third Business Day after the satisfaction or (to the extent permitted by Applicable Law) waiver of the conditions set forth in Articles VI, VII and VIII (other than those conditions to be satisfied or waived at the Closing), at the offices of St. John's Trust Company (PVT) Ltd., 33 Church Street, Hamilton, Bermuda, or at such other time, date or place agreed to in writing by the Purchasers, Spanish Steps and the Company. The date on which the Closing occurs is referred to in this Agreement as the "Closing Date". The Parties agree and acknowledge that, upon the terms and subject to the conditions of this Agreement, the Stock Sale and the Stock Repurchase shall occur simultaneously at the Closing.

# EXHIBIT D-17

2.4 <u>Closing Deliveries.</u> Upon the terms and subject to the conditions of this Agreement, at the Closing:

(a) The Company will deliver (or arrange for delivery not later than thirty (30) days of Closing in the case of the Executives) to each Purchaser a certificate or certificates representing the number of shares of Common Stock set forth on <u>Exhibit A</u> hereto opposite the name of such Purchaser registered in the name of such Purchaser, and such Purchaser will deliver to the Company the purchase price therefor as set forth in Section 2.2;

(b) Spanish Steps will deliver to the Company a certificate or certificates representing not fewer than 803.7975 shares of Common Stock (and the Company shall return to Spanish Steps a certificate representing the excess, if any, of the number of shares delivered by Spanish Steps to the Company over 803.7975 shares of Common Stock, with such certificate representing the relevant number of shares of Common Stock to be returned to Spanish Steps after the Stock Split), accompanied by stock powers duly endorsed in blank, and the Company will deliver to Spanish Steps the purchase price therefor as set forth in Section 2.1; and

(c) The Purchasers, the Company and Spanish Steps will each deliver to the applicable Party all other documents, instruments and writings required to be delivered at or prior to the Closing pursuant to this Agreement.

2.5 <u>Restrictions on Transfer.</u> The certificates representing the shares of Common Stock issued and sold to VEF pursuant to this Agreement will bear the following legend:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER. THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER AND CERTAIN OTHER AGREEMENTS SET FORTH IN A STOCKHOLDERS AGREEMENT BETWEEN THE COMPANY AND THE SIGNATORIES THERETO DATED AS OF JULY 7, 2004. A COPY OF SUCH AGREEMENT MAY BE OBTAINED BY THE HOLDER HEREOF AT THE COMPANY'S PRINCIPAL PLACE OF BUSINESS WITHOUT CHARGE.

The certificates representing the shares of Common Stock issued and sold to the Executives pursuant to this Agreement will bear the following legend:

EXHIBIT D-17

IN WITNESS WHEREOF, the Parties have executed this Stock Purchase and Repurchase Agreement on the <u>date</u> first written above.

**PURCHASERS:**

VISTA EQUITY FUND III, L.P.

By: Performance Investments LLC Its:        General Partner

By: _____

Name: Robert F. Smith

_____

**Dan S. Agan**

Title: Manager

Norman T. Barras

_____

Carlan Max Cooper

Donald Bronislaw Holender

_____

Terry Wallace Jones

COMPANY:

UNIVERSAL COMPUTER CONSULTING HOLDING, INC.

<u>ThR'</u>

U1Mtb,An

# EXHIBIT D-17

By:       _____
          Name: Robert T. Brockman
          Title: **Chairman and Chief Executive**
                 Officer

31

1

EXHIBIT D-17

IN WITNESS WHEREOF, the Parties have executed this Stock Purchase and Repurchase Agreement on the date first written above.

**PURCHASERS:**

VISTA EQUITY FUND III, L.P.

By: Performance Investments LLC Its: General Partner

By: _____
       Name: Robert F. Smith
       Title: Manager

_____
Dan S. Agan

_____
Norman T. Barras

_____

Carlan Max Cooper

_____

Donald Bronislaw Holender

_____

Terry Wallace Jones **COMPANY:**

UNIVERSAL COMPUTER CONSULTING HOLDING, INC.

Name: Robert T. Brockman
Title: <u>Chairman</u> and Chief Executive Officer

By: _____

31

EXHIBIT D-17

IN WITNESS WHEREOF, the Parties have executed this Stock Purchase and Repurchase Agreement on the date first written above.

PURCHASERS:

VISTA EQUITY FUND III, L.P.

By: Performance Investments LLC Its:
General Partner

By: _____
Name: Robert F. Smith
Title: Manager

_____
Dan S. Agan

Norman T. Barras

_____
Donald Bronislaw Holender

_____
Terry Wallace Jones

**COMPANY:**

UNIVERSAL COMPUTER CONSULTING HOLDING, INC.

By: _____
Name: Robert T. Brockman
Title: Chairman and Chief Executive
Officer

31

EXHIBIT D-17

I

        IN WITNESS WHEREOF, the Parties have executed this Stock Purchase and Repurchase Agreement on the date first written above.

**PURCHASERS:**

VISTA EQUITY FUND III, L.P.

By: Performance Investments LLC Its:
      General Partner

By:    ————————————————
        Name: Robert F. Smith
        Title: Manager

I

I

————————————————————
Dan S. Agan

I

Norman T. Barras

I

I

I

————————————————————
Terry Wallace Jones

**COMPANY:**

UNIVERSAL COMPUTER CONSULTING HOLDING, INC.

I

By:  ————————————————
    Name: Robert T. Brockman
    Title: Chairman and Chief Executive
        Officer

I

31

# EXHIBIT D-17

IN WITNESS WHEREOF, the Parties have executed this Stock Purchase and Repurchase Agreement on the date first written above.

**PURCHASERS:**
VISTA EQUITY FUND III, L.P.


By: Performance Investments LLC Its:


By: _____
 General Partner


Name: Robert F. Smith
Title: Manager


_____

Dan S. Agan


_____

Norman T. Barras


_____

Carlan Max Cooper


Donald Bronislaw Holender


**COMPANY:**

UNIVERSAL COMPUTER CONSULTING

By: _____
HOLDING, INC.


Name: Robert T. Brockman

3I

39

# EXHIBIT D-17

Title: Chairman and Chief Executive
Officer

EXHIBIT D-17

**SPANISH STEPS:**

SPANISH STEPS HOLDINGS, LTD.

By: _____

Name: GORDON HOWARD

Title: DIRECTOR

32

EXHIBIT D-17

**EXHIBIT** A

**Information on Purchasers**

| Name of Purchaser | Number of Shares of Common Stock | Purchase Price |
|---|---|---|
| Vista Equity Fund III, L.P. | 184.1901 (post Stock Split - 460) | $90,196,080 |
| Dan S. Agan<br>15914 Harwick<br>Spring, Texas 77379<br>Fax: 713-718-1417 | 4.0041 (post Stock Split - 10) | $1,960,784 |
| Norman T. Barras<br>29 Hedwig Circle<br>Houston, Texas 77024<br>Fax: 713-718-1455 | 4.0041 (post Stock Split - 10) | $1,960,784 |
| Carlan Max Cooper<br>11350 Saxon Road<br>Bryan, Texas 77808<br>Fax: 979-595-2624 | 4.0041 (post Stock Split - 10) | $1,960,784 |
| Donald Bronislaw Holender<br>30 Inverness Park Way<br>Houston, Texas 77055<br>Fax: 801-697-6594 | 4.0041 (post Stock Split- 10) | $1,960,784 |
| Terry Wallace Jones<br>881 Country Lane<br>Houston, Texas 77024<br>Fax: 713-718-1442 | 4.0041 (post Stock Split - 10) | $1,960,784 |
| **Total:** 184.1901 (post Stock Split - 510) | | $100,000,000 |

# EXHIBIT D-17

HOU01:807514.11

EXHIBIT D-17

EXHIBIT **B**

Form of Executive Stock Repurchase Agreement

See attachment.

HOU01:807514.11

# EXHIBIT D-17

## EXECUTIVE STOCK REPURCHASE AGREEMENT

This EXECUTIVE STOCK REPURCHASE AGREEMENT (this "Agreement") is made as of July 7, 2004, by and among UNIVERSAL COMPUTER CONSULTING HOLDING, INC., a Delaware corporation (the "Company"), VISTA EQUITY FUND III, L.P., a Cayman Islands exempted limited partnership ("VEF"), SPANISH STEPS HOLDINGS, LTD., a corporation organized under the laws of the British Virgin Islands ("Spanish Steps"), _____ (the "Executive"), and _____ ("Executive's Spouse"). The Company, the Executive and Executive's Spouse are individually referred to herein as a "Party" and are collectively referred to herein as the "Parties." Capitalized terms used and not otherwise defined herein are defined in Article I below.

WHEREAS, the Executive purchased shares of Common Stock (such shares, the "Executive Stock") pursuant to the terns and conditions of that certain Stock Purchase and Repurchase Agreement, dated as of July 7, 2004, by and among VEF, the Company, Spanish Steps, the Executive and the other parties thereto, as amended, restated or modified from time to time; and

WHEREAS, to induce the Company to sell the Executive Stock to the Executive, the Executive and Executive's Spouse agreed to grant certain repurchase rights to the Company and VEF in respect of the Executive Stock.

NOW, THEREFORE, in consideration of the mutual covenants, agreements and understandings herein contained, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1 Definitions. For the purposes of this Agreement, the following terms have the meanings set forth below:

"Agreed Value" means, with respect to a share of Executive Stock as of any date of determination, the value of such share of Executive Stock as of such date of determination determined as follows:

(i)      for purposes of Section 2.1:

(1)    calculating the product of 10 multiplied by the net income before income taxes of the Company for the fiscal year preceding such date of determination, determined on a basis consistent with GAAP, provided that in determining such net income before income taxes, any extraordinary gains or losses, any impairments of goodwill or other assets, and any gains or losses on the sale of assets not in the ordinary course of business of the Company and its consolidated subsidiaries shall be excluded;

(2)    subtracting from the amount derived in (1) above the amount of any Indebtedness owed by the Company and its consolidated subsidiaries to third parties as of the end of such fiscal year; provided, however, that any such Indebtedness incurred by the Company related directly to the consummation of any stock transactions or corporate reorganizations that occur after the date of this Agreement, but prior to the end of the

EXHIBIT D-17

fiscal year preceding the relevant date of determination shall not be subtracted from the

1

# EXHIBIT D-17

amount derived in (1) above, if in connection with any such stock transactions or corporate reorganizations, any stockholders of the Company (not including the Executive or his successors in ownership of the subject Executive Stock) received a distribution or other payment from the Company with respect to such stockholders' capital stock in the Company; and

(3) dividing the amount derived as a result of the calculation provided for in (3) above by the Common Stock Deemed Outstanding (as defined in the Stockholders Agreement) to arrive at an Agreed Value per share.

(ii)        for purposes of Section 2.2:

(1) calculating the difference between the total assets and the total liabilities of the Company as of the end of the fiscal quarter preceding such date of determination, determined on a basis consistent with GAAP and the Company's accounting practices, at the date hereof ("Net Book Value"); and

(2) calculating the difference between the Net Book Value of the Company immediately before and immediately following consummation of any stock transactions or corporate reorganizations that occur after the date of this Agreement, but prior to the end of the fiscal quarter preceding the relevant date of determination, and adding the absolute value of the aggregate of such differences to the amount derived as a result of the calculation in (1) above in the event that the following has occurred:

In connection with any such stock transactions or corporate reorganizations, any stockholders of the Company (not including the Executive or his successors in ownership of the subject Executive Stock) receive a distribution or other payment from the Company with respect to such stockholders' capital stock in the Company that results in a decrease in the Net Book Value of the Company immediately following consummation of any such transaction.

(3) dividing the amount derived as a result of the calculation provided for in (2) above by the Common Stock Deemed Outstanding to arrive at an Agreed Value per share.

For purposes of clarity, if the Agreed Value determined for purposes of Section 2.1 or 2.2 is not greater than $0, the Agreed Value shall be deemed to be $0.

"Arbitration Law" has the meaning set forth in Section 4.14 (c). "Board" means the

Company's Board of Directors.

"Business Day" means any day other than Saturday or Sunday and any other day on which commercial banks located in San Francisco, California or New York City are required or authorized by law to remain closed.

"Capital Lease Obligations" means for any person as of the date of determination, the obligations of such Person to pay rent and other amounts under *any* lease of (or other arrangement conveying the right to use) real or personal property, or combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP.

EXHIBIT D-17

HOUOI:846487.1                                    2

# EXHIBIT D-17

"Common Stock" means the Company's Common Stock, no par value.

"Company" has the meaning set forth in the introductory paragraph of this Agreement.

"Family Group" has the meaning set forth in the Stockholders Agreement.

"GAAP" means generally accepted accounting principles in the Unites States of America in effect from time to time.

"Guarantee" of or by any Person means any obligations, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments , (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (0 all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (j) all obligations, contingent or otherwise of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extend such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

The Indebtedness of any Person shall include any Indebtedness of any partnership in which such Person is the general partner.

"Net Book Value" has the meaning assigned in the definition of "Agreed Value".

"Party" and "Parties" have the meanings set forth in the introductory paragraph to this Agreement.

"Permanent Disability" has the meaning set forth in Section 2.1.

"Permitted Transferee" has the meaning assigned to such term in the Stockholders Agreement.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Prime Rate" means the rate per annum equal to the prime rate published in *The Wall Street Journal* on the closing date of any purchase by the Company of Executive Stock pursuant to the

# EXHIBIT D-17

terms and conditions of this Agreement (or, if the prime rate is not so published on such date, the prime rate announced publicly by JPMorgan Chase Bank or its successor on such date).

"Regular Employment" means (i) the employment by the Company or any of its Subsidiaries of the Executive to perform regular and recurring duties for an agreed compensation and for a period of at least eleven months per year and thirty-five hours per week or (ii) Executive serving as an officer or director of the Company.

"Repurchase Notice" means a written notice advising of the repurchase of Executive Stock pursuant to Article B.

"Repurchase Price" means, with respect to a number of shares of Executive Stock to be purchased by the Company pursuant to the terms and conditions of this Agreement, an amount equal to the product of such number of shares of Executive Stock multiplied by the Agreed Value.

"Stockholders Agreement" means the Stockholders Agreement, dated as of July 7_, 2004, by and among Universal Computer Consulting Holding, Inc., its stockholders and the spouses of its stockholders who are individuals, as amended, restated or modified from time to time.

"Stock Purchase and Repurchase Agreement" means that certain Stock Purchase and Repurchase Agreement, dated as of July 7, 2004, by and among the Company, VEF, Spanish Steps, the Executive and the other parties thereto as amended, restated or modified from time to time in accordance with its terms.

"Transfer" means any sale, transfer, assignment, pledge, hypothecation, gift or any other disposition of, encumbrance upon or other disposal, whether voluntarily or by operation of law, whether for consideration or for no consideration.

## ARTICLE II
## REPURCHASE RIGHTS

2.1 Death of Executive, Retirement of Executive at Age 65 or Permanent Disability of Executive. If the Executive (a) dies, (b) retires from Regular Employment by the Company and its Subsidiaries at or after age 65 or (c) becomes unable to substantially perform such duties due to physical or mental incapacity and is not expected to be able to substantially perform his duties for at least 120 consecutive days as determined in good faith by an independent physician selected by the board of directors of the Company ("Permanent Disability"), (1) from the date of this Agreement until July 7, 2009 (A) the Company if Spanish Steps provides its prior written consent, which consent may be granted or withheld in the sole discretion of Spanish Steps, to such purchase by the Company or (B) VEF, if Spanish Steps does not provide such consent, and (2) after July 7, 2009 the Company shall purchase, and Executive, Executive's Spouse and Executive's other Permitted Transferees shall sell, all of the Executive Stock (whether held by Executive, the Executive's Spouse or one or more of Executive's other Permitted Transferees, but excluding any Executive Stock that has been Transferred in accordance with the Stockholders Agreement to a Person other than a Permitted Transferee prior to the date of the event specified in clause (a), (b) or (c) of this Section 2.1) at a price per share of Executive Stock equal to the Agreed Value.

2.2 Termination of Regular Employment, Divorce or Death of Executive's Spouse. If (a) Executive ceases Regular Employment with the Company or any of its Subsidiaries for any reason other than retirement at or after age 65, Permanent Disability or death, (b) the Executive and Executive's

EXHIBIT D-17

Spouse divorce or (c) Executive's Spouse dies, Executive's Spouse is, or is deemed to be, by virtue of the community property laws of the State of Texas or any other applicable jurisdiction, the owner of an interest in the Executive Stock, and applicable laws of descent and distribution do not provide for the Transfer of such interest of Executive's Spouse in the Executive Stock to the Executive or the Executive's Family Group, (1) from the date of this Agreement until July 7, 2009 either (A) the Company, if Spanish Steps provides its prior written consent, which consent may be granted or withheld in the sole discretion of Spanish Steps, to such purchase by the Company or (B) VEF, if Spanish Steps does not provide such consent, and (2) after July 7, 2009, the Company, shall purchase, and the Executive, Executive's Spouse and Executive's other Permitted Transferees shall sell, (i) all of the Executive Stock in the case of Executive so ceasing Regular Employment, (ii) the portion of the Executive Stock allocated to Executive's Spouse in the case of such divorce and (iii) the portion of the Executive Stock that would otherwise be Transferred to *any* Person other than Executive or the Executive's Family Group in the case of such death of Executive's Spouse (in any case, whether held by Executive, Executive's Spouse or one or more of Executive's other Permitted Transferees, but excluding any Executive Stock that has been Transferred in accordance with the Stockholders Agreement to a Person other than a Permitted Transferee prior to the date of the event specified in clause (a), (b) or (c) of this Section 2.2) at a price per share of Executive Stock equal to the Agreed Value.

2.3 <u>Delivery of Notice and Closing.</u> VEF or the Company, as the case may be, shall deliver a Repurchase Notice to Executive, Executive's Spouse and any other applicable Permitted Transferee of the Executive within ninety (90) days after the date VEF or the Company, as the case may be, is notified (or otherwise gains actual knowledge) of the event giving rise to the purchase of the Executive Stock pursuant to Section 2.1 or Section 2.2. The closing of the purchase of the Executive Stock shall take place at the Company's executive offices on the later of (a) in the event of the death of Executive or Executive's Spouse, the 90th day following the date that the personal representative of the estate of Executive or Executive's Spouse has been duly appointed and qualified in related probate proceedings (but not later than 180 days after the death of the Executive or Executive's Spouse) and (b) the tenth day following the date of delivery of the Repurchase Notice (provided, that if such tenth day is not a Business Day, then the closing shall take place on the first Business Day thereafter). The Company or VEF, as the case may be, may elect to pay for the Executive Stock to be purchased pursuant to this Section 2.1 or Section 2.2 in cash in one lump-sum or in no more than ten (10) semi-annual installments, with interest accruing on the unpaid balance of the Repurchase Price at the Prime Rate and payable semiannually (commencing on the date of closing of such purchase); provided, however, that any such payment funded from the proceeds of any key man life insurance policy obtained as provided in Section 4.15 shall be paid in one lump-sum; and provided, further, that in the event the Company or VEF, as the case may be, elects to pay for such Executive Stock by making ten (10) semi-annual installments, it shall pledge such Executive Stock as security for its obligation to make such payments. The Executive and Executive's Spouse hereby bind their respective estates, personal representatives, heirs and assigns to sell the Executive Stock in accordance with the terms of this Agreement

2.4 <u>Transfer of Executive Stock</u> Following the date of any event specified in clause (a), (b) or (c) of Section 2.1 or clause (a), (b) or (c) of Section 2.2, none of the Executive, the Executive's Spouse or any of their Permitted Transferees shall be entitled to Transfer (including, without limitation, any Transfer pursuant to any provision of the Stockholders Agreement) any of the Executive Stock subject to purchase pursuant to Section 2.1 or Section 2.2 unless the Company or VEF, as the case may be, defaults on the purchase of such Executive Stock hereunder.

Ho

EXHIBIT D-17

uo1:8464
87.1

5

I

EXHIBIT D-17

EXHIBIT C

**<u>Form of Indemnification Agreement</u>**

See attachment.

EXHIBIT D-17

1

I

EXHIBIT D-17

**INDEMNIFICATION AGREEMENT**

This INDEMNIFICATION AGREEMENT (this "Agreement") is made as of July 7, 2004, by and among SPANISH STEPS HOLDINGS, LTD., a corporation organized under the laws of the British Virgin Islands (the "Indemnitor"), VISTA EQUITY FUND III, L.P., a Cayman Islands exempted limited partnership ("VEF"), and UNIVERSAL COMPUTER CONSULTING HOLDING, INC., a Delaware corporation (the "Company"). Each of the Indemnitor, VEF and the Company is individually referred to herein as a "Party" and are collectively referred to herein as the "Parties." Capitalized terms used and not otherwise defined herein are defined in Article I below.

WHEREAS, to induce VEF to complete the transactions contemplated by the Stock Purchase and Repurchase Agreement, the Indemnitor has agreed to indemnify VEF and the Company from and against certain Losses.

NOW, THEREFORE, in consideration of the mutual covenants, agreements and understandings herein contained, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1     Definitions. For the purposes of this Agreement, the following terms have the meanings set forth below:

"Arbitration Law" has the meaning set forth in Section 4.14(c).

"Business Day" means any day other than Saturday or Sunday and any other day on which commercial banks located in San Francisco, California or New York, New York are required or authorized by law to remain closed.

"Closing" has the meaning set forth in Section 2.2 of the Stock Purchase and Repurchase Agreement.

"Closing Date" has the meaning set forth in Section 2.2 of the Stock Purchase and Repurchase Agreement.

"Company" has the meaning set forth in the introductory paragraph of this Agreement.

"Indemnification Basket" has the meaning set forth in Section 2.3.

"Indemnified Parties" has the meaning set forth in Section 2.2(a).

"Indemnitee" has the meaning set forth in Section 2.2(c).

EXHIBIT D-17

"Indemnitor" has the meaning set forth in the introductory paragraph of this Agreement.

"Losses" has the meaning set forth in Section 2.2(a).

"Party" and "Parties" have the meanings set forth in the introductory paragraph to this Agreement.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Stock Purchase and Repurchase Agreement" means that certain Stock Purchase and Repurchase Agreement, dated as of July 7, 2004, by and among the Company, VEF, Indemnitor and the other parties thereto as amended, restated or modified from time to time in accordance with its terms.

"Stock Sale Purchase Price" has the meaning set forth in Section 2.2(a) of the Stock Purchase and Repurchase Agreement.

"Survival Period" has the meaning set forth in Section 2.1.

ARTICLE II
INDEMNIFICATION

2.1   Survival of Representations and Warranties and Covenants. Notwithstanding anything to the contrary set forth in the Stock Purchase and Repurchase Agreement, the representations and warranties of the Indemnitor and the Company contained in the Stock Purchase and Repurchase Agreement or in any certificate delivered pursuant thereto shall, for purposes of the terms and conditions of this Agreement, survive the Closing until the expiration of eighteen (18) months following the Closing Date; provided, that the representations and warranties contained in Section 3.7 of the Stock Purchase and Repurchase Agreement shall survive until ninety (90) days after the expiration of the statute of limitations applicable to the matters covered thereby. The Parties intend to shorten the statute of limitations and agree that no claims or causes of action may be brought against the Indemnitor based, directly or indirectly, upon any of the representations or warranties of Indemnitor and the Company contained in the Stock Purchase and Repurchase Agreement or in any certificate delivered pursuant thereto after the applicable period referred to in the preceding sentence of this Section 2.1 (the "Survival Period").

2.2   IndemnificationIndemnification for the Benefit of VEF and the Company. The Indemnitor shall indemnify VEF, the Company and their respective Affiliates, shareholders, partners, officers, directors, employees, agents, representatives, successors and permitted assigns (collectively, the "Indemnified Parties") and save and hold each of them harmless against and pay on behalf of or reimburse such Indemnified Parties as and when incurred for any loss, liability, demand, claim, action, cause of action, cost, damage, deficiency, tax, penalty, fine or expense, whether or not arising out of third party claims (including interest, penalties, reasonable

# EXHIBIT D-17

attorneys', consultants' and experts' fees and expenses and all amounts paid in investigation, defense or settlement of any of the foregoing) (but not including any indirect, consequential, special, exemplary or punitive damages or damages for loss profits except in the case of indirect, consequential, special, exemplary or punitive damages actually paid by the Indemnitee to a third party in connection with a third claim as provided in Section 2.4(f) below) (collectively, "Losses"), which *any* such Indemnified Party may suffer, sustain or become subject to, that arise out of or as a result of, or are based upon any facts or circumstances which constitute a breach of any representation or warranty of the Company or the Indemnitor under the Stock Purchase and Repurchase Agreement, or in any of the certificates furnished to VEF by the Company or the Indemnitor pursuant thereto.

(b)      <u>Manner of Payment.</u> Any indemnification obligations of the Indemnitor under this Agreement shall be paid by wire transfer of immediately available funds to an account designated in writing by the applicable Indemnified Party within fifteen (15) days after the determination thereof. Any indemnification payments shall be made together with interest accruing thereon from the date payable to the date of payment at the Prime Rate.

(c)      <u>Defense of Third Party Claims.</u> Any Indemnified Party making a claim for indemnification under this <u>Section 2.2</u> (an "Indemnitee") shall notify the Indemnitor in writing of the claim promptly after receiving written notice of any action, lawsuit, proceeding, investigation or other claim against it by a third party (a "Third Party Claim"), which notice shall set forth with as much specificity as is reasonably practical a description of the claim, the amount thereof (if known and quantifiable) or, to the extent reasonably practicable, a reasonable estimate of the amount thereof and the basis thereof; provided, that the failure to so notify the Indemnitor shall not relieve the Indemnitor of its obligations hereunder unless the Indemnitor shall be actually prejudiced by such failure to so notify. The Indemnitor shall be entitled to participate in the defense of such action, lawsuit, proceeding, investigation or other claim giving rise to an Indemnitee's claim for indemnification at such Indemnitor's expense, and at its option (subject to the limitations set forth below) shall be entitled to assume the defense thereof by appointing a reputable counsel reasonably acceptable to the Indemnitee to be the lead counsel in connection with such defense; provided, that:

(i)      the Indemnitee shall be entitled to participate in the defense of such claim and to employ counsel of its choice for such purpose; provided, that the fees and expenses of such separate counsel shall be borne by the Indemnitee (other than any fees and expenses of such separate counsel that are incurred prior to the date the Indemnitor notified the Indemnitee of its election to assume control of such defense which, notwithstanding the foregoing, shall be borne by the Indemnitor); and provided, further, that the Indemnitor shall be liable to the Indemnitee hereunder for any legal or other expenses incurred by the Indemnitee in connection with its participation in the defense thereof if (i) the Indemnitor fails to assume the defense or diligently prosecute the Third Party Claim or (ii) there shall exist or develop a conflict that would ethically prohibit counsel to the Indemnitor from representing the Indemnitee;

(ii)      if the Indemnitor fails to assume the defense of a Third Party Claim within fifteen (15) days after receipt of written notice of the Third Party Claim, then the Indemnitee shall have the right to defend the Third Party Claim by promptly and vigorously prosecuting all appropriate proceedings to a final conclusion or settlement; provided, that the

EXHIBIT D-17

I

HOUOI:8437293

3

I

EXHIBIT D-17

Indemnitor shall have the right to participate in the defense of the Third Party Claim using counsel of its choice, but the Indemnitee shall not be liable to the Indemnitor for any legal or other expenses incurred by the Indemnitor in connection with its participation in the defense thereof;

(iii)    if requested by the Party defending the Third Party Claim, the other Parties agree to cooperate with the Party defending the Third Party Claim and its counsel in contesting any Third Party Claim, including (A) all aspects of any investigation, defense, pretrial activities, trial, compromise, settlement or discharge of such Third Party Claim, (B) by providing the Party defending the Third Party Claim with reasonable access to employees and officers (including as witnesses) and other information and (C) the making of any related counterclaim against the third party asserting the Third Party Claim or any cross-complaint against any Person, in each case only if and to the extent that any such counterclaim or cross-complaint arises from the same actions or facts giving rise to the Third Party Claim; and

(iv)    the Party defending the Third Party Claim shall have the right, acting in good faith and with due regard to the interests of the other party, to control all decisions regarding the handling of the defense without the consent of the other party; provided, that the Party defending the Third Party Claim shall obtain the prior written consent of the Indemnitee (which consent shall not be unreasonably withheld) before entering into any settlement of a claim or ceasing to defend such claim if, pursuant to or as a result of such settlement or cessation, injunctive or other equitable relief will be imposed against the Indemnitee or if such settlement does not expressly and unconditionally release the Indemnitor and the Indemnitee from all liabilities and obligations with respect to such claim, without prejudice.

2.3    Limitations on Indemnification. The indemnification obligations of the Indemnitor under Section 2.2 shall not apply until aggregate Losses relating to all claims for which any Indemnified Party is entitled to payment under Section 2.2 exceed $200,000 (the "Indemnification Basket"); provided, that in such event, the amount of all such Losses (including the Indemnification Basket) shall be payable. The Indemnitor's aggregate obligation to indemnify the Indemnitees under Section 2.2 shall in no event exceed the Stock Sale Purchase Price.

2.4    Other Indemnification Provisions. (a) The Indemnitor hereby acknowledges and agrees that it shall have no claims or right to contribution or indemnity from the Company with respect to any amounts paid by the Indemnitor pursuant to Section 2.2.

(b) The amount of any Losses shall be reduced by (A) any amount received by any Indemnified Party with respect thereto under any insurance coverage or from any other Person alleged to be responsible therefor and (B) the amount of any tax benefit available to any Indemnified Party relating thereto. The Indemnified Parties shall use reasonable efforts to collect any amounts available under such insurance coverage and from such other Persons alleged to have responsibility. If any Indemnified Parties receive an amount under insurance coverage or from such other Person with respect to Losses at any time subsequent to any indemnification provided by the Indemnitor pursuant to Section 2.2, then such Indemnified Party shall promptly reimburse the Indemnitor for any payment made or expense incurred by the

EXHIBIT D-17

I

HOUOI:843729.3                                    4

I

EXHIBIT D-17

Indemnitor in connection with providing such indemnification up to such amount received by the Indemnified Party.

(c)     The Indemnitor shall be obligated to indemnify the Indemnitees only for those claims giving rise to Losses as to which the Indemnitees have given the Indemnitor written notice thereof prior to the end of the Survival Period. Any written notice delivered by an Indemnitee to the Indemnitor with respect to Losses shall set forth with as much specificity as is reasonably practicable a description of the claim, the amount thereof (if known and quantifiable) or, to the extent reasonably practicable, a reasonable estimate of the amount thereof and the basis thereof.

(d)     Each of the Parties acknowledges and agrees that the Parties' sole and exclusive remedies with respect to any and all claims relating to breaches of any representation or warranty of the Company or Indemnitor under the Stock Purchase and Repurchase Agreement or in any of the certificates furnished to VEF by the Company or Indemnitor pursuant thereto (other than claims based on fraud), shall be pursuant to the indemnification provisions set forth in this Section 2.2. In furtherance of the foregoing, each of the Indemnified Parties hereby waives any and all rights, claims and causes of action relating to breaches of any representation or warranty of the Company or Indemnitor under the Stock Purchase and Repurchase Agreement or in any certificates furnished to VEF by the Company or Indemnitor pursuant thereto (other than claims and causes of action based on fraud).

(e)     The parties hereto acknowledge that the Company is expected in most circumstances to be the primary beneficiary of indemnification claims, but the other Indemnified Parties may also have claims against the Indemnitor under Section 2.2. It is intended, however, that the Company shall have the primary claim for indemnification in any matter related to the property, assets and liabilities of the Company and its subsidiaries and that other Indemnified Parties shall be entitled to indemnification compensation only to the extent they suffer any direct Losses, as opposed to indirect harm, as a result of Losses related to the property, assets and liabilities of the Company.

(f)     Notwithstanding anything to the contrary contained in any other provision of this Agreement, the Indemnitor shall not be required to indemnify any of the Indemnified Parties for any indirect, consequential, special, exemplary or punitive damages or damages for lost profits (except for direct losses by an Indemnified Party as a result of indirect, consequential, special, exemplary or punitive damages actually paid to any third party by the Indemnified Party seeking indemnity hereunder).

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Each Party represents and warrants that (a) this Agreement has been duly authorized, executed and delivered by such Party and constitutes the valid and binding obligation of such Party, enforceable in accordance with its terms, except as the enforceability hereof may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally or (ii) applicable equitable principles (whether considered in a proceeding at law or in equity) and (b) such Party has not granted and is

EXHIBIT D-17

not a party to any proxy, voting trust or other agreement that is inconsistent with, conflicts with, or violates any provision of this Agreement.

## ARTICLE IV
## MISCELLANEOUS

4.1 <u>Remedies.</u> All rights and remedies available to any Party hereunder may be exercised singularly or concurrently. One or more successive actions may be brought by the Indemnitees against the Indemnitor, either in the same action or in separate actions, until all of the obligations of the Indemnitor to such Persons under this Agreement are performed in full.

4.2 <u>Consent to Amendments; Waivers.</u> This Agreement may be amended, or any provision of this Agreement may be waived upon the approval, in a writing, executed by each Party hereto. No course of dealing between any Party hereto shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any such party hereto under or by reason of this Agreement.

4.3 <u>Successors and Assigns.</u> This Agreement and all covenants and agreements contained herein and rights, interests or obligations hereunder, by or on behalf of any of the Parties hereto, shall bind and inure to the benefit of the respective successors and permitted assigns of the Parties hereto whether so expressed or not, except that neither this Agreement nor any of the covenants and agreements herein or rights, interests or obligations hereunder may be assigned or delegated by any Party without the prior written consent of each other Party.

4.4 <u>Severability.</u> Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement or the application of any such provision to any Person or circumstance shall be held to be prohibited by, illegal or unenforceable under applicable law or rule in any respect by a court of competent jurisdiction, such provision shall be ineffective only to the extent of such prohibition, illegality or unenforceability, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

4.5 <u>Counterparts.</u> This Agreement may be executed in counterparts (including by means of telecopied signature pages), any one of which need not contain the signatures of more than one Party, but all such counterparts taken together shall constitute one and the same agreement.

4.6 <u>Descriptive Headings; Interpretation.</u> The headings and captions used in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. The use of the word "including" herein shall mean "including without limitation." Use of either the singular or the plural should not be deemed a limitation, and the use of the singular should be construed to include, where appropriate, the plural. Use of the masculine, feminine or neuter pronouns should not be deemed a limitation, and the use of any such pronouns should be construed to include, where appropriate, the other pronouns.

4.7     <u>Entire Agreement.</u> This Agreement contains the entire agreement and

EXHIBIT D-17

understanding among the Parties with respect to the subject matter hereof and supersedes all

I

EXHIBIT D-17

prior agreements and understandings, whether written or oral, relating, in any way, to such subject matter.

4.8 <u>No Third-Party Beneficiaries.</u> This Agreement is for the sole benefit of the Parties, their permitted successors and assigns and the Indemnified Parties and nothing herein expressed or implied shall give or be construed to give any Person, other than the Parties, such permitted successors and assigns and the Indemnified Parties, any legal or equitable rights hereunder.

4.9 <u>Governing Law.</u> All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or *any* other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware. In furtherance of the foregoing, the internal law of the State of Delaware shall control the interpretation and construction of this Agreement, even though under that jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily apply.

4.10 <u>Notices.</u> All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when delivered personally to the recipient or when sent by facsimile followed by delivery by reputable overnight courier service, one day after being sent to the recipient by reputable overnight courier service (charges prepaid) or five days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid. Such notices, demands and other communications shall be sent to each Party at its address indicated below or to such other address or to the attention of such other Person as the recipient Party has specified by prior written notice to the sending Party. All notices, demands and other communications hereunder may be given by any other means (including telecopy or electronic mail), but shall not be deemed to have been duly given unless and until it is actually received by the intended recipient.

If to the Indemnitor:

Spanish Steps Holdings, Ltd.
33 Church Street Hamilton,
Bermuda HM12
Attention:      Gordon Howard
Facsimile:      441.292.2668

EXHIBIT D-17

<u>If to the Company:</u>

Universal Computer Consulting Holding, Inc.
6700 Hollister
Houston, TX 77040
Attention:      Robert T. Brockman
Telecopy:      713.718.1465

<u>with a copy (which shall not constitute notice to the Company) to:</u>

Baker Botts L.L.P. 910
Louisiana Street One
Shell Plaza
Houston, TX 77002
Attention: Rufus Cormier, Esq.
Facsimile: 713.229.7744

<u>If to VEF:</u>

c/o Performance Investments LLC
c/o Vista Equity Partners, LLC 150
California Street
19th Floor
San Francisco, CA 94111
Attention:      Robert F. Smith
Facsimile:      415.765.6666

<u>with a copy (which shall not constitute notice to the Company) to:</u>

Kirkland & Ellis LLP
Eunu Chun, Esq.   Citigroup Center
212.446.4900      153 East 53rd Street
                  39th Floor
**4.11**          New York, NY 10022-4611   **JURISDICTION   AND   VENUE.   ALL**
**JUDICIAL**      Attention:  **PROCEEDINGS BROUGHT BY OR AGAINST ANY**
**PARTY      TO** Facsimile:  **CHALLENGE OR ENFORCE ANY ARBITRAL ORDER**
**OR AWARD PURSUANT TO <u>SECTION 4.13</u> HEREOF MAY BE BROUGHT IN THE**
**CHANCERY COURT OF THE STATE OF DELAWARE OR ANY FEDERAL COURT**
**OF COMPETENT JURISDICTION IN THE STATE OF DELAWARE. BY EXECUTION**
**AND DELIVERY OF THIS AGREEMENT, EACH PARTY ACCEPTS FOR ITSELF AND**
**IN   CONNECTION   WITH   ITS   PROPERTIES,   GENERALLY   AND**
**UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF**

HOUOI:843729.3                          8

EXHIBIT D-17

**THE AFORESAID COURTS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HEREBY WAIVES ANY CLAIM THAT SUCH JURISDICTION IS AN INCONVENIENT FORUM OR AN IMPROPER FORUM BASED ON LACK OF VENUE. EACH PARTY DESIGNATES AND APPOINTS CT CORPORATION (AND SUCH OTHER PERSONS AS MAY HEREAFTER BE SELECTED BY SUCH PERSON WITH THE CONSENT OF THE PURCHASER) TO RECEIVE ON ITS BEHALF SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDINGS IN ANY SUCH COURT, SUCH SERVICE BEING HEREBY ACKNOWLEDGED BY EACH PARTY TO BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT. A COPY OF SUCH PROCESS SO SERVED SHALL BE MAILED BY REGISTERED MAIL TO EACH PARTY AT SUCH PERSON'S RESPECTIVE ADDRESSES PROVIDED HEREIN. TO THE EXTENT PERMITTED BY LAW, IF ANY AGENT APPOINTED BY ANY PARTY REFUSES TO ACCEPT SERVICE, SUCH PARTY HEREBY AGREES THAT SERVICE UPON SUCH PERSON BY MAIL SHALL CONSTITUTE SUFFICIENT NOTICE.**

4.12 <u>Construction.</u> The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any Party hereto by virtue of the authorship of *any* of the provisions of this Agreement.

4.13 <u>Time is of the Essence.</u> The Parties hereby expressly acknowledge and agree that time is of the essence for each and every provision of this Agreement.

4.14 <u>Dispute Resolution.</u>

(a) <u>Resolution of Disputes.</u> If a Dispute arises among any of the Parties pursuant to or in connection with or under this Agreement, the Parties agree to use the following procedures in good faith to resolve such Dispute promptly and non judicially. For purposes of this Agreement, <u>"Dispute"</u> shall mean any alleged breach of any representation, warranty or obligation herein, or a disagreement regarding the interpretation, performance or nonperformance of any provision thereof, or the validity, scope and enforceability of these dispute resolution procedures, or any dispute regarding any damages arising from the termination of this Agreement. Any Party may give written notice to any other Party of the existence of a Dispute (a <u>"Dispute Notice").</u>

(b) <u>Negotiation.</u> Within ten days after delivery of any Dispute Notice the Parties involved in the Dispute shall meet at a mutually agreeable time and place and thereafter as often as they deem reasonably necessary to exchange relevant information and attempt in good faith to negotiate a resolution of the Dispute. Each of the Parties involved in the Dispute shall appoint an executive officer (or with respect to Parties that are not corporations, a person with similar authority) who has authority to settle the Dispute to attend such meeting. If the Dispute has not been resolved within thirty (30) Business Days after the delivery of the Dispute Notice, then either Party may, by delivering notice to the other Party, commence arbitration proceedings. Each of the Parties involved in the Dispute shall comply with reasonable requests for information made

HOUOI:843729.72

9

EXHIBIT D-17

by the other Party.

I

EXHIBIT D-17

(c)      Arbitration. If the Parties are not successful in resolving a Dispute, then the Dispute shall be resolved by binding arbitration conducted by three arbitrators in accordance with the Arbitration Law of Delaware from time to time in force in Delaware as modified by the terms hereof ("Arbitration Law"). Either Party may initiate final resolution of the Dispute by delivering a written demand for arbitration to the other Party. Each Party shall notify the other Party of its appointment of one neutral arbitrator within fifteen (15) days after receipt of such written demand for arbitration and the third neutral arbitrator shall be appointed by a court of competent jurisdiction in Delaware. Each of the three arbitrators shall function as an arbitrator without any one of them serving as an umpire or having more authority than the other two. If such arbitrator appointments are not made within said time periods, the arbitrators shall be selected by a court of competent jurisdiction in Delaware. All arbitrators must be attorneys with experience in matters described in this Agreement. Further, no arbitrator may be a current or former client or employee of any Party or an attorney that has provided legal advice to any Party within the preceding five years, nor may an arbitrator be a current or former employee of a direct competitor of any of the Parties. Additionally, prior to their assumption of duties as an arbitrator, all arbitrators must sign an oath of neutrality agreed to by the Parties. If requested by either Party, the arbitration award shall set forth findings of fact and conclusions of law upon which the award is based in the same manner as a judgment from a court of Delaware. Judgment upon the award rendered by the arbitrators shall be binding upon the Parties and may be entered by *any* court having jurisdiction thereof. The place of arbitration shall be Houston, Texas, unless the Parties mutually agree otherwise. The language of the arbitration shall be English. The arbitrators may allocate against the losing Party all reasonable costs of arbitration including the fees of the arbitrators and any other costs described herein so long as such arbitrators direct in the award that any such costs shall not be taxable in the courts of Delaware. The Parties agree that a Party's remedies under this arbitration procedure may be inadequate and that, notwithstanding this paragraph (c), such aggrieved Party shall be entitled to seek injunctive relief. The institution and maintenance of an action to obtain or enforce equitable remedies shall not constitute a waiver of the right of any Party including the plaintiff to submit the controversy or claim to arbitration.

(d)      General Dispute Resolution Provisions.

(i)      All deadlines specified in this Section 4.13 may be extended by mutual agreement. The procedures specified in this Section 4.13 are an essential provision of the Agreement and are legally binding on the parties. These procedures shall be the sole and exclusive procedures for the resolution of any Dispute among the Parties arising out of or relating to this Agreement. Any and all actions to enforce the obligations under this Section 4.13 shall be brought pursuant to the provisions of Section 4.10.

(ii)      The Parties acknowledge that the provisions of this Section 4.13 are intended to provide a private resolution of Disputes between them. Accordingly, all documents, records, and other information relating to the Dispute shall at all times be maintained in the strictest confidence and not disclosed to any third party, other than the arbitrators, except where specifically allowed hereunder. All proceedings, communications and negotiations pursuant to this Section 4.13 are confidential. In the event of any judicial challenge to, or enforcement of, any order or award hereunder, any Party may designate such portions of the record of such proceedings, communications, and negotiations as such Party deems appropriate

HOUOI:843729.3                                                10

# EXHIBIT D-17

to be filed under seal. All proceedings, communications and negotiations pursuant to this <u>Section 4.13</u> shall be treated as compromise negotiations for all purposes, including for purposes of the U.S. Federal Rules of Evidence and state rules of evidence. None of the statements, disclosures, offers, or communications (or other assertions made in any proceeding or negotiation) made pursuant to this <u>Section 4.13</u> shall be deemed admissions, nor shall any of said statements, disclosures, offers, communications or assertions be admissible for any purpose other than the enforcement of the terms of this <u>Section 4.13.</u>

(iii) The Parties agree to act in good faith to comply with all of their respective obligations under this Agreement as much as possible as if there were no Dispute during any pending mediation or arbitration hereunder.

(e) <u>Notice.</u> The Parties agree to have any Dispute decided by neutral arbitration as provided in this <u>Section 4.13</u> and the parties are giving up any rights they might possess to have the Dispute litigated in a court or by a jury trial. The Parties are giving up their judicial rights to discovery and appeal, unless such rights are specifically included in this <u>Section 4.13.</u> The Parties acknowledge and agree that their agreement to this arbitration provision is voluntary.

* * *

**[Signature pages follow]**

11

# EXHIBIT D-17

IN WITNESS WHEREOF, the Parties have executed this Indemnification Agreement on the date first written above.

**INDEMNITOR:**

SPANISH STEPS HOLDINGS, LTD.

By: _____
      Name: Gordon Howard
      Title: Managing Director

**COMPANY:**

UNIVERSAL COMPUTER CONSULTING HOLDING, INC.

_____
By:
Name: Robert T. Brockman
Title: Chairman and Chief Executive Officer

**VEF:**

VISTA EQUITY FUND III, L.P.

By: Performance Investments LLC Its:
      General Partner

_____
By:
      Name:
      Title:

HOUO1 :843729.3

# EXHIBIT

# D-18

EXHIBIT D-18

# STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT (this "Agreement") is made as of _____ __, 2006, by and among VISTA EQUITY FUND III, L.P., a Cayman Islands exempted limited partnership ("Seller"), SPANISH STEPS HOLDINGS, LTD., a corporation organized under the laws of the British Virgin Islands ("Purchaser"), and solely for purposes of Section 5.3 and Article X hereof, UNIVERSAL COMPUTER SYSTEMS HOLDING, INC. (the "Company").  Seller and Purchaser (and the Company, for purposes of Section 5.3 and Article X hereof) are individually referred to herein as a "Party" and are collectively referred to herein as the "Parties."  Capitalized terms used and not otherwise defined herein are defined in Article I below.

WHEREAS, Seller owns 460 shares of Common Stock (as defined below), representing 46% of the outstanding shares of Capital Stock (as defined below) of the Company; and

WHEREAS, the Company desires to pursue an acquisition that would involve incurrence by the Company of significant debt financing and the issuance of additional equity that would have a dilutive effect on current stockholders of the Company; and

WHEREAS, Seller does not wish to participate as an investor in such acquisition and has proposed that its 460 shares of Common Stock be purchased by Purchaser prior to pursuit of such acquisition by the Company; and

WHEREAS, the Purchaser has agreed to purchase from Seller such 460 shares of Common Stock upon the terms and subject to the conditions set forth herein (the "Stock Sale"); and

NOW, THEREFORE, in consideration of the mutual covenants, agreements and understandings herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Definitions.  For the purposes of this Agreement, the following terms have the meanings set forth below:

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, contract or otherwise.

"Amended and Restated Executive Stock Repurchase Agreements" means the respective Amended and Restated Executive Stock Repurchase Agreements, dated as of the Closing Date, by and among the Company, Purchaser and officers of the Company who own

EXHIBIT D-18

Common Stock ("Officer Stockholders") and each such officer's spouse, in form reasonably satisfactory to the Purchaser.

"Amended and Restated Registration Rights Agreement" means that certain Amended and Restated Registration Rights Agreement, dated as of the Closing Date, by and among the Company, Purchaser and the Officer Stockholders, in form reasonably satisfactory to the Purchaser.

"Amended and Restated Stockholders Agreement" means an Amended and Restated Stockholders Agreement, dated as of the Closing Date, by and among the Company, Purchaser, and the Officer Stockholders, in form reasonably satisfactory to the Purchaser.

"Applicable Law" means, with respect to any Person, any statute, law, regulation, ordinance, rule, injunction, order, decree, governmental approval, directive, requirement, or other governmental restriction or any similar form of decision of, or determination by, or any interpretation or administration of any of the foregoing by, any government authority, applicable to such Person or its subsidiaries or their respective assets.

"Arbitration Law" has the meaning set forth in Section 10.14(c).

"Business Day" means any day other than Saturday or Sunday and any other day on which commercial banks located in Houston, Texas or New York, New York are required or authorized by law to remain closed.

"Capital Stock" means all shares, interests, participations or other equivalents of capital stock of the Company, however designated (including, but not limited to, Common Stock).

"Closing" has the meaning set forth in Section 2.2.

"Closing Date" has the meaning set forth in Section 2.2.

"Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Common Stock" means the Company's Common Stock, no par value.

"Dispute" has the meaning set forth in Section 10.14(a).

"Dispute Notice" has the meaning set forth in Section 10.14(a).

"Governmental Entity" means individually, and "Governmental Entities" means collectively, the United States of America or any other nation, any state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government, including any court, in each case having jurisdiction over the Purchaser, the Seller and/or the Company.

"HSR Act" has the meaning set forth in Section 3.2.

EXHIBIT D-18

"Indemnification Basket" has the meaning set forth in Section 9.5.

"Indemnitee" has the meaning set forth in Section 9.4(d).

"Indemnitor" has the meaning set forth in Section 9.3.

"Lien" or "Liens" means any pledge, security interest, encumbrance, claim, right of possession, other defect in title or lien or charge of any kind.

"Management Agreement" means the certain Management Agreement between the Company and VEP, dated as of July 7, 2004.

"Party" and "Parties" has the meaning set forth in the introductory paragraph to this Agreement.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Prime Rate" means the prime rate quoted in *The Wall Street Journal* on any date of determination.

"Purchase Price" has the meaning set forth in Section 2.1.

"Purchased Shares" has the meaning set forth in Section 2.1.

"Purchaser Indemnified Parties" has the meaning set forth in Section 9.4(a).

"Purchaser Losses" has the meaning set forth in Section 9.4(a).

"Registration Rights Agreement" means that certain Registration Rights Agreement, dated as of July 7, 2004, by and among the Company, Purchaser, Seller and the individuals party thereto.

"Regulatory Filings" has the meaning set forth in Section 3.2.

"Securities Act" means the Securities Act of 1933, as amended.

"Seller Indemnified Parties" has the meaning set forth in Section 9.4(b).

"Seller Losses" has the meaning set forth in Section 9.4(b).

"Stock Sale" has the meaning set forth in the recitals hereto.

"Stockholders Agreement" means that certain Stockholders Agreement, dated as of July 7, 2004, by and among the Company, Purchaser, Seller and the individuals party thereto.

EXHIBIT D-18

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, limited liability partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof.  For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing director or general partner of such limited liability company, partnership, association or other business entity.

"Survival Period" has the meaning set forth in Section 9.3.

"Termination Date" means September 30, 2006.

"Third Party Claim" has the meaning set forth in Section 9.4(d).

"Transaction Documents" means this Agreement and all other agreements, instruments, certificates and other documents to be entered into or delivered by any Party pursuant to this Agreement.

"VEP" means Vista Equity Partners, LLC, a Delaware limited liability company.

## ARTICLE II
## SALE OF STOCK

2.1     The Stock Sale.  Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller will sell to Purchaser, and Purchaser will purchase from Seller, 460 shares of Common Stock ("Purchased Shares") for the purchase price of One Hundred Twenty-two Million Dollars ($122,000,000) ("Purchase Price") in cash by wire transfer of immediately available funds to an account or accounts designated by Seller prior to the Closing.

2.2     Closing.  Upon the terms and subject to the conditions set forth in this Agreement, the closing of the transaction contemplated by this Agreement (the "Closing") shall take place at __:__ .m., New York time, on the later of (a) _____, 2006 or (b) the third Business Day after the satisfaction or (to the extent permitted by Applicable Law) waiver of the conditions set forth in Articles VI, VII and VIII (other than those conditions to be satisfied or waived at the Closing), at the offices of Purchaser, St. John's Trust Company (PVT) Limited, Bermudiana Arcade Building, 4th Floor, 27 Queen Street, Hamilton, HM11, Bermuda, or at such other time, date or place agreed to in writing by Seller and Purchaser.  The date on which the Closing occurs is referred to in this Agreement as the "Closing Date".

EXHIBIT D-18

2.3 <u>Closing Deliveries</u>.  Upon the terms and subject to the conditions of this Agreement, at the Closing:

(a) Seller will deliver to Purchaser a certificate or certificates representing 460 shares of Common Stock, accompanied by a stock power or stock powers duly endorsed in blank, and Purchaser will deliver to Seller the Purchase Price as set forth in Section 2.1; and

(b) Seller and Purchaser will each deliver to the applicable Party all other documents, instruments and writings required to be delivered at or prior to the Closing pursuant to this Agreement.

2.4 <u>Restrictions on Transfer</u>.  The certificates representing the shares of Common Stock sold to Purchaser pursuant to this Agreement will bear the following legend:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller represents and warrants to Purchaser as follows:

3.1 <u>Organization, Partnership Power and Authority</u>.  Seller (i) is a limited partnership duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization and (ii) has the requisite partnership power and authority and all partnership approvals necessary to enter into, deliver and perform its obligations pursuant to this Agreement.

3.2 <u>Authorization; No Breach</u>.  The execution and delivery by Seller of this Agreement and all other Transaction Documents to which it is a party and the performance by it of its obligations hereunder and thereunder has been duly authorized by all requisite partnership action of Seller.  This Agreement constitutes a valid and binding obligation of Seller, enforceable in accordance with its terms, except as the enforceability hereof may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws affecting the enforcement of creditors' rights generally or (ii) applicable equitable principles (whether considered in a proceeding at law or in equity).  The execution, delivery and performance by Seller of this Agreement and all other agreements and instruments contemplated hereby to which the Seller is a party and the consummation of the transactions contemplated thereby do not and shall not: (i) conflict with or result in a breach of the terms, conditions or provisions of, (ii) constitute a default under (whether with or without the passage of time, the giving of notice or both), (iii) result in the creation of any Lien upon its partnership interests or

EXHIBIT D-18

assets pursuant to, (iv) give any third party the right to modify, terminate or accelerate any obligation under, (v) result in a violation of, or (vi) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any third party or Governmental Entity pursuant to, (A) the organizational documents of Seller, (B) any Applicable Law to which it is subject, or (C) any material agreement, instrument, order, judgment, or decree to which it is a party, by which it is bound, or to which any of its assets are subject, except for (i) filings required under the U.S. Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act") and applicable non-U.S. competition, antitrust or premerger notification laws (the "Regulatory Filings") and (ii) the provisions contained in the Stockholders Agreement and the Registration Rights Agreement.

3.3     Title.  Seller is and will be on the Closing Date the record and beneficial owner and holder of the shares of Common Stock to be sold to Purchaser pursuant to this Agreement, free and clear of all Liens.  There are no subscriptions, options, warrants, voting trusts, proxies, other commitments, understandings, restrictions or arrangements to which the Seller is a party relating to the sale, voting or transfer of any such shares of Common Stock except for the Stockholders Agreement and the Registration Rights Agreement, each which is being amended and restated as of the Closing Date to, among other things, eliminate any such commitments, understandings, restrictions or arrangements relating to the sale, voting or transfer of Common Stock by Seller.  Seller is not the record or beneficial owner of any shares of Capital Stock of the Company other than the Purchased Shares.

3.4     Litigation, etc.  There is no action, suit, proceeding or investigation pending or, to Seller's knowledge, threatened against Seller that questions the validity of this Agreement or the right of Seller to enter into this Agreement, or to consummate the transactions contemplated hereby, or that could reasonably be expected to materially adversely affect Seller's ability to consummate the transaction contemplated hereby.

3.5     Brokers or Finders.  Seller has not incurred, and will not incur, directly or indirectly, as a result of any action taken by Seller, any liability for brokerage or finders' fees or agents' commissions or any similar charge in connection with this Agreement.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser represents and warrants to Seller as follows:

4.1     Organization, Corporate Power and Authority.  Purchaser (i) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and (ii) has the requisite corporate power and authority and all corporate approvals necessary to enter into, deliver and perform its obligations pursuant to this Agreement.

4.2     Authorization; No Breach.  The execution and delivery by Purchaser of this Agreement and all other agreements and instruments contemplated hereby and the performance by Purchaser of its obligations hereunder and thereunder has been duly authorized by all requisite corporate action of Purchaser.  This Agreement constitutes a valid and binding obligation of Purchaser, enforceable in accordance with its terms, except as the enforceability

EXHIBIT D-18

hereof may be limited by (i) bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws affecting the enforcement of creditors' rights generally or (ii) applicable equitable principles (whether considered in a proceeding at law or in equity).  The execution, delivery and performance by Purchaser of this Agreement and all other agreements and instruments contemplated hereby to which Purchaser is a party and the consummation of the transactions contemplated hereby do not and shall not: (i) conflict with or result in a breach of the terms, conditions or provisions of, (ii) constitute a default under (whether with or without the passage of time, the giving of notice or both), (iii) result in the creation of any Lien upon Purchaser's equity interests or assets of Purchaser pursuant to, (iv) give any third party the right to modify, terminate or accelerate any obligation under, (v) result in a violation of, or (vi) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any third party or Governmental Entity pursuant to, (A) the organizational documents of Purchaser, (B) any Applicable Law to which Purchaser is subject, or (C) any agreement, instrument, order, judgment or decree to which Purchaser is a party, by which it is bound, or to which any of its assets are subject, except for (i) Regulatory Filings and (ii) the provisions contained in the Stockholders Agreement and the Registration Rights Agreement.

4.3     Investment Representations.

(a)     The shares of Common Stock to be acquired by Purchaser pursuant to this Agreement will be acquired for Purchaser's own account and not with a view to, or intention of, distribution thereof in violation of the Securities Act, or any other applicable federal or state or foreign securities laws, and such shares of Common Stock will not be disposed of in contravention of the Securities Act or any applicable federal or state or foreign securities laws. Purchaser is an "accredited investor" as such term is defined in Rule 501(a) of Regulation D under the Securities Act.  Purchaser has not offered or sold any portion of the shares of Common Stock to be acquired by it and has no present intention of reselling or otherwise disposing of any portion of such shares of Common Stock either currently or after the passage of a fixed or determinable period of time or upon the occurrence or nonoccurrence of any predetermined event or circumstance.

(b)     Purchaser is sophisticated in financial matters, is able to evaluate the risks and benefits of the investment in the Common Stock, and has determined that such investment in the Common Stock is suitable for it, based upon its financial situation and needs, as well as its other securities holdings.  Purchaser is able to bear the economic risk of its investment in the Common Stock for an indefinite period of time.

(c)     Purchaser understands that the shares of Common Stock to be purchased have not been, and will not be, registered under the Securities Act or qualified under applicable "Blue Sky" or other state securities laws by reason of specific exemptions from the registration provisions of the Securities Act and the qualification provisions of applicable blue sky and other state securities laws, the availability of which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of its representations as expressed herein. Purchaser understands that no Federal or state agency has passed upon the shares of Common Stock or made any finding or determination as to the fairness of the investment or any recommendation or endorsement of the shares of Common Stock.  Purchaser acknowledges that

EXHIBIT D-18

the shares of Common Stock must be held indefinitely unless subsequently registered under the Securities Act or unless an exemption from such registration is available.

        (d)     Purchaser has had an opportunity to ask questions and receive answers concerning the terms and conditions of the offering of Common Stock and has had full access to such other information concerning the Company as such Purchaser has requested.

        4.4     <u>Litigation, etc</u>.  There is no action, suit, proceeding or investigation pending or, to the knowledge of Purchaser, currently threatened against Purchaser that questions the validity of this Agreement or the right of Purchaser to enter into such agreement, or to consummate the transactions contemplated hereby, or that could reasonably be expected to materially adversely affect the ability of Purchaser to consummate the transaction contemplated hereby.

        4.5     <u>Brokers or Finders</u>.  Purchaser has not incurred, and will not incur, directly or indirectly, as a result of any action taken by it, any liability for brokerage or finders' fees or agents' commissions or any similar charge in connection with this Agreement.

**ARTICLE V**
**COVENANTS AND OTHER AGREEMENTS**

    The Parties agree as follows:

        5.1     <u>Commercially Reasonable Efforts; Further Assurances</u>.  Each of Purchaser and Seller shall use all commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things reasonably necessary, proper or advisable under Applicable Laws to consummate and make effective the transactions contemplated by this Agreement and to fulfill all of the conditions set forth in Articles VI, VII and VIII below.

EXHIBIT D-18

5.2     Public Announcements; Confidentiality.  Subject to Applicable Law, no Party shall issue, or permit any agent or Affiliate to issue, any press releases or otherwise make or permit any agent or Affiliate to make, any public statements with respect to this Agreement and the transactions contemplated hereby, including, without limitation, the identity of any Party.

5.3     Company Consent.  The Company hereby consents to the purchase and sale of the Purchased Shares on the terms and conditions set forth herein, and all Parties hereto hereby waive any rights relating to the purchase or sale of the Purchased Shares they may have under the Stockholders Agreement, Registration Rights Agreement or otherwise that conflict with any of the terms or provisions of this Agreement.

**ARTICLE VI**
**CONDITIONS TO THE OBLIGATIONS OF SELLER**

The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction on or prior to the Closing Date of the following conditions:

6.1     Representations and Warranties; Covenants.  The representations and warranties made by Purchaser in Article IV hereof shall be true and correct in all material respects as of the Closing Date as though then made, except to the extent such representations and warranties expressly relate to an earlier date (in which case as of such earlier date), and Purchaser shall have duly performed or complied with all of the covenants, obligations, and conditions to be performed or complied with by it under the terms of this Agreement on or prior to the Closing Date.

6.2     Closing Deliveries.  At the Closing, Purchaser shall have delivered, or shall have caused to be delivered, to Seller all of the following:

(a)     a certificate of Purchaser's Director, dated as of the Closing Date, certifying that the conditions specified in Sections 6.1 have been fully satisfied;

(b)     a certificate of the Secretary or Assistant Secretary of Purchaser, dated as of the Closing Date, as to the incumbency of any officer of Purchaser executing this Agreement or any document related thereto; and

(c)     a certified copy of the resolutions of the Board of Directors **[and stockholders]; [BVI law]**

**ARTICLE VII**
**CONDITIONS TO THE OBLIGATIONS OF PURCHASER**

The obligations of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction on or prior to the Closing Date of the following conditions:

7.1     Representations and Warranties; Covenants

# EXHIBIT D-18

. The representations and warranties made by Seller in Article III hereof shall be true and correct in all material respects as of the Closing Date as though then made, except to the extent such representations and warranties expressly relate to an earlier date (in which case as of such earlier date), and Seller shall have duly performed or complied with all of the covenants, obligations, and conditions to be performed or complied with by it under the terms of this Agreement on or prior to or at Closing.

7.2     Closing Deliveries.  At the Closing, Seller shall have delivered, or shall have caused to be delivered, to Purchaser all of the following:

(a)     a certificate of the Manager of Seller's General Partner, dated as of the Closing Date, certifying that the conditions specified in Sections 7.1 have been fully satisfied;

(b)     a certificate of the General Partner of Seller, dated as of the Closing Date, as to the incumbency of any officer of Seller or Seller's General Partner executing this Agreement or any document related thereto;

(c)     a certified copy of the Consent of the Partners of Seller authorizing the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby; and

(d)     a good standing certificate of Seller from its jurisdiction of organization dated within thirty (30) Business Days prior to the Closing Date.

(e)     A fully executed Amended and Restated Stockholders Agreement.

(f)     A fully executed Amended and Restated Executive Stock Repurchase Agreement.

(g)     A fully executed Amended and Restated Registration Rights Agreement.

(h)     Evidence satisfactory to Purchaser of the termination of the Management Agreement.

7.3     Resignation of Director.  Robert F. Smith shall have delivered to the Company his resignation as a Director of the Company.

## ARTICLE VIII
## CONDITIONS TO THE OBLIGATIONS OF EACH PARTY

8.1     The respective obligations of the Parties to consummate the transactions contemplated by this Agreement are subject to the satisfaction on or prior to the Closing Date of the following conditions:

(a)     Litigation.  No provision of Applicable Law and no judgment, injunction, order or decree of a court or other Governmental Entity of competent jurisdiction

EXHIBIT D-18

shall be in effect, in each case, which has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated by this Agreement; provided, that, prior to invoking this condition, each party agrees to comply with Section 5.1, and no statute, rule or regulation shall have been enacted by any Governmental Entity which prohibits or makes unlawful the consummation of the transactions contemplated by this Agreement.

(b)     Governmental Approvals.  All actions by or in respect of, or filings with, any Governmental Entity required to permit the consummation of the transactions contemplated by this Agreement shall have been taken or made, including, but not limited to, the HSR Act, and any waiting period applicable to the transactions contemplated by this Agreement shall have expired or been terminated.

(c)     Third Party Consents.  The Parties shall have obtained all material third party consents, if any, necessary to consummate the transactions contemplated by this Agreement.

## ARTICLE IX
## TERMINATION

9.1     Conditions of Termination.  This Agreement may be terminated at any time prior to the Closing (or as otherwise specified):

(a)     by the mutual written consent of Seller and Purchaser; or

(b)     by Seller, if there has been a breach by Purchaser of any representation, warranty, covenant, or agreement contained in this Agreement which (i) would result in a failure of a condition set forth herein and (ii) cannot be cured prior to the Termination Date; provided, that the right to terminate this Agreement pursuant to this Section 9.1(b) shall not be available to Seller if it, at such time, is in breach of any representation, warranty, covenant or agreement set forth in this Agreement such that the condition set forth in Section 7.1 shall not be satisfied; or

(c)     by Purchaser, if there has been a breach by Seller of any representation, warranty, covenant, or agreement contained in this Agreement which (i) would result in a failure of a condition set forth herein and (ii) cannot be cured prior to the Termination Date; provided, that the right to terminate this Agreement pursuant to this Section 9.1(c) shall not be available to Purchaser if it, at such time, is in breach of any representation, warranty, covenant or agreement set forth in this Agreement such that the condition set forth in Section 6.1 shall not be satisfied; or

(d)     by Seller or Purchaser, if the transactions contemplated hereby have not been consummated by the Termination Date; or

(e)     by Seller or Purchaser, if any Governmental Entity shall have issued an order, decree or ruling or taken any other action permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such order, decree, ruling or other action shall have become final and nonappealable; provided, that the Party

EXHIBIT D-18

seeking to terminate this Agreement pursuant to this clause (e) shall have complied with Section 5.1.

9.2     Effect of Termination.  In the event of the termination of this Agreement as provided in Section 9.1 above, this Agreement shall forthwith become void and of no further force and effect, except for Section 5.2 and Article X, and each Party shall be deemed to release each other Party from any liability for any breach by such Party of the terms and provisions of this Agreement (except for such Section 5.2 and Article X) or any matters relating to the transactions contemplated hereby; provided, however, that if this Agreement is terminated because of a breach of this Agreement by the non-terminating Party or because one or more of the conditions to the terminating Party's obligations under this Agreement are not satisfied as a result of the non-terminating Party's failure to comply with its obligations under this Agreement, the terminating Party's right to pursue all legal remedies will survive such termination unimpaired.  Each party's right of termination under Section 9.1 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of such right of termination will not be an election of remedies.  If this Agreement shall be terminated, all filings, applications and other submissions made in accordance with this Agreement shall, to the extent practicable, be withdrawn from the Persons to which they were made.

9.3     Survival of Representations and Warranties and Covenants.  Notwithstanding anything to the contrary set forth in this Agreement, the representations and warranties contained in this Agreement or in any certificate delivered pursuant thereto shall, for purposes of the terms and conditions of this Agreement, survive the Closing until the expiration of twelve (12) months following the Closing Date (other than the representations of Seller contained in Section 3.3 hereof, which shall survive indefinitely).  The Parties intend to shorten the statute of limitations as set forth in this Section 9.3 and agree that no claims or causes of action may be brought against any indemnifying Party ("Indemnitor") based, directly or indirectly, upon any of the representations or warranties (other than representations and warranties of Seller in Section 3.3, for which a claim and cause of action may be brought at any time in the future) contained in the this Agreement or in any certificate delivered pursuant hereto after the applicable period referred to in the preceding sentence of this Section 9.3 (the "Survival Period").  The provisions of this Section 9.3 are not intended to limit in any manner the obligation of any Party to perform any covenant or agreement to be performed by such Party under this Agreement after the Closing Date.

9.4     Indemnification of the Benefit of Purchaser.

(a)     The Seller shall indemnify the Purchaser and its Affiliates, shareholders, officers, directors, employees, agents, representatives, successors and assigns (collectively, the "Purchaser Indemnified Parties") and save and hold each of them harmless against and pay on behalf of or reimburse such Purchaser Indemnified Parties as and when incurred for any loss, liability, demand, claim, action, cause of action, cost, damage, deficiency, tax, penalty, fine or expense, whether or not arising out of third party claims (including interest, penalties, reasonable attorneys', consultants' and experts' fees and expenses and all amounts paid in investigation, defense or settlement of any of the foregoing) (collectively, "Purchaser Losses"), which any such Purchaser Indemnified Party may suffer, sustain or become subject to, that arise out of or as a result of (i) any breach or default in the performance by Seller of any

EXHIBIT D-18

covenant or agreement of Seller contained herein or in any certificate or other instrument delivered pursuant hereto or (ii) any breach of any warranty or any inaccuracy of any representation made by Seller herein or any certificate of instrument delivered pursuant hereto.

(b)      Indemnification for the Benefit of Seller.   The Purchaser shall indemnify the Seller and its Affiliates, partners, employees, agents, representatives, successors and assigns (collectively, the "Seller Indemnified Parties") and save and hold each of them harmless against and pay on behalf of or reimburse such Seller Indemnified Parties as and when incurred for any loss, liability, demand, claim, action, cause of action, cost, damage, deficiency, tax, penalty, fine or expense, whether or not arising out of third party claims (including interest, penalties, reasonable attorneys', consultants' and experts' fees and expenses and all amounts paid in investigation, defense or settlement of any of the foregoing) (collectively, "Seller Losses"), which any such Seller Indemnified Party may suffer, sustain or become subject to, that arise out of or as a result of (i) any breach or default in the performance by Purchaser of any covenant or agreement of Purchaser contained herein or in any certificate or instrument delivered pursuant hereto or (ii) any breach of any warranty or any inaccuracy of any representation made by Purchaser herein or any certificate of instrument delivered pursuant hereto.

(c)      Manner of Payment.    Any indemnification obligations of an Indemnitor under this Agreement shall be paid by wire transfer of immediately available funds to an account designated in writing by the Purchaser Indemnified Party or Seller Indemnified Party, as the case may be, within fifteen (15) days after the determination thereof.  Any indemnification payments shall be made together with interest accruing thereon from the date payable to the date of payment at the Prime Rate as published from time to time.

(d)      Defense of Third Party Claims.  Any Purchaser Indemnified Party or Seller Indemnified Party making a claim for indemnification under this Section 9.4 (an "Indemnitee") shall notify the applicable Indemnitor in writing of the claim promptly after receiving written notice of any action, lawsuit, proceeding, investigation or other claim against it by a third party (a "Third Party Claim"), which notice shall set forth with as much specificity as is reasonably practical a description of the claim, the amount thereof (if known and quantifiable) or, to the extent reasonably practicable, a reasonable estimate of the amount thereof and the basis thereof; provided, that the failure to so notify the Indemnitor shall not relieve the Indemnitor of its obligations hereunder unless the Indemnitor shall be actually prejudiced by such failure to so notify.  The Indemnitor shall be entitled to participate in the defense of such action, lawsuit, proceeding, investigation or other claim giving rise to an Indemnitee's claim for indemnification at such Indemnitor's expense, and at its option (subject to the limitations set forth below) shall be entitled to assume the defense thereof by appointing a reputable counsel reasonably acceptable to the Indemnitee to be the lead counsel in connection with such defense; provided, that:

(i)      the Indemnitee shall be entitled to participate in the defense of such claim and to employ counsel of its choice for such purpose; provided, that the fees and expenses of such separate counsel shall be borne by the Indemnitee (other than any fees and expenses of such separate counsel that are incurred prior to the date the Indemnitor notified the Indemnitee of its election to assume control of such defense which, notwithstanding the foregoing, shall be borne by the Indemnitor); and provided, further, that the Indemnitor shall be liable to the Indemnitee hereunder for any legal or

EXHIBIT D-18

other expenses incurred by the Indemnitee in connection with its participation in the defense thereof if (x) the Indemnitor fails to assume the defense or diligently prosecute the Third Party Claim or (y) there shall exist or develop a conflict that would ethically prohibit counsel to the Indemnitor from representing the Indemnitee;

(ii)     if the Indemnitor fails to assume the defense of a Third Party Claim within fifteen (15) days after receipt of written notice from the Indemnitee of the Third Party Claim, then the Indemnitee shall have the right to defend (with the cost and expense of such defense paid by the Indemnitor) the Third Party Claim by promptly and vigorously prosecuting all appropriate proceedings to a final conclusion or settlement; provided, that the Indemnitor shall have the right to participate in the defense of the Third Party Claim using counsel of its choice, but the Indemnitee shall not be liable to the Indemnitor for any legal or other expenses incurred by the Indemnitor in connection with its participation in the defense thereof;

(iii)    if requested by the Party defending the Third Party Claim, the other Party agrees to cooperate with the Party defending the Third Party Claim and its counsel in contesting any Third Party Claim, including (A) all aspects of any investigation, defense, pretrial activities, trial, compromise, settlement or discharge of such Third Party Claim, (B) by providing the Party defending the Third Party Claim with reasonable access to employees and officers (including as witnesses) and other information and (C) the making of any related counterclaim against the third party asserting the Third Party Claim or any cross-complaint against any Person, in each case only if and to the extent that any such counterclaim or cross-complaint arises from the same actions or facts giving rise to the Third Party Claim; and

(iv)    the Party defending the Third Party Claim shall have the right, acting in good faith and with due regard to the interests of the other Party, to control all decisions regarding the handling of the defense without the consent of the other Party; provided, that any Indemnitor defending a Third Party Claim shall obtain the prior written consent of the Indemnitee (which consent shall not be unreasonably withheld) before entering into any settlement of a claim or ceasing to defend such claim if, pursuant to or as a result of such settlement or cessation, injunctive or other equitable relief will be imposed against the Indemnitee or if such settlement does not expressly and unconditionally release the Indemnitee from all liabilities and obligations with respect to such claim, without prejudice.

9.5     Limitations on Indemnification.  The indemnification obligations of each Indemnitor under Section 9.4 shall not apply until aggregate Purchaser Losses or Seller Losses, as the case may be, relating to all claims for which Indemnitees are entitled to payment from such Indemnitor under Section 9.4 exceed $200,000 (the "Indemnification Basket"); provided, that in such event, the amount of all such Purchaser Losses or Seller Losses (including the Indemnification Basket) shall be payable.  Each Indemnitor's aggregate obligation to indemnify Indemnitees under Section 9.4 shall in no event exceed the Purchase Price.

9.6     Notice of Indemnification Claims.  Each Indemnitor shall be obligated to indemnify the Indemnitees only for those claims giving rise to Purchaser Losses or Seller Losses,

EXHIBIT D-18

as the case may be, with respect to which such Indemnitees are entitled to payment from such Indemnitor as to which the Indemnitees have given such Indemnitor written notice thereof prior to the end of the Survival Period.  Any written notice delivered by an Indemnitee to an Indemnitor with respect to Purchaser Losses or Seller Losses, as the case may be, as to which it is entitled to payment from such Indemnitor shall set forth with as much specificity as is reasonably practicable a description of the claim, the amount thereof (if known and quantifiable) or, to the extent reasonably practicable, a reasonable estimate of the amount thereof and the basis thereof.

**ARTICLE X**
**MISCELLANEOUS**

10.1   Fees and Expenses.  Except as otherwise set forth herein, all fees, costs, and expenses incurred in connection with this Agreement and any other agreements or instruments contemplated hereby shall be paid by the Party incurring such fee, cost or expense. Seller and Purchaser shall share equally the filing fees, if any, associated with filings required under the HSR Act with respect to the transactions contemplated by this Agreement.

10.2   Consent to Amendments; Waivers.  This Agreement may be amended, or any provision of this Agreement may be waived upon the approval, in a writing, executed by each Party.  No course of dealing by any Party shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of such Party under or by reason of this Agreement.

10.3   Successors and Assigns.   This Agreement and all covenants and agreements contained herein and rights, interests or obligations hereunder, by or on behalf of any Party, shall bind and inure to the benefit of the successors and assigns of such Party whether so expressed or not.

10.4   Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any provision of this Agreement or the application of any such provision to any Person or circumstance shall be held to be prohibited by, illegal or unenforceable under applicable law or rule in any respect by a court of competent jurisdiction, such provision shall be ineffective only to the extent of such prohibition, illegality or unenforceability, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

10.5   Counterparts.  This Agreement may be executed in counterparts (including by means of telecopied signature pages), any one of which need not contain the signatures of more than one Party, but all such counterparts taken together shall constitute one and the same agreement.

10.6   Descriptive Headings; Interpretation.  The headings and captions used in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  References to an "Article" or a "Section" are, unless otherwise specified, to one of the articles or sections of this Agreement.  The use of the word "including" herein shall mean "including without limitation."  Use of either the singular or the plural should

EXHIBIT D-18

not be deemed a limitation, and the use of the singular should be construed to include, where appropriate, the plural.  Use of the masculine, feminine or neuter pronouns should not be deemed a limitation, and the use of any such pronouns should be construed to include, where appropriate, the other pronouns.

10.7    Entire Agreement.  This Agreement contains the entire agreement and understanding between the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings, whether written or oral, relating, in any way, to such subject matter.

10.8    No Third-Party Beneficiaries.  This Agreement is for the sole benefit of the Parties and their successors and assigns and nothing herein, expressed or implied shall give or be construed to give any Person, other than the Parties and such successors and  assigns, any legal or equitable rights hereunder.

10.9    Governing Law.  All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware without giving effect to any choice-of-law or conflict-of-law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.  In furtherance of the foregoing, the internal law of the State of Delaware shall control the interpretation and construction of this Agreement, even though under that jurisdiction's choice-of-law or conflict-of-law analysis, the substantive law of some other jurisdiction would ordinarily apply.

10.10    Notices.  All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when delivered personally to the recipient or when sent by facsimile followed by delivery by reputable overnight courier service, one day after being sent to the recipient by reputable overnight courier service (charges prepaid) or five days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid.  Such notices, demands and other communications shall be sent to each Party at its address indicated below or to such other address or to the attention of such other Person as the recipient Party has specified by prior written notice to the sending Party.  All notices, demands and other communications hereunder may be given by any other means (including telecopy or electronic mail), but shall not be deemed to have been duly given unless and until it is actually received by the intended recipient.

If to Purchaser:

    Spanish Steps Holdings, Ltd.
    Suite 225, 12 Church Street
    Hamilton, HM11
    Bermuda
    Attention:    Gordon Howard
    Facsimile:    441.295.5931

EXHIBIT D-18

with a copy (which shall not constitute notice to the Purchaser) to:

Baker Botts L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX  77002-4995
Attention:      Rufus P. Cormier
Facsimile:      713.229.7744

If to Seller:

Performance Investments LLC
c/o Vista Equity Partners, LLC
150 California Street
19th Floor
San Francisco, CA  94111
Attention:      Robert F. Smith
Facsimile:      415.765.6666

with copies (which shall not constitute notice to Seller) to:

Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
39th Floor
New York, NY 10022-4611
Attention:      Eunu Chun, Esq.
Facsimile:      212.446.4900

If to the Company:

Universal Computer Systems Holding, Inc.
6700 Hollister
Houston, TX  77040
Attention:      Robert T. Brockman
Facsimile:      713.718.1465

10.11  **JURISDICTION AND VENUE.  ALL JUDICIAL PROCEEDINGS BROUGHT BY OR AGAINST ANY PARTY TO CHALLENGE OR ENFORCE ANY ARBITRAL ORDER OR AWARD PURSUANT TO SECTION 10.14 HEREOF MAY BE BROUGHT IN THE CHANCERY COURT OF THE STATE OF DELAWARE OR ANY FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE OF DELAWARE.  BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS AGREEMENT.**

EXHIBIT D-18

**EACH PARTY HEREBY WAIVES ANY CLAIM THAT SUCH JURISDICTION IS AN INCONVENIENT FORUM OR AN IMPROPER FORUM BASED ON LACK OF VENUE. EACH PARTY DESIGNATES AND APPOINTS CT CORPORATION (AND SUCH OTHER PERSONS AS MAY HEREAFTER BE SELECTED BY SUCH PERSON) TO RECEIVE ON ITS BEHALF SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDINGS IN ANY SUCH COURT, SUCH SERVICE BEING HEREBY ACKNOWLEDGED BY EACH PARTY TO BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT. A COPY OF SUCH PROCESS SO SERVED SHALL BE MAILED BY REGISTERED MAIL TO EACH PARTY AT SUCH PERSON'S ADDRESS PROVIDED HEREIN. TO THE EXTENT PERMITTED BY LAW, IF ANY AGENT APPOINTED BY ANY PARTY REFUSES TO ACCEPT SERVICE, SUCH PARTY HEREBY AGREES THAT SERVICE UPON SUCH PERSON BY MAIL SHALL CONSTITUTE SUFFICIENT NOTICE.**

10.12  <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

10.13  <u>Time is of the Essence</u>.  The Parties hereby expressly acknowledge and agree that time is of the essence for each and every provision of this Agreement.

10.14  <u>Dispute Resolution</u>.

(a)  <u>Resolution of Disputes</u>.  If a Dispute arises among any of the Parties pursuant to or in connection with or under this Agreement or any other Transaction Document, the Parties agree to use the following procedures in good faith to resolve such Dispute promptly and non-judicially.  For purposes of this Agreement, "<u>Dispute</u>" shall mean any alleged breach of any representation, warranty or obligation herein or in any other Transaction Document, or a disagreement regarding the interpretation, performance or nonperformance of any provision thereof, or the validity, scope and enforceability of these dispute resolution procedures, or any dispute regarding any damages arising from the termination of this Agreement.  Any Party may give written notice to any other Party of the existence of a Dispute (a "<u>Dispute Notice</u>").

(b)  <u>Negotiation</u>.  Within ten (10) days after delivery of any Dispute Notice, the Parties involved in the Dispute shall meet at a mutually agreeable time and place and thereafter as often as they deem reasonably necessary to exchange relevant information and attempt in good faith to negotiate a resolution of the Dispute.  Each of the Parties involved in the Dispute shall appoint an executive officer (or with respect to parties that are not corporations, a person with similar authority) who has authority to settle the Dispute to attend such meeting.  If the Dispute has not been resolved within thirty (30) Business Days after the delivery of the Dispute Notice, then either Party may, by delivering notice to the other Party, commence arbitration proceedings.  Each of the Parties involved in the Dispute shall comply with reasonable requests for information made by the other Party.

EXHIBIT D-18

(c) <u>Arbitration</u>. If the Parties are not successful in resolving a Dispute, then the Dispute shall be resolved by binding arbitration conducted by three arbitrators in accordance with the Arbitration Law of Delaware from time to time in force in Delaware as modified by the terms hereof ("Arbitration Law"). Any Party may initiate final resolution of the Dispute by delivering a written demand for arbitration to any other Party or Parties. Each Party shall notify the other Party of its appointment of one neutral arbitrator within fifteen (15) days after receipt of such written demand for arbitration and the third neutral arbitrator shall be appointed by a court of competent jurisdiction in Delaware. Each of the three arbitrators shall function as an arbitrator without any one of them serving as an umpire or having more authority than the other two. If such arbitrator appointments are not made within said time periods, the arbitrators shall be selected by a court of competent jurisdiction in Delaware. All arbitrators must be attorneys with experience in matters described in this Agreement. Further, no arbitrator may be a current or former client or employee of any Party or an attorney that has provided legal advice to any Party within the preceding five years, nor may an arbitrator be a current or former employee of a direct competitor of any of the Parties. Additionally, prior to their assumption of duties as arbitrators, all arbitrators must sign an oath of neutrality agreed to by the Parties. If requested by any Party, the arbitration award shall set forth findings of fact and conclusions of law upon which the award is based in the same manner as a judgment from a court of Delaware. Judgment upon the award rendered by the arbitrators shall be binding upon the Parties and may be entered by any court having jurisdiction thereof. The place of arbitration shall be Houston, Texas, unless the Parties mutually agree otherwise. The language of the arbitration shall be English. The arbitrators may allocate against any losing Party all reasonable costs of arbitration including the fees of the arbitrators and any other costs described herein so long as such arbitrators direct in the award that any such costs shall not be taxable in the courts of Delaware. The Parties agree that a Party's remedies under this arbitration procedure may be inadequate and that, notwithstanding this paragraph (c), such aggrieved Party shall be entitled to seek injunctive relief. The institution and maintenance of an action to obtain or enforce equitable remedies shall not constitute a waiver of the right of any Party including the plaintiff to submit the controversy or claim to arbitration.

(d) <u>General Dispute Resolution Provisions</u>.

(i) All deadlines specified in this Section 10.14 may be extended by mutual agreement. The procedures specified in this Section 10.14 are an essential provision of the Agreement and are legally binding on the Parties. These procedures shall be the sole and exclusive procedures for the resolution of any Dispute among the Parties arising out of or relating to this Agreement. Any and all actions to enforce the obligations under this Section 10.14 shall be brought pursuant to the provisions of Section 10.11.

(ii) The Parties acknowledge that the provisions of this Section 10.14 are intended to provide a private resolution of Disputes between them. Accordingly, all documents, records, and other information relating to the Dispute shall at all times be maintained in the strictest confidence and not disclosed to any third party, other than the arbitrators, except where specifically allowed hereunder. All proceedings, communications and negotiations pursuant to this Section 10.14 are confidential. In the event of any judicial challenge to, or enforcement of, any order or award hereunder, any

# EXHIBIT D-18

Party may designate such portions of the record of such proceedings, communications, and negotiations as such Party deems appropriate to be filed under seal.  All proceedings, communications and negotiations pursuant to this Section 10.14 shall be treated as compromise negotiations for all purposes, including for purposes of the U.S. Federal Rules of Evidence and state rules of evidence.  None of the statements, disclosures, offers, or communications (or other assertions made in any proceeding or negotiation) made pursuant to this Section 10.14 shall be deemed admissions, nor shall any of said statements, disclosures, offers, communications or assertions be admissible for any purpose other than the enforcement of the terms of this Section 10.14.

(iii)     The Parties agree to act in good faith to comply with all of their respective obligations under this Agreement as much as possible as if there were no Dispute during any pending mediation or arbitration hereunder.

(e)     <u>Notice</u>.  The Parties agree to have any Dispute decided by neutral arbitration as provided in this Section 10.14 and the parties are giving up any rights they might possess to have the Dispute litigated in a court or by a jury trial.  The Parties are giving up their judicial rights to discovery and appeal, unless such rights are specifically included in this Section 10.14.  The Parties acknowledge and agree that their agreement to this arbitration provision is voluntary.

*     *     *

**[Signature pages follow]**

# EXHIBIT D-18

IN WITNESS WHEREOF, the Parties have executed this Stock Purchase Agreement on the date first written above.

**SELLER**:

VISTA EQUITY FUND III, L.P.

By:     Performance Investments LLC
Its:     General Partner


By:     _____
        Name:  Robert F. Smith
        Title:   Manager


**PURCHASER**:

SPANISH STEPS HOLDINGS, LTD.


By:     _____
        Name:  _____
        Title:  _____

**COMPANY (Solely for purposes of Section 5.3 and Article X hereof)**:

UNIVERSAL      COMPUTER      SYSTEMS HOLDINGS, INC.


By:     _____
        Name:  _____
        Title:  _____

# EXHIBIT

# D-21

# EXHIBIT D-21

\*\*\* PGP SIGNATURE VERIFICATION \*\*\*
\*\*\* Status:   Good Signature from Invalid Key
\*\*\* Alert:    Please verify signer's key before trusting signature.
\*\*\* Signer:   Bonefish <bonefish@houstonfishingservice.com> (0x25E1D8D0)
\*\*\* Signed:   6/23/2006 5:43:07 PM
\*\*\* Verified: 6/27/2006 2:42:08 PM
\*\*\* BEGIN PGP DECRYPTED/VERIFIED MESSAGE \*\*\*

Bob & Evatt:

I am finally back up on DSL.  Telco said someone "cut a line" or
something.  Whatever, Telsip and Vonage are now working as well.

Talked with Gordon, and he is set for a Tuesday morning VEFIII deal
closing.  David Cooper's secretary (Evatt you may know Laura Miller)
has him scheduled for a 9:30am meeting at St. John's offices (may
need to borrow a couple of chairs) to handle the notary work.  Elaine
Goodman at Butterfield has said she will pull out the $122MM for wire
transfer to VEFIII at VPB.  I am awaiting wire transfer instructions
for that account to give to Elaine to be ready for a Tuesday
(hopefully) transfer.

Don


\*\*\* END PGP DECRYPTED/VERIFIED MESSAGE \*\*\*

# EXHIBIT

# D-27

Don,
Evatt,

Earlier this spring I went to Washington DC to visit SAB and Miller & Chevalier to inquire after their retention of documents related to the 1992-1996 tax issues.

What I got from SAB was not great in volume - but had Brook Voght's files that he had brought with him from Miller & Chevalier relating to the various proposed structures for Hotrod. They gave all of these to me - and I have personally shredded them.

The volume from Miller & Chevalier was much, much greater - probably 15 banker boxes. These are the working files of Brook, George Hani, Holly Porter, Bob Catcher, and others.

I am going through these a page at a time because I wanted to shred personally anything that was super sensitive before turning them over to the outside document shredding and destruction service.

What I wanted to report to you both - is that the volume, detail, and organization of these files was dumbfounding.

For example - the organizational chart of the international entities that was built from Brook's notes had multiple copies - so far I have shredded half a dozen of these - and I still have 6 banker boxes to go through.

The face to face and telephone conversations that we had with M&C were immediately afterwards recounted, transcribed, and typed up - then copies circulated to everyone on the team - and ended up in everyone's working files. I can't tell you how many pages of this type of stuff I have shredded.

Obviously if attorney-client privilege ever broke down - that would an extremely unpleasant occurrence.

Therefore in any further encounters with the house that require the usage of outside tax counsel we need to:

-obtain upfront agreement from the attorneys that we get to review their files - including those of all attorneys that work on the case
-that we get to dictate what gets retained and what does not (like background info on international structures)
-be very circumspect as to what we tell them verbally - as it will all be reduced to writing and kept in the file
-be thoughtful about any piece of paper that they get, as it will for sure be kept in the file of every attorney that works on the case

EXHIBIT D-27

In general, I was super-impressed with the organization and the thoroughness of M&C.  It also turns out the the workhorse in this deal (judging by file volume) was Holly Porter.

Bob