UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT T. BROCKMAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:22-cv-00202-GCH |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

## DECLARATION OF FRANK JACKSON

I, Frank Jackson, declare as follows:

1.      I am a member of the bar of the States of New York, Massachusetts, and Tennessee, and of various other federal courts.  I am a partner of the law firm Jones Day, counsel for Plaintiff Robert T. Brockman.  I make this Declaration in support of Plaintiff Robert T. Brockman's Reply in Support of Motion for Determination on Complaint for Judicial Review and Abatement of Jeopardy Assessment and Jeopardy Levy Pursuant to 26 U.S.C. § 7429.

2.      Attached as Exhibit 1 is a copy of an article published by Bloomberg News on October 15, 2020.

3.      Attached as Exhibit 2 is a copy of a Judgement dated November 17, 2021 by the Chief Justice of the Supreme Court of Bermuda in *Spanish Steps Holdings Ltd. v. Point Investments Ltd.*, 2020: No. 300 (Supreme Court of Bermuda).

4.     Attached as Exhibit 3 is a copy of a letter dated February 3, 2022, from the Padula Law Firm, on behalf of their client, Evatt Tamine, to Herbert Linder, counsel for Defendant, the United States.

5.     Attached as Exhibit 4 is a copy of Robert T. Brockman's Request for Administrative Review of Notice of Jeopardy Assessment and Rights to Appeal (without exhibits) dated October 7, 2021.

6.     Attached as Exhibit 5 are copies of account statements dated December 30, 2020, for two accounts ending in 81 and 82 held with Bessemer Trust.

7.     Attached as Exhibit 6 are copies of excerpts from the transcript of the Competency Hearing, AM Session, held on November 17, 2021, in the case of *United States v. Brockman*, No. 4:21-cv-00009.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York on February 7, 2022.


                                        /s/ *Frank Jackson*
                                        Frank Jackson

# EXHIBIT 1

**Bloomberg**                                    News Story

10/15/2020   18:07:55 [BN] Bloomberg News

## Houston Tech Mogul Indicted for 'Largest–Ever Tax Charge' (3)

- **Robert Brockman is accused of hiding $2 billion offshore**
- **Billionaire Robert Smith avoids prosecution by helping U.S.**

By David Voreacos and Neil Weinberg

(Bloomberg) –– Robert T. Brockman, a Houston software tycoon, was charged with using a web of Caribbean entities to hide $2 billion in income in what prosecutors called the largest U.S. tax case ever against an individual.

Brockman, 79, used a family charitable trust based in Bermuda and other offshore entities to hide assets from the Internal Revenue Service while failing to pay taxes, according to a 39–count indictment unsealed Thursday in federal court in San Francisco. Brockman was also charged with money laundering and other crimes.

Prosecutors received help from Robert Smith, the CEO of Vista Equity Partners, who set up his private equity fund two decades ago with a $1 billion investment from Brockman's trust structure.

Brockman earned about $2 billion in capital gains made through his Vista investments, according to the indictment.

"The allegation of a $2 billion tax fraud is the largest–ever tax charge against an individual in the  United States," David Anderson, the U.S. attorney in San Francisco, said at a news conference.

This report may not be modified or altered in any way. The BLOOMBERG PROFESSIONAL service and BLOOMBERG Data are owned and distributed locally by Bloomberg Finance LP ("BFLP") and its subsidiaries in all jurisdictions other than Argentina, Bermuda, China, India, Japan and Korea (the ("BFLP Countries"). BFLP is a wholly–owned subsidiary of Bloomberg LP ("BLP"). BLP provides BFLP with all the global marketing and operational support and service for the Services and distributes the Services either directly or through a non–BFLP subsidiary in the BLP Countries. BFLP, BLP and their affiliates do not provide investment advice, and nothing herein shall constitute an offer of financial instruments by BFLP, BLP or their affiliates.

# Bloomberg

**News Story**



Robert Brockman

The indictment charges Brockman with crimes including money laundering, evidence tampering and destruction of evidence. He's also charged with wire fraud for using intermediaries to manipulate debt securities at his company. Brockman used code names and encrypted emails to secretly manage the trusts, according to the indictment.

Brockman also "engaged in multiple instances of obstructive conduct," including directing an associate to destroy documents and electronic media using shredders and hammers, according to the indictment.

Brockman appeared by video conference in federal court in Houston, where he pleaded not guilty. He was released on a $1 million bond.

"We look forward to defending him against these charges," said Brockman attorney  Kathryn Keneally.

As part of Smith's settlement, he  admitted that he failed to pay about $30 million in taxes, with penalties and interest making up the remainder of the expected payout. Smith used untaxed income to buy a vacation home in Sonoma County, California, and ski properties in the French Alps, and to make charitable contributions, Anderson said.

Smith, 57, entered into a non-prosecution agreement and will pay $139 million, Anderson said.

"Smith committed serious crimes, but he also agreed to cooperate," he said. "Smith's agreement to cooperate put

This report may not be modified or altered in any way. The BLOOMBERG PROFESSIONAL service and BLOOMBERG Data are owned and distributed locally by Bloomberg Finance LP ("BFLP") and its subsidiaries in all jurisdictions other than Argentina, Bermuda, China, India, Japan and Korea (the ("BFLP Countries"). BFLP is a wholly-owned subsidiary of Bloomberg LP ("BLP"). BLP provides BFLP with all the global marketing and operational support and service for the Services and distributes the Services either directly or through a non-BFLP subsidiary in the BLP Countries. BFLP, BLP and their affiliates do not provide investment advice, and nothing herein shall constitute an offer of financial instruments by BFLP, BLP or their affiliates.

# Bloomberg

**News Story**

him on a path away" from criminal charges.

Smith faced a related four–year criminal tax inquiry involving about $200 million that moved through Brockman–linked offshore structures.

With a net worth of $7 billion, Smith is the wealthiest Black person in America. The criminal tax probe into Smith was first reported by Bloomberg News in August.

Like many wealthy Americans, Brockman set up offshore trusts that on paper were overseen by independent directors. However, the indictment charges that he conspired over two decades to secretly maintain "complete" control over trust assets while failing to pay capital gains and income taxes.

Brockman created false paper trails to secretly purchase a luxury yacht now known as Albula and to spend $30 million on properties called the "Frying Pan Canon Ranch" and the "Mountain Queen" vacation home in Pitkin County, Colorado, prosecutors said.

As the CEO of Reynolds & Reynolds, Brockman oversees one of the largest vendors of software to manage auto dealerships in the U.S. and abroad.

Brockman's investment in the first private equity fund set up by Smith came from an entity held as part of the A. Eugene Brockman Charitable Trust, which was named for Brockman's late father. Brockman is a beneficiary of the trust.

More:

- Billionaire Robert Smith Fighting U.S. Criminal Tax Inquiry
- Tech Mogul's Secrecy Crumbles in IRS Chase of 'Record' Trove

(Updates with Brockman defense attorney's comment)

To contact the reporters on this story:
David Voreacos in New York at dvoreacos@bloomberg.net;
Neil Weinberg in New York at nweinberg2@bloomberg.net

To contact the editors responsible for this story:
Jeffrey D Grocott at jgrocott2@bloomberg.net
David S. Joachim, David Voreacos

This report may not be modified or altered in any way. The BLOOMBERG PROFESSIONAL service and BLOOMBERG Data are owned and distributed locally by Bloomberg Finance LP ("BFLP") and its subsidiaries in all jurisdictions other than Argentina, Bermuda, China, India, Japan and Korea (the "BFLP Countries"). BFLP is a wholly-owned subsidiary of Bloomberg LP ("BLP"). BLP provides BFLP with all the global marketing and operational support and service for the Services and distributes the Services either directly or through a non-BFLP subsidiary in the BLP Countries. BFLP, BLP and their affiliates do not provide investment advice, and nothing herein shall constitute an offer of financial instruments by BFLP, BLP or their affiliates.

# EXHIBIT 2

[2021]SC (Bda) 90 Com (17 November 2021)



# In The Supreme Court of Bermuda

**CIVIL JURISDICTION**
**COMMERCIAL COURT**
**COMPANIES ACT (WINDING UP)**
**2020: No. 300**

**BETWEEN:**

**SPANISH STEPS HOLDINGS LTD.**

**Petitioner**

**- and -**

**POINT INVESTMENTS LTD.**

**Respondent**

---

**Before:**          **Hon. Chief Justice Hargun**

**Representation:**   **Mr. Keith Robinson of Carey Olsen Bermuda Limited for the Petitioner**

**Mr. Mark Diel, Ms. Katie Tornari and Mr. Christopher Snell of Marshall Diel & Myers Limited for the Respondent**

**Date of Hearing: 29 October 2021**          **Date of Judgment: 17 November 2021**

**JUDGMENT**

**Hargun CJ**

**Introduction**

1.  At the conclusion of the hearing on 29 October 2021 the Court ordered that Andrew Childe and Richard Lewis of FFP Limited, Cayman Islands and Mathew Clingerman of Krys Global, Bermuda be appointed as Joint Provisional Liquidators ("**JPLs**") of Point Investments, Ltd ("**the Respondent**") and that the powers of JPLs shall not be limited, pursuant to section 170(3) of the Companies Act 1981 ("**the Act**").

2.  This Judgment sets out the Court's reasons for the appointment of JPLs and also deals with the Respondent's application seeking, *inter alia*, a validation order pursuant to section 166(1) of the Act.

3.  In support of these applications the Petitioner relied upon three affidavits of Kiernan Jane Bell, a former director of the Petitioner, and three affidavits of Peter Goddard, a director of BCT Directors Limited, which is now the sole director of the Petitioner. The Respondent relied upon seven affidavits of James Alexander Fortescue Watlington, a director of the Respondent.

**Background**

4.  The background to these winding up proceedings is helpfully set out in the written submissions prepared by Mr. Robinson on behalf of the Petitioner.

5.  The Petitioner is ultimately wholly owned by the trustee of the A. Eugene Brockman Charitable Trust ("**the Trust**"). While the Respondent commenced its existence as a BVI company, it became a Bermuda company on 30 November 2009. The Respondent is thus a corporate investment vehicle for the Petitioner and ultimately the Trust. It continues to

hold at the date hereof extremely valuable assets (in the region of US$1.8 billion) the vast majority of which are represented by investments in Cayman Islands funds.

6. The share structure of the Company is unusual and means that the Petitioner, while holder of all of the economic interest in the Respondent (save for US$100) represented by 4,900,000 common shares of par value US$0.001, has no right to vote its shares. The holder of the single "Manager Share" with par value of US$100 has all of the voting power (bye-law 4(1)).

7. The Trust has been embroiled in extensive litigation in Bermuda and the United Kingdom since 2018. The beneficiaries of the Trust are certain members of the Brockman family, including Robert Brockman, and charity.

8. The trustee of the Trust is BCT Limited ("**BCT**" or "**the Trustee**") which is a controlled subsidiary of Maples FS Limited. BCT was appointed as trustee of the Trust in place of Medlands PCT Limited ("**Medlands**") by Order of the Court of Appeal dated 2 February 2021 with its appointment to take effect on such date and on such terms as Justice Subair Williams was to appoint. Justice Subair Williams, by Order dated 26 March 2021, appointed 1 April 2021 as the date on which BCT would commence its trusteeship of the Trust. While BCT is a Cayman Islands company, it has irrevocably submitted to the jurisdiction of this Court with respect to the administration of the Trust.

9. The Petition was presented on 16 September 2020 at which point in time the shares of the Petitioner were ultimately held by Medlands as trustee of the Trust and the Board of the Petitioner was made up of Medlands' appointees. Medlands had also been appointed by Order of the Supreme Court dated 19 December 2019. Upon BCT's appointment as trustee, the Board of the Petitioner was changed and is now made up of BCT's nominees.

10. Medlands was appointed as trustee in place of St Johns Trust Company Limited ("**SJTC**") which had been in office since 1995. By Order dated 19 December 2019 Subair Williams J declared that SJTC had not been properly appointed as trustee of the Trust and rather had at all material times been a trustee *de son tort*.

11. Prior to 28 September 2018, Mr. Evatt Tamine had been a director of SJTC together with Mr. James Gilbert. Mr. Tamine was also, until 28 September 2018, a director of the Respondent. On that date, Mr Tamine resigned, *inter alia* , from these directorships. Mr. Tamine had been a director of SJTC from 2010 until 28 September 2018 and the sole director of SJTC between 2013 and 23 June 2017.

12. While Mr. Tamine had resigned his directorship of SJTC, he had not relinquished control of the shareholding of SJTC that was held via a Nevis company called Cabarita. In events which have been examined in the Judgment of this Court dated 26 March 2020 (2019 No. 447), Mr. Tamine used his ultimate control of SJTC to appoint Mr. James Watlington and Mr. Glenn Ferguson as directors of SJTC. Messrs. Watlington, and Ferguson remain in this position today.

13. The Petitioner and BCT are pursuing proceedings in this Court against Mr. Tamine and his associated company, Tangarra Consultants Limited (2018 No. 300), for the return of approximately US$28 million which it is alleged to have been taken wrongfully by Mr Tamine from the Trust while he had control over SJTC. Mr. Tamine has denied any wrongdoing in this regard.

14. SJTC unsuccessfully appealed the order of 19 December 2019 to the Court of Appeal. It was in these Court of Appeal proceedings in which BCT was appointed as an independent fiduciary to take over the trusteeship. The Court of Appeal has dismissed SJTC's appeal with reasons which are awaited. Mr. Tamine intervened in the Court of Appeal proceedings and supported SJTC's (unsuccessful) appeal.

15. SJTC has filed an application seeking leave to appeal to the Privy Council. Accordingly, the present position is that whilst Mr. Watlington and Mr. Ferguson are continuing with SJTC's proposed appeal (in which Marshall Diel & Myers Limited ("**MDM**") are SJTC's counsel) by which they seek to remove BCT as trustee of the Trust, they also remain the sole directors of the Company and thus control one of the Trust's most valuable assets.

16. Mr. Watlington and Mr. Ferguson also owe their position as directors of the Respondent to Mr. Tamine, mirroring the position with SJTC. The holder of the Manager Share in the

Respondent is another Nevis company, Point Investments LLC ("**PI LLC**"). The shares of PI LLC are held by the Point Purpose Trust the trustee of which the Petitioner understands to be or to be controlled by Mr. Tamine.

17. Mr. Tamine has denied in correspondence that the Manager Share is held ultimately and beneficially for the Trust but does accept that the Respondent is an asset of the Trust. In a memorandum sent by Mr. Tamine, in his capacity as a director of the Respondent, to PwC dated 13 August 2017 Mr. Tamine advised PwC that "*Point Investments Limited ... is a closely held investment vehicle for Spanish Steps Holdings Ltd, which in turn is an asset and investment holding vehicle for the A. Eugene Brockman Charitable Trust*."

18. Mr. Tamine is presently a co-operating witness with the United States Department of Justice in respect of the prosecution of one of the beneficiaries of the Trust, Mr. Robert Brockman. It appears that Mr. Tamine has received immunity from prosecution by the United States' authorities.

19. The directors of the Respondent have made it clear in the affidavit evidence filed by Mr. Watlington that they consider that it is their duty to remain in office so that they, rather than the JPLs as officers of the Court, can deal with any claim, which has yet to be brought, but which may be brought by the United States authorities against the Respondent.

**The Petition**

20. The winding up Petition in this matter was presented by the Petitioner on 16 September 2020. The Court should note that there is an outstanding application filed by the Respondent on 11 August 2021 seeking a declaration that the parties agreed that the Petition will be withdrawn and in the circumstances the Court should either dismiss or alternatively strike out these proceedings on the grounds that they or vexatious and/or an abuse of process. Mr. Watlington in his third affidavit accepts that it would be open to the Petitioner to withdraw this Petition, on the terms agreed *inter partes* in December 2020 and file a fresh Petition making the same allegations.

21. It appears to the Court that it is a pointless exercise to require the Petitioner to withdraw this Petition and to refile a fresh Petition in identical terms. Such a course would be wholly wasteful of the parties' resources and contrary to the Overriding Objective. The Court of course accepts that the Respondent may wish to, if so advised, pursue an application for wasted costs or agreed costs arising out of the alleged agreement to withdraw the Petition.

22. The Court should also mention that there is an outstanding application dated 11 August 2021 seeking leave to amend the Petition. Some of the proposed amendments seek to update the Petition to plead circumstances giving rise to change of control over the Petitioner.

23. Paragraph 19A of the draft Amended Petition pleads that, subsequent to BCT's appointment, it called upon Mr. Tamine (via his ultimate control of the holder of the Manager Share in the Respondent) to transfer the Manager Share to a nominee of BCT's choosing. Mr. Tamine has refused to do so asserting that BCT has no right to demand the transfer of Manager Share and asserting that his role in respect of the Manager Share did not arise as a result of his role as a director of SJTC.

24. Paragraphs 57-59 of the draft Amended Petition plead that by letter dated 12 May 2021 MDM forwarded to the Petitioner's counsel a letter from Mr. Tamine's counsel by which he asked for an indemnity against the Respondent purportedly pursuant to bye-law 99 the Respondents bye-laws. It is in excess of US$10 million and relates to Mr. Tamine's legal fees in respect of the DOJ's investigation, the Bermuda police service investigation, an investigation conducted in Switzerland, and proceedings before the Supreme Court of Bermuda 2018 No. 390 and 2020 No. 37.

25. The Petition alleges that given that Mr. Watlington and Mr. Ferguson were appointed by PI LLC, a company controlled by Mr. Tamine, they owe their office to, and could be removed by, Mr. Tamine procuring the voting of the Manager Share. The Petitioner alleges that Mr. Watlington and Mr. Ferguson thus operate under a disabling and incurable conflict of interest and the Board of the Respondent is thus unable to adjudicate on the claim for an indemnity made by Mr. Tamine.

26. Whilst the application to amend the Petition remains outstanding it is highly unlikely that the Court can properly refuse the Petitioner's application to amend the Petition.

27. In addition to the amendment sought in the draft Amended Petition, the evidence filed in support of the Petition asserts that as a result of steps taken by the current directors of the Respondent:

> (1) The Petitioner has been prevented from withdrawing its investment in the Respondent;

> (2) The Petitioner and the Trustee are unable to access US$3 billion of the Trust's assets, including effectively all of the Trust's liquid assets (more than US$1.4 billion), which are the source of the liquidity required for payment of the Trust's routine operational and legal outgoings and expenses as well as meeting the Trust's charitable commitments;

> (3) The former Trustee was forced to pursue alternative funding to meet the charitable commitments due in Q3 2020 at an additional cost to the Trust of US$5 million to avoid harm to the institutions, students and medical research supported by the Trust, and irreparable damage to the Trusts reputation;

> (4) The Trust has had to reduce the level of charitable commitments, which would have involved making over US$40 million of charitable donations during the period September 2020 to  September 2021;

> (5) The Respondent has failed to meet the capital call in respect of at least one of the funds in which it is invested which would have serious consequences for it, and accordingly to the assets of the Petitioner and the Trust.

28. The Petitioner prays that in all the circumstances, it is just and equitable that the Respondent should be wound up. In particular:

(1) The sole purpose of the Respondent is to act as an investment vehicle for the Petitioner and the Petitioner holds all of the economic interest in the Respondent. The Trust owns the Petitioner.

(2) The Trust and the Petitioner desired to terminate the Respondent's role as an investment vehicle for the Petitioner such that the Respondent has no continuing purpose and/or there has been a failure of the Respondent's substratum.

(3) Without proper justification and in breach of their duties to the Respondent, the Board of the Respondent (Mr. Watlington and Mr. Ferguson) have refused to redeem the Common Shares in accordance with the redemptions by, amongst other things, improperly purporting to suspend the Respondent's NAV.

(4) Without proper justification and in breach of their duties to the Respondent, the Board of the Respondent have caused the Petitioner's bank accounts with Bank Mirabaud and Bank of Singapore to be frozen (and thereby caused the Trust to incur additional costs of approximately US$5 million in order to meet certain of its charitable commitments and to reduce the level of the Trusts charitable commitments).

(5) Without proper justification, the Board of the Respondent have caused the Respondent to refuse and/or fail to provide information to the Petitioner relating to the affairs of the Respondent in circumstances where the Petitioner holds effectively all the economic interest in the Respondent.

(6) There is at present no effective management in relation to the affairs of the Respondent and the Petitioner has a justifiable lack of confidence relating to the affairs of the Respondent.

(7) Any winding down of the affairs of the Respondent should be carried out under the control of independent officeholders as officers of the Court.

**Jurisdiction to appoint provisional liquidators**

29. Legal principles with respect to the appointment of provisional liquidators following the presentation of the winding up petition were recently summarised by the Court in *Raswant v Centaur Ventures Ltd & Ors* [2019] SC (Bda) 55 Com (a contributory's petition) as follows:

> *"The legal regime for the appointment of provisional liquidators*
>
> 7. *The statutory basis for the appointment of provisional liquidators is to be found in section 170(2) of the Act and rule 23(1) of the Companies (Winding-Up) Rules 1982.*
>
> 8. *Section 170(2) provides that:*
>
>> *"the Court may on the presentation of a winding-up petition or at any time thereafter and before the first appointment of a liquidator appoint a provisional liquidator who may be the Official Receiver or any other fit person"*
>
> 9. *Rule 23(1) of the Companies (Winding-Up) Rules 1982 provides that:*
>
>> *"After the presentation of a petition for the winding-up of a company by the Court, upon the application of a creditor, or a contributory, or of the company, and upon proof by affidavit of sufficient ground for the appointment of a provisional liquidator, the Court, if it thinks fit and upon such terms as in the opinion of the Court shall be just and necessary, may make the appointment."*
>
> 10. *The appointment of provisional liquidators is an exercise of judicial discretion.  In exercising that discretion, the courts in Bermuda (Re CTRAK Ltd [1994] Bda LR 37 (Ground CJ); Discover Reinsurance Co*

*v PEG Reinsurance Co Ltd [2006] Bda LR 88 (Kawaley J); and BNY AIS Nominees Ltd v Stewarship Credit Arbitrage Fund Ltd [2008] Bda LR 67 (Bell J)), have followed the guidance given in the judgment of Sir Robert Megarry in Re Highfield Commodities Ltd [1984] 3 All ER 884, at 892-893 in following terms:*

> *"At the outset let me say that I accept that the court will be slow to appoint a provisional liquidator unless there is at least a good prima facie case for saying that a winding-up order will be made: see Re Mercantile Bank of Australia [1892] 2 Ch 204 at 210, Re North Wales Gunpowder Co [1892] 2 QB 220 at 224.  Founding himself on cases such as Re Clifoden Benefit Building Society (1868) LR 3 CH app 462 (where the words 'in general' should be noted) and Re London and Manchester Industrial Association (1875) 1 Ch D 466, counsel for HCL contended that if the company opposed the application for the appointment of a provisional liquidator, no appointment would be made (and any ex parte appointment would be terminated) unless either the company was obviously insolvent or it was otherwise clear that it was bound to be wound up, or else the company's assets were in jeopardy, as seems to have been the case in Re Marseilles Extension Rly and Land Co [1867] WN 68.*

> *……………*

> *I do not think that the old authorities, properly read, had the effect of laying down any rule that the power to appoint a provisional liquidator is to be restricted in the way for which counsel for HCL contends. No doubt a provisional*

10

*liquidator can properly be appointed if the company is obviously insolvent or the assets are in jeopardy; but I do not think that the cases show that in no other case can a provisional liquidator be appointed over the company's objection.  As the judge said, s. 238 is in quite general terms.  I can see no hint in it that it is to be restricted to certain categories of cases.   The section confers on the court a discretionary power, and that power must obviously be exercised in a proper judicial manner. The exercise of that power may have serious consequences for the company, and so a need for the exercise of the power must overtop those circumstances.   In particular, where the winding-up petition is presented because the Secretary of State considers that it is expedient in the public interest that the company should be wound up, the public interest must be given full weight, though it is not to be regarded as being conclusive.*

11. *I accept the submission that Highfield Commodities makes clear that the categories of cases in which it would be appropriate to appoint a provisional liquidator are not closed.  Indeed this is demonstrated by the practice in this Court of appointing provisional liquidators to facilitate restructuring where the Company is in the "zone of insolvency" (see Discover Reinsurance, per Kawaley J at [18], [19])."*

## Application for the appointment of JPLs

### *Ability of the Trustee to manage Trust property*

30. In his oral submissions Mr. Robinson referred to the fundamental duty of a trustee to gather, control and manage trust property. Mr. Robinson referred to Mr. Tamine's decision not to

transfer the Management Share to the Trustee of the Trust which results in an entirely unsatisfactory position that the Trust assets are not managed by the Trustee or individuals appointed by the Trustee but by individuals whom the trustees consider "***lack bona fides…have profited very considerably from the personal fees that they have disgorged from [the Respondent] while at the same time committing serious breaches of fiduciary duty***"[1]. In paragraph 41 his first affidavit Mr. Goddard states that the Petitioner considers that "***Mr. Watlington and Mr. Ferguson had breached their fiduciary duties as directors of [the Respondent] and should be personally accountable to [the Respondent] for all of the legal costs incurred in [the Respondent's] opposition to this Petition***."

31. As Mr. Goddard explains in his first affidavit, the renewed pursuit of this Petition by the Petitioner (under its new management) has been necessitated by the conduct of Mr. Tamine, the Respondent, and its directors, Mr. Watlington and Mr. Ferguson. Faced with the concerted resistance by the parties that have no material economic interest in the shares of Respondent, the winding up of the Respondent represents the only legal mechanism by which the Petitioner (on behalf of the Trust) can recover over US$3 billion of assets (according to the financial statements prepared by the Respondent) to which the Petitioner is lawfully entitled as the sole economic shareholder of the Respondent.

32. As noted earlier, Mr. Tamine has acknowledged in his memorandum of 13 August 2017 and to PwC that the Respondent "*is a closely held investment vehicle for Spanish Steps Holdings Ltd, which in turn is an asset and investment holding vehicle for the A. Eugene Brockman Charitable Trust*." In the circumstances it is difficult to understand the sworn evidence of Mr. Watlington when he says in his second affidavit at paragraph 17: "***Ms. Bell in her evidence proceeds on the misconception that*** *we as directors owe duties to [the Petitioner] (which we do not) and that **the assets of [the Respondent] are trust assets (which they are not)**.*"

---

[1] Paragraph 6 of the letter from Carey Olsen Bermuda Limited ("**Carey Olsen**"), attorneys for the Petitioner, to Marshall Diel & Myers, attorneys for the Respondent dated 24 September 2021.

33. I accept Mr. Robinson's submission that in order to hold a trustee accountable as a trustee the Court must ensure that the trustee is able to gather, control and manage the trust property. It would be an abdication of this Court's inherent jurisdiction to supervise the administration of trusts to allow a situation to arise and/or continue where the entire corpus of the trust (in excess of US$3 billion) is managed by individuals whom the trustee considers, by sworn evidence before the Court, not to be fit and proper individuals to be in that position.

**Opposition to the Petition by the Respondent in these proceedings**

34. Bermuda and English authorities dealing with unfair prejudice petitions establish the position that in principle a company should take a neutral position in relation to the relief sought in the petition and should avoid the expenditure of the company's funds in opposition to the petition. I accept Mr. Robinson's submission that the same principles apply to a contributory's petition based upon the just and equitable ground.

35. The position under Bermuda law is made clear in the judgment of Kawaley J (as he then was) in *Westport Trust Co Ltd v Paragon Trust Ltd* [2010] Bda LR 35 at [16]-[18]:

> *"16. The proposition that a company ought not expend its funds save for legitimate corporate purposes was supported as a broad general principle by reference to the principle articulated in* <u>Pickering v Stephenson</u> *(1872) LR 14 Eq 322 at 340 , "that the governing body of a corporation, that is in fact a trading partnership, cannot, in general, use the fund of the community for any purpose other than those for which they were contributed." However, the narrower principle of the impropriety of a company expending its funds to respond to a section 111 petition was supported by a number of dicta, most robustly the following observations of Harman J in* <u>Re a Company No. 004502 of 1988, ex parte Johnson</u> *[1991] BCC 234 at 236-237:* **"The train of authority being well established, it seems to me quite clear that, if it is shown that directors of a company have been causing the company's money to be spent on financing the company's resistance either to a 'pure' sec. 459 petition or, according to Plowman J in Re A &BC Chewing Gum and myself in**

13

*Re Hydrosan*, *in financing the company's resistance to a member's winding-up petition based on the just and equitable ground, the court should prevent such expenditure. Such expenditure is a misfeasance, there is no excuse for it in law and it is not a question of an arguable case being raised showing that it may be right to permit misfeasances. Misfeasances are not matters that are permitted by the courts and there is no question of an arguable case at all."*

17. *Implicit from a reading of the earlier portions of Harman J's judgment is that* **the company's participation at its own expense is not justified where it is "a nominal party to the sec 459 petition, but in substance the dispute is between two shareholders"**: *per Hoffman J in* <u>Re Crossmore Electrical and Civil Engineering Ltd.</u> *(1989) 5 BCC 37 at 38. The question of whether or not "in substance the dispute is between two shareholders" clearly turns on the facts of each case, a point which the principal authority relied upon by Mr. Marshall clearly illuminated. The following principles apply to deciding whether a company's participation in the English equivalent of our own section 111 petitions, according to Lindsay J in* <u>Re a company (No. 1126 of 1992)</u> *[1994] 2 BCLC 146: "Firstly, there may be cases (although it is unlikely nowadays when wide objects clauses are the norm) where a company's active participation in or payment of its own costs in respect of active participation in a s459 petition as to its own affairs is ultra vires in a strict sense. Secondly, leaving aside that possible class, there is no rule that necessarily and in all cases such active participation and such expenditure is improper. Thirdly, that the test of whether such participation and expenditure is proper is whether it is necessary or expedient in the interests of the company as a whole (to borrow from Harman J in ex p Johnson). Fourthly, that in considering that test the court's starting point is a sort of rebuttable distaste for such participation and expenditure, initial scepticism as to its necessity or expediency.* **The chorus of disapproval in the cases puts a heavy onus on a company which has actively participated or has so incurred costs to satisfy the court with evidence of the necessity or expedience in the particular case.** *What will be necessary to discharge that onus will obviously vary greatly from case to case. Fifthly, if a company seeks approval by the court of*

*such participation or expenditure in advance then, in the absence of the most compelling circumstances proven by cogent evidence, such advance approval will obviously vary greatly from case to case."*

*18. Although the fifth point is not applicable to the present case, I find the above statement of principles to be highly persuasive and the fourth point to be of particular relevance to the present case. The starting point is for this Court to be sceptical about the need for the Company's participation."*

36. Following the presentation of the Petition to the Court MDM set out the position of the Respondent (as determined by Mr. Watlington and Mr. Ferguson) in a letter to Wakefield Quin, the Petitioner's then attorneys, that the Respondent would be opposing the application to appoint JPLs and would also oppose the winding up petition:

> **"Following discussions with the US Department of Justice (the DOJ), our client has instructed us that they wish to contest both Spanish Steps Holdings Ltd's (SSH's) application for the appointment of Joint Provisional Liquidators (the JPLs) and SSH's Winding Up Petition**...the DOJ has never agreed to, acquiesced or concurred with the proposed liquidation of [the Respondent] and that the **DOJ does in fact object to the liquidation and/or dissipation of assets currently held in the [Respondent's] name**.."

> "There is no risk at all of [the Respondent] being insolvent so there can be no sensible objection to a Validation Order - which of course is only required because of **your client's misconceived ruse of presenting its Winding Up Petition**."

37. In paragraph 36 of his first affidavit Mr. Goddard states that in a short 6-week period between 24 September 2020 and 7 November 2020, the Respondent spent a "*staggering*" amount of $261,062.44 in legal costs which the Petitioner considers is a totally unwarranted and constitutes misfeasance on the part of Mr. Watlington and Mr. Ferguson.

38. In paragraph 24 of his first affidavit dated 27 October 2020 Mr. Watlington advises the Court that "*In terms of an estimate of future legal fees, **I estimate that they will be approximately $900,000 to the hearing of the Petition. This estimate includes the costs of MDM and Leading Counsel in preparing for the hearing relating to the Petitioner's application to appoint JPLs on the 20 November 2020, preparing replies to the Petition and three affidavits of Kiernan Bell and preparing for the hearing of the Petition in early 2021**, and advising [the Respondent] throughout*."

39. In his fourth affidavit sworn on 23 August 2021 Mr. Watlington advises that of the $2 million transferred to MDM's trust account on 1 February 2021, the sum of $915,439.13 had been paid out in respect of the Respondent's fees and expenses. The schedule provided shows that the sum of $625,588.72 was in respect of the legal fees incurred by MDM, Paul Hastings (US lawyers instructed by the Respondent to "*liaise with*" the DOJ) and English leading counsel. By way of explanation Mr. Watlington advised that the fees paid included "***Defending the Petition and the [Petitioner's] application to appoint JPLs (the JPL Application), in particular working on detailed evidence responding to the Petition and the JPL application… Preparing for Leading Counsel to be called to the Bermuda Bar to appear at the JPL Application…***"

40. In his fifth affidavit dated  10 September 2021 Mr. Watlington states that "***the dispute on the Petition (and the Summons for appointment of JPLs) centres on who ought to be entrusted with control over the underlying assets of [the Respondent] pending the outcome of the DOJ Investigation, rather than any financial issues*.**" Mr. Watlington does not explain why he considers it appropriate that the Respondent should be involved in that dispute and why the Respondent's funds should be expended by its directors in relation to that "*dispute*".

41. In paragraph 10 of the same affidavit that Mr. Watlington states that; "*in my view, it would be a breach of the duties of the current Board to permit all or a significant proportion of its assets to be paid over to any of its members before the indebtedness to potential creditors were established and quantified. **To permit the assets to be disbursed**, **whether by way of redemption, dividend or <u>supine acquiescence in</u> <u>the winding up petition</u>**, would*

*leave [the Respondent] and indeed its directors open to a charge of putting assets beyond the reach of creditors or even, potentially, accusations of committing a crime under the Proceeds of Crime legislation*…" The highlighted passage shows that Mr. Watlington is under the impression that to allow assets to be administered under a court ordered winding up of the Respondent is in fact a breach of his duty and therefore he must take action to oppose the Petition.

42. In paragraph 21 of his fifth affidavit Mr. Watlington says that he believes that the Respondent's future estimated costs (calculated from 10 September 2021) until the hearing of the Petition will be in the region of **$800,000 to $900,000**. This is apparently on the basis that in addition to engaging MDM and English Counsel to advise the Respondent in relation to the Petition and all the various hearings that will take place prior to the hearing of the Petition, the Respondent wishes to take advice from Paul Hastings in the US who are "*liaising with*" the DOJ.

43. A review of the correspondence and the evidence filed (including the evidence of Mr. Watlington himself) shows that he is completely oblivious of the legal position that in circumstances such as the Petition presented by the Petitioner, the Respondent must maintain a neutral position. The fact that the Respondent has taken such a strong position in opposition to the Petition presented by the Petitioner, presumably upon the instructions of Mr. Watlington and Mr. Ferguson, is a matter of concern to this Court. It is also a matter of concern to this Court that substantial amounts have been paid on account of legal fees in opposing the Petition by the Respondent. As Mr. Tamine acknowledged in his memorandum to PwC, these funds ultimately belong to the Trust.

### Duty to the foreign tax authority

44. Section 97(1) of the Act requires that every director of a company in exercising its powers and discharging his duties shall act honestly and in good faith with a view to the best interests of the company and exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances. These duties are owed to the company not merely as an abstract notion but for the benefit of the shareholders as a general body.

In the case of a solvent company directors' decisions are guided, as a general proposition, by what is in the best interest of the shareholders as a general body.

45. However, Mr. Robinson submits that in this case the directors of the Respondent, Mr. Watlington and Mr. Ferguson, appear to be under the misapprehension that they owe some form of undefined duty to the US tax authorities and the DOJ. Mr. Goddard complains in his first affidavit that Mr. Watlington appears to think he owes a greater duty to the DOJ then he does to the Respondent and its sole economic shareholder, the Petitioner.

46. Soon after their appointments as directors of the Respondent, Mr. Watlington and Mr. Ferguson instructed Paul Hastings to "*liaise with*" the DOJ in relation to the DOJ investigation in relation to the tax liability of one of the beneficiaries of the Trust, Mr. Robert Brockman. In this context it is to be noted that Mr. Tamine is a co-operating witness with the DOJ in respect of the prosecution of and as such has received immunity from prosecution by the US authorities.

47. On 10 July 2020 Paul Hastings sent the following email to Mr. Corey J. Smith, Senior Litigation Counsel, Tax Division, US DOJ, on behalf of the Respondent:

> "*Dear Mr. Smith:*
>
> *As you know, Paul Hastings LLP represents Point Investments, Ltd. ("Point"), which acts through Messrs. James Watlington and Glenn Ferguson, the duly appointed Directors of the company.*
>
> *Point has been working to gather documents and otherwise understand efforts to effect the alienation, redemption, transfer, change in custody over and/or unexplained expenditure of Point's assets. **As we have previously advised, at least until this work is completed Point under its current leadership intends only to draw on the company's assets for the payment of reasonable and customary expenses**, including for banking fees, director fees, counsel's fees, and fees*

*associated with other professional services such as those incurred by auditors involved in the preparation of financial statements.*

*We have provided your office with both documentation reflecting the appointment of Messrs. Watlington & Ferguson and relevant Court decisions out of Bermuda. One of Point's banks has asked that we refresh and reaffirm our understanding of the Department of Justice's position as follows:*

> *(1)* **that the Department of Justice is conducting a criminal investigation as to which assets held by or through Point are of central relevance;**
>
> *(2) that the Department of Justice is aware of the appointment of Messrs. Watlington and Ferguson as directors of Point and the decision of the Chief Justice of Bermuda approving the empowerment of these gentlemen as directors of a related entity; and*
>
> *(3) that the persons and actions of Messrs Watlington and Ferguson form no part of the Department's ongoing criminal investigation"*

48. Mr. Smith responds on 13 July 2020 stating *"Matt: This is fine and accurate".*

49. It is not readily apparent why Mr. Watlington and Mr. Ferguson thought it was necessary to voluntarily advise the DOJ that the Respondent did not intend to draw on the Respondent's assets other than for customary expenses given that no formal claim has been asserted by the DOJ against the Respondent. Further, it appears that no analysis has been carried out by Mr. Watlington and Mr. Ferguson as to the enforceability of such a claim against the Respondent in Bermuda. This communication was made to the DOJ on behalf of the Respondent without any discussion with the sole economic shareholder of the Respondent, the Petitioner. Further, it is extraordinary for a company itself to seek confirmation from the DOJ that the DOJ *"is conducting a criminal investigation"* into the company's affairs.

50. In his second affidavit Mr. Watlington sets out his further engagement with the DOJ following the presentation of the current Petition. At paragraph 115 he states:

> "115. **Following the receipt of SSH's Petition and the Application for the appointment of the JPLs on 24 September 2020, [the Respondent] instructed Paul Hastings to make contact with the DOJ to discuss its position as regards the Petition.** On 1 October 2020, Paul Hastings was copied into an email from Mr. Smith of the DOJ… that **the DOJ had never agreed to, acquiesced or concurred with the proposed liquidation of [the Respondent] and that the DOJ did in fact object to the liquidation and/or dissipation of assets currently held in the [Respondent's] name…**
>
> 116…Further, through Paul Hastings, the Independent Directors **[Mr. Watlington and Mr. Ferguson] have advised the prosecution team at the DOJ that, pending resolution of the DOJ's criminal investigation, they will continue to preserve [the Respondent's] assets** and only draw on [the Respondent's] assets for the payment of reasonable and customary expenses… The prosecution team at DOJ does not object to this assurance."

51. Again, Mr. Watlington does not explain why it was thought necessary to obtain the instructions from the DOJ in relation to the present Petition presented by the Petitioner to this Court in circumstances where there was no formal claim against the Respondent. He also does not explain why he thought it was necessary or appropriate to advise the prosecution team at the DOJ that pending resolution of the DOJ's criminal investigation the current directors will continue to preserve the Respondent's assets without any discussion with its sole economic shareholder.

52. In paragraph 119 of the same affidavit Mr. Watlington states that "*The dispute between [the Respondent] and [the Petitioner] is essentially about whether [the Petitioner] ought to have the right to redeem its shares in [the Respondent] and leave the cupboard bare in circumstances where there is a good reason to be concerned that [the Respondent] has a considerable liability to the US authorities*." As noted earlier, this statement by Mr.

Watlington is made in the context where there is no formal claim against the Respondent by any US authority and no proper analysis has been carried out by the Respondent as to whether such a claim would be enforceable against the Respondent in Bermuda. Further, Mr. Watlington does not explain how it can be said that the "*cupboard would be left bare"* in circumstances where the Court appoints its own officers, the JPLs, to wind up the Respondent under the supervision of this Court. As Mr. Robinson rightly submitted any legitimate interest of any creditor of the Respondent recognised under Bermuda law would be fully protected in a Court ordered winding up of the Respondent.

53. In a letter dated 24 September 2021 from Carey Olsen, attorneys for the Petitioner, to MDM, Carey Olsen pointed out that Mr. Watlington and Mr. Ferguson appeared to be under the misapprehension that they have duties to the DOJ. They also pointed out that any tax claim by the DOJ against the Respondent would have to be considered in light of the decision of the House of Lords in *Government of India v Taylor* [1955] AC 491 (taxes due under the laws of a foreign country are unenforceable in English courts and a foreign judgment seeking to recover taxes under foreign law is likewise unenforceable). This Court would expect the directors of the Respondent to have carefully considered this issue before "*liaising with*" the DOJ and before making any representations as to what they intended to do in relation to the assets of the Respondent. In any event this letter clearly required a proper response from the directors of the Respondent.

54. In response to this letter MDM, in their letter of 29 September 2021, stated that the Board of the Respondent is "*well aware that it has no duty to the DOJ, contrary to your insistence - but equally, it can hardly simply ignore a serious and powerful potential creditor which might cripple or even sink [the Respondent]."* There was no direct response to the *Government of India* point raised in the letter from Carey Olsen. This omission was picked up in the further letter from Carey Olsen dated 8 October 2021. In response to that letter MDM stated the directors' position in the following terms:

> "*We are not sure why you are focused on the possibility of enforcement in Bermuda or to the Bermudian courts and the simple rule about foreign tax claims given the nature and place of the claims being made and threatened, and the location of the*

*underlying assets. As you are no doubt aware, there are various exceptions and limitations to the rule about foreign claims which you do not address and we have little doubt that the US authorities would be quite prepared to seek enforcement of their claims in places other than Bermuda*."

55. As noted at the outset Mr. Watlington has filed seven affidavits in relation to this Petition. There is no evidence relating to what, if any, analysis was carried out by Mr. Watlington and Mr. Ferguson and or their advisors in relation to the enforcement of any claims by the DOJ in Bermuda or in any foreign jurisdiction where assets of the Respondent may be located.

56. Review of the affidavit evidence filed in these proceedings in relation to the interaction on behalf of the directors of the Respondent and the DOJ has left the Court with serious concerns as to whether the directors fully appreciate that their duties are owed solely to the Respondent and not to the DOJ. The directors' decision to start "*liaising with*" the DOJ prior to having conducted any serious review of (i) the potential liability of the Respondent to the DOJ in respect of any tax or other claims; (ii) the enforceability of any tax claims in Bermuda or other jurisdictions where the Respondent's assets may be located, leaves the Court with a real sense of unease. The Court is also perplexed as to why it was thought advisable to make voluntary representations on behalf of the Respondent that the Respondent will not dispose of its assets other than its ordinary fees and expenses. The fact that the interaction between the directors of the Respondent and the DOJ took place without any meaningful discussion with and input of the Respondent's sole economic shareholder, the Petitioner, is equally disturbing. In the circumstances, bearing in mind that the assets of the Respondent are trust assets, the Court is clear that Mr. Watlington and Mr. Ferguson should play no further part in the resolution of any tax or other claims made by the DOJ against the Respondent and any such claims must be resolved by the JPLs under the supervision of this Court.

**Mr. Tamine's request for an indemnity under the bye-laws of the Respondent**

57. By letter dated 27 April 2021 Canterbury Law Limited made a claim, on behalf of Mr. Tamine, asserting that Mr. Tamine be indemnified by the Respondent under bye-law 99 of the Respondent's bye-laws. The letter enclosed a draft writ of summons claiming costs and expenses in respect of (i) Mr. Tamine's response to the investigation conducted by the DOJ concerning the Trust structure; (ii) Mr. Tamine's response to an investigation conducted by the Bermuda Police Service which arose as a result of the DOJ investigation; (iii) the judicial review proceedings identified in the draft writ; (iv) Mr. Tamine's response to the investigation conducted by the public prosecutor, Switzerland; and (v) Mr. Tamine's defence of the allegations which formed part of civil proceedings against him in Bermuda.

58. Mr. Goddard, in his first affidavit, states that the claim for indemnity is in excess of $10 million. Mr. Goddard expresses concern on behalf of the Petitioner and the Trust that Mr. Tamine has effective control over PI LLC and thus, just as he was able to arrange for the appointment of Mr. Watlington and Mr. Ferguson as directors of the Respondent, it is to be assumed he can arrange for their removal and replacement if he is displeased with the handling of his claim for $10 million against that the Respondent.

59. Having regard to the unease expressed by the Court in relation to (i) the failure by Mr. Watlington and Mr. Ferguson to ensure that the Respondent remained neutral in relation to this Petition; and (ii) their apparent failure to fully appreciate that their duties are solely owed to the Respondent and not to the DOJ, the Court accepts the submission made by Mr. Robinson that it is not appropriate for Mr. Watlington and Mr. Ferguson to deal with the claim for indemnity made by Mr. Tamine. The Court orders that the claim made on behalf of Mr. Tamine for indemnity from the Respondent under its bye-laws must be considered and dealt with by the JPLs under the supervision of this Court.

*Dysfunction and lack of trust*

60. The Court accepts Mr. Robinson's submission that the relationship between the Respondent and its sole economic shareholder is dysfunctional, as illustrated by the freezing of the Petitioner's account with the Bank of Singapore. The Court has already referred to the Petitioner's complete lack of trust in relation to the conduct of Mr. Watlington and Mr.

23

Ferguson. The Court has already expressed its view that it is wholly untenable to have a position where the Trust assets (the assets held by the Respondent) are managed by persons in whom the trustee has no trust.

61. The Court notes that the structure providing for the Manager Share in the name of PI LLC (allowing it to appoint directors of SJTC and the Respondent) made commercial sense when SJTC was the trustee of the Trust and the Respondent held the assets of the Trust. It clearly makes no sense when SJTC is no longer the trustee of the Trust for PI LLC (Mr. Tamine) to insist that the directors of the Respondent (which holds the assets of the Trust) must be appointed by PI LLC and against the express wishes of the Trustee.

62. The Court also notes that the Court of Appeal Order dated 2 February 2021 expressly provides that at the hearing before Subair Williams J to determine the terms upon which BCT should become the Trustee no parties other than those provided for in the Order shall have "*standing to appear or present evidence or submissions in relation to the matter*". The Court of Appeal was clearly of the view that SJTC and/or Mr. Tamine should play no further part in the life of the Trust. The suggestion that the assets of the Trust, held by the Respondent, should in perpetuity be managed by directors appointed by Mr. Tamine and contrary to the express wishes of the Trustee is obviously unsustainable and cannot be accepted by this Court.

63. It was for these reasons that at the conclusion of the hearing on 29 October 2021 the Court made an order for the appointment of the JPLs.

**Application for validation**

64. Now that the JPLs have been appointed by the Court it is appropriate that they should be given an opportunity to consider, on behalf of the Respondent, the scope of any application to validate the payments pursuant to section 166 of the Act. Accordingly, the Court orders that the present application made by the Respondent by amended summons dated 8 September 2021 be adjourned *sine die* with liberty to apply. The application for a restraining order against the Respondent is no longer pursued by the Petitioner.

65. The Court will hear the parties in relation to any application for costs, if required.

Dated this 17th day of November 2021.

_____
NARINDER K HARGUN
CHIEF JUSTICE

# EXHIBIT 3



**ATTORNEY AT LAW**

**Courvoisier Centre II**
601 Brickell Key Drive, Suite 700
Miami, Florida 33131

1445 Pennsylvania Avenue, SE
Washington, D.C.  20003

305.455.5206
www.padulalawfirm.com

Michael D. Padula
Attorney
*(301) 785-6794* Direct Dial
mpadula@padulalawfirm.com

February 3, 2022

Herbert W. Linder, Esq.
Unites States Department of Justice
Tax Division
717 N. Harwood
Suite 400
Dallas, Texas 75201

Dear Mr. Linder,

I represent Evatt Tamine in connection with United States v. Robert Brockman and related matters.  I write because I have become aware of certain clear factual misrepresentations in the January 31, 2022 United States' Response in Opposition for Determination on Complaint for Judicial Review and Abatement of Jeopardy Assessment and Jeopardy Levy Pursuant to 126 U.S.C. § 7429.  I write to request that as an officer of the Court, you take immediate steps to contact the Court to withdraw these statements even if (as I expect) they were unintentional:

- On page 23 of your brief, you indicate that "some of these communications" between Mr. Tamine and Mr. Brockman directing the location of bank accounts "took place in April of 2020, after Brockman was aware that he was under investigation."  That is false; Mr. Tamine became a cooperating DOJ witness in September of 2018 and, as the government is well aware, had no such communications with Mr. Brockman in April 2020.

- The government also includes on page 23 of its brief a table referring to "March 8 – Apr.19, 2021 Tamine email to Brockman discussing moving funds out of Bermuda based banks and into Switzerland to avoid asset freezing orders and investment risk."  The government is aware that no such emails exist; suggesting that they do and purporting to characterize them in this way is a misrepresentation of fact.

While there are other factual errors in the January 31 filing (Mr. Brockman did not sell his interest in the Albula, for example – it was foreclosed), I find the two factual representations above particularly troubling.  I am concerned that these are not only misstatements that unfairly malign my client (he is and has been for more than three years

a cooperating witness for the government) but that they are highly material to the issue being litigated and have significant potential to mislead the Court.  One of the main thrusts of the government's jeopardy assessment brief is, as I understand it, to argue that Mr. Brockman has taken post-indictment steps to place his wealth outside the reach of the IRS and continues to do so.  Citing nonexistent, purportedly-recent emails from April 2020 and March through April 2021 in support of this argument presents a real possibility that the Court will be misled.

It is important that I address one final matter:  the implication throughout your January 31, 2022 filing that Mr. Tamine and entities which with he is affiliated continue to receive and obey Mr. Brockman's instructions and are actively assisting him to place his assets outside the reach of the IRS.  This is completely untrue.  As the government is well aware, my client Mr. Tamine began cooperating with the Department of Justice in September 2018 and severed ties with Mr. Brockman.  Since that time, Mr. Tamine has not spoken or otherwise communicated with Mr. Brockman, let alone received and obeyed instructions to move assets out of the reach of the IRS.  Moreover, neither Mr. Tamine nor entities with which he is affiliated (including but not limited to Edge Capital Investments Ltd. and Cabot Global Investments Ltd.) hold any assets for the benefit, beneficial or otherwise, of Mr. Brockman or his family.  The implication in your brief that things are otherwise is simply incorrect.

As you know, this proceeding is, by statute, on an extremely fast track, and the Court may rule at any time.  Thus, I must insist that the Department of Justice meet the obligations owed by officers of the Court and call its misstatements of fact to the Court's attention by close of business tomorrow, Friday, February 4th.  In the event it does not, I must fulfill my own professional responsibilities and will take steps to inform the Court myself on Monday.

cc:   Corey Smith, Esq.
      Jason S. Varnado, Esq.

Sincerely,

Michael D. Padula

2

# EXHIBIT 4

# JONES DAY

250 VESEY STREET • NEW YORK, NEW YORK 10281.1047

TELEPHONE: +1.212.326.3939 • FACSIMILE: +1.212.755.7306

DIRECT NUMBER: (212) 326-8329
FJACKSON@JONESDAY.COM

October 7, 2021

*VIA USPS CERTIFIED MAIL (WITH EXHIBITS), UPS OVERNIGHT, AND*
*FACSIMILE (WITHOUT EXHIBITS) (877) 477-7972*

Janice C. Stevens
Internal Revenue Service
1919 Smith Street 4020HOU
Houston, Texas 77002

>      **RE:    Request for Administrative Review of Notice of Jeopardy Assessment and**
>      **Rights to Appeal: Robert T. Brockman (TIN ███████)**

Dear Ms. Stevens:

Pursuant to I.R.C. § 7429(a)(2), Robert T. Brockman requests administrative review of the Notice of Jeopardy Assessment and Rights to Appeal, dated September 9, 2021 (the "Jeopardy Assessment").[1]

The Jeopardy Assessment totals $1,418,272,371.71, inclusive of tax, penalties, and interest, for taxable years 2004 through 2007, 2010, and 2012 through 2018. In its Jeopardy Recommendation Report (the "Jeopardy Report")[2], the IRS alleges the amount assessed is due to Mr. Brockman's purported failure to report approximately $2.7 billion of income on his tax returns. In short, the IRS alleges that Mr. Brockman is the owner of assets held by the A. Eugene Brockman Charitable Trust ("AEBCT"), the Alpheus Charitable Trust ("ACT"), the Messery Charitable Trust ("MCT"), and the Heraclides Charitable Trust ("HCT"), and should have reported income earned by the AEBCT, ACT, MCT, and HCT over a fifteen-year period. Ex. B at 1, 10, 14-15, 17-18. Similar allegations against Mr. Brockman were made in an

---

[1] Attached as Exhibit A is a copy of the Jeopardy Assessment (without enclosures). The Jeopardy Assessment, as issued to Mr. Brockman by the IRS, enclosed (i) IRS Form 4549-A, *Report of Income Tax Examination Changes*, (ii) a 78-page Jeopardy Recommendation Report (with attachments lettered A through D and totaling roughly 3,000 pages), (iii) IRS Publication 1, *The Taxpayer Bill of Rights*, (iv) IRS Notice 609, *Privacy Act Notice*, (v) IRS Publication 1660, *Collection Appeal Rights*, (vi) IRS Publication 594, *The IRS Collection Process*, and (vii) IRS Form 12153, *Request for a Collection Due Process or Equivalent Hearing*.

[2] Attached as Exhibit B is a copy of the Jeopardy Report (without attachments). Certain items referenced within the Jeopardy Report were missing. Counsel for Mr. Brockman contacted the IRS examiners regarding those missing items and was promised copies would be provided. As of the date of this Request for Administrative Review of Notice of Jeopardy Assessment and Rights to Appeal, neither Mr. Brockman nor his counsel has been provided with the missing items.

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • DETROIT
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID • MELBOURNE
MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • SAN DIEGO • SAN FRANCISCO
SÃO PAULO • SAUDI ARABIA • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

Janice C. Stevens
October 7, 2021
Page 2

indictment in *United States v. Brockman*, docketed as No. 4:21-cr-00009 in the Southern District of Texas ("*United States v. Brockman*").

Importantly, if the IRS's position is correct (which Mr. Brockman disputes) there are assets in the United States that are readily available for collection. As the IRS acknowledges, the AEBCT holds a greater than 99% interest in Universal Computer Systems Holding Inc. ("UCSH"), a Delaware entity. Ex. B at 2, 8. UCSH in turn indirectly owns 100% of The Reynolds and Reynolds Company ("R&R"), an Ohio company with operations in Houston, Texas and Dayton, Ohio. Ex. B at 3-4, 8.[3] R&R is estimated to be worth approximately $5 billion. Ex. C at ¶¶ 25-27.[4] There are no allegations in the Jeopardy Report that anyone has taken any action to conceal, dissipate, transfer, or in any way diminish the value of R&R. In other words, based on the IRS's theory that Mr. Brockman is the owner of R&R, there are assets worth a multiple of the asserted tax liability that are and will remain available in the United States. Thus the IRS cannot make out a case that, even if the tax liability against Mr. Brockman were to be established, collection would be jeopardized.

The IRS can only immediately assess an amount of tax due when it determines that such an assessment will be "jeopardized by delay." I.R.C. § 6861(a). Such an assessment, however, is an "extraordinary measure" that is meant to be used "sparingly" and only in light of "exigent circumstances." *See e.g.*, *Fumo v. United States*, No. 13-3313, 2014 U.S. Dist. LEXIS 77082, at *45, *76 (E.D. Pa. 2004). Accordingly, such an assessment may be subject to administrative review to determine whether: (i) the assessment was reasonable under the circumstances, and (ii) the amount assessed was appropriate. I.R.C. § 7429(a)(3). Where jeopardy is not found to exist, the Secretary must abate the assessment. I.R.C. § 6861(g).

Wholly ignoring its own position that Mr. Brockman is the owner of R&R, the IRS, in support of its determination that collection would be "jeopardized by delay," alleges that Mr. Brockman is or appears "to be designing quickly to place [his] property or property controlled by [him] beyond the reach of the government by removing it from the United States, by concealing it, by dissipating it, or by transferring it to other persons." Ex. A at 1. To this end, the IRS relies on (i) certain transfers of real property owned as separate property by his spouse and (ii) legal proceedings in Bermuda concerning the appointment of a trustee of the AEBCT. Ex. A at 1; Ex. B at 52-53. As discussed in detail below, none of these activities in any way dissipated or

---

[3] Throughout the Jeopardy Report, the IRS refers to the assets and activities of the offshore trusts as belonging to or having been undertaken by Mr. Brockman. Thus the Jeopardy Report flatly contends that Mr. Brockman is the true owner of the U.S. companies UCSH and R&R, stating: "Brockman currently owns 99.173% of his company, UCS Holding Inc. and its subsidiaries, though [*sic*] his ownership of the A. Eugene Brockman Charitable Trust, formed in Bermuda." Ex. B at 2.

[4] Attached as Exhibit C is the First Affidavit of Dorothy Kay Brockman dated December 30, 2020 ("DKB Affidavit"), filed *In the Matter of the Trust Settled by A Eugene Brockman on 26 May 1981 for the Benefit of his Children and Charities*, Case No 476 of 2020 (Bermuda Supreme Court).

Janice C. Stevens
October 7, 2021
Page 3

diminished the value of any of Mr. Brockman's assets or moved any assets outside the reach of the United States.

Apart from the two pages setting out the recent transfers of real property and noting (but incorrectly describing) the Bermuda litigation, the balance of the 78-page Jeopardy Report details the allegations in the indictment brought in *United States v. Brockman*. As discussed below, two key points refute the IRS's citation to the indictment as a basis for the Jeopardy Assessment. First and foremost, those allegations remain unproven. Second, the indictment was brought over one year ago, and the activity charged in the indictment is alleged to have taken place long before that. There is simply nothing about the pendency of the indictment or its allegations to support a current basis for the Jeopardy Assessment.

It is also important to note, as the IRS fails to do, that Mr. Brockman was diagnosed with Parkinson's disease and dementia in early 2019, and that his physical and cognitive condition has declined greatly since his diagnosis. As detailed more extensively below, Mr. Brockman's cognitive impairment renders him incapable of engaging in the type of machinations that the IRS speculates are occurring here.

For the reasons set forth herein, the Jeopardy Assessment was not reasonable under the circumstances and must be abated. Jeopardy does not exist in this matter. There are no facts or circumstances supporting a reasonable determination that collection is in danger or that Mr. Brockman is designing quickly to place property outside the reach of the government. In fact, there is no evidence that Mr. Brockman has taken any acts, directly or indirectly, to impede collection, and there is no evidence that any of his assets have been "moved" – whether by concealment, dissipation, or transfer – outside the reach of the government. *Fumo*, 2014 U.S. Dist. LEXIS 77082, at *83 ("An element to analyzing the reasonableness of a jeopardy assessment is whether the taxpayer placed property beyond the reach of the government, *leaving inadequate or no property or other assets for collection by the government*.") (emphasis added). Instead, the IRS misconstrues the facts and circumstances to give the appearance that collection is in danger to justify its assessment. That positon is not supported by the circumstances and is further undermined by the IRS's own position that Mr. Brockman has assets located in the United States that exceed the purported assessment by a factor of five or greater.

**The IRS's issuance of the Jeopardy Assessment was unreasonable under the circumstances.**

In determining whether a jeopardy assessment is reasonable, one of three conditions set forth in the Treasury Regulations must be present. These conditions are: (i) the taxpayer is or appears to be designing quickly to depart from the United States or to conceal himself; (ii) the taxpayer is or appears to be designing quickly to place his property beyond the reach of the government either by removing it from the United States, by concealing it, by dissipating it, or by transferring it to other persons; and (iii) the taxpayer's financial solvency is or appears to be imperiled. Treas. Reg. § 1.6851-1(a)(1). Those are the only three conditions that justify a valid

JONES DAY

Janice C. Stevens
October 7, 2021
Page 4

jeopardy assessment. *McWilliams v. Comm'r*, 103 T.C. 416, 424 (1994). The IRS bears the burden of proving the reasonableness of the Jeopardy Assessment. I.R.C. § 7429(g).

In the Jeopardy Report, the IRS is silent as to the first (risk of flight) and third (financial solvency) conditions. As such, the IRS has apparently conceded that neither of these conditions exist in this case. For completeness, however, we include information below demonstrating that neither condition exists. The Jeopardy Assessment, therefore, turns on whether the IRS can show that there are actions taken by Mr. Brockman that reasonably demonstrate that his property is being placed beyond the reach of the government.

### 1. Mr. Brockman is not (nor appears to be) "designing quickly" to depart from the United States or to conceal himself.

The IRS does not and cannot assert, based on the circumstances, that Mr. Brockman is or appears to be a flight risk. Mr. Brockman has Parkinson's disease and dementia. He has been hospitalized four times this year: in March for five days in connection with a urinary tract infection and resultant sepsis; for another twelve days in late May and early June, again for a urinary tract infection and sepsis; overnight in late June in connection with surgery to alleviate the cause of the infections; and most recently for four days in September for yet another urinary tract infection. He is now wholly dependent on round-the-clock caregivers.

Mr. Brockman is a frail, sick, cognitively impaired 80 year-old man. He is a United States citizen and has a history of military service. He and Dorothy Brockman, his wife of 53 years, have lived in Houston, Texas, for more than five decades. They have one son, a daughter-in-law, and an eighteen-month old grandson, who also live in Houston.

Perhaps even more to the point, the Court in *United States v. Brockman* released Mr. Brockman on bond, and he surrendered his passport and agreed to certain travel restrictions.[5] Mr. Brockman's health makes it a near-impossibility that he could flee the United States, and in any case he lacks the means to do so. He simply is not and could not be "designing quickly to depart from the United States or to conceal himself."

### 2. Mr. Brockman's financial solvency is not and does not appear to be imperiled.

The IRS fails to demonstrate or even allege in the Jeopardy Report that Mr. Brockman's financial solvency is or appears to be imperiled. A taxpayer's solvency must be considered in determining whether a jeopardy assessment is reasonable. Under the IRS's own guidance, a

---

[5] The indictment in *United States v. Brockman* was originally filed in the Northern District of California, and transferred to the Southern District of Texas on Mr. Brockman's motion. Conditions of release were set by the Magistrate Judge in the Northern District of California prior to transfer. Case No. 3:20-cr-00371-WHA, Dkt. No. 10.

JONES DAY

Janice C. Stevens
October 7, 2021
Page 5

taxpayer's financial solvency "*must be threatened . . . or there can be no jeopardy.*" I.R.M. 5.17.15.2.1(3) (12-29-2009) (emphasis added); *see also* Treas. Reg. § 1.6851-1(a). When evaluating a taxpayer's solvency, the Treasury Regulations require that such an evaluation be made without regard to the tax assessment. Treas. Reg. § 1.6851-1(a)(1). In other words, Mr. Brockman's solvency must be evaluated without taking into account the Jeopardy Assessment of approximately $1.4 billion.

There is no evidence that Mr. Brockman's solvency is imperiled. In particular, IRS guidance identifies certain factors to consider when evaluating a taxpayer's solvency, including whether (a) there are balance due accounts open with respect to the taxpayer, (b) a search of the local court records, or other resources, would reveal outstanding judgments against the taxpayer, and/or (c) the taxpayer has at some time in the past filed for bankruptcy. *See* I.R.M. 5.17.15.2.1(3) (12-29-2009) and I.R.M. 4.15.1.9.1.3 (07-26-2021). None of these factors are present in this matter -- Mr. Brockman has no open balance due accounts, no outstanding judgments, and has never filed for bankruptcy. To the contrary, Mr. Brockman's assets exceed known liabilities and he has always met his debts. Moreover, Mr. Brockman's lifestyle and expenses fall well within and are readily met by the income that he has earned and reported on his tax returns, both from his employment at R&R and through personal investments.

Indeed, the IRS's own position in this matter – that Mr. Brockman "controls" assets well in excess of the tax assessment – supports a conclusion that his solvency is not imperiled. The IRS effectively alleges that Mr. Brockman is the owner of assets valued at approximately $8 billion. This amount is well in excess of any outstanding alleged liabilities, including the approximately $1.4 billion allegedly due and owing under the Jeopardy Assessment. Ex. C at ¶¶ 25-27. Further, of the $8 billion in assets, approximately $5 billion is attributable to R&R, an operating company located domestically in Ohio and Texas. The IRS cannot have it both ways. It cannot take the position that, on the one hand, Mr. Brockman's solvency is imperiled, and on the other, he is the true owner of $8 billion in assets, the vast majority of which are located in the United States. As such, "there can be no jeopardy" here.

### 3. The IRS intentionally misconstrues the underlying circumstances to justify the Jeopardy Assessment.

Because the IRS cannot contend that Mr. Brockman is a flight risk or is insolvent, the IRS alleges that he is attempting to move assets outside the reach of the government. In support of this contention, the IRS relies on certain allegations that purportedly establish that Mr. Brockman is "designing quickly" to place property out of the reach of the government. *First,* the IRS focuses on certain dispositions of real property, none of which was owned by Mr. Brockman, to third parties entered into in the ordinary course. *Second,* the IRS alludes to Bermuda litigation involving the AEBCT as having the effect of "moving the activities and transferring the assets" of the trust. Ex. A at 1. Such arguments are erroneous and contradict the very facts set out in the Jeopardy Assessment and facts of which the government is aware.

JONES DAY

Janice C. Stevens
October 7, 2021
Page 6

### i. Recent real property transactions by Mrs. Brockman do not demonstrate that property is being placed outside the reach of the government.

The Jeopardy Assessment improperly asserts that the sale or gift of three separate properties by Mrs. Brockman, along with the listing for sale of a fourth property, demonstrate that Mr. Brockman is placing property outside the reach of the government. Ex. B at 52. This assertion is false, and is belied by the very facts in the Jeopardy Report that establish that all four properties were (and for some time have been) the sole and separate property of Mrs. Brockman.

The four properties are each located in Houston, Texas, and the transactions may be described as follows:

1. **333 West Friar Tuck Lane.** Until earlier this year this property was Mr. and Mrs. Brockman's primary residence. It has been the sole and separate property of Mrs. Brockman since shortly after it was purchased in 1997. Mr. Brockman has not had any property right or interest in or to it since 1998. In January 2021, on account of their advanced age and Mr. Brockman's declining health, as well as to reduce costs, Mrs. Brockman bought a smaller and less expensive home in Houston located at 3465 Overbrook Lane, where she and Mr. Brockman now reside. Mrs. Brockman listed the 333 West Friar Tuck Lane property for sale on May 17, 2021 for $15,350,000. The property has not yet been sold and remains the property of Mrs. Brockman.[6]

2. **335 West Friar Tuck Lane.** This property is a vacant 1.55 acre lot lying adjacent to 333 West Friar Tuck Lane, described above. It was sold for $3,999,000 on December 11, 2020, in connection with the intended sale of 333 West Friar Tuck Lane and a move to a smaller residence. The Jeopardy Assessment erroneously states that the property was jointly owned by Mr. and Mrs. Brockman, and that it was sold by Mrs. Brockman, acting on behalf of Mr. Brockman as his power of attorney. That is not true. It was not owned by Mr. Brockman. Mrs. Brockman purchased this property in 2005 as her sole and separate property. *See* Ex. D.[7]

3. **1731 Sunset Boulevard.** This property is a four-story townhouse that Mr. and Mrs. Brockman acquired in 2011. The Jeopardy Assessment states that "shortly thereafter" it was partitioned and became the sole and separate

---

[6] *333 West Friar Tuck Ln, Houston, TX MLS #20114033*, Zillow (Oct. 6, 2021, 9:10 PM), https://www.zillow.com/homedetails/333-W-Friar-Tuck-Ln-Houston-TX-77024/27806386_zpid/.

[7] Attached as Exhibit D are the underlying property records establishing Mrs. Brockman as the sole owner of 335 West Friar Tuck Lane since it was purchased in 2005.

JONES DAY

Janice C. Stevens
October 7, 2021
Page 7

property of Mrs. Brockman. Ex. B at 52. Mr. and Mrs. Brockman's son, Robert, resided at this property prior to and after his marriage to his wife, Elizabeth. After Elizabeth Brockman became pregnant, they moved to 3702 Inwood Drive, discussed below. On May 12, 2021, after her son and daughter-in-law moved from the townhouse, Mrs. Brockman sold it for $1,375,000. Mr. Brockman had no property right or interest in or to the property at the time of its disposition. *See* Ex. B at 36.

4. **3702 Inwood Drive.** This property is a four-bedroom home and is the current residence of Mr. and Mrs. Brockman's son, daughter-in-law, and toddler grandson. Mrs. Brockman acquired it as her sole and separate property on January 21, 2020, and at no point did Mr. Brockman ever hold any property right or interest in or to it. Ex. B at 37. Mrs. Brockman gifted this property to her daughter-in-law on November 12, 2020.

None of these property transactions indicate that either Mr. Brockman or his wife is attempting to place property outside the reach of the government.

*First*, at the time of disposition or listing (and for quite some time prior), Mr. Brockman had no property right or interest in or to any of these four properties. In short, these are not his properties and, as such, were never within "reach" of the government. Their dispositions or potential disposition is completely irrelevant to the analysis as to whether assessment against Mr. Brockman would be "jeopardized by delay."

*Second*, none of these dispositions or listings demonstrate any jeopardy, as "the jeopardy assessment statute in most cases contemplates the movements of property out of reach of the government by means of underhanded maneuvering." *Fumo*, 2014 U.S. Dist. LEXIS 77082, at *92 (citing *George F. Harding Museum v. United States*, 674 F. Supp. 1323, 1329 (N.D. Ill. 1987). In this case, Mrs. Brockman entered into transfers in a transparent manner, and in a manner that allowed the IRS to trace the transfers using only public databases and public records. *See Fumo*, 2014 U.S. Dist. LEXIS 77082, at *87. For example, each of the properties was registered on a Multiple Listing Service or MLS (a public database in which property information is disseminated among real estate professionals for listing and marketing purposes) and each such transfer was publicly recorded with the Harris County Clerk in Texas. Mrs. Brockman neither transferred the properties to any alter ego or shell corporation, nor to parties unknown to the IRS who might be difficult to locate. *Id.* at *86.

*Third*, such transfers are not indicative that Mr. Brockman or his wife is "designing quickly" to place property beyond the reach of the IRS. Instead, such transfers were entered into in the ordinary course, given the Brockmans' age and family circumstances. Mrs. Brockman has filed separate tax returns since 1996, and maintains property and investments separate from her husband. Mrs. Brockman has engaged in transfers similar to these over the course of her long

JONES DAY

Janice C. Stevens
October 7, 2021
Page 8

marriage to Mr. Brockman. Nothing in the record suggests that this conduct deviates from her previous conduct or that such transfers were in response to any government investigation.

*Fourth*, with respect to the sales of the properties at 335 West Friar Tuck Lane and 1731 Sunset Boulevard (and in the event of a sale of 333 West Friar Tuck Lane), these dispositions were for reasonably equivalent value, and as such they do not "dissipate" assets. The 335 West Friar Tuck Lane property – a vacant 1.55 acre lot – sold for $3,999,000. The 1731 Sunset Boulevard townhouse sold for $1,375,000. Both properties were transferred at arm's length to unrelated third parties, and the IRS does not contend that such assets were for less than their reasonably equivalent value. *See id.* at *83. Moreover, as the Jeopardy Report concedes, Mrs. Brockman acquired two additional properties in the same time period. If, as the IRS alleges, she were Mr. Brockman's nominee (which she is not), then all she did was replace real property assets with other real property assets. Ex. B at 37, 39. Through the use of public records and information provided to the IRS, the IRS was able to (or easily could) determine the amount of each sale and where the proceeds went, as well as the acquisitions of other properties. Ex. B at 35, 37, 39. *See McWilliams*, 103 T.C. at 427 ("Petitioner did not attempt to transfer or hide the assets in another person's name . . . .").

The bottom line with respect to all four real property transactions is that there has been no attempt to hinder or defeat collection by the IRS. These transactions do not support the IRS's determination that collection is in jeopardy. Reliance on these transactions is not reasonable, and the Jeopardy Report misstates and ignores relevant facts.

> ## ii. The appointment of a new and independent institutional trustee by the Bermuda courts did not jeopardize the IRS's ability to collect any liability assessed against Mr. Brockman.

The Jeopardy Report contends that Mr. and Mrs. Brockman "have litigation pending in Bermuda to appoint new trustees" of the AEBCT. Ex. B at 52-53. The Jeopardy Report cites to a case captioned as *St. John's Trust Company (PVT) Limited vs. James Watlington, et al.*, filed in the Supreme Court of Bermuda in 2019 ("*SJTC v. Watlington*"), and states that "Mrs. Brockman is acting on Mr. Brockman's behalf in the trust proceedings pursuant to the power of attorney granted to her by Brockman." Ex. B at 52-53. This speculative contention misstates the facts, wholly misconstrues the Bermuda litigation, and ignores the determinations that have been made by the Bermuda courts.

Contrary to the Jeopardy Report, Mr. and Mrs. Brockman did not initiate and were not parties to *SJTC v. Watlington*. Moreover, the appointment of an independent trustee of the AEBCT is not, as the Jeopardy Report states, pending in *SJTC v. Watlington*, but rather has been fully resolved by the Bermuda Court of Appeal in an entirely separate litigation. Nonetheless, the IRS now baselessly contends that this litigation could "*potentially* grant[] [Mr. and Mrs. Brockman] greater control over the trust and ability to dispose or transfer trust assets." Ex. B at 52 (emphasis added).

JONES DAY

Janice C. Stevens
October 7, 2021
Page 9

By way of background, St. John's Trust Company (PVT) Limited ("SJTC") served as the trustee of the AEBCT for a number of years.  SJTC had no other business apart from this role.  In December 2019, the Supreme Court of Bermuda replaced SJTC with Medlands (PTC) Ltd. ("Medlands"), which similarly was a bespoke trust company that had no purpose other than to serve as the trustee of the AEBCT.  Prior to and following the appointment of Medlands, multiple disputes, including *SJTC v. Watlington*, were pending in Bermuda courts between SJTC and its directors, and Medlands and its directors and counsel, concerning which was the proper trustee for the AEBCT.  As a result, the AEBCT was exposed to the payment of management and litigation fees for all sides of these disputes.  It was also, in many ways, paralyzed from functioning, and was effectively hindered from meeting its charitable commitments.  Ex. C at ¶¶ 6, 9, 29-31, 47-49, 53.

During the pendency of the various disputes in Bermuda, Mr. Brockman's health was deteriorating and his cognitive impairment was worsening.  Citing these health concerns (and not acting through any power of attorney, as erroneously alleged in the Jeopardy Report), Mrs. Brockman sought and was granted authorization by the Bermuda courts to present the views of the individual human beneficiaries of the AEBCT.[8]  Ex. C at ¶ 1; Ex. E at ¶ 1.[9]  Mrs. Brockman made clear that it was her position that the trustee of the AEBCT should be an independent, experienced trust company, and not either of SJTC or Medlands.  Ex. C at ¶ 54.

Through her counsel, Mrs. Brockman investigated appropriate trust companies.  Ex. C at ¶ 54.  Maples FS Limited ("Maples"), a well-regarded, regulated trust company that routinely serves as an independent professional trustee, presented as the most qualified and prepared trust company.  Ex. C at ¶ 54; Ex. F at ¶ 6, MF-2[10]; Ex. G at ¶¶ 6-12[11].  Maples in turn decided to form BCT Limited ("BCT"), a wholly owned subsidiary, to serve as the AEBCT trustee.  In late

---

[8] The interests of the charitable beneficiaries were represented by the Bermuda Attorney General.

[9] Attached as Exhibit E is the Order of the Honorable Justice Subair Williams dated March 26, 2021 ("March 26 Order"), filed *In the Matter of the Trust Settled by A Eugene Brockman on 26 May 1981 for the Benefit of his Children and Charities*, Case No 476 of 2020 (Bermuda Supreme Court) as well as *In the Matter of the "B" Trust*, Case No. 376 of 2018 (Bermuda Supreme Court).

[10] Attached as Exhibit F is a copy of the Second Affidavit of Miriam Fisher, with exhibits thereto, submitted in *In the Matter of the Trust Settled by A Eugene Brockman on 26 May 1981 for the Benefit of his Children and Charities and in the Matter of the Trustee Act 1975, Dorothy Kay Brockman v. Medlands (PTC) Limited, et. al.*, 2020: No. 476 (Supreme Court of Bermuda).

[11] Attached as Exhibit G is a copy of the Third Affidavit of Miriam Fisher, with exhibits thereto, submitted in *In the Matter of the Trust Settled by A Eugene Brockman on 26 May 1981 for the Benefit of his Children and Charities and in the Matter of the Trustee Act 1975, Dorothy Kay Brockman v. Medlands (PTC) Limited, et. al.*, 2020: No. 476 (Supreme Court of Bermuda).

JONES DAY

Janice C. Stevens
October 7, 2021
Page 10

2020, Mrs. Brockman filed an application before the Bermuda Court of Appeal for BCT to be appointed as trustee. Ex. H at ¶ 3.[12]

Noting that Maples and BCT are Cayman-based entities, the IRS postures that the appointment of BCT would have the "effect . . . of moving the activities and transferring assets to yet another offshore location." Ex. A at 1. Again the record in the Bermuda proceeding wholly refutes the IRS's rank conjecture: BCT made a commitment during the proceedings before the Bermuda Court of Appeal to submit to Bermuda law. Ex. G at MF-3 at 2.

On February 2, 2021, following a three-day hearing of an appeal by SJTC of the appointment of Medlands to serve as trustee of the AEBCT, the Clerk of the Bermuda Court of Appeal informed the parties that the Bermuda Court of Appeal determined that Medlands should be relieved as trustee of the AEBCT, that all claims by SJTC were to be dismissed, and that the lower court should appoint BCT as trustee on a date and upon terms to be set by that court. Ex. I.[13] By Order dated March 26, 2021, the Supreme Court of Bermuda formally appointed BCT as the trustee of the AEBCT, effective April 1, 2021. Ex. E at ¶ 2.

The reasons for the appointment of BCT – to bring an end to the costly internecine battle between SJTC and Medlands and thereby enable the AEBCT to meet its charitable purposes – and the qualifications of Maples, acting through BCT, as an independent, professional trust company, were fully presented to and vetted by the Bermuda courts.

Ignoring (or perhaps inexcusably ignorant of) this record,[14] the IRS conjectures that the Bermuda litigation was intended to or somehow did give Mr. and Mrs. Brockman some ability to transfer some unidentified property of Mr. Brockman to a foreign trust, or to establish a new trust for some unspecified purpose, or to amend trust documents to accomplish some uncertain and unstated result. Ex. B at 2, 52. In this mix, the IRS also suggests that Mrs. Brockman would somehow use the durable power of attorney granted to her by her ailing husband to effect this amorphous scheme. Ex. B at 53. Such a conclusion is illogical and unreasonable.

---

[12] Attached as Exhibit H is a copy of the Originating Summons dated December 31, 2020, filed *In the Matter of the Trust Settled by A Eugene Brockman on 26 May 1981 for the Benefit of his Children and Charities*, Case No 476 of 2020 (Bermuda Supreme Court).

[13] Attached as Exhibit I is a copy of the February 2, 2021 letter from the Clerk of the Bermuda Court of Appeal ("February 2, 2021 Bermuda Court of Appeal Letter"), issued in *St. John's Trust Company (PVT) Ltd. v. Medlands (PTC) Ltd.*, Civil Appeal No. 8 of 2020, Bermuda Court of Appeal), as a companion action to *In the Matter of the Trust Settled by A Eugene Brockman on 26 May 1981 for the Benefit of his Children and Charities and in the Matter of the Trustee Act 1975, Dorothy Kay Brockman v. Medlands (PTC) Limited, et. al.*, 2020: No. 476 (Supreme Court of Bermuda). The February 2, 2021 Bermuda Court of Appeal Letter stated the Court would provide "reasons to follow." To date the Court has not done so.

[14] The Jeopardy Report misleadingly creates the impression that a determination as to the appointment of a new trustee is still pending before the Bermuda Court of Appeal. *See* Ex. B at 2, 53. The appointment of BCT was fully resolved by the Bermuda courts many months before the September 9, 2021 Jeopardy Assessment, as set out in the February 2, 2021 Bermuda Court of Appeal Letter and the March 26 Order. *See* Ex. E and Ex. I.

Janice C. Stevens
October 7, 2021
Page 11

The IRS offers nothing, not even a hint, how or why the appointment of BCT could or did give Mr. and Mrs. Brockman any ability to influence the actions of the AEBCT, or why Maples, a long-established independent trust company and the sole owner of BCT, would permit this outcome. To the contrary, the record in the Bermuda litigation reflects extensive and thoughtful oversight by the Bermuda courts concerning the operation and governance of the AEBCT.

Moreover, the mere existence of a durable power of attorney allowing Mrs. Brockman to act on behalf of her husband, which the IRS acknowledges was publicly recorded, *see* Ex. B at 7, adds nothing to the IRS's futile attempt to stir up a vision of potential nefarious future conduct by her. The durable power of attorney played no role in the Bermuda litigation. Mr. Brockman has Parkinson's disease and dementia. He has been hospitalized four times in six months—twice for extended periods to treat life-threatening sepsis. In addition to the durable power of attorney cited by the IRS, Mrs. Brockman also holds medical power of attorney for her husband of fifty-three years. At this point, given Mr. Brockman's health issues and especially his mental incapacity, to omit these measures would be irresponsible.

The IRS's speculations are without a shred of foundation. In any case, speculation as to what either Mr. or Mrs. Brockman may do in the future is not grounds for issuing a jeopardy assessment. *See, e.g., Pircher v. United States*, No. 08-0835, 2008 U.S. Dist. LEXIS 101021, at *9 (W.D. Tex. 2008) ("without evidence, the jeopardy assessment . . . is arbitrary or capricious and subject to release."). "[T]he necessary showing requires more than a showing that a taxpayer's assets could easily be dissipated. It requires . . . a showing that the taxpayer is or appears to be designing quickly to place his property beyond the reach of the government." *Fumo*, 2014 U.S. Dist. LEXIS 77082, at *100. After all, as set forth in *Fumo*, "Any taxpayer could easily dissipate their assets, but that would not justify finding a jeopardy assessment reasonable without also finding that the applicable standards were met." *Id.*

**The IRS's discussion of the allegations in *United States v. Brockman* are not relevant and cannot justify the Jeopardy Assessment.**

The IRS seeks to bolster the shortfalls in its position by tracking and elaborating on the allegations made against Mr. Brockman in the indictment in *United States v. Brockman*. In the Jeopardy Report, as in the indictment, the government contends that Mr. Brockman is the true owner of the assets of the AEBCT, ACT, MCT, and HCT, and should be charged with income earned by entities held in these trusts. Ex. B at 1, 43, 59-62. Mr. Brockman has entered a plea of not guilty to these charges, which remain unproven.[15] It is axiomatic that a criminal defendant is presumed innocent until proven guilty. *Nelson v. Colorado*, 137 S. Ct. 1249, 1255-56 (2017). The Jeopardy Report would also recharacterize a 2004 transaction as a taxable dividend from a

---

[15] A hearing is scheduled in *United States v. Brockman* for the week of November 15, 2021, to determine whether Mr. Brockman is competent to understand the proceedings against him and to assist in his defense.

JONES DAY

Janice C. Stevens
October 7, 2021
Page 12

U.S. entity to an offshore entity held in the AEBCT trust structure, and charge Mr. Brockman with income from that transaction as well.[16]  Ex. B at 1, 43.

The indictment was handed down on October 1, 2020, nearly a year before the IRS took the precipitous action of making the Jeopardy Assessment.  Apart from the continuing and well-known existence of offshore entities, neither the indictment nor the Jeopardy Report speaks to current, ongoing activities to move assets out of the reach of the IRS.  More specific to the issue to be decided now, nothing in the pendency of the indictment nor its allegations supports a conclusion that, were the government able to prove the charges in the indictment, and the IRS able to prove that there is additional tax liability, collection is in any way in jeopardy.  To the contrary, the Jeopardy Report itself makes clear that collection can wait on the outcome of normal assessment procedures.

As set out in the Jeopardy Report, the AEBCT was settled in 1981 by Mr. Brockman's father.  The beneficiaries of the AEBCT are Mr. Brockman, along with his wife, brother, and sister-in-law, and charities in the United States, Great Britain, and Bermuda.  Ex. B at 8.  Although the IRS describes distributions made by the AEBCT to U.S. charities, *see* Ex. B at 1, it does not, and cannot, assert that any U.S. person, including Mr. Brockman, has ever received any distribution.  The Jeopardy Report is similarly devoid of any suggestion that any U.S. individual received a distribution from any of the ACT, MCT or HCT.

As described by the Jeopardy Report, the AEBCT is a non-grantor offshore discretionary trust with U.S. individuals and U.S., British, and Bermuda charities as beneficiaries.  Ex. B at 8.  There is nothing innately wrong with this structure.  *See, e.g.*, P.L.R. 201308016 (Feb. 22, 2013) (concluding that because discretionary beneficiaries cannot "be said to hold more than an expectancy in trust property[,]" certain trust modifications will not result in such beneficiaries realizing income from the trust); F.S.A. 199952014 (Sept. 23, 1999) (concluding that discretionary beneficiaries should not be treated under the grantor trust rules as the owner of foreign trusts).  Nor was the AEBCT the secret that the IRS would make it out to be.  The settlor, Mr. Brockman's father, reported the transfer of assets at the time of the formation of the AEBCT, as well as income earned from the AEBCT during his lifetime.[17]  Ex. J.  Moreover, Mr.

---

[16] The Jeopardy Report repeatedly states that Mr. Brockman "received distributions" from investments made by entities owned by the AEBCT, ACT, MCT, or HCT.  *See, e.g.*, Ex. B at 13, 16, 19.  Nowhere, however, does the indictment or the Jeopardy Report contend that any funds left these trust structures.  To the contrary, the Jeopardy Report bases its contentions on transfers into bank accounts that were in turn also held by the respective trusts.  *See* Ex. B at 13, 16, 19.  Similarly, by the IRS's theory, the proceeds in the 2004 transaction remained within the AEBCT trust structure.  Ex. B at 61-62.  In other words, the IRS's basis for charging Mr. Brockman with alleged unreported income depends solely on treating the offshore entities as shams; there is no allegation anywhere that Mr. Brockman received any distribution from any of the trusts, or of any of the funds at issue directly.

[17] Attached as Exhibit J is a Form 3520, *Creation of or Transfers to Certain Foreign Trusts*, filed by Mr. Brockman's father, Alfred Eugene Brockman, disclosing the formation of the AEBCT in 1981, and Forms 1040, *U.S. Individual Income Tax Returns*, filed by jointly by Alfred and Pearl Brockman for their taxable years 1981 through 1986, reporting income earned from the AEBCT.

JONES DAY

Janice C. Stevens
October 7, 2021
Page 13

and Mrs. Brockman, along with Universal Computer Consulting Holding Inc., the predecessor entity to what is now UCSH, were examined by the IRS for taxable years 1992 through 1995. Contrary to the IRS's current contention, we understand from the counsel who represented Mr. and Mrs. Brockman and Universal Computer Consulting Holding Inc. that the ultimate ownership of Universal Computer Consulting Holding Inc. by the offshore structure was indeed disclosed as part of that examination.  *Cf.* Ex. B at 33.

Most tellingly, the main assets of the AEBCT – UCSH, R&R, and related companies – *are in the United States.*  This simply is not a case, as the IRS would make it out to be, where assets are being hidden offshore.  These are U.S. companies that file and pay taxes in this country.  Mr. Brockman sold the business that he founded to the AEBCT in the mid-1980s, and it grew in value, along with the investments that the IRS describes, inside the AEBCT structure.

The IRS contends that Mr. Brockman used HCT to conceal his alleged ownership interest in real property and a yacht, and used the Framfield Charitable Trust ("Framfield") to conceal his alleged ownership interest in a corporate airplane.  Ex. B at 1, 20-22, 30-31.  As much as the IRS would like to have some inference drawn from its citations to a summer home, fishing property, a yacht, and a plane, nothing in these allegations supports the one factor that the IRS must prove here – that its ability to collect will be "jeopardized by delay."

In making these allegations, the IRS glosses over or ignores key facts:  Mr. Brockman paid fair market value for the use of all of these assets.  The real properties are located in the United States, and directly held by U.S. entities.  Ex. B at 20-21.  And the Jeopardy Report supports its contention that Mr. Brockman has an interest in the yacht by citing to *Mr. Brockman's disclosure on IRS Form 8938 attached to Mr. Brockman's 2017 and 2018 personal tax returns* – hardly an effective means to keep something secret from IRS.  Ex. B at 27.

Most glaring is the IRS's attempt to make something out of the nothingness of the circumstances concerning the corporate airplane.  As the Jeopardy Report states, between 2012 and 2014, the plane was owned by Hardwicke Properties LLC ("Hardwicke"), a Delaware entity, which in turn was owned 99% by Red Plains Air Charter Inc. ("Red Plains"), a Delaware corporation, and 1% by Mr. Brockman.[18]  Ex. B at 30.  The Jeopardy Report acknowledges Hardwicke and Red Plains filed U.S. tax returns, and that Red Plains *fully disclosed that it was wholly owned by the Bermuda trust Framfield.*  Ex. B at 31.  These assets, and Mr. Brockman's relationship to them, were hardly hidden.[19]  Moreover, the events of 2012 through 2014 have no bearing on whether a jeopardy assessment is appropriate in 2021.

---

[18] As noted in the Jeopardy Report, Red Plains sold its 99% interest in Hardwicke to UCSH in 2014.  Ex. B at 31.  Mr. Brockman sold his remaining 1% interest in Hardwicke to R&R in March 2021.

[19] The Jeopardy Report also acknowledges that Hardwicke was included as part of the IRS's examination of Mr. Brockman's 2006 and 2007 tax returns.  Ex. B at 33.

JONES DAY

Janice C. Stevens
October 7, 2021
Page 14

In fact, nothing in the indictment has any relevance to the issue at hand -- whether Mr.
Brockman is "designing quickly" to place assets outside the reach of the IRS.  This is the sole
standard that matters to a determination here as to whether a jeopardy assessment may be
sustained.  Treas. Reg. § 1.6851-1(a)(1); *see also, McWilliams*, 103 T.C. at 424 ("in our review
of jeopardy assessment cases we have found no case in which an assessment was upheld that did
not contain at least one of the three conditions listed in the regulations"); *see also* Joint Comm.
on Taxation, General Explanation of the Tax Reform Act of 1976, H.R. Doc. No. 10612, 94th
Cong., 2d Sess. 361 n. 1 & 7 (1976) ("Congress believes that [one of the three conditions] which
must exist before a jeopardy… assessment is made are reasonable.").

**Conclusion**

As set forth above, a jeopardy assessment is an extraordinary measure that is meant only
for exigent circumstances and should only be used sparingly.  It effectively strips a taxpayer of
the protections of an IRS examination, a normal Appeals process, and pre-assessment access to
the Tax Court.  Nothing in the record supports that any assessment by the IRS is in jeopardy, and
accordingly, the normal assessment procedures should not be circumvented.  The assessment was
not reasonable under the circumstances and there is no jeopardy.  As such, the assessment must
be abated.

An executed Form 2848, *Power of Attorney*, is enclosed as <u>Exhibit K</u>.  We have prepared
the foregoing on behalf of Mr. Brockman and believe the facts alleged to be true and correct.
We reserve the right to supplement this Request for Administrative Review.

Sincerely,

Frank J. Jackson

Enclosures

# EXHIBIT 5

BTCAY SPECIAL ICAS
SPECIAL ICAS CAYMAN - ONLY

BESSEMER TRUST

# Contents

Statement dated December 31, 2020

BTCO (CAYMAN) LTD 82

| Account | Number | Account type | Admin State |
|---------|--------|--------------|-------------|
| BTCAY ▮ | ▮81 | IM | |
| BTCAY ▮ | ▮82 | IM | |

See Legal Notices/Notes/Glossary for defin tion of Account type and any legal notices that may be required under the administrative state's law.

BESSEMER TRUST

# Bessemer Accounts

Statement dated December 31, 2020
BTCO (CAYMAN) LTD 82

## Account balances

| Description | Number | As Of 12/31/2020 |
|---|---|---|
| BTCAY ████ | ████ 81 | $0 |
| BTCAY ████ | ████ 82 | 0 |
| **Total value of accounts** | | **$0** |

**BESSEMER**
**TRUST**

# Bessemer Contacts

Statement dated December 31, 2020
BTCO (CAYMAN) LTD 82

## Relationship team

Bessemer Trust Company (Cayman) Limited
P.O. Box 2254
Grand Cayman
Cayman Islands
KY1-1107

George Wilcox
President

Peter Frischman
Senior Client Advisor

Jackie Stirling
Director

**BESSEMER**
**TRUST**

# Quarterly Account Statement

Statement dated December 31, 2020

Page 1 of 7

████ 81 - BTCAY ████

# Investment overview

## Account balance

| | Year-to-date | This quarter |
|---|---|---|
| **Beginning value 10/01/2020** | | **$93,568** |
| Net additions/(withdrawals) | (1) | (93,570) |
| Change in market value | 1 | 2 |
| Interest and dividends | 0 | 0 |
| **Total value of account 12/31/2020** | | **$0** |

## Account value over time (in thousands)



\**"Change in value" is the sum of: Change in market value (appreciation / depreciation of the assets in the sector) plus the Net Transactions in the sector (purchases, sales, redemptions, maturities, securities added and securities withdrawn) that occurred during the period. Please contact your client advisor or see the transactions schedule later in this statement for additional details.

BESSEMER TRUST

## Investment performance



| | This quarter | Year-to-date |
| | | |

**Return**

| | This quarter | Year-to-date 07/01/2020 - 12/31/2020 |
|---|---|---|
| Cash and Short Term | 0.0% | 0.0% |
| **Total Return** | **0.0%** | **0.0%** |

Note: Inception month returns (and all future period returns incorporating inception month returns) may reflect partial periods and will not be comparable to full period index returns.

## Income

| **Reportable** | This quarter | Year-to-date |
|---|---|---|
| Taxable interest | $2 | $3 |
| **Total taxable income** | **$2** | **$3** |

| Estimated | Annual |
|---|---|
| **Total** | **$0** |

B
BESSEMER
T R U S T

## Indices

| | This quarter | Year-to-date 07/01/2020 - 12/31/2020 |
|---|---|---|
| Conservat ve 20/80 Index (Taxab e) [1] | 3.1% | 5.0% |
| 3 Month Treasury B s | 0.0 | 0.1 |
| Taxab e F xed Income Index | 0.1 | 0.4 |
| Mun c pa Bond Index | 0.7 | 1.5 |
| ICE BofA 1 10 Year U.S. Corporate Index | 1.8 | 0.0 |
| G oba Large Cap Index | 13.9 | 23.3 |
| S&P 500 Index | 12.1 | 22.2 |
| Non U.S. Large Cap Index | 17.0 | 23.9 |
| Sma & M d Cap Core Index | 20.5 | 29.7 |
| Sma & M d Cap Strateg es Index | 21.0 | 30.4 |
| G oba A Cap Core Index | 15.7 | 25.1 |
| G oba A Cap Index | 14.7 | 24.0 |
| Mu t Asset Opportun t es Index | 9.2 | 14.7 |
| B oomberg Commod ty Index | 10.2 | 20.2 |

[1] **Conservative 20/80 Index (Taxable)** Represents:
  Bo A Merr ynch - O Year AAA-A U S Corpora e & Governmen ndex (80%)
  MSC A Coun ry Wor d M (20%)
The **Taxable Fixed Income Index** represents the Bank of America Merrill Lynch 1-10 Year AAA-A US Corporate & Government Index after 2/28/2013 and the Barclays Capital U.S. Government / Credit Index before 3/1/2013.
The **Municipal Bond Index** represents the BofA Merrill Lynch 1-12 Year AAA-AA Municipal Index beginning 1/1/2016; the BofA Merrill Lynch 1-12 Year Municipal Index from 1/1/2011 to 12/31/2015; and the Barclays Capital Municipal Bond Index prior to 1/1/2011.
The **Global Large Cap Index** represents the MSCI All Country World Large Cap Index beginning 1/1/2016 and the S&P Global LargeCap Index prior to 1/1/2016.
The **Non-U.S. Large Cap Index** represents the MSCI All Country World ex-USA Large Cap Index beginning 1/1/2016; the S&P Global ex-US LargeCap Index from 1/1/2011 to 12/31/2015; and the MSCI EAFE Index prior to 1/1/2011.
The **Small & Mid Cap Core Index** represents a composite of the MSCI USA Mid Cap Index (90%) and the MSCI All Country World ex USA Mid Cap Index (10%) beginning 1/1/2016; and a composite of the S&P MidCap 400 Index (90%) and the S&P Global ex US MidCap Index (10%) prior to 1/1/2016.
The **Small & Mid Cap Strategies Index** represents the MSCI All Country World Small Mid Cap Index beginning 1/1/2016; the S&P Global MidSmallCap Index from 1/1/2011 to 12/31/2015; and the MSCI World Small Cap Index prior to 1/1/2011.
The **Global All Cap Core Index** represents the MSCI All Country World Investible Market Index (IM) beginning 4/1/2017; the MSCI All Country World Large Cap Index beginning 1/1/2016; and the S&P Global LargeCap Index prior to 1/1/2016.
The **Global All Cap Index** represents the MSCI All Country World Index.
The **Strategic Opportunities Index** represents a composite of the BofA Merrill Lynch 1-10 Year AAA-A U.S. Corporate & Government Index (40%) and the MSCI All Country World IMI (60%) beginning 1/1/2016; a composite of the BofA Merrill Lynch 1-10 Year AAA-A U S. Corporate & Government Index (40%) and the S&P Global Broad Market Index (60%) from 1/1/2014 to 12/31/2015; and the S&P Global LargeMidCap Index prior to 1/1/2014.

Statement dated December 31, 2020                                    Page 4 of 7
██ 81 - BTCAY ██

Trade date basis

# Account Holdings

| | Shares/un ts | Average tax cost per share/unit | Tax cost | Market value per share/unit | Market value | Percent of asset class | Unrealized gain/loss | Estimated annual income | Yield |
|---|---|---|---|---|---|---|---|---|---|
| **Total value of account** | | | **$0** | | **$0** | | **$0** | | |
| Total interest and dividends accrued | | | | | 0 | | | | |
| **Total value of account including accruals** | | | | | **$0** | | | | |

BESSEMER
TRUST

# Transactions

## Annual summary

| | Current period | | Current year | |
|---|---|---|---|---|
| | Principal | Income | Principal | Income |
| **Beginning Cash Balance** | **$0.00** | **$0.00** | **$0.00** | **$0.00** |
| Additions | | | | |
| Deposits | $100,000.00 | $0.00 | $100,000.00 | $0.00 |
| Income | 0.00 | 3.96 | 0.00 | 3.96 |
| **Total Additions** | **$100,000.00** | **$3.96** | **$100,000.00** | **$3.96** |
| Subtractions | | | | |
| Withdrawals | ($97,916.65) | ($3.96) | ($97,916.65) | ($3.96) |
| Fees | (2,083.35) | 0.00 | (2,083.35) | 0.00 |
| **Total Subtractions** | **($100,000.00)** | **($3.96)** | **($100,000.00)** | **($3.96)** |
| **Ending Cash Balance 12/31/2020** | **$0.00** | **$0.00** | **$0.00** | **$0.00** |

**B**
**BESSEMER**
**TRUST**

Statement dated December 31, 2020                                                    Page 6 of 7

▓▓ 81 - BTCAY ▓▓▓▓

# Annual detail

## Additions

| Date | Transaction type | Shares/units | Descr ption | Principal | Income |
|---|---|---|---|---|---|
| 7/21/2020 | Cash receipt | | AMEGY BANK OF TEXAS<br>INITIAL SETTLED FUNDS - US | $100,000.00 | |
| 8/3/2020 | Interest | | INTEREST ON BESSEMER SWEEP FOR<br>PERIOD 07/01/2020 TO 07/31/2020 | | 0.30 |
| 9/1/2020 | Interest | | INTEREST ON BESSEMER SWEEP FOR<br>PERIOD 08/01/2020 TO 08/31/2020 | | 0.93 |
| 10/1/2020 | Interest | | INTEREST ON BESSEMER SWEEP FOR<br>PERIOD 09/01/2020 TO 09/30/2020 | | 0.90 |
| 11/2/2020 | Interest | | INTEREST ON BESSEMER SWEEP FOR<br>PERIOD 10/01/2020 TO 10/31/2020 | | 0.93 |
| 12/1/2020 | Interest | | INTEREST ON BESSEMER SWEEP FOR<br>PERIOD 11/01/2020 TO 11/30/2020 | | 0.90 |
| **Total additions** | | | | **$100,000.00** | **$3.96** |

## Subtractions

| Date | Transaction type | Shares/units | Descr ption | Principal | Income |
|---|---|---|---|---|---|
| 8/6/2020 | Fees | | CORPORATE TRUSTEE FEE FOR THE<br>PERIOD ENDED 07/31/20 | ($416.67) | |
| 9/1/2020 | Cash disbursement | | BEDELL CRISTIN<br>▓▓▓▓ FIRSTCARIBBEAN INTL BANK<br>(CAYMAN INV # ▓▓▓ ONBOARDING<br>LEGAL ADVICE KY | (5,598.71) | |
| 9/4/2020 | Fees | | CORPORATE TRUSTEE FEE FOR THE<br>PERIOD ENDED 08/31/20 | (416.67) | |
| 10/6/2020 | Fees | | CORPORATE TRUSTEE FEE FOR THE<br>PERIOD ENDED 09/30/20 | (416.67) | |



BESSEMER TRUST

## Subtractions

continued

| Date | Transaction type | Shares/units | Descr ption | Principal | Income |
|------|-----------------|--------------|-------------|-----------|--------|
| 11/5/2020 | Fees | | CORPORATE TRUSTEE FEE FOR THE PERIOD ENDED 10/31/20 | (416.67) | |
| 12/4/2020 | Fees | | CORPORATE TRUSTEE FEE FOR THE PERIOD ENDED 11/30/20 | (416.67) | |
| 12/21/2020 | Cash disbursement | | BEDELL CRISTIN FIRSTCARIBBEAN INTL BANK (CAYMAN INV #███████ LEGAL ADVICE KY | (6,981.98) | |
| 12/22/2020 | Cash disbursement | | BESSEMER CAYMAN - CAPITAL CORPORATE TRUSTEE FEE FOR THE PERIOD ENDED 31DEC20 | (416.67) | |
| 12/30/2020 | Cash disbursement | | ROBERT T BROCKMAN MANAGEMENT TRUST ███████ REGIONS BANK TRUST CLOSURE TRF OF CASH - USA | | (3.96) |
| 12/30/2020 | Cash disbursement | | ROBERT T BROCKMAN MANAGEMENT TRUST ███████ REGIONS BANK TRUST CLOSURE TRF OF CASH - USA | (84,919.29) | |
| **Total subtractions** | | | | **($100,000.00)** | **($3.96)** |

# Quarterly Account Statement

Statement dated December 31, 2020

████ 82 - BTCAY ████

Page 1 of 7

# Investment overview

## Account balance

| | Year-to-date | This quarter |
|---|---|---|
| **Beginning value 10/01/2020** | | **$93,568** |
| Net additions/(withdrawals) | (1) | (93,570) |
| Change in market value | 1 | 2 |
| Interest and dividends | 0 | 0 |
| **Total value of account 12/31/2020** | | **$0** |

## Account value over time (in thousands)



*"Change in value" is the sum of: Change in market value (appreciation / depreciation of the assets in the sector) plus the Net Transactions in the sector (purchases, sales, redemptions, maturities, securities added and securities withdrawn) that occurred during the period. Please contact your client advisor or see the transactions schedule later in this statement for additional details.

BESSEMER TRUST

## Investment performance



| | This quarter | Year-to-date 07/01/2020 - 12/31/2020 |
|---|---|---|
| **Return** | | |
| Cash and Short Term | 0.0% | 0.0% |
| **Total Return** | **0.0%** | **0.0%** |

Note: Inception month returns (and all future period returns incorporating inception month returns) may reflect partial periods and will not be comparable to full period index returns.

## Income

| **Reportable** | This quarter | Year-to-date |
|---|---|---|
| Taxable interest | $2 | $3 |
| **Total taxable income** | **$2** | **$3** |

| Estimated | | Annual |
|---|---|---|
| **Total** | | **$0** |

BESSEMER TRUST

Statement dated December 31, 2020                                              Page 3 of 7

82 - BTCAY

## Indices

| | This quarter<br>07/01/2020 - 12/31/2020 | Year-to-date |
|---|---|---|
| Conservat ve 20/80 Index (Taxab e) [1] | 3.1% | 5.0% |
| 3 Month Treasury B s | 0.0 | 0.1 |
| Taxab e F xed Income Index | 0.1 | 0.4 |
| Mun c pa Bond Index | 0.7 | 1.5 |
| ICE BofA 1 10 Year U.S. Corporate Index | 1.8 | 0.0 |
| G oba Large Cap Index | 13.9 | 23.3 |
| S&P 500 Index | 12.1 | 22.2 |
| Non U.S. Large Cap Index | 17.0 | 23.9 |
| Sma & M d Cap Core Index | 20.5 | 29.7 |
| Sma & M d Cap Strateg es Index | 21.0 | 30.4 |
| G oba A Cap Core Index | 15.7 | 25.1 |
| G oba A Cap Index | 14.7 | 24.0 |
| Mu t Asset Opportun t es Index | 9.2 | 14.7 |
| B oomberg Commod ty Index | 10.2 | 20.2 |

[1]**Conservative 20/80 Index (Taxable)** Represents:
Bo A Merr ynch - O Year AAA-A U S Corpora e & Governmen ndex (80%)
MSC A Coun ry Wor d M (20%)
The **Taxable Fixed Income Index** represents the Bank of America Merrill Lynch 1-10 Year AAA-A US Corporate & Government Index after 2/28/2013 and the Barclays Capital U.S. Government / Credit Index before 3/1/2013.
The **Municipal Bond Index** represents the BofA Merrill Lynch 1-12 Year AAA-AA Municipal Index beginning 1/1/2016; the BofA Merrill Lynch 1-12 Year Municipal Index from 1/1/2011 to 12/31/2015; and the Barclays Capital Municipal Bond Index prior to 1/1/2011.
The **Global Large Cap Index** represents the MSCI All Country World Large Cap Index beginning 1/1/2016 and the S&P Global LargeCap Index prior to 1/1/2016.
The **Non-U.S. Large Cap Index** represents the MSCI All Country World ex-USA Large Cap Index beginning 1/1/2016; the S&P Global ex-US LargeCap Index from 1/1/2011 to 12/31/2015; and the MSCI EAFE Index prior to 1/1/2011.
The **Small & Mid Cap Core Index** represents a composite of the MSCI USA Mid Cap Index (90%) and the MSCI All Country World ex USA Mid Cap Index (10%) beginning 1/1/2016; and a composite of the S&P MidCap 400 Index (90%) and the S&P Global ex US MidCap Index (10%) prior to 1/1/2016.
The **Small & Mid Cap Strategies Index** represents the MSCI All Country World Small Mid Cap Index beginning 1/1/2016; the S&P Global MidSmallCap Index from 1/1/2011 to 12/31/2015; and the MSCI World Small Cap Index prior to 1/1/2011.
The **Global All Cap Core Index** represents the MSCI All Country World Investible Market Index (IM) beginning 4/1/2017; the MSCI All Country World Large Cap Index beginning 1/1/2016; and the S&P Global LargeCap Index prior to 1/1/2016.
The **Global All Cap Index** represents the MSCI All Country World Index.
The **Strategic Opportunities Index** represents a composite of the BofA Merrill Lynch 1-10 Year AAA-A U.S. Corporate & Government Index (40%) and the MSCI All Country World IMI (60%) beginning 1/1/2016; a composite of the BofA Merrill Lynch 1-10 Year AAA-A U S. Corporate & Government Index (40%) and the S&P Global Broad Market Index (60%) from 1/1/2014 to 12/31/2015; and the S&P Global LargeMidCap Index prior to 1/1/2014.

Statement dated December 31, 2020                                             Page 4 of 7

██ 82 - BTCAY ██

Trade date basis

# Account Holdings

| | Shares/un ts | Average tax cost per share/unit | Tax cost | Market value per share/unit | Market value | Percent of asset class | Unrealized gain/loss | Estimated annual income | Yield |
|---|---|---|---|---|---|---|---|---|---|
| **Total value of account** | | | **$0** | | **$0** | | **$0** | | |
| Total interest and dividends accrued | | | | | 0 | | | | |
| **Total value of account including accruals** | | | | | **$0** | | | | |

**B**
**BESSEMER**
**TRUST**

# Transactions

## Annual summary

|  | Current period | | Current year | |
|---|---|---|---|---|
|  | Principal | Income | Principal | Income |
| **Beginning Cash Balance** | **$0.00** | **$0.00** | **$0.00** | **$0.00** |
| Additions |  |  |  |  |
| Deposits | $100,000.00 | $0.00 | $100,000.00 | $0.00 |
| Income | 0.00 | 3.96 | 0.00 | 3.96 |
| **Total Additions** | **$100,000.00** | **$3.96** | **$100,000.00** | **$3.96** |
| Subtractions |  |  |  |  |
| Withdrawals | ($97,916.65) | ($3.96) | ($97,916.65) | ($3.96) |
| Fees | (2,083.35) | 0.00 | (2,083.35) | 0.00 |
| **Total Subtractions** | **($100,000.00)** | **($3.96)** | **($100,000.00)** | **($3.96)** |
| **Ending Cash Balance 12/31/2020** | **$0.00** | **$0.00** | **$0.00** | **$0.00** |

B
BESSEMER
TRUST

Statement dated December 31, 2020                                    Page 6 of 7
██ 82 - BTCAY ██████

# Annual detail

## Additions

| Date | Transaction type | Shares/units | Description | Principal | Income |
|------|-----------------|-------------|-------------|-----------|--------|
| 7/21/2020 | Cash receipt | | AMEGY BANK OF TEXAS<br>INITIAL SETTLED FUNDS - US | $100,000.00 | |
| 8/3/2020 | Interest | | INTEREST ON BESSEMER SWEEP FOR<br>PERIOD 07/01/2020 TO 07/31/2020 | | 0.30 |
| 9/1/2020 | Interest | | INTEREST ON BESSEMER SWEEP FOR<br>PERIOD 08/01/2020 TO 08/31/2020 | | 0.93 |
| 10/1/2020 | Interest | | INTEREST ON BESSEMER SWEEP FOR<br>PERIOD 09/01/2020 TO 09/30/2020 | | 0.90 |
| 11/2/2020 | Interest | | INTEREST ON BESSEMER SWEEP FOR<br>PERIOD 10/01/2020 TO 10/31/2020 | | 0.93 |
| 12/1/2020 | Interest | | INTEREST ON BESSEMER SWEEP FOR<br>PERIOD 11/01/2020 TO 11/30/2020 | | 0.90 |
| **Total additions** | | | | **$100,000.00** | **$3.96** |

## Subtractions

| Date | Transaction type | Shares/units | Description | Principal | Income |
|------|-----------------|-------------|-------------|-----------|--------|
| 8/6/2020 | Fees | | CORPORATE TRUSTEE FEE FOR THE<br>PERIOD ENDED 07/31/20 | ($416.67) | |
| 9/1/2020 | Cash disbursement | | BEDELL CRISTIN<br>████ FIRSTCARIBBEAN INTL BANK<br>(CAYMAN INV # ████ ONBOARDING<br>LEGAL ADVICE KY | (5,598.71) | |
| 9/4/2020 | Fees | | CORPORATE TRUSTEE FEE FOR THE<br>PERIOD ENDED 08/31/20 | (416.67) | |
| 10/6/2020 | Fees | | CORPORATE TRUSTEE FEE FOR THE<br>PERIOD ENDED 09/30/20 | (416.67) | |



Statement dated December 31, 2020

Page 7 of 7

82 - BTCAY

## Subtractions

continued

| Date | Transaction type | Shares/units | Descr ption | Principal | Income |
|------|-----------------|--------------|-------------|-----------|--------|
| 11/5/2020 | Fees | | CORPORATE TRUSTEE FEE FOR THE PERIOD ENDED 10/31/20 | (416.67) | |
| 12/4/2020 | Fees | | CORPORATE TRUSTEE FEE FOR THE PERIOD ENDED 11/30/20 | (416.67) | |
| 12/21/2020 | Cash disbursement | | BEDELL CRISTIN FIRSTCARIBBEAN INTL BANK (CAYMAN INV #　　　LEGAL ADVICE KY | (6,981.98) | |
| 12/22/2020 | Cash disbursement | | BESSEMER CAYMAN - CAPITAL CORPORATE TRUSTEE FEE FOR THE PERIOD ENDED 31DEC20 | (416.67) | |
| 12/30/2020 | Cash disbursement | | ROBERT T BROCKMAN CHARITABLE TRUST 　　　REGIONS BANK TRUST CLOSURE TRF OF CASH - USA | (84,919.29) | |
| 12/30/2020 | Cash disbursement | | ROBERT T BROCKMAN CHARITABLE TRUST 　　　REGIONS BANK TRUST CLOSURE TRF OF CASH - USA | | (3.96) |
| **Total subtractions** | | | | **($100,000.00)** | **($3.96)** |

# Legal Notices/Notes/Glossary

## General

**Account balance**
Beginning and closing market values for this schedule in the Overview and Analysis sections will always include income cash (See note under Amounts included in the income portfolio).

**Asset allocation graphs**
Asset allocation graphs display only asset classes having a positive dollar value.

**Account type**

**Custody Accounts (C)**
We maintain custody of the assets in these accounts on your behalf but we are not responsible for managing them or providing investment advice about them.  We have no author ty or responsibil ty for determining whether to buy or sell the assets in these accounts.  Please see your account agreement for further details about our respective duties concerning these accounts.

**Directed Trust (DT)**
When we serve as trustee of a directed trust or custodian of an IRA, we have no responsibil ty or authority to buy, sell, hold, or manage some or all of the trust's assets.  An independent fiduciary has that author ty and respons bility, as set forth in the governing instruments and federal and state law.

**Investment Advisory (IA)**
We serve as investment advisor for the assets in these accounts and will provide investment advice about them on an ongoing basis.  However, we lack the author ty or responsibil ty to determine whether to buy or sell assets in these accounts, and we will only take such actions upon your spec fic instructions to do so.  Please see your account agreement for further details about our respective duties concerning these accounts.

**Investment Management (IM)**
We serve as investment manager for the assets in these accounts and have full discretion and authority to buy, sell, or hold assets.  Please see your account agreement for further details about our respective duties concerning these accounts.

**Non-Custody, Non-Managed (NC)**
We do not hold assets in these accounts and we are not responsible for ver fying their existence or value, or for managing them or providing investment advice about them.  We have no author ty or respons bility for determining whether to buy or sell the assets in these accounts.  Please see your account agreement for further details about our respective duties concerning these accounts.

**Trust, Estate, UTMA, Guardianship, ERISA, IRA and Keogh Accounts for which Bessemer is a Fiduciary (TE)**
Our authority and respons bility for the assets in these accounts are determined by the governing instruments and federal and state law.

**Checking Accounts**
Though checking accounts are listed under **Account balances** on the **Bessemer accounts** page, checking account statements are mailed separately.  Checking account balances are not reflected in the **Value of accounts over time** and **Asset allocation of accounts** graphs.

**Market prices**
Most prices that appear on this statement are received from an independent pricing service. While every effort is made to ensure that these prices are accurate as of month-end, this cannot be fully guaranteed.

**Market value of International Securities**
The market value of international securities is calculated using an audited price with a precision of 10 decimal places. The result of this calculation is displayed in both the Holdings and Account Holdings by Tax Lot Schedules.  Due to space limitations on the statement, the price is rounded and displayed with three decimal places only.  For this reason the manual calculation of market value (using the Shares / Units x rounded price displayed on the statement) may differ slightly from the market value displayed.

**Mutual funds**
Mutual funds held as investments in accounts for which Bessemer is the Custodian may be held in Bessemer's name.  In this case, your transactions in such mutual funds may be aggregated w th other clients transactions in such funds, and your account may receive the breakpoints available from such funds on the net transaction submitted, which could result in your paying higher or lower sales charges to such funds. Bessemer account records are updated daily for purchase and sale activity.  Dividends and capital gains distr butions are recorded as soon as the information is made available to Bessemer by the Fund.  At times these transactions may be recorded after the effective date of the distribution due to the timing of receipt of such information.

Mutual funds held directly in the client's name, but reflected on Bessemer's records as an accommodation to the client, will be updated only upon receipt of such information from the client.  A copy of the statement should be forwarded to Bessemer either by the client or, preferably, by the fund on a regular basis.

**Net additions/(withdrawals)**
Net additions/(w thdrawals) consists of cash (wire transfers, fees, additions and withdrawals requested by the client) and securities which are received in free and/or delivered out free. Cap tal gain distributions are not included in the net add tions/(withdrawals) total.

**New accounts**
The **Value of accounts over time** and **Account value over time** graphs will not print f the relationsh p or account has been open for less than six months.

**Omissions**
Items less than $1 00 are not included in the Income and Accrual schedules.

**Ratings**
Bond ratings displayed for fixed income secur ties (**Account Holdings**) are provided by Moody's and Standard & Poor's. Assets not covered by Moody's (**Analysis**), will indicate a Standard & Poor's rating.

**Non-custody**
Non-custody assets, or assets "held away," are reported on the basis of statements received from outside custodians or information reported by the client.  The short-term reserve position is updated for non-secur ty trading transactions (e.g., dividends, interest, miscellaneous rece pts and disbursements) on the last business day of the month based on information received from the outside custodian, while security transactions are posted to the account upon receipt of an advice from the executing broker or the outside custodian's month-end statement.  Consequently, secur ty holdings and short-term reserve pos tions reflected in Bessemer's statement may d ffer from the security pos tions and short-term reserve pos tion shown in the custodian's statement.

**Rounding**
Due to rounding, totals between various schedules may differ slightly.

**Trade vs. settlement date reporting**
A  trade/settlement date reporting option is available for **Capital gains, Account holdings** and **Account holdings summary** schedules.  All other schedules are available on a trade date basis only.  When the settlement date option is selected, values may d ffer from other schedules based on trade date.  This d fference is attr butable to market movement on pending trades.

## Overview

**Interest and dividends**
The "Interest & dividends" line tem includes interest and dividend payments, accrued interest paid or received on purchases and sales of fixed income securities and accrued interest imputed on the free receive or free deliver of Fixed Income secur ties.

**Income**
The amounts reflected on the **Income** schedule consist of cash transactions and other adjustments that affect reportable income (i.e., discount bonds).  These amounts may d ffer from those displayed in the **Account balance** and **Transaction summary** schedules.

**Income and capital gains**
This data is being provided to assist you in the preparation of your Federal estimated taxes.  The class fication of dividends between qual fied and non-qual fied will be determined as information becomes available. These figures are unaudited and are not intended to be used in preparing your actual tax return.  See note about Securities sold w th unknown cost schedule for further information.  Net realized long and short term cap tal gains include amounts accrued year-to-date from Bessemer's common trust funds.  Dividends qualifying for the preferential tax rate will be determined at a later date.

**Income and Capital gains** schedules will not print unless applicable.  The amounts reflected in the Cap tal gains schedule are consistent w th date basis used for the **Account holdings** schedule.

**Indices**
Index values sometimes may be month-end estimates. The time period for indices will match the period of the corresponding asset class.

**Performance**
For group accounts, performance has been aggregated for each asset class.

**Total value of account**
For accounts that have elected to receive a settlement date **Account Holdings** schedule, there may be a d fference in the value displayed for "Total account" (settlement date value) at the end of the **Account Holdings** schedule versus the "Total value of account" (trade date) displayed on the **Overview.**
1) When an account has pending trades, the difference is due to the appreciation or depreciation of pending security trades.  In add tion, f a trade is for a fixed income instrument, the "Total account" balance will also reflect the accrued Interest (purchased or sold) until settlement date.


BESSEMER
TRUST

**Total value of account... continued**
2)  When  principal-only accounts have income cash, the d fference is due to the appreciation or depreciation of pending secur ty trades and/or minus the income cash
3)  When a non-cash account (Bessemer does not perform the accounting for the cash) has pending security trades, the difference is explained by the value associated with the pending secur ty trades.
4) When an account has cash and non-cash components, the difference may be any combination of the examples above.

## Account holdings

**Amounts included in the income portfolio**
For accounts maintaining a separate income portfolio, the accumulated income will be shown as a separate line item following the Total value of account at the end of the **Account holdings** schedule.

**Book cost**
A book cost option is available for the **Account holdings** and **Account holdings summary** schedules only.  All other schedules containing cost information will be based on tax cost.

**Book versus market price**
If the market price is unavailable for a particular secur ty, then the book value will be used as a substitute for the price.

**Collateral shares**
When a spec fic holding is footnoted as "Collateral," a portion or all of the asset is held as collateral.

**Restricted shares**
When a spec fic holding is footnoted as "Restricted," a restriction applies to a portion or all of the shares.

**Assets held away**
An asset is considered "held away" when Bessemer Trust is not custodian for all or a portion of the shares or assets.  These assets are marked accordingly within the description on the **Account holdings** schedule.  Assets that are held away are posted on or after settlement date, based on transactions communicated by the client or a third party custodian.

When an entire account is "held away" (a non-custody account), the assets are not marked as "held away". The account is recognized as a non-custody account - see Non-Custody section of Notes/Glossary.

**Amortization of tax cost for fixed income holdings**
IRS regulations require the amortization of the tax cost for certain fixed income holdings purchased at a premium such as municipal bonds. Unless noted otherwise, tax cost for fixed income holdings is amortized.

**Equity sectors**
Sector and Industry classifications included in this statement utilize the Global Industry Classification Standard ("GICS®").  GICS® is the exclusive property and a service mark of Morgan Stanley Capital International Inc. ("MSCI") and Standard & Poor's ("S&P"), a division of The McGraw-Hill Companies, Inc.  Neither MSCI nor S&P makes any express or implied warranties or representations or shall have any liabil ty for any direct, indirect, special, punitive, consequential or any other damages (including lost prof ts) w th respect to GICS® data or results obtained therefrom.

**Account Holdings by Tax Lot**
**Account holdings by tax lot** is not intended as a substitute for **account holdings**. Lot information is shown only for applicable holdings.

**Unknown cost**
Lots whose tax cost is noted as unknown were e ther transferred to Bessemer without the associated tax cost information or affected by a cap tal reorganization associated with the security for which Bessemer does not possess sufficient information to determine the new tax cost.

**Unrealized gain or loss for fixed income holdings**
The unrealized gain/loss for fixed income holdings issued or purchased at a discount may be subject to adjustments at the time of sale per IRS regulations.

## Pending trades

Pending trades are not reflected in settlement date holdings or valuations.

## Accruals

**Dividends**
This section reflects amounts that are ex-dividend and awaiting payment.

**Fixed income**
This section includes both accruals for the current period and amounts awaiting payment.

**Effective Yield**
For Bessemer Trust-managed fixed income holdings, the yield shown is typically the "effective yield." Effective yield is a measure of a security's annualized yield based on the present value of its future cash flows.  The effective yield calculation considers whether the bond was purchased at par or at a premium or discount, assumes the reinvestment and compounding of dividend or interest payments, and includes the value of any embedded options or structural elements, such as calls or prepayments. Effective yield is calculated before fees and expenses.  For Bessemer Trust-managed fixed income funds, the effective yield is the weighted average effective yield of the underlying fixed income holdings.

If the effective yield cannot be determined, the yield shown is yield to matur ty (YTM), which is the total return antic pated f the secur ty is held until the end of ts lifetime.  If the YTM cannot be determined, the yield shown is the current yield.  Current yield is calculated by dividing estimated annual income by the asset's current market value. Where no yield is shown, the calculated yield is not meaningful.

An additional yield calculation, known as the "SEC Yield," is shown for Old Westbury mutual funds.  The SEC Yield is based on the 30-day period ending on the last day of the previous month.  It is computed by dividing the net (of expenses) investment income per share earned during the period by the maximum offering price per share on the last day of the period.

**Securities sold with unknown cost**
This schedule includes information on assets sold for which no cost basis has been provided.  Cap tal gains and losses on these securities are not reflected in the **Capital gains** schedule in the **Overview** section.

**Analysis**
All schedules displayed in this section are made available on a quarterly basis only.

**Alternative Investments**
Non-Marketable Alternative Investments (the "Funds") are generally valued quarterly. As these Funds are a fund-of-funds structure, such valuations are dependent on the information received from the underlying investments/managers and may be received several months after the valuation date. In order to provide a valuation for monthly client account statements, an estimated value is provided and calculated by using information received from the underlying investments/managers and adjusted for subsequent member capital contr butions and distributions. A net internal rate of return is displayed for all funds that have been in existence long enough for the managers to significantly build their portfolios. This figure may not be indicative of the ultimate performance of a fund until all of its investments are realized.

## Transactions

**Equity trade commissions**
All domestic equity trades are executed on a best execution basis, with commissions not to exceed 4.5 cents per share.  In certain rare instances, due to liquid ty and pricing of certain secur ties, higher per share equ ty commissions may be incurred.

**Electronic Fund Transfers and Remittance Transfers Error Resolution Rights**
If you have any questions about Electronic Fund Transfers (such as direct depos ts or w thdrawals, ACH transfers, ATM transactions or deb t card transactions from personal accounts) or Remittance Transfers (non-US wires from personal accounts) (together, "Transfers"), or if you do not recognize any Transfer, please contact us immediately, e ther (1) by calling your Client Advisor at the telephone number on your statement or at 212-708-9100, or  (2) if the Transfer in question is an ATM transaction or a deb t card transaction, by calling (866) 237-7332 (which is 866-BESS-DEB, and which is available both during and after normal business hours). You can also contact us in writing at Bessemer Trust, 100 Woodbridge Center Drive, Woodbridge, New Jersey 07095, Attention: Client Advisory Support. When you contact us, please provide your name and account number, the date and amount of the suspected error, and an explanation of why you believe there is an error or why you need more information.
To ensure that any questions about a Transfer can be resolved and corrective action can be taken, please advise us of any questions or problems within 60 days from the date of the first statement on which an unauthorized Electronic Fund Transfer appeared, or w thin 180 days from the date we told you that a Rem ttance Transfer would be made available to a recipient. We will investigate your questions and will correct any error promptly. Although our investigation may take up to 45 days,  f it takes more than 14 days we will cred t your account within 14 days for the amount you think is in error so that you will have use of the funds during our investigation. We will share the results of our investigation w thin 3 business days after completing  t. If we determine that there was no error, we will send you a wr tten explanation, and we will provide supporting documentation upon your request.

## Legal Notices/Notes/Glossary - continued...

**Direct Deposits**

IIf you would like to know whether a preauthorized transfer to your account has occurred, you may call your Client Advisor at the telephone number **on your statement or at 212-708-9100.**

**Disclaimer notice:**

*"This may contain information obtained from third parties, including ratings from credit ratings agencies such as Standard & Poor's. Reproduction and distribution of third party content in any form is prohibited except with the prior written permission of the related third party. Third party content providers do not guarantee the accuracy, completeness, timeliness or availability of any information, including ratings, and are not responsible for any errors or omissions (negligent or otherwise), regardless of the cause, or for the results obtained from the use of such content. THIRD PARTY CONTENT PROVIDERS GIVE NO EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE. THIRD PARTY CONTENT PROVIDERS SHALL NOT BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, EXEMPLARY, COMPENSATORY, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES, COSTS, EXPENSES, LEGAL FEES, OR LOSSES (INCLUDING LOST INCOME OR PROFITS AND OPPORTUNITY COSTS OR LOSSES CAUSED BY NEGLIGENCE) IN CONNECTION WITH ANY USE OF THEIR CONTENT, INCLUDING RATINGS. Credit ratings are statements of opinions and are not statements of fact or recommendations to purchase, hold or sell securities. They do not address the suitability of securities or the suitability of securities for investment purposes, and should not be relied on as investment advice."*

BESSEMER TRUST

# EXHIBIT 6

07:57:22

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

— — —

THE HONORABLE GEORGE C. HANKS, JR., JUDGE PRESIDING

---

USA,                              No. 4:21-CR-00009-1

          Plaintiff,

vs.

ROBERT T. BROCKMAN,                          **COPY**

          Defendant.

---

COMPETENCY HEARING -- DAY 3 AM SESSION

OFFICIAL REPORTER'S TRANSCRIPT OF PROCEEDINGS

Houston, Texas

WEDNESDAY, NOVEMBER 17, 2021

---

APPEARANCES:

For the Plaintiff:     COREY J. SMITH, DOJ

                       CHRISTOPHER MAGNANI, DOJ

                       LEE F. LANGSTON, DOJ

                       BORIS BOURGET, DOJ

For the Defendant:     JASON S. VARNADO, ESQ., Attorney
                       at Law

                       COLLEEN O'CONNOR, ESQ., Attorney
                       at Law

                       JAMES P. LOONAM, ESQ., Attorney
                       at Law

                       KATHRYN KENEALLY, ESQ., Attorney
                       at Law

For the                n/a
Interpreter:

1
2
3
4

Reported by:          Sean Gumm, RPR, CRR
                      Official Court Reporter
                      United States District Court
                      Southern District of Texas
                      sean_gumm@txs.uscourts.gov

5
6

Proceedings recorded by mechanical stenography.
Transcript produced by Reporter on computer.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    INDEX OF WITNESSES

2

3                                              PAGE

4   ROBERT DENNEY, (For the Government)

5        Cross-Examination Resumed By Mr. Loonam:      12

6   CRAIG MOSS, (For the Government)

7        Direct Examination By Mr. Langston:           60

8        Cross-Examination By Ms. Keneally:            84

9   EVATT TAMINE, (For the Government)

10       Direct Examination By Mr. Langston:           92

11       Cross-Examination By Mr. Varnado:            153

12

13

14

15                      --o0o--

16

17

18

19

20

21

22

23

24

25

26

27

28
```

PEOPLE vs ROBERT T. BROCKMAN, CASE NO. 4:21-CR-00009-1
*** Reproduction only per Govt. Code §69954(d) ***

10:33:48  1  admitted.

10:33:49  2           MR. LANGSTON:  Sorry.  No further

10:33:51  3  questions, Your Honor.  Thank you.

10:33:57  4           THE COURT:  You may proceed whenever

10:33:58  5  you are ready.

10:33:58  6                  **CROSS-EXAMINATION**

10:33:58  7  **BY MS. KENEALLY:**

10:34:03  8  **Q.**  Good morning, Mr. Moss.

10:34:04  9  **A.**  Morning.

10:34:04  10  **Q.**  We've never spoken before; correct?

10:34:06  11  **A.**  I don't believe so.

10:34:07  12  **Q.**  I'm sorry, I'm having trouble hearing you?

10:34:10  13  **A.**  I don't believe so.  I don't know what your

10:34:11  14  name is.

10:34:12  15  **Q.**  My name is Kathy Keneally.  Good morning,

10:34:15  16  Mr. Moss.  Do you remember speaking with me before?

10:34:17  17  **A.**  I do not believe so.

10:34:18  18  **Q.**  Have you ever spoken with any member of the

10:34:21  19  defense legal team?

10:34:23  20  **A.**  Not that I'm aware of.

10:34:25  21  **Q.**  You did speak with the Government, though;

10:34:26  22  correct?

10:34:27  23  **A.**  Yes.

10:34:27  24  **Q.**  Um, how many occasions have you spoken with the

10:34:30  25  Government?

| | | |
|---|---|---|
| 10:34:31 | 1 | **A.**   Two. |
| 10:34:32 | 2 | **Q.**   And when was the first time? |
| 10:34:34 | 3 | **A.**   June of 2019, I believe. |
| 10:34:38 | 4 | **Q.**   Second time? |
| 10:34:40 | 5 | **A.**   Week ago. |
| 10:34:48 | 6 | **Q.**   Fair to say Mr. Brockman had reduced his |
| 10:34:50 | 7 | involvement in Reynolds and Reynolds in the last few |
| 10:34:52 | 8 | years?  Stepping back?  Slowing down? |
| 10:34:56 | 9 | **A.**   Certainly did after the indictments -- or |
| 10:34:58 | 10 | subpoenas had been issued, yes. |
| 10:35:00 | 11 | **Q.**   Well, prior to the indictment? |
| 10:35:03 | 12 | **A.**   Shortly before the indictment, his -- his -- he |
| 10:35:07 | 13 | did not come to the office as often and he was, you |
| 10:35:11 | 14 | know -- his access was limited. |
| 10:35:13 | 15 | **Q.**   When -- when you met with the Government in |
| 10:35:16 | 16 | June of 2020, do you recall telling the Government |
| 10:35:19 | 17 | that Mr. Brockman had been slowing down for about |
| 10:35:22 | 18 | two years prior to that? |
| 10:35:24 | 19 | **A.**   No, I don't recall that. |
| 10:35:25 | 20 | **Q.**   You don't remember saying that to the |
| 10:35:26 | 21 | Government? |
| 10:35:27 | 22 | **A.**   No. |
| 10:35:29 | 23 | **Q.**   Have you been told Bob has Parkinson's disease? |
| 10:35:31 | 24 | **A.**   Yes. |
| 10:35:32 | 25 | **Q.**   When did you learn that? |

10:35:32   1   **A.**   Jim Jackson told me that on a return trip from

10:35:40   2   Dayton.   I don't recall the date.

10:35:44   3   **Q.**   Approximate date?   Year?

10:35:48   4   **A.**   2019, 2020 -- one of those.

10:35:55   5   **Q.**   So Reynolds and Reynolds -- who owns Reynolds

10:36:00   6   and Reynolds?

10:36:00   7   **A.**   The trust.

10:36:01   8   **Q.**   So immediately above Reynolds and Reynolds,

10:36:04   9   that would be --

10:36:05   10   **A.**   UCSH.

10:36:06   11   **Q.**   Universal Computers Services Holding?

10:36:08   12   **A.**   Yes.

10:36:08   13   **Q.**   Above that UCSH?

10:36:10   14   **A.**   Yes.

10:36:11   15   **Q.**   UCSH is?   I get this wrong every time.

10:36:14   16   **A.**   The name?

10:36:15   17   **Q.**   Yeah.

10:36:15   18   **A.**   Universal Computer Systems Holding.

10:36:22   19   **Q.**   And where are those companies located?

10:36:26   20   **A.**   The US, Delaware.

10:36:29   21   **Q.**   Where are the business operations?

10:36:30   22   **A.**   Houston and Dayton, Ohio.

10:36:36   23   **Q.**   Approximately how many people do they employ at

10:36:38   24   those locations?

10:36:39   25   **A.**   About 4,500 employees.

| | | |
|---|---|---|
| 10:36:44 | 1 | **Q.** And -- |
| 10:36:45 | 2 | **A.** I'm sorry, go ahead. |
| 10:36:46 | 3 | **Q.** And they're all -- all three of those, they're |
| 10:36:48 | 4 | US tax-paying entities; correct? |
| 10:36:51 | 5 | **A.** Yes, always. |
| 10:36:51 | 6 | **Q.** And who owns UCSH? |
| 10:36:55 | 7 | **A.** Spanish Steps.  Spanish Steps and Pilot. |
| 10:37:04 | 8 | **Q.** And ultimately, Spanish Steps is owned by the |
| 10:37:10 | 9 | A. Eugene Brockman Charitable Trust; is that |
| 10:37:11 | 10 | correct? |
| 10:37:11 | 11 | **A.** That's my understanding. |
| 10:37:12 | 12 | **Q.** You've known that for a long time; correct? |
| 10:37:15 | 13 | **A.** Yes. |
| 10:37:15 | 14 | **Q.** Not a secret from you? |
| 10:37:16 | 15 | **A.** No. |
| 10:37:17 | 16 | **Q.** And, in fact, it's something you've disclosed; |
| 10:37:21 | 17 | correct -- openly disclosed the offshore structure |
| 10:37:25 | 18 | of the ownership of these US companies; correct? |
| 10:37:27 | 19 | **A.** To that level, yes. |
| 10:37:47 | 20 | **Q.** Now, you -- you mentioned the dividend payments |
| 10:37:58 | 21 | that were made in -- some time in 2020; is that |
| 10:38:04 | 22 | correct? |
| 10:38:04 | 23 | **A.** Yes. |
| 10:38:04 | 24 | **Q.** And it's my understanding those dividend |
| 10:38:08 | 25 | payments -- those dividends had been made by the |

10:38:10   1   company?

10:38:11   2   **A.**   That's correct.

10:38:11   3   **Q.**   Which company?

10:38:12   4   **A.**   I believe that was DCS.

10:38:15   5   **Q.**   And were those dividend payments made to the

10:38:19   6   shareholder, or were they made to pay obligations of

10:38:26   7   the shareholder?

10:38:27   8   **A.**   That's correct.

10:38:27   9   **Q.**   Choice --

10:38:28   10   **A.**   The second one.

10:38:29   11   **Q.**   The second one.   So the dividend payments made

10:38:31   12   in 2020 were made -- obligations ultimately of the

10:38:35   13   A. Eugene Brockman Charitable Trust?

10:38:38   14   **A.**   That's my understanding, yes.

10:38:40   15   **Q.**   Am I right those dividend payments went to

10:38:44   16   charities?

10:38:45   17   **A.**   Charities and schools.

10:38:46   18   **Q.**   Charities and schools?

10:38:47   19   **A.**   Yes.

10:38:47   20   **Q.**   Based primarily in Houston; correct?

10:38:51   21   **A.**   Primarily, yes.

10:38:53   22   **Q.**   So basically what had happened was the trust

10:38:56   23   had made commitments to make charitable

10:38:59   24   contributions, and those charitable contributions --

10:39:01   25   the trust ran into a financial liquidity issue so

1                    C E R T I F I C A T E

2

3

4          I hereby certify that pursuant to Title 28,

5    Section 753 United States Code, the foregoing is a

6    true and correct transcript of the stenographically

7    reported proceedings in the above matter.

8          Certified on 11/17/2021.

9

10

11    Sean Gumm, RPR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25