UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT T. BROCKMAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:22-cv-00202-GCH |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S REPLY IN SUPPORT OF THIRD SUPPLEMENTAL
MEMORANDUM FOR DETERMINATION ON COMPLAINT FOR JUDICIAL
<u>REVIEW AND ABATEMENT OF JEOPARDY ASSESSMENT</u>**

**<u>Expedited Time Limits Apply By Statute –</u> *<u>See</u>* <u>26 U.S.C. § 7429(b)(3)</u>**

# TABLE OF CONTENTS

Page

1.  Plaintiff responded to the Court's inquiry by supplementing the record to show that the Brockmans left tens of millions of dollars in bank accounts in their names in Houston for months after the IRS issued the jeopardy assessment and jeopardy levy.............................................................. 1

2.  The government cannot sustain a jeopardy assessment based on an IRS "belief" that is unsupported by facts. ................................................................ 2

3.  The government's latest submission adds nothing, and does not solve its inability to establish that the jeopardy assessment is reasonable. .................. 4

4.  The government's groundless attacks on Dorothy Brockman should not be countenanced. ............................................................................................... 11

5.  The government's argument that the jeopardy levy itself justifies the jeopardy assessment makes no sense. .............................................................. 13

CONCLUSION ......................................................................................................... 14

i

Plaintiff submits this memorandum in reply to the United States' Response To Plaintiff's Third Supplemental Memorandum In Support Of Motion For Determination On Complaint For Judicial Review And Abatement Of Jeopardy Assessment ("Third Supplemental Response").[1]

**1.     Plaintiff responded to the Court's inquiry by supplementing the record to show that the Brockmans left tens of millions of dollars in bank accounts in their names in Houston for months after the IRS issued the jeopardy assessment and jeopardy levy.**

During the hearing on August 3, 2022, the Court asked whether the balances in the Brockmans' Wallis Bank accounts at the time of the IRS seizure of those accounts were part of the record.  Dkt. No. 65 at 37:4-9; *see also* 37:25–38:3 ("That's a very persuasive argument that if they're trying to . . . put money outside the reach of the IRS, that there was still significant money in those accounts.").  The Court permitted Mr. Brockman's counsel to supplement the record on this point.  *Id*. at 37:10-16; 38:5-16; 58:19–59:3.

Plaintiff subsequently provided a declaration from Dorothy Brockman, with supporting bank records, as well as the IRS's transcript of Mr. Brockman's tax account, showing that over $27 million remained in the Brockmans' accounts at Wallis Bank for more than six months after the IRS began seizing assets pursuant to its jeopardy

---

[1] The substantive filings on this motion to date are Dkt. Nos. 10, 11, 21, 35, 39, 41, 53, 54, 55, 66, and 67.  The transcript of the August 3, 2022 hearing on this motion was filed as Dkt. No. 65.  The time to propose corrections to the transcript has not expired.

assessment, until the IRS issued a levy to Wallis Bank for those funds.  Dkt. No. 66 at 3–5; No. 66-1 at ¶¶ 6, 7 and Exs. 3, 4; No. 66-2, Ex. A.

Plaintiff also addressed the government's contentions at the August 3, 2022 hearing that the IRS did not know where the proceeds from certain real property sales had gone, *see* Dkt. No. 65 at 16:3-8, and its speculation that "[i]t's not unlikely that the funds could have been moved offshore," citing to Mr. Brockman's closed accounts at Amegy Bank.  *Id*. at 16:22–17:1.  As Dorothy Brockman's declaration and supporting exhibits established, the proceeds from the real property sales cited by the government were paid into personal bank accounts in either Mr. Brockman's or Dorothy Brockman's name at Amegy Bank or Wallis Bank, and the funds from the Brockmans' Amegy Bank accounts were transferred to accounts in their names at Wallis Bank.  Dkt. No. 66 at 5–7; No. 66-1 at ¶¶ 3–6, 8–10 and Exs. 1–2, 5–7; *see* Dkt. No. 55 at 11–12 and No. 55-1, Exs. A, B.

Plaintiff's supplemental filings met the Court's inquiry.  The government's response offers no facts in rebuttal, and importantly, still offers no proof that Mr. Brockman, or Dorothy Brockman for that matter, were "designing quickly" to dissipate assets beyond the government's reach.

**2.     The government cannot sustain a jeopardy assessment based on an IRS "belief" that is unsupported by facts.**

The government continues to argue that this Court should sustain the IRS's jeopardy assessment because, as the government contends, "the IRS acted reasonably in *believing* that Brockman appeared to be designing to place his assets beyond the reach of the government . . . ."  Dkt. No. 67 at 14 (emphasis added); *see id*. at 1, 11–12.

- 2 -

What the IRS "believes," however, is not the legal standard, and must yield when shown to be unsupported.  Section 7429(g)(1) of Title 26 (Internal Revenue Code or "IRC") requires that the government prove that the IRS's actions are "reasonable under the circumstances."

In determining whether to abate a jeopardy assessment, the "court . . . is required to evaluate the reasonableness of the IRS's determinations by looking at *all* of the facts and circumstances involved in [the] case." *Burd v. United States*, 774 F. Supp. 903, 906–07 (D.N.J. 1991) (emphasis in original).  In *Burd*, the IRS based its jeopardy assessment on information that the taxpayer was planning to move to Japan, and the IRS's contention that she had listed her home (described as her "only known asset") for sale.  *Id*. at 904–05.  One day after the jeopardy assessment, the taxpayer transferred the home to her daughter for an amount significantly below the listing price, which her daughter sold days later for cash. *Id*. at 905.  The court determined that the allegation that the taxpayer was preparing to leave the country was unsupported, and further concluded that the taxpayer's explanation that she was planning to marry and move into her husband's home provided "a rational justification for transferring the legal title of her home to her daughter."  *Id*. at 907–08.  Finding the IRS's belief to have been refuted, the court abated the jeopardy assessment.  *Id*.

Similarly, in *Hirschhorn v. United States*, 662 F. Supp. 887, 887–88 (S.D.N.Y. 1987), the taxpayer had been a passenger in a car that contained vials that appeared to have drug residue, and a significant sum of cash was seized from the taxpayer.  The IRS made a termination assessment—a proceeding that is similar to and based on the same standards as a jeopardy assessment—against the seized cash.  *Id.* at 889–90.  The court found that the

- 3 -

IRS acted reasonably based on the information available to it at the time that it made the termination assessment.  *Id*. at 891.  At that time, however, the IRS lacked the taxpayer's social security number or other information to establish that he had filed tax returns.  The court found that after copies of the filed tax returns were proffered by the taxpayer's attorney at a conference with the IRS, the termination assessment was no longer reasonable, and abated the assessment.  *Id*. at 892.

Pursuant to the clear language of IRC § 7429(g)(1), and as found by the courts in *Burd* and *Hirschhorn*, the government cannot stand on an IRS "belief" that is subsequently refuted.  The jeopardy assessment against Mr. Brockman must be abated absent a showing by the government that the IRS's actions are "reasonable under the circumstances."  IRC § 7429(g)(1).  The government has failed to meet this standard.

**3.     The government's latest submission adds nothing, and does not solve its inability to establish that the jeopardy assessment is reasonable.**

During the August 3, 2022 hearing, counsel for Mr. Brockman offered to track expenses paid by the Brockmans, noting as an example that funds have gone to legal fees. Dkt. No. 65 at 37:17-21.  The Court responded that this was not necessary.  *Id*. at 37:22. And the government offers no law in support of any contention that a taxpayer bears this burden to refute a jeopardy assessment; rather, the burden to support the jeopardy assessment is assigned by statute to the government.  IRC § 7429(g)(1).

Nonetheless, the government erroneously depicts plaintiff's recent submission as a tracing exercise, and complains that information unrelated to the three property sales, the transfers from Amegy Bank to Wallis Bank, and the Wallis Bank balance information has

been "heavily redacted." *See* Dkt. No. 67 at 1, 2, 8.  The government, however, merely rehashes arguments that have already been refuted, and offers nothing new to meet its burden to show that anyone was "designing quickly" to move assets.

First government chart:  On page 3 of its Third Supplemental Response, the government sets out a chart of what it contends were "domestic funds available to be deposited" into the Brockmans' accounts in 2020 and 2021.  *See* Dkt. No. 67 at 3.  At a minimum, this chart proves a key point made by Mr. Brockman:  substantial income received by Mr. Brockman was reported by or on his behalf to the IRS.  *See Fumo v. United States*, No. 13-3313, 2014 WL 2547797, at *64 (E.D. Pa. June 5, 2014) ("Filing forms with the IRS concerning [transfers of] particular properties undermines any notion of 'a plan to hide assets from . . . the IRS.'")

Second government chart:  The government offers another chart, on page 5, that it contends sets out "the amounts captured by levies, payments to the IRS plus alleged substitute purchases"[2] and subtracts this total from the amount shown on its first chart, to contend that "there is $15,227,305.46 in unaccounted for, dissipated, or missing domestic funds."  *See* Dkt. No. 67 at 5–6.

The government then asks this Court to find that these purportedly "missing funds" support a conclusion that tax collection is in jeopardy.  *See* Dkt. No. 67 at 1, 2, 5–6. Nowhere does the government even suggest, however, that these purportedly "missing"

---

[2] The phrase "substitute purchases" appears to refer to Dorothy Brockman's recent purchases of a new home in Houston and a residence in Colorado.  *See* Dkt. No. 67 at 4, 5 (chart).

funds were moved outside the reach of the government.[3]  The fact that the IRS contends that it cannot figure out where money went does not allow the IRS to conclude that a taxpayer acted to defeat tax collection.  *See Pircher v. United States*, No. 08-0835, 2008 U.S. Dist. LEXIS 101021, at \*9 (W.D. Tex. 2008) (concluding even speculation "[t]hat . . . may be well-grounded" is insufficient for the government to sustain its burden); *Johnson v. United States*, No. 92-15, 1993 U.S. Dist. LEXIS 2489, at \*7–8 (M.D. Ga. 1993) (jeopardy assessment unreasonable when largely "based on conjecture . . . .").

People under IRS examination, under indictment, and subject to jeopardy assessment, still incur expenses.  As stated by counsel at the August 3, 2022 hearing, the Brockmans have unquestionably had legal expenses.  *See* Dkt. No. 65 at 37:20-21.  Equally obvious, the real properties that the government acknowledges are owned by the Brockmans come with operating costs.  *See, e.g.*, Dkt. No. 66 at 4 (noting recent purchases of residences in Houston and Colorado, in addition to the Brockman's former residence at 333 West Friar Tuck Lane).  And as the government knows but ignores, Mr. Brockman posted $1 million as bond in *United States v. Brockman*, Cr. No. 4:21-cr-0009-GCH (S.D. Tex.).  Added to this are health care costs, food, travel—the expenses of living day to day.

---

[3] The government similarly tries to make an issue out of relatively small differences in the net proceeds between, for example, the sales price of properties and the net deposits into the Brockmans' accounts, *see, e.g.*, Dkt. No. 67 at 7 (Lot 16 Property); *see also* Dkt. No. 67 at 7–8 (remittance of funds from Cayman to U.S.), but again has nothing to say beyond its view that if something cannot be explained, it supports a nefarious conclusion.  *See* Dkt. No. 67 at 7–8.  In the same vein, the government gratuitously says that some funds may have been deposited into U.S. bank accounts "from Brockman's offshore network of entities and nominees," with utterly no support, and with the implicit admission that the government has no reason to think this occurred.  *See* Dkt. No. 67 at 4.

As the Court has already implicitly recognized, the burden is not on the Brockmans to account for how money was spent, or more broadly to prove the negative that no improper dissipation of assets occurred.[4]  *See* Dkt. No. 65 at 37:17-22.  Rather, the burden is on the government, by statute, to show some reasonable basis beyond speculation to conclude that Mr. Brockman was "designing quickly" to move assets beyond the government's reach.  *See* IRC § 7429(g)(1); *Pircher*, 2008 U.S. Dist. LEXIS 101021, at *9; *Johnson*, 1993 U.S. Dist. LEXIS 2489, at *7–8.

The government similarly complains that Mr. Brockman did not affirmatively disclose the existence of the Wallis Bank accounts, or the deposit or transfer of the proceeds of the real property sales into those bank accounts.  *See* Dkt. No. 67 at 8–10.  The government offers no law showing that Mr. Brockman had any obligation to do so, let alone that he could or should have disclosed proceeds from sales of properties belonging solely to Dorothy Brockman.[5]  More to the point, the property sales and the Wallis Bank accounts were never hidden from the government.  The real property sales were publicly recorded, traceable, and indeed traced by the IRS.  *See* Dkt. No. 10 at 8–9, No. 10-1 at Exs.

---

[4] To be clear, it is plaintiff's position that the burden, and concomitant time and expense, of tracing the Brockmans' expenditures, are not required to refute the government's contentions.  Plaintiff will of course readily address any further questions that the Court may have on this issue.

[5] The government's citation to *Golden ADA, Inc. v. United States*, 934 F. Supp. 341 (N.D. Cal. 1996) is inapposite.  *See* Dkt. No. 67 at 9, 12.  Among other factors, the government showed in *Golden ADA* that the plaintiff, a company in the gemstone and gold business, had transferred the bulk of its inventory, as well as the proceeds of real property sales, outside the United States.  *Golden ADA, Inc.*, 934 F. Supp. at 345.

- 7 -

4–14.  The Wallis Bank accounts were in the Brockmans' names, and subject to reporting to the IRS.  *See* Dkt. No. 66 at 3–5; No. 66-1 at ¶ 6.

 Third government chart:  Finally, the government offers yet a third chart, on page 12 of its Third Supplemental Response, that sets out ten transactions that the government contends "reasonably appeared to jeopardize collection," and adds on page 13 a reference to the transfer of funds from Amegy Bank to two offshore accounts.  *See* Dkt. No. 67 at 12–13.  Every one of these eleven transactions has been addressed in prior filings.[6]  None were hidden from the IRS, and nothing in the government's prior filings or its Third Supplemental Response supports a conclusion that Mr. Brockman was "designing quickly" to move assets beyond the reach of the government.[7]

---

[6] Indeed, as to seven of the ten transactions set out in the chart appearing on page 12 of the government's Third Supplemental Response, the government verbatim repeats a chart set out in the United States' Response In Opposition For Determination On Complaint For Judicial Review And Abatement Of Jeopardy Assessment And Jeopardy Levy ("Initial Opposition"), adding entries only for the listing of the Brockmans' former residence at 333 West Friar Tuck Lane, the gift of the property at 3702 Inwood Drive, and the sale of the Lot 16 Property, which have also been repeatedly addressed throughout these proceedings. *Compare* Dkt. No. 21 at 67 *with* Dkt. No. 66 at 12; *see* Dkt. No. 10 at 5–8; No. 35 at 6–11; No. 41 at 3; No. 53 at 8; No. 55 at 2, 11–12; No. 66 at 5–11, and all exhibit citations therein.  And the government's discussion of the eleventh transaction was similarly raised in the government's Initial Opposition.  *Compare* Dkt. No. 21 at 68 *with* Dkt. No. 66 at 7, 11.  These contentions have been repeatedly addressed by Plaintiff.  *See, e.g.*, Dkt. No. 10 at 5–12, 23–24, No. 35 at 18–24; No. 41 at 4–5; No. 53 at 9–10; No. 55 at 2–3; No. 66 at 10–11, and all exhibit citations therein.

[7] The government's Third Supplemental Response also claims, without reference or further explanation, that "Brockman also transferred control of his offshore empire to another tax haven locale (Cayman Islands)."  Dkt. No. 67 at 13.  Presumably this is referring back to the IRS's erroneous and disproven contentions concerning proceedings in Bermuda. *See, e.g.,* Dkt. No. 10 at 12–16, 23–24; No. 35 at 11–14; No. 41 at 3–5; No. 53 at 5–6; No. 55 at 20–22; No. 66 at 9–10, and all exhibit citations therein.

Specifically, as the record already shows:

- Items 1 & 2:  The December 2020 sale by Dorothy Brockman of the vacant lot at 335 West Friar Tuck Lane and the May 2021 sale by her of the  townhouse at 1731 Sunset Boulevard were publicly recorded, and the proceeds were deposited into accounts at Amegy and Wallis Banks, respectively; the balance of the Amegy Bank account was ultimately transferred to Wallis Bank.  *See, e.g.*, Dkt. No. 10 at 5–8; No. 10-1 at Exs. 7–12; No. 35 at 6–9, 21; No. 66 at 5–7; No. 66-1 at ¶¶  3–5, 8–9 and Exs. 1–2, 5–6.  Additionally, the 2020 sale was reported by Dorothy Brockman on schedule D of her 2020 federal income tax return.  *See* Dkt. No. 21, Gov. Ex. 32.

- Item 3:  The gift by Dorothy Brockman of a residence to her daughter-in-law was reported by her to the IRS on a gift tax return.  *See* Dkt. No. 10 at 8–9; No. 10-1 at Ex. 13–14; No. 35 at 8, 21.

- Item 4:  The IRS learned about the sale of Mr. Brockman's 1% interest in the entity that owns a corporate airplane to the company that owned the remaining 99%, because it was disclosed in his Request for Administrative Review of the Notice of Jeopardy Assessment and Rights to Appeal that was submitted to the IRS on October 7, 2021.  *See* Dkt. No. 10 at 21 n.8; No. 35 at 19; No. 35-1 at Ex. 4 at 13 n.18.

- Item 5:  The Brockmans' former residence at 333 West Friar Tuck Lane continues to be owned by Dorothy Brockman, is publicly listed for sale, and is currently liened by the IRS.  Dkt. No. 10 at 5–6; No. 10-1 at Exs. 4, 5; No. 35 at 7.

- Items 6 through 8:  The distribution from National Financial Services, the distribution from Great-West Trust Company, and the sale of securities from Morgan Stanley, National Financial Services, and John Hancock accounts were reported to the IRS on Forms 1099-B and 1099-R, demonstrating that Mr. Brockman conducted these transactions with financial institutions that obviously would report them to the IRS.  *See* Dkt. No. 67 at 3 (chart); *see also, e.g.*, Dkt. No. 21, Gov. Ex. 33 at 8–21, 30; No. 35 at 20–22.

- Item 9:  Dorothy Brockman's 2020 sale of securities was reported on Schedule D of her 2020 federal income tax return.  *See* Dkt. No. 21, Gov. Ex. 32; No. 35 at 22; *see also* No. 67 at 3 (chart) (noting that stock sale proceeds were also reported on Form 1099-B).

- Item 10:  The proceeds from the sale of the Lot 16 Property were paid into an account in Mr. Brockman's name at Wallis Bank, and were subsequently seized by the IRS.  *See* Dkt. No. 55 at 11–12; No. 55-1 at Exs. A–E; No. 66 at 6–9; No. 66-1 at ¶¶ 6, 10  and Ex. 7.

- Item 11 (discussed following the chart):  The government learned about these foreign trusts and related transactions because Mr. Brockman timely disclosed this information on IRS Form 3520, which is used to report transactions between a U.S. person and a foreign trust, and on IRS Form 8938 attached to his Form 1040 federal income tax return.  *See* Dkt. 21, Gov. Ex. 1, at ¶ 58 (cited in Dkt. No. 21 at 68 n.281); No. 35 at 22.  Moreover, months before the IRS made the jeopardy

assessment, the balances were moved to a U.S. bank account, and have subsequently been seized by the IRS.  *See* Dkt. No. 35 at 22; No. 35-1 at Ex. 5; No. 67 at 5, 7.

At bottom, none of these transactions supports a contention that Mr. Brockman was "designing quickly" to defeat IRS collection.  *See Fumo*, 2014 WL 2547797, at *64.

The government's latest filing contains much noise, but no signal.  The government fails to address the import of the issue raised by the Court during the August 3, 2022 hearing:  the presence of tens of millions of dollars in the Brockmans' accounts many months after the IRS began seizing assets is persuasive evidence that Mr. Brockman was not "designing quickly" to move assets beyond the reach of the government.  Nothing in the government's prior filings, or the convoluted arithmetic, rank speculation, and repetition of previously refuted arguments set out in its Third Supplemental Response, suffices to support its position that the jeopardy assessment should be sustained.

**4.      The government's groundless attacks on Dorothy Brockman should not be countenanced.**

The government contends that Dorothy Brockman's declaration is "completely devoid" of support for the contention, stated in a prior filing on behalf of Mr. Brockman, that "'[t]he transactions were undertaken in the ordinary course of Mrs. Brockman's life, allowing her to move closer to her son and daughter-in-law as she prepared for the death of her husband of 54 years and the birth of her two grandchildren.'"  Dkt. No. 66 at 2 n.2, *quoting* Dkt. No. 66 at 8; *see also* Dkt.  No. 10 at 5–7; No. 35 at 9; No. 54 at 11.  This was, of course, not the purpose of Mrs. Brockman's August 3, 2022 declaration, which was submitted to respond to the Court's inquiry concerning the real property transactions and

- 11 -

the Wallis account.  *See* Dkt. No. 65 at 37:10-16; 38:5-16; 58:19-59:3; Dkt. No. 66-1.

More tellingly, what part of the quoted language does the government dispute?  The

government knows the locations of the new home that Dorothy Brockman bought, the

former residence that she put up for sale, and her son's home.  *See, e.g.*, Dkt. No. 67 at 3, 4,

12.  Her grandchildren were in fact born, her marriage lasted 54 years, and husband has

now died.

Specific to the issue raised in the recent filings, the government contends that

"Brockman *alleges* that the Wallis Bank accounts were opened in early 2021 and thereafter

they moved other bank funds and proceeds of property sales or transfers to these Wallis

bank accounts,"  Dkt. No. 67 at 8 (emphasis added), and in effect contends that this

statement is false.  *See id*. at 11.  The government's position is wrong in myriad ways.

Dorothy Brockman did not "allege" as the government states: rather, she *attested, with*

*supporting documentation*, to the facts that (1) the proceeds of the sale of 335 West Friar

Tuck were deposited in Amegy Bank; Dkt. No. 66-1 at ¶ 8, Ex. 5; (2) Amegy demanded

that the Brockmans close their accounts after Mr. Brockman was indicted; *id.* at ¶ 3; (3) the

funds from the Amegy accounts were transferred to Wallis Bank; *id*. at ¶¶ 3–6, Exs. 1, 2;

(4) the proceeds of the sale of 1731 Sunset Boulevard and the Lot 16 Property were

deposited in Wallis Bank accounts; *id.* at ¶¶ 9, 10, Exs. 6, 7; and (5) over $27 million in

accounts in the Brockmans' names were seized from Wallis Bank over six months after the

IRS issued the jeopardy assessment and jeopardy levy.  *Id.* at ¶ 7, Exs. 3, 4; Dkt. No. 66-2,

Ex. A; *see also* Dkt. No. 55-1, Ex. C–E.

The government's readiness to attack Dorothy Brockman's credibility without evidence or reason undercuts any contention that the IRS's collection actions are reasonable.

**5.     The government's argument that the jeopardy levy itself justifies the jeopardy assessment makes no sense.**

The government variously states:  "the fact that the IRS was able to capture the Wallis Bank funds shows that the jeopardy levies and assessment worked exactly how they were designed to work," Dkt. No. 67 at 8, and "Brockman essentially argues that, because the IRS caught him and found his cash, he could not have been designing quickly to move his funds, and thus there is no jeopardy."  *Id*. at 14.  Elsewhere, the government contends that "Brockman's argument essentially nullifies the jeopardy assessment statute and its purpose (which is to preserve collection) . . . ."  *Id*. at 10–11.  Finally, the IRS contends that Mr. Brockman is seeking the abatement of the jeopardy assessment and release of the levied funds "so that he can again move them as he pleases."  *Id*. at 10.

The IRS does not get to use a jeopardy assessment "to preserve collection" whenever it concludes that a taxpayer owes taxes, and does not get to use a jeopardy levy whenever there are taxes to be collected.  These drastic remedies may be used only when it is "reasonable under the circumstances" to conclude that collection would otherwise be in jeopardy, either because the taxpayer appears to be designing quickly to flee, designing quickly to move assets outside the reach of the government, or is insolvent—and the only question on this motion is whether Mr. Brockman was "designing quickly" to move assets

beyond the reach of collection.  *See* IRC §§ 7429(b)(3) and (g)(1); Treas. Reg. § 301.6861-1(a) (incorporating by reference Treas. Reg. § 1.6851-1(a)(1)).

On the issue that matters, it is significant that the Brockmans had over $27 million dollars in their names in bank accounts in Houston—funds that could readily be traced from the Amegy accounts and other sources—for over six months after they learned that the IRS was seizing their assets.

Moreover, the issue is not whether release of the jeopardy assessment and the return of the Brockmans' funds will enable Mr. Brockman to "again move them as he pleases." Dkt. No. 67 at 10.  Mr. Brockman has died.  And the government has failed to show that, leading up to the IRS's issuance of the jeopardy assessment and jeopardy levy, he used his ability to move his assets "as he pleases" by "designing quickly" to move assets outside the reach of the government.

## CONCLUSION

As this Court observed at the August 3, 2022 hearing, it is significant that the Brockmans, who knew about the IRS's collection activities in September 2021, nonetheless had more than $27 million on deposit in their names in accounts at a bank in Houston for over six months before the IRS executed the levies in March 2022.  As previously noted, instead of moving assets beyond the reach of the government, Mr. Brockman properly sought recourse before this Court.  *See, e.g.*, *Clark v. Campbell*, 501 F.2d 108, 110 (5th Cir. 1974) (IRC § 7429(b) is the sole safeguard for a taxpayer to seek abatement of a jeopardy assessment and release of a jeopardy levy); *Burd,* 774 F. Supp. at 905 ("Realizing the drastic nature of this proceeding, Congress concluded that the taxpayer should be able to

- 14 -

obtain immediate judicial review of the propriety of the jeopardy assessment."); *Modern Bookkeeping, Inc. v. United States*, 854 F. Supp. 475, 477 (E.D. Mich. 1994)(same); *see* Dkt. No. 66 at 9.

Whether Mr. Brockman, or now his Estate, will someday owe additional taxes is before the U.S. Tax Court. At issue before this Court is whether the liens on Dorothy Brockman's real property should be released and whether the amounts seized from her accounts pursuant to the jeopardy levy should be returned, along with whether Mr. Brockman's properties and funds should be released by the government. The government has made many attempts, but has yet to meet its burden to show that the jeopardy assessment, jeopardy levy, and resultant collection activities by the IRS are reasonable under the circumstances, as the law requires.

For the foregoing reasons, and for the reasons set forth in Mr. Brockman's previous filings, the jeopardy assessment should be abated and the jeopardy levy should be released. In the alternative, and at a minimum, IRS collection actions should be stayed.

Dated: August 22, 2022

/s/ *Jason S. Varnado*
Jason S. Varnado
Texas Bar No. 24034722
SDTX Ad. ID No. 32166
Email: jvarnado@jonesday.com
Julia N. Camp
Texas Bar No. 24123598
SDTX Ad. ID No. 3688104
Email: juliacamp@jonesday.com
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002
Telephone: 832-239-3939
Facsimile: 832-239-3600

- 15 -

Kathryn Keneally (*Admitted Pro Hac Vice*)
New York Bar No. 1866250
Email: kkeneally@jonesday.com
Frank J. Jackson (*Admitted Pro Hac Vice*)
New York Bar No. 2870251
Email: fjackson@jonesday.com
Michael J. Scarduzio (*Admitted Pro Hac Vice*)
New York Bar No. 5147186
Email: mscarduzio@jonesday.com
Anthony J. DeRiso (*Admitted Pro Hac Vice*)
New York Bar No. 5787312
Email: aderiso@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281-1047
Telephone: 212-326-3939
Facsimile: 212-755-7306

Irina K. Bleustein (*Admitted for Pro Hac Vice*)
District of Columbia Bar No. 1044772
Email: ibleustein@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone: 202-879-3450

*Attorneys for Plaintiff Robert T. Brockman*

## **CERTIFICATE OF SERVICE**

I certify that on the 22nd day of August, 2022, I electronically served this document on all counsel of record.

*/s/ Michael J. Scarduzio*
Michael J. Scarduzio