```
             THE UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF TEXAS
                    HOUSTON DIVISION

                    *  *  *  *  *

ROBERT T. BROCKMAN          *   NO. 4:22-CV-202
                            *   Houston, Texas
VS.                         *
                            *   9:50 a.m. - 11:04 a.m.
UNITED STATES OF AMERICA    *   August 3, 2022

                    *  *  *  *  *
```

**MOTION HEARING**

**(Oral Argument of Counsel)**

```
    BEFORE THE HONORABLE GEORGE C. HANKS, JR.
           UNITED STATES DISTRICT JUDGE

                    *  *  *  *  *
```

Proceedings recorded by electronic sound recording
Transcript produced by transcription service

*GLR TRANSCRIBERS*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1610

1   **APPEARANCES:**

2   For the Plaintiff:

3        MR. JASON VARNADO
         **Jones Day**
4        717 Texas, Suite 3300
         Houston, Texas 77002

5
         MS. KATHRYN KENEALLY
6        MR. FRANK JACKSON
         **Jones Day**
7        250 Vesey Street
         New York, NY 10281

8    For the Defendant:

9
         MR. HERBERT W. LINDER
10       MR. JONATHAN L. BLACKER
         MR. JOHN P. NASTA, JR.
11       **U.S. Department of Justice**
         **Tax Division**
12       717 N. Harwood, Suite 400
         Dallas, TX 75201

13
     Court Clerk:
14
         BYRON THOMAS
15
     Electronic Recorder:
16
         ANTONIO B. BANDA
17

18

19

20

21

22

23

24

25

1         **P R O C E E D I N G S**

2           **9:50 A.M. - AUGUST 3, 2022**

3              THE COURT:  Good morning, everyone.  The first

4    case on the Court's docket this morning is Cause No.

5    4:22-CV-202, Mr. Robert Brockman vs. The United States

6    of America.

7                 Can counsel for each side just introduce

8    themselves to the Court and then state the parties they

9    represent, starting with the Government.

10             MR. LINDER:  Good morning, Your Honor.  Herb

11   Linder on behalf of the United States.

12             THE COURT:  Okay, good morning.

13             MS. KENEALLY:  Good morning, Your Honor.

14   Kathryn Keneally on behalf of Robert Brockman.

15             THE COURT:  Okay.

16             MS. KENEALLY:  And I'm joined today by Jason

17   Varnado.

18             THE COURT:  Mr. Varnado.

19             MR. VARNADO:  Good morning, Your Honor.

20             MS. KENEALLY:  And Frank Jackson.

21             MR. JACKSON:  Good morning.

22             THE COURT:  Welcome, Mr. Jackson.

23                 We're here this morning, everyone, for the

24   Motion for Determination on the Complaint for Judicial

25   Review and abatement of the Jeopardy Assessment and the

1  Jeopardy Levy, pursuant to 26 U.S.C. 7429.

2              I've received all the information that

3  you've filed with the Court.  The last thing I received

4  was Document 55, which was filed on the 27th.  Was there

5  anything filed after that?  I took some time this

6  morning to go through the file to see if there was any

7  additional documents.  That was the last document that

8  was filed, which was Plaintiff's Reply in Support of

9  the Second Supplemental Memorandum.

10         MS. KENEALLY:  No, Your Honor.

11         MR. LINDER:  No, Your Honor.

12         THE COURT:  Great.  Then I'm up to speed.

13  I've read all the exhibits, read the briefing, gone

14  through all the exhibits.

15              Before we begin, is either side expecting

16  an evidentiary hearing?  You've submitted a lot of

17  affidavits, but is anybody going to be called live for

18  this morning's oral argument?

19         MS. KENEALLY:  Not from Mr. Brockman, Your

20  Honor.

21         MR. LINDER:  Not on behalf of the United

22  States.

23         THE COURT:  Great, okay.

24              Well, as you can imagine, I've got a lot

25  of questions, but I'd like to let the parties argue the

1  motion.  How long does side believe that they need to

2  argue?

3           MS. KENEALLY:  About 20 to 30 minutes, Your

4  Honor.

5           THE COURT:  Okay.  30 minutes will be great.

6           MS. KENEALLY:  Thank you, Your Honor.

7           THE COURT:  30 minutes good for you as well?

8           MR. LINDER:  We can fit it in 30 minutes, Your

9  Honor.

10          THE COURT:  Okay, great.

11               Well, the Government has the burden in

12  this matter, so if you'd like to proceed, I'll give you

13  30 minutes.  And then, Ms. Keneally, did you want to go

14  first?  I mean, it's your motion, but I thought the

15  Government has the burden of establishing --

16          MS. KENEALLY:  I'm fine with the Court's

17  pleasure, so if Mr. Linder is ready, I'll listen and

18  respond.

19          THE COURT:  Okay, great.

20          MS. KENEALLY:  Thank you.

21          THE COURT:  It's not coming up on my screen.

22  One second.

23          *[Pause]*

24               Well, I have -- is what you're showing me

25  some of the exhibits?

1        MR. LINDER:  It's the exhibits.

2        THE COURT:  Okay, I have all the exhibits in

3   front of me.  Perfect.  So, if you can just refer to

4   me -- refer me to the exhibit number or which document

5   it's in, I can --

6        MR. LINDER:  It's Government Exhibit 3.

7        THE COURT:  Okay, great.  You may proceed.

8        MR. LINDER:  Good morning, Your Honor.  Robert

9   Brockman was assessed over $1.4 billion in tax, fraud

10   penalties and interest for the years of 2004 through

11   2018.  This jeopardy assessment represents the

12   largest -- possibly the largest individual jeopardy

13   assessment case in the history of the United States.

14        The scale of Robert Brockman's fraudulent

15   activity, which utilizes offshore trusts, offshore

16   foreign entities, nominees, alter egos in well-known

17   tax haven jurisdictions is overwhelming and

18   unprecedented.  Mr. Brockman used this offshore

19   structure to avoid reporting almost $2.7 billion in

20   unreported income.  He also used this structure to hide

21   his assets.  Mr. Brockman has owned nothing in his own

22   name, but control of everything is evident throughout

23   this case.  Mr. Brockman's transfers of property and

24   other actions clearly establish jeopardy.

25        Mr. Brockman would like to ignore all of

1  his past history, have this Court ignore all of his

2  past actions, have the Court ignore his complex

3  offshore structure and consider this case in a vacuum.

4  That is simply not the law.  Determination is whether

5  this IRS's jeopardy assessment is reasonable under the

6  circumstances.  The past history -- the circumstances

7  include Mr. Brockman's past history.

8            The United States has the burden to show

9  that the IRS's jeopardy assessment is reasonable under

10  the circumstances.  The burden of proof to show this is

11  very low.  It's akin to a burden for probable cause in

12  a criminal proceeding.  The United States has more than

13  met its burden.  It has produced a significant amount

14  of evidence, including post-jeopardy assessment

15  transfer.  Mr. Brockman has submitted little evidence

16  to rebut the United States' case.  He has not submitted

17  any declaration by Robert Brockman, it appears, or

18  Dorothy Brockman in this case.

19            Mr. Brockman used a complex offshore

20  structure to hide and control his vast empire.

21  Brockman's owned nothing, controlled nothing, as set

22  forth in this structure.  This structure was contained

23  on Government Exhibit 3, which we tried to put up.

24            This structure includes entities and

25  trusts in known tax havens:  Switzerland, Bermuda, The

1 | Virgin Islands, Nevis, the Cayman Islands, the Who's
2 | Who of tax havens.  This offshore structure consisted of
3 | eight different foreign trusts in Bermuda and at least
4 | 14 different foreign corporations in Nevis and in the
5 | Cayman Islands, British Virgin Islands, and Bermuda.
6 | Mr. Brockman also used almost at least 12 different
7 | foreign bank accounts set in Bermuda and Switzerland.
8 | Mr. Brockman's offshore complex structure
9 | was designed for one thing:  To hide his assets from
10 | the IRS and to hide his income from the IRS.
11 | Mr. Brockman had complete control of the structure.  He
12 | gave very detailed instructions.  He made all the
13 | substantive and strategic decisions, including for one
14 | of the main entities in this with the AEBTC, or what we
15 | refer to it as the Brockman Trust, and all the other
16 | entities associated with this.
17 | Mr. Brockman controlled this trust
18 | through his main nominee and employee, Evatt Tamine.
19 | He controlled Mr. Tamine because he controlled
20 | Mr. Tamine's compensation.  He controlled other
21 | trustees and trust protectors by having doomsday
22 | documents, pre-signed letters of resignation.
23 | The purpose, as I stated, was to hide his
24 | income and assets from the IRS.  This isn't conjecture.
25 | This is based on Mr. Brockman's own statements as set

1  forth as evidence in this case.  Mr. Brockman referred

2  to the IRS as "The House."  Mr. Brockman made a

3  statement:  You can never tell what crazy things The

4  House will do as the Brockman Trust is exposed to them.

5           The other structures, referring to Edge

6  Investments and Cabot Global, need to be kept in the

7  background with separate charitable trusts, trust

8  protectors, and underlying companies.  A view of

9  Government Exhibit 3 shows that exact type of ownership.

10          Mr. Brockman went on to state:  Take

11  actions to avoid IRS.  No distributions from the

12  Brockman Trust, as this will draw attention to my

13  personal returns.

14          Mr. Brockman makes the statement:  Worried

15  about the big activities.  Worried about big brother

16  activities of the United States Government.

17          Mr. Brockman timed purchases.  In one

18  case, in one exhibit, Mr. Brockman refers to:  We need

19  to time the purchase to hide the ultimate beneficial

20  ownership of the assets, in particular, Spanish Steps

21  in the Brockman Trust.

22          Mr. Brockman also approved numerous

23  actions by Mr. Tamine, his nominee.  Mr. Tamine came up

24  with a list of ideas to avoid the IRS.  He stated:  We

25  need to set up additional banking relationships for the

1    Brockman Trust, Cabot, Edge, and Regency in separate

2    jurisdictions to keep these from being frozen.  Kill

3    off all the references to Robert Brockman in foreign

4    bank documents.  Be aware of Robert Smith and the

5    Albula, the yacht, creates a target for Mr. Brockman

6    and Tamine.

7              Mr. Tamine also suggests that they should

8    keep any records they needed in the United States to

9    conduct business at Brockman's close friend and

10   physician, Stuart Yudofsky.

11             Also in this email, Mr. Tamine said they

12   should create a hidden front for Robert Brockman's

13   legal fees and expenses that has nothing to do with

14   Robert Brockman or Tamine that they can control, and

15   disguise a payment of any legal fees and expenses as a

16   loan from this Trust.

17             All these suggestions by Mr. Tamine to

18   Mr. Brockman, Mr. Brockman's response:  I concur with

19   all of these.  Mr. Brockman was onboard with hiding his

20   assets and income from the IRS.  Mr. Brockman used code

21   names, aliases.  Mr. Brockman referred to himself as

22   John Barnes.  Tamine was [James] Gilbert.

23             Edge Investments and Cabot Global, the two

24   entities Mr. Brockman tried to keep hidden from the

25   IRS, these entities were also used to transfer over $22

1  million to purchase and run real estate in Colorado.

2  Cabot Global --

3          THE COURT:  Can I interrupt you just a second?

4          MR. LINDER:  Absolutely, Your Honor.

5          THE COURT:  I understand the allegation, the

6  very thing that Mr. Brockman has allegedly done in the

7  past, but the argument that you make in your briefing

8  is that you have a reasonable belief that he's

9  designing to "quickly move assets out of the reach of

10  the IRS."  What's the evidence that he has done

11  something or has plans to quickly move assets out of the

12  reach of the IRS?

13          I mean, I understand he's allegedly done

14  all these things in the past.  Mr. Brockman's argument

15  is:  Look, you know where all the money is now.  I've

16  not done anything to try to move it outside the IRS's

17  jurisdiction.

18          What's the evidence that he has done that

19  post-Indictment?

20          MR. LINDER:  Post-Indictment.  Okay, Your

21  Honor, as you know, Mr. Brockman was aware in April of

22  2020 that he was going to be indicted, at least by that

23  date.  Around that date in 2020, Mr. Brockman began

24  selling his stock and receiving distributions from

25  certain accounts after that -- during that 2020 time

1  frame.

2         THE COURT:  Okay.

3         MR. LINDER:  And that was reported to the IRS,

4  these distributions.  It was approximately about

5  $3.6 million, at least.

6              When the IRS levied in September of 2021

7  on Mr. Brockman's -- all these known accounts, these

8  funds were no longer there in these known accounts.

9  There was approximately $3.6 million from stock sales

10 and distributions.  And when the IRS levied in on these

11 known accounts, there was approximately about 163,000

12 in there.

13        THE COURT:  Okay.

14        MR. LINDER:  Stock sales.  Moving those assets

15 and transferring those funds.  An important discovery

16 was Mr. Brockman appears to own a property called Lot 16

17 in Elk Creek Ranch.  This was sold to a third party

18 right after the assessment.

19        THE COURT:  Okay.

20        MR. LINDER:  In September of 2010, Mr. Brockman

21 purchased property in this Elk Creek Ranch, Lot 16.  And

22 like his offshore assets, he purchased this property in

23 the name of an entity -- not in his own name, but the

24 name of an entity.  He concealed his personal ownership.

25 And in this case it was a Texas LLC, Brockman Elk Creek,

 1  Lot 16, LLC.  This entity was not disclosed to the IRS.

 2  This entity did not obtain a taxpayer identification

 3  number, an employer identification number.  It did not

 4  file any returns.

 5          September 7th, the IRS makes the jeopardy

 6  assessment.  On September 9, 2021, the United States

 7  informs and serves Mr. Brockman with notice of the

 8  assessments.  Within three weeks, Mr. Brockman, through

 9  his wife, who signed the sales documents, transfers the

10  Lot 16 property to a third party and he transfers at a

11  loss.  After holding the property for 11 years,

12  Mr. Brockman quickly sold the Lot 16 property.

13          And now Mr. Brockman has produced evidence

14  that this property and the sales proceeds or the

15  selling of the sales proceeds went to a bank called

16  Wallis Bank.  What's interesting about Wallis Bank was

17  when the IRS issued this levy in September 2021, it did

18  so on all of Robert Brockman's known accounts.

19  Accounts that were reported to the United States, the

20  United States levied on all those accounts.  One of the

21  accounts that the IRS did not levy on was Wallis Bank,

22  because at that time Wallis Bank was either not open or

23  unknown to the IRS.  So it appears during 2021,

24  Mr. Brockman sold the concealed property, opens up a

25  new bank account at Wallis Bank, and transferred the

1  proceeds there.

2          This sale highlights jeopardy, it

3  highlights -- it's an event because it's telling that

4  after the IRS made its jeopardy assessment, it filed

5  tax liens in numerous counties, several counties in

6  Colorado.  One of the counties it did not file the lien

7  in was Rio Blanco County where this Lot 16 property was

8  held -- where it was.

9          And so that enabled Mr. Brockman to sell

10  the property and then transfer and move the proceeds.

11  Were those proceeds going offshore?  It's unknown, but

12  the United States was able to levy on an account and

13  now it's known that those were the proceeds.  The fact

14  that the IRS was able to find out about the sale and get

15  the proceeds does not relieve jeopardy.  It does not

16  relieve or excuse Mr. Brockman's actions in this case.

17          Mr. Brockman has other property sales in

18  this matter.  There are several sales of Houston

19  property.  Mr. Brockman was indicted in October of

20  2020.  Within a month, the property at 1731 Sunset

21  Boulevard was listed for sale and sold within a few

22  months for 1.375 million.  Mr. Brockman bought this

23  property from his wife -- with his wife in 2011.

24          In September of 2018, Bermuda Police

25  executed a search warrant on Brockman's nominee, Evatt

1  Tamine.  Shortly thereafter in 2019, Mr. Brockman

2  transferred the property to his wife.  Three weeks

3  after his Indictment, Mr. Brockman, through his wife,

4  who signed the deed, quickly transferred this property

5  to a third party.  The location of these proceeds are

6  unknown.

7              Mr. Brockman will argue that these

8  properties and other properties are the sole separate

9  property of Dorothy Brockman.  The United States and

10 the IRS disagree.  The fact that a deed is titled in

11 one name is not dispositive of the true beneficial

12 ownership or whether it is community property or

13 separate property.

14             The IRS then investigated.  All of these

15 properties we've been discussing were purchased during

16 the marriage of Dorothy and Robert Brockman.  All of

17 these properties were purchased with the funds of

18 Robert Brockman.  Dorothy Brockman does not work.

19 Dorothy Brockman does not have a separate business.

20 Dorothy Brockman does not have separate income, as set

21 forth in the declaration.  Dorothy Brockman simply --

22 her income is simply income that is earned by Robert

23 Brockman, and this is not separate income.  So the fact

24 that they can claim it's separate property, there is

25 evidence to rebut that presumption, if there is a

1  presumption.  So it doesn't make -- it makes the IRS's

2  determination reasonable under the circumstances.

3          THE COURT:  Okay.  And I guess what I'm --

4  another question I have is:  So we have evidence of

5  various transactions, sales, property, transfers.  Does

6  the IRS know where the proceeds for those transfers

7  have gone?

8          MR. LINDER:  No.

9          THE COURT:  I mean --

10          MR. LINDER:  I'm sorry, Your Honor.

11          THE COURT:  Oh, no, no, that's the question.

12          MR. LINDER:  No, the IRS does not.

13          THE COURT:  Okay.

14          MR. LINDER:  One problem with this is that

15  Mr. Brockman is under Indictment.  The IRS is not able,

16  because of the statute, they cannot summons for

17  information.  They cannot summons and obtain information

18  to try to trace off these funds.  So the IRS does not

19  know where these sales proceeds are.  It does not know

20  whether the sales proceeds went to other property, or

21  they went to the Wallis Bank or they went offshore.

22          It's not unlikely that the funds could

23  have been moved offshore because what we know, one of

24  the evidences in this case is that sometime in 2020

25  Mr. Brockman closed two known bank accounts, the Amegy

1  Bank and Wells Fargo Bank.  And in that 2020, he

2  created two new foreign trusts in the Cayman Islands,

3  and in these two new foreign trusts they created two

4  new bank accounts in the Cayman Islands.  And what we

5  do know as evidence in this case is Mr. Brockman

6  actually transferred funds from a closed bank account

7  to these Cayman Island accounts.  If you look at

8  Government Exhibit 3, these new trusts are not on there.

9         THE COURT:  Okay, that's what I was looking

10 for.  You read my mind.

11        MR. LINDER:  Yes.  Were these trusts

12 ultimately disclosed and these accounts disclosed to

13 the United States by Mr. Brockman?  Yes, they were.

14 That doesn't relieve the fact that these actions create

15 jeopardy.  It doesn't relieve the fact that he did not

16 move funds or may have moved funds there.

17           So there were other property transfers.

18 Shortly after his Indictment in December of 2020,

19 Robert Brockman, through Dorothy Brockman, transferred

20 property worth $4.1 million.  This was in December of

21 2020.  The deed on this property for sale to the third

22 party actually lists Robert Brockman as the grantor.

23 And Dorothy Brockman signs this deed as a grantor on

24 behalf of Robert Brockman, using a Power of Attorney.

25             There was also property gifted during

1   that time period.  There was property gifted to their

2   daughter -- their daughter-in-law.  Mrs. Dorothy

3   Brockman purchased this property in January of 2020.

4   Mr. Brockman and her were married at the time.  The

5   property was purchased with Mr. Brockman's income or

6   community income.  And then it's held for 10 months.

7   And one month after his Indictment, it's gifted.  This

8   is also evidence of quickly designing or appears to be

9   designing to move property out of control or away from

10  the United States.

11         There's also another sale.  There's the

12  sale of a small interest in the company.  This sale,

13  while small in numbers, highlights to the extent of

14  Mr. Brockman appearing and trying to move property

15  beyond the reach of the Government.  This sale is

16  called a one percent interest in a company called

17  Hardwicke.  Hardwicke, LLC had a one percent interest

18  in an entity that held several planes.  Mr. Brockman

19  held this interest in Hardwicke, this one percent

20  interest, some eight years.  Within six months of his

21  Indictment, this interest was sold to a party for

22  $288,000 in cash.  Dorothy Brockman actually signed the

23  sales documents for this on behalf of Robert Brockman

24  as her Power of Attorney.

25         What's interesting about this sale is

1  Hardwicke, LLC is contesting the lien in the

2  collections actions against it.  And their contestment

3  is that the United States cannot maintain an action

4  against Hardwicke because Robert Brockman sold this

5  interest prior to this jeopardy assessment and prior to

6  the liens.

7              So Brockman's sale of this interest is a

8  move due to evade collection.  Now the IRS find this

9  cash, it must chase this cash around.  This quick

10 disposal of an asset after his Indictment is an action

11 to place property beyond the reach of the Government.

12 It is reasonable to view it that way.

13             All these amounts may seem small in

14 comparison to $1.4 billion.  They are all actions to

15 place property beyond the reach of the Government.

16 It's interesting to note that almost all these assets

17 are Mr. Brockman's U.S. based assets where the United

18 States can take collection action.  If they were so

19 small and insignificant, why make the post-petition --

20 why make the post-Indictment transfers?  Why make the

21 transfer --  why make the transfers right after the

22 jeopardy assessment, other than to move property away

23 from the Government.  The timing is suspect.  What you

24 won't have is there is no evidence from Dorothy

25 Brockman or Mr. Brockman of why they made these

1    transfers or why they did this.  The evidence in the

2    case of why they did transfers is just statements by

3    counsel.

4              One of the items that's been brought up

5    has been numerous statements made about the mistakes

6    the United States made in this case.  There were no

7    mistakes in the jeopardy report.  There was no

8    mistakes -- the Government in this case simply has a

9    wrong in a chart, and on that date they have a

10   partially incorrect statement.  The Government -- the

11   attorneys for the Government in this case were notified

12   of this and promptly corrected it by a Notice of

13   Correction.

14             What's interesting is, while everyone

15   wants to focus on -- the opposing counsel and

16   Mr. Brockman want to focus on this mistake by the

17   attorneys is they don't want to focus on the underlying

18   exhibits.  The underlying exhibits have the correct

19   dates on them.  The underlying exhibits in this are

20   Government Exhibit A-61.  They show Mr. Brockman's

21   control -- control of offshore bank accounts.  In the

22   bank accounts in this particular instance, they had

23   user names and passwords for at Bank Mirabaud in

24   Switzerland.  The accounts were Spanish Steps Holdings

25   and Point Investments.  While the Government made a

1  small mistake, it corrected its mistake, and that's all

2  it was is a mistake, a scrivener's error, like a

3  mistake.  What's interesting is we should focus on the

4  evidence that was underlying that.

5          There's been a repeated argument on behalf

6  of Mr. Brockman that no jeopardy exists because the

7  Government could theoretically collect from Reynolds

8  and Reynolds.  Brockman asserts that if the

9  Government proves its case, which I'm not exactly sure

10  which case -- the jeopardy case, the tax case, or the

11  criminal case -- Mr. Brockman would then be an indirect

12  owner of that entity.

13          And then the Government, I guess, in the

14  recent filing, would then have to go out and get a

15  judgment from a Court, from the U.S. Court, saying that

16  Mr. Brockman is a direct owner.  And then the

17  Government could theoretically collect against Reynolds

18  and Reynolds.  That's simply not the standard.

19  Basically, that's nullifying the jeopardy statute.

20  Requiring the Government to prove its case, to prove

21  the tax liabilities, then prove non-entity ownership,

22  and to overcome this layered up ownership, is simply

23  not what the jeopardy statute is for.

24          This also ignores the layered up ownership

25  of this entity.  The Brockman Trust, AEBCT, owns

22

1   Spanish Steps Holdings, a Nevis company, which in turn

2   owns Spanish Steps Holdings, LTD, which is a company

3   in the British Virgin Islands, which then owns a U.S.

4   company, USCHS, which is in Delaware, which owns Dealer

5   Computer Services, which then owns Reynolds and

6   Reynolds.  This layered ownership not only helps

7   establish the factor for jeopardy assessment, but it

8   also shows the impossibility or the theoretical

9   problems with asserting that the Government could

10  collect from this entity at any time it wanted to.

11          The United States knows that Reynolds and

12  Reynolds is not a public owned company.  Thus, the

13  entities that hold the ownership of this could sell

14  their stock or move their assets just as Mr. Brockman

15  sold his one percent interest in Hardwicke and his Lot

16  16 property in Colorado.  These entities could pledge

17  their stock.  They could encumber all these assets.

18  These assets are simply available.

19          Also, in this case, which has been the

20  subject of numerous briefs the Court is probably tired

21  of reading, is this theoretical letter proposal from

22  the BCT Trustees.

23          THE COURT:  That was my next question.  I'm

24  glad you're getting into that because I wanted to find

25  out what's the status of that?  Is it -- what's your

1  understanding as to whether or not Mr. Brockman is able

2  to post a bond or not?

3          MR. LINDER:  The status of that is those funds

4  that are held in Switzerland are frozen by the Swiss

5  prosecutors.  We have now been authorized that the

6  Swiss prosecutors informed the Government that these

7  funds are frozen and they are not available for use.

8  The Swiss prosecutors informed the Government at times

9  that they read about this BCT letter in a news article

10 and they promptly notified the Government that they had

11 frozen the account and the funds are no longer -- the

12 funds are not available for use and they will not

13 available for use.

14          Unfortunately, while the Government

15 disclosed that the funds were frozen, we couldn't

16 provide all the details.  We weren't authorized to

17 provide that until just recently.  We would have liked

18 to have disclosed all that.  The attorneys in this case

19 simply weren't able to do so, so those funds were never

20 available for use.  We can argue all about if it was a

21 prosecutor freeze or it was frozen, but the funds were

22 never available.

23          Mr. Brockman is telling the Court that no

24 jeopardy existed.  This letter and this proposal were

25 wholly determinative of the idea that this was all

1  collection concerns for the United States and the Court.

2  And based on this one theoretical proposal that

3  couldn't happen, based on the jeopardy assessment, it

4  must be abated and the jeopardy levy released.  What it

5  shows is that it was impossible from the start, it's

6  impossible from the get-go.

7        And this theoretical proposal --

8        THE COURT:  Oh, I'm sorry, one other question.

9        MR. LINDER:  Yes.

10       THE COURT:  Do you know or have you had any

11 conversations with Mr. Brockman's representatives about

12 any other assets that might be available to support the

13 bond?

14       MR. LINDER:  No, Your Honor.  The only -- I

15 think what we said this in the last hearing before the

16 Court was that we had -- with the IRS representative,

17 on the phone, we did have one discussion with the

18 attorneys, the U.S. Attorneys for the BCT Trust, and

19 they were inquiring about how to post a bond, what were

20 the requirements, and we had discussed that.  It was

21 about half an hour conversation.  At that point there

22 was never any assets posted.  There weren't any

23 recommendations we could do this.

24       The United States points out that since

25 that time -- this was in April -- there have been no

1    discussions with the United States.  There's been no

2    contact between BCT Trustees or, to our knowledge, that

3    Mr. Brockman's representatives have contacted the IRS

4    or the United States about posting a bond.  Simply,

5    there has been no bond, there is no stay of collection.

6              THE COURT:  Okay.

7              MR. LINDER:  And I think what's important about

8    this theoretical proposal is this is the same type of

9    theoretical proposal that the IRS, the Government,

10   could just collect from Reynolds and Reynolds whenever

11   it wanted to.  And like that letter, it's a theoretical

12   proposal that doesn't cut bait.  Theoretical proposals

13   are potential or theoretical, and ideas simply do not

14   satisfy the jeopardy, does not resolve the jeopardy

15   assessment.

16              There were lots made about the

17   Government's actions or claiming that the Government

18   completely got the Bermuda litigation wrong, it failed

19   to understand the Bermuda litigation.  Well, the

20   Government would point out that most of the litigation

21   filings in the Bermuda cases aren't available to the

22   public.

23              And regards to whether the Government got

24   it wrong or right, it's not whether the Government is

25   exactly right that jeopardy will be -- that the

1  collections are in jeopardy, it's whether it might be,

2  whether it appears to be, whether the IRS's review is

3  reasonable, whether the IRS's belief is that the

4  Bermuda litigation was instituted to move control or

5  keep control of the offshore empire -- in this case it

6  is the Brockman Trust -- offshore.  And that's exactly

7  what happened.  The BCT Trustees are located in the

8  Cayman Islands.  They've admitted they're going to be

9  subject to Bermuda law, but the control of that trust

10 still remains offshore.

11            An important note is that when

12 Mr. Brockman and Mrs. Brockman had the -- when they

13 were looking at trustee, they did not domesticate the

14 AEBTC or this Brockman Trust back to the United States.

15 They could have easily moved control back to the United

16 States.  They chose not to.  They chose to keep it in a

17 tax haven.

18            So, again, the IRS, was exactly it right

19 on all the Bermuda litigation?  Probably not.  But

20 their belief that the litigation was instituted to keep

21 control of this asset overseas, is not only reasonable,

22 but it looks like that is exactly what happened.

23            THE COURT:  One second.  I think you're almost

24 out of time, but just one second.  Counsel, hold on for

25 just one second.

1    *[Pause]*

2         Okay, counsel, you may proceed.

3         MR. LINDER:  Your Honor, one of the things

4    that I think we're going to do at this hearing is

5    Mr. Brockman relies extensively on a case called *Fumo*

6    *vs. The United States.*  I have some case citings I

7    think the Court is aware of it.  I can provide it.

8              This case is an outlier.  No other

9    District Court has followed this case.  The one

10   District Court that has cited the case, it cited it for

11   the standard that the review here is *de novo.*  This is

12   the *Kalkhoven vs. United States* case.  This is 2021

13   Westlaw 4206767.  It's out of the Eastern District of

14   California.

15             In this case, it's the very same -- it's

16   actually making the very same argument based on *Fumo*,

17   that a sale of property, if it was disclosed publicly

18   with a public sale, there could be no jeopardy.  The

19   Court in *Kalkhoven* did not find this argument

20   persuasive and decided that it is reasonable for the

21   IRS to conclude, in this case *Kalkhoven,* could place

22   and would place sales proceeds beyond the reach of the

23   Government.  It rejected the idea that a sale that was

24   a public sale was not -- did not appear to or could not

25   be considered as moving quickly.

1          In *Fumo*, one of the most distinctive facts

2   that makes that case completely different from this one,

3   throughout that case the Court brought up the main fact

4   that in *Fumo* the IRS notified the taxpayer in October

5   of 2012 that there were going to be additional

6   assessments, additional tax liabilities that he was

7   going to be liable for.  It didn't assess.  It waited

8   then until March of the next year and then it did a

9   jeopardy assessment.  And the Government admitted --

10  the IRS admitted that in October there was no jeopardy

11  when they did this.  The jeopardy was in March.  And

12  there were no intervening facts.

13          That does not exist in this case.  At no

14  point has the Government said that there has been no

15  jeopardy or admitted there was no jeopardy in this

16  case.  And if you consider that the Indictment was

17  notifying Mr. Brockman of potential liabilities, the

18  United States has went and outlined numerous

19  post-Indictment transfers.  But the main fact in that

20  case doesn't exist.

21          In *Fumo*, also in regard to property

22  transfers, the taxpayer in *Fumo* maintained an interest

23  in the property.  The Government has outlined in its

24  briefing, and certainly today, many of the properties

25  that were transferred are transferred to unrelated

1   third parties.  So the IRS may not be able to proceed

2   against those properties.

3                    And unlike in *Fumo*, the taxpayers in *Fumo*

4   submitted declarations outlining and detailing their

5   transactions and why they did them.  There is no such

6   declarations filed in this case.

7                    In closing, Your Honor, the United States

8   has produced overwhelming evidence of Brockman's past

9   history, his current conduct.  We have opening

10  accounts, opening foreign accounts, closing U.S.

11  accounts after his Indictment, selling stock, receiving

12  distributions, moving the proceeds from those sales and

13  distributions to some unknown account.  We have

14  property sales after the Indictment.  We even have a

15  property sale close to jeopardy assessment.

16                    The United States' burden is low in the

17  case.  It believes it has overwhelmingly produced

18  evidence to support its jeopardy assessment.  The IRS's

19  actions were reasonable based upon the circumstances,

20  and we believe the jeopardy assessment should be

21  upheld, and we request the Court deny Mr. Brockman's

22  motion and uphold the jeopardy assessment.

23                    THE COURT:  Thank you, counsel.

24                    *[Pause while Elmo is set up]*

25                    Ms. Keneally, you may proceed.

1            MS. KENEALLY:  Good morning, Your Honor.  I

2     appreciate that the Court looked to the issue of

3     whether Mr. Brockman is designing quickly to do

4     anything.  And unfortunately, I need to start today

5     with an update as to how Mr. Brockman is --

6            THE COURT:  Okay.

7            MS. KENEALLY:  -- because the Court inquired.

8                As the Court knows, he's in hospice care.

9     Since I think middle of last week, he's been treated

10    with morphine.  His body is no longer tolerating food

11    or liquid.  So at this point going forward, Mr.

12    Brockman is not designing to do anything.  That's where

13    we start today.

14           THE COURT:  Okay.

15           MS. KENEALLY:  Jeopardy assessment is a rare

16    tool for the Government.  The IRS has -- and I respect

17    this.  The IRS has tremendous tools to collect once

18    it's been determined that somebody owes tax.  Whether

19    that tax is reported on a tax return and not paid or

20    whether that tax is determined at the end of an IRS

21    examination or the IRS appeals process or Tax Court or

22    Federal Court, the IRS has tremendous tools to collect.

23    They can go immediately to the banks and into

24    somebody's bank account.  They can lien and sell

25    property, and there's reason for that.

1            But the jeopardy assessment lets the IRS

2  jump ahead.  It lets the IRS jump ahead of determining

3  whether there is a tax liability and simply begin to

4  take assets and to grab assets.  And there's a reason

5  it's there and there's a reason that it's internally in

6  play.

7            In the common case -- and the Government

8  has a lot of cases in their papers -- the only times

9  we see jeopardy assessments made, there's cash at the

10 Border, there's a stop and there's cash in the trunk of

11 the car, there's a gambling operation, there's illegal

12 source income, and you grab that money.  And from the

13 enforcement point of view, that makes sense.

14            Or there is actually action.  Jeopardy

15 assessment can be done on three criteria:  One of them

16 is quickly designing to leave, somebody who's going;

17 quickly designing to remove the assets; they're

18 becoming insolvent without regard to the possible tax

19 liability, don't consider the tax liability.  The only

20 one here is the quickly designing.  That's the only

21 issue here is whether he was quickly designing to

22 remove assets.

23            And jeopardy assessment is not there to

24 keep somebody from living their lives while there is a

25 tax dispute.  So, yes, Mr. Brockman was indicted in

1   October '20.  Everybody -- you know, well known,

2   Mr. Brockman was indicted in '20.  And there is now a

3   matter pending in the Tax Court, which is one of the

4   consequences of the jeopardy assessment is the taxpayer

5   has the right to go to the Tax Court immediately with a

6   matter pending in the Tax Court.

7            So, again, I know we have the other case.

8   It's looking more likely we're going to have a criminal

9   determination and we'll address that in the other case.

10  But the Tax Court case will continue.  It will continue

11  against Mr. Brockman's Estate and it will determine

12  whether or not he owes taxes.  That's not for this

13  Court to decide.  The IRS says he does.  We say he

14  doesn't.  The IRS doesn't get to shut down people

15  living lives inbetween unless they can show somebody is

16  designing quickly.  So to the extent --

17           THE COURT:  I agree with you on that argument.

18  I guess the quick question I have -- and I didn't mean

19  to interrupt, I know you've got a lot.  But the one

20  thing that I asked counsel for the Government about

21  and I wanted to ask you is that these assets are being

22  transferred in a way that the IRS cannot track down

23  after they have been transferred.  That is, you know,

24  that the purchases or the sales and the transfers,

25  there's nothing wrong with the purchases, the sales,

1  and the transfers.  It's that the proceeds can't be

2  tracked once it happens.

3           I want you to kind of talk to me about

4  the IRS's position that basically this money is going

5  places that there is no way to track it for later

6  collection if it turns out there is a liability.

7           MS. KENEALLY:  And, Your Honor, that's why we

8  put together the deck because there's been an enormous

9  amount of paper here.  And we listed up and went

10 through the IRS's allegations about actions that are

11 current.  We want to walk through what those actions

12 are.

13           THE COURT:  Okay.

14           MS. KENEALLY:  And they've been raised at

15 three separate times.  And we certainly agree with the

16 Government.  The Government can continue to supplement

17 and say, "We learned something new."  That is the law

18 of jeopardy assessment.  But they've made three

19 allegations at three different times.

20           The first, which is summarized on page 3,

21 and I'm going to go through those three first -- page 3

22 of the deck -- are the grounds on which the IRS based

23 its action.  So the case begins with a jeopardy

24 assessment supported by a jeopardy recommendation

25 report by the IRS.  Three issues:

 1              Four real property transactions by Dorothy

 2  Brockman, the issues concerning the Bermuda litigation,

 3  and the investigation -- the underlying investigation.

 4              So let me turn to slide 4, which describes

 5  the four transactions.

 6              THE COURT:  Okay.

 7              MS. KENEALLY:  These are four transactions of

 8  people living their lives.  So the four properties are:

 9              Mr. and Mrs. Brockman's former residence.

10  They moved from one home in Houston to another home in

11  Houston, and they moved to a smaller home closer to

12  their son, daughter-in-law, and now two children.  So

13  the babies have been born in the last three years.  And

14  this is, again, Dorothy Brockman planning her life.

15  She puts that property up for sale.  That property has

16  been in her name for 25 years and she puts that

17  property up for sale.

18              And there's a vacant lot next to it and

19  that property is sold.

20              The next piece of property of their four

21  is a townhouse that was in Mrs. Brockman's name.  This

22  is where Mr. Linder focused on in particular.  Again,

23  it was in Mrs. Brockman's name.  When it was sold, her

24  son was residing in it before his marriage.  After his

25  marriage and as they expected a child, they moved to

1   another home.  She sells that home.

2            And then there's the property that she

3   gifts to her daughter-in-law, again in anticipation of

4   the birth of her first grandchild.

5            Those properties -- and again, Mr. Linder

6   can comment on the *Fumo* case, when you are in jeopardy

7   assessment cases, we only have just the Court opinions

8   because it's non-appealable.  This Court is the sole

9   safeguard.  The District Court is the sole safeguard in

10  the statute that's for jeopardy assessment.  And the

11  cases are fact-specific among other cases, but *Fumo* in

12  particular says, if you can trace the transactions

13  through public records, then you're not designing

14  quickly to hide them from the Government.  These are

15  open sales.  These are things the Government learns

16  about because they're listed.  The real estate sales

17  are listed.  The fact that they occur are listed.  The

18  transactions are understandable.

19       THE COURT:  I agree with that, but do you

20  dispute, or what's your position on the Government's

21  apparent argument that we can trace the transactions,

22  but we can't trace the money?

23       MS. KENEALLY:  So, Your Honor, I will

24  acknowledge, we have not come back and traced all the

25  dollars and where they went, but I want to talk about

1   the Wallis Bank account right now.

2           THE COURT:  Okay.

3           MS. KENEALLY:  And I want to talk about these

4   two closed accounts that happened with Amegy and Wells

5   Fargo and the Wallis Bank account.  Mr. Brockman was

6   indicted in October of 2020.  The banks throw them

7   out.  Again, the banks say:  Okay, you know, notorious

8   enemies, go find another bank.  They move their bank

9   accounts to the Wallis Bank account.  The Government

10  has seized the Wallis Bank account.  The Government has

11  seized tens of millions of dollars from the Wallis Bank

12  account, and nobody touched that money other than to

13  live their lives.  Other than to pay expenses and do

14  whatever they were doing, that money was sitting there

15  when the Government issued a levy and took the funds

16  from the Wallis Bank account.

17          And the levy for the Wallis Bank account

18  is in the records.  If you need us to get the bank

19  records, you can see how much was there.  They seized

20  Mrs. Brockman's account, the joint account, and

21  Mr. Brockman's account.  So I can't stand here and tell

22  you that the proceeds from this sale went into that

23  account and this sale went into that account, but I can

24  tell you the Brockmans left tens of millions of dollars

25  sitting in a bank account -- three bank accounts --

1    after the levy issued.

2              Also, in terms of the public disclosure

3    here, Your Honor --

4         THE COURT:  I mean, one quick question.  Is

5    that fact in anything that I have?  Because that wasn't

6    clear to me when I looked at -- I mean, I admit, I

7    looked at a lot of exhibits.  Is that fact of what was

8    left in the accounts in some of the evidence that's

9    been presented to me?

10        MS. KENEALLY:  No, Your Honor.  We can

11   supplement the record with the information as to the

12   balances in each account.

13        THE COURT:  Okay, because I didn't remember

14   seeing.  I'd like you to do that.

15        MS. KENEALLY:  We'd be happy to do that.

16        THE COURT:  Okay.

17        MS. KENEALLY:  To show the balances that were

18   in those accounts.  Again, if the Court wants, we'll

19   trace the dollars.  I mean, you know, we'll trace the

20   dollars.  Some of it's going to go -- some of it's

21   going to go to legal fees.

22        THE COURT:  I'm not -- I don't want that.

23   It's just that you made an argument that they took

24   money and there was still lots of money left in the

25   account.  That's a very persuasive argument that if

1  they're trying to, you know, put money outside the

2  reach of the IRS, that there was still significant

3  money in those accounts.

4         MS. KENEALLY:  Tens of millions.

5         THE COURT:  Tens of millions.  I didn't see

6  that in the evidence.  So, if you can submit that, that

7  is to me evidence to support the argument that there is

8  no effort to -- you know, there are designs to quickly

9  move assets outside the reach of the IRS.

10         MS. KENEALLY:  Your Honor, because the

11  accounts are now closed, it takes us a little bit of

12  time to get the bank to get its records, but we'll

13  promptly be about supplementing the record to show you

14  what was in the Wallis account when those accounts were

15  seized.

16         THE COURT:  Okay.

17         MS. KENEALLY:  The other points are just to

18  complete on the -- because this is going to be

19  something that comes up again in terms of what it means

20  to design quickly to move assets out of the reach of

21  the Government.

22          One of the things that is the antithesis

23  of moving assets out of the reach of the Government is

24  telling the Government about your transaction.  And in

25  the case of Mrs. Brockman's transfer of the gift to her

1  daughter-in-law, she reports a gift tax to her.  And in

2  the case of the fact that her son was using the

3  property as his residence, she reports the fair market

4  value of the property on her gift tax account.  This is

5  not about people hiding things.

6          And yet the other thing I do want to --

7  in terms of the funds that are being seized, these are

8  after-tax dollars.  It's not true that Mrs. Brockman

9  never worked and it's not true that Mrs. Brockman never

10  earned income.  It is true that she did not earn the

11  income that her husband earned from Reynolds.  But the

12  funds we are talking about here, the funds that are

13  being seized right now, are funds that were paid --

14  and the assets that are purchased here, there is no

15  evidence that any of this came from any of the offshore

16  activity.  The assets here are purchased.  The funds

17  are received from Mr. Brockman's income at Reynolds,

18  from investments that the Brockmans made, from some

19  investments after the Brockmans -- the Brockmans split

20  income, something you can do under Texas law.  These

21  are after-tax dollars, for want of a better statement.

22          THE COURT:  Ms. Keneally, can you hold on just

23  one second.

24          *[Pause]*

25          You may continue.

1    MS. KENEALLY:  So I'm going to turn briefly to

2  the Bermuda proceedings.

3    THE COURT:  Okay.

4    MS. KENEALLY:  You know, just briefly to the

5  Bermuda proceedings.

6    Mr. Linder stood up and the Government

7  often in its papers talks about that the Government

8  needs to show that the IRS acted reasonably under the

9  circumstances.  In their papers they actually refer to

10 it as reasonable belief in what they're doing.

11    It can't be a reasonable belief once they

12 find out it's not correct.  They can't stand here

13 today -- in my view at least, my argument would be they

14 can't stand here today and say, "Well, at the time we

15 thought something was going on in Bermuda."  We now see

16 from the Bermuda Court opinion that nothing was going

17 on in Bermuda, but we should continue with the jeopardy

18 assessment because there's reasonable belief.  That's

19 first.

20    And then second, it's simply not true that

21 there wasn't access to the Bermuda proceedings.  The

22 Bermuda Court of Appeal argument was a three-day public

23 argument.  You could watch it on the Internet.  It was,

24 you know, open.  And the decision is not -- it's not

25 sealed, it's not secret.  And what the Court in Bermuda

1    did was appoint BCT as an independent institutional

2    trustee.  So whatever charts you want to show that what

3    was happening, you know, since 1981 to 2018, today the

4    trust, the ABCT, is controlled by an independent

5    trustee appointed by the Bermuda Court after vetting by

6    the Bermuda Court.  And that happened seven months

7    ahead of the jeopardy assessment.

8              So, again, I think we should take the

9    Bermuda proceedings off the table.  But I do want to

10   address, whatever it is they find and why ever they

11   thought it, it's not true today.  You know, it's not

12   correct and they can't -- it wasn't true at the time

13   and they can't base a reasonable belief on something

14   that's really shown not to be correct.

15             THE COURT:  Okay.

16             MS. KENEALLY:  Briefly to the next slide, Your

17   Honor, because I think that you addressed it.  The

18   allegations in the Indictment go through 2018.  The

19   Notice of Correction is based on the letter from

20   counsel for Evatt Tamine, who says in the letter

21   there's been no communication, no activity, no

22   involvement by Mr. Brockman in the offshore structure

23   since 2018.  So, I mean, I'm happy to talk about it,

24   but I think, Your Honor, you already answered the

25   question, so I don't want to draw on something unless

1  you want to hear more about that.  But it's not

2  current, you know, the assets.

3          THE COURT:  Okay.

4          MS. KENEALLY:  So I want to move to the next

5  set of allegations, and these come together.  And

6  again, we're not disputing.  The Government can -- if

7  the Government finds some information, they can bring

8  it to the Court's attention.  If we find any

9  information, we can bring it to the Court's attention.

10  It's the nature of the jeopardy assessment proceeding.

11          But in their January 21 opposition there's

12  a list.  There's a list of transactions where they're

13  saying:  Take a look at these transactions.  You know,

14  these are transactions that the Brockmans are engaging

15  in -- sometimes Mrs. Brockman, sometimes Mr. Brockman.

16  These are transactions the Brockmans are engaging in.

17  The reason they know about these transactions is

18  they're reported.  They're reported to the Internal

19  Revenue Service.

20          So, if you take a look, Your Honor, just

21  to pull it all together in one place, on slide 8.  So

22  the first transaction which Mr. Linder specifically

23  focused on, this sale of the one percent interest of

24  Hardwicke from Mr. Brockman to Reynolds.  Hardwicke

25  owns a corporate jet.  Mr. Brockman -- in his condition

1   physically at the time, he had retired and he's no

2   longer going to be traveling for business, and without

3   question he is physically deteriorating.  He sold the

4   one percent interest -- he sold the one percent

5   interest in the company that owns a corporate jet to

6   the company that owns the other 99 percent.

7                And the Government knows about this

8   because I told them about it.  When the jeopardy

9   assessment issued, the jeopardy assessment issued, one

10  of the things that the Government raised specifically

11  were earlier transactions involving the plane.  And we

12  said:  No longer Mr. Brockman's.  It was sold.  So this

13  is not something anybody tried to keep secret.  And this

14  is, again, a living your life kind of transaction.

15               Every other transaction that they cite,

16  every other one is reported to them either by

17  Mr. Brockman or on behalf of Mr. Brockman.  These are

18  not concealed, these are not hidden.  And the list of

19  the transactions that I can -- if the Court wants, I

20  can go through each of the transactions.  But the list

21  of the transactions in the form that they are reported

22  on, again, there's case law that supports that you

23  can't be acting quickly, designing quickly to move your

24  assets outside of the reach of the Government if what

25  you are doing is you are telling the IRS on IRS forms,

1  "This is my transaction, this is what I'm doing."

2       THE COURT:  Well, unless you're -- unless

3  there is no way to trace the assets, the proceeds from

4  those sales and transactions.  I mean, the argument the

5  Government is making on that, and that's why I asked

6  the question earlier, you know about the transactions,

7  but you don't know about where the proceeds went, so

8  that if an assessment does need to be made, you can try

9  to track those moneys down, or have moneys to satisfy

10  the judgment.

11       MS. KENEALLY:  Again, Your Honor, first of

12  all, they never asked.  And I heard Mr. Linder say,

13  because of the criminal case, they couldn't issue

14  summonses.  But, in fact, they could have issued

15  summonses to the banks.  Setting aside Mr. Brockman's

16  Fifth Amendment rights, what we may or may not have

17  answered, they could have issued summonses to the

18  banks.

19       THE COURT:  Okay.

20       MS. KENEALLY:  They could have issued

21  summonses to Wallis and Amegy and found out -- to Amegy

22  and -- sorry.

23       MR. VARNADO:  Wells Fargo.

24       MS. KENEALLY:  Wells Fargo, thank you.

25       -- and seen the transfers to Wallis.

1           THE COURT:  Okay.

2           MS. KENEALLY:  I mean, it wasn't -- it wasn't

3   hidden, it was -- you know, it was traceable, it was

4   openly there.  That's first.

5               Second, if you are going to hide assets,

6   you genuinely don't tell the IRS, "By the way, I

7   engaged in this transaction and then I'm going to go

8   hide the assets."

9               Third, they don't get to just speculate.

10  They don't get to just say, "Wow, we don't know where

11  the assets went, so we're just going to speculate that

12  they went out of our reach."  I mean, that's just --

13  you can't base a jeopardy assessment on "woulda coulda,"

14  might have.

15              And then to go back to what's the

16  fundamental point, which is what we need to supplement

17  the record with, there was just tens of millions of

18  dollars setting in the Wallis account.  So, whether

19  each of these transactions traces it to there, again,

20  if the Court wanted that, we could do that, but they

21  don't -- the assets stay here, you know.  There's just

22  so much money that's sitting here.

23          THE COURT:  Okay.

24          MS. KENEALLY:  And then we come page 9, Lot 16,

25  the sale of Lot 16.  And here again, I'm not saying the

1  Government said anything incorrect.  The Government

2  said they don't know what happened to the funds that

3  came out of the sale of Lot 16.  I appreciate that,

4  they didn't know.

5          But, you know, there's a -- you know,

6  there's a famous old closing statement that I think it

7  was Edward Bennett Williams used to do when he talked

8  about "seeing the world through dirty windows and then

9  you see dirt on everything." They don't get to look

10 through a dirty window and say, "We don't know where

11 the money went, so it must have gone outside of our

12 reach."

13         This is in the record.  It went into the

14 Wallis Bank account in Mr. Brockman's name, and it

15 stayed there even when he knew, we knew, Mrs. Brockman

16 knew, because we have cognitive issues with

17 Mr. Brockman, but where everybody knew that the levy

18 was out there.  They found the Wallis account, they

19 took the Wallis account.  So the sale of Lot 16 is not

20 moving assets outside of the Government's reach.

21         So those are the -- just to pause, I want

22 to pause here for a moment, Your Honor, to ask if you

23 have questions, because that's it.  Those are the

24 things they're saying are the designing quick reacts,

25 and that's the summary on that.

1          THE COURT:  Well, I think I've got that and I

2     think both sides have covered my questions thoroughly.

3               The next issue I had was on the bond.

4          MS. KENEALLY:  Right.

5          THE COURT:  What was that all about?  I mean,

6     because the last hearing you represented that, you

7     know, there was money that could be posted as a bond,

8     but these assets in Switzerland take care of

9     everything.  We can move on down the road.  And now it

10    looks like that's not the case.

11         MS. KENEALLY:  So I want to put the bond issue

12    into context.  And, yes, Your Honor, the last time I

13    represented that to the best of my knowledge, those

14    assets were not frozen.

15         THE COURT:  No, I'm not implying that you've

16    made any misrepresentations.  I just, you know --

17         MS. KENEALLY:  And to the best of my

18    knowledge, those assets were not frozen.

19         THE COURT:  Right.

20         MS. KENEALLY:  And but the bond is not

21    something Mr. Brockman can post.  The bond is something

22    that BCT, as the trustee for the A. Eugene Brockman

23    Charitable Trust, is looking into posting.

24              And the reason that the BCT -- and BCT has

25    been very upfront about this and this is in the record

1   in BCT's correspondence.  The reason that BCT believes

2   that it's in the trust's interest to do this is because

3   Reynolds is at risk.  If the Government does prevail

4   in the Tax Court case or in the Criminal Case -- and

5   Mr. Linder said he doesn't know which case.  But either

6   case, if the Government prevails, you have a Court

7   Order that says the trust is a sham and that Reynolds

8   belongs to Mr. Brockman at that point.

9         And Reynolds is a U.S. company that is

10   owned by a U.S. company that is owned by a U.S.

11   company, and then that holding company is ultimately

12   owned in the trust structure.  But you've got three

13   U.S. companies that report taxes here, operate here,

14   you know, have business, and nobody disputes that

15   Reynolds itself is worth in excess of $5 billion.

16   There's never been any pushback on that suggestion.

17         The trust had two issues:  The pendency in

18   the jeopardy assessment was causing the trust to have

19   problems in its own operations.  It's got banks going,

20   you know, "Are you going to be liable?"  And the trust

21   does charitable work, the Brockmans have never received

22   a single distribution from the trust.  The trust makes

23   charitable distributions.

24         And the trust, so it's own operation is

25   potentially impaired by the pendency of the jeopardy

1  assessment, and so Reynolds is potentially jeopardized

2  down the road.  And so the trust stepped forward and

3  said:  We want to post cash instead so that we can move

4  on as the trust and run the valuable asset of Reynolds

5  and we can get back to our operations.  Cash is sitting

6  there in an account in Switzerland.

7           What happened is that the bank, Mirabaud,

8  never told the trust there was a freeze order.  The

9  Swiss prosecution never told the trust that there was a

10  freeze in place.  And so BCT and Spanish Steps, as the

11  actual account holder and their Swiss counsel, thought

12  that the only issue that was pending was whether -- was

13  waiting until the Bermuda order appointing BCT could be

14  domesticated in Switzerland.  But, yes, we do now know

15  that there is a freeze in place on the account.  That's

16  a fact.

17           And there are ongoing discussions.  This

18  is a declaration that was submitted by counsel for the

19  trust that would be in the record.  There are ongoing

20  discussions right now, ongoing communications right now

21  between counsel for Spanish Steps as the account

22  holder, which is owned by the trust, is controlled by

23  BCT, and the Geneva Prosecutor's Office, to determine

24  whether some of those funds can be made available to

25  post the bond.  So that issue remains open.  And it's

1  not my place to say what the chances are or where they

2  are, nor what I think -- you know, I think it's

3  sufficiently sensitive that they need to have those

4  discussions.

5              But from Mr. Brockman's point of view, I

6  want to be clear why we raised the question of the trust

7  willingness to post a bond, which is we requested a

8  stay of collection so that the Brockmans could be

9  living their lives, dealing with their bank accounts,

10  finally selling the home they don't live in any more,

11  while we see if these funds can come through.

12              Because what we're talking about here,

13  Your Honor, and Mr. Linder addressed this, we're talking

14  about significant sums of money that the Government has

15  located in the United States and grabbed from the

16  Brockmans.  But those significant sums of money pale in

17  comparison to the $1.4 billion, $1.45 billion

18  liability.  If that liability is ever going to get

19  paid, it's going to get paid either because the trust

20  posts the bond and it's sitting there, or because

21  somebody looks to Reynolds as an asset that will have

22  been determined at that point to belong to

23  Mr. Brockman.

24              If Mr. Brockman is found, or

25  Mr. Brockman's estate is found to owe the funds, to owe

 1  back taxes, penalties, interest, the only chance the
 2  Government has of coming close to collection, being
 3  actually able to fully collect, has to come from one of
 4  those sources.
 5            So what they're doing here is they're
 6  taking, you know, after tax dollars, assets, from a
 7  family that is really just living their lives.  And I'm
 8  not -- you know, living their lives well, hard-earned
 9  money because, you know, he built and served as the
10  head of this company for many years.  But it's not
11  addressing the issue here.  And at a certain point,
12  Your Honor, it's punitive to keep going after the
13  Brockmans in this way.
14       THE COURT:  Counsel, you have got about
15  another minute.
16       MS. KENEALLY:  Your Honor, I'm also --
17  coincidentally, there's something Mr. Varnado
18  apparently wants me to say.
19            *[Pause]*
20            To right back on the bond, just to make
21  the one point on the bond, again, the core question,
22  the core thing we're asking this Court to do is to find
23  that there's no basis for a jeopardy assessment.  The
24  bond, that request is, given that that is still in
25  flux, to stay collection and that's fully briefed in

 1  the papers.

 2              But, you know, I was about to say, I'm on

 3  the last slide and it's something that I've already

 4  commented on, which is they have to have something.  I

 5  mean, I respect it can be a reasonable belief, but it

 6  can't be speculation, it can't be dirty windows, it

 7  can't be might, could.  It can't be, if we don't do

 8  something now, somebody might do something in three

 9  months.  And it can't be we thought it was happening,

10  but that's not what occurred.

11              So, Your Honor, thank you for your time

12  this morning and we ask for an abatement of the

13  jeopardy assessment.

14          THE COURT:  Thank you, Ms. Keneally.

15              Counsel, I know that you have sort of the

16  burden, but I think I've heard everything that I need

17  to hear from the parties in oral argument.  Was there

18  anything, just briefly from the Government, that you

19  wanted to tell the Court?

20          MR. LINDER:  Yes, Your Honor.  I want to

21  correct just maybe a slight mistake.  It's that the

22  IRS could not investigate by statute, the IRS could not

23  issued an administrated summons.  An example counsel

24  gave was the IRS could not issue an administrated

25  summons at the banks to chase out the proceeds.

1              26 U.S.C. 7602 prevents the IRS from

2  issuing an administrative summons after there's been a

3  referral to the Department of Justice for a criminal

4  referral.  And I acknowledge that there -- I mean,

5  there is a criminal referral and Mr. Brockman is under

6  Indictment, so they couldn't issue that.

7              I think just what on this idea that things

8  are disclosed to the IRS, I mean, these disclosures are

9  after the fact.  The Hardwicke disclosure that

10  Ms. Keneally is referring to is in a footnote in a

11  protest they filed.  No one is contacting the IRS

12  saying, "Hey, we sold this property."  I mean, that

13  property was sold -- that interest they are deferring

14  to was sold in March.  They filed a protest.  They say,

15  oh, the property was sold.

16              But what's important, as the Court picked

17  up, is where are the funds?  I mean, you've taken a

18  hard asset, you've converted this asset to cash, now

19  the cash is gone.  And in the case of the Lot 16

20  property, I mean, it's the jeopardy assessment itself.

21  The ability to issue a jeopardy levy prevented those

22  proceeds from going somewhere.  You can claim that they

23  were going to stay there the whole time, but what we

24  know is there is no evidence that the bank came in and

25  said you have to close all your accounts.  The evidence

1   is that there was a new account at Wallis Bank not

2   reported to the IRS, the IRS happened to find it, and

3   lo and behold, there were the proceeds from that sale.

4                And I note, Your Honor, that that property

5   was sold for about $1.45 million, and the evidence they

6   presented that show the proceeds went into that account

7   were a little over a million dollars.  So there's

8   300,000 that appears to be missing or unaccounted for.

9                Disclosure to the IRS of a sale is not

10  enough.  I mean, these sales, stock sales,

11  distributions were disclosed to the IRS from the known

12  financial institution.  The IRS levied.  No funds.

13  Over $3 million was not found available.  Small amount.

14  But it shows them moving the cash.  It shows the

15  importance of being able to trace it.

16                Mr. Brockman has not come in and said, "I

17  sold this property, the proceeds went X."  That's their

18  choice.  If they don't want to disclose that to the

19  IRS, that's their choice, but you can't use a sword and

20  a shield at the same time.  If they don't want to

21  disclose to the IRS, maybe they are not disclosing

22  because they are worried about the IRS collecting.

23  You can't have it both ways.  You can't say, "Well, we

24  disclosed the sale, but you guys try to find the

25  proceeds."

1       And I don't think the IRS should be

2   penalized in regards to this jeopardy because it

3   actually discovered a sale, acted, and was able to just

4   find the proceeds.  That's the point of the jeopardy

5   assessment is to grant the movement of funds.

6       That's all I have.  Thank you, Your Honor.

7       THE COURT:  Okay.  Thank you.

8       MS. KENEALLY:  Your Honor, may I have a moment?

9       THE COURT:  Sure.

10      MS. KENEALLY:  Thank you, Your Honor.

11      I'll accept Mr. Linder's representation

12  on the statute and apologize on the statement on the

13  summonses.  But I do want to address the sale of the

14  plane and the Wallis Bank account and a little bit more

15  on the Lot 16 for a moment.

16      The sale of the plane, my first point on

17  the sale of the plane is it's fully understandable that

18  Mr. Brockman would sell a one percent interest back to

19  the company that owns the 99 percent.  It's not showing

20  that you're trying to get rid of a hard asset to keep

21  the Government from getting your one percent interest

22  in that company.  And again, we're talking about

23  speculating as to where the funds went.

24      In terms of the Wallis Bank account, I've

25  already represented we'll undertake and we'll let the

1   Court know -- we'll keep the Court apprised of our

2   efforts and we'll undertake to get the records from the

3   Wallis Bank account.  But the Wallis Bank account was

4   opened in I believe early '21 and it's a bank account

5   like any other bank account where, you know, eventually

6   there's going to be a 1099 issued on the bank account.

7   And it's opened as a routine bank account.  It's not

8   hidden.

9            THE COURT:  How much -- how much is in the bank

10  account now?

11           MS. KENEALLY:  Zero.

12           THE COURT:  Okay.

13           MS. KENEALLY:  They have it all.

14           THE COURT:  And so the Government has all of

15  that?

16           MS. KENEALLY:  The Government wiped out the

17  Wallis Bank account.

18           THE COURT:  Okay.

19           MS. KENEALLY:  Yes.  They grabbed everything

20  in the Wallis Bank account.  And again, we'll get to

21  Your Honor -- now it's three accounts.

22           THE COURT:  Well, don't they know how much

23  they took from the bank account?

24           MS. KENEALLY:  I don't know if they know that

25  here today.

1           THE COURT:  Okay.

2           MS. KENEALLY:  I don't know if they know that

3   here today.  But my point on the Wallis Bank account

4   is, again, if you're going to move assets outside of

5   the reach of the Government, you don't put them in a

6   bank account in a bank in Texas where the bank is going

7   to issue 1099s on the account and leave the funds

8   sitting there after a jeopardy levy issues.

9           THE COURT:  All right.  But their point was

10  that the Wallis Bank -- and I thought I read this --

11  that the Wallis Bank wasn't the source -- am I correct,

12  counsel?  The Wallis Bank wasn't targeted in the first

13  round of seizures, for lack of a better word?

14          MS. KENEALLY:  That's correct, Your Honor.

15          THE COURT:  I mean --

16          MS. KENEALLY:  The Wallis Bank sat in place --

17          THE COURT:  So they weren't really --

18          MS. KENEALLY:  The Wallis Bank --

19          THE COURT:  So they weren't -- the Wallis Bank

20  account wasn't really on the radar of the IRS at the

21  time the original -- I'm just calling them seizures --

22  the original collections were made?

23          MS. KENEALLY:  That's correct, Your Honor, but

24  the existence of the Wallis Bank is not only not proof

25  that Mr. Brockman is trying to move assets outside of

 1  their reach.  It's proof that the Brockmans are leaving

 2  the asset sitting right here in the United States.  I

 3  mean, it was there to be levied and it was levied.

 4            It was -- and to the extent that it was

 5  not yet reported, it was not due yet to be reported.

 6  But it would have been reported and there was no effort

 7  to move the money out before that reported or before

 8  they found it.  It just -- you know, it sat there for

 9  the take.

10            Unless you have any other questions, Your

11  Honor.  Thank you for your time this morning.

12            THE COURT:  No further questions.  Thank you,

13  counsel.  Excellent argument, gave me a lot to think

14  about.  I will give this priority.  I will get an

15  answer back to you quickly.  Very interesting issues

16  and very good argument, but I'm going to get a decision

17  back to you quickly.

18            MS. KENEALLY:  Your Honor, may we have --

19            THE COURT:  Oh, you want time to --

20            MS. KENEALLY:  I think what I'd like to ask

21  for, particularly given that I have to contact the

22  Brockman family and it's a difficult time right now for

23  the Brockman family:  If we could have two weeks to

24  either get the records or inform you of our efforts to

25  get the records, I would appreciate that.

```
 1          THE COURT:  Sure.  No opinions will be issued
 2   or anything done for two weeks until I get that
 3   information.
 4          MS. KENEALLY:  Thank you, Your Honor.
 5          THE COURT:  Great.  Anything further from the
 6   Government?
 7          MR. LINDER:  Nothing further, Your Honor.
 8   Thank you.
 9          THE COURT:  Great.  Thank you, counsel, and
10   we'll stand in recess.
11          MS. KENEALLY:  Thank you, Your Honor.
12          [11:04 a.m. - Proceedings adjourned]
13
14             C E R T I F I C A T I O N
15
16       I certify that the foregoing is a correct
17   transcript of the electronic sound recording of the
18   proceedings in the above-entitled matter.
19
20
21   /s/ Gwen Reed
22   9-6-22
23
24
25
```