Case 4:22-cv-00202   Document 71   Filed on 09/30/22 in TXSD   Page 1 of 13

United States District Court
Southern District of Texas
**ENTERED**
September 30, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ROBERT T. BROCKMAN,<br>    Plaintiff, | §<br>§<br>§<br>§ |
| VS. | §    CIVIL ACTION NO. 4:22-CV-202<br>§<br>§ |
| UNITED STATES OF AMERICA | §<br>§ |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Plaintiff Robert T. Brockman's ("Brockman") motion to abate an Internal Revenue Service ("the IRS" or "the Government") jeopardy assessment and jeopardy levy under 26 U.S.C. § 7429.[1] The motion (Dkt. 10) is **DENIED**, and this civil matter is **DISMISSED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On October 1, 2020, Brockman was charged in a 39-count indictment in the Northern District of California with a variety of financial crimes, including tax evasion; wire fraud affecting a financial institution; money laundering; failure to file Foreign Bank Account Reports; evidence tampering; and destruction of evidence. The IRS asserts that Brockman owes it over $1.4 billion in taxes, fraud penalties, and interest and that this

---

[1] Brockman passed away after the jeopardy assessment and levy were imposed. (Dkt. 59).

matter "represents the largest jeopardy assessment/levy case in the history of the United States" and features tax fraud on an "unprecedented" scale.

The scale and complexity of the schemes through which Brockman allegedly avoided paying U.S. taxes are immense; the Government's jeopardy assessment recommendation report alone spans 70 pages, not counting the many exhibits and attachments. The Government has presented evidence in both this matter and Brockman's criminal case[2] supporting its conclusion that Brockman used a labyrinthine web of nominees,[3] offshore entities, foreign bank accounts, and encrypted communications to mask his assets and avoid reporting billions of dollars in income between 2004 and 2018.

Much of the information on which the Government relies was provided by two men who were participants in and beneficiaries of Brockman's alleged fraud: Robert Smith ("Smith") and Evatt Tamine ("Tamine"). Smith is a billionaire investor and former business associate of Brockman's who stated in a non-prosecution agreement that he evaded U.S. taxes between 2000 and 2015 using a system of offshore trusts, companies, and bank accounts that was similar to Brockman's system and was in fact recommended by Brockman. Tamine is an Australian barrister who, according to the Government, was Brockman's nominee, a self-described "figure head" who served as the nominal trustee or director of Brockman's offshore entities. IRS agents and Bermudan police executed a

---

[2] The undersigned judge also presided over Brockman's criminal case, which was dismissed when Brockman passed away. *See* Southern District of Texas case number 4:21-CR-9.

[3] "The nominee theory focuses upon the taxpayer's relationship to a particular piece of property. The ultimate inquiry is whether the taxpayer has engaged in a legal fiction by placing legal title to property in the hands of a third party while actually retaining some or all of the benefits of true ownership." *Holman v. United States*, 505 F.3d 1060, 1065 (10th Cir. 2007) (citation omitted).

search warrant for a raid on Tamine's home office in Bermuda in September of 2018, and Tamine has been a cooperating witness in the Government's investigation of Brockman.

The Government contends that Brockman evaded taxes by concealing his income, and that he concealed his income by using nominees to conceal his ownership and control of assets—a strategy of "owning nothing but controlling everything." To take one illustrative example that weaves Brockman, Tamine, and Smith together, the Government alleges that Brockman formed an entity called Point Investments ("Point") to invest in private equity funds with Smith with a focus on U.S.-based software and technology companies. Point held bank accounts in Bermuda, Switzerland, and Singapore. Brockman did not report his ownership of Point or its bank accounts on his tax forms. Below is a diagram of Point's ownership structure, which included entities in Bermuda, Nevis, and the British Virgin Islands. Vista Equity Funds, at the bottom of the diagram, is the Cayman Islands entity in which Brockman invested with Smith:



Tamine was the nominal trustee or director of the entities in the Point ownership structure; but he has told investigators (and testified to this Court, at Brockman's competency hearing in his criminal case) that in reality Brockman controlled the entities, including the Bermudan trusts at the top of the ownership chain. Through his undisclosed beneficial ownership of the entities in the Point ownership structure, the Government alleges that Brockman avoided U.S. income taxes on taxable investment income and gains in the amounts of $2.3 billion of net capital gains, $29 million in interest income, and $5.9 million in dividends during the years 2004 through 2018. Brockman set up two other investment vehicles, Edge Capital Investments (Edge") and Cabot Global Investments

("Cabot"), that had ownership structures similar to Point's and that also generated large amounts of unreported income.

With the money from his untaxed income, Brockman, according to the Government, "bought vacation homes, investment real estate, a jet aircraft, and a luxury yacht[.]" As he did with Point and other entities, the Government contends that Brockman concealed his ownership of and control over these purchases. For instance, when Brockman bought real estate in Colorado with his untaxed Edge and Cabot income to develop for his personal use, the properties' titles were held by Colorado companies that were owned by a Bermudan company that was, in turn, owned by a Bermudan trust of which Tamine was the trustee:



Brockman exercised complete control over the Colorado properties; Tamine and the other officers of the associated entities were nominees.

The Government provided evidence that Brockman went to great lengths to keep the IRS—which he called "The House"—from learning about his connections to the various entities and properties. He used an encrypted private email server to communicate with Tamine, and the two used aliases ("Redfish" for Tamine, "Permit" for Brockman) in their communications. Decrypted email conversations between Brockman and his business associates obtained in the Tamine raid discuss the falsification, backdating, concealment, and destruction of documents. Tamine testified to this Court at Brockman's competency hearing that, on one occasion, he traveled to the home of a recently deceased business associate at Brockman's behest to destroy documents and hard drives pertaining to Brockman. Tamine later wrote to Brockman in an email that Brockman could "rest easily that any attempt to search [the associate's] home would be fruitless."

The Government asserts that it imposed a jeopardy assessment because, as investigators closed in, Brockman began moving and liquidating assets. Brockman and his wife sold or gifted several pieces of real property after Brockman learned that he was under Government investigation. Six months before his indictment, Brockman transferred his community property interest in a Houston, Texas property to his wife, who sold the property three weeks after Brockman's indictment for $1.375 million. A month after Brockman's indictment, Brockman's wife gifted a $3.5 million property to the Brockmans' daughter-in-law. Two months after Brockman's indictment, Brockman and his wife sold another Houston property for $4.1 million. Moreover, the Brockmans sold a parcel in Elk

Creek Ranch in Colorado at a loss three weeks after the IRS imposed the jeopardy assessment. The Elk Creek Ranch property was owned by an entity that was not disclosed to the IRS and did not file any tax returns. After learning that he was under Government investigation, Brockman also closed several bank accounts and withdrew over $3 million from other accounts. Brockman created two new foreign trusts with Cayman Islands bank accounts and transferred funds to them from a closed U.S. bank account. Brockman's wife sold $9 million worth of securities. Brockman sold his interests in his jet and his yacht. The Government established that all of these financial transactions took place after Brockman learned that he was under Government investigation. Many took place after Brockman's indictment. At least one—the Elk Creek Ranch sale—took place after the IRS imposed the jeopardy assessment.

The location of the proceeds of the property sales, and whether the sales indicated an intent to move money out of the Government's reach, was hotly disputed at oral argument and continues to be so in the parties 'post-argument briefing. The Government accuses Brockman of trying to hide the proceeds, while Brockman contends that there is no evidence that he tried to hide anything because the proceeds sat in a domestic bank account for months and were eventually seized by the IRS through its jeopardy assessment. Specifically, the parties' arguments focus on Brockman's relationship with the Wallis Bank. The record reflects that Brockman opened new accounts in Texas at the Wallis Bank after he was indicted. Brockman's counsel represents that Brockman opened these new accounts because his former banks, Amegy and Wells Fargo, ceased doing business with him after his indictment. According to Brockman, the Wallis Bank accounts contained the

proceeds of the property sales, along with other cash, and the cash in those accounts totaled over $27 million at the time of seizure. Brockman's post-argument briefing notes that the $27 million sat in the Wallis Bank accounts for more than six months after the IRS first imposed its jeopardy levy. In its post-argument briefing, the Government responds that the Wallis Bank accounts were not disclosed to the IRS, which discovered the accounts on its own.

The Government further contends that there is a $15 million discrepancy between the $62.1 million in "domestic funds" disclosed on Brockman's 2020 and 2021 tax forms and the $46.8 million (including the Wallis Bank accounts) that the IRS has obtained from Brockman through its jeopardy assessment and other payments. Brockman responds that it is not his burden to explain any discrepancy, the existence of which he denies; to the extent that there is one, Brockman attributes it to legal fees, a $1 million bond that he posted in his criminal case, operating costs on properties, and other day-to-day living expenses.

Brockman has raised the possibility that the trustee of one of his trusts could post a bond to cover his tax liability. However, at oral argument, the parties told the Court that the funds with which Brockman was planning to post the bond have been frozen by Swiss prosecutors.

## II. **LEGAL STANDARD**

If the collection of income tax will be jeopardized by delay, the IRS is statutorily authorized to expedite collection by immediate levy, via a jeopardy assessment, upon a taxpayer's property. *See* 26 U.S.C. § 6861; *see also Olbres v. Internal Revenue Service*, 837 F. Supp. 20, 21 (D.N.H. 1993). The jeopardy proceeding is of a summary nature and

does not amount to a final determination of the taxpayer's correct tax liability. *Varjabedian v. United States*, 339 F. Supp. 2d 140, 144–45 (D. Mass. 2004). 26 U.S.C. § 7429(b) allows a taxpayer to seek *de novo* judicial review of a jeopardy assessment in federal district court. *Olbres*, 837 F. Supp. at 21. The district court's review is limited to determining only 1) whether the jeopardy assessment was reasonable under the circumstances, and 2) whether the amount assessed was appropriate. *Id*.

Brockman does not challenge the amount assessed, so the Court's review here is limited to the first determination. The Government bears the burden of proof of showing that the jeopardy assessment was reasonable under the circumstances. 26 U.S.C. § 7429(g). "'Reasonable under the circumstances' means something more than 'not arbitrary or capricious' and something less than 'supported by substantial evidence.'" *Wellek v. United States*, 324 F. Supp. 2d 905, 911 (N.D. Ill. 2004). "To sustain its jeopardy assessment the government need only show that circumstances are such that collection of taxes owed might be jeopardized if collection efforts are delayed pending routine administrative processing—not that collection actually will be jeopardized." *Olbres*, 837 F. Supp. at 22. "Thus the Government need only establish that the taxpayer's circumstances *appear* to be jeopardizing collection of a tax—not whether they definitely do so." *Cantillo v. Coleman*, 559 F. Supp. 205, 207 (D.N.J. 1983) (emphasis in *Cantillo*); *see also Bean v. United States*, 618 F. Supp. 652, 658 (N.D. Ga. 1985) ("Whether Bean in fact intended to depart the country, liquidate his assets and thereby avoid payment of his taxes is irrelevant."). "It is not essential that every fact upon which the determination is based be proven accurate in a subsequent judicial proceeding in order for that determination to be reasonable under

§ 7429. The standard is one of reasonableness, not one of substantial evidence." *Wellek*, 324 F. Supp. 2d at 911–12 (brackets and ellipsis omitted).

The Treasury Regulations set out three conditions for courts to use as a measure of whether a jeopardy assessment is reasonable. *Kalkhoven v. United States*, No. 2:21-CV-1440, 2021 WL 4206767, at *3 (E.D. Cal. Sept. 15, 2021). Those conditions are:

(i) The taxpayer is or appears to be designing quickly to depart from the United States or to conceal himself or herself.

(ii) The taxpayer is or appears to be designing quickly to place his, her, or its property beyond the reach of the Government either by removing it from the United States, by concealing it, by dissipating it, or by transferring it to other persons.

(iii) The taxpayer's financial solvency is or appears to be imperiled.

*Id*. at *3–4; *see also* 26 C.F.R. § 1.6851-1(a)(1).

"While courts traditionally consider these three conditions, the analysis is not in any way, shape or form restricted thereto." *Varjabedian*, 339 F. Supp. 2d at 155 (quotation marks omitted). For instance, courts have considered whether: the taxpayer has recently conveyed real estate or discussed such conveyance; the taxpayer controls bank accounts containing liquid funds; the taxpayer has not supplied public agencies with appropriate forms or documents when requested to do so; the taxpayer controls numerous business entities; the taxpayer attempts to make sizable bank account withdrawals at the time of the assessment; the taxpayer maintains foreign bank accounts; the taxpayer takes large amounts of money offshore; or the taxpayer has many business entities which can be used to hide his assets. *Kalkhoven*, 2021 WL 4206767 at *2; *see also Bean*, 618 F. Supp. at 658.

Courts have found jeopardy assessments reasonable when the Government has shown that the taxpayer used nominees to purchase assets, concealed assets in foreign bank accounts, concealed sources of income, and refused to cooperate with the IRS, *Harvey v. United States*, 730 F. Supp. 1097, 1106 (S.D. Fla. 1990), and when the Government has "put forth substantial information" that the taxpayer "perpetrated a massive fraudulent tax refund scheme[.]" *Golden West Holdings Trust v. United States*, No. CV-05-2237, 2009 WL 1457107, at *6–7 (D. Ariz. May 21, 2009) ("Plaintiff's involvement in illegal activity itself satisfies the requirements of reasonableness.").

Judicial review of the jeopardy assessment is summary, and the reviewing court may decide the case based on affidavits without conducting an evidentiary hearing. *Kalkhoven*, 2021 WL 4206767 at *2. "Due to the summary nature of the judicial proceeding, the court can hear evidence that may be inadmissible in a trial on the merits." *Varjabedian*, 339 F. Supp. 2d at 144 (quotation marks omitted). Moreover, in determining whether the assessment is reasonable, the reviewing court "is to take into account not only information available to the Internal Revenue Service on the assessment date, but also any other information which bears on the issues before it." *Guillaume v. Commissioner of Internal Revenue*, 290 F. Supp. 2d 1349, 1353 (S.D. Fla. 2003) (quotation marks omitted). The reviewing court's determination "shall be final and conclusive and shall not be reviewed by any other court." 26 U.S.C. § 7429(f).

### III. THE GOVERNMENT HAS MET ITS BURDEN.

The Court concludes that the Government has shown that the jeopardy assessment was reasonable under the circumstances. The Government has presented substantial

evidence that Brockman engaged in tax fraud; and the nature, sophistication, and sheer size of the tax fraud alleged here satisfy the reasonableness requirement by themselves. *See Harvey*, 730 F. Supp. at 1106; *Golden West*, 2009 WL 1457107 at *6–7. The evidence provided by Smith (who himself admitted to evading U.S. taxes) and Tamine and uncovered in the raid on Tamine's home office is compelling, and the Government secured a 39-count indictment against Brockman for tax evasion and other financial crimes. Prosecutors in at least one other country, Switzerland, have frozen Brockman's accounts there. Furthermore, considering that he controlled myriad bank accounts and business entities in multiple countries and was open about his determination to keep his money from going to "The House," Brockman's closing and opening of domestic bank accounts, creation of new offshore trusts, and transfer and liquidation of property interests after he learned that he was under Government investigation—and in some instances after he was indicted and after the IRS imposed a jeopardy assessment—created the appearance that the Government's ability to collect his taxes was in jeopardy, even if the transactions were ultimately innocuous. *See Cantillo*, 559 F. Supp. at 207; *see also Bean*, 618 F. Supp. at 658 ("Whether Bean in fact intended to depart the country, liquidate his assets and thereby avoid payment of his taxes is irrelevant.").

The Government has satisfied its burden.

### IV. <u>CONCLUSION</u>

The Court concludes that the Government has met its burden to show that the challenged jeopardy assessment was reasonable under the circumstances. Plaintiff Robert

T. Brockman's motion to abate the jeopardy assessment and jeopardy levy under 26 U.S.C. § 7429 (Dkt. 10) is **DENIED**, and this civil matter is **DISMISSED**.

SIGNED at Houston, Texas on ⎯⎯September 30⎯⎯ 2022.

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE